**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————— x
In re:                                        :          Chapter 11
                                              :          Case No. 07-12148 (BRL)
ALPER HOLDINGS USA, INC.,                     :
                                              :
                          Debtor.             :
——————————————————————— x
                                              :
RAY AND CATHY FLAKE,                          :
                                              :
                          Appellants,         :          District Court
                                              :          Case No. 08-cv-02489-CM
            -against-                         :
                                              :
ALPER HOLDINGS USA, INC.,                     :
                                              :
                          Appellee.           :
——————————————————————— x


<u>**APPENDIX OF ITEMS INCLUDED IN BRIEF OF APPELLEE**</u>




MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Counsel for Debtor-Appellee Alper Holdings USA, Inc.*

| **Description of Pleading/Evidence** | **Tab** |
|---|---|
| Memorandum Decision and Order Granting Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed by Flake Plaintiffs (Docket No. 123) | 1 |
| Declaration of Jessica L. Fink in Support of Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed by Cathy Flake and Ray Flake (Docket No. 68) (only referenced portions included) | 2 |
| Response of Ray and Cathy Flake to Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed by Flake Plaintiffs (Docket No. 105) (only referenced portions included) | 3 |
| Transcript of Hearing Held on January 8, 2008 Re: Objection to Claim Numbers 20 and 21 Filed by Flake Plaintiffs; Debtor's Motion for Order Authorizing Debtor to Object to Multiple Claims in Single Objection (Docket No. 133) | 4 |

**TAB 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| ALPER HOLDINGS USA, et al. | |
| Debtors. | |

FOR PUBLICATION

Chapter:    11

Case No.:   07-12148 (BRL)
            Jointly Administered

## MEMORANDUM DECISION AND ORDER GRANTING
## OBJECTION OF ALPER HOLDINGS USA, INC. TO PROOFS
## OF CLAIM (CLAIM NOS. 20 AND 21) FILED BY FLAKE PLAINTIFFS

Alper Holdings USA, Inc. ("Alper"), the debtor, seeks entry of an order disallowing and expunging (the "Objection") claim numbers 20 and 21 (the "Flake Claims") filed by Cathy and Ray Flake (together, the "Flake Plaintiffs"), pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Flake Plaintiffs oppose the Objection asserting that the Flake Claims have been sufficiently pled in their corresponding proofs of claim to put Alper on notice of the claims filed against it.  For the reasons set forth below and at oral argument, the Court finds Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire Industrial, Inc.'s ("Saltire") alleged contamination or remediation in Dickson County, Tennessee.  Therefore, the Flake Claims are disallowed.

## BACKGROUND

### History of Alper and Saltire

The Flake Claims arise in connection with groundwater contamination and environmental problems that arose in the mid-1980's in Dickson County, Tennessee, that were allegedly caused, in part, by Saltire.  From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the "Dickson Plant") where it made automotive tire valves and associated products and where Trichloroethyleme ("TCE") was used as a degreaser.  The Dickson Plant ceased operations in March 1985.  *See* Objection, at ¶12.

The existence of potential environmental problems including contamination of groundwater in Dickson County has been widely known since at least the mid-1980s. From 1985 through August 2004, Saltire worked under the auspices of state and federal environmental regulatory authorities in a multi-million dollar investigation and remediation of environmental contamination at the Dickson Plant site. *See Id.*, at ¶¶ 12-13. Despite the well-publicized contamination, in 2002, the Flake Plaintiffs purchased property within 8 miles of the Dickson Plant for use as a *water bottling facility*. *Id.* at ¶ 19 (emphasis supplied).

In 1992, <u>seven years</u> after the Dickson Plant closed and <u>decades</u> after the alleged disposal of industrial wastes in Dickson County first occurred, Alper became the controlling shareholder of an entity known as First City Industries Inc. ("First City") (an incidental and indirect parent of Saltire, through First City's then-pending chapter 11 case).[1] Although Alper ultimately became the direct parent of Saltire, Alper had no relationship with Saltire during the period the Dickson Plant was operating and during the period Saltire allegedly disposed of industrial waste in Dickson County.[2] As an incidental parent holding company of Saltire, Alper did not become a

---

[1]     As a creditor of First City, Alper received shares of stock as a stock for debt distribution in the reorganized First City on account of its allowed claim pursuant to First City's plan of reorganization. *See* Transcript of January 8, 2008 Hearing (the "Hearing"), at 25-26.

[2]     Since 2003, numerous parties have filed lawsuits against Alper, among others, for alleged personal injury and property damage claims related to the environmental contamination in Dickson, Tennessee (collectively, the "Tennessee Actions"). The Tennessee Actions include three actions known as the "Dickson Actions": (1) Flake v. Saltire Industrial, Inc. f/k/a Scovill, Inc.; Schrader-Bridgeport International, Inc. f/k/a Schrader Automotive, Inc.; Alper Holdings USA, Inc.; Tomkins PLC; the City; William Andrews; Lewis Edward Kilmarx and John Doe(s) 1-10 (the "Flake Action"), which forms the basis of the Flake Claims; (2) Armstrong v. Saltire Industrial, Inc. f/k/a Scovill, Inc.; Schrader-Bridgeport International, Inc f/k/a Schrader Automotive, Inc.; Alper Holdings U.S.A., Inc.; Tomkins PLC; ArvinMeritor, Inc.; William Andrews; Lewis Edward Kilmarx and John Doe(s) 1-10 (the "Armstrong Action"); and (3) Adkins v. Schrader-Bridgeport International, Inc.; Alper Holdings USA, Inc.; ArvinMeritor, Inc; the City; the County; William Andrews; Lewis Kilmarx and John Does (the "Adkins Action" and collectively with the Armstrong Action and the Flake Action, the "Dickson Actions"). The other Tennessee Actions are: (1) Harry Holt, et al. v. Scovill, Inc., n/k/a Saltire Industrial, Inc.,

successor in interest to Saltire.  *See Id.* at  ¶ 13.  On August 17, 2004, in part to deal with

liabilities related to the Dickson Plant, Saltire filed a voluntary petition for relief in this Court

under chapter 11 of the Bankruptcy Code.[3]

On or about March 7, 2007, plaintiffs in the Dickson Actions, including the Flake

Plaintiffs, settled with Saltire for the aggregate amount of $1.5 million.  In addition, on or about

October 13, 2006, the Flake Plaintiffs entered into a settlement and release agreement with two

of the other defendants to the Flake Action, the City of Dickson, Tennessee (the "City") and the

County of Dickson, Tennessee (the "County"), whereby the Dickson Plaintiffs agreed to release

the City and County – the entities that owned and operated the Dickson Landfill – from their

claim in return for, among other things, 75% of any recoveries that the City and County received

from Saltire.[4]  *See Id.*, at  ¶¶ 14-15.

**Alper Chapter 11 Case and**
**the Flake Claims**

On July 13, 2007, Alper filed for relief under chapter 11 of the Bankruptcy Code.  On or about

September 19, 2007, the Flake Plaintiffs filed the "contingent, unliquidated, and disputed" Flake

Claims asserting *See Id.*, at ¶ 9.  The fourth amended complaint (the "Complaint") filed by the

Flake Plaintiffs in the Flake Action accompanied each of the Flake Claims.[5]  Among other

---

Alper Holdings USA, Inc., Ebbtide Corporation and the City and County of Dickson,
Tennessee (the "Holt Action"); (2) Lavenia Holt, et al. v. Scovill, Inc. et al (the "Lavenia
Holt Action"); and (3) Dunbar v. Saltire Industrial, f/k/a Scovill, Inc. et al., pending in the
Circuit Court of Dickson County, Tennessee (the "Dunbar Action").

[3]    *In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004).

[4]    The City dropped its claim against Saltire, and the Flake Plaintiffs effectively received no
recovery from the City.  The County's claim against Saltire continues to be litigated, but
Alper asserts that the Flake Plaintiffs' share of any recovery the County receives from
Saltire will be de minimis.

[5]    In addition to the Complaint, the Flake Plaintiffs included the following paragraph in the
supporting documents attached to the Flake Claims:

things, the Complaint, which the Flake Plaintiffs relied upon entirely to support their claims, alleged that the Flake Plaintiffs suffered personal and property damage due to the intentional or negligent failing of Alper (along with 20 other defendants) to "adequately monitor, control, supervise and/or monitor the disposal of the TCE at all locations throughout Dickson." *See* Complaint, at ¶¶ 31-36.  However, nowhere in their Complaint do the Flake Plaintiffs allege specific negligent acts or causes of action against Alper; rather, they rely on six broadly pled causes of action asserted generally against the "defendants." *See Id.*, at ¶¶ 37-71.

On November 14, 2007, Alper filed the Objection alleging that the Flake Claims were both baseless and facially deficient based on the following: (a) Alper had no connection or relationship to Dickson County or the Dickson Plant before it became the indirect controlling shareholder of Saltire in 1992 – at least two decades after any alleged contamination first occurred and at least seven years after the Dickson plant closed; (b) by their own admission, the Flake Plaintiffs did not perform any investigation or due diligence with respect to the water quality and contamination, which had been widely reported beginning in the mid-1980's; and (c) to the extent that the Flake Plaintiffs were attempting to assert claims against Alper on a theory that Alper was the alter ego of Saltire, such claims must be disallowed because (i) alter ego claims that Saltire may have had against Alper were property of the estate and were released pursuant to Saltire's plan of reorganization (the "Saltire Plan") and (ii) even if such claims were not released pursuant to the Saltire Plan, no alter ego claims could be asserted against Alper because Saltire was a publicly traded company during the entire time that it operated the Dickson

---

Creditor's property and personal damage claim arises from contamination by hazardous waste including Trichloroethyleme ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings, USA, Inc. in connection with said contamination.

*See* Supporting Document Attachment to Flake Claims.

Plant and Alper did not exercise any dominion or control over Saltire's operations as required to support such claims. *See* Objection, at ¶¶ 16-21.

On December 27, 2007, the Flake Plaintiffs responded to the Objection (the "Response") claiming that the Flake Claims should not be dismissed because *inter alia* (a) the Flake Plaintiffs' proofs of claim contained sufficient allegations to support their claims against Alper, and (b) the Flake Plaintiffs' alter ego claims against Alper could not have been released by Saltire during Saltire's bankruptcy because the Flake Plaintiff's alter ego claims were not property of Saltire's bankruptcy estate. *See* Response, at pp. 9-21.

## DISCUSSION

It is well settled that a proof of claim executed and filed in accordance with the Federal Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim. *In re Musicland Holding Corp.*, 362 B.R. 644, 651-652 (Bankr. S.D.N.Y. 2007); *In re Castaldo*, No. 05-36349, 2006 WL 3531459, *3 (Bankr. S.D.N.Y. Dec. 7, 2006). The filing of a proof of claim, however, is only the beginning of the Court's inquiry.

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is *"prima facie"* valid .... [and] the ... burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant.

*In re Spiegel, Inc.*, No. 03-11540, 2007 WL 2456626, *15 (Bankr. S.D.N.Y. Aug. 22, 2007)

(citing *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992)); *In re Lehning*, No. 05-

16245, 2007 WL 1200820, *3 (Bankr. N.D.N.Y  Apr. 20, 2007); *In re MarketXT Holdings Corp.*, No. 04-12078, 2007 WL 680763, *4 (Bankr. S.D.N.Y. Mar. 1, 2007).  The Court finds as a matter of law that the Flake Plaintiffs have failed to meet this burden.

In the Response, the Flake Plaintiffs contend that either (a) Alper is directly liable to the Flake Plaintiffs for negligently causing damage to their persons and/or property, or in the alternative that (b) Alper is indirectly liable as a successor or alter ego of Saltire for negligently causing damage to their persons and/or property.  The Courts finds, however, that as a matter of law, Alper had no connection with the original contamination that occurred in Dickson County or Saltire's efforts to remedy that contamination and, therefore, Alper is not liable for damages stemming from those actions.

## Alper Has No Direct Liability to the Flake Plaintiffs

To establish a direct cause of action against Alper, the Flake Plaintiffs must prove that Alper owed a duty to the Flake Plaintiffs, that the duty was breached, and that the breach was the cause in fact and proximate cause of the Flake Plaintiffs' injury or loss.  *See Ham v. Hospital of Morristown, Inc*., 917 F. Supp. 531, 534 (E.D. Tenn. 1995) ("The law is well settled in Tennessee that, in a cause of action for negligence, there must first be a duty of care owed by the defendant to the plaintiff.").  The alleged disposal of industrial waste and TCE in Dickson County occurred during the 1960s and 1970s, and Saltire ceased all operations and closed the Dickson Plant in March 1985.  Alper, however, had no connection or relationship to Saltire or Dickson County prior to obtaining an indirect ownership interest in Saltire in 1992 – nearly two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant was closed.  *See* Objection, at ¶¶ 16-17.

Rather than set forth any specific factual allegations with respect to Alper, the Flake Plaintiffs attempt to hide behind a generic complaint directed at 21 different defendants without

alleging any specific liability to the Flake Plaintiffs owed on the part of Alper. Such generic, flypaper pleadings will not suffice. *Robbins v. Cloutier*, 121 Fed. Appx. 423, 425 (2d Cir. 2005) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; [d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."); *Little v. City of New York*, 487 F. Supp. 2d 426, 441 (S.D.N.Y. 2007) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002)); *C.f. Apace Communications, Ltd. v. Burke*, 07-CV-6151L, 2007 WL 4125232, *6 (W.D.N.Y. Nov. 16, 2007) (citing *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990)) ("A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient"); *Ballew v. Black*, 06-CV-70-HRW, 2006 WL 3193379, *4 (E.D. Ky. Nov. 1, 2006) ("When a complaint (such as the one filed in this case) merely lists multiple defendants and then describes at length the facts generally without naming the specific defendants involved in each event, and without setting forth with particularity which acts by each defendant caused each constitutional deprivation, the complaint is insufficient.").

Even if the Flake Plaintiffs had alleged specific liability on the part of Alper, it was Saltire, not Alper, who operated the manufacturing facility in Dickson County. "As a general rule, under Tennessee law, persons do not have a duty to control the conduct of other persons to prevent them from causing harm to others." *McConkey v. McGhan Med. Corp.*, 144 F. Supp. 958 (E.D. Tenn. 2000); *Cooley v. Unique Vacations, Inc.*, Civ. A. 04-141-KSF, 2005 WL 2757249, *2 (E.D. Ky. Oct. 25, 2005) ("As a general rule, an actor whose own conduct has not created a risk of harm has no duty to control the conduct of a third person to prevent him from causing harm to another."); *Ham*, 917 F. Supp. at 534 ("In Tennessee, while all persons have a duty to use reasonable care not to engage in conduct that will foreseeably cause injury to others,

they do not ordinarily have a duty to act affirmatively to protect others from conduct other than their own.  Thus, as a general rule in Tennessee, persons do not have a duty to control the conduct of other persons to prevent them from causing physical harm to others.") (internal citations omitted).  The only connection that the Flake Plaintiffs have been able to point to between Alper and Saltire's remediation efforts in Dickson County was (i) a management agreement (the "Management Agreement") entered into between Saltire and Alper in 1995 whereby Alper agreed to oversee certain environmental matters and (ii) an Alper employee (who was simultaneously an officer of Saltire) who the Flake Plaintiffs assert was involved in the clean-up efforts in Dickson County.  As more thoroughly set forth below, the existence of the Management Agreement and a common employee are insufficient to impose even indirect liable on Alper.  Accordingly, as it was Saltire and not Alper who operated the Dickson Plant and presumably contaminated the groundwater in Dickson County, Alper owed no duty to the Flake Plaintiffs.

At the Hearing, the Flake Plaintiffs argued, in the alternative, that Alper assumed a duty to the Flake Plaintiffs by voluntarily undertaking to oversee or control Saltire's remediation efforts in Dickson County.  *See* Transcript, at pp. 22-31.  Under Tennessee law, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all…."  *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d 242, 246 (Tenn. App. 1980) (citing *Glanzer v. Shepard,* 233 N.Y. 236 (1922)).  To prevail, however, on a claim under the so-called "Good Samaritan" rule, one must demonstrate reliance on the undertaking to the detriment of the plaintiff.[6]  *See Lemar v. U.S.*, 580 F. Supp. 37, 40 (D. Tenn. 1984) ("The

---

[6]    In Tennessee, the "Good Samaritan" rule is embodied in Section 324A of the Restatements, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as

essential element for recovery under § 324A and the 'Good Samaritan' rule is reliance."). The Flake Plaintiffs, however, have set forth no facts that Alper actually participated in or oversaw Saltire's remediation in Dickson County to support a finding that Alper may have assumed a duty of care to the Flake Plaintiffs. *See* Transcript of Hearing, at p. 36. Moreover, a fundamental premise of the Flake Plaintiffs' claim is that they were unaware of environmental contamination and subsequent remediation in Dickson County. As the Flake Plaintiffs were allegedly unaware of any contamination or remediation efforts, they could not, simultaneously, have relied on Alper's alleged control of that remediation. *See, e.g., Howell v. U.S.*, 932 F.2d 915, 919 (11th Cir. 1991) ("To establish 'good samaritan' liability, therefore, appellants must show reliance... the required reliance must be actual though not necessarily specific...at a minimum, [this] requires knowledge that the allegedly negligent inspection occurred before reliance can be found and 'good samaritan' liability can attach."); *see also* Transcript of Hearing, at 28-29. Accordingly, Alper did not assume a duty of care to the Flake Plaintiffs.

**<u>Alper Has No Indirect Liability to the Flake Plaintiffs</u>**

The Flake Plaintiffs argue, in the alternative, that Alper was indirectly liable for the negligent acts or omissions of Saltire in its remediation efforts on a theory of alter ego or piercing the corporate veil. Response, at p. 17. As noted above, to support their alter ego

---

necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

claims, the Flake Plaintiffs point to the existence of (i) the Management Agreement between Alper and Saltire, which provided, *inter alia*, that Alper would oversee certain environmental remediation for Saltire, and (ii) an Alper employee (who was simultaneously an officer of Saltire) who the Flake Plaintiffs contend was involved in the clean-up activities in Dickson County. *See* Reply of Alper Holdings USA, Inc. to Response of Ray and Cathy Flake to Objection Filed by Alper Holdings USA, Inc. to Proofs of Claim Nos. 20 and 21, at ¶¶ 8-11.

Courts are very reluctant to disregard the corporate form.[7] *See Power Integrations, Inc. v. Fairchild Semiconductor Intern.*, Inc., 233 F.R.D. 143, 145 (D. Del. 2005) ("[T]he separate and distinct corporate identities of a parent and its subsidiary are not readily disregarded, except in rare circumstances justifying the application of the alter ego doctrine to pierce the corporate veil of the subsidiary."); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("It is only the exceptional case where a court will disregard the corporate form…"); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) ("Since it is the exceptional instance where a court will disregard the corporate form, the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'"). Under Delaware law, a corporate veil will not be pierced absent a showing of "fraud or something like it." *Mobile Oil Corp.*, 718 F. Supp. at 268; *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) ("[T]o pierce the corporate veil based on an agency or 'alter ego' theory, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (internal quotations omitted). Moreover, as set forth by the Supreme Court in *United States v. Bestfoods*:

---

[7]    Under New York law, the law of the state of incorporation controls the analysis of alter ego claims. *See Kalb v. Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("[b]ecause a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003).

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.  Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Although this respect for corporate distinctions when the subsidiary is a polluter has been severely criticized in the literature, nothing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible.

524 U.S. 51, 61-62 (1998) (internal citations omitted*); See also Velez v. Novartis Pharmaceuticals Corp.*, 244 F.R.D. 243, 254 (S.D.N.Y. 2007) ("A parent corporation's possession of a controlling interest in a subsidiary entitles the parent to the normal incidents of stock ownership, such as the right to select directors and set general policies, without forfeiting the protection of limited liability."); *In re King*, 305 B.R. 152, 166 (Bankr. S.D.N.Y. 2004) (citing 18 Am. Jur.2d *Corporations* § 57 (2003)) (the fact that a corporation owns all or the majority of the stock of another "does not in itself destroy the identity of the latter as a distinct legal entity...and the fact that stockholders, officers or directors in two corporations may be the same persons does not operate to destroy the legal identify of either corporation*....*").

Clearly, special circumstances do not exist here that would justify the extraordinary remedy of piercing the corporate veil.  The Flake Plaintiffs have not alleged fraud or "something like it" on the part of Alper, which would be necessary to impose indirect liability.  The fact that Saltire and Alper had a common employee is insufficient to hold Alper liable for Saltire's alleged contamination or remediation.  *See Bestfoods*, 524 U.S. at 61-62; *Velez*, 244 F.R.D. at 254; *In re King*, 305 B.R. at 166.  While the Flake Plaintiffs point to certain deposition excerpts to support their contention that the employee in question, Nicholas Bauer, was an employee of

Alper only, it is clear from the record that not only was Mr. Bauer an officer of Saltire, specifically vice president of environmental affairs, *see* Transcript of Hearing, at 30, but that he was acting on behalf of Saltire and not Alper in overseeing or participating in the remediation in Dickson County.  *Bestfoods*, 524 U.S. at 69 ("[C]ourts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary,...") (internal quotations omitted).  Similarly, the mere existence of the Management Agreement alone is also insufficient to impose such liability where the Flake Plaintiffs have not alleged any facts to support their claim that Alper participated (negligently or otherwise) in the remediation. *United States v. Newmont, Ltd.*, No. CV-05-020-JLQ, 2007 WL 2405040 (E.D. Wash. Aug. 17, 2007).  Regardless of whether the Flake Plaintiffs' alter ego claims were released under Saltire's plan of reorganization as Alper contends, the Court finds that no such claims may be asserted against Alper as a matter of law.

## CONCLUSION

For the reasons set forth above and at the hearing, the Court finds that Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee.  Therefore, the Flake Claims are disallowed and expunged.

It is so ordered.

Dated:  New York, New York
        January 15, 2008


          /s/  Burton R. Lifland
          The Honorable Burton R. Lifland
          United States Bankruptcy Judge

**TAB 2**

Luc A. Despins (LD 5141)
Andrew M. Leblanc (*pro hac vice*)
Jessica L. Fink (JF 6399)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Counsel for Alper Holdings USA, Inc.,
Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------x
In re:                        :    Chapter 11
                              :
ALPER HOLDINGS USA, INC.,     :    Case No. 07-12148 (BRL)
                              :
                              :
                  Debtor.     :
-----------------------------x

**DECLARATION OF JESSICA L. FINK IN SUPPORT OF OBJECTION**
**OF ALPER HOLDINGS USA, INC. TO PROOFS OF CLAIM**
**(CLAIM NOS. 20 AND 21) FILED BY CATHY FLAKE AND RAY FLAKE**

        Jessica L. Fink, pursuant to 28 U.S.C. § 1746,
hereby declares:

        1.    I am an attorney with the firm of Milbank,
Tweed, Hadley & M<sup>c</sup>Cloy LLP, counsel for Alper Holdings USA,
Inc., debtor and debtor in possession in the above-captioned
chapter 11 case (the "Debtor").  I submit this declaration in
support of the Debtor's objection to proofs of claim numbers
20 and 21 filed by Cathy Flake and Ray Flake (together, the
"Flake Plaintiffs").

        2.    Attached hereto as Exhibit A are true and
correct copies of proofs of claim numbers 20 and 21.

3.    Attached hereto as Exhibit B is a true and correct copy of the Complaint (as amended) originally filed by the Flake Plaintiffs on or about February 24, 2004.

4.    Attached hereto as Exhibit C are true and correct copies of excerpts of numerous articles regarding alleged environmental issues in Dickson County.

5.    Attached hereto as Exhibit D is a true and correct copy of the Environmental Indicator Memorandum, dated February 18, 2005.

6.    Attached hereto as Exhibit E is a true and correct copy of the Debtor's Modified First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for its First Amended Chapter 11 Plan of Liquidation in the matter of In re Saltire Industrial, Inc., Chapter 11, Case No. 04-15389 (BRL), dated December 28, 2005.

7.    Attached hereto as Exhibit F is a true and correct copy of excerpts from the Final Site Inspection Report, dated October 10, 1991.

8.    Attached hereto as Exhibit G is a true and correct copy of an excerpt from the Dickson County Landfill Reassessment Report, dated March 5, 2004.

9.    Attached hereto as Exhibit H is a true and correct copy of the Order Confirming Modified First Amended

Plan of Liquidation of Saltire Industrial, Inc. Under Chapter 11 of the Bankruptcy Code, dated March 8, 2006.

10.  Attached hereto as Exhibit I is a true and correct copy of the Modified First Amended Chapter 11 Plan of Liquidation of Saltire Industrial, Inc., dated December 28, 2005.

11.  Attached hereto as Exhibit J is a true and correct copy of the Stipulation and Order Approving Settlement Between And Among the Saltire Industrial, Inc. Creditors Liquidating Trustee and the Holders of Claim Numbers 241, 242, 243, 244, 245, 247, 249, 250, 251, 252, 253, 254, 255, 257 and 258 Fixing an Aggregate Allowed Claim for All of the Claim Holders Listed Herein, dated March 7, 2007.

12.  Attached hereto as Exhibit K is a true and correct copy of the Settlement Agreement And Master Release By And Between The County Of Dickson, Tennessee, The City Of Dickson, Tennessee, Plaintiffs, And Plaintiffs' Attorneys.

13.  Attached hereto as Exhibit L is a true and correct copy of the Flake Plaintiffs' Answers to Alper Holdings U.S.A., Inc.'s Set of Interrogatories.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 14, 2007

/s/Jessica L. Fink
Jessica L. Fink, Esq.

**(Only Referenced Exhibits Included)**

# EXHIBIT A

B 10 (Official Form 10) (04/07)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE  This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A "request" for payment of an administrative expense may be filed pursuant to 11 U S C § 503

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br><br>Flake, Cathy | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars          SDNY |
|---|---|

| Name and address where notices should be sent<br><br>Flake, Cathy<br>c/o Barrett Law Office, P A , One Burton Hills<br>Blvd , Ste  380, Nashville, TN 37215<br>Telephone number   (615) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case    07-12148 (BRL)<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court |
|---|---|

ALPER HOLDINGS USA, INC

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor | Check here<br>if this claim   ☐ replaces<br>                 ☐ amends      a previously filed claim, dated _____ |
|---|---|

| 1   Basis for Claim |  |  |
|---|---|---|
| ☐ Goods sold | ☐ Personal injury/wrongful death | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Services performed | ☐ Taxes | Last four digits of your SS # ____ |
| ☐ Money loaned | ☐ Retiree benefits as defined in 11 U S C § 1114(a) | Unpaid compensation for services performed |
|  | ☑ Other  property damage | From _____ to _____<br>         (date)          (date) |

2   Date debt was incurred   02/27/2004          3   If court judgment, date obtained

4   Classification of Claim   Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed
See reverse side for important explanations

**Unsecured Nonpriority Claim** $_____

☐ Check this box if  a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority

Amount entitled to priority   $_____

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan - 11 U S C § 507(a)(5)

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff)

Brief Description of Collateral
☐ Real Estate          ☐ Other_____
☐ Motor Vehicle

Value of Collateral   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any   $_____

THE GARDEN CITY GROUP, INC
SEP 20 2007

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units - 11 U S C § 507(a)(8)

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(___)

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

5   Total Amount of Claim at Time Case Filed      $_____   _____   (st Contingent/        unknown
                                                      (unsecured)                          Unliquidated/Disputed    (total)
☐ Check this box if claim includes interest or other charges in addition to the principal amount                              of all interest or additional
charges

6   Credits   The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim

7   Supporting Documents   Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien  DO NOT SEND ORIGINAL DOCUMENTS  If the documents are not available, explain  If the documents are voluminous, attach a summary

8   Date-Stamped Copy   To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
SEP 19 2007
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>9/14/2007 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>Patrick Barrett, Attorney for Creditor |
|---|---|

Penalty for presenting fraudulent claim   Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------

ALPER HOLDINGS USA, INC ,

                          Debtor

vs

CATHY FLAKE
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                         Creditor

--------------------------------------------------------------

Chapter 11

Case No  07-12148 (BRL)

**SUPPORTING DOCUMENT ATTACHMENT**

      Creditor's property and personal damage claim arises from contamination by hazardous waste including Trichloroethylene ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc in connection with said contamination

**POWER OF ATTORNEY**

      A Power of Attorney authorizing Barrett Law Office P A  to file this claim is attached hereto

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------

ALPER HOLDINGS USA, INC ,

                    Debtor

vs

CATHY  FLAKE
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                    Creditor

--------------------------------------------------------

Chapter 11

Case No  07-12148 (BRL)

## STATEMENT OF RELATED CLAIMS

Filed simultaneously herewith are 18 other Proof of Claims arising out of contamination by hazardous waste including Trichloroethylene ("TCE"), an industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc  in connection with said contamination

# CONTRACT TO HIRE ATTORNEY

CLIENTS Ray and Catherine Flake                DATE: 12/29/03

DATE OF INJURY _____

NATURE OF INJURY: Property Damage _____

PLACE OF INJURY: Dickson, TN _____

1. **MATTER INVOLVED**    Clients retain Provost ★ Umphrey Law Firm, L.L.P., Barrett Law Office, P.A., and Lynn Agee ("The Firms" collectively) to represent clients in a claim for personal injuries and/or property damage arising from the Dickson County TCE issues described above

2. **CLIENT'S FUNCTIONS**    The clients agree to perform the following functions
   A)    To pay The Firms for the performance of such legal services and to pay for all expenses incurred in connection therewith, as specified in paragraphs 3 and 4 below
   B)    To cooperate fully with The Firms and to provide all information known by or available to the clients which may aid them in representing the clients in this matter

3. **LEGAL FEES**    The Firms collectively shall receive as compensation ▇▇▇▇▇▇▇▇▇ of all amounts recovered through insurance or otherwise from the party, or parties, responsible for the injuries and damages sustained by clients as a result of the occurrence described above  If this matter proceeds to trial or an appeal then The Firms shall receive as compensation ▇▇▇▇ of all amounts recovered

4. **EXPENSES**    The Firms shall not be liable for costs and expenses of any kind and shall be reimbursed by clients from any recovery for necessary expenses advanced and paid for by them in connection with the prosecution of this claim  Such expenses may include charges made by court reporters, expert witnesses and investigators  Additionally, clients agree to reimburse the Firms for all out of pocket expenses from any recovery including, but not limited to charges for filing and serving papers, depositions, transcripts, witness fees, photocopy expenses, long distance phone calls, and travel expenses  In the event there is not a recovery, Clients shall not be responsible for any expenses  Clients agree that associate counsel may be employed at the discretion and expense of the Firms and that any attorney so employed may be designated to appear on clients' behalf to undertake their representation in this matter  The clients further authorize the Firms to deduct and pay medical expenses of this claim from their recovery directly to the person or firms to whom the expenses are due

5. **NO GUARANTEES:**    The Firms have made no guarantees regarding the outcome of this matter and all expressions about the outcome are only opinions

6. **TERMINATION OF AGREEMENT**    The Firms may withdraw from this matter if clients fail to honor the agreement, or if after investigation, the Firms determine available evidence is insufficient to warrant further representation or there is a lack of available sums to satisfy a successful claim  Clients may terminate contract subject to the reimbursement of expenses, and payment of fees equal to ▇▇▇▇▇ of the most recent offer of settlement

   **DISPUTE RESOLUTION**  Any disputes relating to interpretation, enforcement or alleged breach of this agreement shall be submitted to binding arbitration in Nashville, Tennessee, under the auspices of the American Arbitration Association  Judgment on any arbitration award may be entered by any court of competent jurisdiction  This includes any derivative claims, inclusive of legal negligence, fraud, duress, misappropriation of funds  or any other claims against PROVOST ★ UMPHREY LAW FIRM, L.L.P., BARRETT LAW OFFICE, P.A., and/or LYNN AGEE, any of their partners, associates, or other representatives, arising out of the legal services made the basis of this contract  This agreement shall be interpreted under the laws of the State of Tennessee

UNDERSTOOD AND AGREED AND COPY RECEIVED:

_____          _____
CLIENT                                   PROVOST ★ UMPHREY LAW FIRM, L.L.P.

_____          _____
CLIENT                                   BARRETT LAW OFFICE, P.A.

                                         _____
                                         LYNN AGEE

B 10 (Official Form 10) (04/07)

| UNITED STATES BANKRUPTCY COURT __SOUTHERN__ DISTRICT OF __NEW YORK__ | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor<br>ALPER HOLDINGS USA, INC | Case Number<br>07-12148 (BRL) |
| --- | --- |

NOTE  This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A request" for payment of an administrative expense may be filed pursuant to 11 U S C § 503

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br>Flake, Ray | ✔ Check box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars | FILED # 0021<br>**SDNY**<br>**ALPER HOLDINGS USA, INC**<br>**07-12148 (BRL)** |
| --- | --- | --- |
| Name and address where notices should be sent<br>Flake, Ray<br>c/o Barrett Law Office, P A , One Burton Hills Blvd , Ste 380, Nashville, TN 37215<br>Telephone number  (615) 665-9990 | □ Check box if you have never received any notices from the bankruptcy court in this case<br>□ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor | Check here  □ replaces<br>if this claim  □ amends      a previously filed claim, dated _____ | |

| 1  Basis for Claim<br>□ Goods sold<br>□ Services performed<br>□ Money loaned | ✗ Personal injury/wrongful death<br>✗ Taxes<br>✗ Retiree benefits as defined in 11 U S C § 1114(a)<br>✔ Other __Property Damage__ | ✗ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS # _____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)        (date) |
| --- | --- | --- |

| 2  Date debt was incurred  02/27/2004 | 3  If court judgment, date obtained |
| --- | --- |

4  Classification of Claim  Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed
See reverse side for important explanations

| Unsecured Nonpriority Claim  $_____<br><br>□ Check this box if  a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority | Secured Claim<br>□ Check this box if your claim is secured by collateral (including a right of setoff)<br>Brief Description of Collateral<br>□ Real Estate      □ Other_____<br>□ Motor Vehicle<br>Value of Collateral  $_____<br>Amount of arrearage and other charges at time case filed included in secured claim, if any  $_____ |
| --- | --- |

Unsecured Priority Claim

□ Check this box if you have an unsecured claim, all or part of which is entitled to priority

Amount entitled to priority  $_____

Specify the priority of the claim

□  Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

□  Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U S C § 507(a)(4)

□  Contributions to an employee benefit plan - 11 U S C § 507(a)(5)

□  Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C § 507(a)(7)

□  Taxes or penalties owed to governmental units - 11 U S C § 507(a)(8)

□  Other—Specify applicable paragraph of 11 U S C § 507(a)(___)

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

| 5  Total Amount of Claim at Time Case Filed   $_____  Contingent/ _____  **unknown**<br>(unsecured)                           (total)<br>□ Check this box if claim includes interest or other charges in addition to the principal Unliquidated/Disputed  itement of all interest or additional charges | THIS SPACE IS FOR COURT USE ONLY |
| --- | --- |

6  Credits  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim

7  Supporting Documents  Attach copies of supporting documents such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien  DO NOT SEND ORIGINAL DOCUMENTS  If the documents are not available, explain  If the documents are voluminous, attach a summary

8  Date-Stamped Copy  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

RECEIVED
SEP 1 9 2007
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>9/14/2007 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>[signature]       Patrick Barrett, Attorney for Creditor |
| --- | --- |

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

THE GARDEN CITY GROUP
SEP 20 2007

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------

ALPER HOLDINGS USA, INC ,

Chapter 11

                Debtor

Case No  07-12148 (BRL)

vs

RAY FLAKE
c/o Barrett Law Office, P.A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                Creditor
----------------------------------------------------------

## SUPPORTING DOCUMENT ATTACHMENT

Creditor's  property and commercial damage claim arises from contamination by hazardous waste including Trichloroethylene ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc  in connection with said contamination

## POWER OF ATTORNEY

A Power of Attorney authorizing Barrett Law Office P A  to file this claim is attached hereto

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------

ALPER HOLDINGS USA, INC.,

                          Debtor

vs

RAY FLAKE
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                          Creditor

:     Chapter 11

.     Case No  07-12148 (BRL)

:

----------------------------------------------------------------

## STATEMENT OF RELATED CLAIMS

Filed simultaneously herewith are 18 other Proof of Claims arising out of contamination by hazardous waste including Trichloroethylene ("TCE"), an industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc. in connection with said contamination

12/29  2003 11 25 FAX 01000000000

# CONTRACT TO HIRE ATTORNEY

CLIENTS Ray and Catherine Flake          DATE 12/29/03

DATE OF INJURY:

NATURE OF INJURY Property Damage

PLACE OF INJURY: Dickson, TN

1  **MATTER INVOLVED**  Clients retain Provost ★ Umphrey Law Firm, L L P., Barrett Law Office, P.A , and Lynn Agee ("The Firms" collectively) to represent clients in a claim for personal injuries and/or property damage arising from the Dickson County TCE issues described above

2  **CLIENT'S FUNCTIONS**  The clients agree to perform the following functions
    A)    To pay The Firms for the performance of such legal services and to pay for all expenses incurred in connection therewith, as specified in paragraphs 3 and 4 below
    B)    To cooperate fully with The Firms and to provide all information known by or available to the clients which may aid them in representing the clients in this matter

3  **LEGAL FEES.**  The Firms collectively shall receive as compensation ███████████ of all amounts recovered through insurance or otherwise from the party, or parties responsible for the injuries and damages sustained by clients as a result of the occurrence described above  If this matter proceeds to trial or an appeal then The Firms shall receive as compensation ██████ of all amounts recovered

→  **EXPENSES**  The Firms shall not be liable for costs and expenses of any kind and shall be reimbursed by clients from any recovery for necessary expenses advanced and paid for by them in connection with the prosecution of this claim  Such expenses may include charges made by court reporters, expert witnesses and investigators  Additionally, clients agree to reimburse the Firms for all out of pocket expenses from any recovery including, but not limited to charges for filing and serving papers depositions, transcripts, witness fees, photocopy expenses, long distance phone calls, and travel expenses  In the event there is not a recovery, Clients shall not be responsible for any expenses  Clients agree that associate counsel may be employed at the discretion and expense of the Firms and that any attorney so employed may be designated to appear on clients' behalf to undertake their representation in this matter  The clients further authorize the Firms to deduct and pay medical expenses of this claim from their recovery directly to the person or firms to whom the expenses are due

5  **NO GUARANTEES**  The Firms have made no guarantees regarding the outcome of this matter and all expressions about the outcome are only opinions

6.  **TERMINATION OF AGREEMENT:**  The Firms may withdraw from this matter if clients fail to honor the agreement, or if after investigation, the Firms determine available evidence is insufficient to warrant further representation or there is a lack of available sums to satisfy a successful claim  Clients may terminate contract subject to the reimbursement of expenses, and payment of fees equal to ███████████ of the most recent offer of settlement

**DISPUTE RESOLUTION.**  Any disputes relating to interpretation, enforcement or alleged breach of this agreement shall be submitted to binding arbitration in Nashville, Tennessee, under the auspices of the American Arbitration Association  Judgment on any arbitration award may be entered by any court of competent jurisdiction  This includes any derivative claims, inclusive of legal negligence, fraud, duress, misappropriation of funds  or any other claims against PROVOST ★ UMPHREY LAW FIRM, L.L.P. , BARRETT LAW OFFICE, P.A., and/or LYNN AGEE, any of their partners, associates, or other representatives, arising out of the legal services made the basis of this contract  This agreement shall be interpreted under the laws of the State of Tennessee

## UNDERSTOOD AND AGREED AND COPY RECEIVED:

CLIENT

CLIENT  Catherine A Flake

PROVOST ★ UMPHREY LAW FIRM, L.L.P.

BARRETT LAW OFFICE, P.A.

LYNN AGEE

**EXHIBIT B**

IN THE CIRCUIT COURT OF DICKSON COUNTY, TENNESSEE

RAY FLAKE and CATHY FLAKE,

     *Plaintiffs,*

vs.

SALTIRE INDUSTRIAL, INC. f/k/a
SCOVILL, INC.; SCHRADER-
BRIDGEPORT INTERNATIONAL, INC.
f/k/a SCHRADER AUTOMOTIVE, INC.;
TOMKINS PLC; ALPER HOLDINGS U.S.A.,
INC.; ARVINMERITOR, INC., CITY OF
DICKSON, TENNESSEE; COUNTY OF
DICKSON, TENNESSEE; WILLIAM
ANDREWS; LEWIS EDWARD KILMARX
and JOHN DOE(S) 1-10;

     *Defendants.*

Case No. CV-1911

<u>AMENDED COMPLAINT</u>

Jury Trial Demanded

FILED: January 11 20 2006
     11:00 AM
     Pamela A. Myatt
     Circuit Court Clerk

## <u>FOURTH AMENDED COMPLAINT</u>

Plaintiffs hereby allege the following on information and belief against Defendants

Saltire Industrial, Inc. f/k/a Scovill, Inc., Alper Holdings U.S.A., Inc., Schrader-Bridgeport

International, Inc. f/k/a Schrader Automotive, Inc., Tomkins PLC, ArvinMeritor, Inc., City of

Dickson, Tennessee, County of Dickson, Tennessee, William Andrews, Lewis Edward Kilmarx,

and John Doe(s) 1-10.

### PARTIES

1.     Ray Flake and Cathy Flake are a married couple residing in Dickson County,

Tennessee.

2.      Saltire Industrial, Inc. is a Delaware corporation formerly known as Scovill, Inc. Scovill, Inc. was a Connecticut corporation during the relevant time period. Scovill, Inc., through its Schrader Automotive Group division, operated a manufacturing facility (the "Facility") on Schrader Drive in Dickson County from 1964 through March 1985. Saltire Industrial, Inc., Scovill, Inc. and the Schrader Automotive Group are collectively referred to as "Scovill/Schrader."

3.      Schrader-Bridgeport International, Inc. is a foreign corporation with its principal place of business in North Carolina. Schrader-Bridgeport International, Inc. is formerly known as, and is the successor in interest to, Schrader Automotive, Inc. Schrader Automotive, Inc. was formerly known as the Schrader Automotive Group which was the Scovill, Inc. division that operated the Facility during the relevant time period.

4.      Tomkins PLC is a foreign corporation that owns, operates, and controls Schrader-Bridgeport International, Inc. Schrader-Bridgeport International, Inc. is an alter ego and mere instrumentality of Tomkins PLC. Tomkins PLC is also sued herein for its own direct acts and omissions.

5.      ArvinMeritor, Inc. is a foreign corporation and successor in interest to Schrader Automotive Group, Inc. Schrader Automotive Group, Inc. was the Scovill division that operated the Facility during the relevant time period.

6.      Alper Holdings U.S.A., Inc. is successor in interest to Scovill, Inc. and Saltire Industrial, Inc. Alper Holdings U.S.A., Inc. is also sued herein for its own direct acts and omissions. Alper Holdings U.S.A., Inc. is a Delaware corporation with its principal place of business in New York.

7.    The City of Dickson, Tennessee is a municipality organized under the laws of Tennessee.

8.    The County of Dickson, Tennessee is organized under the laws of Tennessee.

9.    Lewis Edward Kilmarx is a resident of Dickson County, Tennessee. Defendant Kilmarx is sued herein in his individual capacity as it is alleged that he knowingly and/or negligently engaged in the unlawful conduct attributed to Defendants as set out below. Defendant Kilmarx was an employee for Scovill/Schrader during the relevant time period.

10.    William F. Andrews was the chairman, president and CEO of Scovill/Schrader during the relevant time period. Defendant Andrews is sued herein in his individual capacity as it is alleged that he knowingly and/or negligently engaged in the unlawful conduct attributed to Defendants as set out below.

11.    John Doe(s) 1-10 are presently unidentifiable parties who will be added as more information becomes available during discovery. These parties were involved in the management of Defendants during the relevant time period, environmental monitoring of various sites throughout Dickson County and the City of Dickson, and/or the consultation and engineering of the location and use of city well DK-21. These parties directly and personally participated in (1) the unlawful dumping and disposal of hazardous wastes, including TCE, without regard to the safety and health of Plaintiffs and the surrounding landowners, (2) the decision not to warn Plaintiffs or the public of the dangerous chemicals to which they were being exposed, and/or (3) the decision to conceal facts that would have put the public on notice of the ongoing health threat resulting from the Defendants' contamination. Additionally, these parties include consultants who were hired to evaluate the environmental hazards associated with the operation of the Facility and the disposal of hazardous chemicals, and negligently failed to

adequately assess the risk to Plaintiffs and the public posed by the subject environmental contamination.

12.    Defendants are sued individually and as joint-tortfeasors, aiders and abettors. The liability of Defendants arises from the fact that they, directly and/or through their predecessors in interest, alter-egos, agents, employees, and/or representatives, engaged in all or part of the acts, events, schemes and/or transactions described herein.

13.    Defendants are jointly and severally liable for Plaintiffs' damages. Defendants, directly and/or through their agents, alter-egos, employees, representatives and/or predecessors in interest, substantially participated or assisted in the conduct complained of herein and had knowledge of the secret activities alleged herein or recklessly disregarded the conduct. Defendants are also jointly and severally liable for any future injunctive relief imposed by this Court.

### JURISDICTION AND VENUE

14.    This Court has jurisdiction over this matter because the damages sought exceed the jurisdictional minimums of this Court and Plaintiffs' claims arise in substantial part from events occurring in Tennessee. All Defendants are subject to the jurisdiction of this Court.

15.    Venue is proper in this Court because Plaintiffs' claims arose in Dickson County and because Plaintiffs and the Tennessee Defendants reside in Dickson County.

16.    There is no federal diversity jurisdiction because Plaintiffs and several defendants are Tennessee citizens. There is also no federal question jurisdiction as Plaintiffs' claims invoke no federal question or statute, and federal law does not preempt Plaintiffs' Tennessee causes of action. Plaintiffs state, and intend to state, causes of action solely under Tennessee law and expressly deny any attempt to state a cause of action under federal law.

FACTS

17.    Plaintiffs own and reside on a 22 acre parcel of property located at 709 Bruce Road, Dickson, Tennessee ("Property #1"). Plaintiffs have lived on Property #1 since August 2002.

18.    A natural spring is located on Property #1 which produces an estimated one million gallons of water per day. Plaintiffs used water from this spring for all domestic purposes, including but not limited to, drinking, cooking, bathing, gardening, clothes and dish washing.

19.    Defendant Scovill/Schrader owned and operated the manufacturing Facility in Dickson County, Tennessee from 1964 through March 1985. During this time, Scovill/Schrader leased the Facility from the County of Dickson, Tennessee. In March 1988, Scovill/Schrader purchased the Facility and its surrounding grounds from the County of Dickson, Tennessee.

20.    The Facility manufactured automotive tire valves and gauges. The manufacturing process included metal plating, etching, rubber molding and application, polishing, painting and degreasing.

21.    Scovill/Schrader generated hazardous wastes by its operations in Dickson, including trichloroethylene ("TCE"), which was used as a solvent and degreaser for machinery, and metal plating sludges with high concentrations of heavy metals. During the relevant time period, Scovill/Schrader generated thousands of gallons of TCE waste – all of which required proper disposal.

22.    TCE is a hazardous waste toxic to plants and animals. TCE is considered a health hazard to humans at very low concentrations. TCE is a known animal carcinogen and a probable human carcinogen. The probability of TCE causing cancer in humans is increased by the level of TCE ingested by the human. The United States Environmental Protection Agency has found

no acceptable level for such carcinogens in the environment, and for that reason has established a maximum contaminant level goal of 0 for TCE in groundwater. TCE is heavier than water, and tends therefore to pollute deep groundwater sources such as wells, especially in the karst-type system in Dickson County.

23.    Scovill/Schrader disposed of its TCE by simply dumping it on the open ground at several locations on or near the Facility and throughout Dickson. In 1985, the Tennessee Department of Environment and Conservation, Division of Solid Waste Management identified various sites in Dickson County on which wastes from the Facility had been dumped in the 1970s.

24.    Two of the locations were (1) a dump at the Facility itself and (2) Dickson County's public landfill (the "Landfill") which is located approximately three miles from the Facility and Property #1.

25.    In 1986, the dump located at the Facility became subject to a closure order by TDEC. Scovill/Schrader failed to perform the ordered closure until TDEC initiated legal enforcement action. The dump site was eventually closed over time during 1987 and 1988.

26.    On May 11 and 14, 1993, Scovill/Schrader's environmental consultants tested privately owned wells close to the Facility. The test results showed TCE levels far above proper maximum contaminant levels.

27.    Over the course of several years in the 1970's, Scovill/Schrader also dumped thousands of gallons of TCE at the Landfill. Scovill/Schrader used trailer trucks to transport the TCE. The TCE dumped by Scovill/Schrader contaminated the Dickson County water supply including a city well labeled DK-21.

28.    During a portion of the relevant time period, the Landfill was owned and operated by the City of Dickson.  On September 1, 1972, the City of Dickson gave control of the Landfill to the County of Dickson.

29.    In 1977 the City of Dickson sold part of the Landfill to the County of Dickson.

30.    Currently, the Landfill sits on property owned by the City of Dickson and on property owned by the County of Dickson.

31.    Defendants, either intentionally or negligently, failed to adequately monitor, control, supervise, and/or maintain the disposal of the TCE at all locations throughout Dickson.

32.    Defendants did not adequately warn Plaintiffs or the public about the existence of the TCE contamination or the dangers posed by the TCE.

33.    In addition to domestic use, Plaintiffs intended to commercially bottle and market the spring water on Property #1.  From the time Property #1 was purchased, Plaintiffs sought to enter into an agreement with a company that would help market and sell their spring water.

34.    In and around September 2003, Plaintiffs formed a partnership and entered into an agreement to purchase a nearby piece of property ("Property #2").  Property #2 also has a natural spring which produces water that could be bottled and sold.  Property #2 produces approximately 2 million gallons of water per day.

35.    TCE was later detected in the spring on Property #1 which rendered the spring water located on both Property #1 and Property #2 commercially worthless.  Furthermore, as a result of TCE detection, Plaintiffs did not close on the purchase of Property #2 and were forced to surrender the earnest money placed on deposit.

36.    Plaintiffs have been injured because the value of Property #1 has been decimated due to the TCE contamination originating from Scovill/Schrader's actions at the Facility and the

Landfill. Likewise, Plaintiffs and the partnership have also been injured by the loss of business opportunity, investment, earnest money and potential profits forfeited via Property #2.

## COUNT ONE

### TRESPASS

37.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

38.    Defendants, by the maintenance of the storage and disposal facilities for TCE at the Facility and the disposal actions at various sites including the Landfill, have caused the contamination of Property #1.

39.    Plaintiffs have at no time given any consent to the pollution of Property #1. Such pollution is an unlawful entry upon Plaintiffs' land and impairs their right to exclusive possession of said land.

40.    Defendants' TCE continues to exist on Property #1. As a result, Defendants have trespassed and continue to trespass on the Property #1.

41.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered a diminution in the value of Property #1 and the value of the improvements connected thereto and damages for loss of business opportunity, investment, loss of use, aggravation, and emotional distress.

## COUNT TWO

### PERMANENT NUISANCE

42.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

43.    The leaking of the underground storage tank and the disposal of TCE at the Facility and other sites including the Landfill constitute a permanent nuisance on Property #1

that will persist for an indefinite time, interfering with Plaintiffs reasonable use and enjoyment of their property.

44.     The interference with the use and enjoyment of Property #1 is the direct result of Defendants' negligent management, storage and disposal of TCE. Defendants' acts have resulted in the permanent migration of TCE on Property #1 causing damage to the value of Property #1.

45.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered a diminution in the value of Property #1 and the value of the improvements connected thereto and damages for loss of business opportunity, investment, loss of use, aggravation, and emotional distress.

## COUNT THREE

### NEGLIGENCE

46.     Plaintiffs incorporate the allegations contained in the preceding paragraphs.

47.     Defendants negligently monitored, managed, designed, installed, maintained, and abandoned the underground storage tank and above-ground barrel storage areas for TCE. Defendants also negligently disposed of TCE at various sites throughout Dickson County including the Landfill.

48.     Defendants negligently failed to monitor and/or investigate contamination resulting from TCE storage and disposal facilities on-site and at the Landfill. Also, Defendants knew of significant TCE groundwater contamination at the Facility for many years, and negligently failed to take action to prevent the TCE from migrating from the Facility and/or warn Plaintiffs of the existence of TCE contamination or the dangers posed by TCE. These negligent

acts and omissions allowed TCE onto Property #1 thereby causing the spring water on both properties to be rendered worthless.

49.     Defendants, in operating the Facility, including the generation, management, and haphazard storage and disposal of its TCE and other hazardous wastes, knew or should have known Plaintiffs were likely to be harmed as a result of the aforementioned conduct.

50.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages, including but not limited to, loss of property value, investment, lost profits, and loss of business opportunity.

<div align="center">

**COUNT FOUR**

**NEGLIGENCE PER SE**

</div>

51.     Plaintiffs incorporate the allegations contained in the preceding paragraphs.

52.     Defendants' disposal of TCE into soil and groundwater with no state permit is in violation of section 108 of the Tennessee Solid Waste Management Act of 1977, Tenn. Code Ann. § 68-212-108.

53.     Defendants' disposal of TCE into soil and groundwater with no state permit is in violation of Rule 1200-1-11-.07 of the Official Compilation: Rules and Regulations of the State of Tennessee, Department of Environment and Conservation.

54.     Defendants' release of TCE into the groundwater surrounding its TCE storage facilities and the Landfill without a permit is a violation of section 108 of the Tennessee Water Pollution Control Act, Tenn. Code Ann. § 69-3-108.

55.     The release of hazardous waste from Defendants' drum storage areas and underground storage tank and the Landfill into the groundwater is a violation of section 105 of the Tennessee Solid Waste Management Act of 1977, Tenn. Code Ann. § 68-212-105.

56.    These statutes and regulations are intended to protect Plaintiffs and their Property from harm by pollution of the environment.

57.    Violation of these statutes and regulations constitutes negligence *per se*.

58.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs have suffered damages, including but not limited to, loss of property value, investment, lost profits, and loss of business opportunity.

## COUNT FIVE

### STRICT LIABILITY

59.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

60.    Defendants have disposed of TCE without the required permit(s).  Defendants' disposal areas at the Facility and the Landfill were maintained even though Defendants knew or should have known that the hazardous waste contained in the underground tank could leak or was leaking from the tank into the soil and groundwater surrounding the site and the Landfill.

61.    The generation, storage, and disposal of TCE, and other hazardous wastes, is an ultra-hazardous activity.

62.    Defendants are strictly liable for Plaintiffs' damages which proximately resulted from these ultra-hazardous activities.

63.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages, including but not limited to, loss of property value, investment, lost profits, and loss of business opportunity.

## COUNT SIX

### VIOLATION OF THE TENNESSEE GOVERNMENTAL TORT LIABILITY ACT

64.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

65.    The City of Dickson, Tennessee and the County of Dickson, Tennessee are governmental entities under T.C.A. § 29-20-101 *et seq.* and are sued in this capacity.

66.    Both governmental entities are liable under all applicable provisions of the Tennessee Governmental Tort Liability Act, including but not limited to, T.C.A. § 29-20-204 and T.C.A. § 29-20-205.

67.    Both governmental entities are liable because of the negligent act or omission of an employee acting within the scope of his or her employment.

68.    Both governmental entities had a duty to monitor TCE and other hazardous waste disposal at the various dump sites throughout Dickson including Scovill/Schrader's disposal facilities on-site and at the Landfill. They also had a duty to investigate possible releases of TCE and other hazardous waste from Scovill/Schrader's disposal facilities on-site and at the Landfill.

69.    Both governmental entities knew or should have known of significant TCE groundwater contamination on Property #1 and Property #2, but either intentionally or negligently failed to either take action to prevent the TCE from migrating to the properties or to warn Plaintiffs of the dangers. These acts and omissions caused injury to Plaintiffs.

70.    Both governmental entities had constructive and/or actual notice of the TCE contamination throughout Dickson County.

71.    The conduct of the City of Dickson and the County of Dickson was willful, wanton, and/or grossly negligent.

## PUNITIVE DAMAGES

72.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

73.    Defendants knew or should have known of the dangerous propensities of its TCE and of the inadequacies of its storage procedures and facilities. Further, Defendants knew in

March 1988 that TCE had entered the groundwater at the Facility and the Landfill in high concentrations, and knew or should have known that the TCE was migrating into the groundwater surrounding the Facility and the Landfill and that toxic concentrations of TCE were contaminating the groundwater of neighboring properties.

74.    Defendants knew TCE had been released into the groundwater at the Facility and the Landfill in very high concentrations in March 1988, and knew of the proximity of the water wells that were contaminated, but failed to sample the wells for TCE for more than five years after gaining such knowledge, in complete disregard for Plaintiffs' rights.

75.    As a result of its business operations, Defendants have intentionally, knowingly, and willfully stored and disposed of TCE in such a manner that it caused TCE contamination.

76.    Defendants acted in a wanton, reckless, and malicious manner in failing to take the precautions necessary to prevent such contamination.  Defendants' actions were intentional, fraudulent, willful, wanton, malicious and/or reckless, and in total disregard for the rights of Plaintiffs such that punitive damages should be awarded.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.    For an order finding Defendants liable under applicable cause of action pleaded above;

b.    For compensatory damages including lost profits and investment;

c.    For punitive damages;

d.    For an order granting such injunctive and equitable relief as this Court deems proper;

e.    For attorneys' fees and costs incurred in the pursuit of their action; and

f.    For an order awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.


Dated:  January 9, 2006.

Respectfully submitted,

Patrick Barrett
Charles Barrett
BARRETT LAW OFFICE, P.A.
One Burton Hills Blvd.
Suite 380
Nashville, TN 37215
(615) 386-8391
(615) 386-8392 (fax)

Henry F. Todd, Jr.
TODD & SPENCER LAW FIRM
404 East College St.
Dickson, TN 37055
(615) 446-0511
(615) 441-3437 (fax)

Michael Hamilton
Provost Umphrey Law Firm, L.L.P.
2002 Richard Jones Road
Suite 103-C
Nashville, TN 37215
(615) 242-0199
(615) 256-5922 (fax)

Lynn Agee, Attorney
4551 Lascassas Pike
Murfreesboro, TN 37130
(615) 896-4204
(615) 904-0496 (fax)

Don Barrett
BARRETT LAW OFFICE, P.A.
404 Court Square North
P.O. Box 987
Lexington, MS 39095
(662) 834-2376
(662) 834-2628 (fax)

Charles L. Cunningham, Jr.
Charles E. Fell, Jr.
Randall L. Wright
6010 Brownsboro Park Blvd., Suite G
St. Matthews, KY 40207-1294
(502) 893-8994
(502) 893-8994 (fax)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Patrick Barrett, hereby certify that a true and complete copy of the foregoing was sent via U.S. Mail to the following on January 9, 2006:

J. Andrew Goddard, Esq.
Gregory T. Young, Esq.
BASS, BERRY & SIMS, PLC
315 Deaderick Street, Suite 2700
Nashville, TN 37238-3001
(615) 742-6200
(615) 742-0445 (fax)
*Attorneys for Defendant Schrader-Bridgeport International, Inc.*


Scott E. Ratner, Esq.
TOGUT, SEGAL & SEGAL, LLP
One Penn Plaza
New York, NY 10119
(212) 594-5000
(212) 967-4528 (fax)
*Attorney for Saltire Industrial Inc., f/k/a Scovill, Inc.*


John O. Belcher, Esq.
William H. Lassiter, Jr., Esq.
Clark H. Tidwell, Esq.
LASSITER, TIDWELL & HILDEBRAND, PLLC
1850 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2408
(615) 259-9344
(615) 242-4214 (fax)
*Attorneys for Louis Kilmarx*


Glenn B. Rose, Esq.
Anne-Marie Moyes, Esq.
315 Deaderick St., Suite 1800
Nashville, TN 37238
(615) 256-0500
(615) 251-1057 (fax)
*Attorneys for William Andrews*

R. Eric Thornton, Esq.
Steven J. Meisner, Esq.
RAMSEY, THORNTON & BARRETT
Midtown Center, Suite D
320 East College St.
Dickson, TN 37055
(615) 740-5700
(615) 446-1686 (fax)
*Attorneys for the County of Dickson*


Teresa Reall Ricks, Esq.
J. Russell Farrar, Esq.
FARRAR & BATES, L.L.P.
211 Seventh Ave. N., Suite 420
Nashville, TN 37219
(615) 254-3060
*Attorneys for the City of Dickson*


Jerry V. Smith, Esq.
300 N. Main St.
P.O. Box 633
Dickson, TN 37056-0633
(615) 446-5951
*Attorneys for the City of Dickson*


William H. Farmer, Esq.
Jennifer L. Brundige, Esq.
FARMER & LUNA, PLLC
333 Union St., Suite 300
Nashville, TN 37201
(615) 254-9146
*Attorneys for the City of Dickson*


William David Bridgers, Esq.
William T. Ramsey, Esq.
NEAL & HARWELL
200 First Union Tower
150 4th Avenue North
Nashville, TN 37219
(615) 244-1713
(615) 726-0573 (fax)
*Attorneys for Alper Holdings*

George Nolan, Esq.
BOULT, CUMMINGS, CONNERS & BERRY, PLLC
1600 Division Street, Suite 700
P. O. Box 340025
Nashville, TN  37203
(615) 252-2385
(615) 252-6385 (fax)
*Attorney for ArvinMeritor*

Mark Nolan, Esq.
BATSON, NOLAN, BRICE, HARVEY & WILLIAMSON
121 South Third Street
P.O. Box 0
Clarksville, TN 37040
(931) 647-1501
(931) 648-7841 (fax)

Patrick Barrett

STATE OF TENNESSEE
COUNTY OF DICKSON

I, Pamela (Pam) Myatt, Clerk of the Circuit Court for Dickson County, Tennessee, do hereby certify that the foregoing is a full true and exact copy of fourth Amended Complaint as the same appears of record in Minute Book No. _____ page _____ in my office at Charlotte, Tennessee.

Witness my hand and official seal, this the 14th day of February, 20 06.

Pamela Myatt Clerk
/TT

# EXHIBIT C

# THE DICKSON HERALD

*"Your Local Hometown Newspaper for 78 Years"*

VOL. 78—No. 31
The Dickson Herald

Dickson, Tennessee, Friday, March 1, 1985

3 Sections—32 Pages—25 Cents
A Multimedia, Inc. Newspaper

# Dickson Schrader Plant Closes Today

By CHRIS NORMAN
Associate Editor

The Dickson Schrader automotive plant officially ceases operations today and closes its doors while Scovill officials are still contemplating buying the plant.

Plant officials announced last September that production would be "phased out in an orderly manner and will be completed by March 1, 1985."

In the September 19 dated letter, Schrader Vice President and General Manager J. Kevin Nameth said the company plans "to consolidate the Dickson production into other Schrader and Scovill business units worldwide."

Plant manager Tony Harvill said Thursday that all current employees would be laid off today "with the exception of plant maintenance employees."

Harvill said he did not have exact figures on how many workers would be laid off in the final group today as the plant has been gradually letting people go since announcing its closing.

Negotiations between the company and the United Auto Workers local union are continuing as far as severance for those who have recently been laid off.

Harvill said the maintenance personnel would continue helping with the removal of equipment from the Dickson plant and the shipping of that equipment to other Scovill and Schrader operations.

Harvill said the gradual shutdown has gone smoothly and the company has not experienced any problems.

Today's final lay off ends Schrader's 20 year existence in Dickson County.

The company, then called A. Schrader's Son, announced

*Continued on Page 3-A*



These Oakmont first graders enjoy the springtime weather as they pose for a picture on the jungle gym.

## Vo-Tech Offers Realtor Courses

The Frank G. Clement Area Vocational School and the Dickson County Board of REALTORS have banned together to offer a new pilot program in Real Estate Education in the Dickson, Waverly, Centerville Area. This educational program, to improve real estate agents proficiency and productivity is open to all existing agents and agents who are now entering the business.

The first of a series of courses involving Listing and Selling Techniques will be offered beginning next Tuesday night at the Area Vocational School on Hwy 46 South. This course will feature such topics as Prospecting and Qualifying buyers and elements of successful selling.

According to Jim Lietz, Educational Chairman of the Dickson County Board of Realtors, "The area vocation school contacted me in the fall of last year to explore ways in which the Area School could serve the Real Estate profession needs for additional skill development."

Results of that contact and contacts with the Tennessee Real Estate Education Foundation (TREEF), the education arm of the Tennessee Association of Realtors, has

*Continued on Page 2-A*

## Prisoner Escapes

A Dickson County jail inmate is at large after walking away from a work crew Monday evening.

Sheriff Don Martin said Thursday that an escape warrant has been issued for Ralph Neblett, 21, Route 5, Dickson, after he apparently hid from the work crew supervisor as the inmates loaded into the truck to return to the jail Monday.

Martin said the crew was working in the Grab Creek Road

added that it is the jail's policy not to allow potentially dangerous criminals out of the jail to work on road crews.

The sheriff said Neblett's escape simply points up another problem the department has in the fact that he does not have a bus, or van-type, vehicle to transport work crews.

Martin said the road crew is loaded in the back of a truck that has some rails on it, but that any prisoner could conceivably jump from the truck during transport.

# Underhill Motors Now Jim Cobb Dealerships

Underhill Motors in Dickson is no more.

In its place there will be two dealerships, about 24 more employees, larger, more efficient service departments with better-trained mechanics, about purchased Underhill Motors, Highway 46, Dickson, and the former Bill Grizzle Ford building.

They are in the process of upgrading the old Underhill facility for sales and service of The place had already undergone a thorough housecleaning, the telephone was constantly ringing, and Cobb's interview was interrupted several time as he quickly dealt with business.

Both Nissan and Chrysler have told Cobb he can have more vehicles to sell because of other place (the old Grizzle dealership) would give us more room to be able to service our customers' cars at either location," he said.

Crummie told me usually tried to get his corn in during April and May. But, he said, everybody didn't feel that way about planting. "I had a good neighbor who planted corn in March, even if there was snow on the ground. Now, I'll tell you, I told him how I felt about planting corn, but if he wanted to plant his on Christmas, I wouldn't have faulted him. If a man wants to walk on his hands instead of his feet and he doesn't harm anybody by doing it, that's the way he ought to walk," Crummie said.

Crummie will be remembered by many senior citizens as one of the most agile square dancers who ever danced a set to the fiddles of Billy Stuart and Jim Gentry.

"Back when Edward and I were at home, and felt as good...

something new about a visit with him.

"Jimmy, I've told you that I have a famous name. I don't know at the times people have asked me how I got my name," Crummie said.

As I listened to him, I wanted to say, "Even without a famous name, you would have been a great man, because you are a wonderful human being."

I will never forget the first prayer I heard him offer, "Lord, we thank You for lettin' things be as well with us as what they are."

I believe this was a sincere prayer and a genuine effort by a humble man to communicate with his Creator. If Diogenes had run up on a 'Crummie,' he could've stopped looking; he would've found the honest man he was looking for.

himself above another person. I thought he even gave his coat, ribbon, or half of it, to his brother, Edward, when they got home from the dance. That's Crummie's philosophy; that's his way of life.

I'm more than twice the size of Crummie, but I'll tell the world one thing, I'll never be half the man he is...

Crummie

I've knocked many a fancy step
To the sound of country tune,
While a drowsy world slept
And the sun bedded down with the moon.

The years like a river mist
Have drifted from the scene,
The fiddle is but an echo,
The dancers in a dream.

Simply put, a scarcity of customers. Dale Kelley reported Wednesday.

Kelley blamed a rise in unemployment throughout the county.

Bob Sullivan, Director and Jerry Williams, assistant director of the area school have worked diligently in getting the necessary funds and approvals for the courses. The courses have been approved by the Tennessee Real Estate Commission to meet their continuing educational requirements of licensed agents. The course will also offer CEU credits which

increase in unemployment.

Dickson County had in January a labor force of 17,830 of whom 1,600 were unemployed.

## ...Vo-Tech School

resulted in the availability of these courses and is serving as a pilot program for other areas of Tennessee.

"will be a first for area Vocational Schools. "Through Mr. Sullivan and Mr. Williams' efforts the course fees are going to be minimal," said Rick Hollis, President of the Dickson Board of REALTORS.

"Registration for the course will be Monday evening at 6:30 till 8:00 P.M. at the School. Inquiries may be directed to the school or Jim Lietz at ERA M&L during business hours."

"Hollis complimented "Jim Lietz for his significant contribution to our profession. Lietz's innovation and leader-

# ...Underhill Motors

geared and the thing I am preaching to all of our employees is we want total customer satisfaction at both of these dealerships. And that is in sales and service. I am a big believer that service is what sells our cars."

He said he will eventually employ about 40 people at the two dealerships, compared to 16 which had worked at Underhill Motors.

The employees will be better trained, he added. "We are going to upgrade all of our technicians," he said. "We are going to send them to special

training schools to get them specialized in the areas they need to be. Our service is so that places will overlap. If we have an overflow here, (the old Underhill place), because this is the smaller facility, we will jockey it up the street to get it handled. I don't want to have a lot of things left hanging. I want to get it done.

Concerning better selection of vehicles, Cobb said he will receive more than 140 cars and trucks from Chrysler within the next 30 days. Nissan will send 70 to 80 vehicles a month.

"He (Underhill Motors) had been running...around 50 to 70

units of total sales, new and used," he said. "We feel that we can generate sales up to 125 to 150."

Cobb, who has worked in Alabama, Atlanta, and Tennessee, was born and raised in Paducah, Texas—"a town much smaller than Dickson," he said.

He and his family have already moved to Dickson and are renting on the the Laurel Court Condos, he said.

They are planning to build a house here and have been talking to local builders, he said.

He and his wife, Dorothy, have one son, Scott, 15.

# ...Schrader Plant

plans in 1984 to locate a plant in Dickson that would manufacture valves for automobile tires.

The company was Dickson County's largest industrial employer for most of its time here, providing jobs for up to 1000 people at various times.

But company records indicated financial difficulty as far back as August, 1982, when Executive Vice President C.C. Brake asked the employees to make several contract concessions which he said were "considered to be major impediments in our ability to be competitive and not lose money."

Brake's letter to the union said the concessions were to help turn the Dickson plant into a "break-even position from the current significant loss operation that it is."

Company officials said after announcing the shut down that foreign imports and the increasing cost of materials severely hurt the Dickson operation.

The employees voted down the concessions and Brake wrote in another memo that the company will have to "look into the possibility of phasing down the Dickson operation."

In the spring of 1983, UAW local 581 went on strike for two months. Union officials said they were striking over give up some of their security

rights and added the strike was not based on monetary issues.

Before the strike was even settled, Schrader officials announced they would cut production back about in half and lay off some 250 workers.

Recently, the company has announced it is considering

exercising its option to buy the property and building from the county. The option built into the lease gives the company the right to buy the plant for a price "not to exceed $225,000," and the plant has been listed with an Atlanta real estate firm for $3.5 million.



It's I.R.A. time
and that's

Good for You

Bank of Dickson



MONDAY NIGHTS
SPAGHETTI NIGHT
5 PM - 9 PM

SPAGHETTI WITH
MEAT SAUCE $2.4
Children (7-12) $.99
Children 6 & Under
Eat FREE

All You Can Eat

Pizza Hut

TUESDAY NIGHTS
FAMILY NITE
5 PM - 10 PM

Just $11.95
● Any Large 2 Topping Piz
2 One Trip Salad Bars & Pitcher of S
OR
Just $9.95
● Any Medium 2 Topping Pi
2 One Trip Salad Bars & Pitcher of S

Highway 4
Mathis Drive

Child Fingerprinting Tomorrow Page 7-A
Farm Day Features Dairy Farm Page 3-B
Turney Chapel To Rebuild Page 5-A

# THE DICKSON HERALD

"Your Local Hometown Newspaper for 78 Years"

VOL. 78—No. 69
©The Dickson Herald

Dickson, Tennessee, Friday July 12, 1985

2 Sections—16 Pages—25 Cents
A Multimedia, Inc., Newspaper

*May Contain Toxic Material*

## State To Check Schrader Waste Dump On Farm

By JOHN HARDING
Managing Editor

Copyright, 1985
The Dickson Herald

An official with state Solid Waste Management will next week begin investigating possibly toxic industrial waste which a Dickson County landowner says Schrader Automotive Group dumped on his property about 15 years ago.

James Spicer, an Enviromental Engineer with Solid Waste Management Division of the State Department of Health and Environment, told The Dickson Herald he will next week investigate a site on property owned by Ivan Jason Lewis, on which the Lewis family says Schrader dumped a green spongy substance.

Spicer, who is assigned to monitor Schrader's toxic waste disposal, was contacted by The Herald as part of a continuing Dickson Herald investigation into toxic waste produced by Schrader.

The Lewis family told The Dickson Herald they gave permission to Schrader to dump the substance on their property, off Rock Church Road.

A former Schrader employee who has technical training told The Herald the green substance may contain several toxic substances including cadmium, lead, copper, nickel, zinc, chromium and possibly cyanide.

State Solid Waste Management officials and Dickson City officials confirmed that Schrader before it closed in March produced a sludge which contained those substances.

The Herald made several attempts to contact Schrader officials for comment during the past four weeks, however, those officials did not return The Herald's telephone calls.

Spicer said each of the metals which may be in the sludge are toxic to humans if exposure exceeds cetain levels.

Earl Lewis, Jason Lewis's son, said Schrader officials obtained verbal permission from his parents to dump the substance on his property, saying it contained soap and copper shavings.

The Lewis family said they were told the substance is harmless and would turn into sand.

"That was about 15 years ago," Earl Lewis said. "I don't how

Continued on Page 2A

Staff Photo by John Harding

Photo shows a patch of the substance the Lewis family says Schrader dumped on their property about 15 years ago. A patch of the green, spongy substance can be seen in the center of the photograph. Some of the substance has been covered by fallen leaves. However, more of the substance can be seen in the background.

*32 New Beds*

## Goodlark Starts $3.6 Million Wing

By CHRIS NORMAN
Associate Editor

The administrator of Dickson's Goodlark Medical Center confirmed Thursday that the hospital is beginning construction on a $3.6 million expansion that will include the addition of about 32 new beds.

Administrator Dan Jones said in an interview that the hospital plans "to start clearing the land today (Thursday)" and hopes to get into serious construction of the new four-floor wing within the next two weeks.

Jones said construction is projected to take two years to complete.

The administrator said the center recently received approval from the Tennessee Health Facilities Commission to add 32 new patient beds to the hospital, bringing the expected total number of beds to 176.

Jones said the new wing would be built on the west side of the hospital, facing the new Mathis Drive.

He said it would extend from the current building near the upper

Continued on Page 2-A

## Skydivers To Jump At Airport Sunday

By GAIL PRUITT
Staff Writer

Thrill-seekers are in for a treat Sunday.

Spectators' spirits will soar sky-high when they witness what has been described as "one of the greatest feelings a person can experience."

All day Sunday, beginning at 9:30 a.m., at Dickson Airport, located on Sylvia Road, skydivers will be jumping out of a two-engine plane at altitudes between 3,000 and 12,500 feet. And for some, it will be their first attempt at the death-defying feat.

B.J. Brown of Nashville, a retired army lieutenant, now a skydiving instructor, is bringing 19 of his students to Dickson to make their first jumps. Fort Campbell soldiers from the 101st Airborne Division, as well as experienced skydivers from the state, will make jumps also, Brown said.

And anyone willing to train all day Saturday may make the Sunday jump, Brown said. But there is only room for two more people in Brown's class, which is held on the grounds of the Tennessee Ridge Apartments, located on Murfreesboro Road in Nashville. The training cost and jump fee are $75, Brown said.

If you are considering it, Brown's qualifications help soothe "soar" jump jitters.

Brown began jumping in Shrieveport, La., where he served in the army from 1975-1977. He is a member of the First Tennessee Regiment Club which is a unit of the 1st Airborne Division in Shrieveport.

Brown said he has trained over 18,000 people. His list of students include actor Jan Michael Vincent and CBS newsman Hughes Rudd.

And as if that were not impressive enough, Brown said he returned two weeks ago from

Continued on Page 3A

## Science Fair Winner Tours Air Force Bases

When Kim Kullman becomes a thoracic surgeon, she may treat her patients with anti-cancer drugs she "invented" during her senior year of high school.

Miss Kullman who recently graduated from Dickson County High School, earned first place honors in one division in an international science fair.

Also, she was one of 13 students who won the Air Force Award which consisted of a week-long tour of AF bases throughout the United States.

During an interview at Arnold Air Force Station, Tenn. Miss Kullman described her project entitled, "The Synthesis of Anti-Cancer Drugs From Platinum Complexes."

In extensive experiments Miss Kullman determined the

Continued on Page 2A

*Five Killed Sunday*

## THP Continuing Investigation Into Interstate Wreck

By GAIL PRUITT
and CHRIS NORMAN

The Tennessee Highway Patrol says its investigation into last Sunday's wreck on Interstate 40 which killed five people is continuing.

Trooper Dave Starr said Wednesday that the case is definitely "not closed" as far as the THP is concerned, and the biggest point right now is the wait for the results of blood-alcohol tests taken from the deceased driver of the vehicle being blamed for the wreck.

Starr said late Tuesday that troopers had determined that the 1977 Lincoln being driven by Ralph Swanson of Nashville was travelling approximately 94 miles per hour when Swanson drove onto the inside shoulder of the eastbound lane of the interstate in an attempt to pass two tractor-trailers that were side-by-side.

Starr said investigators were able to determine Swanson's approximate speed by measuring "yaw marks" left on the pavement by Swanson's car when his left side tires hit the shoulder and he lost control.

Starr said the yaw marks are the marks made by Swanson's right side tires as they were pushed sideways in a semi-skid.

By taking measurements of the distance of the yaw marks and the arc of the curve they created and working those figures into a scientific formula, investigators were able to figure the speed of the car.

Continued on Page 2A

Page 5A—The Dickson Herald, Dickson, Tenn.                                                    Friday, July 12, 1985

# Fair Winner Tours AF Bases

complete show, the ability to inhibit cell division which is a "possible indication of anti-cancer activity."

The drugs she studied in the experiments were sent to a national laboratory where animal tests will be used to determine if the complexes are anti-cancer drugs, Miss Kullman explained, adding, "They may be on the market in several years."

She became interested in the anti-cancer drugs when she attended a Summer Challenge Program at Vanderbilt where a professor lectured about medicinal values. Her project "blossomed" from that class and she set up her experiments in a lab.

Under the direction of her high school chemistry teacher, Ron Robertson, and Vanderbilt University chemistry professor

Dr. Marvin Joesten, Miss Kullman spent about seven hours weekly for eight months working on her project. She worked at Vanderbilt, her home, the high school and the Goodlark Hospital in Dickson.

Her project was entered in the Tennessee regional science fair, then advanced to the international fair in Shreveport, La., where she reached the finalists stage for the Air Force Award. Also, Miss Kullman's project earned her designation as the alternate in line for the Nobel Peace Prize competition; first place in the 'international division; and the alternate grand prize winner our of 617 students.

She credited her parents, Robert and Nancy Kullman of Bellsburg, Tenn., for their support of her project.

In June, Miss Kullman and the other 12 finalists assembled at

Andrews Air Force Base. While in the Washington, D.C. area, the students toured the Pentagon. They flew in flight simulators at Wright-Patterson AFB in Ohio; flew in a C130 cargo troop carrier to Arnold where they examined the wind tunnels; toured Brooks AFB in San Antonio, Texas; and finished with a tour of the weapons research center at Eglin AFB in Florida.

Miss Kullman said she was "impressed with the Air Force. I didn't realize the advanced involvement in high technology or the involvement in technology and research."

"I think it's neat for a student to be rewarded for hard work in this way - especially when everyone concentrates on the bad when they should concentrate on something good," she said.



Kim Kullman, one of 13 finalists for the Air Force science award, listens as MSgt. Dale Clements explains testing on a model displayed at the Engine Test Facility at Arnold Air Force Station, Tenn. Miss Kullman and her fellow students toured the Aeropropulsion Systems Test Facility, the Propulsion Wind Tunnel Facility and the von Karman Gas Dynamics Facility. The visit was part of a week-long tour for the science winners. Miss Kullman is from Bellsburg, Tenn.

# ...Goodlark Starts Wing

Continued from Page 1A

pavillion's lobbies and waiting areas down the hill to Mathis Drive.

He added this will mean shutting off the driveway that circles the hospital on the west side.

The new wing will have a service entrance off of Mathis Drive, according to Jones.

Jones said the ground floor of the new wing will house a new purchasing department, laundry and a general services area.

The second floor will be storage for now with sights set for even more expansion in the future.

Jones said the third and fourth floors would house the 32 new patient rooms, designed at this time as private rooms, but consideration is being made into turning some of them into semi-private rooms and shutting down one of the original Goodlark Hospital room wings.

Jones said the rooms in the old East Wing of the original hospital are old and fast

becoming outdated, as well as an increased flow of traffic into the emergency room in that same wing and service offices such as the X-ray department have made patient rooms less practical there.

Jones said if the rooms in the old East Wing were shut down, the beds could be moved to the new wing and some of those rooms made into semi-private.

The administrator cited low reasons for the expansion.

"We're desperately needing the additional general services area," Jones gave as the first reason.

For the second reason, Jones said hospitals "can't always get beds when you want them," meaning getting approval from the state for additional beds.

He said the Commission was ready to approve the beds and the hospital is "looking ahead to the future."

Jones said Goodlark is averaging about 70-75 percent occupancy right now and that by

the time the expansion is completed or soon thereafter, the beds will be needed.

Jones said Goodlark Medical Center is "continuing to grow," pointing out the recent additions of a CT Scan unit, a Cardiac Catheritization unit, Oncology (cancer treatment) and the scheduled addition of an OB-GYN specialist (obstetrics and gynecology).

Jones said Dickson is in an "unusual situation" for a town its size to have a medical facility the size of Goodlark Medical Center and Jackson Clinic.

The hospital has become a regional medical center for persons in many surrounding counties and has even opened "branch clinics" in some areas such as White Bluff, Fairview and Lyles.

"We are trying to offer new services," Jones said, as well as continually expanding to handle the number of patients that travel to Goodlark to see one of the 28 staff doctors.

# THP Continuing Investigation

Continued from Page 1A

Starr said Swanson lost control of the car, veered back into the truck he was passing and bounced off it, across the median and struck a 1984 Lincoln head-on carrying the members of an Arkansas family home from an outing at Opryland.

Swanson and three members of the Arkansas family and a family friend were all killed in the accident.

Two family members, Christie Michelle Henderson, 10, and Lisa Henderson, 31, survived the crash and are still hospitalized with injuries.

Emergency vehicles from the Dickson County Rescue Squad, the Dickson County Ambulance Service and Cheatham County units, as well as the Dickson Fire Department, responded to the scene.

Starr said investigators were

able also to determine that the Henderson car was travelling at approximately 58 mph at the time of the head-on collision.

Starr said the investigation is continuing to determine if Swanson was drinking before the wreck.

Starr said Swanson was convicted last January for driving while intoxicated and as part of his punishment, had his license revoked for one year.

Starr said the car Swanson was driving was not his, but instead was owned by a cousin in Nashville

Starr could not say where Swanson had been before the wreck, but said he was returning to Nashville

Starr said both vehicles had to have passed Highway Patrol

cars within a few miles of the accident site.

Starr said one trooper was issuing a citation about four miles from the wreck, another trooper was within a few miles the other direction and the patrol had a "dummy car" or an empty THP vehicle, parked next to the interstate to slow motorists down, just a few miles from the 172 mile marker, near the accident scene.

Starr said he expects the blood-alcohol test results to be back in about two weeks.

Killed in the wreck were:
Swanson, 36, of Nashville;
John Henderson, 54, of Harrisburg, Ark., the driver of the second car;
Greg Henderson, 21, and his three year old daughter, whose name was not released;
and Florene Wright, 59, of Trumann, Ark., a family friend of the Hendersons.

# ...State To Check Industrial Waste Site On Local Farm

Continued from Page 1A

many years it will take, but it is still spongy and springy."

Earl Lewis said he is concerned that the substance may be toxic and may be poisoning his family.

Spicer said the company produced a sludge containing the metals, but added the substance could be as Schrader officials described it to Joan Lewis.

The substance is in an old road bed about 150 years long and is covered by a thin layer of soil in some places and exposed in other places.

The substance was hauled onto the property in dump trucks about once a week for several months, Earl Lewis said.

Spicer and the former Schrader employee said Schrader has an on-site site in which the sludge was treated.

Virgil Bellar, director of the county's solid waste program, said Schrader dumped sludge at the county landfill until the county ordered Schrader to

cease the dumping about 15 years ago.

He said he does not know where Schrader dumped the sludge after the county denied permission for the company to use the landfill

Heavy metals from Schrader sludge caused problems for the City of Dickson sewage treatment plant until about two years ago when production at the plant was reduced, City Water Department Supervisor Larry Gardner told The Herald

He said Schrader's output of heavy metals was exceeding the ability of the plant's pre-treatment system to remove heavy metals, causing excessive concentrations of heavy metals to come to the treatment plant

Gardner said the heavy metals disturbed the population of organism which "eat" domestic sewage, by making those organisms "sick."

The organism could not effectively "eat" the raw sewage,

causing unacceptable levels of sewage to flow into the East Fork of the Piney River, he said

Former Dickson Mayor J Dan Buckner said the Schrader sewer problems caused a fish kill in the East Fork of the Piney River in 1973

Gardner added Schrader was not acting illegally since no ordinance prevented the company from allowing the heavy

metals into the sewer system at that time.

The City has recently adopted an ordinance, which has been adopted by cities nationwide, which would prevent similar problems in the future he said

Schrader's on-site toxic waste treatment area is monitored by Solid Waste Management, Spicer said, adding no water

pollution has been detected so far.

Bellar and County Executive William Field said Schrader has submitted a "close-out plan" to deal with the toxic waste site

Schrader must continue to monitor ground water to make sure none of the toxic substances leak into the groundwater for 30 years, Spicer said

Solid Waste Management will spot check Schrader's

monitoring during that period, he said.

If some of the substances leak into ground water, Spicer said, Schrader would have to submit a plan to clean it up.

"I couldn't begin to guess how they would do it" Spicer said.

## Briefly

**1965 Reunion**

The Dickson High School Class of 1965 will hold its 20th year reunion on July 20. All classmates who have not received an information letter are encouraged to contact Jackie (Nelson) Clifton at 446-3031 for reunion plans.



*"Something For Everyone"*
THE DICKSON HERALD

THE DICKSON HERALD

(USPS 156-720)

The Dickson Herald is published each Wednesday and Friday at 206 Church Street, Dickson. TN 37055. Phone (615) 446-2811. Second Class postage paid at Dickson, TN 37055.

POSTMASTER: Send address changes to The Dickson Herald, P O Box 687, Dickson, TN 37055.

MAIL SUBSCRIPTION RATES
Dickson County
One Year ............ $13.00
One Year — Senior ...... $11.00
Outside Dickson County
One Year ............ $20.00
One Year — Senior Citizen .. $16.00

Single Copy Price ........ 35 Cents



# GRAND OPENING OF KAREN'S BODY SHOP





# FREE
## CHILD FINGERPRINTING AND IDENTIFICATION








# THE DICKSON HERALD

*"Your Local Hometown Newspaper for 78 Years"*

VOL. 78—No. 73
© The Dickson Herald

Dickson, Tennessee, Friday, July 26, 1985

3 Sections—32 Pages—25 Cents
A Multimedia, Inc., Newspaper

# Second Off-Site Schrader Waste Dump Alleged

**By JOHN HARDING**
Managing Editor

Copyright, 1985
The Dickson Herald

Possibly hazardous waste sludge from the Schrader Automotive Group plant on Schrader Road was dumped on a farm off Old Highway 46, according to a man who says he dumped it and another who "went along for the ride."

The alleged Old Highway 46 site is the second rural Dickson County site possibly hazardous Schrader sludge is alleged to have been dumped about 13 years ago.

And a second contractor has told The Herald he was hired by Schrader to haul the sludge from the Schrader plant to the property of Ivan Lewis, on Rock Church Road near Burns.

The Herald revealed July 12 that a green spongy sludge which

state officials say may contain hazardous heavy metals and cyanide was allegedly dumped on the Lewis property, starting an investigation by the state Solid Waste Management Division.

W.L. Lewis, who worked for a contractor hired by Schrader to haul off and dump the sludge and who hauled it to the property of his brother, Ivan, said Wednesday he also hauled some of the sludge and dumped it on a farm on Old Highway 46.

Ivan Lewis said he was with W.L. Lewis when he hauled one of the dump truck loads of sludge to the Old Highway 46 farm.

W.L. Lewis said he hauled loads of the sludge "several times" to the Old Highway 46 farm, while working for Orland Duke, a contractor who earlier told The Herald his now-defunct company was hired by Schrader to remove the sludge from the Schrader site.

Though a Schrader official said he is "not aware" of Schrader having hauled sludge off its site, two contractors have told The Herald they were hired to haul the sludge and hauled it to the

Lewis farm.

State officials took water samples and a second set of sludge samples from the Lewis property Wednesday.

Glen Erranton told The Herald Wednesday he was hired by Schrader to haul the sludge, and the July 24 Herald quoted Duke as saying his now-defunct company also was contracted to haul and dump the sludge.

Both Duke and Erranton say they or their employees hauled the sludge to the Lewis property.

According to a realtor who is listing the Old Highway 46 farm on which W.L. Lewis says he dumped Schrader sludge, the 95-acre farm is currently owned by Jim Jones.

The realtor said she lists the address of the farm, located across fromthe Diversified Printing Corporation plant on Old Highway 46, as Old Adcock Cemetery Road.

Continued on Page 2A

## Asbestos Removal
## Contractor Predicts No Problems

**By GAIL PRUITT**
Staff Writer

"We have done numerous asbestos jobs, and we haven't had a problem yet," was the reply of All Gulf Contractors Project Manager Robert Pettie when asked about the safety of removing asbestos from county schools.

All Gulf Contractors, of Mobile, Ala., was awarded the asbestos removal job last week by the school board.

Pettie, who has been involved in asbestos removal for the past two years, said, "We have completed several projects, and all of our men are well experienced at removing asbestos."

Pettie said he completed a 1-week Supervision of Asbestos Abatement course at the Georgia Institute of Technology. "It covers removal and safety procedures from A to Z - from looking forsurveying to removing it (asbestos)," Pettie said.

All supervisory personnel have been through the Georgia Tech course, and all other workers involved in the removal process have been through a 3-day course taught by the Alabama Department of Environmental Management, which stresses the hazards and safety measures

linked with asbestos and its removal, Pettie said.

"We teach them how to remove it," Pettie added.

Pettie said a crew of about 12 men, with one job supervisor, should begin removing asbestos simultaneously from Dickson Junior High School and Dickson County Senior High School Saturday or Sunday, which should take about a week.

Six or seven local workers are also being recruited by the company, who has 35 days, including weekend days, to complete the job before a $400-a-day penalty ensues.

The local workers will be kept out of the asbestos removal as much as possible, Pettie said. They will mainly be hired for "prep" work, such as setting up scaffolding and putting up protective plastic, Pettie said.

But anyone interested must first complete a 1-day training course and pass a written exam, Pettie said.

Pettie said the actual removal is not like a big "snowstorm." "We keep fibers down to a minimum when we're removing."

Pettie said the material is wet with an oil put in water, scraped off, and wet again.

Continued on Page 2A

## New Cinema Delayed For Changes

**By CHRIS NORMAN**
Associate Editor

Dickson contractor Dan Gordon says new state regulations have forced him to temporarily halt construction on Colonial Cinema III, a new triple theater planned for Dickson.

Gordon said Thursday that he is having to "revise plans" to meet new fire codes that have just recently gone into effect in Tennessee.

Gordon said the regulations govern any building that has a capacity of more than 300 people and his proposed theater falls into that category since it will hold over 400 people including employees.

Gordon said his architect in Memphis is working on revisions to the plans to meet the new state requirements which Gordon said concern fire walls and alarms and similar things.

Gordon announced earlier this year plans to build the new triple cinema on a lot on Highway 70 East, between Colonial Village and Mary's Music.

Gordon said the project would include three theaters which would all run different movies each week.

Gordon, owner of Universal Contractors in Dickson, said he had obtained the services of Nashville newsman Chris Clark as a consultant for the theaters' operations.

Clark, anchor for WTVF, Channel 5, runs a theater consulting firm which includes several Nashville theaters.

Gordon said Colonial Cinema III would show popular movies at the same times they were being shown in Nashville.

The theater was originally planned to be completed for a September 1 opening, but Gordon says the revisions forced by the new codes will delay the opening until an as yet unknown date.

Gordon said work has been temporarily halted on the site where some foundation work has already been done.

## Dickson Water Supply Holding Up For Now

**By CHRIS NORMAN**
Associate Editor

Recent weeks' hot weather and lack of rainfall has greatly increased the demand on the city of Dickson's water supply, but Superintendent Larry Gardner says the supply is holding up for now.

Gardner cautions, however, that without significant rainfall between now and September, the city could face serious water trouble.

"We have been running more (water)," Gardner said Wednesday.

Gardner said the small rain showers the city has experienced in



ABOVE: Map shows locations of dump sites. X number one shows the approximate location of the rural Lewis farm dump site. X number two shows the location of the alleged Old Highway 46 dump site. The red dot indicates the location of the Schrader plant. BELOW: (left to right) Ivan Lewis paces as James Stokel and Bill Krisle of the state Solid Waste Management Division take samples from a well on the Lewis property. Allen Kistin a SWMD chemist is inside the well.

## New Kentucky Fried Chicken Opens




Page 2A - The Dickson Herald, Dickson, Tenn.    Friday, July 26, 1985

## ...Second Off-Site Dump



### Waste Dump Sites

ABOVE: Ivan Lewis shows the site on the farm off Old Highway 46 where he and his brother say his brother dumped waste sludge from Schrader. Inset shows a view of the Adcock Cemetery Road, off of which they say the sludge was dumped. Below: Solid Waste Management chemist Ellen Klahn collects a sample of waste from the Ivan Lewis farm Wednesday.



THE
# SIDEWALK
# SALE
THAT WILL SELL YOU ON
# DOWNTOWN
# DICKSON
JULY 26 & 27
FRIDAY & SATURDAY

# DICKSON COUNTY ELECTION

# COMMISSION

## COURT HOUSE ANNEX

## CHARLOTTE, TENNESSEE 37036

### ELECTION COMMISSION HOURS
### AND DATES ANNOUNCED

The Dickson County Election Commission will be located on the lower level of the Municipal Building in Dickson, on Monday, Wednesday, and Friday during the period beginning Friday, August 2, through Friday, August 23, for registration or changes in registration. The deadline for registration for the Dickson City election is August 28.

The qualifying deadline for candidates for this election is 12 o'clock noon Saturday, August 17.

Absentees by Personal Appearance will be September 6, through September 21. September 9 through September 20, the office will be located in the Municipal Building on Monday, Wednesday and Friday during this period for Absentee Voting. Applications for voting by mail must be received by September 19.

The Election Office is located in the Courthouse Annex in Charlotte. The office is open on Monday,

Highway 47.

...[Dickson]... said the girl's brother, Linda R. England stated she sent Amber and her 10-year-old brother out to the end of their driveway on Highway 47 to wait for the bus.

Dickson said Mrs. England wanted the children "don't get close to the road and don't cross it until the bus stops," at they headed out of the house.

(Continued on Page 3A)



...England site on Santa's lap during a Christmas shopping spree sponsored by The Dickson Herald and Diversified Printing...    ...in this file photo from last December. Amber was struck by a car Thursday morning while waiting for her school bus.

## State Lab Report:

# Schrader Yellow Creek Dump Has Hazardous Heavy Metals

By JOHN HARDING
Managing Editor

Copyright 1992
The Dickson Herald

Recently completed laboratory tests of sludge allegedly dumped by Schrader Automotive Group contractors on the bank at Yellow Creek contain high levels of lead, chromium and nickle, state officials said Wednesday.

And Schrader officials have met twice with state Solid Waste Management Division officials to discuss a request from the state that Schrader clean up the sites, SWMD officials said.

The Yellow Creek site, one of four Dickson County sites identified by The Dickson Herald at which toxic sludge was allegedly dumped by Schrader about 15 years ago, is located where the creek intersects Walnut Grove Road.

The SWMD laboratory also reported even higher levels of lead, chromium, and nickle in sludge samples taken from the property of Ivan Jason Lewis, Rock Church Road, officials said.

In both cases, the levels are high enough to warrant further testing to determine how much of the heavy metals could leech out into ground water, Ellen Klahn, a SWMD chemist said.

Heavy metals in water can cause serious health problems if ingested in sufficient quantities, Ms. Klahn said.

Though the Dickson Herald has reported that former Schrader contractors have said they dumped Schrader sludge in rural Dickson County, Schrader officials did not make any admissions during meetings with SWMD officials concerning the dumping of the sludge, James Spicer, a SWMD environmental engineer, said.

"We showed them the sites on the map," Spicer said. "They said they would get back with us."

SWMD officials have turned over to Schrader samples taken at the sites and provided other information to Schrader during the meetings, he said.

Spicer said Schrader officials, accompanied by Charles Perry, an Atlanta attorney, reported during a Tuesday meeting with SWMD officials that they had inspected the sites.

Continued on Page 3A



The late & witfull James Junior High School  Westcott, Kellis Marsh, Amy May; CENTER: cheerleaders stand ready to cheer the Cobras.  Lonae Vaughter, Tammy Whitfield; TOP: Pictured are: BOTTOM ROW (l-r) Angela  Jennifer Pyle.

# Triple Cinema Construction May Begin Next Week: Owner

By CHRIS NORMAN
Associate Editor

Construction on Dickson's proposed new triple cinema may resume next week, according to the projects financier, now that some problems have been worked out.

Dan Gordon, owner and president of Universal Builders, Inc., said Wednesday that most of the problems created by new state regulations that went into effect last month have been worked out and work should begin again on the Highway 70 East site of Colonial Cinema III, between Colonial Village and Mary's Music.

Gordon said the delayed theater project is going ahead despite a Chapter 11 reorganization his company is going through at this time.

In a prepared statement issued Wednesday, Gordon said Universal Builders, his local construction firm which does business in middle Tennessee and southern Kentucky, will remain in business and continue to represent Butler Manufacturing Company in the sales of pre-engineered steel buildings while undergoing the reorganization.

Gordon said the reorganization "became necessary when the firm was unable to collect "over $700,000 in current receivables on projects which the corporation had completed for various branches of the U.S. Govern-

Continued on Page 3A

# County 4-H'ers Return From Stay In Japan

By GAIL PRUITT
Staff Writer

Ask two Dickson County kids if they have any friends by the name of Junichi and Yukiko, and they'll say "sure."

Chuck Redden and Jennifer Pyle recently returned from a month's stay in Japan.

They were two of 25 4-H'ers across Tennessee who joined in the exchange venture.

They were flown to Tokyo and then separated. Each

Chuck said there were some right wing protestors which had to be subdued by police, but all in all the ceremony was an even he'll always remember, especially when they released several doves as a peace symbol.

Chuck was so busy touring the city with his friend he had little time to be homesick.

But Jennifer, on the other hand, was in a little different situation. Her best mother could not speak English, and Yukiko was part of a brass band and had to practice her music at a special school seven days a week from 7 a.m. to 7 p.m.

Thus, Jennifer admitted she was homesick at first. "The first week I was there I was

Continued on Page 3A



# Man Killed In Accident

A Dickson man was killed early Wednesday morning when his car left Jones Creek Road and hit a bridge, according to Highway Patrolman Gerald Bomba.

Kevin D. Smith, 21, of Route 6, Dickson, was dead on the scene, after his 1976 Datsun 280 Z left Jones Creek Road "for an unknown reason" and struck Jones Creek Bridge, Wednesday, at 5:30 a.m., according to Trooper Bomba.

Bomba said there were no skid marks on the road, and speculated that the man may have been tired. There was heavy ground fog in the area, which may also have been a contributing factor, Bomba said.

There were no witnesses to the accident, Bomba said.

Funeral services will be held at Taylor Funeral Home Chapel today at 2 p.m., with Dr. Don McCoy officiating.

Burial will be in Dickson Union Cemetery.

Smith was a native of Dickson County and the son of James and Bernadine Smith of Dickson.

Smith was an employee of Wal-Mart in Dickson and a member

# Girl Struck By Car While Awaiting Bus

**Continued from Page 1A**

Donaldson said statements from Mrs. England show that she looked out of the window a few minutes later and saw Amber had crossed the highway safe for the bus.

"Mrs. England told police she told her daughter to stay where she was and ran out of the house after her

Mrs. England indicated that about the time the girl got halfway across the front yard, the little girl attempted to cross the road again.

Donaldson said another witness indicated the girl waited for a west-bound car to pass then ran into the road where she was struck by the east-bound car driven by Barbara Easley, High Street, Dickson, a Burns Elementary teacher.

Donaldson said the girl was apparently struck by the right front grill of the car, then went over the hood and landed head first on the right shoulder of the road.

Donaldson said at this time, witnesses indicate there was not much Mrs. Easley could do to avoid the accident.

Mrs. Easley's statements to Donaldson show she saw the little girl on the side of the road and watched her as she first started to cross the road and then stopped for the west-bound car.

But after it passed, Mrs. Easley told Donaldson, the girl ran back across the road.

Donaldson said Mrs. Easley locked up her brakes, evidenced by a set of skid marks, and apparently swerved to the left, but was still unable to avoid the accident.

England was taken to Goodlark and a spokesperson in Dr. Butch Bell's office said a CT scan was being run on the girl's brain to ascertain the extent of the head injuries.

Later yesterday morning, a Dickson County Ambulance Service official said Amber was taken to Vanderbilt Hospital in emergency traffic just before presstime.

Results of the tests at Goodlark or the girl's condition were not available by the Dickson Herald's deadline.

Dickson Herald also report a near miss on Hummingbird Lane Tuesday where another child was almost hit while waiting for a school bus.

Police urge all motorists as well as the parents of the children waiting for buses to use extreme caution during the morning and afternoon times that buses are running.

Police ask that parents make sure their children know the rules of safety and have a safe place to wait for the buses away from the road.

# ...Schrader Yellow Creek Dump

**Continued from Page 1A**

Spicer said earlier that the state can ask Schrader to clean up the sites or that state Superfund officials can clean up the sites and bill Schrader for double the cost.

The four sites identified by The Dickson Herald are:

- the Lewis property near Burns;

- a site off Old Adcock Cemetery Road near the Diversified Printing Corporation plant;

- the Yellow Creek site;

The Yellow Creek sludge is very similar in appearance to sludge found at the other three sites and contains high levels of the same potentially toxic heavy metals.

# ...Triple Cinema Construction

**Continued from Page 1A**

ment at Fort Campbell, Kentucky, Monteagle, Hohenwald and Old Hickory Lake in Hendersonville, Tennessee."

Gordon explained that "the Government refused to pay Universal when the projects were completed and accepted due to a takeover attempt by the insurance company which provided bonding on the projects."

The statement says Universal has won the rights through the Federal Court to continue operations and receive payment of the $700,000 in contract funds due the firm."

"The $700,000 was to be the final payments on eight contracts on which construction has been completed and accepted. The contracts totaled more than $4½ million and were all government funded projects," Gordon said.

The builder said Universal Builders is being kept in operation with his own funds "until the government red tape can be cut through and the $700,000 in outstanding receivables collected."

Gordon said the reorganization will in no way affect the construction of Colonial Cinema III, the triple theater he announced he would build earlier this year after Dickson's lone theater closed down.

Gordon said he made the announcement about the reorganization "in order to clear up rumors that Universal Builders is bankrupt."

Gordon states that the firm is solvent and now has over $1,000,000 of new work in progress.

Gordon said he hopes to resume work on the theater next week and still is under contract with the Nashville theater consulting firm of WTVF news anchor Chris Clark.

**THE DICKSON HERALD**
(USPS 156-720)

The Dickson Herald is published each Wednesday and Friday at 106 Church Street, Dickson, TN. 37055. Phone (615) 446-2811. Second Class postage paid at Dickson, TN. 37055.

POSTMASTER: Send address changes to The Dickson Herald, P.O. Box 587, Dickson, TN. 37055.

MAIL SUBSCRIPTION RATES
Dickson County

| | |
|---|---|
| One Year | $13.00 |
| One Year Senior Citizens | $11.00 |
| Outside Dickson County | |
| One Year | $20.00 |
| One Year Senior Citizens | $18.00 |
| Single Copy Price | 25 Cents |

# ...County 4-H'er's

**Continued from Page 1A**

tremendously homesick."

Jennifer said she would cry herself to sleep at night as well as during afternoon naps.

But Jennifer adjusted only forgetting a few times the Japanese custom of removing her shoes before she entered her host family's house.

In fact, both Jennifer and Chuck said their Japanese friends expressed sympathy to them for having such dirty carpets.

"No, we have vacuum

But one admirable distinction about the Japanese people, Chuck and Jennifer agreed upon was their generosity. Jennifer said if a person admires anything, even if it is a treasured item, a Japanese person will insist upon giving it to him.

It was hard to say goodbye, Chuck and Jennifer remembered. Jennifer said she was sitting down writing in her diary towards the end and contemplated whether she wanted to stay or go. She finally decided she wanted to load her family on the plane



# First Sec
# will b
# Monday S
# in obse
# Labo




**MAIN OFFICE**

# 446-9091

200 Henslee Dr.



**YOU CAN'T DO BETTER**

Kmart

the Sav



| CANDIDATE | SOCCER | POT PLAN |
|---|---|---|
| Announces *Page 3-A* | League Forming *Page 3-B* | Busted Near 48-S |

# THE DICKSON HERAL

*"Your Local Hometown Newspaper for 78 Years"*

VOL. 78—No. 74
© The Dickson Herald

Dickson, Tennessee, Wednesday, July 31, 1985

2 Sections
A Multime...

# Two More Off-Site Schrader Dumps Alle

## State Now Investigating Four Sites

By JOHN HARDING
and CHRIS NORMAN

Copyright 1985
The Dickson Herald

Two more sites at which possibly hazardous waste produced by Schrader Automotive Group, may have been dumped in rural Dickson County have been located by The Herald.

One of the sites is on the banks of Yellow Creek and another is off Fanny Branch Road.

State Solid Waste Management Division officials announced they will investigate all of the alleged sites found by The Herald as part of its investigation into toxic waste produced by Schrader.

The first site, already under investigation by SWMD, is on the property of Ivan Lewis, near Burns.

The second site is off Adcock Cemetery Road.

The third alleged site is next to Walnut Grove Road where the state Department of Transportation is curently building a bridge over Yellow Creek.

The fourth site is on the Fanny Branch Road property of Glenn Erranton, a contractor hired by Schrader to remove and dispose of the possibly hazardous sludge.

Erranton said Tuesday that he began dumping the sludge on his Fanny Branch Road farm after Schrader asked him to begin burying the sludge.

He said Schrader officials requested the sludge be buried, which Erranton said he wasn't equipped to do, so he said he dumped the sludge on his farm and buried it there until his contract ran out.

Erranton said he did not remember dumping any of the sludge on the bank of Yellow Creek, which is about a mile from his home.

"I don't think I dumped that there - I don't remember that," Erranton said.

Erranton said he does not know who Schrader contracted to dispose of the sludge after his contract expired.

Residents of the Walnut Grove area say dump trucks dumped a green, jelly-like substance on the bank of Yellow Creek about 15 years ago.

State Solid Waste Management Division officials have taken several water and soil samples from the Lewis property and from a neighbor's property near Burns and are testing them for toxic heavy metals and cyanide after The Herald revealed July 12 that Lewis alleges Schrader sludge was dumped on his property.

The substance at Yellow Creek is very similar in appearance to that which is dumped on the Lewis property.

A Schrader Vice-President, Kevin Nameth, has told The Herald he is "not aware" of Schrader

Continued on Page 2A



Close-up photo shows a patch of the green, spongy substance on the bank of Yellow Creek where Walnut Grove Road crosses it. The substance is very similar in ... substance on the property of ... investigation by the state.

# Saturn Plant May Mean More Jobs In Dicks

## County Officials Begin Search



Hig
Pro
Na
Dis

By CHRI...



# ...Two More Off-Site Schrader Waste Dumps Alleged

Continued from Page 1A

having dumped any of its sludge on private property.

However, Erranton and another local contractor have told The Herald they were hired to remove sludge from Schrader Road.

The other contractor who hauled sludge from Schrader is Orland Duke. W.L. Lewis, a former Duke employee and brother of Ivan Lewis, said he dumped Schrader sludge on the Old Adcock Cemetary Road site. Ivan Lewis, who "went along for the ride" with his brother also said sludge was dumped on the Old Adcock Cemetary Road site.

A person who owns land near the Old Adcock Cemetery Road site told The Herald he after seeing Friday's story she remembers seeing the sludge, and added it was bulldozed over some years ago.

Glenn Kimbro, whose house on Walnut Grove Road is within sight of the alleged Yellow Creek dump, said the sludge was quite visible when he moved to the property in 1972.

"It was spongy and like Jello," Kimbro said. "It was green and other colors.

Though some of the sludge has been bulldozed over by state DOT crews constructing the bridge and is partially covered by decayed leaves, patches of it are still visible.

Kimbro said a horse being ridden along the creek bank sank "up to his belly" into the substance a few years ago.

Charles Smith, who currently owns the property on Yellow Creek on which the substance was dumped, said the green substance was on the property and clearly visible when he purchased the property from Edgar Underhill about 15 years ago.

Area residents told The Herald it is generally believed in the Walnut Grove area that the green substance came from Schrader.

However, neither Erranton, who lives near the Yellow Creek site, nor Duke have said they dumped the sludge at the Yellow Creek site.

State officials say Schrader produced a green, jelly-like sludge which contains cyanide, lead, zinc, tin, chromium, nickle, copper and cadmium.

Any of those substances can he hazardous to human health

if ingested in sufficient quantities, experts say, and the U.S. EPA has classified the Schrader sludge as hazardous.

Heavy metals build up in human tissue and can attack the central nervous system and various organs, experts say.

The danger in the substances being dumped, according to Solid Waste Management Division geologist Bill Krispin, is that they can "leach out" into ground water and be consumed as drinking water.

Also, the substances can enter the food chain if contaminated water is absorbed by plants, he said.

Schrader opened its Dickson County plant in 1964 and closed it down in March of this year.

The plant was financed with county-issued industrial development bonds.

Schrader continues to rent the property from the county and under the terms of its contract can buy the building for resale if the buyer provides jobs.

Schrader would have to pay the county $225,000 and and Hart Corporation, an industrial real estate company

representing Schrader, is asking $3.5 million for the building and grounds.

The company has an onsite, legal hazardous waste disposal site and is working with the U.S. Environmental Protection Agency to finalize a close-out plan for the disposal site, Nameth said.

Michael Park, a Hart representative, said he is "impressed with the extent to which they (Schrader) are

going" to clean up the site at the plant.

He said Schrader is going "to great lengths" to work with the U.S. EPA and is "spending a great deal of money" on the on-site cleanup.

He also said he did not think allegations of off-site dumping would adversely affect efforts to sell the building for Schrader.





Dickson County Se
High School Sea
Football tickets wi
on sale Aug. 1-Aug
$10.00 per ticke



**Seated- Tom Loose-Branch Manager**

Left to Right: Steve Nicholson-Loan Officer, Diane Baker-Office Asst., Betty Forkum-Clerical Supervisor, Jim Smith-Loan Officer

Come in and talk with people who understand the business of farm finances. People who are as dedicated to agriculture as you are. People who can provide the right balance of short, intermediate and



# Save big lira
# on your next Priazzo

In Italy, there's a pie with two light, tasty crusts filled with delicious pizza toppings and smothered in rich, zesty sauce and melted cheeses. You really ought to try it.

Round-trip tickets to Italy are unnecessary and far too expensive. Just visit your Pizza Hut® restaurant and order our Priazzo™ Italian pie.

And take the coupon you see here to your participating Pizza Hut® restaurant. You'll save a few lira. And after all, a lira saved is a lira earned.

**Highway 46, Mathis Dr. Dickson**

**446-9019**

Pizza Hut®
© 1985 Pizza Hut, Inc.



$3.00 OFF LARGE
Priazzo™ Italian Pie
$2.00 OFF Medium Priazzo™
$1.00 OFF Small Priazzo™

One coupon per party per visit at participating
Pizza Hut® restaurants. Not valid in
combination with any other offer.
August 14, 1985

Priazzo is a trademark of
Pizza Hut, Inc. © 1985
Pizza Hut, Inc.
1/20¢ cash redemp-
tion value.

**Gross Or Glorious - Jimmy Brown** Page 6-A

**Ponytails Win State - Sports** Page 2-B

**Piney Project: Pro And Con - Letter To The Editor** Page 6-A

# THE DICKSON HERALD

*Your Local Hometown Newspaper for 78 Years*

Dickson, Tennessee, Friday, August 2, 1985

3 Sections—28 Pages—25 Cents
A Multimedia, Inc., Newspaper

---

*Former CES Principal*

## Gray Files EEOC Complaint, Claims Sex Discrimination

**GAIL PRUITT**
*Staff Writer*
*Copyright, 1985*
*The Dickson Herald*



*Virginia Gray*

The Herald has learned that transferred Charlotte Elementary School Principal Virginia Gray has filed with the Equal Employment Opportunity Commission a complaint against the Dickson County Board of Education claiming sexual and age discrimination.

The board unanimously voted to transfer Gray May 9 "for the more efficient operation" of Charlotte Elementary School, which time Gray filed a grievance against the board. Gray was later dropped.

County Attorney Allan Kerns, who filed the complaint with the EEOC's state office in Nashville July 17, in which Gray discriminated against because she is a female and age 45. Kerns also said Gray alleges in her complaint that there have

to make supportable allegations.

"She has always said before it was politically motivated, now she is saying is was sexually (motivated)."

Kerns also said there are several allegations in the complaint which do not seem to have anything to do with age or sex.

Kerns said EEOC will review the complaint, and based upon their decision, a hearing could occur.

Kerns added he feels there will be a hearing.

In the meantime, Dickson County School Superintendent Noah Daniel said he plans to meet with Kerns today and draft a reply to the complaint, which Kerns said will be sent to the EEOC in the next couple of weeks.

In response to Gray's allegations, Daniel said, "We're going to stick with the same old story - more efficient operation of the school."

"male principles who have had problems at their schools who have never received any complaints or reprimands."

"It is our position that there has been no discrimination," Kerns said on behalf of the school board. Kerns said Gray's complaint "does not even begin

*Continued on Page 2A*

## Council Candidate Says Job Won't Cause Pay Conflict

**By JOHN HARDING**
*Managing Editor*

A candidate for the Dickson City Council says he will not create a possible conflict of interest with his job as a volunteer fireman if elected because he will not accept pay for the part-time job.

In a statement released Thursday, Ken Greene, candidate for the 1st Ward council seat in the upcoming municipal election, said he will avoid any possible conflict by not accepting pay, but would continue to be a volunteer fireman.

Greene's statement says, "A question has been

raised on whether I could be serving (as a councilman) for the Dickson City Council while being a paid on call fireman for the city fire department."

"I want to state at this time that if I am successful in my campaign for the council, I will at that time forego my compensation as a firefighter while a councilman."

"I will continue volunteering my firefighting services to the citizens of Dickson."

Greene said questions were raised about the legality of his serving on a governing body that is charged with the responsibility of setting his pay as a part-time city employee.

*Continued on Page 2A*

## Nashville Man Dies At Park

A Nashville man was found dead in the swimming pool at Montgomery Bell State Park Wednesday morning and officials speculate he may have

The investigator said a fellow state employee attending the seminar found Hall in the pool.

Starkey said Hall had apparently gone out for an early

autopsy, and one was not performed.

Starkey said County Medical Examiner Dr. W.A. Bell believes Hall may have suffered the

---



## Mobile Home

Workers with House Mover of Indian Mound, Tennessee, give new meaning to mobile home as they move this house Wednesday. The home was sold by the city to Mac Adams who had it moved to a site on Highway 47 near the fairgrounds.

---

*Requests Herald Series*

## Federal Agency Considering Studying Waste Dumps Here

**By JOHN HARDING**
*Managing Editor*

The U.S. Geological Survey, a federal agency, has requested copies of The Dickson Herald's stories regarding alleged hazardous waste dumping in Dickson County.

Michael Bradley, a USGS hydrologist, said the agency, which studies ground and underground water conditions, requested copies of the stories to see "if we (USGS personnel) need to get involved" in an investigation of alleged Schrader

Automotive Group waste dumping around Dickson County.

He also said the agency may be asked to aid in the investigation by the state Solid Waste Management Division of the Department of Health and Environment, the state agency investigating the alleged dumping revealed in The Dickson Herald.

"We are gathering background information now," Bradley said. "We want to see if we need to get involved."

*Continued on Page 3-A*

## Vet: Abandoned Animals A Major Problem In County

**By GAIL PRUITT**
*Staff Writer*



They are the innocent victims of human disregard...

The dumping or "dropping" of unwanted animals is continuing to be a "major" problem in Dickson County which continues to

Page 3A—The Dickson Herald, Dickson, Tenn.

Friday, August 7, 19__

# ...Federal Agency Considers

**Continued from Page 1A**

He said The Herald's stories indicate dumping of sludge may have been widespread, adding the substances which may be in the sludge would "cause problems because they are toxic."

USGS has conducted extensive surveys of Dickson County water patterns in the past, he said.

The Solid Waste Management Division is currently investigating four rural Dickson County sites identified by The Dickson Herald at which possibly hazardous sludge was allegedly dumped by Schrader contractors.

SWMD is testing water and sludge samples to determine if the sludge contains toxic heavy metals and cyanide which could leach out into ground water and be consumed as drinking water from wells.

Numerous Dickson County families who live near each of the four sites at which sludge was dumped consume well water and some families drew water directly from Yellow Creek, a site at which sludge was dumped on the bank of the creek.

Ingesting heavy metals above specific limits can be hazardous to human health, experts say.

Former Schrader contractors or their employees have alleged three sites at which the sludge was dumped about 15 years ago.

Those sites are:
* the property of Ivan Lewis on Rock Church Road near Burns;
* a site off Adcock Cemetery Road off Old Highway 46;
* and the Fanny Branch Road farm of Glenn Erranton, a former Schrader contractor who says he dumped Schrader sludge on his property.

The Herald located another possible site on the bank of Yellow Creek at which trace of Walnut Grove Road. The sludge on the bank of Yellow Creek is very similar in appearance to that which is on the Lewis property and a former Schrader training, and a Dickson City official said they believe the substance is sludge from Schrader.

The contractors, however, have not said they dumped any of the sludge at Yellow Creek.

Schrader closed down its Schrader Road plant this year after 21 years of operation.

The company is currently trying to sell its building for $1.5 million, $225,000 of which would have to be paid to the county.

Schrader officials say they are working with the U.S. Environmental Protection Agency to clean up a legal, permitted onsite toxic waste disposal area.



# Yellow Creek Sludge

Photo shows the site where a green spongy substance which area residents say may have be

sludge produced by Schrader was dumped on the bank of Yellow Creek. The substance

was found to the right of the bridge.

# ...Abandoned Pets

**Continued from Page 1-A**

any more animals in and said she has made nine trips in eight weeks to the Clarksville pound with kittens which were dropped near her home.

Whitmire said every Monday a new animal turns up. Presently there are two yellow kittens living in the woods across the road from her house.

They peer in fear from their dirt bed, scarcely hidden behind their security blanket of leaves.

Whitmire feeds them and can only coax one close enough to her to catch. Thus, Whitmire will not take one without the other and fears the pitiful pair will venture into the road and get hit by a car or fall prey to a dog pack known to make vicious neighborhood visits.

Neither Dr. Carroll nor Mrs.

Whitmire sees any immediate solution to the problem.

"It's like telling people to stop littering," Dr. Carroll said. People leave them at a dumpster and drive away, practicing the old cliche - "Out of sight, out of mind," Carroll added.

"Dickson is going to have to do something if they continue to grow," Carroll said. Both Carroll and Whitmire agreed that an animal shelter is the only solution.

Whitmire said the city does have a pound for stray dogs picked up withing the city limits and keeps them for a few days and then destroys them.

"I have thought about offering a reward for the arrest and conviction of these people," Whitmire said, but agreed with her husband she would go broke

paying the reward money.

Whitmire said there is a federal law against the dumping of animals which entails a maximum fine of $500 and 11 months and 29 days in jail. Most of the time, she said, the sentence is a $50 fine and 30 days suspended, which Whitmire said, "is a slap on the wrist."

Whitmire and Carroll urge people to stop dropping their animals and consider the consequences. Rabies and animal diseases can be spread by stray animals to someone's beloved pet, Carroll said.

Whitmire said she is tired of people dumping their problems on her porch, but refuses to ignore the problem and continues to fight what seems like a lost cause to most people and the only hope for the animals.

# ...Council Candidate Says

**Continued from Page 1-A**

Greene works for Avco Aerostructures in Nashville and is a lieutenant with the Dickson Fire Department in charge of the volunteer forces.

Greene said he had checked with the Dickson County Election Commission which told him there was no conflict in his candidacy, but he said after checking with Dickson Mayor Tom Waychoff, Fire Chief Clayton Brazzell and other people, he decided to go ahead and make a statement concerning what some may term a conflict of interest.

Greene is seeking the seat currently held by Clarence Dunagan, who was appointed to fill the seat vacated by Waychoff

when he was elected Mayor in 1983.

Dunagan said at that time and has re-affirmed recently that he will not seek election to the seat, but was merely finishing the unexpired term.

Greene is opposed at this point by Mrs. Edna Johnson who has filed qualifying papers also in the first ward.

A council seat from each of the four wards as well as the Mayor's office will be on the September 26 ballot as well as a referendum on changing the term of office for the Mayor from two to four years.

Waychoff is the only announced candidate for the Mayor's race.

Second ward councilman David Shepard has filed his

qualifying petition, but has yet to officially announce his candidacy.

No one else has filed in the second ward.

Third ward incumbent Bill Gilmore has announced his bid for re-election and is opposed by Eddie Ray Burch, who has yet to announce.

Fourth ward incumbent Robert Blue has not yet filed for reelection or announced, but has indicated he will seek another four year term.

Kenneth Edmisson and Danny Tidwell have announced their candidacy in the fourth ward.

The deadline for candidates to file their qualifying petitions is noon, Saturday, August 17.

# ...Gray Files Complaint

**Continued from Page 1A**

When asked about Gray's complaint, an EEOC spokesman said EEOC does not acknowledge whether or not a complaint has been filed.

After Gray's involuntary transfer in May, she filed a grievance against the action to Daniel.

But Gray failed to complete the

grievance procedure when she filed her grievance to the Dickson County Education Association one day past the deadline.

Gray then applied for her old job as CES principal in June, at which time the board voted to

approve Daniel's recommendation, Wesley Freeman, former Oakmont Elementary School physical education teacher, for the job.

Gray was transferred to a remedial reading position at Dickson Junior High School.

Gray could not be reached for comment.

# Charges Dropped

# USGS Water Study Is Made Available

On August 25,1984, the U.S. Geological Survey, Department of the Interior, conducted a seepage investigation on segments of the Piney River, East and West Piney Rivers, and principal tributaries in Dickson and Hickman Counties, central Tennessee.

Base-flow discharge measurements were made at 44 pre-selected stream sites to define base-flow characteristics of the streams. These measurements, along with additional base-flow measurements and analyses at seven of the sites on the main stems of the rivers, were used to construct base-flow profiles of the August 28 discharges and the estimated 3-day minimum discharge with a 20-year recurrence interval, a severe drought condition.

The report "Base-flow Characteristics of Segments of the Piney River and East and West Piney Rivers, Dickson and Hickman Counties, Tennessee" by V. Jeff May was released as U.S. Geological Survey Open-File Report 85-155. It was prepared in cooperation with the city of Dickson and the Tennessee Department of Health and Environment, Division of Water Management.

The report contains discharge data, base-flow profiles and data and analyses of 68 years of continuous discharge record for the Survey's gaging station at Vernon, Tennessee, at the downstream limit of the study. These data and analyses can be used by water managers to determine the water available during drought conditions in the Piney River, East and West Piney Rivers, and principal tributaries within the study area.

Copies of the report are available for inspection at the U.S. Geological Survey, A-413 Federal Building-U.S. Courthouse, Nashville, Tennessee 37203 or may be purchased from the Open-File Service Section, Western Distribution Branch, U.S. Geological Survey, Box 25425, Federal Center Lakewood, Colorado 80225.



Dickson County Senior High School Season Football tickets will be on sale Aug. 1-Aug. 30 at $10.00 per ticket.

# DOWNTOWN SURVEY

We are conducting this survey as part of Dickson's participation in the promotion of downtown. Your answers will help us in developing recommendations for improvements to Downtown Dickson. Thank you for your time. Do Not Sign Your Name.

What kinds of businesses do you regularly patronize downtown? (circle all applicable)
1 Groceries
2 Clothing and Accessories
3 Home Furnishings/appliances
4 Drug Store
5 Restaurants
6 Bank
7 Hardware
8 Professional Services
9 Post Office
10 Other (specify)

How important is patronizing downtown businesses to you? (Circle one)
1 Very Important
2 Somewhat Important
3 Important
4 Not very Important
5 Doesn't Matter

How would you rate the downtown area for the following? (circle your answer)
a. Attractiveness .................... Good Fair Poor Don't Know
b. Number of eating places .............. Good Fair Poor Don't Know
c. Cleanliness of streets and sidewalks .... Good Fair Poor Don't Know
d. Comfortable places to sit outside ...... Good Fair Poor Don't Know
e. Number of convenient parking spaces .. Good Fair Poor Don't Know
f. Convenience of shopping hours ....... Good Fair Poor Don't Know
g. Friendliness of sales people ......... Good Fair Poor Don't Know
h. Safety during the evening .......... Good Fair Poor Don't Know
i. Number of events, festivals, and
    special downtown promotions....... Good Fair Poor Don't Know
j. Variety of goods sold ............. Good Fair Poor Don't Know
k. Cost of goods sold .............. Good Fair Poor Don't Know
l. Quality of goods sold ............ Good Fair Poor Don't Know
m. Smoothness of traffic flow ......... Good Fair Poor Don't Know
When you think of downtown, what business, building, or landmark first comes to mind?

You can afford
SATELLITE TV

# THE DICKSON HERALD

*"Your Local Hometown Newspaper for 78 Years"*

VOL. 78—No. 71
© The Dickson Herald

Dickson, Tennessee, Friday, July 19, 1985

3 Sections—28 Pages—25 Cents
A Multimedia, Inc., Newspaper

*Alleged Schrader Dump*

## State Testing Soil, Water From Local Farm

**By JOHN HARDING**
Managing Editor

Copyright, 1985
The Dickson Herald

State officials Wednesday took samples for laboratory testing of a possibly toxic material allegedly dumped by the Dickson Schrader plant on the Ivan Lewis' property near Burns and said they will test well water on the property next week.

And Schrader officials contacted state Solid Waste Management Division, which is investigating the dump site, before Wednesday and requested that the Division turn over a sample from the Lewis property to the company, state officials said.

Two state officials visited the property after learning from The Dickson Herald that Ivan Jason Lewis told The Herald that Schrader dumped the substance on the property between 12 and 15 years ago.

A former employee with technical training and state officials have told The Herald the green spongy substance on the Lewis property may be sludge from Schrader and may contain toxic heavy metals and traces of cyanide.

James Spicer, an Environmental Engineer with the Solid Waste Management Division of the State Department of Health and Environment and Bill Krispin, a geologist with the same department, took samples of the substance Wednesday, and Spicer said Thursday a Health Department chemist recommended taking well water samples as soon as possible.

While taking the samples Wednesday, both Solid Waste Management officials asked Lewis family members questions concerning whether they consumed well water from the property.

The Lewis family drank well water from the property until hooking up to the city water system about 10 years ago, Earl Lewis, Ivan Lewis' son, said.

Earl Lewis also said his brother, who lives in a house on the property, still uses well water from the property.

Chemical analysis of the water and the green substance on the Lewis property should indicate if the substance poses any danger, Spicer said.

"The sludge that they (Schrader) were generating when they quit production was classified hazardous because of those (heavy) metals," Spicer said. "It doesn't necessarily mean that it will get into the ground water. But it was listed as hazardous for those metals because they can, under certain conditions, leach out.

Continued on Page 2A



TAKING SAMPLES / State Solid Waste Management officials take samples of a spongy, green substance allegedly dumped by Schrader Automotive Group on the property of Ivan Jason Lewis, Rock Church Road. The officials used a stainless steel spoon to gather the samples to avoid contamination of the samples. Chemical analysis will be run on the samples. From Left to Right: Bill Krispin, a Solid Waste Management geologist, and James Spicer, a Solid Waste Management Environmental Engineer.

*Staff Photo by John Harding*

## Tax Increase Unnecessary: Commissioner

**By JOHN HARDING**
Managing Editor

Dickson County Commissioner Larry Robertson said Wednesday he believes the Dickson County Board of Commissioners could have funded the county 1985-1986 budget with the same expenditures without raising property taxes by 15 cents per $100 of assessed value.

Robertson, who led an unsuccessful attempt to cut the County General Fund Budget from 81 cents to 81 cents, said some overcharging of taxes on the revenue side of the budget and spending part of a fund balance could have resulted in no tax increase.

His unsuccessful plan, he said, was to transfer about $4,000 out of the county's federal revenue sharing fund which is earmarked for the County Bridge and Highway fund to the county school fund.

The Bridge and Highway fund could have used about the same amount out of its fund balance, he said, and the $4,000 in revenue sharing funds could have been given to the school fund for non-recurring expenses such as capital outlays for building improvements.

He said, however, he could "live with" spending about $73,000 of the County General Fund balance.

Then, he said, the County General Fund could have been reduced by 6 cents, reducing the County General Fund balance from about $900,000 to about $830,000, he said.

Robertson said the transfers would have made a tax increase unnecessary.

County Executive William Field said at the Commission meeting Monday night that reducing the county general fund by 6 cents would amount to punishing various offices for not having spent all funds allocated last year.

He added, however, he could "live with" spending about $73,000 of the County General Fund balance.

He also added that reducing the County General Fund balance by about $73,000 would not adversely affect the county's bond rating.

Continued on Page 2A

## Attorney For Save The Piney Requests Hearing Date Change

**By CHRIS NORMAN**
Associate Editor

The attorney representing Save The Piney has asked the state to consider changing the date set for a public hearing on the proposed Piney River project for environmental/water pollution

late," Bowers said, explaining that thirty days notice is required before the meeting can be held and such notice has already been given.

Bowers said the department was aware of possible church conflicts when the hearing was set for a Wednesday night but said August 7 was the only night the Dickson City Council cham-

*Asbestos Removal*

## Bids Baffle Board, Hayes Calls Meeting

**By GAIL PRUITT**
Staff Writer

An emergency school board meeting was held last night at Dickson County Senior High School so the board could award an asbestos contract, which unexpectedly caused an excess in the previously budgeted amount for asbestos removal.

At the July meeting the school board gave the asbestos committee, which consists of board members Dwight Ragsdale, Wendy Beasley and Donald Redden the authority to award the contract Wednesday to a removal company if the total amount did not exceed the $217,000 budgeted for the entire project.

The board came up with the $217,000 amount upon the advice Applied Technology Consulting Engineer Vish Verma, who did not attend Wednesday's contract meeting," School Superintendent Noah Daniel said.

"We banked on that figure," school board chairwoman Marilyn Hayes said Wednesday to ATC engineers Ron Thompson and Marving Farmer in Daniel's office, as asbestos committee members also voiced discontent with the estimate.

ATC Engineer Ron Thompson told the group "It's the old supply and demand. You're in the peak season. You're also dealing with individuals. We cannot second guess what an individual is going to ask for his time.

"We've missed 13 percent. There's no way you can get it exactly."

The seven bids out of a possible 50 greatly exceeded the budgeted amount. The lowest bid package was $245,000 from Gulf Contractors, located in Mobile, Ala. The highest bid package was just over a $1 million from ACMAT Corporation in Hartford, Conn.

Therefore, Hayes, in agreement with the asbestos committee Daniel and County Attorney Allan Kerns, decided to call a school board meeting immediately and present a motion before the board the next night requesting the contract be awarded to the lowest bidder, Gulf Contractors, located in Mobile, Ala, with some deletions.

Continued on Page 2A



## Dickson Couple Reunited In Korea

79¢

$2³⁹

$2⁹⁹

Page 2A—The Dickson Herald, Dickson, Tenn.

Friday, July 19, 1985

# State Samples Soil, Water On Local Farm

**Continued from Page 1A**

"He doesn't mean that they will," he continued. "But the possibility exists."

Laboratory tests of the samples taken Wednesday will probably not be completed for one to three months, Spicer said.

Analysis of well water samples may be completed within two weeks at the earliest, he said.

"It is quicker to test water and it also has a has a little higher priority," Spicer said.

The samples taken Wednesday and the well water samples to be taken will undergo a test to see if the substance has the heavy metals, Spicer and Krispin said.

If there are heavy metals in the substance, another test will be run to determine how much of the toxic substances which may be in the substance may migrate into the ground water, if they have not already, they said.

Spicer said the substance which was dumped on the Lewis property may not be dangerous even if it contains heavy metals because it may not necessarily "leach out."

Ivan Lewis said he gave Schrader permission about 12 to 15 years ago permission to dump the substance on his property because he wanted an old road bed filled in.

He said he was told the substance, which Earl Lewis said was jelly-like when it was dumped, was hardness and would dry out.

"You can walk in it and get mired up yet," Ivan Lewis said. "It got in it cutting down a tree up there, and I sank into it. I thought it was going to dry out."

He said the substance is five feet deep in some places and is still jelly-like a few feet below the surface.

He received no compensation from Schrader for allowing the company to dump the substance in the 150-yard long road bed, he said.

Schrader produced a sludge which contained lead, zinc, nickle, zinc, chromium, cadnium, copper and possibly cyanide, state officials, Dickson City officials and former Schrader employees have told The Herald.

Kevin Nameth, a Schrader Vice-president, said he is not aware of any dumping on private property by Schrader.

He said Schrader officials are working with the U.S. Environmental Protection Agency to work up a plan for closing down the company's legal, state-approved, on-site landfill.

Nameth declined to elaborate

further, saying it is premature to reveal specifics of the uncompleted plan.

Spicer said Schrader previously demonstrated it had "somewhat environmentally conscious" by applying for a permit for its on-site dump, which allowed the state to monitor the site, though it was not required to do so.

Schrader, which made auto parts, opened its plant on Schrader Road in 1964 and shut its plant down March, 1985.

The Schrader plant was financed with Dickson County-issued industrial development bonds.

Schrader is currently continuing to lease the building from the county on a month-to-month basis and is trying to sell it.

Under its contract with the county, it will have to sell it to a company which will supply jobs, and will only have to pay the county $225,000 for the 330,000-square-foot building, which is located on a 76-acre site.

A price tag for the Dickson Schrader plant of $1.5 million is being listed by Hart Corporation, an industrial real estate company hired to sell the building for Schrader.

### State Investigating

Ivan Jason Lewis, who says Schrader dumped sludge on his property about 15 years ago, talks with Bill Krispin, a geologist with the Solid Waste Management Division of the state Department of Health and

Environment as Krispin and Solid Waste Management Division Environmental Engineer (background) inspect the dump site on the Lewis property Wednesday.



# ...Bids Baffle Board

**Continued from Page 1A**

The committee chose only to recommend the base price of $197,226 for total removal and the $8,038 fee for additional work, which would entail additional sampling and removal if more suspect material is found during the removal.

(Farmer told school officials additional sampling occurs 100 percent of the time.)

Even though the base price and additional work fee add up to $205,265, within the budgeted $217,000, those items deleted in the bid package as well as payment to ATC must be made, which will probably result in removing the extra money from the $400,000 fund balance, pending county commission approval Daniel said.

Those items included in the Gulf Contractors bid package which the committee recommended deleting were spraying back a sealing material on the Dickson Junior High School and the Dickson County Senior High School (ceiling over stage) auditorium ceilings after asbestos-containing material is scraped away. The DJHS cost was bid at $20,400 and the DCHS bid was $8,400.

Also included in the bid

package were seat and carpet removals from the two auditoriums. The Gulf bid on DJHS was $6,000, and the bid on DCHS was $5,000.

Daniel and the committee discussed the possibility of school maintenance personnel doing the "spray back" or remolding that part of the contract.

Daniel also said the seat removals could be done by maintenance personnel or by one of two local companies which have placed bids on replacing and refurbishing the seats. Those bids will be reviewed Friday, Daniel said.

The contract with ATC, which has not been finalized, may also

be subject to change in order to cut costs. Thompson and Farmer said they may be able to reduce ATC's 235-a-day air monitoring charge to $250 a day for the project, which Hayes said is not to exceed 90 days after the contract is awarded.

Farmer said the company has eight days to begin work after the contract is awarded. Thus if the board awards the contract Thursday night, (past :The Herald's deadline) work should begin July 26.

Farmer agreed with Daniel's speculation that Gulf Contractors is a big enough firm to complete the job in 3 weeks.

### ...Budget

**Continued from Page 1A**

Robertson's attempt to implement his plan was defeated 12-10, however. At least 13 commissioners would have had to vote for Robertson's motion for it to pass.

The Commission approved a 15-cent increase in the county tax rate Monday night, raising the tax rate to $2.70 per $100 of assessed value.

Residential property is assessed at 25 percent of its appraised value, and commercial property is assessed at 40 percent of its appraised value.

All department except the school department requested no tax increase Monday night.

The school department requested a 21-cent increase to fund additional projects, give raises to professional employees and restore its fund balance.

The school system's fund balance was somewhat depleted last year when the school system partially funded an insurance program which was implemented by the County Commission.

Despite having paid of some obligations for which a 10-cent property tax increase was added earlier, the County Highway Department Monday asked that the rate not be lowered.

Commissioners said they had promised that the increase would be removed when

THE DICKSON HERALD
(USPS 156-720)

The Dickson Herald is published each Wednesday and Friday at 104 Church Street, Dickson, TN 37055. Phone (615) 446-2811. Second class postage paid at Dickson, TN 37055.
POSTMASTER: Send address changes to: The Dickson Herald, P.O. Box 587, Dickson, TN 37055.

MAIL SUBSCRIPTION RATES
Dickson County

One Year ............................. $12.00
Two Years ............................ $22.00
One Year Senior Citizens ......... $8.00
Outside Dickson County
One Year ............................. $20.00
One Year Senior Citizens ......... $16.00

Single Copy Price ........... 25 Cents

## THE DICKSON HERALD
### Brightens Your Day



# SEARS

## GIGANTIC INVENTORY REDUCTION
# SALE

Limited Quantities
Some one of a kind.
Sale Ends
July 31, 1985.

SHOP EARLY FOR BEST SELECTION

| STOCK # | DESCRIPTION | REGULAR PRICE | CLEARANCE PRICE | SAVE | QUANTITY AVAILABLE | CONDITION |
|---|---|---|---|---|---|---|
| 20-22551 | Vacuum Cleaner | $47.99 | $29.99 | $13.00 | 1 | New |
| 20-93182 | Sewing Cabinet | 124.99 | $94.99 | $30.00 | 1 | New |
| 20-1355 | Sewing Machine | $304.99 | $172.99 | $132.00 | 1 | New |
| 22-88753 | Microwave Oven | $459.99 | $309.99 | $150.00 | 1 | New |
| 22-88851 | Microwave Oven | $479.99 | $299.99 | $180.00 | 1 | New |
| 22-88852 | Microwave Oven | $499.99 | $329.99 | $170.00 | 4 | New |
| 22-92648 | Continuous Clean Range | $529.99 | $419.99 | $110.00 | 1 | New |
| 22-93741 | Self Cleaning Range | $619.99 | $519.99 | $100.00 | 1 | New |
| 46-64641 | Refrigerator | $614.99 | $499.99 | $115.00 | 1 | New |
| 46-65821 | Refrigerator | $664.99 | $524.99 | $140.00 | 1 | New |
| 57-91870 | Stereo | $274.99 | $164.99 | $110.00 | 3 | New |
| 57-40266 | Portable Color TV | $274.99 | $194.99 | $80.00 | 3 | New |
| 57-91896 | Stereo | $539.99 | $389.99 | $150.00 | 1 | New |

Case 1:08-cv-... It is Just Human Nature - Jimmy Brown-AJ... Filed 08/18/2008 Page 7 of 9



# THE DICKSON HERALD

*"Your Local Hometown Newspaper for 78 Years"*

VOL.-78—No. 70
© The Dickson Herald

Dickson, Tennessee, Wednesday, July 17, 1985

2 Sections—28 Pages—25 Cents
A Multimedia, Inc., Newspaper

## Schrader Dumping Widespread: Ex-Employee

By JOHN HARDING
Managing Editor

Copyright, 1985
The Dickson Herald

Dickson County may have .numerous sites similar to one on which Schrader Automotive Group allegedly dumped sludge and which may contain hazardous waste, according to a former employee who was a union health and safety officer at the Dickson County Schrader plant.

The Dickson Herald last Friday, as part of an investigation into hazardous waste produced by Schrader, revealed that the family of Ivan Jaxon

Lewis says Schrader dumped a green, spongy substance on the Lewis property near Burns about 15 years ago.

Officials with the Solid Waste Management Division of the state Department of Health and Environment upon hearing from The Herald about the site on the Lewis property said they would begin an investigation this week.

The substance on the Lewis farm may contain several potentially dangerous toxic substances including heavy metals and cyanide, according to a former Schrader employee who has technical training.

State officials say the substances which may be in the sludge could leak into ground water and

can be hazardous to human health if ingested in sufficient quantities.

Billy Proctor, who is former president of the local United Auto Workers, a former safety and health officer and worked at the plant on Schrader Road for nearly 21 years, said sludge similar to that which was allegedly dumped on the Lewis property, "Rock Church Road, was dumped "everywhere."

He said Schrader removed sludge from on-site settling ponds designed to treat the toxic waste and dumped it "everywhere" for about 10 years.

The company later hired a contractor, Proctor said, who worked nearly full-time removing the sludge.

The former employee who has technical training said Schrader generated an average of 4,800 cubic feet a month of the sludge.

Kevin Nameth, a Schrader Vice-President, told The Herald Monday he is "not aware" if Schrader dumped any sludge off-site.

"I am not aware of any of that happening," Nameth said. "As far as I know we (Schrader) have always been in conformity with the laws and regulations."

James Spicer, an environmental Engineer with the state Solid Waste Management Division, said Schrader "may or may not" have violated

Continued on Page 2A

## County Tax Rate Increased By 15¢

By JOHN HARDING
Managing Editor

Dickson County property owners will pay a $2.70 per $100 of assessed value tax rate this year, with the 15-cent increase from last year's rate going to the county school department, the Dickson County Board of Commissioners decided Monday night.

The increase will cost a taxpayer who owns a $50,000 home an additional $3.75, and will cost that taxpayer a total of $97.50.

The decision to increase taxes came near the end of a meeting which lasted until midnight and after much debate over the proposed school budget.

The Dickson County Board of Education had asked for a 21-cent property tax increase, which School Superintendent Noah Daniel said would fund items they relied, an employee insurance program to which the County Commission obligated the School Board, and would restore a fund balance which was somewhat depleted by paying for last year's partially funded authorized programs.

Taxes were only levied through a series of motions, amendments, recesses and discussions, the 15-cent increase passed 16-4.

Voting on no the school budget, which contained the only increase, were Fritz Sander, Burton Sealer, Grady Mitchell,

Continued on Page 2A

## Dickson Man Killed Girlfriend's Husband Charged With Murder

A Dickson man was killed Thursday night by his girlfriend's estranged husband, a former prison guard.

Charles Wayne Hedge, 27, of 300 Grandview Drive, Dickson, had returned Kreecentia Ray, 30, to her position home after the couple adopted a baseball game together, police said.

While Hedge and Ray were in the house, Mrs. Ray's husband, Dempsey Ray, 36, of Whites Creek Pike, Whites Creek, Tenn, disconnected Hedge's truck ignition wires, police said.

When Hedge came out of the house, Ray confronted him and the two men argued. Hedge, unable to get his truck started, was shot by Ray in the abdomen, and was later pronounced dead on the scene, police said.

Ray then kicked in the rear door of his wife's house and shot her from behind in the upper back, police said. She is in critical condition in Memorial Hospital.

A nationwide manhunt ensued for Ray, who fled to Panama City, Fla., and turned himself in to Florida police Saturday night.

Ray is now in the custody of Nashville police after he was flown back from Panama City Monday. He was charged with murder and assault with intent to commit murder, police said.

Charles Pruitt, chief of personnel at the Tennessee State Prison, where Ray was employed as a guard, said Ray had

Continued on Page 2A



Vera Miller of Dickson shows off her unusually large tomato and cabbage which she grew in her backyard garden. Mrs. Miller said her one cabbage will make 3 to 4 quarts of sauerkraut.

## Schrader Was Cited On Chemical Violations

By JOHN HARDING
Managing Editor

Copyright, 1985
The Dickson Herald

Among the concerns of former Schrader employees is that a degreaser, trichloroethylene, a known cancer-causing substance, may have gotten into their bodies.

At least two former Schrader employees have told The Dickson Herald that workers were heavily exposed to trichloroethylene at the Schrader plant in Dickson County.

And The Herald has learned that the Tennessee Occupational Safety and Health Administration cited and fined Schrader for violation of a regulation involving trichloroethylene.

The Aug. 13, 1976 TOSHA citation, which the agency deemed "non-serious," cited Schrader for not providing respirators for workers using trichloroethylene.

Schrader was fined $45 for the violation.

Another citation, issued Dec. 30, 1975, cited Schrader for not making workers use "protective equipment" on their hands while working with chemical hazards," TOSHA records reveal.

Billy Proctor, who worked for Schrader as a tool maker for nearly 21 years and served as United Auto Workers local union president and also as union safety officer, said Schrader officials never told workers about the dangers of the carcinogen trichloroethylene and never provided training on its proper handling.

He also said trichloroethylene concentrations in the plant were often heavy because high-pressure air hoses were used for a while to blow the substance off parts.

Continued on Page 2A

## Board Approves DES Principal

By GAIL PRUITT
Staff Writer



Gary Brunett

Gary Brunett has been named as Dickson Elementary Principal, replacing retiring principal Melton Self.

The school board at Thursday night's monthly meeting unanimously approved Brunett, who has served as assistant principal of the school for 6½ years, after Schools Superintendent Noah Daniel's recommendation.

Daniel said he chose Brunett from a list of three candidates based on Brunett's experience in the school and added, "He has the school's interest in his heart."

School teacher and former Dickson County Education Association president Barbara Easley and Oakmont Elementary School teacher Kay Welton.

Brunett addressed the board and said he earned a bachelor of science degree in biology from Memphis State University in 1972 and has a master's degree in administration and supervision from Austin Peay State University.

Board member Joe Swift asked Brunett if he felt like he had the school faculty's support. Brunett said he felt like he had the support of the majority.

Other personnel assignments

Continued on Page 3A



## Asbestos Removal To Begin Soon

By GAIL PRUITT
Staff Writer

A contract for asbestos removal in county schools is expected to be awarded today, and removal may begin July 25, Schools Superintendent Noah Daniel said at Thursday night's school board meeting.

The school board unanimously approved the following amendments:

A. Budget is approved.

B. The contract does not exceed budgeted money.

C. The contract meets Asbestos Committee approval.

D. The contract be approved by County Attorney Allan Kerns.

Kerns also suggested that the contract should specify a completion date and invoke a penalty for each day past the contractual deadline.

The budget was implemented by the county commission Monday night from the 21 cents requested by the school board to 15 cents, but no expenditures will be affected.

School officials revised their sales tax revenue estimates upward from 5 to 8 percent. If sales tax revenues fall short, the money will have to come out of the fund balance.

The money to pay for asbestos

removal will come out of capital outlay money to be paid back over a period of three years, board chairwoman Marilyn Hayes said earlier.

Included in the fee is the contractor's cost with Applied Technology Corporation, the consulting engineering company, Daniel said.

The contract the school system holds with ATC stipulates a 10-percent fee for consulting fees, which includes drawing up specifications and helping select a removal company. The contract also provides $220 a day for monitoring; $50 a day for one

Continued on Page 2A



## ...Tax Rate Increased By 15 Cents

Continued from Page 1-A
and Lawrence Brown.

Voting yes were Dan Eubank, Anna Katherine Miller, Billy Averitte, Larry Robertson, Gale Larkins, Hastings Brown, Billy Lankford, Joe Greer, Wayne Kaiser, Henry Ragan, Clayton Brazzell, Tom Woodall, W.G. Ingram, Tommy Nicks, Tom Hayes, John Luther, Wagner Duke, and Bruce Corlew.

Commissioners Roland Marshall and Tom Nesbitt were absent.

Sparking a debate over whether the school system needs a fund balance of more than $400,000 for its $13,900,000 budget, Greer suggested that the school system give $100 across-the-board raises to teachers, rather than an average of more than $200 to teachers, and lower the tax increase by 4 cents.

Daniel explained to Greer that the proposed raises were indexed and were not to be given across the board.

Also, Daniel and County Executive William Field explained to Greer that the school budget called for raises in administration, attendance, Vocational Education, Handicapped instruction, and instructors working under other programs.

Daniel also said Dickson County teachers were among the lowest paid in the area and deserve a raise.

Greer replied that the raises should be reduced "wherever those lie."

Daniel and Ms. Miller said Greer's proposal discriminated against school personnel and was unfair because other departments were going to get larger raises.

After the commission defeated Greer's motion, Duke apparently prompted by Greer, proposed that the school system's fund balance be further reduced and used for revenue to lower the proposed increase to 15 cents.

Daniel responded that state officials said a $13 million budget should have a fund balance of about $400,000 for emergencies.

Field told Greer that the fund balance generates interest revenue and thereby keeps the tax rate down.

Hayes said some schools, including one in Duke's district, were in "deplorable" condition and asked how Commissioner could lose parents in their districts.

Woodall objected to the move to cut revenues from the school system, saying the County Commission had passed an insurance package last year which obligated the school system. In not having the "intestinal fortitude" to fund the schools system's insurance obligation last year, Woodall said, the County Commission

had reduced the school system's fund balance by $360,000.

Kaiser also objected, saying Greer's motion was "unfair" because other departments were getting raises for employees.

Daniel then suggested that the School Board could revise its estimate of sales tax revenue upward to keep revenues the same with a 15 cent increase.

He said he hopes the sales tax revenues will match the upwardly revised estimate.

The revised school budget passed 18-4 with Sander, Sesler, Mitchel and Lawrence Brown voting no.

A move by Robertson to reduce the County General Fund budget from 87 cents to 81 cents by clipping into that Fund's $900,000 balance failed after Field, who oversees the General Fund, said Commissioners were punishing him for "running a tight ship" and spending less than was allocated.

He said the fund its balance had risen from about $60,000 where he became County Executive to its current $900,000. He also said the fund balance keeps the tax rate lower by generating interest income.

He and Mitchell agreed that by penalizing departments which do not always spend all allocated funds, the Commission would be telling them to spend all their funds and avoid holding the line.

**More controversy** was generated in the Road and Bridge budget when Commissioners asked Road Engineer B.M. Petty why the 25 cent rate was not lowered now that obligations have been paid off.

Earlier, the road budget was increased by 12 cents for capital outlay. Commissioners had promised to reduce the road tax rate by 10 cents when the obligations were paid off.

Petty said the county, under state regulations, could not lower its road tax rate this year if it wants to receive revenues from the recently passed 3-cent state gasoline tax.

Petty's budget was passed after Petty said he intends to use the money "to do more work" on county roads.

The debt service tax rate, which is 20 cents, was passed without controversy.

The $2.70 property tax rate breaks down like this:
- School system—$1.41
- County General Fund—$.87
- Debt Service Fund—$.20
- Bridge and Highway Fund—$.22

The total county budget for fiscal year 1985-1986 comes to more than $20,235,000.

The school system's budget is nearly $13,932,000, the County General Fund is more than $3,126,000, the Bridge and Highway fund is $1,617,400.

## Asbestos

Continued from Page 1-A
person's room and equipment, and
Assistant Superintendent Dale Vernon of ATC has sent out invitations to bid to several companies, and to have replied, Daniel said, and added that several companies have come to Dickson and looked at the schools.

Daniel said he expects the removal process to be completed before school starts August 19 and said he would accept a higher bid if it would promise to complete the work before school starts, to spare school children from any possible danger.

All schools except James E. Sullivan Middle School, Dickson Elementary School, and Warf School contain asbestos and will be subject to the removal process.

But another problem prevails. The school board passed Thursday night a motion for the refurbishment and replacement of the auditorium seats at Dickson Junior High School and Dickson County Senior High School.

Daniel said the seats must be removed before asbestos removal begins and said he as

well as men from the roofing crew and maintenance crew could remove the seats themselves if a bid is not accepted in time or the company awarded the bid is unable to remove the seats.

Daniel said five companies have bid on the job, which involves refurbishing the seats at DJHS and replacing the seats at DCSH. The seats will be in July 19, Daniel said.

Take stock in America.

### THE DICKSON HERALD
(USPS 158-730)

The Dickson Herald is published each Wednesday and Friday at 106 Church Street, Dickson, TN 37055. Phone (615) 446-2811. Second Class postage paid at Dickson, TN 37055.

POSTMASTER: Send address changes to The Dickson Herald, P.O. Box 367, Dickson, TN 37055.

MAIL SUBSCRIPTION RATES
One Year ....................................... $13.00
Two Years ...................................... $24.00
One Year Senior Citizens ............... $11.00
Outside Dickson County
One Year ....................................... $15.00
Two Years ...................................... $28.00
One Year Senior Citizens ............... $13.00

Single Copy Price ............................ 35 Cents

### NOTICE
### TO ALL LICENSED ATTORNEYS
### IN MIDDLE TENNESSEE

Pursuant to Sections 17-4-102, et. seq., T.C.A., there will be an election to fill the vacancy on the Appellate Court Nominating Commission for the Middle Grand Division. Licensed attorneys in the Middle Grand Division of the state are eligible to be elected to this office provided they are otherwise qualified under the provisions of Title 17, Chapter 7, T.C.A. Qualifying petitions signed by the candidate and twenty-five (25) or more licensed attorneys from the Middle Grand Division of the state must be received not later than twelve (12:00) noon, prevailing time, July 25, 1985, in order for the candidate's name to appear on the official ballot. (This election is for the unexpired term for the Middle Grand Division position which will expire June 30, 1989.)

Said election will end at 4:00 p.m., prevailing time August 30, 1985.

If you have not received your ballot by August 12, 1985, contact the Coordinator of Elections office (615-741-7956).

## ...Schrader Dumping Widespread

Continued from Page 1-A
regulations or laws if the company dumped sludge on the Lewis property.

Schrader dumped sludge at the County Landfill until about 15 years ago, according to Virgil Bellar, director of the county's solid waste program. The company was asked to quit dumping the substance at the landfill about 15 years ago, be said.

The sludge which was dumped on the Lewis property may contain lead, nickle, cadmium, zinc, copper, and tin, chromium and cyanide, Dickson City, county and state officials, and former Schrader officials said.

Earl Lewis, Jason Lewis' son, said Schrader officials told his family the sludge contains soap

and copper shavings and was harmless when asking permission to dump the substance.

Spicer said the sludge on the Lewis farm may be as Schrader officials described. He confirmed Schrader produced a sludge which contained hazardous waste, but said he does not know if the sludge on the Lewis property is hazardous until state officials investigate it.

Several sources have told The Herald that Schrader has an onsite site in which some of the sludge is buried.

Spicer said the sludge buried at the Schrader site requires constant monitoring for ground water pollution and will be monitored for at least 30 years.

He said Solid Waste Division

has not detected signs of pollution of ground water on the approved site near the Schrader building.

Nameth said Schrader is working with U.S. Environmental Protection Agency officials to work up a close-out plan concerning the on-site waste.

He said he would not discuss details of the plan because it is not finalized. He also said the company has hired a consulting firm to work on the close-out plan, but declined to name the company.

Schrader opened its plant in Dickson County in 1964 and shut it down March 1, 1985.



## ...Schrader Cited

Continued from Page 1-A
"That turns it into a gas," Proctor said. "It was in the main building and was accessible to about 50 people per shift."

He also said he saw trichloroethylene periodically being allowed into the Dickson sewer system up until the plant shut down this year.

The union was often "onto them (Schrader officials)" concerning trichloroethylene, Proctor said.

Proctor also said raw ammonia often leaked or was accidently spilled at the Schrader plant, causing at least a dozen evacuations" during the plant's 20-year stay in Dickson County.

He said the ammonia was often concentrated enough to leave "spots on people's cars" in the Schrader parking lot.

Kevin Nameth, a Schrader Vice-President, said he has no knowledge of problems with toxic substances at the plant, and added the company to his knowledge has always conformed to laws and regulations concerning toxic substances.

Proctor and another former Schrader employee said trichloroethylene can cause cancer, liver damage, lung damage and other ailments.

Trichloroethylene can be harmful if breathed or absorbed into the skin.

## ...Dickson Man

Continued from Page 1-A
received a "superior officer" rating in November on an evaluation conducted by his supervisor.

Pruitt said there are a lot of nice things being said about Ray. "But there is no excuse for what he has done," Pruitt added.

Reports said that Hedge had been separated from his wife, Connie Hedge, for about 18 months and was dating Kay Ray, who separated from her husband in June.

Funeral services were held for Hedge Sunday at the Dickson Funeral Home Chapel. Hedge was employed as an engineer at Genesco, Inc. Burial was in Dickson County Memorial Gardens.

He is survived by his parents, Delton Ray Hedge and Dorothee Jane Southerland; two sons, Kevin Hedge and Christopher Hedge, both of Dickson; three brothers, Mark Hedge, Michael Hedge and Stephen Hedge, all of Dickson; and his grandmother, Mrs. Emma Derro of Nashville.

## Clinical Hypnosis
### in Dickson & Nashville - Group or Individual

For: **Weight Reduction**
**Stopping Smoking**
**Headache Relief**
**Sound Sleeping - Insomnia**
**Fears**
**Worries**

By Licensed Clinical Psychologist - Member of
American Psychological Association
Tennessee Psychological Association



### The Forward Bank

FIRST SECURITY BANK
Member FDIC

# The Wednesday Luncheon

**T**hings here at First Security Bank get a little hectic on Wednesday mornings.

You see, that's the day each week when we host a business development luncheon in our executive board room. These luncheons are small, intimate affairs that help us keep our finger on the pulse of Dickson County.

As we meet with various opinion leaders in the area, we discuss the business climate, community needs, and plans for the county's future.



No. We don't have to do this. But it just seems right that Dickson's forward bank should be helping to chart Dickson's future.

# EXHIBIT D

## (Intentionally Omitted)

**EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                 :

In re:                                       :
                                               :

SALTIRE INDUSTRIAL, INC.,          :        Chapter 11
                                         :        Case No. 04-15389 [BRL]
                                         :

                             Debtor.      :
                                               :
---------------------------------------------------------------------X

**DEBTOR'S MODIFIED FIRST AMENDED DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE
<u>FOR ITS FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION</u>**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000

Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

Dated:   December 28, 2005

## TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...................................................................................1

II.  OVERVIEW OF THE PLAN ..................................................................2

    A.  GENERAL ...................................................................................2

    B.  CLASSIFICATION AND TREATMENT SUMMARY ...................3

    C.  SOURCE OF PLAN FUNDING...................................................6

III.  PROCEDURAL HISTORY OF THE CASE, BACKGROUND HISTORY
    OF THE DEBTOR AND EVENTS LEADING TO THE CHAPTER 11 FILING .......7

    A.  PROCEDURAL HISTORY OF THE CASE ...................................7

        1.  First Day Orders .................................................................7

        2.  The Official Committee........................................................7

    B.  BACKGROUND OF THE DEBTOR.............................................8

        1.  The Debtor's Operations......................................................8

        2.  The Debtor's Employees......................................................8

        3.  The Debtor's Financials and Debt Structure .......................8

    C.  CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING............10

        1.  Legacy Liabilities...............................................................10

IV.  CORPORATE GOVERNANCE OF THE DEBTOR DURING THE CASE ............10

    A.  MANAGEMENT ..........................................................................10

V.  SIGNIFICANT DEVELOPMENTS IN THE CASE ...................................11

    A.  TERMINATION OF RETIREE BENEFITS....................................11

    B.  ENVIRONMENTAL RELATED LIABILITIES AND LITIGATION............12

        1.  Description of Environmental Liabilities ...........................12

        2.  The USA Sites ....................................................................13

        3.  The USA Motion regarding the Puente Valley Escrow.....................14

        4.  Negotiations with the USA..................................................16

        5.  Disposition of the Schrader-Dickson Facility....................16

    C.  TENNESSEE LITIGATION ..........................................................17

        1.  Description of Litigation.....................................................17

        2.  Adversary Proceeding against Dickson Plaintiffs ............17

i

D.      GENERAL BANKRUPTCY ADMINISTRATION ....................................................19

       1.      Schedules of Assets and Liabilities and Statement of
           Financial Affairs ....................................................................19

       2.      Deadline for Filing Proofs of Claim ...................................19

VI.     SUMMARY OF THE PLAN..................................................................................19

   A.      GENERAL                 .......................................................................19

   B.      DESCRIPTION AND TREATMENT OF CLAIMS AND EQUITY
      INTERESTS UNDER THE PLAN ...........................................................21

       1.      Unclassified Claims...............................................................21

       2.      Classified Claims and Equity Interests................................22

   C.      TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN ....................24

       1.      Prosecution of Objections to Disputed Claims ..................24

       2.      No Distributions Pending Allowance of a Disputed Claim ............24

       3.      Distributions After Allowance of a Disputed Claim........................24

       4.      Disputed Claims Reserve......................................................24

   D.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER
      THE PLAN                 .......................................................................25

   E.      CONDITIONS PRECEDENT TO THE CONFIRMATION DATE
      AND THE EFFECTIVE DATE OF THE PLAN ...........................................25

       1.      Conditions Precedent to Confirmation of the Plan ...........................25

       2.      Conditions Precedent to the Effective Date.......................................25

   F.      WAIVER OF CONDITIONS PRECEDENT .................................................26

VII.    MEANS OF IMPLEMENTATION OF THE PLAN ................................................26

   A.      GENERAL                 .......................................................................26

   B.      CREATION OF THE LIQUIDATING TRUST.................................................26

   C.      Appointment AND DUTIES of the LIQUIDATING TRUSTEE..................27

   D.      Establishment of the Operating Reserve Account ........................................27

   E.      DISTRIBUTIONS UNDER THE PLAN.........................................................27

       1.      Date of Distributions............................................................27

       2.      Delivery of Distributions .....................................................28

       3.      Time Bar to Cash Payments.................................................28

       4.      Disputed Distributions.........................................................28

|  | 5. | Manner of Payment Under the Plan | 29 |
|  | 6. | Distributions After Effective Date | 29 |
| F. | OFFICIAL COMMITTEE | | 29 |
| G. | CORPORATE ACTION AND CONTINUED EXISTENCE OF DEBTOR | | 29 |
| VIII. | EFFECT OF CONFIRMATION OF THE PLAN | | 30 |
| A. | DISCHARGE OF DEBTOR | | 30 |
| B. | DEBTOR'S AUTHORITY | | 30 |
| C. | VESTING AND LIENS | | 30 |
| D. | TERMINATION OF BANKRUPTCY INJUNCTIONS OR STAYS | | 30 |
| E. | INJUNCTION AND RELEASES OF CLAIMS | | 31 |
|  | 1. | General Injunction | 31 |
|  | 2. | Release and Injunction in Favor of Alper | 31 |
|  | 3. | Exculpation | 32 |
| F. | AVOIDANCE ACTIONS AND OTHER CAUSES OF ACTIONS | | 33 |
|  | 1. | Bankruptcy Code Avoidance and Recovery Actions | 33 |
| G. | RETENTION OF JURISDICTION | | 33 |
| H. | MODIFICATION OF THE PLAN | | 35 |
| I. | NOTICES | | 35 |
| IX. | CERTAIN U.S. TAX CONSEQUENCES OF THE PLAN | | 36 |
| X. | VOTING AND CONFIRMATION OF THE PLAN | | 36 |
| A. | WHO MAY VOTE | | 36 |
| B. | VOTING PROCEDURES | | 38 |
| C. | CONFIRMATION AND CONSUMMATION OF THE PLAN | | 39 |
|  | 1. | Confirmation Hearing | 39 |
|  | 2. | Objections to Confirmation of the Plan | 39 |
|  | 3. | Requirements for Confirmation of the Plan | 40 |
|  | 4. | Fair and Equitable Test (Cram-Down) | 40 |
| XI. | LIQUIDATION ANALYSIS | | 41 |
| XII. | CONCLUSION | | 43 |

## TABLE OF EXHIBITS

Exhibit 1:      Plan of Liquidation

Exhibit 2:      Form of Ballot

# I.

# INTRODUCTION

Saltire Industrial, Inc., as debtor and debtor in possession in the above-caption Chapter 11 case (the "Debtor"), makes this Disclosure Statement, pursuant to section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 1330 (the "Bankruptcy Code"), for creditors of the Debtor (collectively, the "Creditors") in connection with: (i) the solicitation of acceptances or rejections from Creditors of the Modified First Amended Plan of Liquidation, dated December 28, 2005 (the "Plan"), proposed by the Debtor and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and (ii) the hearing on confirmation of the Plan scheduled for March 8, 2006 at 10:00 a.m. Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement will have the meanings ascribed to them in the Plan, a copy of which is annexed as Exhibit 1 hereto.

The Plan, which this Disclosure Statement describes, is intended to resolve all Claims against, and Equity Interests in, the Debtor, and provides a mechanism for the liquidation of all of the Debtor's remaining assets and for the distribution of Aggregate Cash to the Debtor's Creditors.

The Plan is the product of extensive negotiations between the Debtor and the official committee of unsecured creditors of the Debtor (the "Official Committee"), together with Alper Holdings USA, Inc. ("Alper"), the Debtor's parent, and other parties. The Official Committee supports confirmation of the Plan and urges Creditors to vote to accept the Plan and support confirmation.

On December 28, 2005, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable hypothetical, reasonable investors typical of the Creditors in each Class under the Plan to make an informed judgment as to whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR THE MERITS OF THE PLAN.

EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE OTHER EXHIBITS TO THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE OTHER EXHIBITS AND SCHEDULES HERETO AND THERETO, AND ANY OTHER DOCUMENTS REFERENCED HEREIN OR THEREIN. IN THE EVENT OF ANY DISCREPANCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND CONDITIONS OF THE PLAN SHALL GOVERN.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider the confirmation of the Plan (the "Confirmation Hearing") on March 8, 2006 at 10:00 a.m. before the Honorable Burton R. Lifland, United States Bankruptcy Judge, Courtroom 623, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served upon the Debtor's counsel, counsel for the Official Committee and the Office of the United States Trustee and filed through the Bankruptcy Court's electronic filing system (see the Court's Website at http://www.nysb.uscourts.gov/ for instructions for electronic filing or contact the office of the clerk for the Bankruptcy Court at (212) 668-2870, Monday to Friday, 8:30 a.m. to 5:00 p.m.) with a paper copy delivered to the Chambers of Judge Lifland, Room 625 at the Bankruptcy Court, so as to be received on or before February 20, 2006 at 5:00 p.m. Eastern Prevailing time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTOR BELIEVES THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO ITS CREDITORS. THE DEBTOR THEREFORE BELIEVES ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN. THE OFFICIAL COMMITTEE SUPPORTS CONFIRMATION OF THE PLAN AND URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.

UNLESS OTHERWISE INDICATED, ALL DOLLAR AMOUNTS USED OR REFERENCED HEREIN OR IN THE PLAN ARE UNITED STATES DOLLAR AMOUNTS.

## II.

## OVERVIEW OF THE PLAN

### A.    GENERAL

The following discussion of the Plan is a summary only and is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit 1.

The Plan is intended to resolve all existing Claims against, and Equity Interests in, the Debtor. The Plan provides for payment in full of all Allowed Administrative Expense Claims, Allowed Priority Claims, Allowed Priority Non-Tax Claims, and Secured Claims. Distribution to the Holders of Allowed General Unsecured Claims will be made on a pro rata periodic basis until the Liquidating Trustee, on behalf of the Debtor, completes the liquidation of all remaining assets. Alper, as the Holder of Intercompany Claims against, and the Holder of Equity Interests in, the Debtor will receive no Distribution under the Plan.

**B.     CLASSIFICATION AND TREATMENT SUMMARY**

The following table briefly summarizes the classification and treatment of Claims against, and Equity Interests in, the Debtor under the Plan.

| CLASSES | TYPE OF CLAIM AND TREATMENT |
|---|---|
| Administrative Expense Claims (No Class Designation) | • The Debtor estimates that the aggregate amount of Allowed Administrative Expense Claims as of the Effective Date will not exceed $1 million. Administrative Expense Claims consist of, among others, (i) fees and expenses due Professionals, estimated to be $500,000; (ii) the USA Claim (as defined herein) as it pertains to the parcel of real property owned by the Debtor in Dickson County, Tennessee in the amount of approximately $300,000;[1] and (iii) other expenses of administration, including rent and payroll, estimated to be $125,000.<br><br>• Each Holder of an Allowed Administrative Expense Claim shall be paid in Cash from the Operating Reserve Account or the Disputed Claims Reserve, as the case may be, in an amount equal to such Allowed Administrative Expense Claim on the later of: (a) the Effective Date; and (b) ten (10) Business Days after the date on which such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.<br><br>• See Section 3.1 of the Plan. |
| Priority Tax Claims (No Class Designation) | • The Debtor estimates that the aggregate amount of Priority Tax Claims, if Allowed, will not exceed $200,000.[2]<br><br>• On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder |

---

[1]     The United States contends that the Estate's liability for this property may exceed this amount.

[2]     The above estimate is not an admission by the Debtor that any valid Priority Tax Claims exist against the Estate.

of an Allowed Priority Tax Claim shall be paid in Cash by the Debtor or the Liquidating Trustee, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor or the Liquidating Trustee.

- See Section 3.2 of the Plan.

Priority Non-Tax Claims
(Class 1)

- Unimpaired.

- The Debtor estimates that the aggregate amount of Allowed Priority Non-Tax Claims will be less than $2,000, representing certain unpaid amounts for prepetition payroll.

- On the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid in Cash, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor or the Liquidating Trustee.

- See Section 5.2.1 of the Plan.

Secured Claims
(Class 2)

- Unimpaired.

- The Debtor does not believe there will be any Allowed Secured Claims on the Effective Date because the Holder of the only known Secured Claim entered into a stipulation with the Debtor that was approved by Bankruptcy Court Order during the Case, pursuant to which stipulation the Secured Claim was fully satisfied.

- To the extent there are any Allowed Secured Claims, on the Effective Date, each Holder of an Allowed Secured Claim shall receive, in the Liquidating Trustee's discretion, either (A)(i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor or the Liquidating Trustee and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash on the later of (a) the Effective Date or

4

as soon thereafter as may be practical, or (b) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practical;  and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the Allowed amount of such Holder's Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan; or (B) the Liquidating Trustee shall abandon the property securing the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or as soon thereafter as may be practical or (ii) that date which is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order; or (C) such other treatment as the Holder of such Allowed Secured Claim and the Debtor or the Liquidating Trustee shall agree upon in writing.

- See Section 5.2.2 of the Plan.

General Unsecured Claims
(Class 3)

- Impaired.

- The Debtor estimates that the aggregate principal amount of Allowed General Unsecured Claims will not exceed $35 million.

- Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of its Allowed Class 3 Claim, periodic ratable Distributions from Available Cash in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim;  provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Estate's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.  **The Debtor anticipates that Holders of Allowed General Unsecured Claims will**

**receive periodic Distributions, aggregating approximately 15% of the Allowed amount of their Claims.**

- See Section 5.2.3 of the Plan.

Intercompany Claims
(Class 4)

- Impaired.

- The Debtor estimates that the aggregate principal amount of Intercompany Claims will be approximately $1,264,392.  Such amount excludes unliquidated amounts that Alper has asserted it is owed pursuant to contractual indemnification agreements with the Debtor.

- On the Effective Date, as part of the Alper Settlement Agreement, Alper shall not receive any Distribution on account of its Intercompany Claims, and such Intercompany Claims shall be deemed discharged.

- See Section 5.2.4 of the Plan.

Equity Interests
(Class 5)

- Impaired.

- On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests.  As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

- See Section 5.2.5 of the Plan.

**C.    SOURCE OF PLAN FUNDING**

For purposes of making Distributions under the Plan on account of Allowed General Unsecured Claims, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall make such Distributions from the Debtor's Available Cash and/or the X-Fund, as the case may be.  Distributions to be made on the Effective Date on account of Allowed

Administrative Expense Claims and Allowed Priority Claims shall be made by the Debtor from Available Cash.

## III.

### PROCEDURAL HISTORY OF THE CASE, BACKGROUND HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE CHAPTER 11 FILING

### A.    PROCEDURAL HISTORY OF THE CASE

On August 17, 2004, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  The Honorable Burton R. Lifland was selected and has served as the presiding Bankruptcy Judge.

### 1.    <u>First Day Orders</u>

On or shortly after the Petition Date, the Debtor sought certain relief from the Bankruptcy Court to facilitate the efficient administration of the Case and the Debtor's transition to debtor in possession status.  The relief granted by the Bankruptcy Court at the commencement of the Case included Orders (i) authorizing the employment of Togut, Segal & Segal LLP as bankruptcy counsel for the Debtor;  and (ii) authorizing the retention of Garden City Group, Inc. as claims and noticing agent for the Debtor.

### 2.    <u>The Official Committee</u>

On September 3, 2004, the Office of the United States Trustee appointed the Official Committee pursuant to section 1102 of the Bankruptcy Code.  At the time of its appointment, the Official Committee consisted of five (5) members, as follows:

1. Caldwell Trucking Trust Fund
2. Masco Corporation
3. Leonard F. Leganza, CPA
4. Shaw Environmental Infrastructure, Inc.
5. Engelhard Corporation.

In April 2005, Englehard Corporation resigned from the Official Committee.  Since that time, and through the date of this Disclosure Statement, the Official Committee has consisted of the remaining four (4) members.

Each of the members of the Official Committee is a Holder of a General Unsecured Claim in Class 3.

By Bankruptcy Court Order dated October 21, 2004, the Official Committee was authorized to retain Lowenstein Sandler PC as its counsel.  Lowenstein Sandler PC continues to represent the Official Committee.

## B.      BACKGROUND OF THE DEBTOR

### 1.      The Debtor's Operations

The Debtor, previously known as Scovill, Inc., began operations in the early 1800s and grew to become a major industrial company listed on the New York Stock Exchange.  As such, the Debtor was a manufacturer of diverse consumer and industrial products sold under a variety of brand names, including Scovill, Yale, Hamilton Beach, Nutone and Schrader.

In 1985, the Debtor was acquired by an affiliate of First City Industries Inc. ("First City"), a public company listed on the New York Stock Exchange.  Following its acquisition by First City, the Debtor began a divestiture program which, by 1987, significantly reduced the size and scope of its operations.  The Debtor retains a number of liabilities resulting from its long history of operations prior to 1987.  These liabilities principally related to:  (i) alleged environmental contamination ("Environmental Claims");  (ii) post-retirement employee benefits ("Retiree Claims");  and (iii) other business-risk liabilities such as product liability claims ("Product Liability Claims" and, together with Environmental Claims and Retiree Claims, the "Legacy Liabilities").  Since 1987, the Debtor's primary business has been the administration, management and (if appropriate) funding of these Legacy Liabilities.  In 1992, Alper became the controlling indirect shareholder of the Debtor as a result of its acquisition of First City.  Alper currently is the direct parent of the Debtor.

### 2.      The Debtor's Employees

The Debtor currently has two full-time employees, whose total monthly wages are approximately $24,500.  This amount reflects voluntary salary and staff reductions, effective January 1, 2005, that reduced the Debtor's aggregate payroll by more than 50%.

### 3.      The Debtor's Financials and Debt Structure

On the Petition Date, the Debtor reported (on an uncertified and unaudited basis) assets of approximately $7,153,000 and liabilities of approximately $18,223,000, as of June 30, 2004.

The Debtor's reported assets consisted of approximately:  (i) $1,344,000 in cash;  (ii) $5,653,000 in a note receivable;  and (iii) $156,000 for prepaid expenses and deposits.

The note receivable is dated March 4, 2004 and is payable by Grupo IUSA, S.A. de C.V. ("Grupo"), a Mexican corporation (the "Note").  The principal amount of the Note is $8,250,000 and bears an interest rate of 10% per annum.

As of October 31, 2005, the Debtor reported (on an uncertified and unaudited basis) assets of approximately $4,687,207 and liabilities of approximately $16,870,217, excluding certain contingent liabilities for, among others, indemnification and other litigation claims including claims for property damage and personal injury for which no book reserves have been established.

As of October 31, 2005, the principal outstanding balance of the Note was $3,854,790.80 and accrued but unpaid interest was $22,178.25.  Grupo has agreed to repay the remaining outstanding principal amount and all accrued but unpaid interest as set forth in the Plan.

In addition to the foregoing, the Debtor's assets include (a) the X-Fund, with an estimated value of approximately $475,000 as of October 31, 2005, originally maintained by Aetna under Group Insurance policy #47400 to provide certain life insurance benefits to the Debtor's Retirees (see V.A. below);  and (b) the Puente Valley Escrow in the amount of $500,000, which has been offset against the Debtor's environmental liabilities for financial reporting purposes (see V.B.3 below)[3].  The Debtor also maintains a Workers Compensation insurance policy that the Debtor believes may be utilized to offset, in part, the Debtor's liability.  The Debtor may also have certain Causes of Action, including Avoidance Actions under the Bankruptcy Code, which cannot be quantified at this time.

As of October 31, 2005, per its books and records, the Debtor's outstanding pre-petition liabilities can be categorized as follows:

| | |
|---|---|
| Payables and Accrued Liabilities | $1,429,180 |
| Management Fees Payable | $1,264,392 |
| Environmental Liabilities | $7,568,229 |
| Keyman Life Insurance Obligation | $1,366,000 |
| Retiree Benefits Life | $1,649,901 |
| Retiree Benefits Health | $2,456,651 |
| Deferred Compensation | $647,408 |

Except for the Management Fees Payable, substantially all of the prepetition liabilities arose from, or relate to, the Debtor's operations prior to 1987.  The amounts for Retiree Benefits Life, Retirees Benefits Health, Deferred Compensation and Keyman Life Insurance are based on amounts calculated by the Debtor's prepetition actuarial consultants.  The amount for Environmental Liabilities is an estimate that was prepared by the Debtor's environmental consultants and other advisors.

---

[3]    The United States has appealed the Bankruptcy Court ruling that, among other things, the Puente Valley Escrow is property of the Debtor's estate.  See Section V.B.3

The Debtor's books and records do not reflect any reserves for certain contingent and unliquidated liabilities for, among others, indemnification and other litigation claims, including claims for property damage and personal injury.

## C.    CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING

### 1.    **Legacy Liabilities**

Since the mid-1980's, the Debtor has pursued a policy of funding its Legacy Liabilities to the extent they were matured, liquidated and not subject to dispute and minimizing its exposure to other liabilities that did not fall into this category. During that time, the Debtor estimates that it has expended in excess of $100 million to: (a) pay medical and life benefits to retirees;  (b) fund pension obligations;  (c) pay other employee benefits including workers compensation and deferred compensation; (d) fund environmental clean-up and remediation activities;  and (e) defend the Debtor against disputed claims.  Where possible, the Debtor also settled certain claims relating to the Legacy Liabilities on terms favorable to the Debtor.  In spite of its efforts, the Debtor was unable to bring closure to certain of its Legacy Liabilities due to their contingent, unliquidated and/or disputed nature.

The cost of managing, administering and funding the Legacy Liabilities represented a significant use of the Debtor's limited resources.  Despite having ceased operations nearly twenty years ago, new claims continued to be asserted against the Debtor with respect to its  pre-1987 business operations.

In light of all of the foregoing circumstances, and after carefully considering all available options and alternatives, the Debtor's management concluded that a filing under Chapter 11 would be the best way to preserve the Estate's assets from rapid dissipation, to complete the liquidation of assets, and to provide for the maximum recovery for its Creditors in a fair and equitable manner.

## IV.

## CORPORATE GOVERNANCE OF THE
## DEBTOR DURING THE CASE

## A.    MANAGEMENT

As of the Petition Date and continuing through the Case, the Debtor's senior management consists of:

Robert A. Bertellotti        President

Wayne R. Smith            Senior Vice President and Chief
                          Financial Officer

<div align="center">

**V.**

**SIGNIFICANT DEVELOPMENTS IN THE CASE**

</div>

**A.    TERMINATION OF RETIREE BENEFITS**

The Debtor historically provided its retired employees with medical, life, and pension benefits.  Prior to the Petition Date, the Debtor had fully funded and terminated its ERISA-qualified pension plan within the guidelines set forth by the Pension Benefit Guaranty Corporation.  **Pension benefits were annuitized prior to the Petition Date and pension payments to eligible Retirees are not affected by the Debtor's Chapter 11 case or the Plan.**

As of the Petition Date, the Debtor provided medical and/or life insurance benefits to 486 Retirees.  Generally, the medical benefits the Debtor provided were not the Retirees' primary source of medical coverage.  Except for two Retirees, virtually all the Retirees rely on Medicare and Medicaid benefits to cover their major medical costs, while the Debtor's benefit plan provided supplemental medical and prescription drug coverage for them.

During this Case, the Debtor paid, on average, $85,500 per month to cover all post-petition retiree benefits, including insurance premiums.  Consequently, as of May 31, 2005, about nine months into the Case, the Debtor had paid more than $769,000 in retiree benefits on an administrative priority basis.  This ongoing obligation was draining the Debtor's diminishing assets and threatened the Debtor's ability to settle its other Claims and Liabilities.

With the assistance of the Official Committee, the Debtor negotiated with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), whose members comprised the largest group of the Debtor's Retirees, the terms of a modification to the retiree benefits package that provided for, among other things:  (i) the cessation of all retiree benefits as of April 30, 2005;  (ii) the fixing and allowance of a General Unsecured Claim for each Retiree in the amount of their  respective remaining medical and life benefits on a present value basis; and (iii) a one-time payment of $500 to each Retiree entitled to medical benefits.  The $500 payment was on account of, and is to be credited against, any Distribution to which such Retiree would be entitled under a confirmed plan.  A total of 203 Retirees qualified for the $500 payment, aggregating to $101,500.  The X-Fund was the source of the funding for the $500 payments.

The Debtor and the Official Committee filed with the Bankruptcy Court a joint application to obtain approval of the proposed modification.  One of the Debtor's unions, The United Steelworkers of America, AFL-CIO, CLC (the "Steelworkers"), objected to the modification on various grounds.  All of the parties, including both the UAW and Steelworkers, were able to agree upon a revised modification extending medical benefits coverage through May 31, 2005.  The Steelworkers withdrew their objection.

<div align="center">

11

</div>

On April 21, 2005, the Bankruptcy Court entered an Order approving the joint application, including the modification, as revised (the "Retiree Order"). The Debtor made the $500 payment to each eligible Retiree from the X-Fund and amended its Schedules in accordance with the Retiree Order.

The Debtor has continued to pay Retiree's medical benefit claims incurred through May 31, 2005, that had not yet been processed due to the time lag between the date of service and the date the claim was submitted for reimbursement. Such payments have aggregated an additional $93,920 since May 31, 2005. The amounts the Debtor has paid on a monthly basis have decreased significantly and no further claims will be accepted or paid as of December 31, 2005.

## B.    ENVIRONMENTAL RELATED LIABILITIES AND LITIGATION

### 1.    Description of Environmental Liabilities

As a result of the Debtor's almost 200 years of industrial operations throughout the country, it has been involved in numerous matters relating to the discharge of materials into the environment. The Debtor has participated in a number of on-site cleanups of former operating locations and a number of off-site cleanup locations, which are managed by federal and/or local regulatory agencies. The Debtor was involved in up to twenty-five (25) such sites during the past ten years.

As of the Petition Date, the Debtor was aware of nine (9) environmental sites in which it was involved to varying degrees. Certain of the sites are interrelated due to such factors as, for example, the waste from one site may have been transported to, and disposed of, at another site or one site being within or part of the contamination caused by another site. In certain cases, the Debtor committed to performing certain activities and paying certain amounts of money pursuant to prepetition agreements and/or consent decrees, some of which have been approved by a court of competent jurisdiction. The Debtor has cooperated with local and federal governmental agencies in trying to reach a reasonable settlement of these remediation efforts. As of the Petition Date, the Debtor also was a defendant in a number of proceedings pending in the courts of Tennessee. In such cases, individual plaintiffs sought awards based on claims for property damages and/or personal injuries arising from environmental contamination for which the Debtor is alleged to have been partially or wholly responsible.

Due to the technical and legal nature of the potential environmental-related liabilities, the Debtor has utilized and continues to utilize (on a more limited basis) the services of local counsel and environmental consultants to obtain the technical advice and expertise necessary to ensure that the Debtor's rights are protected.

At virtually all of the sites, the Debtor is but one of several potentially responsible parties. The degree of the Debtor's potential liability varies from site to site. The remediation work at these sites is in varying stages of completion. As a result, in tracking these liabilities for accounting purposes, the Debtor always has faced an

ongoing uncertainty as to the ultimate cost of remediation and the Debtor's portion of financial responsibility.  Therefore, the extent of the Debtor 's liability, if any, cannot be determined with certainty.

2.    **The USA Sites**

Nine sites (collectively, the "USA Sites") in which the Debtor is alleged to have liability are supervised by the United States Department of Justice and the Environmental Protection Agency (the "USA").  On February 15, 2005, the USA filed a single proof of claim to, among other things, recover reimbursement of clean-up costs at the USA Sites (the "USA Claim").

The USA Sites consist of the following:

| USA Site | Potentially Responsible Parties (including the Debtor) | Status |
|---|---|---|
| Saltire Landfill Site, Waterbury, CT | 2 | Work at the site is being conducted in accordance with a Unilateral Administrative Order issued by EPA pursuant to CERCLA. |
| Solvents Recovery Service of New England Superfund Site, Southington, CT | Several hundred | Work at the site is being conducted in accordance with Consent Orders with issued pursuant to CERCLA. |
| Caldwell Trucking Superfund Site, Fairfield, NJ | 90 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Arrowhead Plating, Montross, VA | 3 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Maryland Sand, Gravel, and Stone Superfund Site, Elkton, MD | 40 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Dickson County Landfill, Dickson, TN | At least several, if not more | The Dickson County Landfill is under a State Order to assess and remediate the contamination related to the landfill. |
| Fultz Landfill Superfund Site, Byesville, OH | 5 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Puente Valley Operable Unit of the San Gabriel Valley Superfund Site Area 4, Los Angeles County, CA | 80 | Work at the site is being conducted by the potentially responsible parties other than the Debtor in accordance with a Consent Order with EPA issued pursuant to CERCLA.  The |

13

| USA Site | Potentially Responsible Parties (including the Debtor) | Status |
|---|---|---|
| | | United States disagrees with the characterization by the Debtor as to this site. |
| Saltire-Schrader Facility, Dickson, TN | At least 2 | The site investigation and cleanup was conducted pursuant to an administrative order issued pursuant to section 3008(h) of RCRA. |

As of the Petition Date, the Debtor was in compliance with all existing consent orders and decrees and was making payments to fund its share of remediation costs. During the past twenty years, the Debtor cooperated and engaged in numerous clean-up and remediation operations. The Debtor estimates that it paid in the aggregate at least $50 million for its share of cleanup costs at the USA Sites alone.

The USA Claim, when liquidated, will likely constitute, in the aggregate, the largest Claim against the Debtor's Estate. The USA seeks recovery for, among other things, reimbursement and future funding of remediation costs at the USA Sites. In most of these sites, the Debtor's alleged liability represents a modest percentage of the alleged aggregate liability of all the co-defendants.

### 3. The USA Motion regarding the Puente Valley Escrow

One of the USA Sites is known as the "Puente Valley Operable Unit of the San Gabriel Valley Superfund Site, Area 4." Prior to the Petition Date, the USA had commenced an enforcement action entitled, United States v. Acorn Engineering, Civil Action No. CV03-5470-WFR(FMOx), against the Debtor and eleven other defendants. This proceeding is pending in the United States District Court for the Central District of California, Western Division (the "California Court"). On December 16, 2002, the defendants, including the Debtor, conditionally entered into a Consent Decree purporting to resolve their respective liabilities in connection with this site. As part of this process, the Debtor signed an Escrow Account Agreement in May 2002. On or about July 5, 2002, pursuant to a Special Deposit Agreement, Saltire deposited into escrow $500,000 (the "Puente Valley Escrow"), subject to the approval of the Consent Decree by the California Court. It is a condition precedent to the release of the escrow fund to the USA that the Consent Decree be entered by the California Court. As of the date of this Disclosure Statement, the Consent Decree has been pending for nearly 2½ years without being approved by the California Court as to the Debtor.[4]

---

[4]     The USA has requested the Debtor to include the following factual allegations regarding the USA Motion:

> Saltire entered into Escrow and Special Deposit Agreements with the eleven other settling defendants to this action on May 31, 2002, to establish a fund to be used as payment to the United States upon entry of the Consent Decree. Under the terms of the Escrow Account, Saltire was required to make an irrevocable deposit of $500,000 into the escrow fund and agreed that upon the District Court's approval of the Consent Decree, all amounts paid into the escrow

Based on the terms of the Special Deposit Agreement, the Puente Valley Escrow Account and the Consent Decree, the USA took the position that the $500,000 that the Debtor deposited into the Puente Valley Escrow is not property of the Debtor's Estate and, therefore, is not subject to the automatic stay imposed by section 362(a) of the Bankruptcy Code.

On April 11, 2005, the USA filed a motion seeking, among other things, a declaration that the automatic stay contained in section 362 of the Bankruptcy Code did not apply to the Puente Valley Escrow (the "USA Motion"). The Debtor, joined by the Official Committee, opposed the USA Motion.

At a hearing conducted on May 3, 2005, the Bankruptcy Court denied the USA Motion in its entirety. By motion dated May 10, 2005, the USA asked the Bankruptcy Court to amend or alter its decision on the grounds that the Bankruptcy Court failed to apply the proper legal standards in deciding the USA Motion. In a decision, dated June 3, 2005, the Bankruptcy Court denied the USA's motion for reconsideration. On June 9, 2005, the USA timely filed a notice of appeal. The appeal has been docketed with the United States District Court for the Southern District of New York. The brief of the USA in support of its appeal is due to be filed no later than February 16, 2006. The appellee briefs of the Debtor and the Official Committee in opposition to the appeal are due no later than March 17, 2006. The USA's reply brief is due no later than March 31, 2006.

As a result of negotiations among the Debtor, the USA and the Official Committee, the parties agreed to a procedure so that the USA may pursue entry of the Consent Decree in the Puente Valley matter as to all parties other than the Debtor, so that the Debtor's rights to the Puente Valley Escrow remain unaffected.

Accordingly, on September 8, 2005, the California Court granted the USA's unopposed motion and entered the Consent Decree against all defendants except the Debtor. The Puente Valley Escrow, plus accrued interest thereon, remains intact and continues to earn interest.

---

account, plus interest, were to be released to the United States in the manner set forth in the Consent Decree. On July 5, 2002, in accordance with the Special Deposit Agreement terms, Saltire deposited $500,000 into the "Deposit Fund" as its contribution to the Escrow Account.

Under the terms of the Escrow Account, Saltire transferred its $500,000 deposit beyond its possession and control and retained only a narrow legal right to repossess this property contingent upon the occurrence of specified escrow conditions entirely beyond its control. Saltire then executed the U.S. v. Acorn Engineering, et al. Consent Decree on December 16, 2002, agreeing to entry of the Consent Decree without further notice. The United States simultaneously filed a Complaint and lodged a Consent Decree in the District Court for the Central District of California on July 31, 2003. U.S. v. Acorn Engineering, et al. (Civil Action No. CV03-5470-WJR(ABCOx)).

4. **Negotiations with the USA**

Despite the ongoing litigation between the USA and the Debtor concerning the Puente Valley Escrow, the parties, including the Official Committee, have met on several occasions to discuss the various aspects of the USA Claim and to explore the possibility of a global settlement respecting all of the USA Sites. These meetings have been constructive and resulted in a productive exchange of ideas and documentation regarding these sites. In addition to exchanging written settlement proposals, the Debtor has provided the USA with documentation analyzing the status of the USA sites, estimating the Debtor's liabilities for the sites, calculating the amounts the Debtor has expended to date for remediation and compliance, and providing a status of remediation efforts on a site-by-site basis.

Based on the foregoing, the Debtor is cautiously optimistic that a global resolution among the Debtor, the Official Committee and the USA can be reached concerning the USA Claim.

5. **Disposition of the Schrader-Dickson Facility.**

As of the Petition Date, the Debtor held title to approximately thirty-seven (37) acres of land in Dickson, Tennessee (the "Schrader-Dickson Facility"). The Debtor ceased operations at the Schrader-Dickson Facility more than twenty (20) years prior to the Petition Date. In addition, from 1986 through 1988, the USA ordered several investigations of the site. The site investigations resulted in ongoing monitoring and treatment obligations in accordance with a pre-petition administrative order issued pursuant to section 3008(h) of RCRA. The Debtor has continued to fund these monitoring and pump and treat obligations since May 1990 and has expended more than $11 million in investigation and remediation costs. The USA maintains that the Debtor's environmental obligations at this site may exceed another $3 million.

The Debtor and the USA have been and remain in discussions concerning the disposition of the Schrader-Dickson Facility. The site investigations have shown that the environmental issues at the Schrader-Dickson Facility do not present any imminent threat to the public health or welfare.

The Schrader-Dickson Facility has no value to the Estate and represents a continued drain on the Debtor's scant resources. The site has not generated income in over twenty (20) years and is not marketable.

Therefore, the Debtor has concluded that it is in the best interests of the Estate and its creditors to abandon, pursuant to section 554 of the Bankruptcy Code, the Schrader-Dickson Facility effective as of the date the Confirmation Order is entered.

Pursuant to section 554 of the Bankruptcy Code, a debtor in possession may abandon property which does not pose an imminent threat to public health and welfare. See Midlantic Nat'l Bank v. New Jersey Dep't of Environ. Protection, 474 U.S. 494, 507, 106 S. Ct. 755, 88 L.Ed.2d 859 (1986). Therefore, the Debtor's proposed abandonment of the Schrader-Dickson Facility is not in contravention of any statute or

regulation that is reasonably designed to protect the public health or welfare from identified environmental hazards.

## C.    TENNESSEE LITIGATION

### 1.    Description of Litigation

More than twenty years ago, the Debtor ceased manufacturing activities and operations in Dickson, Tennessee.  Over the past several years, however, the Debtor and/or Alper, the Debtor's parent, have been named as a defendant in six (6) lawsuits brought in the courts of the State of Tennessee (collectively, the "Tennessee Actions").[5] The plaintiffs (the "Dickson Plaintiffs") in the Tennessee Actions seek recovery for alleged property damage and/or personal injury claims relating to the Debtor's former operations in Dickson County (the "Tort Claims").

As the Debtor understands the complaints, each contains cursory allegations that Alper is the alter ego of, and/or successor in interest to, the Debtor. It is the Debtor's contention that, to the best of its knowledge, information and belief, any alleged liability on the part of Alper in the Tennessee Actions is derivative of claims against the Debtor.  In fact, Alper did not become the parent of the Debtor until 1992, approximately seven years after the Debtor had ceased business operations in Dickson County, Tennessee.  Moreover, the Debtor was a public corporation during the entire period (through March 1985) that the Dickson Plaintiffs allege that the Debtor contaminated the environment with hazard wastes.  The Debtor had no relationship or connection whatsoever to Alper during that time.  Alper only became the controlling indirect shareholder and ultimate parent of the Debtor subsequent to this period.  The Debtor never assigned any of its liabilities or prospective liabilities to Alper, and Alper never acquired or assumed the Debtor's liabilities or prospective liabilities by operation of law or otherwise.  As the Debtor perceived it, the claims asserted by the Dickson Plaintiffs against Alper were based on theories of alter ego and successor in interest liability and were derivative claims that not only had no legal or factual justification, but if they were colorable, under applicable Delaware case law, those claims belong exclusively to the Debtor.  As a result, the Debtor believed that the continued prosecution of the Tennessee Actions threatened to interfere with property of the Debtor's estate, *i.e.*, the derivative claims, and its ongoing settlement discussions with Alper.

### 2.    Adversary Proceeding against Dickson Plaintiffs

During this period, Alper and the Official Committee were negotiating, among other things, the amount of the settlement contribution to be made by, and the scope of the proposed releases to be granted to, Alper.  To provide the parties with preliminary injunctive protection while these negotiations were being finalized and, in part, to raise the legal issues associated with the proposed release and injunction to be

---

[5]    A similar seventh suit that was filed on March 8, 2005 against Alper and others was subsequently dismissed.

granted under the plan in Alper's favor, the Debtor, supported by the Official Committee, commenced an adversary proceeding by serving a summons and complaint (the "Complaint") on the Dickson Plaintiffs. The Complaint primarily sought a declaratory judgment that the automatic stay of section 362(a) of the Bankruptcy Code precluded the commencement or continuation of the Tennessee Actions against Alper, including any other action with respect to any property in which both Alper and the Debtor have a legal, beneficial, equitable, contractual or other interest. The Complaint also sought entry of a permanent injunction pursuant to section 105(a) of the Bankruptcy Code enjoining the pursuit of all such claims.

At the same time, the Debtor filed a motion seeking injunctive relief that would restrain and enjoin the commencement or continuation of any and all actions or other proceedings against Alper, including the Tennessee Actions, pending a final adjudication of the Complaint. The Debtor argued that an injunction was necessary because the claims against Alper in the Tennessee Actions are derivative of claims against the Debtor; the continued litigation of claims against Alper would place the Debtor at risk of being bound by a judgment adverse to Alper; and, finally, a judgment against Alper also would create a right of contribution or indemnification by Alper against the Debtor thereby increasing the Debtor's liabilities. Accordingly, the Debtor contended that the Court should exercise its power to grant a preliminary injunction to enjoin the Tort Claims asserted against Alper in the Tennessee Actions, pending the final adjudication of the Debtor's adversary proceeding seeking to permanently enjoin the Dickson plaintiffs' from prosecuting the Tort Claims.

After the Debtor served the Complaint and injunction motion papers, certain of the Dickson Plaintiffs jointly retained counsel and one group of plaintiffs appeared *pro se*. The Debtor and counsel reached an interim standstill agreement whereby the Dickson Plaintiffs agreed not to pursue any legal action against Alper until no fewer than 14 days after the Bankruptcy Court ruled on the Debtor's motion for a preliminary injunction. The parties also agreed to reschedule the hearing on the Motion from June 28, 2005 to July 28, 2005 and to a briefing schedule for the motion. The parties memorialized their agreement in a stipulation that the Bankruptcy Court so ordered on June 29, 2005.

On July 28, 2005, the Bankruptcy Court heard argument from the parties, including the Debtor, the Official Committee and the Dickson Plaintiffs. At the conclusion of the hearing, the Bankruptcy Court denied the Debtor's motion. Thereafter, following an extensive dialogue among the Debtor, the Official Committee and Alper, the parties renegotiated the terms and scope of the proposed settlement with Alper that has resulted in the amendment of the plan previously filed by the Debtor. Based on the Alper Settlement Agreement (as modified), the Debtor believes it can confirm its Plan on a largely consensual basis and that Creditors will receive enhanced Distributions on their Claims.

## D.     GENERAL BANKRUPTCY ADMINISTRATION

### 1.     Schedules of Assets and Liabilities and Statement of Financial Affairs

On August 24, 2004, the Debtor filed its Schedules with the Bankruptcy Court.  On January 25, 2005, the Debtor filed an amended statement of financial affairs.  On April 13, 2005, the Debtor filed an Amended Schedule F to reflect changes to its schedule of Holders of certain General Unsecured Claims.  On May 4, 2005, the Debtor filed an Amended Schedule F to reflect, among other things, the Allowed General Unsecured Claims of those Retirees affected by the Retiree Order.

### 2.     Deadline for Filing Proofs of Claim

By Order, dated November 3, 2004, the Bankruptcy Court fixed December 10, 2004 as the deadline for Creditors, excluding governmental entities, to file proofs of Claim against the Debtor based on prepetition debts or Liabilities.  The deadline for governmental entities was February 14, 2005.  To date, more than 470 proofs of Claim have been filed.  The asserted face amount of filed Claims exceeds $590 million in the aggregate, including Claims for unliquidated environmental contamination and personal injury and property damage.  Of these claims, several claims relating to the Tennessee Actions were filed by a single family and seek recovery of $560 million.  The Debtor so far has filed two omnibus objections to claims.

## VI.

## SUMMARY OF THE PLAN

## A.     GENERAL

This section of the Disclosure Statement summarizes the Plan, a copy of which appears as Exhibit 1 hereto.  YOU SHOULD READ THE PLAN IN ITS ENTIRETY AND DISCUSS THE DISTRIBUTIONS AND RIGHTS TO WHICH YOU ARE ENTITLED THEREUNDER WITH YOUR ADVISORS.

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests" are classified instead of "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class.  For purposes of this Disclosure Statement, the terms "Creditor" and "Equity Interest Holder" refer to the Holder, whether legal or beneficial, of a "Claim" or "Equity Interest", respectively, in a particular Class under the Plan.  If such Claims and Equity Interests are "impaired" under the Plan, their Holders are receiving this Disclosure Statement (and the related Ballots and other materials delivered together herewith) for the purpose of voting to accept or reject the Plan, if applicable.

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full on the effective date of the plan or are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively deemed to accept the plan. Accordingly, under section 1126(f) of the Bankruptcy Code, it is not necessary to solicit acceptances from the holders of claims or equity interests in such unimpaired classes. Pursuant to the Plan, Class 1 Priority Non-Tax Claims and Class 2 Secured Claims are not impaired and, therefore, Holders of Claims in these Classes are conclusively deemed to have accepted the Plan.

A Chapter 11 plan also may specify that certain classes of claims or equity interests will not receive or retain any property on the effective date of the plan. These are impaired claims or equity interests, but unlike those that are afforded some treatment by a plan, they receive no treatment and are therefore discharged and extinguished. Under section 1126(f) of the Bankruptcy Code, such classes are conclusively deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Pursuant to the Plan, Class 4 Intercompany Claims and Class 5 Equity Interests are impaired and shall receive no treatment or distribution under the Plan. Accordingly, Holders of Intercompany Claims in Class 4 and Equity Interests in Class 5 are deemed to have rejected the Plan and their votes will not be solicited.

Holders of General Unsecured Claims in Class 3 are impaired and are entitled to vote whether to accept or reject the Plan.

The "Effective Date" of the Plan means the date that is at least (11) eleven days (calculated under Rule 9006 of the Bankruptcy Rules) after the Confirmation Date if no stay of the Confirmation Order is then in effect, which date shall be fixed after the Confirmation Date by the Debtor by filing a notice thereof with the Bankruptcy Court. On the Effective Date, the transactions and distributions contemplated under the Plan are to be effected; provided, however, that in no event will the Effective Date occur prior to the satisfaction of the conditions precedent to the occurrence of the Effective Date of the Plan specified in Section 11.2 of the Plan, unless waived as provided in Section 11.3 of the Plan.

The Plan is the product of extensive negotiations among the Debtor, the Official Committee and Alper. Under the Plan, the Holders of Allowed Administrative Expense Claims and Allowed Priority Claims will be paid on the Effective Date in full, in Cash, by the Debtor. The Holders of Allowed General Unsecured Claims are entitled to receive periodic pro rata Distributions of Aggregate Cash in an amount up to 100% of their Allowed Claims.

20

**B.    DESCRIPTION AND TREATMENT OF CLAIMS
AND EQUITY INTERESTS UNDER THE PLAN**

### 1.    Unclassified Claims

#### A.    Administrative Expense Claims

Creditors holding Allowed Administrative Expense Claims are those Entities holding Claims against the Debtor entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including: (i) all actual and necessary costs and expenses of preserving the Debtor's Estate; (ii) any actual and necessary costs and expenses of operating the business of the Debtor; (iii) any indebtedness or obligations incurred or assumed by the Debtor after the Petition Date in connection with the conduct or operation of its business; and (iv) any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 331 of the Bankruptcy Code, whether fixed before or after the Effective Date.

Subject to the Administrative Bar Date provisions herein and except to the extent the Debtor or the Liquidating Trustee and the Holder of an Allowed Administrative Expense Claim agree to a different treatment, each Holder of an Allowed Administrative Expense Claim shall be paid, in Cash, by the Debtor or the Liquidating Trustee an amount equal to such Allowed Administrative Expense Claim on the later of (a) the Effective Date or (b) ten (10) Business Days after the date on which such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

#### B.    Priority Tax Claims

Creditors holding Priority Tax Claims are governmental units with Claims against the Debtor entitled to priority under section 507(a)(8) of the Bankruptcy Code. Such Claims are for taxes based on income or gross receipts, property taxes, taxes of other parties required to be collected or withheld by the Debtor on behalf of governmental units, excise taxes, transfer taxes, custom duties and penalties for actual pecuniary loss related to the foregoing.

On the Effective Date, or as soon as practicable after such Claims become Allowed Claims if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amount and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

2.     **Classified Claims and Equity Interests**

A.     **Priority Non-Tax Claims (Class 1)**

Holders of Class 1 Claims are those Creditors holding Priority Claims against the Debtor, other than Administrative Expense Claims and Priority Tax Claims, that are entitled to priority under section 507(a) of the Bankruptcy Code. These Claims may include employee wages, salaries and commissions (subject in all such cases to certain limitations prescribed by the Bankruptcy Code).

On the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amount and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

**Class 1 Priority Non-Tax Claims are not impaired under the Plan.**

B.     **Secured Claims (Class 2)**

Holders of Class 2 Claims are those Creditors holding Secured Claims against the Debtor.

The Debtor does not believe there will be any Allowed Claims in Class 2 as of the Effective Date because the Holder of the only known Secured Claim was paid in full pursuant to a Final Order entered by the Bankruptcy Court during the Case. Accordingly, the Debtor believes all Class 2 Claims already have been satisfied.

In the event and to the extent there exist any Allowed Secured Claims against the Debtor, each Holder of an Allowed Secured Claim shall receive, in the Debtor's sole discretion, one of the following types of Distribution:

(a)     (i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash, on the later of (A) the Effective Date or as soon thereafter as may be practicable, or (B) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practicable; and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the amount of such Holder's Allowed Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan; or

(b)     the Debtor shall abandon the property that secures the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or (ii) that date that

22

is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order;  or

(c)    such other treatment as the Holder and the Debtor shall agree upon in writing.

**Class 2 Secured Claims are not impaired under the Plan.**

### C.    General Unsecured Claims (Class 3)

Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of its Allowed Class 3 Claim, periodic ratable Distributions from the Liquidating Trust in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim;  provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Debtor's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.

**Class 3 General Unsecured Claims are impaired under the Plan.**

### D.    Intercompany Claims (Class 4)

Pursuant to the Alper Settlement Agreement, Alper will waive all claims against the Debtor's Estate, in their entirety and with prejudice, including but not limited to its Intercompany Claim under the Alper management agreement in the amount of $1,264,392.00.  Accordingly, on the Effective Date, Alper shall not receive any Distribution and any such Intercompany Claims shall be deemed discharged.

**Class 4 Intercompany Claims are impaired under the Plan.**

### E.    Equity Interests (Class 5)

On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests.  As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

**Class 5 Equity Interests are impaired under the Plan.**

C.    **TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN**

    1.    <u>Prosecution of Objections to Disputed Claims</u>

        Upon the Effective Date, the Liquidating Trustee shall be responsible for pursuing any objection to the allowance of all Disputed Claims with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.  The Liquidating Trustee may compromise and settle any Disputed Claims.  The Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019(a).  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed no later than one hundred twenty (120) days after the Effective Date; <u>provided</u>, <u>however</u>, that this deadline may be extended upon motion by the Liquidating Trustee, without notice to Creditors.

    2.    <u>No Distributions Pending Allowance of a Disputed Claim</u>

        Notwithstanding any other provision of the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until it becomes an Allowed Claim.

    3.    <u>Distributions After Allowance of a Disputed Claim</u>

        Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims in which such Allowed Claim is classified.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim any payment that would have been distributed to such Holder if the Claim had been Allowed on the Effective Date, plus any payments that would have been made on account of such Allowed Claim after the Effective Date, without any interest thereon.

    4.    <u>Disputed Claims Reserve</u>

        On the Effective Date, and prior to making the Distributions to Holders of Allowed General Unsecured Claims required to be made on the Effective Date, the Liquidating Trustee shall establish a Disputed Claims Reserve.  Distributions from the Disputed Claims Reserve shall be governed by Articles III and IV of the Plan.  If, and when, a Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall utilize funds in the Disputed Claims Reserve to make Distributions on account of such Allowed Claim.

D.    **EXECUTORY CONTRACTS AND
        UNEXPIRED LEASES UNDER THE PLAN**

In accordance with Section 10.1 of the Plan, the Plan constitutes a motion by the Debtor to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for any Executory Contract that (a) has been assumed pursuant to an order of the Bankruptcy Court prior to the Effective Date, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code and pending on the Effective Date.

If the rejection of any Executory Contract under the Plan or other pending objection results in damages to the other party or parties to such contract, a Claim for such damages (a "Rejection Claim"), if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Estate, or its properties or interests in property or agents, successors, or assigns, unless a proof of Rejection Claim is filed with the Bankruptcy Court and served upon the Debtor and the Liquidating Trustee (in the event the Effective Date has occurred), on or before thirty (30) days after the earlier to occur of (a) the Effective Date and (b) the entry of an order by the Bankruptcy Court authorizing rejection of a particular Executory Contract.

Any Rejection Claim filed will be treated as a Disputed Claim until the period of time has elapsed within which the Liquidating Trustee may file an objection to such Claim. If no such objection is filed within the prescribed period under the Plan, the Claim shall be deemed as of the expiration of said period to be an Allowed General Unsecured Claim, and the holder thereof have the rights of a Holder of an Allowed General Unsecured Claim.

E.    **CONDITIONS PRECEDENT TO THE CONFIRMATION
        DATE AND THE EFFECTIVE DATE OF THE PLAN**

1.    **Conditions Precedent to Confirmation of the Plan**

This Plan may not be confirmed unless each of the following conditions has been satisfied: (a) the Disclosure Statement Order shall have been entered on the legal docket for the Case and shall have become a Final Order; (b) the Confirmation Order shall be in a form reasonably acceptable to the Debtor and the Official Committee; and (c) the Alper Settlement Agreement has been approved through the Confirmation Order.

2.    **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date is subject to satisfaction of the following conditions: (a) the Confirmation Order shall have been entered on the legal docket for the Case and shall have become a Final Order; (b) Alper shall have paid $1,000,000 to the Debtor's Estate within forty-five (45) days of the entry of the Confirmation Order; (c) upon the entry of the Confirmation Order, Grupo shall have

paid the Debtor's Estate an amount equal to 50% of the total outstanding balance due to the Debtor under the Grupo Note; (d) within forty-five (45) days of the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate the remaining balance due under the Grupo Note, including all accrued interest thereon; and (e) all actions and documents necessary to implement the provisions of this Plan shall have been effected or executed and delivered.

Payment in full of the Grupo Note and the $1,000,000 settlement payment by Alper are express conditions to the Effective Date of the Plan. The Effective Date of the Plan shall be no earlier than two (2) business days after all payments by Alper and Grupo have been paid in full through cleared funds to the Debtor's Estate.

## F.    WAIVER OF CONDITIONS PRECEDENT

The conditions precedent in Sections 11.1 and 11.2 of the Plan as described above, except for the requirements that the Disclosure Statement Order and the Confirmation Order must be entered and become Final Orders, may be waived or modified, in whole or in part, upon the joint consent of the Debtor and the Official Committee. Any such waiver or modification of a condition precedent in Sections 11.1 and 11.2 hereof may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any other formal action.

## VII.

## MEANS OF IMPLEMENTATION OF THE PLAN

## A.    GENERAL

Each of the transactions required to implement the Plan will be implemented in accordance with the provisions of the Plan, including Article VII thereof.

## B.    CREATION OF THE LIQUIDATING TRUST

On the Effective Date or as soon thereafter as is practicable, all of the assets of the Debtor's Estate will be transferred to the Liquidating Trust for the benefit of Holders of General Unsecured Claims, including, but not limited to, all Cash, receivables and Causes of Action; provided, however, that the Debtor shall retain such Cash as may be necessary to fund (i) Distributions on the Effective Date to Holders of Allowed Administrative Expense Claims and Allowed Priority Claims, and (ii) the creation and maintenance of the Operating Reserve Account.

**C.      APPOINTMENT AND DUTIES OF THE LIQUIDATING TRUSTEE**

At least ten (10) days prior to the Confirmation Hearing, the Official Committee shall designate the Liquidating Trustee who shall be paid in accordance with the terms of the Liquidating Trust Agreement.

On the Effective Date or as soon thereafter as practicable, all Cash and Assets of the Debtor, including but not limited to Causes of Action, shall be transferred to the Liquidating Trust for liquidation and distribution in accordance with the Plan and the Liquidating Trust Agreement.

As of each March 31, June 30, September 30 and December 31, the Liquidating Trustee shall prepare a quarterly report, and, upon the resolution of the last Disputed Claim or Cause of Action, a final report, regarding receipts, disbursements and the status of pending, contemplated and resolved Disputed Claims and Causes of Action. Such report shall be filed with the Bankruptcy Court and a copy shall be delivered to the Debtor within fifteen (15) days of the end of each calendar quarter and the final report on or before sixty (60) days following the resolution of the last Disputed Claim, Avoidance Action or Cause of Action.

For purposes of making Distributions on account of Allowed Claims under the terms and conditions of the Plan, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code.

**D.      ESTABLISHMENT OF THE OPERATING RESERVE ACCOUNT**

On or before the Effective Date, the Debtor will establish the Operating Reserve Account. The Operating Reserve Account shall be used to pay the post-Confirmation Date Administrative Expense Claims of the Case, including the fees and expenses of any Professionals by the Debtor and/or the Official Committee. The Operating Reserve Account will be funded from the Estate's Available Cash. When the Plan has been consummated and the Debtor dissolved, any remaining funds in the Operating Reserve Account shall be transferred to the Liquidating Trustee.

**E.      DISTRIBUTIONS UNDER THE PLAN**

**1.      Date of Distributions**

Any Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for under the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## 2.     Delivery of Distributions

Subject to Rule 9010 of the Bankruptcy Rules, and except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made at the address of each of such Holders as set forth in the Schedules filed by the Debtor with the Bankruptcy Court, unless superseded by the address set forth on proofs of Claim filed by such Holders (or at the last known address of such Holders if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address). If any Distribution to any Holder is returned as undeliverable, the Liquidating Trust shall use reasonable efforts to determine the current address of such Holder, but no Distribution to any such Holder shall be made unless and until the Liquidating Trust has determined the then current address of such Holder, at which time such Distribution to such Holder shall be made to such Holder without interest. Amounts in respect of any undeliverable Distributions made by the Liquidating Trust shall be returned to the Liquidating Trust until such Distributions are claimed. If such Distributions are not claimed by the expiration of the later of: (a) one year from the Effective Date; or (b) one year from the actual date of the making of such Distribution (the "Unclaimed Distribution Date"), such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. If no proofs of Claim are filed and the Schedules filed with the Bankruptcy Court fail to state addresses for Holders of Allowed Claims, Distributions that would have been made on account of such Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the Unclaimed Distribution Date. After the Unclaimed Distribution Date, all unclaimed property shall be transferred to the Liquidating Trust for Distribution to Holders of Allowed General Unsecured Claims and the Claim of any Holder to such property shall be discharged and forever barred.

## 3.     Time Bar to Cash Payments

Any check issued by the Debtor or the Liquidating Trustee, as the case may be, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof, unless it has been returned as undeliverable. Requests for reissuance of any check shall be made in writing directly to the Debtor or the Liquidating Trust, as the case may be, by the Holder of the Allowed Claim with respect to which such check originally was issued. Any request for reissuance of a voided check constituting the Distribution in respect of an Allowed Claim shall be made in writing on or before the first anniversary of the Effective Date. After such date, all Claims in respect of void checks shall be discharged and forever barred.

## 4.     Disputed Distributions

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, in lieu of making a Distribution to such Person, the Debtor and/or Liquidating Trustee, as the case may be, shall deposit the Distribution at issue into a segregated account until the disposition of such Distribution is determined

by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

      **5.**      **Manner of Payment Under the Plan**

      At the option of the Debtor or the Liquidating Trustee, as the case may be, any Distribution of Cash to be made pursuant to this Plan may be made by a check or wire transfer, or as otherwise required by or provided in applicable agreements.

      **6.**      **Distributions After Effective Date**

      Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**F.**      **OFFICIAL COMMITTEE**

      As of the Effective Date, the Official Committee shall be deemed dissolved and shall have no further duties, authority or responsibility under the Bankruptcy Code, or otherwise, with respect to the Debtor, its assets, or the Plan.  Neither the Debtor nor the Liquidating Trustee shall be responsible for any fees, costs or expenses of the Official Committee, its individual members or its Professionals incurred after the Effective Date;  provided, however, that following the Effective Date, the responsibilities of the Official Committee and its Professionals shall be limited to the preparation and prosecution of their respective fee applications for which they shall be entitled to reasonable compensation by the Debtor.

**G.**      **CORPORATE ACTION AND CONTINUED EXISTENCE OF DEBTOR**

      From and after the Confirmation Date, the Debtor shall continue in existence solely for the purpose of winding up its affairs as expeditiously as reasonably possible.  Except as otherwise provided in the Plan, the Plan will be administered by the Liquidating Trustee and all actions taken thereunder shall be taken through the Liquidating Trustee.

      From and after the Confirmation Date, the then current officers and directors of the Debtor shall continue to serve in their respective capacities through the earlier of the date the Debtor is dissolved under applicable state law and the date such officer or director resigns, is replaced or is terminated.  The officer and directors of the Debtor shall continue to serve in their respective capacities on the same terms and conditions upon which they presently serve the Debtor.  In addition, after Confirmation and throughout the winding down period, the remaining officers of the Debtor will remain reasonably available to the Liquidating Trustee to assist in the liquidation of any and all assets, including but not limited to, Causes of Action.

# VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.    DISCHARGE OF DEBTOR**

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan and the Confirmation Order shall not discharge the Debtor from any Claim or Liability that arose before the Confirmation Date.

**B.    DEBTOR'S AUTHORITY**

Until the Effective Date, the Bankruptcy Court shall retain custody and jurisdiction of the Debtor, its properties, interests in property and operations.  On the Effective Date, the Debtor, its properties and interests in property and operations shall be released from the custody and jurisdiction of the Bankruptcy Court, except as provided in Article XV of the Plan.

**C.    VESTING AND LIENS**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, title to all Avoidance Actions, Causes of Action, Assets and Cash of the Debtor and its Estate shall vest in the Liquidating Trust, free and clear of aliens, Claims and Interests.  The Liquidating Trust is a grantor trust and is assumed to have no tax liabilities.  On or before the Effective Date, the Liquidating Trust and the Debtor shall enter into the Liquidating Trust Agreement.  The Liquidating Trustee shall liquidate the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan.  The Debtor shall execute any and all documents necessary to transfer and convey all of its Assets not otherwise required to satisfy its obligations under the Plan to the Liquidating Trust on the Effective Date.

**D.    TERMINATION OF BANKRUPTCY INJUNCTIONS OR STAYS**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays provided for in the Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the occurrence of the Effective Date, all such injunctions or stays shall be deemed terminated or vacated and shall have no further force and effect.

E.     **INJUNCTION AND RELEASES OF CLAIMS**

1.     <u>General Injunction</u>

The Debtor shall seek the entry of a Confirmation Order that provides for an injunction permanently enjoining and restraining all Entities from:

(i)     Commencing or continuing any action or proceeding respecting any claim or interest against the Debtor or its property (other than abandoned property);

(ii)     Enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);

(iii)     Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);

(iv)     Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and

(v)     Performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

2.     <u>Release and Injunction in Favor of Alper</u>

**As of the Effective Date, the Debtor, on its own behalf, and on behalf of its estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, releases, acquits and forever discharges Alper and its principals, shareholders, subsidiaries, affiliates, and their respective employees, agents, representatives, officers, directors, members, partners, professionals (all solely in their capacities as such), successors and assigns, and any Entity claimed to be liable derivatively through the Debtor, or any of the foregoing (each such party, a "Released Party") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of this Case or during the course of the Case (including through the Effective Date), in any way relating to the Debtor, this Case, or the ownership, management, and operation of the Debtor, that the Debtor could assert directly or any Holder of a Claim or Interest or other Entity could assert derivatively or on behalf of the Debtor or its Estate (the "Released**

Claims"); <u>provided</u> <u>that</u> the foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or cause of action arising out of any express contractual obligation owing by any current or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation of any current or former, director, officer, or employee with respect to a loan or advance made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or cause of action against Grupo and its employees, agents, representatives, officers, directors, members, partners, professionals, successors and assigns (all solely in their capacities as such). The releases described in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity. Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

The Confirmation Order shall provide that the Debtor and its Estate shall be permanently enjoined, from and after the Effective Date, from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to this Plan.

3.    <u>Exculpation</u>

As of the Effective Date, each Holder of a Claim or Equity Interest, each party-in-interest and each Entity acting or claiming or purporting to act or claim by, through under or on behalf of any of the foregoing, shall forever be enjoined from the commencement or continuation of any action, the employment of process, or any act to assert a claim for relief against the Debtor, the Official Committee, Alper and their respective officers, directors, attorneys or other professionals (collectively, the "Plan Releasees") in respect of: (A) any actions taken or not taken in connection with the Case; (B) the Plan; (C) the Disclosure Statement; (D) Distributions, payments or transfers made under the Plan; (E) acts performed pursuant to the Plan; (F) any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with the Plan; or (G) any Claim compromised, settled or released under or pursuant to the Plan; <u>provided</u>, <u>however</u>, that the foregoing release shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for any acts, or omissions to act, evidencing and/or constituting gross negligence, willful misconduct, breach of fiduciary duty or malpractice. Notwithstanding the foregoing, under no circumstances shall a nondebtor third party be enjoined from the continuation or commencement of any derivative action against a Released Party, except to the extent such derivative claim is property of the Debtor's Estate.

### F. AVOIDANCE ACTIONS AND OTHER CAUSES OF ACTIONS

#### 1. <u>Bankruptcy Code Avoidance and Recovery Actions</u>

Except as released under Section 13.1(b) of the Plan, as of the Effective Date, the Liquidating Trustee shall retain the right to prosecute, on behalf of itself and the Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor, Debtor in Possession or the Estate, and the Liquidating Trustee expressly retains the right to assert such claims and Causes of Action as defenses to, and setoffs against, Disputed General Unsecured Claims. The Liquidating Trustee may prosecute, compromise and settle any Cause of Action it deems necessary and appropriate. All settlements shall be subject to Bankruptcy Court approval under Bankruptcy Rule 9019.

All Causes of Action, whether asserted or not as of the Effective Date, are specifically preserved by the Plan and will survive the occurrence of the Effective Date. Any Cause of Action asserted or commenced as of the Effective Date shall be prosecuted, settled, withdrawn or otherwise disposed of by the Debtor or the Liquidating Trust, as the case may be, in their sole discretion, subject, only to applicable judicial requirements or duties or requirements imposed under the Plan.

### G. RETENTION OF JURISDICTION

Section 15.1 of the Plan provides that, as of the Effective Date, the Bankruptcy Court will retain jurisdiction with respect to the matters listed below. If the Bankruptcy Court exercises its retained jurisdiction, it will have exclusive jurisdiction with respect of all matters arising out of, and relating to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

    (a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

    (b)    To determine any and all adversary proceedings, applications and contested matters;

    (c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

    (d)    To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    To issue such orders in aid of execution of the Plan in accordance with section 1142 of the Bankruptcy Code;

(g)    To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to implementation and effectuation of the Plan;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    To compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(l)    To enforce remedies upon any default under the Plan;

(m)    To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan;

(p)    To determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)    To enter a final decree closing the Case.

34

## H.    MODIFICATION OF THE PLAN

After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper; provided, however, the Plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified in accordance with Section 15.2 of the Plan if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

## I.    NOTICES

To be effective under the Plan, all notices, requests and demands to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtor:

Saltire Industrial, Inc.
274 Riverside Avenue
Westport, CT 06880
Attn.: Robert A. Bertellotti
Telephone:    (203) 454-0077
Telecopier:    (203) 454-2277

with copies to:

Togut, Segal & Segal LLP
One Penn Plaza
Suite 3335
New York, New York 10119
Attn:   Scott E. Ratner
Telephone:    (212) 594-5000
Telecopier:    (212) 967-4258

To the Official Committee:

      Lowenstein Sandler PC
      1251 Avenue of the Americas
      18th Floor
      New York, New York  10020
      Attn.:  Michael S. Etkin
      Telephone:    (212) 262-6700
      Telecopier:    (212) 262-7402

## IX.

## CERTAIN U.S. TAX CONSEQUENCES OF THE PLAN

The Debtor has not evaluated the tax consequences of the Plan to Holders of Claims and Equity Interests.  EACH HOLDER OF A CLAIM AGAINST, OR EQUITY INTEREST IN, THE DEBTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.

## X.

## VOTING AND CONFIRMATION OF THE PLAN

For the Plan to be confirmed, various statutory conditions prescribed by the Bankruptcy Code must be satisfied, including:  (i) acceptance of the Plan by at least one impaired Class of Claims entitled to vote on the Plan;  (ii) provision for payment or distribution under the Plan to each claimant of money and/or other property at least equal in value to what the claimant would have received in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code;  (iii) a finding by the Bankruptcy Court that the Plan is feasible;  and (iv) with respect to each Class, either acceptance of the Plan by that Class or a finding by the Bankruptcy Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against that Class.

The Disclosure Statement has been approved by order of the Bankruptcy Court, dated December 28, 2005.  Accordingly, this Disclosure Statement is being used in connection with the solicitation of acceptances of the Plan from those Creditors holding Claims in Classes entitled to vote on the Plan.

## A.    WHO MAY VOTE

Only the Holder of a Claim in a Class that is impaired under the Plan and that is not deemed to have rejected the Plan is entitled to vote on acceptance or rejection of the Plan.  Generally, section 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless the proposed plan of reorganization

36

proposed leaves unaltered the legal, equitable and contractual rights of the holder of the claim or interest. In addition, those classes are impaired unless all outstanding defaults, other than defaults relating to the solvency or financial condition of the debtor or the commencement of the Chapter 11 case, have been cured and the holders of claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance on any contractual provisions or applicable law to demand accelerated payment.

Classes 1 and 2 are not impaired under the Plan and, as such, Classes 1 and 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, the Holders of Claims in Classes 1 and 2 are not receiving a Ballot to vote to accept or reject the Plan.

Class 3 is impaired hereunder and the Holders of General Unsecured Claims in such Class are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims in Class 4 and Equity Interests in Class 5 are receiving no Distributions under the Plan, and accordingly, each of Class 4 and Class 5 is conclusively deemed to have rejected the Plan. Therefore, the Holders of Claims and/or Equity Interests in Classes 4 and 5 are not receiving a Ballot to vote to accept or reject the Plan.

The Bankruptcy Code requires, as a condition to confirmation of a consensual plan, that each class of claims against, or equity interests in, a debtor that is impaired under a proposed plan vote to accept such plan. The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims in that class that cast ballots for acceptance or rejection of the plan. Under the Bankruptcy Code, acceptance by a class of equity interests requires the acceptance by the holders of at least two-thirds (2/3) of the allowed equity interests of that class held by the holders of equity interests who cast ballots for acceptance or rejection of the plan (that is, at least two-thirds of the shares voting on the plan must vote in favor of the plan to constitute acceptance by a particular class of equity interests).

For the Plan to be confirmable under section 1129(a) of the Bankruptcy Code, the Plan must be accepted by the requisite majorities of holders of claims. For a complete description of the requirements for acceptance of the Plan, see "Voting and Confirmation of the Plan -- Confirmation and Consummation of the Plan," in subsection "C" immediately below.

The Debtor may also seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, notwithstanding the nonacceptance of the Plan by one or more impaired Classes of Claims. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests. Under that Bankruptcy Code section, a plan of reorganization may be confirmed if it does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting class.

A Creditor is entitled to vote only if either (i) its Claim has been scheduled by the Debtor as not disputed, contingent or unliquidated, or (ii) it has filed a proof of Claim on or before the applicable Bar Date that is not (a) contingent in nature and/or unliquidated in amount or (b) the subject of a pending objection.

The Holder of a Disputed Claim, or a Claim which is unliquidated and/or contingent, is not entitled to vote unless the Creditor has obtained a Final Order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan. If a Creditor has filed an unliquidated or contingent proof of Claim, *i.e.*, the Creditor failed to specify the dollar amount in the proof of Claim or the Liability is subject to judicial determination, then pursuant to Bankruptcy Rule 3018(a), a dollar value for each such Claim may be estimated and allowed by the Bankruptcy Court solely for voting purposes. A Creditor's vote may be disregarded if the Bankruptcy Court determines that its acceptance or rejection was not solicited or procured in accordance with the provisions of the Bankruptcy Code.

## B.    VOTING PROCEDURES

A Ballot is enclosed herewith for each Holder of a Claim eligible to vote on the Plan, which will serve as the official Ballot for indicating acceptance or rejection of the Plan pursuant to the requirements of sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018(c). In voting for or against the Plan, a Creditor must use only the Ballot sent with this Disclosure Statement.

After carefully reviewing this Disclosure Statement, including the Exhibits hereto, each Creditor holding an General Unsecured Claim in impaired Class 3 should vote using the enclosed Ballot and return the Ballot in the pre-addressed envelope so that it is actually received no later than 5:00 p.m. Eastern Prevailing time on February 20, 2006 (the "Voting Deadline"). Please vote and return your Ballot to the Debtor's agent for purposes of receiving and tabulating Ballots ("Voting Agent"):

> The Garden City Group, Inc.
> 105 Maxess Road
> Melville, NY 11747
> Attention:    Ms. Karen E. Petriano

TO BE COUNTED, YOUR BALLOT MUST BE SIGNED AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SPECIFIED ABOVE BY 5:00 P.M. EASTERN PREVAILING TIME ON OR BEFORE FEBRUARY 20, 2006. ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN (OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION) WILL NOT BE CONSIDERED IN THE TABULATION OF VOTES OF THE PLAN.

IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS REGARDING THE VOTING PROCEDURES, CALL (212) 594-5000, ATTENTION:  MS. DAWN PERSON.

For the Plan to be accepted by a Class, at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of each impaired Class that are actually voted must be cast for acceptance of the Plan.  Thus, only Creditors who actually vote on the Plan (*i.e.*, by timely returning a properly completed Ballot) are counted in determining whether the Plan has been accepted or rejected.

If you have any questions about this Disclosure Statement or the Plan or other aspects of the Case, you may contact the Debtor's attorneys at:

> Togut, Segal & Segal LLP
> One Penn Plaza
> Suite 3335
> New York, New York 10119
> (212) 594-5000
> Attention:  Ms. Dawn Person

## C.    CONFIRMATION AND CONSUMMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 1.    <u>Confirmation Hearing</u>

Section 1129(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for March 8, 2006, at 10:00 a.m. in Courtroom 623 located at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004.

### 2.    <u>Objections to Confirmation of the Plan</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether it is entitled to vote thereon.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has directed that, on or before February 20, 2006 by 5:00 p.m. (Eastern Prevailing time), any written objections to the Plan must be filed with the Bankruptcy Court and a copy served upon counsel for the Debtor and other parties in interest.  Unless the Bankruptcy Court schedules a separate hearing to consider objections to confirmation of the Plan, all properly filed and served objections will be considered by the Bankruptcy Court at the Confirmation Hearing.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the hearing or any adjourned hearing.  While the Debtor anticipates that any hearing to consider objections to the confirmation of the Plan will be held in conjunction with the Confirmation Hearing, there can be no assurance that such will be the case.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 3.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of sections 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include:

(a)    "Best Interests Test" - Confirmation of the Plan requires that, with respect to each impaired Class of Claims, each Holder of an Allowed Claim in the Class has either accepted the Plan or will receive a Distribution under the Plan of property (such as Cash) of a value, as of the Effective Date, that is not less than the amount the Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

(b)    Feasibility of the Plan - In order for the Plan to be confirmed, the Bankruptcy Court must determine that it is feasible;  that is, as a practical matter, the Debtor has sufficient resources to meet the obligations prescribed under the Plan on a timely basis according to its terms.  The Debtor believes the Plan is feasible.

(c)    Acceptance by Impaired Classes - Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired Class must accept the Plan by the requisite votes for confirmation to occur.  A Class of impaired Claims will have accepted the Plan if at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims actually voting in the Class have voted in favor of the Plan. In the event any Class of Claims that is impaired under the Plan fails to accept the Plan by the minimum percentage of votes, the Debtor may seek to modify the Plan or seek confirmation pursuant to the so-called "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to the "dissenting" Class.

### 4.    Fair and Equitable Test (Cram-Down)

Under section 1129(b) of the Bankruptcy Code, "fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests:

(a)    With respect to a <u>secured</u> claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed secured claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of its interest in the property securing its liens;  (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of its lien, the impaired secured creditor receives a lien attaching to the proceeds of the sale;  or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

(b)    With respect to an <u>unsecured</u> claim, "fair and equitable" means either (i) the impaired unsecured creditor receives property of a value, as of the effective date, equal to the amount of its allowed claim;  or (ii) the holders of all claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)    With respect to a class of equity interests, "fair and equitable" means either (i) each holder of an interest in such class receives or retains, on account of such interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest;  or (ii) the holder of any interest that is junior to the interest of such class will not receive or retain any property on account of such junior interest.

## XI.

## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must determine that the Plan is in the "best interests" of each Holder of a Claim in any such impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each dissenting member of such impaired Class a recovery on account of the Holder's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that such Creditor would receive if the Debtor and its property were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what the members of each impaired Class of Claims would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Case were converted to a case under Chapter 7 of the Bankruptcy Code and the Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any Cash held by the Debtor.

Prior to the Petition Date, substantially all of the Debtor's assets already were liquidated and reduced to Cash or its equivalents. However, the liquidation of the Debtor's remaining assets under Chapter 7 would entail the appointment of a trustee who would not have any experience with the Debtor's records and remaining assets to be liquidated. Such trustee also would lack the historical knowledge and basis to evaluate and help liquidate the Debtor's significant Legacy Liabilities – virtually all of which are contingent, disputed and/or unliquidated in nature. A substantial period of time would be required for the education of the trustee, who would retain his or her own professionals (*i.e.*, attorneys, accountants, etc.), to conclude the liquidation of the Debtor's Estate and would add an additional layer of administration costs to this Estate. Moreover, further delay would result from the need to fix claims that are being compromised by the Plan. Additionally, in a Chapter 7 context, there are no assurances

that the $1,000,000 consideration to be received by the Estate in connection with the Alper Settlement Agreement will still be available, nor can there be any assurances that the Grupo Note will be paid in full in the same manner as provided for under the Plan. As a result, the conversion of the Debtor's case to Chapter 7 would significantly delay the transmittal of, and reduce the amount of, Distributions to the Holders of Allowed Claims.  The Debtor believes substantial cost and delay will be avoided by confirmation of the Plan.  Consequently, the Plan will provide a greater return, in a more expedient manner, to Holders of Allowed Claims than would dismissal of the Case or a conversion to a Chapter 7 liquidation.  Moreover, given the fact that the Plan proposes to make Distributions to Creditors in accordance with so-called "absolute priority" scheme of the Bankruptcy Code, the Plan, by definition, provides Creditors with at least as much as they would receive in a liquidation under Chapter 7.

<div align="center">**[continued on the following page]**</div>

## XII.

## CONCLUSION

Accordingly, the Debtor urges all Creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before 5:00 p.m. (New York) time on February 20, 2006.

Dated:   December 28, 2005

SALTIRE INDUSTRIAL, INC.,
Debtor and Debtor in Possession

By:  /s/ Robert A. Bertellotti
    Name:  Robert A. Bertellotti
    Title:    President

TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

By:  /s/ Scott E. Ratner
    SCOTT E. RATNER (SR-0015)
    A Member of the Firm
    One Penn Plaza
    Suite 3335
    New York, New York 10119
    Telephone (212) 594-5000

# EXHIBIT 1

PLAN OF LIQUIDATION

(Filed Separately)

# EXHIBIT 2

FORM OF BALLOT

**MUST BE RECEIVED BY 5:00 PM EASTERN STANDARD TIME _____, 2006**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                          :     Chapter 11
                                                :     Case No.  04-15389 [BRL]
        SALTIRE INDUSTRIAL, INC.,               :
                                                :     **Ballot for Plan of Liquidation**
                                Debtor.          :
-----------------------------------------------------------------x

## CLASS 4 - GENERAL UNSECURED CLAIMS

    1.      **VOTE ON PLAN**     <u>NOTE</u>:  PLEASE CHECK ONLY ONE BOX BELOW.  IF NO BOXES ARE CHECKED, OR IF BOTH BOXES ARE CHECKED, THIS BALLOT WILL NOT BE COUNTED IN THE VOTING ON THE PLAN.  A BALLOT THAT IS NOT SIGNED WILL NOT COUNT.

<u>**ACCEPT PLAN**</u>     <u>**REJECT PLAN**</u>

    ☐           ☐

    2.      **TAX INFORMATION**  Under penalties of perjury, claimant certifies that:

        A.      Claimant's correct taxpayer identification number is:

            (Social Security Number) _____-_____-_____

            (or Employer Identification Number) _____-_____;  and

        B.      Please check the appropriate box(es) below:
            Claimant is not subject to backup withholding because:

☐    (a)  Claimant is exempt from backup withholding.

☐    (b)  Claimant has not been notified by the Internal Revenue Service ("IRS") that Claimant is subject to backup withholding as a result of a failure to report all interest or dividends;  or

☐    (c)  The IRS has notified Claimant that Claimant is no longer subject to backup withholding.

    3.      **SIGNATURE**  By signing this Ballot, the undersigned certifies that it is either: (a) a creditor with a claim to which this Ballot pertains that is designated in the above-referenced Class pursuant to the Debtor's Modified First Amended Plan of Liquidation dated December ___, 2005 (the "Plan");  or (b) an authorized signatory of such creditor, and has the full power and authority to vote to accept or reject the Plan.  The undersigned also acknowledges that such vote is subject to all the terms and conditions of the Disclosure Statement and the Plan.

           **Print or Type Name of Claimant:**_____

           **Signature:**_____

           **If by Authorized Agent, Name and Title:**_____

           **Street Address:**_____

           **City, State, Zip Code:**_____

           **Telephone Number:**_____

           **Date Completed:**_____

**PLEASE MAKE SURE YOU HAVE PROVIDED ALL INFORMATION REQUESTED ON THIS BALLOT. PLEASE SEE REVERSE SIDE FOR IMPORTANT VOTING INSTRUCTIONS.**

On December __, 2005, the United States Bankruptcy Court for the Southern District of New York (the "Court") approved the Modified First Amended Disclosure Statement filed by Saltire Industrial, Inc. on December ___, 2005 (the "Disclosure Statement") and directed the Debtor to solicit votes with regard to the approval or rejection of the Debtor's Modified First Amended Plan of Liquidation dated December ____, 2005, which is attached as Exhibit "1" to the Disclosure Statement.

<div align="center">INSTRUCTIONS</div>

**TO HAVE YOUR VOTE COUNT, YOU MUST COMPLETE, SIGN AND RETURN THIS ORIGINAL BALLOT SO THAT IT IS ACTUALLY <u>RECEIVED</u> BY GARDEN CITY GROUP, VOTING AGENT FOR THE DEBTOR, NOT LATER THAN <u>5:00 P.M. EASTERN STANDARD TIME, ON _____</u>, 2006 (THE "VOTING DEADLINE").  FACSIMILE OR PHOTOCOPIED BALLOTS WILL NOT BE COUNTED.  ALL BALLOTS REQUIRE AN ORIGINAL SIGNATURE.  BALLOTS ARE TO BE RETURNED TO THE FOLLOWING ADDRESS:**

    (A)   <u>Regular Mail</u>, to:  Saltire Industrial, Inc., c/o The Garden City Group, Inc., P.O. Box 9000-#6256, Merrick, NY 11566-9000.

    (B)   <u>Overnight Courier</u> or <u>Personal Delivery</u>, to:  Saltire Industrial, Inc., c/o The Garden City Group, Inc., 105 Maxess Road, Melville, NY  11747, Attn:  Karen E. Petriano.

**BALLOTS MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 5:00 PM, E.D.T. ON _____, 2006.  IF A BALLOT IS RECEIVED AFTER THIS DATE AND TIME, IT WILL NOT BE COUNTED.**

It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least 2/3 in amount and more than 1/2 in number of claims actually voting in each voting class of claims. The votes of the claims actually voted in your class will bind those who do not vote. In the event that the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if at least one impaired class of claims has accepted the Plan and the Court finds that it accords fair and equitable treatment to, and does not discriminate unfairly against, the class(es) rejecting it and otherwise satisfies the requirements of section 1129(b) of title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

Your signature is required in order for your vote to be counted.  If the claim is held by a partnership, the ballot should be executed in the name of the partnership by a general partner.  If the claim is held by a corporation, the ballot must be executed by an officer.  If you are signing in a representative capacity, also indicate your title where requested.

This ballot has been prepared to reflect the class(es) in which you are eligible to vote.  IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A CLAIM IN A SEPARATE CLASS AND YOU SHOULD COMPLETE AND RETURN ALL OF THEM.  If you have any questions, please contact the Saltire Solicitation Agent, Garden City Group, Inc. at (631) 470-5000.

Ballots are being sent to all holders of claims entitled to vote on the Plan as of the voting record date of December __, 2005.  Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Court may estimate and temporarily allow a claim for purposes of voting on the Plan.  The Debtor may seek an order of the Court, temporarily allowing, for voting purposes only, certain disputed claims.  If the Debtor avails itself of this right, allowance for voting purposes does not constitute allowance for purposes of distributions under the Plan.

**This ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or an admission by the Debtor of the validity of a claim.**

If your ballot is damaged or lost or if you did not receive a ballot, you may request a replacement by addressing a written request to Garden City Group, Inc., 105 Maxess Road, Melville, NY  11747 or by calling (631) 470-5000.

If your claim is disputed as of the Voting Deadline, the ballot submitted with respect to that claim shall not be counted, except to the extent the Debtor's objection to that claim states otherwise or the Court orders otherwise upon the timely application of the claim holder in accordance with the Court's Order dated December __, 2005, <u>inter alia</u>, establishing (a) procedures for the estimation of claims for voting purposes and (b) voting procedures and approving forms of ballots, respectively.

<div align="center">2</div>

# EXHIBIT F

## (Intentionally Omitted)

# EXHIBIT G

## (Intentionally Omitted)

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                         :

In re:                             :     Chapter 11
                                   :     Case No. 04-15389 [BRL]

      SALTIRE INDUSTRIAL, INC.,        :

                                   :

                      Debtor.     :

                                   :
-------------------------------------------------------------------x

**ORDER CONFIRMING MODIFIED FIRST AMENDED
PLAN OF LIQUIDATION OF SALTIRE INDUSTRIAL,
INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

         The Modified First Amended Plan of Liquidation of Saltire Industrial, Inc.

under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), dated

December 28, 2005 (the "Plan"), having been filed with this Court by Saltire Industrial,

Inc. (the "Debtor") and assigned docket number 201, and the Debtor's Modified First

Amended Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the

Plan, dated December 28, 2005 (the "Disclosure Statement"), having been approved by

Order of this Court, dated December 28, 2005 (the "Disclosure Statement Order"), as

containing "adequate information" as such term is defined under section 1125 of the

Bankruptcy Code;  and certificates of service and/or certifications of publication having

been filed with the Court demonstrating compliance with the notice, solicitation and

publication requirements of the Disclosure Statement Order;  and acceptances and

rejections of the Plan by those holders of Claims that voted thereon having been duly

received and tabulated by the Debtor with the assistance of The Garden City Group,

Inc. ("GRG"), the Debtor's Court retained voting agent;  and certifications by GRG of ballots accepting or rejecting the Plan having been filed with the Court;  and upon the Affidavit of Robert A. Bertellotti submitted in support of confirmation of the Plan;  and the Court having considered the objections to confirmation of the Plan filed by (i) Schrader-Bridgeport International, Inc. and (ii) Century Indemnity Company on behalf of itself and certain related companies (collectively the "Objections");  and all such Objections to the Plan having been voluntarily withdrawn, overruled or denied by the Court;  and upon all of the evidence presented and the arguments of counsel made at the March 8, 2006 hearing to consider, *inter alia*, confirmation of the Plan (the "Confirmation Hearing");  and upon the entire record of the Debtor's Chapter 11 case; and after due deliberation, and sufficient cause appearing therefor;  and

**IT HAVING BEEN FOUND AND DETERMINED** by this Court that:

A.     Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Plan.

B.     This Court has jurisdiction over the Case pursuant to 28 U.S.C. § 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). Confirmation of the Plan is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2) and this Court has jurisdiction to enter a Final Order with respect thereto.  Venue of this Case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     This Court takes judicial notice of the docket of the Case maintained by the Clerk of the Court and/or its duly appointed agent, including,

without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of the Case.

       D.      The classification of Claims and Equity Interests in Article IV of the Plan is necessary and reasonable to implement the Plan, and satisfies the requirements of section 1122(a) of the Bankruptcy Code in that each Claim or Equity Interest in each particular Class is substantially similar to other Claims or Equity Interests in such Class.

       E.      Article IV of the Plan adequately and properly identifies and classifies all Claims and Equity Interests, thereby satisfying the requirements of section 1123(a)(1) of the Bankruptcy Code.

       F.      Article V of the Plan identifies the Classes of Claims and Equity Interests which are not impaired and which are impaired.  Therefore, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

       G.      Article V of the Plan specifies the treatment of each impaired Class of Claims and Equity Interests and thereby satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

       H.      The Plan provides for the same treatment for each Claim or Equity Interest in a particular Class and thereby satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

       I.      The Plan provides adequate means for its implementation, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including, among other things: (a) the creation of the Liquidating Trust and the appointment of the Liquidating Trustee

to, *inter alia*, liquidate the Assets of the Debtor being transferred under the Plan to the Liquidating Trust (the "Trust Assets") and perform such other duties as provided in the Liquidating Trust Agreement;  (b) the transfer to the Liquidating Trust of all the Debtor's right, title and interest in all of the Trust Assets;  (c) the creation of a Disputed Claims Reserve;  and (d) the procedures specified in the Plan under which Distributions will be made to Holders of Allowed Claims.

J.    The Plan does not provide for the issuance of new equity securities and section 1123(a)(6) of the Bankruptcy Code is, therefore, inapplicable to the Debtor.

K.    The provisions of the Plan are consistent with the interests of the Holders of Claims and Equity Interests and public policy and, therefore, satisfy the requirements of section 1123(a)(7) of the Bankruptcy Code.

L.    In accordance with section 1123(b)(1) of the Bankruptcy Code, Article V of the Plan impairs Class 3, Class 4 and Class 5 under the Plan and leaves unimpaired Class 1 and Class 2 under the Plan.

M.    The Plan constitutes a motion by the Debtor to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party except for any Executory Contract that:  (a) has been assumed pursuant to an order of this Court;  (b) is the subject of a separate motion by the Debtor to assume or assume and assign pursuant to section 365 of the Bankruptcy Code and is pending as of the Effective Date;  or (c) is the subject of a stipulation or other written agreement between the Debtor and the other party to a particular Executory Contract, either approved or to be approved by this Court.

4

N.     The Debtor's decision regarding the assumption or rejection of Executory Contracts, as authorized by section 1123(b)(2) of the Bankruptcy Code and as provided for in Article X of the Plan, is a reasonable exercise of sound business judgment and is in the best interests of the Debtor and the Estate.

O.     The Debtor has provided sufficient notice of its intention to abandon, pursuant to section 554 of the Bankruptcy Code, all of its right, title and interest in, and to, two parcels of real property consisting of approximately 37 acres located in Dickson, TN (the "Dickson Parcels") that are identified on the Dickson County Tax Map as Parcel 91.00, consisting of 30.10 acres, and Parcel 91.03, consisting of 6.37 acres, which parcels lie to the south of State Highway 47, and to the north of Marshall Stuart Road, located between Tennsco Drive and Printwood Drive.

P.     The Debtor's proposed abandonment of the Dickson Parcels is in the best interests of the Debtor and the Estate because such parcels are burdensome, and of inconsequential value and benefit, to the Debtor's Estate.

Q.     Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Plan provides that the Debtor shall transfer to the Liquidating Trust the right to prosecute, on behalf of itself and its estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor or the Estate.

R.     The Plan complies with all applicable provisions of the Bankruptcy Code, thereby satisfying the requirements of section 1129(a)(1) of the Bankruptcy Code

and, as required by Bankruptcy Rule 3016(a), is dated and specifically identifies the Debtor as the proponent of the Plan.

S.      The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and orders of this Court with respect to the Plan. Good, sufficient and timely notice of the Confirmation Hearing has been given to holders of Claims and Equity Interests and to other parties-in-interest to whom notice is required to be given in accordance with the Disclosure Statement Order. The solicitation of votes was made in good faith and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and all other rules, laws and regulations. Ballots of Holders of Claims entitled to vote on the Plan were properly solicited and tabulated in accordance with the Disclosure Statement Order. Holders of at least two-thirds (2/3) in amount and one-half (1/2) in number of the Claims actually voting in Class 3 have accepted the Plan. Holders of Claims in Classes 1 and 2 are not impaired under the Plan and were not entitled to vote to accept or reject the Plan. Holders of Claims in Class 4 and holders of Equity Interests in Class 5 are conclusively presumed to have rejected the Plan, and were not entitled to vote on the Plan. Therefore, the Debtor has satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

T.      The Plan, and the compromises and settlements embodied therein, has been proposed in good faith and not by any means forbidden by law, as evidenced by, among other things, the totality of the circumstances surrounding the formulation of the Plan, the record of the Case, and the recoveries of Holders of Claims thereunder.

Therefore, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

U.    Any payment made or to be made under the Plan or by any Person acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Case, or in connection with the Plan and incident to the Case, has been approved by, or will be subject to the approval of, the Court as reasonable, thereby satisfying the requirements of section 1129(a)(4) of the Bankruptcy Code.

V.    The Debtor's current officers and current members of its board of directors shall serve in their respective capacities, pending the Debtor's formal dissolution under applicable state law.  Therefore, the Debtor has satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

W.    Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Case because the Plan does not contain rate changes for which a governmental regulatory commission has jurisdiction after confirmation.

X.    Section 1129(a)(7) of the Bankruptcy Code requires each Holder of a Claim or Equity Interest in an impaired Class to either accept the Plan, or receive or retain under the Plan property having a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive on account of such Claim or Equity Interest if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. The following Classes are impaired under the Plan:  Class 3, Class 4, and Class 5.  Each Holder of a Claim or Equity Interest in such Classes has either accepted the Plan, or will receive or retain under the Plan property having a value, as of the Effective Date of the

Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date. The Plan, therefore, satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

Y.    Section 1129(a)(8) of the Bankruptcy Code requires that for each Class of Claims or Equity Interests under the Plan, such Class has either accepted the Plan or is not impaired under the Plan. Impaired Class 3 has accepted the Plan. Unimpaired Classes 1 and 2 are conclusively presumed to have accepted the Plan without the solicitation of acceptances or rejections pursuant to section 1126(f) of the Bankruptcy Code. Impaired Classes 4 and 5 are deemed to have rejected the Plan. Because the impaired Classes 4 and 5 have not accepted the Plan, the requirements of section 1129(a)(8) have not been met, thereby requiring application of section 1129(b) of the Bankruptcy Code. As is more fully set forth below in paragraph EE of this Confirmation Order, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to Classes 4 and 5.

Z.    The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code since, except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that (i) the Holder of each Allowed Administrative Expense Claim shall be paid in full, in Cash; and (ii) the Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims shall be paid in full, in Cash, or in such amounts and on such other terms as may be agreed to by the Holders of such Claims and the Debtor, or according to the ordinary business terms of the Debtor and such Holders.

8

AA.    The provisions of section 1129(a)(10) of the Bankruptcy Code are satisfied because at least one impaired Class of Claims (*i.e.*, Class 3) has accepted the Plan, determined without inclusion of any acceptance of the Plan by any insider.

BB.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of, the Debtor, except as proposed by the Plan.  The Plan provides for the liquidation and distribution of all of the Debtor's remaining Assets and, therefore, satisfies section 1129(a)(11) of the Bankruptcy Code.

CC.    The Debtor has paid, or shall pay as provided by the Plan, all amounts due under 28 U.S.C. § 1930, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

DD.    As a consequence of this Court's Order dated April 21, 2005, there are no current and/or continuing "retiree benefit" obligations of the Debtor, as that term is defined in section 1114 of the Bankruptcy Code, as to any current or former employees.  Thus, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Case.

EE.    Neither Holders of Intercompany Claims in Class 4 nor Holders of Equity Interests in Class 5 will receive any Distribution or retain any value under the Plan and, accordingly, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  These are the only Classes which have not accepted, or have been deemed to have rejected, the Plan.  Pursuant to section 1129(b) of the Bankruptcy Code, the Court finds that the Plan does not discriminate unfairly and is fair and

equitable with respect to the treatment of Claims and Equity Interests in Classes 4 and 5. With respect to Classes 4 and 5, as required by section 1129(b)(2)(B) of the Bankruptcy Code, (i) there is no Holder of a Claim or Equity Interest (as the case may be) junior to the Holders of Claims in Class 4 or Equity Interests in Class 5 (as the case may be) which is to receive or retain under the Plan any property on account of such junior Claim or Equity Interest. Thus, the Plan satisfies section 1129(b) of the Bankruptcy Code.

FF.     The principal purpose of the Plan is not the avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933. No Governmental Unit has requested that the Court deny confirmation on such basis. Therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

GG.     The Plan constitutes and embodies a good faith compromise and settlement of certain disputed claims and issues (including, but not limited to, those claims and issues encompassed by the Alper Settlement Agreement), which compromise and settlement is fair, equitable and within the range of reasonableness, is in the best interests of the Debtor, the Estate and its creditors, and was entered into in good faith, at arms' length and otherwise satisfies the requirements of Bankruptcy Rule 9019.

HH.     Each of the discharge and injunctive provisions of Article XII and XIII of the Plan:

        i.      falls within the jurisdiction of this Court under 28 U.S.C. § 1334(a), (b), (d) and (e);

ii.  is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

iii.  is an integral element of the transactions incorporated into the Plan;

iv.  confers a material benefit on, and is in the best interests of, the Debtor, the Estate, and its creditors;

v.  is important to the overall objectives of the Plan;  and

vi.  is consistent with sections 105, 1123, 1129, and other applicable provisions of the Bankruptcy Code.

II.  All Entities which are benefited by the discharge and injunctive provisions of the Plan have contributed and/or will contribute value to the Debtor and/or the Estate under the Plan.

JJ.  The failure to effect the discharge and injunctive provisions of the Plan would impair the Debtor's ability to confirm the Plan.

KK.  All conditions precedent to confirmation set forth in Article XI of the Plan have been satisfied, will be satisfied by entry of this Confirmation Order, or have been duly waived.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1.  The Plan is confirmed as having satisfied all of the applicable requirements of Chapter 11 of the Bankruptcy Code.

2.  The Alper Settlement Agreement is hereby incorporated by reference into, and is an integral part of, this Confirmation Order.

3.  Any Objection to the Plan and any response or request for continuance regarding confirmation of the Plan not resolved by the terms of this

Confirmation Order, by the terms of a separate order entered contemporaneously herewith, or by a statement announced on the record of the Confirmation Hearing and not otherwise withdrawn, waived or settled, is overruled and denied.

4.    The record of the Confirmation Hearing is closed.

5.    The findings of fact and conclusions of law of the Court set forth herein and at the Confirmation Hearing shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, as made applicable herein by Bankruptcy Rule 9014, and the findings and conclusions of the Court at the Confirmation Hearing are incorporated herein by reference. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and *vice versa*.

6.    Pursuant to section 554 of the Bankruptcy Code, the Debtor's abandonment of its right, title and interest in, and to, the Dickson Parcels is approved.

7.    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its successors and assigns, including, without limitation, the Liquidating Trust, or in the assets of the Debtor, its successors and assigns or the Liquidating Trust, in each case regardless of whether the Claim or Equity Interest of such Holder is impaired under the Plan and whether such Holder has accepted the Plan.

8.    The Liquidating Trust Agreement, substantially in the form filed with the Bankruptcy Court on February 24, 2006, is approved and will be effective as of the Effective Date of the Plan.

9.      The initial Liquidating Trustee shall be Mr. Wayne Smith.

10.      Subject to the terms of the Plan and the Liquidating Trust Agreement, the Debtor and the Liquidating Trustee are duly and validly authorized to issue, execute, deliver, file or record any and all documents necessary to implement the Plan, and to take any action reasonably necessary or appropriate to implement the Plan, in accordance with its terms.

11.      In accordance with sections 1141 and 1142 of the Bankruptcy Code and Section 7.1 of the Plan, which is incorporated herein by reference as if set forth herein in extenso, the Debtor shall and hereby does transfer, convey and assign to the Liquidating Trust all of the Debtor's right, title and interest in all of the Trust Assets, free and clear of any Lien, Claim or Interest in such property of any other Person, which transfer, conveyance and assignment shall be effective only upon the Effective Date of the Plan.  Following such transfer, the Liquidating Trust shall hold valid title to all such Trust Assets.  The Trust Assets shall not include those assets otherwise assigned or transferred pursuant to the Plan or this Confirmation Order or retained by the Debtor. The Liquidating Trustee shall administer the Liquidating Trust and the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code for purposes of administering and liquidating the Trust Assets, and the Disputed Claims Reserve and resolving Claims, and shall have all the powers, authority and responsibilities specified in the Liquidating Trust Agreement.

12.      On the Effective Date, and after making all Distributions required to be made on the Effective Date, including, without limitation, Distributions pursuant

13

to Sections 5.2.1., 5.2.2 and 5.2.3 of the Plan, the Debtor and/or the Liquidating Trustee (as the case may be) shall establish the Disputed Claims Reserve, which shall be funded in an amount to be determined by the Debtor or the Liquidating Trustee as required by the terms of the Plan.  Distribution(s) on account of a Disputed Claim and/or an Administrative Expense Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made solely from the Disputed Claims Reserve  in accordance with the provisions of the Plan governing the Class of Claims in which such Claim is classified, and in accordance with the terms of the Liquidating Trust Agreement.  Any Disputed Claim and/or Administrative Expense Claim that becomes an Allowed Claim prior to the Effective Date shall receive such treatment as the Plan prescribes for Claims in the Class in which the Allowed Claim is classified.  As for Disputed Claims and/or Administrative Expense Claims that become Allowed Claims subsequent to the Effective Date, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Administrative Expense Claim becomes a Final Order or the parties otherwise agree, the Debtor and/or the Liquidating Trustee, as the case may be, shall distribute to the holder of such Allowed Claim any payment that would have been distributed to such holder if the Claim had been Allowed on the Effective Date, plus any payments that would have been made on account of such Allowed Claim after the Effective Date, without any interest thereon. Any Distributions held in the Disputed Claims Reserve for the benefit of a Holder of a Disputed Claim, which is subsequently disallowed, in whole or in part, shall be distributed in accordance with the Plan.

14

13.    The Liquidating Trustee may settle any Disputed Claim (including without limitation claims based on the rejection of executory contracts) without notice, a hearing or an order of the Bankruptcy Court.  Notwithstanding the foregoing, the Liquidating Trustee may of his own discretion, seek and obtain an order of the Bankruptcy Court compromising or settling any Disputed Claims.

14.    As set forth in Section 13.2 of the Plan, except as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code, the Debtor shall and hereby does transfer, convey and assign to the Liquidating Trust the right to prosecute, on behalf of itself and its Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor or the Estate, which transfer, conveyance and assignment shall be effective only upon the Effective Date of the Plan.  In pursuing any claim, right or Cause of Action, the Liquidating Trustee, as representative of the Estate, shall be entitled to the extensions provided under section 108 of the Bankruptcy Code, if any.

15.    As set forth in Section 12.4 of the Plan, except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, all Liens against any property of the Debtor shall be deemed extinguished and discharged, and the Debtor will be revested with the assets, if any, of the Debtor not distributed or otherwise transferred under the Plan, free and clear of all Liabilities and Liens;

15

provided, however, that upon the dissolution of the Debtor, any remaining assets shall be contributed to the Liquidating Trust.

16.     Pursuant to section 1141(d)(3) of the Bankruptcy Code and as set forth in Section 12.5 of the Plan, occurrence of the Effective Date will not discharge the Claims against the Debtor;  provided, however, that no Holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment from, or seek recourse against, the Debtor, the Liquidating Trust, the Liquidating Trustee, Alper, or their property, successors and assigns, except as expressly provided in the Plan or this Confirmation Order.

17.     As set forth in Section 13.1 of the Plan, as of the Effective Date, all Entities shall be permanently enjoined and restrained from:  (a) commencing or continuing any action or proceeding  respecting any claim or interest against the Debtor or its property (other than abandoned property);  (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);  (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);  (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and (e) performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order.

18.     As of the Effective Date, the Debtor, on its own behalf, and on behalf of its Estate, subject to the Debtor's receipt of payment pursuant to the Alper

Settlement Agreement, releases, acquits and forever discharges Alper and its principals,

shareholders, subsidiaries, affiliates, and their respective employees, agents,

representatives, officers, directors, members, partners, professionals (all solely in their

capacities as such), successors and assigns, and any Entity claimed to be liable

derivatively through the Debtor, or any of the foregoing (each such party, a "Released

Party") from any and all actions, causes of action, liabilities, obligations, rights, suits,

accounts, covenants, contracts, agreements, promises, damages, judgments, claims,

debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or

contingent, matured or unmatured, known or unknown, foreseen or unforeseen,

existing as of the Effective Date or thereafter arising, in contract or in law, at equity or

otherwise, based in whole or in part upon any act or omission or other event occurring

prior to the commencement of this Case or during the course of the Case (including

through the Effective Date), in any way relating to the Debtor, this Case, or the

ownership, management, and operation of the Debtor, that the Debtor could assert

directly or any Holder of a Claim or Interest or other Entity could assert derivatively or

on behalf of the Debtor or its Estate (the "Released Claims"); provided that the

foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or

cause of action arising out of any express contractual obligation owing by any current

or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation

of any current or former, director, officer, or employee with respect to a loan or advance

made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or

cause of action against Grupo and its employees, agents, representatives, officers,

17

directors, members, partners, professionals, successors and assigns (all solely in their capacities as such). The releases as set forth in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity. Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

19.     From and after the Effective Date, the Debtor and its Estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, shall be permanently enjoined from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to the Plan and this Confirmation Order.

20.     The provisions of the Plan and this Confirmation Order shall not diminish or impair in any manner the enforceability and coverage of any insurance policies that may cover Claims against the Debtor or any other Person. Notwithstanding any other terms or provisions in the Plan, this Confirmation Order (i) is without prejudice to the rights, remedies, claims, exclusions, limitations and/or defenses of Century Indemnity Company, Pacific Employers Insurance Company and/or any other of their related insurance companies (collectively, the "Insurers") under any insurance policies issued by Insurers that may provide coverage for the

Debtor and/or under any agreements relating to such insurance policies (collectively, the "Agreements") and/or any of the reservations of rights by Insurers as to any issues relating to the Agreements (as such issues are set forth in Insurers' Objections to Debtor's First Amended Disclosure Statement (Doc. No. 197)), provided, however, that nothing in the Plan or this Confirmation Order shall be deemed to constitute a rejection of the Agreements under section 365 of the Bankruptcy Code to the extent the Agreements exist and are executory;  (ii) confirms that all of the terms, provisions, conditions, limitations and/or exclusions contained in the Agreements shall remain in full force and effect;  (iii) confirms that the Debtor and/or the Liquidating Trust shall remain as the insured under the Agreements, and that the Debtor and the Liquidating Trust shall remain bound by all of the terms, provisions, conditions, limitations and/or exclusions contained in the Agreements;  (iv) confirms that the Agreements shall not be assigned by the Debtor, except to the Liquidating Trust pursuant to the Plan, without Insurers' prior express written consent, which consent shall not be unreasonably withheld;  (v) confirms that nothing in the Plan shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Agreements, or create any direct right of action against Insurers;  (vi) is without prejudice to any of Insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which Insurers may seek a declaration regarding the nature and/or extent of any insurance coverage under the Agreements;  (vii) confirms that the Debtor and/or the Liquidating Trust shall satisfy all continuing duties and obligations of the insureds under the Agreements to the extent any such duties and obligations

exist;  and (viii) confirms that nothing in the Plan shall be construed as an acknowledgment either that the Agreements cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Agreements.

21.     As of the Effective Date, and subject to paragraph 20 above, all Executory Contracts of the Debtor shall be deemed rejected by the Debtor pursuant to the provisions of section 365 of the Bankruptcy Code, except:  (a) any Executory Contract that has been assumed or assumed and assigned pursuant to an Order of the Bankruptcy Court prior to the Effective Date;  and (b) any Executory Contract to be assumed or assumed and assigned pursuant to a separate motion of the Debtor pending on the Effective Date;  or (c) is the subject of a stipulation or other written agreement between the Debtor and the other party to a particular Executory Contract, either approved or to be approved by the Court.

22.     As set forth in Section 10.2 of the Plan, if the rejection of any Executory Contract under the Plan or otherwise, results in damages to the other party or parties to such contract, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, and the Liquidating Trust or their respective properties or interests in property or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor and the Liquidating Trustee and their respective counsel, on or before thirty (30) days after the earlier to occur of:  (a) the Confirmation Date and (b) the entry of an Order by the Bankruptcy Court authorizing rejection of a

particular Executory Contract.  Payment of Allowed Claims based on such rejection

damages, if any, shall be made solely from the Disputed Claims Reserve.

23.      Except for Administrative Expense Claims of Professionals

requesting compensation or reimbursement of expenses, requests for payment of

Administrative Expense Claims must be filed no later than twenty (20) days after the

notice of entry of this Confirmation Order (the "Administrative Bar Date") is served in

accordance with Paragraph 24 below.  Holders of such Administrative Expense Claims

who are required to file a request for payment of such Claims and who do not file such

requests by the Administrative Bar Date, shall be forever barred from asserting such

Claims against the Debtor, or the Liquidating Trust, the Liquidating Trustee or their

respective property.  To the extent not paid on or prior to the Effective Date, payments

on account of Allowed Administrative Expense Claims shall be made solely from the

Operating Reserve Account contemplated by the Plan.

24.      Unless otherwise ordered by the Court, all Professionals or other

Entities requesting compensation or reimbursement of expenses pursuant to sections

327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before

the Confirmation Date (including compensation requested by any Professional or other

Entity for making a substantial contribution in the Case) shall file with the Bankruptcy

Court (with a courtesy copy to Judge Lifland's Chambers) an application for final

allowance of compensation and reimbursement of expenses no later than thirty (30)

days after the Confirmation Date and serve such application upon:  (a) counsel for the

Debtor, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York

10119, Attn:  Scott E. Ratner, Esq.;  (b) Mr. Wayne Smith, Liquidating Trustee for the

Saltire Industrial, Inc. Creditors Liquidating Trust, 274 Riverside Avenue, Suite 1,

Westport, CT 06880;  and (c) the United States Trustee, 33 Whitehall Street, 21st Floor,

New York, New York 10004, Attn:  Tracy Hope Davis, Esq.  Objections to final

applications of Professionals or other Entities for compensation or reimbursement of

expenses must be filed with the Bankruptcy Court and served on the applicable

Professionals or Entity no later than fifty (50) days after the Confirmation Date.  All

compensation and reimbursement of expenses allowed by the Bankruptcy Court by a

Final Order and not previously paid by the Debtor shall be paid by the Debtor or the

Liquidating Trustee, as the case may be, to the applicable Professional immediately

thereafter from Available Cash set aside and reserved for such purpose in the Operating

Reserve Account on or before the Effective Date.

       25.     Payment obligations incurred after the date and time of entry of

this Confirmation Order, including, without limitation, the fees and expenses of

Professionals incurred from the Confirmation Date (a) shall not be subject to application

or proof of Claim and may be paid by the Debtor in the ordinary course of business and

without further Bankruptcy Court approval, as Administrative Expense Claims, and

(b) shall be paid by the Debtor to the applicable Professional from Available Cash set

aside and reserved for such purpose by the Debtor on or before the Effective Date.

       26.     All fees payable pursuant to section 1930 of title 28 of the United

States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be

paid on the Effective Date.  Any statutory fees accruing after the Confirmation Date

shall be paid by the Debtor or, if the Debtor has dissolved, by the Liquidating Trust,

when due and owing.

27.     As of the Effective Date, each Holder of a Claim or Equity Interest,

each party-in-interest and each Entity acting or claiming or purporting to act or claim

by, through under or on behalf of any of the foregoing, shall forever be enjoined from

the commencement or continuation of any action, the employment of process, or any act

to assert a claim for relief against the Debtor, the Official Committee, Alper, and their

respective officers, directors, attorneys or other professionals (the "Plan Releasees") in

respect of:  (a) any actions taken or not taken in connection with the Case;  (b) the Plan;

(c) the Disclosure Statement;  (d) Distributions, payments or transfers made under this

Plan;  (e) acts performed pursuant to this Plan;  (f) any contract, release, or other

agreement or document created or entered into, or any other action taken or omitted to

be taken, in connection with this Plan;  or (g) any Claim compromised, settled or

released under or pursuant to this Plan;  provided, however, that the foregoing release

shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for

any acts, or omissions to act, evidencing and/or constituting gross negligence, willful

misconduct, breach of fiduciary duty or malpractice.  Notwithstanding the foregoing,

under no circumstances shall a nondebtor third party be enjoined from the assertion of

any claim, or the continuation or commencement of any derivative action, against a

Released Party, except to the extent such claim or derivative action is property of the

Debtor's Estate.

28.    Notwithstanding confirmation of the Plan or the occurrence of the

Effective Date, the Bankruptcy Court shall retain jurisdiction for all purposes permitted

under applicable law, including, without limitation, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided herein;

(d)    To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    To issue such orders in aid of execution of this Plan in accordance with section 1142 of the Bankruptcy Code;

(g)    To consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to the implementation and effectuation of this Plan;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)     To compel the conveyance of property and other performance contemplated under this Plan and documents executed in connection herewith;

(l)     To enforce remedies upon any default under the Plan;

(m)     To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Plan;

(p)     To determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)     To enter a final decree closing the Case.

29.     To the extent this Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, or any other agreement entered into by the Debtor and any third party (excluding, however, the Liquidating Trust Agreement), (i) the Plan shall control (x) the Disclosure Statement and (y) any such agreements between the Debtor and any third party and (ii) this Confirmation Order (and any other orders of the Court) controls the Plan.

30.     The principal purpose of the Liquidating Trust Agreement is to aid in the implementation of the Plan and therefore the Plan incorporates the provisions of

the aforesaid agreement, and the provisions of the Liquidating Trust Agreement are hereby approved.  To that end, the Liquidating Trustee shall have the full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of the implementation of the Plan or the Liquidating Trust Agreement, as the case may be.  If any provision of the Liquidating Trust Agreement is found to be inconsistent with the provisions of the Plan or this Confirmation Order, the provisions of this Confirmation Order shall control.

31.    After the entry of this Confirmation Order and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper;  provided that:  (i) the Debtor obtains approval of the Bankruptcy Court for such modification, after notice and a hearing;  and (ii) such modification shall not materially and adversely affect the interests, rights, treatment, or Distributions of any Class under the Plan.

32.    The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety.

33.    To the extent that any provisions of this Confirmation Order could be construed as modifications to the Plan, such modifications do not materially or adversely affect or change the treatment of any Claims against or Equity Interest in the Debtor.  Accordingly, such modifications would not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims against the Debtor be afforded an opportunity to change previously cast acceptances or rejections of the Plan as filed with the Bankruptcy Court.

34.    The Debtor or its authorized agent shall serve notice of (a) entry of this Confirmation Order and (b) the last date to file (i) Administrative Expense Claims and (ii) Claims arising from the rejection of Executory Contracts, substantially in the form annexed hereto as Exhibit "1," which form is hereby approved, on all creditors of the Debtor as of the date hereof and other parties in interest within ten (10) Business Days from the date of entry of this Confirmation Order.

DATED:   New York, New York
         March 8, 2006

                              /s/ Burton R. Lifland
                              HONORABLE BURTON R. LIFLAND
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT "1" TO CONFIRMATION ORDER

TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.
Debtor and Debtor in Possession
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                   :

In re:                              :    Chapter 11

                                 :    Case No. 04-15389 [BRL]

        SALTIRE INDUSTRIAL, INC.,       :

                                 :

                       Debtor.     :

                                 :
------------------------------------------------------------------x

### NOTICE OF ENTRY OF ORDER (A) CONFIRMING MODIFIED FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF SALTIRE INDUSTRIAL, INC.;  AND (B) FIXING DEADLINES FOR THE FILING OF (i) ADMINISTRATIVE CLAIMS AND (ii) CLAIMS RELATING TO REJECTED EXECUTORY CONTRACTS

**TO ALL KNOWN CREDITORS AND PARTIES-IN-INTEREST:**

      **PLEASE TAKE NOTICE** that:

      1.      Saltire Industrial, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 14, 2004 (the "Petition Date") with the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.      On March ___, 2006, the Bankruptcy Court issued an order (the "Confirmation Order") confirming the Debtor's Modified First Amended Plan of Liquidation, dated December 28, 2005 (the "Plan").

3.      Copies of the Confirmation Order, the Plan, and all pleadings filed, and orders entered, in the Debtor's Chapter 11 case may be examined and inspected by interested parties at the Bankruptcy Court, The Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, during regular business hours and are publicly available online in electronic format at the Bankruptcy Court's general web site address at www.nysb.uscourt.gov.

4.      **Administrative Claims Bar Date.**  Except as provided in Paragraph 5 below, all holders of claims against the Debtor arising on or after the Petition Date, which are asserted to be entitled to a priority under sections 503(b) or 507(a)(1) of the Bankruptcy Code as expenses of administration ("Administrative Claims"), are required to file a proof of such Administrative Claim on or before [_____, 2006] (the "Administrative Bar Date") as set forth in Paragraph 6 below.

5.      You are not required to file a proof of an Administrative Claim on or before the Administrative Bar Date if:  (a) you have already filed a proof of Administrative Claim against the Debtor;  (b) your Administrative Claim was previously fixed by Stipulation and/or Order of the Bankruptcy Court;  or (c) you are a professional retained by the Debtor pursuant to Bankruptcy Court Order and your Administrative Claim is for unpaid fees or expenses incurred after the Petition Date.

6.　　　Each original proof of Administrative Claim must be filed on or before the Administrative Bar Date by delivering same:  (i) if by mail, to Saltire Industrial, Inc., c/o The Garden City Group, Inc., P.O. Box 9000-#6256, Merrick, NY 11566-9000;  or (ii) if by hand delivery or overnight courier, to the Clerk of the Bankruptcy Court, One Bowling Green, Room 534, New York, New York 10004-1408, Attn:  Saltire Industrial, Inc.  A copy only of any proof of Administrative Claim filed with the Bankruptcy Court should also be delivered to counsel to the Debtor at the address indicated below.

7.　　　Any holder of an Administrative Claim against the Debtor who is required, but fails, to file a proof of Administrative Claim on or before the Administrative Bar Date in the manner set forth in Paragraph 6 above shall be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtor (or from filing a proof of claim with respect thereto), and the Debtor and its property shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Claim and such holder shall not be permitted to participate in any distribution or payment in this Chapter 11 case on account of such Administrative Claim.

**[concluded on the following page]**

3

8.    **Rejection of Executory Contracts.**  If the rejection by the Debtor of an unexpired contract or lease pursuant to the Plan results in a claim, then such claim shall be forever barred and shall not be enforceable against the Debtor or its property unless a proof of claim is filed with the Clerk of the Bankruptcy Court and served upon counsel to the Debtor at the address indicated below so that it is received on or before [_____, 2006].

DATED:    New York, New York
          March ___, 2006

<div align="right">

**BY ORDER OF THE COURT:**


_____

HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

</div>

SALTIRE INDUSTRIAL, INC.
Liquidated Debtor,
By its attorneys,
TOGUT, SEGAL & SEGAL LLP,
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000
Attention:    Albert Togut, Esq.
              Scott E. Ratner, Esq.

**EXHIBIT I**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                               :

In re:                               :

                               :

SALTIRE INDUSTRIAL, INC.,      :        Chapter 11

                               :        Case No. 04-15389 [BRL]

                               :

                    Debtor.     :

                               :
--------------------------------------------------------------X

## DEBTOR'S MODIFIED FIRST AMENDED
## <u>CHAPTER 11 PLAN OF LIQUIDATION</u>

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000

Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

Dated:   December 28, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I ..................................................................................................................................1

DEFINITIONS .............................................................................................................................1

1.1.  "Administrative Bar Date" ..............................................................................1
1.2.  "Administrative Expense Claim" ....................................................................1
1.3.  "Aggregate Cash" ............................................................................................1
1.4.  "Allowed" ........................................................................................................1
1.5.  "Alper" .............................................................................................................2
1.6.  "Alper Settlement Agreement" .......................................................................2
1.7.  "Assets" ...........................................................................................................2
1.8.  "Available Cash" .............................................................................................2
1.9.  "Avoidance Actions" ......................................................................................2
1.10.  "Ballot" ............................................................................................................2
1.11.  "Ballot Date" ...................................................................................................2
1.12.  "Bankruptcy Code" .........................................................................................2
1.13.  "Bankruptcy Court" .........................................................................................2
1.14.  "Bankruptcy Rules" .........................................................................................3
1.15.  "Bar Date" ........................................................................................................3
1.16.  "Business Day" ................................................................................................3
1.17.  "Case" ..............................................................................................................3
1.18.  "Cash" ..............................................................................................................3
1.19.  "Causes of Action" ..........................................................................................3
1.20.  "Claim" ............................................................................................................3
1.21.  "Claims Agent" ...............................................................................................3
1.22.  "Class" ..............................................................................................................3
1.23.  "Class [___] Claim" .........................................................................................3
1.24.  "Collateral" ......................................................................................................3
1.25.  "Confirmation Date" ........................................................................................3
1.26.  "Confirmation Hearing" ..................................................................................3
1.27.  "Confirmation Order" ......................................................................................4
1.28.  "Debtor" ...........................................................................................................4
1.29.  "Debtor in Possession" ....................................................................................4
1.30.  "Disclosure Statement" ...................................................................................4
1.31.  "Disclosure Statement Order" .........................................................................4
1.32.  "Disputed Claim" .............................................................................................4
1.33.  "Disputed Claims Reserve" .............................................................................4
1.34.  "Distribution" ..................................................................................................4
1.35.  "Effective Date" ..............................................................................................4
1.36.  "Entity" ............................................................................................................4
1.37.  "Environmental Claim" ...................................................................................5
1.38.  "Equity Interest" ..............................................................................................5
1.39.  "Equity Interest Holder" ..................................................................................5
1.40.  "Estate" ............................................................................................................5
1.41.  "Executory Contract" .......................................................................................5

i

1.42. "Face Amount" .................................................................................................5
1.43. "Final Order" ..................................................................................................5
1.44. "General Unsecured Claims" ..........................................................................5
1.45. "Governmental Unit" ......................................................................................5
1.46. "Grupo" ..........................................................................................................5
1.47. "Grupo Note" ..................................................................................................6
1.48. "Holder(s)" .....................................................................................................6
1.49. "Intercompany Claims" ..................................................................................6
1.50. "Liability" or "Liabilities" ............................................................................6
1.51. "Lien" .............................................................................................................6
1.52. "Liquidating Trust" ........................................................................................6
1.53. "Liquidating Trust Agreement" .....................................................................6
1.54. "Liquidating Trustee" .....................................................................................6
1.55. "Official Committee" ......................................................................................6
1.56. "Operating Reserve Account" ........................................................................7
1.57. "Person" ..........................................................................................................7
1.58. "Petition Date" ...............................................................................................7
1.59. "Plan" .............................................................................................................7
1.60. "Priority Claims" ............................................................................................7
1.61. "Priority Non-Tax Claim" ..............................................................................7
1.62. "Priority Tax Claim" ......................................................................................7
1.63. "Professionals" ...............................................................................................7
1.64. "Ratable or Ratable Share" ............................................................................7
1.65. "Retiree" .........................................................................................................7
1.66. "Retiree Claim" ..............................................................................................7
1.67. "Schedules" ....................................................................................................7
1.68. "Secured Claim" .............................................................................................8
1.69. "Security" .......................................................................................................8
1.70. "U.S. Trustee" ................................................................................................8
1.71. "Unsecured Claim" .........................................................................................8
1.72. "X-Fund" ........................................................................................................8

ARTICLE II ....................................................................................................................8

INTERPRETATION;  APPLICATION OF DEFINITIONS AND RULES OF
CONSTRUCTION ........................................................................................................8

ARTICLE III ..................................................................................................................8

PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
CLAIMS .........................................................................................................................8
  3.1  Administrative Expense Claims. ...................................................................8
  3.2  Priority Tax Claims. ......................................................................................9

ARTICLE IV ..................................................................................................................9

CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ...................................9
  4.1  Claims Against and Equity Interests in the Debtor. ......................................9

ARTICLE V .......................................................................................................................9

    TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ..............9
    5.1  Designation of Treatment. ....................................................................................9
    5.2  Claims Against and Equity Interests in the Debtor. ...........................................10

ARTICLE VI.....................................................................................................................11

    IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS  AND EQUITY INTERESTS
    UNDER THE PLAN;   ACCEPTANCE OR REJECTION OF THE PLAN....................11
    6.1  Holders of Claims and Equity Interests Entitled to Vote....................................11
    6.2  Elimination of Classes........................................................................................12
    6.3  One Vote Per Holder. .........................................................................................12
    6.4  Non-consensual Confirmation. ...........................................................................12
    6.5  Revocation of the Plan........................................................................................12

ARTICLE VII ...................................................................................................................12

    FUNDING AND IMPLEMENTATION OF THE PLAN .............................................12
    7.1  Creation of the Liquidating Trust. ......................................................................12
    7.2  Appointment of the Liquidating Trustee. ...........................................................13
    7.3  Duties of the Liquidating Trustee. ......................................................................13
    7.4  Retention and Compensation of Professionals. ..................................................14
    7.5  Resignation, Death or Removal...........................................................................15
    7.6  Establishment of the Operating Reserve Account. .............................................15
    7.7  Establishment of Disputed Claims Reserve. ......................................................15
    7.8  Funding of Distributions.....................................................................................15
    7.9  Abandonment of the Schrader-Dickson Facility................................................16
    7.10  Substantial Consummation. ...............................................................................16

ARTICLE VIII..................................................................................................................16

    DISTRIBUTIONS UNDER THE PLAN ......................................................................16
    8.1  Date of Distributions. .........................................................................................16
    8.2  Delivery of Distributions. ...................................................................................16
    8.3  Disputed Distributions........................................................................................17
    8.4  Time Bar to Cash Payments................................................................................17
    8.5  Manner of Payment Under the Plan....................................................................17
    8.6  Distributions After Effective Date......................................................................17

ARTICLE IX.....................................................................................................................18

    DISPUTED CLAIMS UNDER THE PLAN .................................................................18
    9.1  Prosecution of Objections to Claims...................................................................18
    9.2  Claims Filed or Amended after the Bar Date......................................................18
    9.3  No Distributions Pending Allowance of a Disputed Claim. ...............................18
    9.4  Distributions After Allowance of a Disputed Claim. ..........................................18

ARTICLE X ...............................................................................................................................19

    EXECUTORY CONTRACTS UNDER THIS PLAN ...........................................................19
        10.1  General Treatment. ..................................................................................................19
        10.2  Deadline to Seek Rejection Damages. ....................................................................19

ARTICLE XI ..............................................................................................................................19

    CONDITIONS PRECEDENT TO THE CONFIRMATION DATE AND THE
    EFFECTIVE DATE ...............................................................................................................19
        11.1  Conditions to Confirmation of the Plan. ...............................................................19
        11.2  Conditions to Effective Date of the Plan. ..............................................................20
        11.3  Waiver of Conditions Precedent ............................................................................20

ARTICLE XII .............................................................................................................................20

    EFFECT OF CONFIRMATION .........................................................................................20
        12.1  Debtor's Authority. ................................................................................................20
        12.2  Corporate Action and Continued Existence of the Debtor. ...................................21
        12.3  Dissolution. ............................................................................................................21
        12.4  Vesting and Liens. ..................................................................................................21
        12.5  Discharge of the Debtor. ........................................................................................21
        12.6  Binding Nature of Plan. .........................................................................................22
        12.7  Termination of Injunctions or Stays. .....................................................................22

ARTICLE XIII ...........................................................................................................................22

    INJUNCTION AND RELEASES OF CLAIMS ..................................................................22
        13.1  Injunctions. ............................................................................................................22
        13.2  Avoidance and Recovery Actions. .........................................................................24

ARTICLE XIV ...........................................................................................................................24

    ADMINISTRATIVE PROVISIONS ...................................................................................24
        14.1  Further Documents and Action. .............................................................................24
        14.2  Official Committee. ................................................................................................24
        14.3  Expenses of Liquidation. .......................................................................................25
        14.4  Obligations Incurred after Confirmation Date. .....................................................25

ARTICLE XV ............................................................................................................................25

    RETENTION OF JURISDICTION .....................................................................................25
        15.1  Retention of Jurisdiction. .......................................................................................25
        15.2  Modification of the Plan. .......................................................................................27

ARTICLE XVI ...........................................................................................................................27

    COMPROMISES AND SETTLEMENTS ...........................................................................27

ARTICLE XVII............................................................................................................28

MISCELLANEOUS PROVISIONS...........................................................................28
   17.1  Payment of Statutory Fees............................................................................28
   17.2  Severability of Plan Provisions. ...................................................................28
   17.3  Governing Law. ............................................................................................28
   17.4  Notices. .........................................................................................................29
   17.5  Controlling Documents. ...............................................................................29
   17.6  Reservation of Rights...................................................................................30
   17.7  Binding Effect...............................................................................................30

# MODIFIED FIRST AMENDED
# CHAPTER 11 PLAN OF LIQUIDATION

Saltire Industrial, Inc., as debtor and debtor in possession in the above-captioned Chapter 11 case (the "Debtor"), proposes the following Modified First Amended Chapter 11 Plan of Liquidation, dated as of December 28, 2005 (the "Plan"), pursuant to the provisions of Chapter 11 of Title 11 of the United States Code. The Debtor's history, description of its business and properties, results of operations and a summary and analysis of the Plan and related matters are set forth in the Debtor's First Amended Disclosure Statement. Except as otherwise provided, capitalized terms herein shall have the meanings set forth in Article I of the Plan.

## ARTICLE I

## DEFINITIONS

The following terms, when used in this Plan or any subsequent amendments or modifications thereof, shall have the meanings defined below:

1.1.    "Administrative Bar Date" means the date established by the Bankruptcy Court that shall constitute the final date by which any Administrative Expense Claim must be asserted against the Debtor; provided, however, that the Confirmation Order shall fix a separate date by which final applications by Professionals for the allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code must be filed.

1.2.    "Administrative Expense Claim" means any right to payment constituting a cost or expense of administration of the Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses of preserving the estate of the Debtor; (b) any actual and necessary costs and expenses of operating the business of the Debtor; (c) any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business; and (d) any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 331 of the Bankruptcy Code, whether fixed before or after the Effective Date.

1.3.    "Aggregate Cash" means, as of any date, the amount of Available Cash plus the amount of the X-Fund.

1.4.    "Allowed" means, with reference to any Claim or Equity Interest: (a) any Claim against or Equity Interest in the Debtor, proof of which was filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or (ii) as to which no action has been commenced to avoid such Claim or Equity Interest within the applicable period of limitation fixed by this Plan, or (iii) as to which an objection has been interposed, only to the extent such Claim or Equity Interest has been allowed

(whether in whole or in part) by a Final Order;  (b) if no proof of Claim was so filed, any Claim against or Equity Interest in the Debtor which the Debtor has listed in its Schedules, as such Schedules may be amended from time to time in accordance with Rule 1009 of the Bankruptcy Rules, as liquidated in amount and neither disputed nor contingent;  (c) any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code;  or (d) any Claim deemed as allowed by the Plan.

1.5.    "Alper" means Alper Holdings USA, Inc., a Delaware corporation.

1.6.    "Alper Settlement Agreement" means the agreement by and among the Debtor, Alper and the Official Committee pursuant to which, among other things, Alper will make a contribution to the Debtor's Estate, including, but not limited to, payment of the aggregate amount of $1,000,000 in Cash and the waiver of any Distributions on account of any Claims or Equity Interests it may hold against the Debtor's Estate, in exchange for a general release and waiver of any claims and Causes of Action the Debtor's Estate may hold against Alper, as set forth in Section 13.1 of this Plan.

1.7.    "Assets" means all assets of the Debtor, of any nature whatsoever, and property of the Estate pursuant to section 541 of the Bankruptcy Code, including, without limitation, all claims, Causes of Action, rights, interests and property, whether real or personal, tangible or intangible, and any and all insurance coverage and/or policies of the Debtor, as well as any and all rights thereto or thereunder.

1.8.    "Available Cash" means, as of any date, the amount of Cash or Cash equivalents available as of such date to make Distributions to Holders of Allowed Claims in accordance with (and to the extent required by) this Plan.

1.9.    "Avoidance Actions" means rights, claims and causes of action of the bankruptcy estate of the Debtor arising under Chapter 5 of the Bankruptcy Code.

1.10.    "Ballot" means the form or forms distributed to each Holder of an impaired Claim entitled to vote on this Plan on which Ballot is to be indicated either an acceptance or rejection of this Plan.

1.11.    "Ballot Date" means the date set by the Bankruptcy Court by which all Ballots for acceptance or rejection of this Plan must be received.

1.12.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified at Title 11, United States Code, 11 U.S.C. § 101, *et seq.*

1.13.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Case and, to the extent of any reference under section 157, Title 28, United States Code, the unit of such District Court constituted under section 15, Title 28, United States Code.

2

1.14.  "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075, Title 28, United States Code, and the Local Rules of the Bankruptcy Court.

1.15.  "Bar Date" means December 10, 2004 or such other date(s) fixed by order(s) of the Bankruptcy Court by which proofs of Claim must be filed.

1.16.  "Business Day" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.17.  "Case" means the case commenced on the Petition Date under Chapter 11 of the Bankruptcy Code by the Debtor before the Bankruptcy Court, as referenced by Case No. 04-15389 [BRL].

1.18.  "Cash" means legal tender of the United States of America.

1.19.  "Causes of Action" means any and all rights, claims, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity or otherwise, including Avoidance Actions.

1.20.  "Claim" means:  (a) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured;  or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.21.  "Claims Agent" means Garden City Group, Inc. or such successor as the Debtor may designate, subject to approval of the Bankruptcy Court.

1.22.  "Class" means a group of Claims or Equity Interests as classified in Article IV under the Plan.

1.23.  "Class [___] Claim" means a Claim in the particular Class of Claims identified and described in Article IV of the Plan.

1.24.  "Collateral" means any property, or interest in property, of the estate of the Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code.

1.25.  "Confirmation Date" means the date on which the Confirmation Order is entered on the legal docket for the Case.

1.26.  "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan in accordance with section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

1.27.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

1.28.    "Debtor" means Saltire Industrial, Inc., a Delaware corporation.

1.29.    "Debtor in Possession" means the Debtor in its capacity as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

1.30.    "Disclosure Statement" means the disclosure statement relating to this Plan, dated as of December 28, 2005, including the exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time.

1.31.    "Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code.

1.32.    "Disputed Claim" means a Claim, or a portion of a Claim against the Debtor:  (a) to the extent that allowance of such Claim is the subject of an objection or a motion to estimate interposed by the Debtor;  (b) which is scheduled by the Debtor as disputed, contingent and/or unliquidated;  or (c) which has been filed as unliquidated or contingent, provided that a Disputed Claim shall also include, prior to the time that an objection has been or may be timely filed, that portion of a filed Claim in excess of the amount of the Claim as scheduled by the Debtor other than as disputed, contingent or unliquidated.

1.33.    "Disputed Claims Reserve" means such Cash reserve as may be established on or after the Effective Date by the Liquidating Trustee, with respect to any Disputed Claim in Classes or categories under the Plan, which reserve shall be set aside in a separate interest-bearing account in amounts sufficient to make Distributions on account of up to the Face Amount of each Disputed Claim in accordance with the provisions of this Plan in the event such Disputed Claim becomes an Allowed Claim.

1.34.    "Distribution" means a payment and/or distribution of Cash or other consideration to be made to Holders of Allowed Claims in accordance with the terms and conditions of this Plan.

1.35.    "Effective Date" means the date that is at least eleven (11) days (calculated under Bankruptcy Rule 9006) after the Confirmation Date, if no stay of the Confirmation Order is then in effect, which date shall be fixed after the Confirmation Date by the Debtor by filing a notice thereof with the Bankruptcy Court, and on which date the transactions and distributions contemplated to be made under the Plan on the Effective Date are to be effected;  provided, however, that in no event shall the Effective Date occur prior to the satisfaction of the conditions precedent to the occurrence of the Effective Date specified in Section 11.2 hereof unless waived as provided in Section 11.3 hereof.

1.36.    "Entity" has the meaning assigned to such term in section 101(15) of the Bankruptcy Code.

4

1.37.   "Environmental Claim" means a Claim against the Debtor that arises out of environmental contamination allegedly caused by the Debtor.

1.38.   "Equity Interest" means any interest in the Debtor represented by duly authorized, validly issued and outstanding shares of stock.

1.39.   "Equity Interest Holder" means Alper.

1.40.   "Estate" means the bankruptcy estate of the Debtor created as of the Petition Date pursuant to section 541 of the Bankruptcy Code and being comprised of all property, rights and interests of the Debtor, whether existing as of the Petition Date or acquired thereafter.

1.41.   "Executory Contract" means any pre-Petition Date contracts and leases, including leases for nonresidential real property, which had not expired, or were not terminated, prior to the Petition Date and under which performance by the parties thereto remains due to some extent.

1.42.   "Face Amount" means, with respect to any Disputed Claim, the lesser of:  (i) the liquidated amount, if any, set forth in the proof of claim;  (ii) the amount as estimated by the Bankruptcy Court in accordance with section 502(a) of the Bankruptcy Code;  or (iii) such amount as may be agreed to by the Holder of the Disputed Claim for purposes of establishing the Disputed Claims Reserve.

1.43.   "Final Order" means:  (a) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending;  or (b) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired;  provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.44.   "General Unsecured Claims" means all Unsecured Claims against the Debtor that are not Intercompany Claims.

1.45.   "Governmental Unit" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

1.46.   "Grupo" means Grupo IUSA, S.A. de C.V., a Mexican corporation.

1.47.    "Grupo Note" means the promissory note, dated March 4, 2004, in the original principal amount of $8,250,000 and bearing an interest rate of 10% per annum that is payable by Grupo to the Debtor.

1.48.    "Holder(s)" means the legal or beneficial holder(s) of a Claim or Equity Interest (and, when used in conjunction with a Class or type of Claim or Equity Interest, means a holder of a Claim or Equity Interest in such Class or of such type).

1.49.    "Intercompany Claims" means those Claims, if any, Alper may hold against the Debtor, which the Debtor believes are limited to claims for any outstanding fees and expenses due under a certain management agreement, dated as of January 1, 1995, and any indemnification claims Alper may hold pursuant to such management agreement.

1.50.    "Liability" or "Liabilities" mean any and all costs, expenses, actions, causes of action, suits, controversies, damages, claims, liabilities or demands of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence taking place on or prior to the Effective Date.

1.51.    "Lien" has the meaning assigned to such term in section 101(37) of the Bankruptcy Code (but a lien that has been avoided in accordance with sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a Lien).

1.52.    "Liquidating Trust" means the trust to be formed on the Effective Date to receive, liquidate, and distribute the remaining Assets of the Debtor in accordance with the Plan, and to which the Debtor shall assign its rights to (a) make Distributions to Holders of Allowed General Unsecured Claims, and (b) prosecute and settle Causes of Action for the benefit of Holders of Allowed Claims.

1.53.    "Liquidating Trust Agreement" means the Liquidating Trust Agreement, the form of which agreement shall be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing.

1.54.    "Liquidating Trustee" means the trustee of the Liquidating Trust, or any Bankruptcy Court approved successor, who is responsible for implementing the functions of the Liquidating Trust, maintaining and administering the Debtor's Available Cash from and after the Effective Date, and effectuating the Distributions to Holders of Allowed General Unsecured Claims as prescribed by this Plan.  The initial Liquidating Trustee shall be designated by the Official Committee in a notice to be filed with the Bankruptcy Court and served on the United States Trustee at least ten (10) days prior to the Confirmation Hearing.

1.55.    "Official Committee" means the official committee of unsecured creditors appointed in the Debtor's Chapter 11 case, as it was originally constituted and may be reconstituted from time to time.

1.56.   **"Operating Reserve Account"** means an account(s) to be established and maintained by the Debtor and into which funds will be deposited in amounts, sufficient to satisfy the Estate's Allowed Administrative Expense Claims that arise prior to, on or after the Confirmation Date, including expenses of the Estate's administration after confirmation.

1.57.   "Person" means an individual, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint venture, trust, estate, unincorporated organization, or a government or any agency or political subdivision thereof.

1.58.   "Petition Date" means August 17, 2004, the date on which the Debtor filed its petition under Chapter 11 of the Bankruptcy Code.

1.59.   "Plan" means this Modified First Amended Chapter 11 Plan of Liquidation, dated December 28, 2005, including any schedules and exhibits hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

1.60.   "Priority Claims" means all Priority Non-Tax Claims and Priority Tax Claims.

1.61.   "Priority Non-Tax Claim" means any Claim of a kind specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.62.   "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.63.   "Professionals" means the attorneys, accountants and other professionals whose retention has been approved by the Bankruptcy Court in the Case or pursuant to the Liquidating Trust Agreement.

1.64.   "Ratable or Ratable Share" means a number (expressed as a percentage) equal to the proportion that an Allowed Claim bears to the aggregate amount of Allowed Claims plus Disputed Claims (in their aggregate Face Amount) in such Class as of the date of determination.

1.65.   "Retiree" means a former employee of the Debtor who was entitled to receive benefits from the Debtor pursuant to a prepetition medical or life insurance plan that was terminated by the Debtor in accordance with the terms of the Order entered by the Bankruptcy Court on April 21, 2005.

1.66.   "Retiree Claim" means a Claim held by a Retiree.

1.67.   "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed in the Case by the Debtor with the Bankruptcy Court under section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

7

1.68.   "Secured Claim" means a Claim secured by a Lien on Collateral to the extent of the value of the Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code.

1.69.   "Security" means security as defined in section 101(49) of the Bankruptcy Code.

1.70.   "U.S. Trustee" means the United States Trustee appointed under section 591, Title 28, United States Code to serve in the Southern District of New York.

1.71.   "Unsecured Claim" means any Claim against the Debtor other than Administrative Expense Claims, Priority Claims and Secured Claims.

1.72.   "X-Fund" means that premium deposit fund originally created pursuant to an agreement entered into by the Debtor with Aetna Life Insurance Company, dated December 29, 1980, to provide life insurance benefits under Aetna's Group Insurance policy #47400, and which currently is being held in a special purpose bank account and whose use is restricted for the benefit of Retirees.  The estimated value of the X-Fund was approximately $475,000 as of October 31, 2005.

## ARTICLE II

## INTERPRETATION;  APPLICATION OF
## DEFINITIONS AND RULES OF CONSTRUCTION

Unless otherwise specified, all article, section, schedule or exhibit references in this Plan are to the respective article or section of, or schedule or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to this Plan as a whole and not to any particular article, section, subsection or clause contained in this Plan.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of this Plan.  Unless otherwise indicated herein, all references to dollars means United States dollars.

## ARTICLE III

## PAYMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

3.1    Administrative Expense Claims.

Subject to the Administrative Bar Date provisions herein and except to the extent the Debtor or the Liquidating Trustee and the Holder of an Allowed Administrative Expense Claim agree to a different treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in Cash by the Debtor or the

8

Liquidating Trustee from the Operating Reserve Account or the Disputed Claims Reserve, as the case may be, in an amount equal to such Allowed Administrative Expense Claim on the later of: (a) the Effective Date; and (b) ten (10) Business Days after the date on which such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

3.2     Priority Tax Claims.

On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Except for Administrative Expense Claims and Priority Tax Claims, Claims against, and Equity Interests in, the Debtor are classified as follows:

4.1     Claims Against and Equity Interests in the Debtor.

4.1.1     Class 1: Priority Non-Tax Claims. Class 1 consists of all Priority Non-Tax Claims against the Debtor.

4.1.2     Class 2: Secured Claims. Class 2 consists of all Secured Claims against the Debtor.

4.1.3     Class 3: General Unsecured Claims. Class 3 consists of all General Unsecured Claims, including Retiree Claims, against the Debtor.

4.1.4     Class 4: Intercompany Claims. Class 4 consists of all Intercompany Claims against the Debtor.

4.1.5     Class 5: Equity Interests. Class 5 consists of all Equity Interests in the Debtor.

## ARTICLE V

## TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

5.1     Designation of Treatment. The following treatment set forth in this Article V shall be accorded in full and complete satisfaction of all Claims against, and Equity Interests in, the Debtor designated by Class. No Claim shall entitle the Holder thereof to any Distribution pursuant to this Plan unless, and only to the extent that, such Claim is an Allowed Claim.

     5.2    <u>Claims Against and Equity Interests in the Debtor</u>.

       5.2.1   <u>Class 1:  Priority Non-Tax Claims</u>.

On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amount and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

Class 1 Priority Non-Tax Claims are not impaired.

       5.2.2   <u>Class 2:  Secured Claims</u>.

Each Holder of an Allowed Secured Claim shall receive, in the Debtor's sole discretion, one of the following types of treatment:

    (a)   (i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash on the later of (A) the Effective Date or as soon thereafter as may be practicable, or (B) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practicable;  and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the amount of such Holder's Allowed Secured Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan; or

    (b)   the Debtor shall abandon the property that secures the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or (ii) the date that is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order; or

    (c)   such other treatment as the Holder of such Allowed Secured Claim and the Debtor shall agree upon in writing.

Class 2 Secured Claims are not impaired.

       5.2.3   <u>Class 3:  General Unsecured Claims</u>.

Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of their Allowed Class 3 Claim,

periodic ratable Distributions from the Liquidating Trust in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim;  provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Debtor's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.

Class 3 General Unsecured Claims are impaired.

5.2.4    Class 4:  Intercompany Claims.

Pursuant to the Alper Settlement Agreement, Alper will waive and release all Claims against the Debtor's Estate in their entirety and with prejudice, including but not limited to its asserted Intercompany Claim under its management agreement with the Debtor in the amount of $1,264,392.  Accordingly, on the Effective Date, Alper shall not receive any Distribution and all Intercompany Claims shall be deemed expunged.

Class 4 Intercompany Claims are impaired.

5.2.5    Class 5:  Equity Interests.

On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests.  As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

Class 5 Equity Interests are impaired.

## ARTICLE VI

## IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN; ACCEPTANCE OR REJECTION OF THE PLAN

6.1    Holders of Claims and Equity Interests Entitled to Vote.

(a)    Each Holder of an Allowed Claim, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a), in an impaired Class of Claims against the Debtor, shall be entitled to vote separately to accept or reject this Plan.

(b)    Class 3 is impaired hereunder and the Holders of Allowed Claims in such class are entitled to vote on this Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims in Class 4 and Holders of Equity Interests in Class 5 are receiving no Distributions under the Plan and,

accordingly, each of Class 4 and Class 5 is conclusively deemed to have rejected this Plan.

(c)    Classes 1 and 2 are not impaired hereunder.  In accordance with section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are conclusively deemed to have accepted this Plan.

6.2    Elimination of Classes.

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim, or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Plan for purposes of voting on acceptance or rejection of this Plan, and for purposes of determining acceptance or rejection of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

6.3    One Vote Per Holder.

If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

6.4    Non-consensual Confirmation.

If any impaired Class of Claims shall not have accepted this Plan by the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtor may:  (a) request the Bankruptcy Court to confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code to such non-accepting Class-of-Claims or Equity Interests;  or (b) modify this Plan in accordance with Section 15.2 hereof.

6.5    Revocation of the Plan.

The Debtor reserves the right to revoke and withdraw this Plan at any time prior to entry of the Confirmation Order.  If this Plan is so revoked or withdrawn, then it shall be deemed null and void.

## ARTICLE VII

## FUNDING AND IMPLEMENTATION OF THE PLAN

7.1    Creation of the Liquidating Trust.

On the Effective Date or as soon thereafter as is practicable, all of the Assets of the Debtor's Estate will be transferred to a Liquidating Trust for the benefit of the Holders of General Unsecured Claims, including, but not limited to, all Cash and Causes of Action;  provided, however, that the Debtor shall retain such Cash as may be necessary to fund (i) Distributions on the Effective Date to Holders of Allowed

Administrative Expense Claim and Allowed Priority Claims, and (ii) the creation and maintenance of the Operating Reserve Account.

7.2     Appointment of the Liquidating Trustee.

(a)     Prior to the Confirmation Hearing, the Official Committee shall designate the Liquidating Trustee who shall be paid in accordance with the terms of the Liquidating Trust Agreement.

(b)     On the Effective Date or as soon thereafter as practicable, all Cash and Assets of the Estate not otherwise required by the Debtor to satisfy its obligations under this Plan, including but not limited to Causes of Action, shall be transferred to the Liquidating Trust for liquidation and distribution in accordance with the Plan and the Liquidating Trust Agreement.

(c)     For purposes of making Distributions on account of Allowed Claims under the terms and conditions of this Plan, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code.

(d)     As of each March 31, June 30, September 30 and December 31, the Liquidating Trustee shall prepare a quarterly report, and, upon the resolution of the last Disputed Claim, Avoidance Action or Cause of Action, a final report, regarding receipts, disbursements and the status of pending, contemplated and resolved Disputed Claims, Avoidance Actions and Causes of Action. Such report shall be filed with the Bankruptcy Court and a copy shall be delivered to the Debtor within fifteen (15) days of the end of each calendar quarter and the final report on or before sixty (60) days following resolution of the last Disputed Claim, Avoidance Action or Cause of Action.

(e)     Post-confirmation and throughout the winding down period, the officers of the Debtor will remain reasonably available to assist in the liquidation of any and all Assets, including but not limited to, Avoidance Actions and Causes of Action that the Liquidating Trust may pursue or commence.

7.3     Duties of the Liquidating Trustee.

(a)     On the Effective Date, the Liquidating Trustee shall begin acting on behalf of the Liquidating Trust and its beneficiaries subject to the provisions hereof and the Liquidating Trust Agreement. The Liquidating Trustee shall be compensated at the rate to be disclosed at or prior to the Confirmation Hearing, plus reimbursement for his/her reasonable, actual and necessary expenses incurred in connection with the performance of his/her duties, without the need of Bankruptcy Court approval. The Liquidating Trustee shall not be liable for any action taken or omitted to be taken that he/she believes in good faith to be authorized or within his/her rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of gross negligence or willful misconduct. All Distributions to Holders of General Unsecured Claims to be made under the Plan after the Effective Date shall be made by the Liquidating Trustee, who shall deposit and hold all Cash in trust pursuant to the Liquidating Trust Agreement.

(b)     The duties and powers of the Liquidating Trustee shall, to the extent not inconsistent with the Plan and the Liquidating Trust Agreement, include the following:

(i)     To exercise all power and authority that may be exercised, commence all proceedings that may be commenced and take all actions that may be taken by any officer, director or shareholder of the Debtor, with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including consummating the Plan and making all transfers thereunder on behalf of the Debtor and prosecuting any Avoidance Actions or Causes of Action;

(ii)    To maintain all accounts, make Distributions and take other actions consistent with the Plan, including the maintenance of appropriate reserves;

(iii)   To take all steps to file and serve on the Office of the United States Trustee any reports that may be required by law and to pay all fees associated therewith;

(iv)    To prosecute objections to General Unsecured Claims and compromise or settle any General Unsecured Claims, Disputed or otherwise;

(v)     To make decisions regarding the retention and employment of Professionals or other Persons and to pay, without Bankruptcy Court order, all reasonable fees and expenses incurred by the Liquidating Trust after the Effective Date;

(vi)    To prepare and file a closing report and a final decree to close this Case;  and

(vii)   To take all other action not inconsistent with the provisions of the Plan and the Liquidating Trust Agreement that the Liquidating Trustee deems reasonably necessary or desirable in connection with the administration of the Plan.

7.4     <u>Retention and Compensation of Professionals</u>.

In order to carry out his/her duties under the Plan and the Liquidating Trust Agreement, the Liquidating Trustee, in addition to the rights hereunder and in the Liquidating Trust Agreement, shall have the right, but not the obligation, to (i) retain and compensate Professionals (including, but not limited to, the Professionals retained by the Official Committee or the Debtor prior to the Effective Date) to assist the Liquidating Trustee in liquidation and distribution of the Assets without prior

Bankruptcy Court approval, and (ii) employ such procedures, not inconsistent with the Plan and the Liquidating Trust Agreement, necessary for the Liquidating Trustee to perform his/her duties hereunder. The reasonable and necessary fees and actual and necessary expenses of such Professionals and the Liquidating Trustee shall be paid by the Liquidating Trust upon each monthly submission of a fee statement to the Liquidating Trustee. The Liquidating Trustee shall have fifteen (15) days after the delivery of a fee statement to give notice of an objection to the fee statement of a Professional seeking compensation and/or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is delivered may be submitted to the Bankruptcy Court for resolution. The uncontested portion of the each fee statement shall be paid within thirty (30) days after its delivery to the Liquidating Trust.

7.5     Resignation, Death or Removal.

The Liquidating Trustee may be removed by the Bankruptcy Court upon application for good cause. In the event of resignation, removal, death or incapacitation of the Liquidating Trustee, the Bankruptcy Court shall designate another Person to become the Liquidating Trustee and thereupon the successor shall become fully vested with all the rights, powers, duties and obligations of his/her predecessor. In the event of the removal, resignation or death of the Liquidating Trustee, counsel to the Reorganized Debtor or the Liquidating Trust shall file with the Bankruptcy Court and serve on the United States Trustee a notice regarding such change.

7.6     Establishment of the Operating Reserve Account.

On or before the Effective Date, the Debtor will establish the Operating Reserve Account. The Operating Reserve Account shall be used to pay the post-Confirmation Date Administrative Expense Claims of the Case, including the fees and expenses of any Professionals retained by the Debtor and/or the Official Committee. The Operating Reserve Account will be funded from the Estate's Available Cash. When the Plan has been consummated and the Debtor dissolved, any remaining funds in the Operating Reserve Account shall be transferred by the Debtor to the Liquidating Trustee for subsequent disposition in accordance with terms of Liquidating Trust Agreement.

7.7     Establishment of Disputed Claims Reserve.

On the Effective Date, and prior to making the Distributions to Holders of Allowed General Unsecured Claims required to be made on the Effective Date, the Liquidating Trustee shall establish a Disputed Claims Reserve. Distributions from the Disputed Claims Reserve shall be governed by Articles III and IV of this Plan.

7.8     Funding of Distributions.

All Distributions required to be made by the Debtor on the Effective Date on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Non-Priority Tax Claims and Allowed General Unsecured Claims shall be

made by the Debtor and/or the Liquidating Trustee, as the case may be, from the Aggregate Cash.

7.9     Abandonment of the Schrader-Dickson Facility.

Effective as of the date the Confirmation Order is entered by the Bankruptcy Court, the Debtor will abandon, pursuant to section 554 of the Bankruptcy Code, its interest in that certain thirty-seven (37) acre tract of land in Dickson, Tennessee known as the "Schrader-Dickson Facility."

7.10     Substantial Consummation.

Substantial consummation of this Plan as defined by section 1101(2) of the Bankruptcy Code shall not be deemed to occur, the Case shall remain open and shall not be deemed fully administered, and no final decree closing this Case shall be entered pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022, until the Effective Date, at the earliest.

# ARTICLE VIII

# DISTRIBUTIONS UNDER THE PLAN

8.1     Date of Distributions.

Any Distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by this Plan.  If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8.2     Delivery of Distributions.

Subject to Rule 9010 of the Bankruptcy Rules, and except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made at the address of each of such Holder as set forth in the Schedules filed by the Debtor with the Bankruptcy Court, unless superseded by the address set forth on proofs of Claim filed by such Holder (or at the last known address of such Holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address).  If any Distribution to any Holder is returned as undeliverable, the Liquidating Trustee shall use reasonable efforts to determine the current address of such Holder, but no Distribution to any such Holder shall be made unless and until the Liquidating Trustee has determined the then current address of such Holder, at which time such Distribution to such Holder shall be made to such Holder without interest.  Amounts in respect of any undeliverable Distributions made by the Liquidating Trust shall be returned to the Liquidating Trust until such Distributions are claimed.  If such Distributions are not claimed by the expiration of the later of:  (a) one year from the Effective Date;  or (b) one year from the actual date of the making of such Distribution (the "Unclaimed Distribution Date"),

such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  If no proofs of Claim are filed and the Schedules filed with the Bankruptcy Court fail to state addresses for Holders of Allowed Claims, Distributions that would have been made on account of such Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the Unclaimed Distribution Date.  After the Unclaimed Distribution Date, all unclaimed property shall be transferred to the Liquidating Trust for Distribution to Holders of Allowed General Claims and the Claim of any Holder to such property shall be discharged and forever barred.

8.3    <u>Disputed Distributions</u>.

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, in lieu of making a Distribution to such Person, the Debtor and/or the Liquidating Trustee, as the case may be, shall deposit the Distribution at issue into a segregated account until the disposition of such Distribution is determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

8.4    <u>Time Bar to Cash Payments</u>.

Any check issued by the Debtor or the Liquidating Trustee, as the case may be, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof, unless it has been returned as undeliverable.  Requests for reissuance of any check shall be made in writing directly to the Debtor or the Liquidating Trustee, as the case may be, by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any request for reissuance of a voided check constituting the Distribution in respect of an Allowed Claim shall be made in writing on or before the first anniversary of the Effective Date. After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.5    <u>Manner of Payment Under the Plan</u>.

At the option of the Debtor or the Liquidating Trustee, as the case may be, any Distribution of Cash to be made pursuant to this Plan may be made by a check or wire transfer, or as otherwise required by  or provided in applicable agreements.

8.6    <u>Distributions After Effective Date</u>.

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

# ARTICLE IX

## DISPUTED CLAIMS UNDER THE PLAN

9.1     Prosecution of Objections to Claims.

Upon the Effective Date, the Liquidating Trustee shall be responsible for pursuing any objection to the allowance of all Disputed Claims with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.

The Liquidating Trustee may compromise and settle any Disputed Claims.  The Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019(a).

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed no later than one hundred twenty (120) days after the Effective Date;  provided,  however, that this deadline may be extended upon motion by the Liquidating Trustee, without notice to Creditors.

9.2     Claims Filed or Amended after the Bar Date.

Except as otherwise provided in the Plan, any new or amended Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtor or the Liquidating Trust, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the filing.  The Holder of a Claim that is disallowed pursuant to this section shall not receive any Distribution on account of such Claim.

9.3     No Distributions Pending Allowance of a Disputed Claim.

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until it becomes an Allowed Claim.

9.4     Distributions After Allowance of a Disputed Claim.

Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of this Plan governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim any payment that would have been distributed to such Holder if the Claim had been Allowed on the Effective Date, plus any payments that have been made on account of such Allowed Claim after the Effective Date, without any interest thereon.

18

## ARTICLE X

## EXECUTORY CONTRACTS UNDER THIS PLAN

10.1    General Treatment.

This Plan constitutes a motion by the Debtor to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for any Executory Contract that (a) has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code and pending on the Effective Date.

10.2    Deadline to Seek Rejection Damages.

If the rejection of any Executory Contract under this Plan or other pending motion results in damages to the other party or parties to such contract, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Estate or its properties or interests in property or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor and the Liquidating Trustee (in the event the Effective Date has occurred), on or before thirty (30) days after the earlier to occur of:  (a) the Confirmation Date;  and (b) the entry of an order by the Bankruptcy Court authorizing rejection of a particular Executory Contract.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE
## CONFIRMATION DATE AND THE EFFECTIVE DATE

11.1    Conditions to Confirmation of the Plan.

This Plan may not be confirmed unless each of the conditions set forth below is satisfied.  Except as provided in section 11.3 below, any one or more of the following conditions may be waived at any time by the Debtor:

(a)    the Disclosure Statement Order shall have been entered on the legal docket for the Case and shall have become a Final Order;

(b)    the Confirmation Order shall be in a form reasonably acceptable to the Debtor, the Official Committee;  and

(c)    the Alper Settlement Agreement shall be approved through the Confirmation Order.

19

11.2    Conditions to Effective Date of the Plan.

The Effective Date for this Plan may not occur unless each of the conditions set forth below is satisfied.  Except as provided in section 11.3 below, any one or more of the following conditions may be waived at any time by the Debtor:

(a)    the Confirmation Order shall have been entered on the legal docket for the Case and shall have become a Final Order;

(b)    Alper shall have paid $1,000,000 to the Debtor's Estate within forty-five (45) days of the entry of the Confirmation Order;

(c)    upon the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate an amount equal to 50% of the total outstanding balance due to the Debtor under the Grupo Note;

(d)    within forty-five (45) days of the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate the remaining balance due under the Grupo Note including all accrued interest thereon;  and

(e)    all actions and documents necessary to implement the provisions of this Plan shall have been effected or executed and delivered.

Payment in full of the Grupo Note and the $1,000,000 settlement payment by Alper are express conditions to the Effective Date of the Plan.  The Effective Date of the Plan shall be no earlier than two (2) business days after all payments by Alper and Grupo have been paid in full through cleared funds to the Debtor's Estate.

11.3    Waiver of Conditions Precedent.

Other than the requirements set forth in sections 11.1(a) and 11.2(a) of this Plan, the requirement that a particular condition set forth in sections 11.1 and 11.2 hereof be satisfied may be waived or modified, in whole or in part, upon the joint consent of the Debtor, and the Official Committee.  Any such waiver or modification of a condition precedent in sections 11.1 and 11.2 hereof may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any other formal action.

## ARTICLE XII

## EFFECT OF CONFIRMATION

12.1    Debtor's Authority.

Until the Effective Date, the Bankruptcy Court shall retain custody and jurisdiction over the Debtor, its properties, interests in property and operations.  On the Effective Date, the Debtor, its properties and interests in property and operations shall

20

be released from the custody and jurisdiction of the Bankruptcy Court, except as provided in Article XV of this Plan.

12.2    Corporate Action and Continued Existence of the Debtor.

From and after the Confirmation Date, the Debtor shall continue in existence solely for the purpose of winding up its affairs as expeditiously as reasonably possible. Except as otherwise provided herein, the Plan will be administered by the Liquidating Trustee and all actions taken hereunder shall be taken through the Liquidating Trustee. The Debtor, however, shall retain responsibility for (a) the preparation and submission of all final tax returns, if any, for the Debtor, and (b) the steps necessary to terminate the corporate existence of the Debtor.

From and after the Confirmation Date, the then current officers and directors of the Debtor shall continue to serve in their respective capacities through the earlier of the date the Debtor is dissolved under applicable state law such officer or director resigns, is replaced or is terminated, the officer and directors of the Debtor shall continue to serve in their respective capacities on the same terms and conditions upon which they presently serve the Debtor.

12.3    Dissolution.

Upon completion of its purposes detailed in Section 12.2, the Debtor shall be dissolved under applicable state law. Immediately prior to such dissolution, to the extent not already done, all remaining Available Cash shall be transferred to the Liquidating Trust for Distribution in accordance with the Plan's treatment of Allowed General Unsecured Claims.

12.4    Vesting and Liens.

Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, title to all Avoidance Actions, Causes of Action, Assets and Cash of the Debtor and its Estate shall vest in the Liquidating Trust, free and clear of aliens, Claims and Interests. The Liquidating Trust is a grantor trust and is assumed to have no tax liabilities. On or before the Effective Date, the Liquidating Trust and the Debtor shall enter into the Liquidating Trust Agreement. The Liquidating Trustee shall liquidate the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan. The Debtor shall execute any and all documents necessary to transfer and convey its Assets not otherwise required to satisfy its obligations under this Plan to the Liquidating Trust on the Effective Date.

12.5    Discharge of the Debtor.

In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan and the Confirmation Order shall not discharge the Debtor from any Claim or Liability that arose before the Confirmation Date.

12.6    Binding Nature of Plan.

Except as otherwise provided in section 1141(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind all present and former Holders of Claims against, or Equity Interests in, the Debtor and its successors and assigns, whether the Claim or Equity Interest of such Holder is impaired under the Plan and whether such Holder has filed a proof of Claim or Equity Interest or voted to accept the Plan.  The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

12.7    Termination of Injunctions or Stays.

Unless otherwise provided in this Plan or the Confirmation Order, all injunctions or stays provided for in the Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the occurrence of the Effective Date, all such injunctions or stays shall be deemed terminated or vacated and shall have no further force and effect.

## ARTICLE XIII

## INJUNCTION AND RELEASES OF CLAIMS

13.1    Injunctions.

(a)    General Injunction.  The Debtor shall seek the entry of a Confirmation Order that provides for an injunction permanently enjoining and restraining all Entities from:

(i)    Commencing or continuing any action or proceeding respecting any claim or interest against the Debtor or its property (other than abandoned property);

(ii)    Enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);

(iii)    Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);

(iv)    Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and

22

(v)    Performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

(b)    **Release and Injunction in Favor of Alper.  As of the Effective Date, the Debtor, on its own behalf, and on behalf of its estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, releases, acquits and forever discharges Alper and its principals, shareholders, subsidiaries, affiliates, and their respective employees, agents, representatives, officers, directors, members, partners, professionals (all solely in their capacities as such), successors and assigns, and any Entity claimed to be liable derivatively through the Debtor, or any of the foregoing (each such party, a "Released Party") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of this Case or during the course of the Case (including through the Effective Date), in any way relating to the Debtor, this Case, or the ownership, management, and operation of the Debtor, that the Debtor could assert directly or any Holder of a Claim or Interest or other Entity could assert derivatively or on behalf of the Debtor or its Estate (the "Released Claims"); provided that the foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or cause of action arising out of any express contractual obligation owing by any current or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation of any current or former, director, officer, or employee with respect to a loan or advance made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or cause of action against Grupo and its employees, agents, representatives, officers, directors, members, partners, professionals, successors and assigns (all solely in their capacities as such).  The releases described in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity. Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.**

**The Confirmation Order shall provide that the Debtor and its Estate shall be permanently enjoined, from and after the Effective Date, from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to this Plan.**

(c)    Exculpation.  As of the Effective Date, each Holder of a Claim or Equity Interest, each party-in-interest and each Entity acting or claiming or purporting to act or claim by, through under or on behalf of any of the foregoing, shall forever be enjoined from the commencement or continuation of any action, the

employment of process, or any act to assert a claim for relief against the Debtor, the Official Committee, Alper, and their respective officers, directors, attorneys or other professionals (the "Plan Releasees") in respect of: (A) any actions taken or not taken in connection with the Case; (B) this Plan; (C) the Disclosure Statement; (D) Distributions, payments or transfers made under this Plan; (E) acts performed pursuant to this Plan; (F) any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with this Plan; or (G) any Claim compromised, settled or released under or pursuant to this Plan; provided, however, that the foregoing release shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for any acts, or omissions to act, evidencing and/or constituting gross negligence, willful misconduct, breach of fiduciary duty or malpractice. Notwithstanding the foregoing, under no circumstances shall a nondebtor third party be enjoined from the continuation or commencement of any derivative action against a Released Party, except to the extent such derivative claim is property of the Debtor's Estate.

13.2    Avoidance and Recovery Actions.

Except as released under Section 13.1(b) of the Plan, as of the Effective Date, the Liquidating Trustee shall retain the right to prosecute, on behalf of itself and the Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor, Debtor in Possession or the Estate, and the Liquidating Trustee expressly retains the right to assert such claims and Causes of Action as defenses to, and setoffs against, Disputed General Unsecured Claims. The Liquidating Trustee may prosecute, compromise and settle any Cause of Action it deems necessary and appropriate. All settlements shall be subject to Bankruptcy Court approval under Bankruptcy Rule 9019.

## ARTICLE XIV

## ADMINISTRATIVE PROVISIONS

14.1    Further Documents and Action.

The Debtor, the Official Committee and/or the Liquidating Trustee shall: (a) execute and deliver, and are authorized to file with the Bankruptcy Court, such agreements and other documents as may be necessary or appropriate to effect and further evidence the terms and conditions of this Plan; (b) take or cause to be taken such action in connection therewith; and (c) consummate the transactions and transfers contemplated by this Plan. The Debtor and all other parties shall execute any and all documents and instruments that must be executed under, or in connection with, this Plan in order to implement the terms of this Plan and/or effectuate Distributions under this Plan.

14.2    Official Committee.

As of the Effective Date, the Official Committee shall be deemed dissolved and shall have no further duties, authority or responsibility under the Bankruptcy

24

Code, or otherwise, with respect to the Debtor, its assets, or the Plan. Neither the Debtor nor the Liquidating Trustee shall be responsible for any fees, costs or expenses of the Official Committee, its individual members or its Professionals incurred after the Effective Date; provided, however, that following the Effective Date, the responsibilities of the Official Committee and its Professionals shall be limited to the preparation and prosecution of their respective fee applications for which they shall be entitled to reasonable compensation by the Debtor.

14.3    Expenses of Liquidation.

Except as otherwise provided by the Plan or may as otherwise be agreed, all costs and expenses incurred by the Liquidating Trustee or the Debtor and their respective Professionals for implementing the Plan after the Effective Date, including the costs of fees and expenses of professionals and agents retained by the Estate following the Confirmation Date, shall be paid from the Operating Reserve Account, in the case of costs incurred by the Debtor, and from the Liquidating Trust, in the case of costs incurred by the Liquidating Trustee.

14.4    Obligations Incurred after Confirmation Date.

Payment obligations incurred after entry of the Confirmation Order, including, but not limited to, the fees of Professionals, will not be subject to application or proof of Claim and may be paid by the Debtor and/or the Liquidating Trustee, as the case may be, in the ordinary course without further order of the Bankruptcy Court.

## ARTICLE XV

## RETENTION OF JURISDICTION

15.1    Retention of Jurisdiction.

As of the Effective Date, the Bankruptcy Court shall retain jurisdiction, and if the Bankruptcy Court exercises its retained jurisdiction, shall have exclusive jurisdiction, over all matters arising out of, and relating to, the Case and this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided herein;

(d)     To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)     To issue such orders in aid of execution of this Plan in accordance with section 1142 of the Bankruptcy Code;

(g)     To consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)     To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to the implementation and effectuation of this Plan;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)     To compel the conveyance of property and other performance contemplated under this Plan and documents executed in connection herewith;

(l)     To enforce remedies upon any default under the Plan;

(m)     To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate

26

to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Plan;

(p)　　To determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)　　To enter a final decree closing the Case.

15.2　　<u>Modification of the Plan</u>.

After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper;  <u>provided</u>, <u>however</u>, the Plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified in accordance with Section 15.2 of the Plan if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

# ARTICLE XVI

## COMPROMISES AND SETTLEMENTS

This Plan incorporates a proposed compromise and settlement of certain issues related primarily to Alper's potential liability to the Debtor and its Estate and the cancellation of Intercompany Claims against, and Equity Interests in, the Debtor held by Alper.

This Plan further provides for the compromise and settlement of certain rights, Claims and Causes of Action of, and against, the Debtor as set forth in Articles III, V, IX, X and XIII.  To the extent Bankruptcy Rule 9019 is applicable to such compromises and settlements, this Plan shall be deemed a motion by the Debtor pursuant to Bankruptcy Rule 9019(a) for approval by the Bankruptcy Court thereof and notice of such motion as is required by said Rule and Bankruptcy Rule 2002 shall be deemed to have been provided by the Debtor, if it complies with the provisions of the Disclosure Statement Order concerning notice of the Confirmation Hearing.  The entry of the Confirmation Order shall be deemed an approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019 of all compromises and settlements contained in this Plan and shall be binding upon the Debtor, all creditors and Persons whether such Persons have voted to accept or reject this Plan.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

17.1    Payment of Statutory Fees.

All outstanding fees payable pursuant to section 1930, Title 28, United States Code, shall be paid by the Debtor on or before the Effective Date.  Responsibility for, and the payment of, post-Effective Date quarterly fees and charges through the date of entry of either an order dismissing this Case or a final decree shall be paid by the Liquidating Trust from the Operating Reserve Account or from such other funds as may be available to pay such fees.

17.2    Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the consent of the Debtor, the Official Committee, and Alper shall have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid, enforceable or confirmable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision, as it may have been interpreted, modified or deleted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

17.3    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a schedule or exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York.

17.4    Notices.

To be effective, all notices, requests and demands shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtor:

Saltire Industrial, Inc.
274 Riverside Avenue
Westport, CT 06880
Attn.:  Robert Bertellotti
Telephone:  (203) 454-0077
Telecopier:  (203) 454-2277

with copies to:

(i)    counsel to the Debtor:

Togut, Segal & Segal LLP
One Penn Plaza
New York, New York 10119
Attn.:  Scott E. Ratner
Telephone:    (212) 594-5000
Telecopier:    (212) 967-4258

and

(ii)    counsel to the Official Committee:

Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, New York  10020
Attn.:  Michael S. Etkin
Telephone:    (212) 262-6700
Telecopier:    (212) 262-7402

17.5    Controlling Documents.

To the extent this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan shall be controlling.  To the extent that this Plan is inconsistent with the terms of the Alper Settlement Agreement, the Plan shall control.

17.6    Reservation of Rights.

If this Plan is not confirmed by the Bankruptcy Court or any other court of competent jurisdiction for any reason or if this Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concession, compromise or settlement reflected herein, if any, is made for purposes of this Plan only, and if the Effective Date does not occur, no party in interest in the Case shall be bound or deemed prejudiced by any such concession, compromise or settlement.

17.7    Binding Effect.

The rights, benefits and obligations of any Entity named or referred to in this Plan, or whose actions may be required to effectuate the terms of this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for the Debtor under Chapters 7 or 11 of the Bankruptcy Code). The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

Dated:   December 28, 2005

SALTIRE INDUSTRIAL, INC.,
Debtor and Debtor in Possession

By: /s/ Robert A. Bertellotti
    Name:   Robert A. Bertellotti
    Title:    President

TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

By: /s/ Scott E. Ratner
    SCOTT E. RATNER (SR-0015)
    A Member of the Firm
    One Penn Plaza
    Suite 3335
    New York, New York 10119
    (212) 594-5000

# EXHIBIT J

## (Intentionally Omitted)

# **EXHIBIT K**

## **(Intentionally Omitted)**

# EXHIBIT L

## (Intentionally Omitted)

**TAB 3**

Sander L. Esserman, Esq. (SE 0356) (admitted pro hac vice)
Cliff I. Taylor, Esq. (CT 4711) (admitted pro hac vice)
STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
(214) 969-4900

and

Douglas T. Tabachnik, Esq. (DT 6337)
LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
(732) 792-2760

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 07-12148 [BRL] |
| ALPER HOLDINGS USA, INC., | |
| Debtor. | |

_____

### RESPONSE OF RAY AND CATHY FLAKE TO OBJECTION OF ALPER HOLDINGS USA, INC. TO PROOFS OF CLAIM (CLAIM NOS. 20 AND 21) FILED BY FLAKE PLAINTIFFS

Ray and Cathy Flake (the "Flake Plaintiffs"), hereby file their Response of Ray and Cathy Flake to Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed by Flake Plaintiffs and show this Court as follows:

# I.
# INTRODUCTION

At issue in this contested matter are the claims of the Flake Plaintiffs for damages stemming from the contamination of two parcels of land by trichloroethylene ("TCE")[1]: (1) a 22 acre parcel of land located at 709 Bruce Road, Dickson, Tennessee (the "Bruce Road Property"), at which the Flake Plaintiffs have resided since 2002; and (2) a piece of property adjacent to the Bruce Road Property (the "Investment Property"), which the Flake Plaintiffs attempted to purchase in 2003.

The Flake Plaintiffs contend that Saltire Industrial, Inc. ("Saltire"), a subsidiary of Alper, caused the soil and groundwater at its manufacturing facility at 201 Tennsco Dr., Dickson, Tennessee (the "Dickson Plant"), to become contaminated by TCE by negligently dumping TCE waste at the plant site. The Flake Plaintiffs further contend that these contaminants migrated through the soil and groundwater, eventually contaminating the Bruce Road Property and Investment Property. The Flake Plaintiffs have never alleged that Alper caused or contributed to the initial contamination at the Dickson Plant. However, the Flake Plaintiffs contend that Alper negligently controlled the remediation of the contamination at the Dickson Plant, failing to properly contain the contamination and allowing the migration of TCE contaminants to surrounding properties—including the Bruce Road Property and the Investment Property.

For years, the Flake Plaintiffs sought to hold Alper liable in the Tennessee tort system for the damages they have suffered due to the contamination of the Bruce Road

---

[1] TCE is a hazardous waste that is toxic to plants and animals. The United States Environmental Protection Agency has found that there is no acceptable level for TCE in the environment, and has established a maximum contaminant level of 0 for TCE in groundwater. TCE is heavier than water, and tends therefore to pollute deep groundwater sources such as wells, especially in the karst-type system in Dickson County.

Property and the Investment Property.  But the Flake Plaintiffs' efforts to prosecute their claims were impeded by procedural wrangling and the bankruptcy of Saltire, which was a co-defendant of Alper in the state court action.  When Alper filed for bankruptcy protection on July 13, 2007, the Flake Plaintiffs dismissed their state court actions against Alper and submitted their proofs of claim in these proceedings.  At that time, the Flake Plaintiffs had still not conducted adequate written discovery in the Tennessee state court action and had not been able to conduct any depositions.

Now, Alper has filed its Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 20 and 21) Filed by Flake Plaintiffs (the "Motion to Dismiss"), erroneously asserting that the Flake Plaintiffs do not have a claim against Alper that is cognizable under Tennessee law.[2]  However, in its Motion to Dismiss, Alper does not identify any authority that bars the Flake Plaintiffs' claims as a matter of law; nor does Alper identify what elements of the Flake Plaintiffs' claims are not supported by the allegations in their proof of claim materials.  Instead, Alper has improperly attempted to submit evidence and argue the substantive and factual merits of the Flake Plaintiffs' claims, which is premature and wholly improper, given the Flake Plaintiffs' inability to conduct adequate discovery.

As shown below, Alper's Motion to Dismiss lacks merit and the relief requested by Alper therein should be denied.

---

[2] Tellingly, Alper never sought judgment on the pleadings during the three years the Flake Plaintiffs' claims were pending in Tennessee state court, even though the Flake Plaintiffs assert the same claims in these proceedings as they asserted in their state court proceedings.  Indeed, the Flake Plaintiffs have attached to their proofs of claim the Fourth Amended Complaint (the "Complaint") from the state court proceedings, which is the last complaint filed by the Flake Plaintiffs prior to the dismissal of Alper in those proceedings.

## II.
## <u>BACKGROUND</u>

**A.     The Flake Plaintiffs have suffered damages stemming from the contamination of the Bruce Road Property and the Investment Property by TCE.**

In 2002, the Flake Plaintiffs purchased the Bruce Road Property, which contains a natural spring that produces an estimated one million gallons of water each day (<u>Exhibit A</u>, Complaint at p. 5, ¶ 18).[3]  Before the Flake Plaintiffs discovered that the Bruce Road Property was contaminated by TCE, they intended to commercially bottle and sell this spring water (Complaint at p. 7, ¶ 33).  In fact, in September, 2003, the Flake Plaintiffs formed a partnership and entered into a purchase agreement to buy the nearby Investment Property for the purposes of marketing spring water from a natural spring on that property as well (Complaint at p. 7, ¶ 34).  The Flake Plaintiffs' endeavors to market the spring on the Bruce Road Property and to purchase the Investment Property, however, were frustrated when TCE was detected in the spring on the Bruce Road Property (Complaint at p. 7, ¶ 35; *see also*, <u>Exhibit B</u>, Analytical Report at p. 2).  This contamination rendered the spring water on the two properties commercially worthless, destroying the value of the Bruce Road Property and thwarting the Flake Plaintiffs' attempts to purchase the Investment Property (Complaint at p. 7, ¶ 35).  The Flake Plaintiffs' failure to close on the Investment Property resulted in the loss of earnest

---

[3] Prior to the detection of TCE at the Bruce Road Property, the Flake Plaintiffs used the water from the natural spring on the property for all domestic purposes, including drinking, cooking, and bathing (Complaint at p. 5, ¶ 18).  Although, the Flake Plaintiffs have not yet manifested any symptoms of a TCE related illness due to their ingestion of the contaminated water, they have suffered the understandable anxiety and emotional distress resulting from the possibility that an illness caused by their exposure to TCE may develop (Complaint at p. 9, ¶ 45).

money deposited by the Flake Plaintiffs as part of the sale transaction (Complaint at p. 7,

¶ 35).

**B.    The contamination of the Bruce Road Property and the Investment Property was caused by the migration of TCE contaminants from the Dickson Plant.**

From approximately 1964 until March 1985, Saltire, a major industrial company,

operated the Dickson Plant in Dickson, Tennessee, producing automotive tire valves and

associated products (Alper Claim Objection at p. 9, ¶ 12).  It is undisputed that Saltire

used TCE at the Dickson Plant and that TCE contamination occurred at the plant.  As

Robert Bertellotti, Alper's president, conceded at Alper's Section 341 Meeting of

Creditors:

> . . . during the time that [the Dickson Plant] operated, it utilized
> trichloroethylene in greasing some of the machinery that was used at the
> plant.  Trichloroethylene has evidently found its way into ground water in
> certain limited locations in Dixon County, Tennessee.  That, I don't think
> is in dispute.  Everybody knows that the company used it . . And
> everybody knows that there is [TCE] in certain locations in Tennessee.
> All of these—to the extent that these—this discharge took place and
> misconduct took place, it took place sometime between 1966 and March
> of 1985 . . . [Saltire] knew that there was some contamination at its former
> facility [the Dickson Plant]. [4]

(Exhibit C, September 13, 2007, Transcript §341 Meeting, p. 29, lines 4-21; *see also*

Alper Claim Objection at p. 13, ¶ 16).  The Flake Plaintiffs contend that the

contamination of the Bruce Road Property and the Investment Property is the direct result

---

[4] During the Section 341 Meeting of Creditors, Mr. Bertellotti also recognized that Saltire
contributed to the TCE contamination in Dickson, Tennessee, even indicating when such
contamination ceased:

> Soltare (sic) operated the facility.  If anybody is responsible for the
> pollution it's Soltare (sic).  The—the discharge of the hazardous waste
> ceased in 1985 and federal and sate regulators have been in there for the
> last 20 years overseeing this investigation and cleanup.

(September 13, 2007, Transcript §341 Meeting, p. 30, lines 10-15).

of the migration of TCE contaminants from the Dickson Plant site through the ground water to the properties, which are within eight miles of the Dickson Plant (Complaint at p. 6, ¶ 22).[5]   The Flake Plaintiffs further contend that the migration of TCE contaminants to the properties would not have occurred if proper remediation of the Dickson Plant site had occurred (Complaint at 9, ¶ 48).

**C.    Alper controlled the remediation of the Dickson Plant contamination.**

Alper's assertion that it "never operated or engaged in any activities in Dickson, Tennessee" (Motion to Dismiss at p. 5, ¶ 4) and that it "has never been involved in [the investigation and cleanup at the Dickson Plant] in any way, shape or form" (September 13, 2007, Transcript §341 Meeting, p. 30, lines 16-17) is impeached by statements of Alper's  own employees.  As shown below, Alper was directly involved in the remediation at the Dickson Plant.

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  (Alper Claim Objection, p. 10 ¶ 13).  In that same year, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  (Exhibit D, January 1, 1995, Management Agreement at p. 1).  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement"), wherein Alper agreed to provide "***supervision and management of various environmental matters***, including risk assessment, risk management, technical assessment, ***remediation***, legal and compliance." (January 1, 1995, Management Agreement at p. 2, § 1(g).

---

[5] The "karst" topography in Dickson, Tennessee, renders the area susceptible to the migration of contaminants through groundwater, because surface water can run unimpeded from a sinkhole or other source to the groundwater, bypassing the normal filtering that occurs in a porous aquifer.

Around the time the Management Agreement was executed, remediation of the Dickson Plant site was place under the control of Nicholas Bauer (Exhibit E, February 23, 2001, Nick Bauer Deposition, p. 121, lines 11-22 through p. 122, lines 1-4). Mr. Bauer was an employee of Alper, which paid his salary and "loaned [him] out as needed to various subsidiaries" (Exhibit F, October 22, 2003, Robert Bertellotti Deposition, p. 86, lines 23-25 through p. 87, lines 1-2). Despite Alper's assertions to the contrary, when Mr. Bauer was engaged in remediation endeavors at the Dickson Plant, he was doing so as an employee of Alper, not as an officer of Saltire. As Mr. Bauer has testified:

> Q:      Are you not an employee of Saltire Industrial?
> Bauer:  No, I am not an employee of Saltire Industrial.
>
> . . . .
>
> Q:      Okay. Well, who are you an employee of?
> Bauer:  I'm actually an employee of Alper Holdings, USA, Inc.

(February 23, 2001, Nick Bauer Deposition, p. 113, line 22 through p. 114, line 3 & p. 126, lines 3-5). Indeed, Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sights. As Mr. Bertellotti has recognized:

> [Mr. Bauer] was hired specifically—in effect, specifically for the purpose—if it wasn't for Saltire's environmental issues, Nick Bauer wouldn't have been hired. He was hired for the purpose of dealing with Saltire's environmental issues.

(October 22, 2003, Robert Bertellotti Deposition, p. 88, lines 4-10).

The Flake Plaintiffs contend that, either under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the remediation of the Dickson Plant contamination by placing an Alper employee in charge of the remediation.

**D.**    **The Flake Plaintiffs sued Alper in Tennessee state court, asserting that Alper negligently controlled the remediation of the Dickson Plant, which allowed TCE contaminants to migrate onto the Bruce Road Property and Investment Property.**

On February 27, 2004, the Flake Plaintiffs initiated a state court tort action, Case No. CV-1911 (the "State Court Action"), against, *inter alios*, Alper in the Circuit Court of Dickson County, Tennessee (the "Tennessee State Court").  In the State Court Action, the Flake Plaintiffs alleged that Alper, through its employees and its control over Saltire, negligently conducted the remediation of TCE contamination at the Dickson Plant, thereby allowing the contamination to migrate through the soil and/or groundwater onto the Bruce Road Property and the Investment Property (Complaint at p. 9, ¶ 48).  The Flake Plaintiffs also asserted in the State Court Action that Alper failed to notify the public of the migration of the TCE contamination, which failure left the Flake Plaintiffs unaware of the potential for contamination of their property.  (Complaint at p. 9, ¶ 48 & p. 12-13, ¶¶ 73-74).  The Flake Plaintiffs diligently pursued their claims against Alper in the State Court Action, but progress in their prosecution efforts was frequently stalled by procedural wrangling and Saltire's 2004 bankruptcy proceedings.

**E.**    **After Alper filed for bankruptcy relief, the Flake Plaintiffs dismissed Alper from the State Court Action and submitted proofs of claim in these proceedings.**

Alper filed for bankruptcy relief on July 13, 2007 (the "Petition Date").  Soon after the Petition Date, on September 9, 2007, the Flake Plaintiffs dismissed Alper from the State Court Action and filed essentially identical proofs of claim in this bankruptcy case.  The Flake Plaintiffs' respective proofs of claim (as amended, the "Flake Proofs of Claim," attached as Exhibit G) were each filed along with a "Supporting Document Attachment," which provides a brief statement of the Flake Plaintiffs' claims against

Alper  (Flake Proofs of Claim, Supporting Document Attachment).  After Alper filed its

Motion to Dismiss on November 14, 2007, the Flake Plaintiffs amended their proofs of

claim, on December 11, 2007, to include: (i) a statement reserving their rights to assert

certain defenses and jurisdictional arguments, and (ii) the Complaint from the State Court

Action.

<div align="center">

**III.**
**RESPONSE**

</div>

A.    **Alper's Motion to Dismiss lacks merit, because the Flake Plaintiffs' Proofs of
       Claim contain sufficient allegations to support the Flake Plaintiffs' claims
       against Alper.**

1.    *When considering Alper's Motion to Dismiss, the Court must not consider
       the evidentiary materials attached to Alper's motion, but must limit its
       review to the face of the proof of claim materials and the evidence relied
       upon by the Flake Plaintiffs when submitting their claims.*

At a December 13, 2007, hearing in this matter, Alper took the position in open

court that "[t]he only thing [Alper is] asking, Your Honor, is that there be a hearing to—

on our—effectively what is our motion to dismiss their claim for failure to state a claim

as a legal matter"[6] (Exhibit H, December 13, 2007, Transcript at p. 8, lines 17-20).  If

---

[6]  Notably, while Alper indicated at the December 13, 2007, hearing that it requests a
judgment on the pleadings only, it has attached evidentiary materials to its Motion to
Dismiss and makes the following argument:

> If Alper were merely to object to the Flake Claims on that basis or on the
> basis that the Flake Claims are facially deficient, the inevitable response
> by the Flake Plaintiffs would be to attempt to describe their claims with
> greater particularity.  Accordingly, Alper is filing a substantive objection
> in an effort to bypass a needless round of responses and objections related
> to the Flake Claims.  Rather than simply rejecting the Flake Claims as
> stated, the Court should reject the Flake Claims in their entirety.

(Motion to Dismiss at p. 5, ¶ 5).  Alper's failure to limit itself to an argument appropriate
for a motion to dismiss created ambiguity as to the true nature of the relief requested.
This ambiguity has resulted in unnecessary cost and expense for both the Alper estate and
the Flake Plaintiffs, because it has unnecessarily required the Flake Plaintiffs to take steps

appropriate, such relief could only be available to Alper pursuant to either Federal Rule of Civil Procedure 12(b)(6) (allowing for disposition of a claim on the ground that it fails to state a claim upon which relief can be granted) or Federal Rule of Civil Procedure 12(c) (allowing for judgment on the pleadings).[7]

Under either rule, the Court must not consider any matters raised by Alper that are outside of the pleadings—*i.e.*, the Proofs of Claim. FED. R. CIV. P. 12(b)(6); FED. R. CIV. P. 12(c); *In re Edwards*, No. 96-17868DWS, 1999 WL 223506 at *1 n. 1 (Bankr. E.D. Pa. April 13, 1999). Therefore, the Court must not consider the factual allegations made in and evidentiary materials accompanying Alper's Motion to Dismiss. *See DeRosa v. Jacone*, 156 B.R. 740, 743 (Bankr. S.D.N.Y. 1993) ("In deciding a motion for judgment on the pleadings, a court will only consider statements which appear in the pleadings"). Instead, the Court must limit itself to a review of the proof of claim materials submitted by the Flake Plaintiffs and other evidence relied upon by the Flake Plaintiffs when submitting their claims. *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 29 (S.D.N.Y. 2002) (quoting, in part, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), when holding that "[in the context of a motion to dismiss], the Second Circuit has held that a complaint is deemed to 'include . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit'"). When reviewing the Flake Plaintiffs' Proofs of Claims, the Court must take all factual allegations in the claims materials as true and must consider the allegations in the

---

to prevent consideration of the merits of their claims before they have been afforded their right to conduct adequate discovery.

[7] Tellingly, Alper never cited to either Rule 12(b)(6) or Rule 12(c) in its Motion to Dismiss. Nonetheless, both Rule 12(b)(6) and Rule 12(c) may be applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012(b). *In re Adelphia Communications Corp.*, 359 B.R. 54, 56 n. 5 (Bankr. S.D.N.Y. 2006).

light most favorable to the Flake Plaintiffs. *Juster Assocs. v. City of Rutland, Vermont*, 901 F.2d 266, 269 (2d Cir. 1990) ("for purposes of Rule 12(b)(6), we view all facts and allegations in the complaint in the light most favorable to [the non-movant]"); *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989 ) ("In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of the nonmoving party . . . The court must also take the 'well-pleaded material facts alleged in the complaint . . . as admitted'"); *In re HRT Indus., Inc.*, 29 B.R. 861, 863 (Bankr. S.D.N.Y. 1983).

2.     *The Court must deny the relief requested in Alper's Motion to Dismiss if the allegations in the Flake Plaintiffs' proof of claim materials are adequately detailed to put Alper on notice of the claims against it and to assure the Court that there is a basis in fact for the allegations.*

Here, the Court must deny the relief requested in Alper's Motion to Dismiss, if the Flake Plaintiffs have alleged facts sufficient to support any possible cause of action against Alper. *Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 452-53 (S.D.N.Y. 1987) ("on a motion to dismiss the court must examine the complaint to determine whether the allegations provide for relief on any possible theory"). The Flake Plaintiffs need not state with precision all the elements necessary to give rise to their claims, but need only allege facts from which an inference may be drawn that evidence on the material points for their claims will be introduced at trial. *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 306 (8th Cir. 1978); *Raine*, 71 B.R. at 454 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief"); *Newton v. Kroger Co.*, 501 F.Supp. 177, 179 (E.D. Ark. 1980) (Claim should survive motion to dismiss if it sets out facts sufficient for court to infer that all required elements of cause of action are

present);  *In re Black & Geddes, Inc.*, 16 B.R. 148, 151 (Bankr. S.D.N.Y. 1981) (if within

framework of complaint some evidence may be introduced which could sustain grant of

relief, complaint is sufficient and can withstand motion to dismiss).  Thus, the Flake

Plaintiffs' claim materials are sufficient to withstand Alper's Motion to Dismiss if they

are adequately detailed to put Alper on notice of the specific nature of the claims against

it and also to assure the Court that there is at least some basis in fact for the allegations.

*See Raine*, 71 B.R. at 455.

> 3.   *The relief requested in Alper's Motion to Dismiss is improper, because the*
>      *Proofs of Claim  are adequately detailed to put Alper on notice of the*
>      *nature of the claims against it and to assure the Court that there is at least*
>      *some basis in fact for the allegations.*

Alper's assertion that the Proofs of Claim "do not describe any of Alper's alleged

direct acts or omissions in the Flake Claims or the Complaint because they cannot do so"

is contradicted by even the most cursory review of the Proofs of Claim.  Furthermore,

Alper's implication that the Flake Plaintiffs must prove their case in chief at this early

stage of the claims process is simply erroneous.  *See Raine*, 71 B.R. at 453 n. 2 (holding

that it is improper for a Court to dismiss a complaint if the plaintiff is not immediately

able to prove its allegations and to offer witnesses in support thereof); *Heyman*, 277 B.R.

at 29 (recognizing that the issue when considering a motion to dismiss is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support its claims).  An environmental contamination matter, such as the one at bar, is

entirely too complicated and technical to fairly require the amount of specificity Alper's

Motion to Dismiss seeks to impose on the Flake Plaintiffs.  The Flake Plaintiffs have not

yet been able to conduct adequate discovery in this matter.  To require them to allege the

specific acts or omissions of Alper that led to their damages at this time would not only be premature, it would be unfair.

As shown below, the allegations in the Proofs of Claim materials are adequately detailed to put Alper on notice of the specific nature of the charges against it and to assure the Court that there is at least some basis in fact for the allegations, which is all that is required at this early juncture. Consequently, the relief sought in Alper's Motion to Dismiss is improper.

        a.     The Flake Proofs of Claim allege facts sufficient to support the Flake Plaintiffs' Claims.

The Flake Proofs of Claim contain a "Supporting Document Attachment", which provides a brief statement of their claims against Alper:

> Creditor's property and commercial damage claim arises from contamination by hazardous waste including Trichloroethylene ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc. in connection with said contamination.

(Flake Proofs of Claim, Supporting Document Attachment). Also attached to the Proofs of Claim is a copy of the Complaint. The Complaint sets forth, *inter alia*, the following allegations:

- The Flake Plaintiffs purchased the Bruce Road Property in 2002 (Complaint at p. 5, ¶ 17).

- Saltire owned and operated a manufacturing facility in Dickson County, Tennessee from 1964 through March 1985, in which it generated hazardous wastes, including TCE (Complaint at p. 5, ¶¶ 19 and 21).

- Saltire, over the course of several years in the 1970s, improperly disposed of its TCE waste at a landfill which is located approximately three miles from their property (Complaint at p. 6, ¶¶ 23-24 and 27).

13

- TCE has been detected in the spring on the Flake's property which has rendered the spring water located thereon commercially worthless (Complaint at p. 7, ¶ 35).

- The damage to the Bruce Road Property and the Investment Property has resulted from the migration of TCE contaminants from the Dickson Plant and the Landfill (Complaint at p. 9, ¶ 44).

- Alper, itself, engaged in acts (*viz.*, negligent remediation) which allowed such migration to occur (Complaint at p. 9, ¶ 44).

- Alper negligently failed to take action to prevent the TCE from migrating from the Dickson Plant (Complaint at p. 9, ¶ 48).

- Alper knew that TCE had entered the groundwater at the Facility and the Landfill in high concentrations, and further knew that the TCE was migrating into the groundwater surrounding the Facility and the Landfill and that the toxic concentrations of TCE were contaminating the groundwater of neighboring properties (Complaint at p. 13, ¶73).

- Alper knew of the significant TCE groundwater contamination that eventually affected the property of the Flake Plaintiffs, but negligently failed to take action to prevent the TCE from migrating or to warn the Flake Plaintiffs of the existence of the TCE contamination or the dangers posed by TCE (Complaint at p. 34, ¶48).

These allegations, on their face, support the Flake Plaintiffs' negligence claims against Alper under Tennessee state law—the applicable law governing the substance of the Flake Plaintiffs' claims. *See Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 127 S.Ct. 1199, 1205 (2007) (quoting, in part, *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 120 S.Ct. 1951 (2000) and recognizing that "the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law'").

14

     b.     The Flake Plaintiffs relied on further information when filing their claims, of which the Court should take cognizance.

In addition to the proof of claim materials submitted by the Flake Plaintiffs, the Court may also take cognizance of those documents and that evidence relied upon by the Flake Plaintiffs when submitting their Proofs of Claim. *See DeRosa*, 156 B.R. at 743; *Heyman*, 277 B.R. at 29. The materials relied on by the Flake Plaintiffs when submitting their claims indicate the following:

- Nick Bauer was in charge of the TCE contamination remediation efforts at the Dickson Plant (February 23, 2001, Nick Bauer Deposition, p. 121, lines 11-22 through p. 122, lines 1-4).

- Nick Bauer was an employee of Alper, not Saltire, and Alper paid Nick Bauer's salary and expenses (October 22, 2003, Robert Bertellotti Deposition, p. 86, lines 23-25 through p. 87, lines 1-2).

- During the remediation of the Dickson Plant contamination, Saltire had no employees (February 23, 2001, Nick Bauer Deposition, p. 113, lines 15-22).

- During the remediation of the Dickson Plant contamination, Alper placed its own employees as officers of Saltire (October 22, 2003, Robert Bertellotti Deposition, p. 94, lines 15-25 through p. 95, lines 1-8).

- During the remediation of the Dickson Plant contamination, Alper and Saltire were parties to the Management Agreement, whereby Alper agreed to perform environmental remediation services for Saltire (January 1, 1995 Management Agreement).

     c.     The allegations in the Proofs of Claim and the information relied upon when submitting the Proofs of Claim support a claim of negligence under Tennessee state law.

Under Tennessee state law, "[t]here are three elements . . . necessary to the existence of a cause of action for negligence: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) a causal relation between the injury to the

plaintiff and defendant's breach of his duty of care." *Shouse v. Otis*, 224 Tenn. 1, 448 S.W.2d 673 (1969).

Here, the Flake Plaintiffs have alleged facts sufficient to meet these elements. First, the Flake Plaintiffs have alleged that Alper was directly involved with the remediation of the Dickson Plant contamination. In fact, as shown above, an Alper employee controlled and managed the remediation efforts at the plant site. Alper's control of and direct involvement in the remediation of the Dickson Plant contamination imposed on it a duty to conduct such remediation in a reasonable, non-negligent manner.

Second, the Flake Plaintiffs have alleged that Alper negligently failed to take adequate action to prevent the migration of TCE contaminants from the Dickson Plant to surrounding properties—including the Bruce Road Property and the Investment Property. Alper's failure to properly remediate the Dickson Plant contamination was a breach of its duty to surrounding property owners, which unnecessarily allowed TCE contaminants to migrate through the soil and groundwater to the Bruce Road Property and the Investment Property.

Finally, the Flake Plaintiffs have alleged that the migration of TCE contaminants from the Dickson Plant site onto the Bruce Road Property resulted in the contamination of the natural spring on the Bruce Road Property, which caused a diminution of the value of the property and the value of the improvements connected thereto. The Flake Plaintiffs have also alleged that the contamination of the Bruce Road Property and the Investment Property resulted in losses for the Flake Plaintiffs relating to loss of business opportunity, loss of investment, loss of use, aggravation and emotional distress.

These allegations are adequately detailed to put Alper on notice of the specific nature of the claims against it. Furthermore, the allegations in the Proofs of Claim, as well as the materials relied upon by the Flake Plaintiffs when submitting their Proofs of Claim, are sufficient to assure the Court that there is a basis in fact for the Flake Plaintiffs' claims against Alper. Therefore, the relief sought in Alper's Motion to Dismiss is improper.

**B.      The Flake Plaintiffs' alter ego claims against Alper were not, and could not have been, released by Saltire during Saltire's bankruptcy, because the Flake Plaintiffs' alter ego claims were not property of Saltire's bankruptcy estate.**

As discussed above, the Flake Plaintiffs certainly have viable claims against Alper for its own direct acts. The Flake Plaintiffs, however, may also hold Alper liable on the basis that Saltire was an alter ego of Alper during the negligent remediation of the Dickson Plant contamination. In its Motion to Dismiss, Alper erroneously asserts that the Flake Plaintiffs are barred from asserting their alter ego claims against Alper, because the claims were released by Saltire during its bankruptcy. Alper's argument, however, erroneously presumes that the Flakes Plaintiffs' alter ego claims were property of the Saltire estate. Nothing could be further from the truth. Under both Tennessee state law and bankruptcy law, the Flake Plaintiffs' alter ego claims, which are peculiar and personal to the Flake Plaintiffs, did not constitute property of Saltire's bankruptcy estate. Because a debtor cannot release claims that do not belong to it, Alper's assertion that the Flake Plaintiffs are barred from asserting their alter ego claims lacks merit.

> 1.    *Only alter ego claims that are general and common to the debtor and creditors become property of a debtor's bankruptcy estate.*

Bankruptcy courts recognize that an alter ego claim is only the property of a debtor's bankruptcy estate if the claim is generalized, "with no particularized injury

stemming from it and where the claim may be brought by any creditor." *Variable-Perameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 608 (S.D.N.Y. 1996); *In re Enron Corp.*, No. 01816034AJG, 2003 WL 1889040, at *4 (Bankr. S.D.N.Y. April 17, 2003). Consequently, the court must determine whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors. *Koch Ref. v. Farmers Union Ctr. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987) (recognizing that "[t]o determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors"). To make this determination, a bankruptcy court must look to applicable state law. *In re Del-Met Corp.*, 322 B.R. 781, 830 (Bankr. M.D. Tenn. 2005) (recognizing that "[w]hether a particular cause of action is available to the debtor, and thus constitutes property of the estate, is determined by state law").

In *Del-Met Corp.*, the bankruptcy court for the Middle District of Tennessee held that, under Tennessee state law, an action to disregard corporate form belongs to individual creditors, and not the debtor, when the wrong from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation. *In re Del-Met Corp.*, 322 B.R. at 833-34. In so holding, the bankruptcy court quoted extensively from the only Tennessee state court case addressing alter ego claims in the context of bankruptcy as follows:

> . . . the majority rule is to the effect that [an action to pierce the corporate veil and reach the assets of another corporation as its alter ego] is a right vested in the individual creditors. It is not a right which belongs to the bankrupt and under the Bankruptcy Act the trustee has no authority to maintain such action . . . The doctrine of alter ego does not create assets for or in the corporation. It simply fastens liability upon the individual

> who uses the corporation merely as an instrumentality in the conduct of his own personal business. The liability springs from fraud. The fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation. And the doctrine has been invoked only at the behest of such third parties as have suffered injury by reason of the fraud.

*Id.* at 833 (quoting *Brown v. Vencap Inv. Corp.*, 1984 Tenn. App. LEXIS 3424, at *9-25 (Tenn. Ct. App. March 31, 1984)).

Similarly, in *Variable-Perameter*, Variable sued Morpheus for damages relating to certain patent infringement allegations. 945 F. Supp. at 604. Variable also sued John Richardson, the sole shareholder of Morpheus, based on an alter ego theory. Subsequently, Morpheus filed for bankruptcy relief and Richardson sought the protection of the automatic stay provided by virtue of Morpheus's bankruptcy. Richardson asserted that the claims against him were "generalized alter ego" claims and that, under California law, a generalized alter ego claim was exclusively the property of the debtor. The court, however, found that Variable's alter ego claims alleged a "particularized injury" and therefore the claim was not property of Morpheus's bankruptcy estate. In so holding, the court recognized that under California law there were two types of alter ego claims:

> The first type alleges general injury to the corporation and gives rise to a right of action on the part of the corporation against the "alter ego." In the second type, the creditor or other third party files suit claiming that an opposing party is "using the corporate form unjustly and in derogation of the plaintiff's interests."

*Variable,* 945 F. Supp. at 607 (internal citations omitted). The court recognized that Variable's complaint alleged acts by Richardson that caused harm directly to Variable. "In other words, Variable has alleged a 'particularized injury' and not solely injury to the corporation." *Id.* at 608.

2.    *The Flake Plaintiffs' alter ego claims against Alper were not Saltire's claims to release.*

In its Motion to Dismiss, Alper fails to address the distinction between the Flake Plaintiffs' alter ego claims for particularized injuries and the generalized claims that constituted property of Saltire's bankruptcy estate. Instead, Alper cavalierly asserts that all alter ego claims have been released by Saltire. However, this case is similar to *Del-Met Corp*, in which the court held that, under Tennessee law, alter ago claims such as the Flake Plaintiffs' claims against Alper, do not constitute property of a debtor's estate.

The Flake Plaintiffs are claiming damages particular to them—*viz.*, property damage and emotional distress associated with the failure of Saltire and Alper to take proper measures to prevent the migration of TCE contamination from the Dickson Plant to the Bruce Road Property and the Investment Property. Alper does not—and cannot— assert that the Flake Plaintiffs' claims are claims that could have been brought by Saltire or that Saltire's general creditor body could have sought recovery on such grounds. Furthermore, the Flake Plaintiffs' alter ego claims are based on actions that are specific to the contamination at the Dickson Plant and the migration of that contamination to the Bruce Road Property and Investment Property. For example, the Flake Plaintiffs' state court actions assert that Alper is liable for, *inter alia*, the following reasons:

> 48. Defendants negligently failed to monitor and/or investigate contamination resulting from TCE storage and disposal facilities on-site and at the Landfill. Also, Defendants knew of significant TCE groundwater contamination at the Facility for many years, and negligently failed to take action to prevent the TCE from migrating from the Facility and/or warn Plaintiffs of the existence of TCE contamination or the dangers posed by TCE.

(Complaint at p. 9, ¶ 48).

These claims, on their face, are peculiar and personal to the Flake Plaintiffs. Neither Saltire nor any other creditor of Saltire could assert these claims. An action belongs to the debtor-in-possession only where the harm suffered by the claimant is no different than the harm suffered by other creditors. Such is not the case here.

## IV.
## CONCLUSION

WHEREFORE the Flake Plaintiffs respectfully request that the Court enter an order (1) denying the relief requested in Alper's Motion to Dismiss; and (2) granting the Flake Plaintiffs such other and further relief to which they may be entitled.

Dated: December 27, 2007.                    Respectfully submitted,

*/s/ Douglas T. Tabachnik*
Douglas T. Tabachnik (DT 6337)
LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
Telephone: (732) 792-2760
Facsimile: (732) 792-2761

and

Sander L. Esserman (SE 0356)
(admitted pro hac vice)
Cliff I. Taylor (CT 4711)
(admitted pro hac vice)
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

**ATTORNEYS FOR THE**
**FLAKE PLAINTIFFS**

**(Only Referenced Exhibits Included)**

**EXHIBIT A**

**(Intentionally Omitted)**

**EXHIBIT B**

**(Intentionally Omitted)**

**EXHIBIT C**

**(Intentionally Omitted)**

**EXHIBIT D**

## MANAGEMENT AGREEMENT

AGREEMENT, dated as of January 1, 1995 by and among Alper Holdings USA, Inc., a Delaware corporation ("Alper Holdings") and Saltire Realty Holdings, Inc. a Washington corporation ("Realty Holdings"), Saltire Realty, Inc., a Washington corporation ("Realty"), Saltire Industrial, Inc., a Delaware corporation ("Saltire Industrial"), First City Diversified Inc., a Delaware corporation ("Diversified"), Alper Development, Inc., a Delaware corporation ("Alper Development"), Alper Northwest, Inc., a Washington corporation ("Alper Northwest"), First City Capital Corporation, a New York corporation ("FCC") and Alper Securities, Inc., a Nevada corporation ("Alper Securities"); (Realty Holdings, Realty, Saltire Industrial, Diversified, Alper Development, Alper Northwest, FCC and Alper Securities sometimes are referred to collectively as the "Companies").

Whereas, the Companies require certain management, supervisory and advisory services; and

Whereas, Alper Holdings is in the business of providing such services; and

Whereas, the Companies are among numerous affiliated entities which require various types and levels of management, supervisory and advisory services, and the Companies acknowledge that such services can be provided more effectively and efficiently by Alper Holdings than if each such entity were to engage its own personnel and other elements necessary to receive the services required; and

Whereas, Alper Holdings and the affiliated entities to which such services are to be provided by Alper Holdings have attempted in good faith to determine the type and level of services required by each such entity and the various personnel and other elements of overhead of Alper Holdings necessary to deliver the aggregate level of services required by such entities; and

Whereas, Alper Holdings and the Companies hereby terminate their previous Management Agreement, dated as of November 30, 1992.

Now, therefore, the parties hereto agree as follows:

(1)    _Management_. Each of the Companies hereby retains Alper Holdings to provide certain management, supervisory and advisory services to be agreed upon by Alper Holdings and each such Company. Such services may include, without limitation, the following:

(a)    _Business_ - formulation and review of business plans in collaboration with line managers; periodic reviews of operations and results;

U:\950002

(b) <u>Personnel</u> - advice on retention and dismissal of employees; review of staffing plans; design and administration of benefit plans;

(c) <u>Investment</u> - analyses and selection of investment; management of investment; cash management;

(d) <u>Accounting</u> - maintenance of books and records and preparation of all financial and statistical information (including financial statements), management reports and all other operating, accounting, and financial data reasonably necessary for management of the business; selection and retention of auditors and consultants; management of auditors and consultants;

(e) <u>Legal</u> - supervision and provision of legal services, including, selection and retention of counsel for various matters; management of retained law firms;

(f) <u>Tax</u> - tax planning; preparation of tax returns; conduct of tax audits; and

(g) <u>Environmental</u> - supervision and management of various environmental matters, including risk assessment, risk management, technical assessment, remediation, legal and compliance.

(2)   <u>Direct Expenses</u>.  Each of the companies shall be responsible for all direct out of pocket expenses reasonably incurred by Alper Holdings in connection with the performance of its responsibilities to such Company hereunder (which shall include all services rendered to any direct or indirect subsidiaries of such Company which is not a signatory to this agreement), as well as any taxes and other transaction-related fees imposed.  Each of the Companies hereby authorizes Alper Holdings to incur and pay for such reasonable expenses (including, without limitation, the retention of all lawyers, accountants and other advisors and professionals if not engaged by any Company) on behalf of such Company and such Company agrees promptly to reimburse Alper Holdings for any such expenses.

(3)   <u>Compensation</u>.

(a) As compensation for the services rendered pursuant to this Agreement for the period January 1, 1995 through December 31, 1995, each Company shall pay to Alper Holdings an aggregate annual fee to be agreed upon by Alper Holdings and such Company no later than January 31, 1995 equal to the product of (i) Alper Holdings' budgeted overhead and operating expenses for such period (the "Period Budget") and (ii) the quotient resulting

U:\950002

from a fraction of the numerator of which is (x) the portion of the Period Budget reasonably allocable to the management of each such Company based upon a review by each such Company and Alper Holdings of Alper Holdings' budgeted overhead and operating expenses and the nature and level of services anticipated to be required by each such Company, and the denominator of which is (y) the sum of the portions of the Period Budget allocable to Companies other than Alper Holdings. Such fee shall be paid in advance in four equal quarterly payments. The first payment shall be payable on or prior to January 31, 1995.

(b)  For each succeeding one year period for which this Agreement is renewed following the completion of the initial period, on or before the December 15 of the immediately preceding year Alper Holdings shall submit (i) a budget of Alper Holdings' anticipated overhead and operating expenses for the next calendar year, (ii) the portion of such budgeted overhead and expenses reasonably allocable to each of the Companies on the basis described in 3(a) above (the "Annual Fee") and (iii) the basis for such allocation. As compensation for the services rendered pursuant to this agreement for such calendar year, the Companies shall pay to Alper Holdings the Annual Fee in advance, no later than the first business day of the quarter, in four equal quarterly payments.

(c)  If the nature and level of services actually required by any Company differs materially from the anticipated nature and level of services indicated by such Company, such Company and Alper Holdings agree to modify the Annual Fee (or the fee payable for the year ending December 31, 1995) by an amount appropriate under the circumstances.

(4)  <u>Term</u>.  This agreement shall be effective until December 31, 1995 (the "Primary Term") and shall be automatically renewed each year for subsequent one year terms. Each of Alper Holdings and the Companies may terminate this agreement prior to the scheduled termination date by giving written notice of termination; provided however, upon a termination by any Company, such Company shall pay to Alper Holdings an amount equal to the unpaid portion of the management fee that would have been payable in respect of the remainder of the year in which the Agreement is terminated.

(5)  <u>Other Transaction by Alper Holdings; Conflicts</u>.  Until such time as this agreement is terminated pursuant to the immediately preceding section, Alper Holdings shall use its best efforts in connection with the management of the Companies and the employees of Alper Holdings shall devote such time and activity during business days and hours as is reasonably necessary for the management of the Companies. Alper Holdings shall be free to act as manager, management adviser, financial adviser, or consultant to any person or account, or to participate in

U:\950002

any other business, including those substantially similar to the business of the Companies. Alper Holdings and each of the Companies recognize and accept that they may have common directors, officers, employees, consultants, agents and advisors. Alper Holdings and each of the Companies hereby waive any consequent conflict of interest or breach of fiduciary responsibility, confidence or other duty against each other and against each of their officers, directors, employees, agents and representatives unless there is a final judicial determination that such entity or person did not act in a manner it or he reasonably believe to be in or not opposed to the best interest of such corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was lawful.

(6)    Liability.    Neither Alper Holdings nor any of its directors, officers, employees, agents or representatives shall be liable to any of the Companies and neither the Companies nor any of their respective directors, officers, employees, agents or representatives shall be liable to Alper Holdings for any action, omission, error of judgment or mistake of law except to the extent that there is a final judicial determination that (i) any of the foregoing results solely from willful misfeasance or gross negligence of the party seeking exculpation and (ii) the party seeking exculpation did not act in a manner he reasonably believed to be in or not opposed to the best interest of such other Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was lawful.

(7)    Indemnification.

(a)    Each of the Companies hereby respectively agrees to indemnify and hold harmless Alper Holdings and its directors, officers, employees, agents and representatives (an "indemnified party") form any and all loss, damage, claim or liability ("Liability") of any nature (including, but not limited to, investigating, preparing or defending any litigation, commenced or threatened, or any claim whatsoever and the fees and expenses of counsel selected by such indemnified party and approved by the Companies (which approval shall not be withheld unreasonably)) arising out of services provided to such Company pursuant to this Agreement or the transactions contemplated hereby except to the extent that there is a final judicial determination that (i) such Liability results solely from the willful misfeasance or gross negligence of the indemnified party and (ii) the indemnified party did not act in good faith and in a manner it or he reasonably believed to be in or not opposed to the best interest of the Company to whom the services were provided and, with respect to any criminal action, had no reasonable cause to believe that the conduct of such party out of which such Liability arose, if any, was lawful. Each Company agrees to advance all costs and expenses for the indemnified party as incurred, subject to the agreement of the indemnified party to repay such advance upon a final determination that indemnification was not owed.

U:\950002

(b)     Alper Holdings hereby agrees to indemnify and hold harmless the Companies and their officers, directors, employees, agents and representatives (an "indemnified party") from any and all Liability of any nature (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending any litigation, commenced or threatened, or any claim whatsoever and the fees and expenses of counsel selected by such indemnified party and approved by Alper Holdings (which approval shall not be withheld unreasonably)) arising out of this agreement or the transactions contemplated hereby to the extent that there is a final judicial determination that (i) such Liability results solely from the willful misfeasance or gross negligence of Alper Holdings and (ii) Alper Holdings did not act in good faith and in a manner it reasonably believed to be in or not opposed to the best interest of the party seeking such indemnification and, with respect to any criminal action, had no reasonable cause to believe that the conduct of such party out of which such Liability arose, if any, was lawful. Alper Holdings agrees to advance all costs and expenses of the indemnified party as incurred, subject to the agreement of the indemnified party to repay all such advances upon a final determination that indemnification was not owed.

(8)     <u>Amendment and Modification</u>.     This agreement may be modified or amended only by written agreement executed by Alper Holdings and the Companies.

(9)     <u>Successors and Assigns</u>.  Neither the Companies nor Alper Holdings shall assign or otherwise transfer any of its rights under this agreement without the written consent of the other party.

(10)     <u>Captions; Severability</u>.     Section titles contained in this agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this agreement or the intent of any provision hereof. Each provision of this agreement is severable.  If any provision or term hereof is determined, for any reason whatsoever, to be illegal or otherwise unenforceable, (i) such provision shall be reformed and constructed in such a manner as to fulfill the intent of the parties hereto to the greatest possible extent and (ii) such determination shall not affect the validity of the remaining provisions and terms of this agreement.

(11)     <u>Governing Law</u>.  This agreement shall be construed in accordance with and governed by the laws of the State of New York without regard to the conflicts of law rules thereof.

(12)     <u>Counterparts; Effectiveness</u>.  This agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By: _____

ALPER HOLDINGS USA, INC.

By: _____

ALPER DEVELOPMENT, INC.

By: _____

SALTIRE REALTY, INC.

By: _____

ALPER NORTHWEST, INC.

By: _____

SALTIRE INDUSTRIAL, INC.

By: _____

FIRST CITY CAPITAL CORPORATION

By: _____

FIRST CITY DIVERSIFIED INC.

By: _____

ALPER SECURITIES, INC.

By: _____

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

　　　　　IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By: _____

ALPER HOLDINGS USA, INC.

By: _____

ALPER DEVELOPMENT, INC.

By: _____

SALTIRE REALTY, INC.

By: _____

ALPER NORTHWEST, INC.

By: _____
　　Kenneth V. Bellamy, President
By: _____
　　Dean R. Erickson, Secretary

SALTIRE INDUSTRIAL, INC.

By: _____

FIRST CITY CAPITAL CORPORATION

By: _____

FIRST CITY DIVERSIFIED INC.

By: _____

ALPER SECURITIES, INC.

By: _____

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By: _____

ALPER HOLDINGS USA, INC.

By: _____

ALPER DEVELOPMENT, INC.

By: _____

SALTIRE REALTY, INC.

By: _____

ALPER NORTHWEST, INC.

By: _____

SALTIRE INDUSTRIAL, INC.

By: _____

FIRST CITY CAPITAL CORPORATION

By: _____

FIRST CITY DIVERSIFIED INC.

By: _____

ALPER SECURITIES, INC.

By: _____

**EXHIBIT E**

Bauer1

```
<?xml version="1.0"?>
<TRN>
<DocType>Summation Transcript Export File</DocType>
<Version>0.9</Version>
<Source_Loc>I:\SW52\NORMAN\TRAN\</Source_loc>
<Transcript_Name>022201.001</Transcript_Name>
<Transcript_Description>N. Bauer 2/22/2001</Transcript_Description>
<Notes>
</Notes>
<Transcript Info>
0,1,10,0,0
</Transcript Info>
<Transcript>
```

1

```
 1          IN THE CIRCUIT COURT FOR THE TWENTY THIRD
                          JUDICIAL DISTRICT
 2                   DICKSON COUNTY, TENNESSEE
      ────────────────────────────────
 3
      GEORGE HAROLD NORMAN, et al.,    x
 4                                     :
                        Plaintiffs,    :
 5          vs.                        : No. 383A-CV
                                       :
 6      SCOVILL, INC., et al.,         :
                                       :
 7                      Defendants.    x
      ────────────────────────────────
 8
 9                   McLean, Virginia
10              Thursday, February 22, 2001
11   VIDEOTAPED DEPOSITION OF:
12                   NICHOLAS B. BAUER,
13   a witness, was called for examination by counsel
14   for the plaintiffs, pursuant to Notice and
15   agreement of the parties as to time and date,
16   beginning at approximately 9:14 o'clock, a.m., in
17   the law offices of Hunton & Williams, Esquires,
18   1751 Pinnacle Drive, McLean, Virginia 22102,
19   before Catherine S. Boyd, a Court Reporter and
20   Notary Public in and for the Commonwealth of
21   Virginia, when were present on behalf of the
```

Page 1

                                    Bauer1
22        respective parties:

                                                        2

 1        APPEARANCE OF COUNSEL:

 2            For the Plaintiffs:

 3                WALLER LANSDEN DORTCH & DAVIS, ESQUIRES
                  BY:  MICHAEL G. STEWART, ESQUIRE
 4                Nashville City Center
                  511 Union Street, Suite 2100
 5                Nashville, Tennessee  37219-8966

 6            For the Defendants:

 7                HUNTON & WILLIAMS, ESQUIRES
                  BY:  JOHN A. LUCAS, ESQUIRE
 8                900 S. Gay Street, Suite 2000
                  Knoxville, Tennessee 37902
 9        and
                  HUNTON & WILLIAMS, ESQUIRES
10                BY:  CHARLES A. PERRY, ESQUIRE
                  Bank of America Plaza
11                Suite 4100
                  600 Peachtree Street, N.E.
12                Atlanta, Georgia  30308-2216

13        ALSO PRESENT

14                STEPHEN CRITER, Video Specialist

15                        - 0 -

16                      I-N-D-E-X

17        Witness:                           Page:

18        Nicholas B. Bauer

19                Examination by Mr. Stewart        5

20                        - 0 -

21

22

                                                        3

Bauer1

```
 1      Exhibits: (Not included with transcript) Page:

 2      Exhibit No. 31 for Identification
        to the Bauer Deposition
 3      (Notice of Deposition)                    6

 4      Exhibit No. 32 for Identification
        to the Bauer Deposition
 5      (Agreement)                             163

 6      Exhibit No. 33 for Identification
        to the Bauer Deposition
 7      (Document)                              168

 8      Exhibit No. 34 for Identification
        to the Bauer Deposition
 9      (Packet of documents)                   219

10      Exhibits Nos. 34A & 34B for
        Identification to the Bauer Deposition
11      (Letters)                               219

12      Exhibits Nos. 35 & 36 for
        Identification to the Bauer Deposition
13      (Blow-ups of maps)                      226

14                        - 0 -

15

16

17

18

19

20

21

22
```

4

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2              THE VIDEO SPECIALIST:  This is the
```

Page 3

Bauer1

```
 3      deposition of Nicholas B. Bauer noticed by the
 4      plaintiffs in the case number 373A-CV in the case
 5      of George Harold Norman, et al. versus Scovill,
 6      Incorporated, et al, in the Circuit Court for the
 7      23rd Judicial District, Dickson County,
 8      Tennessee.
 9              This deposition is taken on February 22,
10      2001, at the offices of Hunton & Williams, 1751
11      Pinnacle Drive in Virginia.
12              The time is noted on the bottom portion
13      of the television screen.
14              The videographer operating the videotape
15      equipment for this deposition is Steven Criter of
16      Carol J. Thomas Reporting.
17              The court reporter is Kathy Boyd of
18      Carol J. Thomas Reporting.
19              Will counsel please identify themselves
20      and the parties they represent?
21              MR. STEWART:  Mike Stewart of Waller
22      Lansden Dortch & Davis for the plaintiffs.
```

5

```
 1              MR. LUCAS:  John Lucas of Hunton &
 2      Williams for the defendant.
 3              MR. PERRY:  Charles Perry of Hunton &
 4      Williams for the defendant.
 5              THE VIDEO SPECIALIST:  Swear the
```

Bauer1

```
 6    witness, please.
 7    Whereupon,
 8                   NICHOLAS B. BAUER,
 9    having been duly sworn by the Notary Public, was
10    called as a witness herein, and testified as
11    follows:
12                   THE VIDEO SPECIALIST:   Okay.
13                   EXAMINATION BY COUNSEL FOR THE
14    PLAINTIFFS
15                   BY MR. STEWART:
16         Q.    Please state your name.
17         A.    Nicholas Bauer.
18         Q.    Mr. Bauer, I'm Mike Stewart, and could
19    we agree that as I'm asking you questions today,
20    if you don't understand a question, you'll tell
21    me before you answer?
22         A.    Okay.
```

                                                              6

```
 1         Q.    And that way, if you do answer a
 2    question, we'll know that you thought you
 3    understood it?
 4         A.    Yes, sir.
 5         Q.    Okay.  I'm going to hand you a notice to
 6    take deposition.
 7                   MR. LUCAS:  Can we similarly agree that
 8    if he doesn't understand the question, he can ask
```

Bauer1

```
 9    you for clarification?

10              MR. STEWART:  Oh, certainly.

11              BY MR. STEWART:

12         Q.   I just want to hand you a Notice of

13    Deposition.

14              Is that the notice that you were

15    provided for this deposition?

16              (The witness reviewed the document.)

17              THE WITNESS:  I believe so.  To the best

18    of my recollection, yes.

19              MR. STEWART:  Okay.  I'll just make that

20    Exhibit 31.

21                              (Exhibit No. 31

22                              was marked for
```

                                                          7

```
 1                              identification.)

 2              BY MR. STEWART:

 3         Q.   Mr. Bauer, pursuant to that notice or

 4    for any other reason, have you brought any

 5    documents today?

 6         A.   No, I have not.

 7         Q.   Before we get into the details of your

 8    deposition, are you appearing today or are you

 9    appearing as the representative, the 3006

10    representative of Scovill, Inc., the defendant?

11         A.   No.  My notice was for myself as an
```
                          Page 6

Bauer1

12      individual, and that is how I am appearing today.

13                  THE COURT REPORTER:  Was that 3006

14      representative?

15                  MR. LUCAS:  30 point 02 paren 6.

16                  MR. STEWART:  Let's go off the record for

17      a moment.

18                  THE VIDEO SPECIALIST:  Off record, and

19      the time on screen is 09 and 19:32.

20                  (A discussion was held off the record.)

21                  THE VIDEO SPECIALIST:  On record, and

22      the time on screen is 09:22:47.

8

1                   BY MR. STEWART:

2           Q.   So Mr. Bauer, you're appearing as an

3       individual?

4           A.   Yes.

5           Q.   And are you right now planning to

6       provide expert testimony in this case?

7           A.   No, I'm not.

8           Q.   Okay.  Have you --

9                   MR. LUCAS:  Let me ask you this.

10      Expert, as you and I know as lawyers use it, is a

11      term of art.

12                  Can you clarify for him what you mean by

13      that?

14                  MR. STEWART:  Well, perhaps the best way

Page 7

Bauer1

15    to do this, I mean I'll ask you, we, during
16    Claudia Brand's deposition, Scovill, Inc. was
17    very clear to make its position known that Mrs.
18    Brand was to be considered a non-testifying
19    expert, and therefore, we were careful to
20    question her about facts and not about opinions
21    that an expert might give in the case.
22            And so the question is is, is Mr. Bauer

9

1     or are you taking the same position with Mr.
2     Bauer, that he is a non-testifying expert and he
3     is not here to give or will not be giving at
4     trial expert testimony?
5             MR. LUCAS:  I cannot say that at trial,
6     that he might not, may or may not offer an
7     opinion on something.
8             He is certainly not an expert, you know,
9     an outside expert within the meaning of the rule.
10            But I just, I don't want to tell you and
11    I don't want his answer to be interpreted that at
12    trial, he might not express an opinion on whether
13    or not it's going to snow tomorrow or something
14    that would be within the normal scope of his
15    duties, but that's not why he is here.
16            I mean he is here as an individual
17    witness, and you know, and hasn't been obviously
                          Page 8

Bauer1

18    retained or prepared as an expert witness.

19            MR. STEWART:  Okay.  And we would expect

20    to receive the appropriate report and information

21    if he was going to provide testimony about his

22    opinions other than those expressed in the

10

1    environmental documents that have been provided

2    to the EPA, as with Ms. Brand, separate from

3    those documents.

4            MR. LUCAS:  We will certainly provide

5    you with whatever you're entitled to receive

6    under the rules.

7            BY MR. STEWART:

8        Q.    Let me ask about that, Mr. Bauer.  I

9    mean are you right now intending to come to trial

10    or preparing for the possibility of coming to

11    trial to testify about the source of

12    trichloroethylene in various wells and points

13    throughout around the site of the former Scovill

14    Dickson Schrader Automotive plant facility?

15        A.    I have not discussed that with my

16    attorneys.

17            I don't know.

18        Q.    Mr. Bauer, have you ever taken your

19    deposition before?

20        A.    Yes, I have.

Page 9

Bauer1

21        Q.    Tell me when.

22        A.    I don't recall precise dates.

11

1         Q.    Well, tell me generally when and for

2    what you were deposed.

3         A.    Approximately a year ago, I was deposed

4    in another matter relating to waste disposal

5    issues, and approximately eight years ago, I was

6    deposed in a bankruptcy matter.

7         Q.    See if we can take the bankruptcy matter

8    off the table.

9              Did that have any relationship to this

10   case?

11        A.    No.

12        Q.    Was that involving some personal issue

13   for you?

14        A.    No.  It was a issue where I was working

15   for a consulting firm, and we had done some work

16   for a company that had since gone into

17   bankruptcy, and it was tangential to the case, as

18   I understand it, but my deposition was taken

19   relating to the work we had done for the debtor.

20        Q.    And who is we at the time?

21        A.    ICF Kaiser Engineers.

22        Q.    Okay.  Did you give any opinions about

Page 10

Bauer1

12

```
 1     anything relating to environmental issues or
 2     hazardous waste issues?
 3          A.    Not that I recall.
 4          Q.    Okay.  Were you primarily testifying
 5     about billing issues, that sort of thing?
 6          A.    Testifying about the work we had
 7     performed and the cost of that work.
 8          Q.    What kind of work was it?
 9          A.    I believe it was a Phase 1 audit.
10          Q.    For whom was the work performed?
11          A.    I don't even recall.
12          Q.    Okay.  Do you remember where that case
13     was being litigated?
14          A.    No, I don't.  The deposition was taken
15     locally in Washington or Northern Virginia, but I
16     don't know where the case was being litigated.
17          Q.    Did that case involve any EPA regulated
18     site, CERCLA site, or anything like that?
19          A.    Not to my knowledge.
20          Q.    Okay.  Tell me about your year ago
21     deposition about disposal issues.
22          A.    What in particular would you like to
```

Bauer1

```
 1     know?
 2          Q.    Well, who was deposing you, what party
 3     or agency?
 4          A.    The counsel for Mr. Calabrese.
 5          Q.    And who is Mr. Calabrese?
 6          A.    He is a property owner, current property
 7     owner.
 8          Q.    An owner of property where?
 9          A.    In Connecticut.
10          Q.    And -- excuse me.
11          A.    Go ahead.
12          Q.    Continue.
13          A.    In Waterbury, Connecticut.
14          Q.    And what did Mr. Calabrese's counsel
15     want to ask you?
16               MR. LUCAS:   Object to the form.  Let me
17     explain the reason for that.
18               Let me explain the reason for that.
19               MR. STEWART:  I understand.
20               MR. LUCAS:   Unless you don't want me to.
21               MR. STEWART:  I'll be happy to rephrase.
22               BY MR. STEWART:
```

14

Bauer1
1          Q.    What is the nature -- put it this way.
2     Is the deposition an outgrowth of current
3     litigation?
4          A.    Yes.
5          Q.    Okay.  Who are the parties to that
6     litigation?
7          A.    Mr. Calabrese, to the best of my
8     recollection, all the parties involved, Mr.
9     Calabrese, the estate of a Mr. McHugh, Saltire
10    Industrial, and Scovill Fasteners, Inc.
11         Q.    Is Mr. Calabrese the plaintiff or the
12    defendant?
13         A.    The plaintiff.
14         Q.    And what claims has he made against
15    Saltire Industrial that you know of?
16         A.    The specific claims, I don't recall in
17    terms of the legal jargon that was involved.
18         Q.    Well, what do you recall about the
19    factual nature of the claims?
20         A.    The case involved a dispute about past
21    disposal practices on the property in Connecticut
22    of which Mr. Calabrese is the current owner.

                                              15

1          Q.    Whose disposal practices?
2          A.    Scovill Manufacturing, Inc. or Scovill
3     Manufacturing Corporation.
                    Page 13

Bauer1

4      Q.   Which one?

5      A.   I believe that's Scovill Manufacturing,

6    Inc., but the exact title of that company, I

7    don't, I'm not sure.

8      Q.   Disposal practices by the same Scovill

9    that is the defendant in this lawsuit?

10      A.   A -- yes.  It's related, yes.

11      Q.   Related how?  A subsidiary, or tell me

12    how Scovill Manufacturing, Inc. relates to

13    Scovill, Inc.

14      A.   There was, through a series of mergers,

15    acquisitions, et cetera, Scovill Manufacturing

16    eventually, eventually the name changed to

17    Scovill, Inc.  It became Scovill, Inc.

18      Q.   Scovill, Inc. and Scovill Manufacturing,

19    Inc. had the same owners?

20      A.   I'm not sure of that.

21      Q.   Okay.  Scovill, Inc. was a successor

22    corporation to Scovill Manufacturing, Inc., is

16

1    that what you just described?

2      A.   I'm not sure in terms of term of art

3    here, but they, Scovill Manufacturing I believe

4    was the original name or one of the original

5    names of the company that ultimately became

6    Scovill, Inc.

Page 14

Bauer1

7      Q.    Okay.  Do you know when that would have
8   happened?
9      A.    No.  I don't recall the dates of those
10   transitions.
11      Q.    When did the disposal on the Calabrese
12   property we have talked about occur or when was
13   it alleged to have occurred?
14      A.    Alleged to have occurred from
15   approximately 1919 through 1974.
16      Q.    And what was allegedly disposed of?
17      A.    Cinders, ash, clean fill, and related
18   materials; there was also, there were also
19   capacitors found at the site.
20      Q.    PCBs?
21      A.    Containing PCBs.
22      Q.    Were there any, were there any volatile

17

1   organic compounds disposed of at the Calabrese
2   site?
3      A.    None have been detected there, nor do we
4   have any information of any such compounds being
5   disposed of there.
6      Q.    Were any heavy metals disposed of there?
7      A.    There were some metals identified in
8   sampling results.
9           The, to the best of my knowledge, there

Page 15

Bauer1

10    were no heavy metal wastes disposed of there.

11        Q.    Where did Mr. Calabrese think the waste

12    came from, that is, literally what manufacturing

13    operation?

14            MR. LUCAS:   Object to the form where

15    you're asking him what someone else thinks.

16            BY MR. STEWART:

17        Q.    Fair enough.  Do you know where it's

18    alleged the materials disposed of at Mr.

19    Calabrese's property came from?

20        A.    The allegation is that there is a former

21    Scovill Manufacturing Company facility in

22    Watertown -- Waterbury -- excuse me -- Waterbury,

18

1    Connecticut, and wastes were allegedly, from that

2    operation of the type we just described, were

3    disposed of in that area.

4        Q.    What was made at the Waterbury site?

5        A.    Many different types of metal-related

6    products, brass-related products.

7        Q.    Products similar to the products

8    manufactured at the Scovill facility in Dickson,

9    Tennessee?

10        A.    I don't recall whether such, whether

11    there was a period where similar items may have

12    been manufactured at that, at that, at that

Bauer1

13    Waterbury facility.

14            I'm not sure.

15        Q.    At the Waterbury plant, it was a metal

16    finishing plant, is that right?

17        A.    There were many metal-type operations

18    that went on.

19            There was forming and finishing

20    operations there at various times.

21        Q.    Do you know where this case brought by

22    Mr. Calabrese is being litigated, what court?

19

1        A.    No.  I don't recall.

2        Q.    Okay.  Did you have your deposition

3    taken here?

4        A.    No.  It was taken in Connecticut.

5        Q.    Were you a company representative?

6        A.    In that case, yes, I was.

7        Q.    And were you representing Saltire

8    Industrial?

9        A.    Yes.

10        Q.    Were you also representing Scovill

11    Manufacturing, Inc?

12        A.    Well, Scovill Manufacturing, Inc.

13    doesn't currently exist.

14        Q.    Were you noticed as a representative of,

15    30(b)(6) representative for Scovill

Bauer1

16    Manufacturing, Inc. in that case?

17        A.    I don't recall.

18        Q.    Well, were you providing the company's

19    position based on not only activities of Saltire

20    Industrial, Inc. during its existence, but also

21    activities of Scovill Manufacturing, Inc?

22        A.    Yes.

20

1        Q.    Okay.  Do you have a copy of that

2    deposition transcript?

3        A.    Not with me, no.

4        Q.    I understand.  Do you have one in your

5    offices or in your possession as an officer for

6    Saltire Industrial, Inc?

7        A.    As an individual, I have a copy.

8             MR. STEWART:  I would like to make that

9    an exhibit to this deposition.

10            MR. LUCAS:  We'll entertain the request.

11    I don't think it's appropriate to make a document

12    that's not here an exhibit.

13            MR. STEWART:  So I would like to make it

14    a late filed exhibit.

15            Is that problematic?

16            MR. LUCAS:  Yeah.  I mean I just don't

17    think the rules provide for late filed exhibits

18    for a document that's not here, not been

Bauer1

19    requested.

20             If you all want a copy of it, we'll, you

21    know, my procedure  --

22             MR. STEWART:  You just want us to make a


                                                        21



1     request formally in writing later?

2              MR. LUCAS:  Yeah, and you know, if -- my

3     procedure when someone requests a document during

4     a deposition that I hadn't seen before is I want

5     to, you know, consider the request, and if it's

6     responsive and you're entitled to it, you will

7     get it.

8              BY MR. STEWART:

9         Q.   Is the Environmental Protection Agency

10    involved with the site at issue in what I'll call

11    the Calabrese litigation?

12        A.   Yes.

13        Q.   Is it a Superfund site?

14        A.   Yes.

15        Q.   How long has it been a Superfund site?

16        A.   A few months.

17        Q.   Okay.  How long has the Environmental

18    Protection Agency been involved with the site?

19        A.   Similarly, you know, an order of months.

20    I don't recall precisely.

21        Q.   Why is the estate of Mr. McClure

                          Page 19

Bauer1
22          interested in, or McHugh interested in the

22

1     litigation?
2              MR. LUCAS:  Object to the form of the
3     question.
4              BY MR. STEWART:
5         Q.   Let me rephrase.  What has the -- first
6     of all, is the estate of Mr. McHugh a party to
7     that litigation?
8         A.   My understanding is they are also a
9     defendant in that litigation.
10        Q.   Is Mr. McHugh a former independent
11    contractor who worked for Scovill Industrial,
12    Inc?
13        A.   No.
14        Q.   What has been alleged as to Mr. McHugh's
15    involvement with the litigation surrounding the
16    Calabrese site?
17        A.   Mr. McHugh was a former owner of the
18    property.
19        Q.   Do you know what damages have been
20    alleged in that lawsuit?
21        A.   No, I don't.
22        Q.   Do you know who the attorneys are that

Page 20

Bauer1

23

1     deposed you?

2          A.    Nick Harding; I don't recall the name of

3     the firm.

4          Q.    Did Saltire Industrial at your

5     deposition admit to contaminating the property

6     owned by Mr. Calabrese?

7          A.    No.

8          Q.    Did you admit to placing, not you

9     personally, but to Scovill Manufacturing, Inc.'s

10    placement of waste or materials or anything on

11    the Calabrese site?

12          MR. LUCAS:   Counsel, let me ask you just

13    that's a compound question rolled into one.

14          If the question, the last question was

15    did they admit to placing anything on the site?

16    Is that the question you want to ask?

17          MR. STEWART:   That's fine.

18          THE WITNESS:   Okay.   The response then

19    to that question did we place anything on the

20    site or the company admit to placing anything on

21    the site, the answer is that our understanding is

22    that ashes, cinders, clean fill, similar kinds of

24

Bauer1

```
 1    materials, were disposed of by Scovill
 2    Manufacturing at that location.
 3              BY MR. STEWART:
 4      Q.    Is the -- well, then did you testify in
 5    your deposition that Scovill Manufacturing and
 6    Saltire Industrial took the position that there
 7    wasn't anything, there were no hazardous
 8    constituents in that, in those items disposed?
 9      A.    I would have to review my testimony to
10    see what I actually, you know, specific responses
11    to questions.
12      Q.    Well, I understand, my understanding is
13    you just told me that you for the company,
14    conceded having placed cinders and what not on
15    the site?
16      A.    Um-hm.
17      Q.    And did you, was that, did you concede
18    having placed those items on the site through
19    1974?
20      A.    The end date is not clearly known.
21      Q.    And you didn't set an end date?
22      A.    That's correct.
```

25

```
 1      Q.    Okay.  Is the distinction you're making
 2    that, is your recollection that you for the
```

Bauer1

3      company have not conceded that what was disposed

4      on the site contained hazardous materials?

5          A.    Yeah.  We only know in general terms the

6      nature of the materials in terms of, you know, no

7      specific analysis were available as far as we

8      know relating to the contents or characterization

9      of those materials.

10         Q.    Has the Environmental Protection Agency

11     ordered Saltire Industrial or Scovill

12     Manufacturing, Inc. to clean up the Calabrese

13     site?

14             MR. LUCAS:  Mike, let me just -- the

15     court reporter is having trouble hearing you

16     because your voice is real low.

17             If you could speak up just a little bit,

18     I think it will help her.

19             THE COURT REPORTER:  I am, yes.

20             MR. STEWART:  I'll do what I can.  Do

21     you need her to read back the question?

22             THE WITNESS:  I believe I already

26

1      answered.

2             No is the response.

3             BY MR. STEWART:

4          Q.    What has the Environmental Protection

5      Agency, what has the Environmental Protection

Page 23

Bauer1

```
 6      Agency's involvement been to date with the
 7      Calabrese site litigation?
 8              MR. LUCAS:  Object to the form of the
 9      question.
10              THE WITNESS:  Specifically what kind of,
11      what are you interested in?
12              BY MR. STEWART:
13      Q.    Well, you have told me the EPA was
14      involved, and I want to know just in your own
15      words what that involvement has amounted to up to
16      this point.
17              MR. LUCAS:  I'm going to again object to
18      the form of the question.  It's overly-broad.
19              You may answer.
20              BY MR. STEWART:
21      Q.    Please.
22      A.    Okay.  The EPA had sent an information
```

27

```
 1      request.
 2              As to whether it was actually to Scovill
 3      or whether it was to Saltire, I don't frankly
 4      remember -- an information request relating to
 5      the site, as well as a general notice letter.
 6      Q.    And has Saltire Industrial responded to
 7      the information request yet?
 8      A.    No.
```

Page 24

Bauer1

```
 9        Q.   When is it going to respond to the
10   information request by the Environmental
11   Protection Agency relating to the Calabrese site?
12        A.   Responses are due in early March.
13        Q.   Have you given me an exhaustive
14   description of the depositions that you have had
15   taken in your career?
16        A.   Yes.
17        Q.   Okay.  Have you ever sued anyone, Mr.
18   Bauer?
19        A.   No, sir.
20        Q.   Okay.  Has anyone ever sued you before
21   personally?
22        A.   No.
```

28

```
 1        Q.   Okay.  Has anyone sued Saltire
 2   Industrial, Inc. other than Mr. Calabrese and the
 3   litigation in that case and Scovill, Inc. and --
 4   pardon me -- the plaintiffs in this case?
 5        A.   Perhaps; I don't know.
 6        Q.   Do you know of any litigation currently
 7   pending against Saltire Industrial other than the
 8   litigation we're here to talk about today and the
 9   Calabrese litigation you have discussed?
10        A.   No.  I don't recall any others.
11        Q.   Do you recall any litigation against
```

Bauer1

12    Saltire Industrial or Scovill, Inc. at any time
13    other than the litigation involving the Calabrese
14    property and, and the litigation we're here to
15    talk about today?
16         A.    I understand there was allegations of
17    asbestos exposure due to product manufacturing,
18    you know, years past.
19              I don't know the status or anything
20    about those cases that are outside of my realm.
21              I believe there was also a case relating
22    to the Stringfellow site in California.

29

1              Again, the nature, the exact extent of
2    that case I'm not aware of.
3              There certainly may be others, but I
4    don't recall at this time.
5         Q.    You have told me every item of
6    litigation that you do recall?
7         A.    Yes.
8         Q.    Well, then can you tell me what you do
9    know about, first of all, whether any asbestos
10    exposure cases are still pending against Saltire
11    Industrial?
12         A.    I'm not, I'm not aware of any, but I --
13    I don't know is the better answer.
14         Q.    Do you know who in the company would
                              Page 26

Bauer1

15    know?

16         A.    Wayne Smith, Chief Financial Officer

17    that handled those matters.

18         Q.    Does --

19         A.    And we were one of the many parties, and

20    it wasn't the case that it was a big deal.

21         Q.    Does Mr. Smith work at Saltire

22    Industrial today?

30

1          A.    He is in the New York office.

2          Q.    So the answer to my question is yes?

3          A.    Mister, Mr. Smith is an officer of

4     Saltire Industrial.

5          Q.    Okay.  Tell me about the Stringfellow

6     site.

7                Is that a CERCLA site?

8          A.    Yes.

9          Q.    Okay.  Is that, has that been remediated

10    that you know of?

11         A.    There has been substantial remedial work

12    on that site.

13               As a player in that site, Saltire was a

14    de minimis party, but there have been subsequent

15    personal injury kind of cases that have been

16    filed, and all of the potentially responsible

17    parties associated with the site typically have

Page 27

Bauer1

18    been named.

19         Q.    Do you know how many personal injury

20    lawsuits Saltire Industrial, Scovill or any of

21    Scovill's subsidiaries have been named in in

22    California?

31

1         A.    No, I do not.

2         Q.    Do you think it's more than one?

3         A.    That's the only one that I know of that

4    I can recall at the moment.

5         Q.    A single personal injury lawsuit filed

6    relating to the Stringfellow site?

7         A.    I believe there were actually two.

8         Q.    Are these class action lawsuits?

9         A.    Whether they were class action or

10    whether they were simply multi-party suits, I'm

11    not aware.

12         Q.    Are you aware of whether those had been

13    settled?

14         A.    I don't believe those have been settled.

15         Q.    Do you know who the attorneys are that

16    have brought those lawsuits or claims?

17         A.    No.  I don't recall.

18         Q.    Do you know where those cases are being

19    litigated?

20         A.    In California, but I don't know where.

Bauer1

21      Q.    How long has the EPA been involved with
22      the Stringfellow site?

                                                    32

1       A.    Many years; I don't -- you know, it's
2       one of the early Superfund sites.
3       Q.    Are you aware of any, who -- is Mr.
4       Smith the person in the company who would have
5       the most detailed knowledge -- and by company, I
6       mean Saltire Industrial -- most detailed
7       knowledge about those lawsuits not settled in
8       California that you just described?
9             MR. LUCAS:  I object to the form of the
10      question.
11            MR. STEWART:  I think you're objecting
12      because I included information -- well, I won't
13      speculate.
14            MR. LUCAS:  If you want me to clarify
15      the basis, I'll be glad to.
16            MR. STEWART:  No.  Let me just rephrase
17      so we're perfectly clear.
18            BY MR. STEWART:
19      Q.    Who in the company or related to Saltire
20      Industrial, Inc. could provide the most
21      information about the two lawsuits?
22            MR. LUCAS:  I'm sorry.  I didn't quite

                        Page 29

Bauer1

33

1    get that question.

2            Would you mind repeating it?

3            MR. STEWART:  Not at all.

4            BY MR. STEWART:

5        Q.    Who in the company, by which I mean

6    Saltire Industrial, would be able to provide the

7    most information about those lawsuits in

8    California?

9        A.    Probably myself, but I would simply have

10    to, you know, refresh my recollection of those

11    sites.

12        Q.    What would you need to refresh your

13    recollection of those sites?  What documents?

14        A.    Take a look at the complaints that were,

15    that were filed.

16        Q.    Do you have copies of those complaints

17    at Saltire Industrial, Inc.'s offices?

18        A.    I believe so.

19        Q.    Okay.  Do you know of any -- first of

20    all, have you given me an exhaustive list of

21    every item of litigation that you know of that

22    Saltire Industrial or Scovill have been involved

Bauer1

34

1    with?

2         A.    Yes.   Litigation meaning, you know,

3    court ordered.

4         Q.    Right.

5         A.    Or type of actions; those are all that I

6    recall at the moment.

7         Q.    Okay.  Well, do you recall any purely

8    administrative disputes or hearings or matters

9    that Saltire Industrial, Inc. Or Scovill was

10   involved in?

11        A.    Relating to environmental matters, or

12   related to a broader question than that?

13        Q.    Well, why don't we say relating to

14   environmental matters?

15        A.    Yes.   The company is involved in other

16   administrative environmental issues.

17        Q.    Why don't you tell me which ones the

18   company is involved in?

19             Before you do that, can we agree that

20   when we're talking about the company, that we're

21   talking about Saltire Industrial, Inc., which I

22   take it is the successor entity to the various

35

Bauer1

1    Scovill Manufacturing entities that you
2    described?
3        A.    That's okay.   That was my -- yes.
4        Q.    That's what we're talking about when we
5    say the company, right?
6        A.    That's a good clarification.
7        Q.    Okay.   Now tell me the environmental
8    administrative issues that the company has been
9    involved in.
10       A.    So you're interested in a list of
11    issues, sites?
12       Q.    That's right.
13       A.    Et cetera, that the company has been
14    involved in, or is that encompassing all time or
15    sort of more currently active sites or issues or
16    what's your focus?
17       Q.    My focus is everything you know about,
18    but you might start from --
19       A.    How many days do you have?
20       Q.    Okay.   Well, why don't you start, and
21    I'll tell you when I'm no longer interested?
22       A.    Okay.

36

1           MR. LUCAS:   When you say why don't you
2    start, can you kind of narrow the focus of the
3    question for me?

Page 32

                              Bauer1
 4               MR. STEWART:   Certainly.

 5               BY MR. STEWART:

 6          Q.   I would just like you to just start

 7     listing for me the administrative I think you

 8     said environmentally-related actions, hearings,

 9     proceedings, that Scovill or that the company has

10     been involved in.

11          A.   Okay.  And by administrative, I assume

12     you mean any kind of agency agreements, or is

13     that --

14          Q.   Yes.  And let me help clarify.  What I'm

15     interested in from you, Mr. Bauer, is just to

16     describe for me the, the, the proceedings, so for

17     a clarification, you could describe the

18     proceeding we're involved in as working with the

19     Tennessee and federal regulatory officials to

20     remediate the Dickson site understanding that

21     there are hundreds of documents that you have

22     provided me about that.

                                                      37

 1               I don't want you to list every document.

 2     I just want you to tell me about each, each

 3     occurrence or site that you're dealing with.

 4               Does that clarify that?

 5               MR. LUCAS:  It doesn't.  That's why I'm

 6     going to object to the form.

                         Page 33

Bauer1

7           MR. STEWART:  Fair enough.

8           MR. LUCAS:  Do you want to ask him

9      about, for example, each site?

10          MR. STEWART:  Yeah, why don't we start

11     that way?

12              I'm just trying to provide a framework

13     whereby he can describe fairly the company's

14     environmentally-related administrative actions.

15              I don't want him to take me through at

16     this point Phase 1, Phase 2, and so forth.

17          MR. LUCAS:  Yeah, that was my concern.

18     When you said, when you mixed together in your

19     question you said tell me about each occurrence

20     or each site.

21              Each occurrence, I mean I don't know

22     what mean by occurrence.  That's every time they

38

1      write a letter back and forth or what?

2           MR. STEWART:  Well, given our time

3      constraints, I'll start with sites.

4           MR. LUCAS:  That's what I thought.

5      That's what I thought you wanted, so can we agree

6      he's going to tell you about sites that are the

7      subject of administrative actions?

8           MR. STEWART:  For this question, yes.

9           MR. LUCAS:  Sure.

Page 34

Bauer1

10          THE WITNESS:  Okay.  There's a -- okay.
11   Dealing with the Regional Water Quality Control
12   Board in southern California, remediation and
13   ongoing monitoring of site in the City of
14   Industry, California.
15          MR. LUCAS:  I'm sorry.  City of what?
16          THE WITNESS:  City of Industry,
17   California; working with the Environmental, U.S.
18   Environmental Protection Agency, remediation and,
19   remediation of the Caldwell Trucking Superfund
20   site, Fairfield, New Jersey, U.S. EPA Region 9,
21   and investigation and remediation of the Puente
22   Valley Operable Unit -- Puente Valley Operable

39

1    Unit of the San Gabriel Valley Superfund site.
2           And for this matter, related to this
3    matter, working with the U.S. EPA in the State of
4    Tennessee on investigation, remediation of the
5    former Schrader Automotive site in Dickson,
6    Tennessee.
7           BY MR. STEWART:
8      Q.   And can we agree for clarification that
9    when we refer to the site or the facility today,
10   that we'll be referring to the site you just
11   described in Dickson, Tennessee?
12     A.   Agreed at least except as I may be

Bauer1

13  perhaps doing this listing, I may occasionally

14  refer to the current site that we're talking

15  about.

16      Q.   Certainly.

17      A.   With the State of Connecticut DEP,

18  Department of Environmental Protection,

19  investigation and remediation of facility in

20  Watertown, Connecticut.

21          Let's see.  What are the others?  We

22  were a party with the Stringfellow case as we

40

1  mentioned before, Stringfellow Superfund site, so

2  that was an investigation and remediation again

3  with the U.S. EPA.

4          Okay.  Other sites also with

5  environmental, U.S. Environmental Protection

6  Agency include the solvent recovery services of

7  New England site, Southington, Connecticut, again

8  investigation and remediation activities, the old

9  Southington landfill, also in Southington,

10  Connecticut, investigation and remediation

11  activities.

12          Enterprise Recovery Systems, and that's,

13  I don't recall the location.  What's the location

14  of that site?  It was also working with U.S. EPA

15  investigation and remediation activities.

Page 36

Bauer1

16                    Can I see the list so far that we have?

17        Q.    Certainly.  This is a handwritten list I

18    have been making since we started the proceeding.

19    You're welcome to refer to it.

20                    (The witness reviewed the document.)

21                    MR. STEWART:  It's on two pages.

22                    (The witness reviewed the document.)

41

1                    THE WITNESS:  Okay.  Another site is the

2    Arrowhead Plating site, Montrose, Virginia, with,

3    under the auspices of the U.S. EPA,

4    investigation, remediation activities.

5                    (The witness reviewed the document.)

6                    THE WITNESS:  Those are the sites, the

7    active sites that I remember at the moment.

8                    I may be leaving out some of the less

9    significant sites, but those are the ones that I

10    remember at the moment.

11                    BY MR. STEWART:

12        Q.    Where could I find a list of those, all

13    of the sites?

14                    Does one exist at Saltire Industrial,

15    Inc?

16        A.    I don't believe we have a comprehensive

17    list of all sites.

18        Q.    You said active sites.  Can you tell me

Page 37

Bauer1

19    about any inactive sites?

20         A.    There are sites that have been settled

21    over the years, Stringfellow, for example, being,

22    you know, one of them, although we still have

42

1     other litigation as a result of that site.

2          There was the Auburn Road landfill, PJP

3     landfill.  There are many others.

4          Enterprise Recovery, we already

5     mentioned that one.  That's still ongoing.  Saad

6     site, S-A-A-D, Superfund site.

7          Q.    If you went back to your office, what

8     would you look at to, to develop a comprehensive

9     list of every inactive site and active site?

10         A.    Have to go back and look at my files.

11         Q.    What documents in those files would tell

12    you, allow you a way to comprehensively establish

13    all of your inactive and active sites?

14         A.    I would have to go back and piece that

15    together from probably several different sources

16    to come up with such a list, just going through

17    and looking, categorizing and going through the

18    list of each site that I have got, that I have

19    files on.

20         Q.    Would you be able to do that, though, if

21    you went back to your office, actually come up

Bauer1
22          with a complete list of all the active and

43

1       inactive sites that the company has been involved
2       with environmentally?
3            A.   It may not be entirely comprehensive.  I
4       could put together a more comprehensive list than
5       I can simply by recollection.
6            Q.   Okay.  So are you saying it's possible
7       that, that even with your records at your office,
8       the list that you would come up with of all the
9       sites active and inactive might not be totally
10      comprehensive?
11           A.   That's correct.
12           Q.   There might be some for which records no
13      longer exist?
14           A.   That's correct.
15           Q.   Okay.  Before we talk about these, have
16      you settled any litigation involving any of the
17      sites that you talked about, any of the
18      administrative sites you just described?
19                By you, I mean the company.
20           A.   I don't believe any of those settled.
21      Well, some of those past matters may have
22      involved litigation.

Page 39

Bauer1

44

```
 1              The ones I just mentioned do not
 2    involve, you know, settled litigation.  I think
 3    actually to go back, correct one thing on the
 4    Caldwell Trucking site, there is litigation with
 5    other potentially responsible parties and their
 6    insurance carriers in terms of other sites where
 7    there is active litigation.
 8         Q.   Do you know has any litigation been
 9    initiated relating to personal injuries or damage
10    to neighboring properties relating to any of
11    those sites?
12         A.   I don't recall.
13         Q.   Who in the company would be most likely
14    to recall any litigation relating to any of those
15    sites by which I mean all of the administrative
16    sites that you just described?
17              MR. LUCAS:  I'm going to object to the
18    form, object to the lack of foundation.
19              BY MR. STEWART:
20         Q.   Answer the question.
21         A.   Could you restate the question?
22         Q.   Certainly.  Do you know of anyone in the
```

45

Bauer1

1          company other than you who would be more likely
2          than you to have information about litigation
3          that would have arisen, if any, about these
4          sites?
5                    MR. LUCAS:  Based on that rephrasing, I
6          will withdraw my objection.
7                    THE WITNESS:  No, I don't.
8                    MR. LUCAS:  Do you mind if we take a
9          short break?
10                    MR. STEWART:  Let me -- I just have a
11          few questions on this line, and then I will
12          break.
13                    MR. LUCAS:  Okay.
14                    BY MR. STEWART:
15          Q.    I want to make sure.  Am I clear do you
16          not recall any settlements of any litigation
17          involving Saltire Industrial, Inc. or the
18          companies we described other than -- well, I
19          guess --
20          A.    There have been administrative
21          settlements associated with some of these other
22          sites.

46

1                    Whether some of these settled matters
2          may have also involved settlements of litigation,
                              Page 41

Bauer1

3      that's what I'm struggling to, you know, to

4      separate at the moment, and I don't recall

5      specifically sites where it was a settlement of a

6      litigated matter.

7          Q.   And I want to make sure you understand

8      that my question did not just involve the

9      question about any settlements, you know, about,

10     did not just relate to the specific sites you

11     mentioned, but any such settlements.

12             MR. LUCAS:  By settlement, you mean a

13     settlement of litigation as opposed to a

14     agreement, agreement with EPA to do such and such

15     on a site?

16             MR. STEWART:  Let me clarify, I mean a

17     settlement with a private party, not a

18     governmental body, relating to any of the sites

19     you have mentioned.

20             MR. LUCAS:  Thank you for the

21     clarification.

22             THE WITNESS:  And again, yes, my answer

47

1      is I don't recall there being any, any such

2      settlements at the moment.

3             BY MR. STEWART:

4          Q.   And do you recall any settlements

5      involving anything else with private parties not

Bauer1

6      specifically related to those sites?

7          A.   Relating to litigation, no.

8          Q.   How about relating to any claims,

9      whether litigated or not, involving property

10     damage or personal injuries?

11             MR. LUCAS:  I'm sorry.  What's the

12     question?

13             MR. STEWART:  The question is whether he

14     remembers the company entering into any

15     settlements regardless of whether litigation was

16     initiated that stem from accusations of personal

17     injuries or property damage.

18             MR. LUCAS:  And again, you mean

19     settlements with private individuals --

20             MR. STEWART:  Yes.

21             MR. LUCAS:  As opposed to administrative

22     matter with the government?

48

1              MR. STEWART:  Yes.

2              THE WITNESS:  Yeah.  No, I don't, I

3      don't recall any such matters.

4              BY MR. STEWART:

5          Q.   Is it possible that Wayne Smith has also

6      had information or has any information about such

7      matters?

8          A.   While Mr. Smith was dealing with, for

Page 43

Bauer1

9    example, the asbestos cases, you know, I can't
10   speculate as to, you know, what he knows and
11   doesn't, you know, doesn't recall.
12       I would be the one still in the company
13   probably with the best understanding of the
14   environmental matters anyway.
15   Q.   If you went back to your office, would
16   your files enable you to know for certain whether
17   any settlements had been made?
18   A.   Not comprehensively; certainly given the
19   long history of operation of including
20   predecessor companies, you know, it might shed
21   some light on, you know, materials that I, I have
22   dealt with in my term here in the company.

49

1    Q.   Do you think your files would reveal any
2    settlements of the companies entered in the last
3    decade from today?
4    A.   I would have records on environmental
5    matters certainly over the last five years.
6        In the preceding five years, I can't
7    suggest that I would necessarily have them all.
8        MR. STEWART:  Okay.  This is a good time
9    for a break.
10       THE VIDEO SPECIALIST:  Off record, and
11   the time on screen is 10:17:28.

Bauer1

12                (A recess was taken.)

13                THE VIDEO SPECIALIST:   On record, and

14      the time on screen is 10:30:48.

15                BY MR. STEWART:

16           Q.   Mr. Bauer, has the company ever been

17      accused of a crime?

18           A.   Not to my knowledge.

19           Q.   I take it you personally have not?

20           A.   No.

21           Q.   Has the company ever been assessed civil

22      fines by an administrative agency?

50

1            A.   There may have been fines for

2       environmental, alleged environmental violations.

3                 I don't recall any specifics.

4            Q.   Do you know who at the company would be

5       in the best position to know about fines that

6       have been paid out on, to regulators relating to

7       environmental claims?

8            A.   You know, I probably would be, actually

9       be in the best position to know, but I just

10      don't, you know, don't recall there being any.

11           Q.   Okay.  I want to make sure.  So you

12      don't recall there being any fines over the last

13      five years?

14           A.   That's correct.

                        Page 45

Bauer1

15          Q.    Okay.  Do you know of documents in your

16     files that would reveal whether or not the

17     company has been fined by the Environmental

18     Protection Agency or a state environmental

19     authority?

20          A.    Yeah.  I could review those files to

21     confirm my recollection.

22          Q.    Okay.  And would those files also enable


51


1          you to determine whether such fines had been

2          assessed prior to five years ago?

3               A.    My files are in  --

4                    MR. LUCAS:  I'm going to object to the

5          form of the question to the extent that it, it

6          seems to assume or imply that there are fines.

7                    I think he has testified that he doesn't

8          recall any fines.

9                    BY MR. STEWART:

10              Q.    It's my intention have -- tell me about

11         your files, five years -- if you looked at your

12         files relating to periods prior to five years

13         ago, would they reveal if the company had been

14         fined for environmental-related activities?

15              A.    I would suggest that they are not

16         comprehensive, that there may have been, you

17         know, activities that would not be, not be

Bauer1

18    reflected in the files.

19         Q.    Can you tell me what would account for

20    any non-comprehensiveness in your files relating

21    to environmental matters?

22         A.    In particular, former transactions,

52

1     sales of former businesses, typically the records

2     associated with those businesses would go with

3     the sale.

4          Q.    Are any of the environmental sites the,

5     where administrative activity has been initiated

6     that you listed, in the State of Tennessee?

7          A.    Other than the Dickson property that we

8     are, we talked about the site -- let's see.

9          Q.    I'm not trying to trick you.  I'll

10    mention you have a Saad --

11         A.    The Saad site is also in Tennessee.

12         Q.    Okay.  Can you tell me where the Saad

13    site is?

14         A.    I don't recall the name of the town.

15         Q.    Okay.  What do you recall about the

16    administrative action that occurred in that site?

17         A.    That actually really predated my

18    involvement with the company.

19               To my understanding, that was settled

20    and there was no, you know, no further

Page 47

Bauer1

21    involvement by the company.

22        Q.    Do you know whether or not it involved

53

1    contaminated land, the Saad site?

2        A.    The Saad site, to the best of my

3    knowledge, there was issue about, you know,

4    contamination or potential contamination at that

5    property.

6        Q.    Do you know if that involved potential

7    contamination to groundwater?

8        A.    I don't know the details of the Saad

9    site.

10        Q.    Okay.

11        A.    You know, that kind of information

12    presumably would be available through U.S. EPA or

13    similar kind of sources.

14        Q.    Do you know whether ICF Kaiser or IT

15    Corporation were involved with the Saad site?

16        A.    I don't believe so.

17        Q.    Okay.  Can you tell me which of the

18    sites that you listed, and I'll hand you the list

19    if it would help --

20        A.    Sure.

21        Q.    Are sites about which you have personal

22    knowledge.

Page 48

Bauer1

54

```
 1              (The witness reviewed the document.)
 2              THE WITNESS:  I have some degree of
 3     personal knowledge relating to all of those
 4     listed sites.
 5              BY MR. STEWART:
 6         Q.   Okay.  Does the City of Industry site
 7     that you mentioned involve contaminated or
 8     accusations of contaminated land?
 9         A.   Yes.
10         Q.   Does it involve a site that was operated
11     by the company?
12         A.   Yes.
13         Q.   So I take it that it is not a site where
14     the company simply was one of many companies
15     depositing potential waste?
16         A.   That's correct.
17         Q.   And was, was the Stringfellow site one
18     in which the company was involved as a company
19     that deposited waste with a landfill?
20         A.   Yes, one of many hundreds of others.
21         Q.   Okay.  What facility or factory does the
22     City of Industry, California, matter relate to?
```

Bauer1

```
 1          A.    The former Ajax Hardware facility.

 2          Q.    And was that owned by the company?

 3          A.    Yes.

 4          Q.    And does, does that environmental action

 5    involve contaminated groundwater?

 6          A.    Yes.

 7          Q.    Does it involve volatile organic

 8    compounds?

 9          A.    Yes.

10          Q.    Does it involve trichloroethyene?

11          A.    Yes.

12          Q.    Does it involve also other contaminants

13    like heavy metals?

14          A.    The groundwater contamination does not

15    involve heavy metals.

16                There were some metals identified in

17    soils that had been remediated.

18          Q.    Has the company conceded that the Ajax

19    Hardware facility contaminated the groundwater in

20    that area that you know of?

21          A.    The company is pursuing and it continues

22    to perform cleanup and monitoring activities at
```

                                        Bauer1
1     that site.

2              Whether there has been any kind of

3     actual admission of contamination, I don't know.

4        Q.    Is any other company performing

5     remediation or monitoring activities at that

6     site?

7        A.    No.

8        Q.    Have any monitoring activities been

9     conducted off the property on which the Ajax

10    Hardware facility sat?

11       A.    Yes.

12       Q.    And have any monitoring wells or soil

13    samples or soil borings revealed contamination of

14    off-site property?

15       A.    Yes.  It's a regional groundwater

16    problem.

17       Q.    So have wells off site revealed that the

18    aquifer in the area has trichloroethylene in it?

19       A.    Yes.

20       Q.    Okay.  Do you know if the company has

21    used any environmental specialists or engineers

22    in that site or with regard to that site?

                                                        57

1              MR. LUCAS:  Question -- are you asking

2     about people as, they have used as consultants on

3     that site?

                        Page 51

Bauer1

4          MR. STEWART:  Yeah.  Let me clarify.

5          BY MR. STEWART:

6     Q.    First of all, has any person, employee

7     of ICF Kaiser Engineers worked at the or with

8     regard to the Ajax Hardware facility site?

9     A.    No.

10    Q.    Okay.  Has any person related to or

11    employed by IT Corporation worked at that site?

12    A.    No.

13    Q.    Okay.  Do you know the name of any

14    environmental engineers or other environmental

15    specialists who have been retained by the company

16    to work on that site?

17         MR. LUCAS:  Hold on.  Here is my concern

18    over that question.

19         MR. STEWART:  Please.

20         MR. LUCAS:  I don't know personally

21    whether there's potential litigation over that

22    site or not.

58

1          If there is, and if there are people who

2     have been retained as consultants, as you know,

3     non-testifying consultants --

4          MR. STEWART:  I understand your concern.

5     I think we can agree that, that what I'm entitled

6     to know and really all I'm interested in knowing

Page 52

Bauer1

```
 7      is the name of the environmental engineering firm
 8      that is operating on that site rather than the
 9      particular potentially non-testifying experts.
10          MR. LUCAS:  If there's an environmental
11      consulting firm working on that that's publicly
12      known, then you can disclose that.
13          Is that fair enough, counsel?
14          MR. STEWART:  It is, although I would
15      say I think, I believe that the fact that the
16      experts are non-testifying in another case
17      probably does not exclude discovery of them in
18      this case, but I don't really care at this
19      juncture because I don't  --
20          MR. LUCAS:  If you don't care, then it's
21      probably not an issue, but let me tell you my
22      concern so that I'm not trying to hide a ball
```

59

```
 1      from you.
 2          If there were in the future litigation
 3      over that, and if there were people who were
 4      retained as consultants in anticipation of
 5      litigation, then we would not want to disclose
 6      them publicly unless you might have waived it,
 7      and I don't know if that's the case here or not,
 8      but I think, I think that based upon our
 9      agreement and the focus of your question, you can
```

Page 53

Bauer1

10    go ahead and answer for publicly known project

11    engineers.

12          THE WITNESS:  So the question, could you

13    repeat it?

14          BY MR. STEWART:

15    Q.    I just want to know if the company's

16    retained an engineering firm similar to ICF

17    Kaiser if you will to deal with the regional

18    groundwater problem relating to the Ajax Hardware

19    facility?

20    A.    Meredith Boli, B-O-L-I, and Associates,

21    has been the firm assisting the company at the

22    Ajax site.

60

1          Q.    And how long has the Environmental

2    Protection Agency been interested in that site?

3          A.    Actually this is a site that's being,

4    work is being done under the auspices of the

5    Regional Water Quality Control Board.

6                It's a state agency.

7          Q.    How long have they been involved with or

8    curious about contamination on the Ajax Hardware

9    facility?

10                MR. LUCAS:  Object to the form of the

11    question.

12                BY MR. STEWART:

Page 54

Bauer1

13        Q.    Well, put it this way.  How long, when

14    was the first time that you know of that the

15    company met with or wrote to officials of the

16    California or the Regional Water Quality Control

17    Board about this site?

18              MR. LUCAS:  Based on that clarification,

19    I withdraw the objection.

20              THE WITNESS:  Mid-1980s.

21              BY MR. STEWART:

22        Q.    Okay.  When did the site close or cease

                                                        61

1     operations?

2         A.    Similar timeframe.

3         Q.    Okay.  Was that site clean closed?

4         A.    There were no hazardous waste units on

5     the site, so there really wasn't an issue of

6     clean closure or not.

7         Q.    So no RCRA clean closure documents were

8     ever filed?

9         A.    That's right.

10        Q.    Okay.

11        A.    There is a, no further action letter

12    from the Regional Water Quality Control Board

13    relating to the remedy, remediation that was

14    done, so while it's not exactly a clean closure,

15    it's similar.

                    Page 55

Bauer1

16          Q.     What would the letter, when would that

17     letter have been dated?

18          A.     I don't recall the, I don't recall the

19     date of that.

20                 That would have been late 1980s

21     probably.

22          Q.     When or do you know when concerns were

62

1      first raised by anyone that the groundwater near

2      the Ajax Hardware facility was contaminated?

3           A.     I don't believe there was any concern

4      raised about the Ajax site contamination or

5      constituents were identified during the process

6      of closure of the facility.

7                  Now the regional, the other half of your

8      question about, related to the regional problem

9      and the groundwater, and that, I don't know when

10     that, that regional problem was identified, but

11     it was prior to then in the 1970's.

12          Q.     When was, do you know when anyone first

13     attempted to link the problem of regional

14     contamination of the groundwater to the Ajax

15     facility?

16          A.     Not specifically; I would say that was

17     some time starting in the 1990s.

18          Q.     Okay.  Do you know whether or not the

Page 56

Bauer1

19    first person or entity to raise that concern was

20    the company?

21              MR. LUCAS:  What concern?

22              MR. STEWART:  I'll rephrase.

63

1              BY MR. STEWART:

2         Q.    Do you know whether or not the first

3    person or entity to raise concerns that the Ajax

4    hardware facility was a source of contamination

5    of groundwater was the company?

6         A.    No, I don't know.

7         Q.    You don't know, or it wasn't?

8         A.    I don't know whether, what the mechanism

9    was, what the initiation was for linking, linking

10    the two.

11        Q.    Do you know if the Regional Water

12    Quality Control Board or anyone else conducted an

13    investigation on site at the Ajax Hardware

14    facility?

15        A.    No.  We have always worked with the,

16    with the Regional Water Quality Control Board and

17    done the worked with the board to design

18    monitoring remediation work that was done, so we

19    were following the directions of the Regional

20    Water Quality Control Board.

21        Q.    Do you know what fact came to light in

Page 57

Bauer1
22        the 1990s that raised concerns that the Ajax

64

1        Hardware facility was a source of contamination
2        of the regional aquifer?
3            A.    To try to clarify the earlier response,
4        it's a matter really of just greater
5        understanding of the regional problem itself I
6        would say and the scope of the regional
7        groundwater, the scope of the regional
8        groundwater problem.
9            Q.    Well, what fact about the scope of the
10       regional groundwater problem raised concerns in
11       the nineties that the Ajax Hardware facility was
12       a source of groundwater contamination?
13           A.    I don't think I can speculate on to what
14       the specifics, you know, were because I don't
15       know.
16           Q.    Did you personally have any involvement
17       with this site, the Ajax Hardware facility, from
18       1990 to 1995?
19           A.    No.
20           Q.    The remediation of the Caldwell Trucking
21       Superfund site, did that involve a site that had
22       been operated by the company?

Bauer1

1          A.    No.
2          Q.    Is that a Superfund site where the
3    company is alleged to have deposited waste?
4          A.    That's correct.
5          Q.    Was the company one among many companies
6    that is involved with that site?
7          A.    Yes.
8          Q.    Does that site involve contaminated
9    groundwater?
10         A.    Yes, it does.
11         Q.    Does that site involve contamination of
12   groundwater with volatile organic compounds?
13         A.    That's correct.
14         Q.    And do the volatile organic compounds of
15   concern at that site include trichloroethylene?
16         A.    They do.
17         Q.    Okay.  Has anyone alleged that the
18   company is one of the sources of that
19   trichloroethylene that is in the groundwater?
20   I'll restate.
21              Has it been alleged that the company is
22   a source of any volatile organic compounds in the

Bauer1

1      groundwater near the Fairfield, New Jersey,
2      Superfund site.
3          A.    In terms of because of the waste
4      disposal at the Caldwell Trucking site?
5          Q.    Yes.
6          A.    Yes.
7          Q.    Is there a particular facility that was
8      owned by the company that supposedly placed
9      contaminants in the Caldwell Trucking Superfund
10     site?
11         A.    Yes.
12         Q.    Which facility is that?
13         A.    General Hose Products.
14         Q.    And where is that located?
15         A.    It is also in Fairfield, New Jersey.
16         Q.    Did the General Hose Products Company
17     dispose of volatile organic compounds in that
18     landfill that you know of?
19         A.    Not to our knowledge.  There -- we don't
20     believe that the company was a source of volatile
21     organic compounds.
22         Q.    Okay.  The EPA Region 9 investigation at

67

1      the Puente Valley Operable Unit, does that
2      involve a site that was once operated by the
                        Page 60

Bauer1

```
 3    company?
 4         A.    That relates back to the Ajax Hardware
 5    property.
 6         Q.    Tell me about that relation so I can
 7    understand the relation between the Puente Valley
 8    Operable Unit and the Ajax Hardware facility?
 9         A.    The Puente Valley  --
10               MR. LUCAS:  I'm sorry.  Would you mind
11    repeating that question for me?
12               BY MR. STEWART:
13         Q.    What is the relationship between the
14    Puente Valley Operable Unit and the Ajax Hardware
15    facility?
16         A.    The Ajax facility is located in Puente
17    Valley.
18               It's a, it's just a region in California
19    that encompasses several towns, including the
20    City of Industry, so as one of, as being
21    physically located within this valley in this
22    area of regional groundwater contamination, it's
```

68

```
 1    one of many potentially responsible parties
 2    associated with the Puente Valley site.
 3               The Puente Valley, work for the Puente
 4    Valley Operable Unit is being overseen by the
 5    U.S. EPA, and involves regional groundwater
```
Page 61

Bauer1

6      monitoring and remediation, whereas the work at
7      the Ajax site and other site-specific work of
8      other potentially responsible parties is overseen
9      by the Regional Water Quality Control Board, the
10     state agency.
11          Q.    Did -- maybe I missed it.   What
12     physically happened at the Puente Valley Operable
13     Unit with regard to the Ajax Hardware facility?
14              Was waste disposed there?
15          A.    The Puente Valley Operable Unit is
16     simply a regional groundwater contaminated area
17     with an area of many industries located in the
18     Valley, and commingled groundwater plumes from
19     many facilities, creating a regional groundwater
20     problem.
21          Q.    Where is the Puente Valley?   That is
22     where is the San Gabriel Valley I guess?

69

1          A.    It's southern California.
2          Q.    Where?
3          A.    North of and east of Los Angeles.
4          Q.    Okay.   Is, is the involvement of the
5      company in the EPA Region 9 investigation solely
6      based on occurrences at the Ajax Hardware
7      facility plant?
8          A.    Yes.
              Page 62

Bauer1

```
9           Q.     Okay.  Is Meredith Boli & Associates
10     working independently on the Puente Valley
11     Operable Unit cleanup?
12           A.     No.
13           Q.     Are any other engineers working for the
14     company relating to the Puente Valley Operable
15     Unit separate and apart from the Ajax Hardware
16     facility?
17           A.     The Camp, Dresser & McKee is the
18     consulting firm working on the Puente Valley
19     issue.
20           Q.     The State of Connecticut, Watertown,
21     Connecticut, issue, does that involve a plant or
22     facility or factory operator owned by the
```

                                                    70

```
1     company?
2           A.     Yes.
3           Q.     What factory or facility is that?
4           A.     It was a, a Scovill facility in
5     Watertown.
6           Q.     What was produced there?
7           A.     Buttons, snaps, zippers, all kinds of
8     products.
9           Q.     Was it a metal working factory?
10           A.     Primarily.
11           Q.     By the way, was the Ajax Hardware
```
                          Page 63

Bauer1

12    facility a metal working factory?

13         A.    Primarily.

14         Q.    Okay.  Does the Watertown, Connecticut,

15    site involve groundwater contamination?

16         A.    Yes.

17         Q.    And does it involve contamination of the

18    groundwater with volatile organic compounds?

19         A.    Yes.

20         Q.    And among the volatile organic compounds

21    found in the groundwater, does it involve

22    trichloroethylene?

71

1          A.    Yes, it does.

2          Q.    How long has -- well, is the company

3    currently involved in groundwater testing or

4    remediation at that site?

5          A.    Involved in ongoing monitoring at the

6    site.

7          Q.    Has the company installed groundwater

8    monitors off the site?

9          A.    No.

10         Q.    Has the company conducted any

11    groundwater monitoring or soil testing or soil

12    boring off the site?

13         A.    No.

14         Q.    Okay.  Is there any evidence that, well,

Bauer1

15    has trichloroethylene been found in monitoring
16    wells on site?
17         A.   Yes.
18         Q.   Okay.  Has trichloroethylene or any
19    other compound of concern been found off site?
20         A.   No.
21         Q.   How long has the monitoring on this
22    site, the Connecticut site, been performed?

72

1         A.   I don't recall when that, when that
2    started.
3         Q.   Would it have been before 1990?
4         A.   Yes.
5         Q.   Okay.
6         A.   I expect that site to be, you know,
7    closed -- not physically closed, but the
8    environmental issues to be closed shortly.
9         Q.   Was that site ever clean closed?
10         A.   Again, it was not, there weren't any
11    RCRA units for clean closure to be applicable.
12         Q.   Can you just, so we'll have it clear on
13    the record, can you tell me what you mean by a
14    RCRA unit?
15         A.   A storage treatment or disposal facility
16    handling hazardous wastes.
17         Q.   And is that, was the contamination on
                    Page 65

Bauer1

18    this site a result not of storage of waste but

19    perhaps leaks or that sort of thing?

20        A.    The source of contamination was never

21    explicitly identified.

22        Q.    Is the, but I guess is what you're

73

1    saying that there were no RCRA storage units,

2    there was no landfill or established storage area

3    for waste on the site?

4        A.    That's correct.

5        Q.    Okay.  So -- but trichloroethylene, was

6    that used at that facility?

7        A.    Yes.

8        Q.    Okay.  Do you know when facts came to

9    light that revealed contamination in the

10    groundwater?

11        A.    I don't recall when that, when that

12    occurred.

13        Q.    Would it have been before 1990?

14        A.    Yes.

15        Q.    Do you have any knowledge as to what

16    person or entity discovered the facts that

17    revealed contaminated groundwater?

18        A.    The company identified the, those facts

19    in the course of closure of the, of the facility.

20        Q.    At that time, was the company working

Bauer1

21      with the EPA or the state officials?

22          A.    State officials.

74

1       Q.    Okay.

2           A.    And back on similar questions relating

3       to the Ajax Hardware site, all the data related

4       to the site was data generated by the company

5       working with, under the direction of the regional

6       water control, Water Quality Control Board.

7               There wasn't, you know, other

8       independent investigations by other parties or

9       the government.

10          Q.    When the information at Ajax was

11      provided to regulators, the Water Quality Control

12      Board, was the Water Quality Control Board

13      already, had it already raised concerns about

14      potential contamination on the site?

15          A.    We're doing, as I understand it, doing

16      routine closure activities and monitoring

17      associated with closure of the facility, so there

18      weren't any other more specific concerns raised

19      prior to that time.

20              There weren't any understanding or were,

21      there weren't any knowledge or expectation of

22      finding contamination or contaminants.

Page 67

Bauer1

75

```
 1          Q.    And so was the, as part of closure, was
 2     the company trying to monitor groundwater to show
 3     that there wasn't contamination so it could close
 4     the site?  Is that --
 5          A.    Just performing monitoring to fulfill
 6     the requests of the Regional Water Quality
 7     Control Board.
 8          Q.    I see.  And is that what happened in the
 9     Watertown, Connecticut, site, too, basically?
10          A.    Yes.
11          Q.    Okay.  Okay.  You mentioned a Solvent
12     Recovery Services of New England site in
13     Southington, Connecticut.
14               Is that different from the Watertown,
15     Connecticut, site?
16          A.    Yes.
17          Q.    Does that involve a factory facility or
18     plant that was owned or operated by the company?
19          A.    No.
20          Q.    Is that a Superfund site at which the
21     company deposited or is alleged to have deposited
22     waste?
```

Bauer1

1      A.    Yes.

2      Q.    Okay.  Is the company one of a number of

3   companies that were involved?

4      A.    Yes.

5      Q.    Is the, does that case, does that

6   matter, the Southington, Connecticut, Solvent

7   Recovery Services of New England matter involve

8   poisoned -- I'll restate that -- involve

9   contaminated groundwater?

10      A.    Yes.

11      Q.    Does it involve groundwater contaminated

12   with volatile organic compounds?

13      A.    Yes.

14      Q.    Does it involve groundwater contaminated

15   with trichloroethylene?

16      A.    Yes.

17      Q.    Is it alleged that the company

18   contributed to the volatile organic compounds and

19   trichloroethylene in the groundwater?

20      A.    It's alleged that the company sent waste

21   materials to Solvent Recovery Systems for

22   recycling.

Bauer1

1      Q.    Is it alleged that a particular

2  operation of the company was responsible for

3  sending those waste materials, a particular

4  factory?

5      A.    I don't recall which facilities were

6  involved with sending materials or alleged to

7  have sent materials to that site.

8      Q.    Do you know how many facilities Scovill

9  had or the company I'll say, was operating in

10  Connecticut at that time?

11      A.    No, I do not know.

12      Q.    Do you know the timeframe when the waste

13  was allegedly generated that went into the

14  Solvent Recovery Services of New England site?

15      A.    I don't recall.  I would have to review

16  that material.

17      Q.    Was it before 1985?

18      A.    Again, I don't recall.

19      Q.    Okay.  Now is the old Southington

20  landfill a different site from the Recovery

21  Services of New England site?

22      A.    Yes.

78

1      Q.    Is that a site involving a plant or

2  facility or operation owned by the company?

3      A.    No.

Page 70

Bauer1

4    Q.    Is that a CERCLA site where the company

5    allegedly deposited waste?

6    A.    Indirectly, yes.

7    Q.    Okay.  Tell me what you mean by

8    indirectly.

9    A.    Waste from the Solvent Recovery site

10    were disposed of at old Southington landfill.

11    Q.    I see.  And so is there groundwater

12    contamination at the old Southington landfill?

13    A.    Yes.

14    Q.    Is that contamination with volatile

15    organic compounds?

16    A.    Yes.

17    Q.    And is that contamination with

18    trichloroethylene?

19    A.    That's a constituent there, yes.

20    Q.    Okay.  Has the company accepted or

21    admitted that trichloroethylene from its

22    operations got into the groundwater at the old

79

1    Southington landfill site?

2    A.    No.  I don't believe we have ever made

3    such an admission.

4    Q.    Had the company ever admitted that any

5    of its trichloroethylene or other hazardous

6    materials got into the groundwater at the Solvent

Page 71

Bauer1

```
 7         Recovery Services of New England site?
 8              A.   No.  Again, I don't think we have ever
 9         made such an admission.
10                   You know, we're participating at those
11         sites, but in terms of legal issues of having
12         made such an admission, I don't believe so.
13              Q.   Okay.  You said you're participating at
14         the site.
15                   How are you participating at the New
16         England Solvent Recovery Systems of New England
17         site?
18              A.   As part of a potentially responsible
19         party group.
20              Q.   Do you know how many potentially
21         responsible parties there are in that group?
22              A.   There are many dozens.  I don't remember
```

                                              80

```
 1         the number.
 2              Q.   Has one firm been retained to work with
 3         the environmental agencies to clean up that site
 4         by this group?
 5              A.   Yes.
 6              Q.   Is that ICF Kaiser?
 7              A.   No.
 8              Q.   Is it IT?
 9              A.   No.
```

Bauer1

10          Q.    Do you know who it is?

11          A.    The sort of management consultant is

12    American Environmental Consultants.

13          Q.    Do you know where they're located?

14          A.    No.  I don't recall.

15          Q.    Do you know who the project manager,

16    other person in charge of that site is?

17          A.    Randy Smith.

18          Q.    Okay.  Do you know a name of the project

19    manager involved at the Ajax site?

20          A.    William Hass.

21          Q.    Okay.  And the manager at the Watertown,

22    Connecticut, site, do you know who that is?

81

1           A.    Mike Lowe.

2           Q.    Okay.  Did I ask you -- I don't think

3     so -- who the -- is ICF Kaiser involved with the

4     Watertown, Connecticut, site, or have they been?

5           A.    Yes.

6           Q.    Is IT Corporation now responsible for

7     that site?

8           A.    Yes.

9           Q.    Okay.  The Enterprise Recovery Systems

10    site, where is that?

11          A.    Mississippi.

12          Q.    Does that involve a plant or facility

Page 73

Bauer1

13       that had been operated by the company?

14              A.    No.

15              Q.    Is that a CERCLA site where the company

16       is alleged to have deposited waste?

17              A.    Yes.

18              Q.    What facility of the company is alleged

19       to have participated in depositing waste?

20              A.    I do not recall which facilities are

21       involved there.

22              Q.    Do you know if the company has over time

82

1        had more than one facility in Mississippi?

2               A.    No, I do not know.

3               Q.    Do you know of any facilities in

4        Mississippi?

5               A.    No, I don't.

6               Q.    Okay.  Do you know if the Enterprise

7        Recovery Systems site involves a contaminated

8        groundwater?

9               A.    I don't recall.  I think, I believe it

10       does, yes.

11              Q.    Do you recall whether or not the

12       groundwater is contaminated with volatile organic

13       compounds?

14              A.    We're a minor player at the site, and I

15       just don't, I don't remember.

Page 74

Bauer1

16          Q.    Okay.  Do you know who the engineering

17    firm that is handling that site remediation is?

18          A.    I don't recall.

19          Q.    Okay.  You say you're a minor player.

20    Is that because of the amount of waste deposited?

21          A.    Yes.

22          Q.    Okay.  In the, in the New England site,

83

1     Recovery Services' New England site, is Scovill,

2     is the company a major player?

3          A.    No.

4          Q.    Is the company a major player at

5     Southington, Connecticut?

6               MR. LUCAS:  Object to the form of the

7     question.

8               MR. STEWART:  Okay.

9               THE WITNESS:  We are considered, you

10    know, very small players in and contributors to

11    the, to either one of those sites.

12              BY MR. STEWART:

13         Q.    Either one meaning the --

14         A.    Old Southington or the Solvent Recovery

15    site.

16         Q.    Okay.  Caldwell Trucking, are you a

17    significant player in your mind?

18              MR. LUCAS:  Object to the form.

Page 75

Bauer1

19          THE WITNESS:  What do you mean by

20    significant in that case?

21          BY MR. STEWART:

22      Q.    I was kind of keying off your

84

1    terminology.

2          I mean is your involvement in that

3    Caldwell Trucking matter more substantial than in

4    the New England Solvent Recovery Services?

5      A.    Yes, that's fair to say.

6      Q.    Okay.  And who are the, who are the

7    engineers involved with the remediation of the

8    Caldwell Trucking Superfund site?

9      A.    By engineers, you mean the sort of

10    design and construction?

11      Q.    ICF Kaiser equivalent, if that helps

12    you.

13      A.    Okay.  Golder Associates.

14      Q.    And who is the project manager?

15      A.    Grant Hocking.

16      Q.    Okay.  Okay.  You mentioned an Arrowhead

17    Plating site in Montrose, Virginia.

18          Does that involve a facility plant or

19    operation that was owned or operated by the

20    company?

21      A.    Yes.

Bauer1

22          Q.    Okay.  Does that involve a contaminated

85

1      groundwater?

2          A.    Yes.

3          Q.    Is the groundwater contaminated with

4      volatile organic compounds?

5          A.    Yes.

6          Q.    Is one of the volatile organic compounds

7      in the groundwater trichloroethylene?

8          A.    Yes.

9          Q.    Okay.  Is -- how long has it been known

10     that there are volatile organic compounds in

11     groundwater at that site?

12         A.    Closure of that site again occurred in

13     mid-1980s, and at that time, monitoring, initial

14     monitoring was conducted, and volatile organic

15     compounds were identified.

16         Q.    Okay.  The monitoring was conducted by

17     the company?

18         A.    Yes.

19         Q.    Okay.  At that time, was this a site

20     where there were RCRA units?

21         A.    I don't recall whether there were RCRA

22     units at that site or not.

Page 77

Bauer1

86

```
 1              It was, the actual closure of the
 2     facility was prior to my time, and I don't recall
 3     whether there were any RCRA units there.
 4              I don't believe so.
 5         Q.    Okay.  So was the site clean closed, or
 6     do you recall?
 7         A.    No, I don't recall.  I mean I don't
 8     recall.
 9         Q.    But closure, was closure being conducted
10     with environmental authorities?
11         A.    Yes.
12         Q.    And at that time, groundwater testing
13     was done?
14         A.    That's correct.
15         Q.    And that's when the trichloroethylene
16     was found?
17         A.    Yes.
18         Q.    And I think that you said this, but
19     that's what occurred essentially at the Ajax
20     Hardware facility?
21         A.    Yes.
22         Q.    And that's what occurred at the
```

87

Bauer1

1    Watertown, Connecticut, facility?

2        A.    That's correct.

3        Q.    Okay.  And now at Arrowhead Plating,

4    were groundwater monitoring devices, soil samples

5    or soil borings taken off the site grounds?

6        A.    Yes.

7        Q.    Okay.  Has any contamination with

8    volatile organic compounds been revealed to exist

9    off the site grounds?

10       A.    Yes.

11       Q.    Okay.  Can you tell me the nature of the

12   contamination that you know of that has occurred

13   at the Arrowhead Plating facility off the site

14   grounds?

15       A.    Nature meaning the type of constituents

16   or --

17       Q.    Well, I would like to know the type of

18   the constituents and how far off the site they

19   have traveled.

20       A.    The constituents are volatile organic

21   compounds.

22             Migration is limited by natural surface

88

1    features.

2             I don't recall exact distances.  It's in

Page 79

Bauer1

3      the order of a few hundred feet at the most.

4          Q.   Would there be public records that would

5      show exactly how many feet, that sort of thing,

6      and the exact nature of it?

7          A.   Yes.

8          Q.   By the way, as long as we're talking

9      about these things, you mentioned a plume when we

10     were talking earlier.

11              Can you tell me what a plume is just

12     when you use that term.

13         A.   It's probably not a very precise term,

14     so I'll try to be more precise in the answers.

15         Q.   Sure.

16         A.   But I would generally describe a plume

17     as a region of groundwater in which particular

18     compounds, substances have been detected.

19         Q.   Okay.  Does a plume mean all the

20     contaminants in the ground, or just the kind of

21     the source area?

22         A.   I wouldn't describe it as either.

                                                   89

1          Q.   Okay.

2          A.   You can define a plume at some

3      particular concentration level, and you know,

4      there are going, there are going to be molecules

5      beyond what you draw as a, as a, as a plume, but

Bauer1

6    it is basically a concentration defined area.

7        Q.    So if I say, if I were to describe, is

8    this right, a plume of trichloroethylene at ten

9    UG/L, then that means this is where we think

10   trichloroethylene at that level has flowed?

11            Is that what that means?

12       A.    Or whether it has flowed or not,

13   whatever, that's where it has been identified and

14   it's extrapolated to from a limited number of

15   data points to be within that area, and if by

16   UG/L micrograms per liter, is that the -- parts

17   per billion?

18       Q.    Um-hm.

19       A.    Sort of concentration level, whatever it

20   happens to be?

21       Q.    Okay.  Yeah, and because we'll be

22   referring to this a lot, parts per billion and

90

1    UG/L, we can use those terms interchangeably, is

2    that correct?

3        A.    Micrograms per liter, I mean it's, a U

4    is actually a mew I think.  It's one of those

5    little, you know, Roman kind of --

6        Q.    Right.

7        A.    Or Greek letters; that is the symbol for

8    micro, so it's a microgram per liter.

Page 81

Bauer1

9      Q.    If I say five UG/L TCE in the

10   groundwater and you say five PPB in the

11   groundwater of TCE, are we talking about the same

12   thing?

13      A.    Approximately, yes.

14      Q.    Okay.  Do you know if that's the maximum

15   contaminant level of, level for TCE in

16   groundwater?

17      A.    Five micrograms per liter is the maximum

18   contaminant level for TCE.

19         It has no particular bearing on

20   groundwater.

21      Q.    Oh, okay, but that's the maximum

22   contaminant level for trichloroethylene?

91

1      A.    Yeah.  For maximum, right, that's

2   correct.

3      Q.    What does the maximum contaminant level

4   mean?

5      A.    It's a EPA established level that

6   applies to, applies at the drinking water tap,

7   and is a level that water purveyors with a

8   certain, of a certain size are required to have,

9   to monitor and to ensure that the water provided

10   to their customers is at or below that level.

11      Q.    Okay.  And so public water, public water

Bauer1

12    for the City of Washington can't have over five

13    UG/L of trichloroethylene in it?

14        A.    That's correct.

15        Q.    Okay.  The inactive sites, the Auburn

16    Road landfill, was that involving a plant or

17    facility run or owned by the company?

18        A.    No.

19        Q.    Was that a CERCLA site where the company

20    was alleged to have deposited materials?

21        A.    Again, one of, you know, one of many

22    potentially responsible parties, generators.

92

1        Q.    Does that site involve contaminated

2    groundwater?

3        A.    Yes.

4        Q.    Does that site involve groundwater

5    contaminated with volatile organic compounds?

6        A.    I don't recall the constituents of

7    concern there.

8        Q.    Okay.  How about the PGP landfill?

9        A.    Similar question?

10        Q.    Yeah.  Does that, is that a CERCLA site

11    where the company is alleged to have contributed

12    hazardous materials?

13        A.    This site at which, yes, the company is

14    alleged to have arranged for the disposal of

Page 83

Bauer1

15      wastes there.

16          Q.   Is that a site where the company is

17      alleged to be the primary source of waste?

18          A.   No.

19          Q.   Okay.  Are any of the sites that we have

20      described so far that have not involved a

21      company-owned facility, have any of those sites

22      been sites in which the company is alleged to

93

1       have been the primary source of contamination?

2           A.   No.

3           Q.   Is the -- where is the Auburn Road

4       landfill?

5           A.   I don't recall.  I have to check.

6           Q.   Okay.  Where is the PGP landfill?

7           A.   It's in New Jersey.

8           Q.   Where at?

9           A.   North Jersey some place; I don't

10      remember the name of the town.

11          Q.   Hopefully my English teacher will never

12      watch this tape!

13              MR. LUCAS:  Can I object to the form of

14      the dangling preposition?!

15              Do you want me to object ever time you

16      dangle a preposition?

17              MR. STEWART:  Please no.  It would make

Bauer1

18    the tape impossible to watch!

19            BY MR. STEWART:

20        Q.    Is this, the Saad Superfund site, was

21    the company alleged to have been the primary

22    source of materials deposited at that site?

94

1        A.    I don't know.  Again, I wasn't really

2    involved in that site.

3        Q.    Okay.  Do you know whether or not that

4    site involved contamination of groundwater?

5        A.    No, I don't.

6        Q.    Okay.  Do you know what engineers were

7    involved with remediating that site?

8        A.    No, I do not.

9        Q.    Okay.  Do you know -- I take it that

10    site is not a site where the company owned a

11    plant or operation?

12        A.    That's correct.

13        Q.    Okay.  Do you receive reports on the

14    Ajax site on a monthly basis?

15        A.    No.

16        Q.    Do you receive reports on any of the

17    sites that we have discussed or that you have

18    listed as having administrative activities

19    ongoing or past on a monthly basis?

20        A.    Yes.

Page 85

Bauer1

21      Q.    What sites do you receive reports on?

22      A.    There are reports filed with the

95

1       Environmental Protection Agency at the, for the

2       Arrowhead Plating site and the Dickson site and

3       the Caldwell Trucking site, all in, on a monthly

4       basis, and I receive copies of those reports.

5       Q.    Okay.  How about the Watertown site?

6       A.    No.

7       Q.    Why are there no reports being filed at

8       Ajax, well, I don't want to put words in your

9       mouth.

10            What reporting is going on at the Ajax

11      Hardware facility?

12      A.    Semi-annual groundwater monitoring

13      report.

14      Q.    Okay.  And at the Watertown,

15      Connecticut, facility?

16      A.    Monitoring reports, and we are currently

17      working toward closure of that facility.

18            MR. LUCAS:  Excuse me.  We have got one

19      minute left on the tape according to the

20      videographer.

21            THE WITNESS:  Can we take a break?

22            MR. LUCAS:  Why don't we go ahead and

Bauer1

96

1    take a short break?  And we'll resume with a new
2    tape.
3            THE VIDEO SPECIALIST:  Off record, end
4    of Tape 1, and the time on screen is 11:26:52.
5            (A recess was taken.)
6            THE VIDEO SPECIALIST:  On record; this
7    is Tape 2, and the time on screen is 11:45:36.
8            BY MR. STEWART:
9        Q.    Mr. Bauer, back on the record; I have a
10   few questions about these administrative actions.
11       A.    Yes, sir.
12       Q.    Do you know if the -- I don't know if we
13   tried to assign a date to the Ajax Hardware
14   facility.
15           Do you know when contamination was first
16   discovered there?
17       A.    Again, it was mid, mid-1980s.
18       Q.    Do you think it predated say the closure
19   of the Dickson plant?
20       A.    It's similar kind of timeframe.  I would
21   say perhaps.  You know, it's similar timeframe.
22       Q.    Okay.  How about the Watertown,

Bauer1

```
 1    Connecticut, site?  Did that --
 2         A.    I would have to check on the exact
 3    dates; similar, similar timeframe.
 4         Q.    Mid-'80s?
 5         A.    Mid to late '80, yes.
 6         Q.    That's for Watertown?
 7         A.    Yeah.
 8         Q.    Okay.  And how about the Arrowhead
 9    Plating, which I notice is now, did you say
10    it's -- well, no.  I won't put words in your
11    mouth.
12              Do you know the date timeframe for the
13    discovery of contaminants at Arrowhead Plating?
14         A.    Again, closure there was in a similar
15    timeframe, mid-1980s.
16         Q.    I take it for all three of those sites,
17    could we look at, you know, I mean would you
18    assume there would be public, would you assume
19    there would be company records that would show,
20    you know, the first time that volatile organic
21    compounds were discovered in groundwater near
22    those sites?
```

Bauer1

1          A.    Yes.

2          Q.    Okay.  Have there been Phase 1 reports

3    of the sort performed or created for the Dickson

4    facility created relating to the Arrowhead

5    Plating facility?

6          A.    There have been investigation reports

7    not titled similarly, but with investigation

8    results.

9          Q.    So I could go to the EPA you think and

10   find an investigative report that would probably

11   tell me when the date was that you or that say

12   trichloroethylene was first discovered in the

13   groundwater at Arrowhead Plating?

14         A.    I would think so.

15         Q.    And the same would be true for the

16   Watertown, Connecticut, site?

17         A.    Yes.

18         Q.    And the same would be true for the Ajax?

19         A.    At Ajax, you would need to go to the

20   Regional Water Quality Control Board.

21         Q.    Okay.  And you probably have records of

22   that sort at your company for all three sites?

99

1          A.    Yes.  I have the investigation reports,

2    and to the extent that they document, you know,

3    initial findings, I have those.

Page 89

Bauer1

4      Q.    Okay.

5      A.    I may not have every report that was

6    filed certainly for some of these sites.

7      Q.    Okay.

8      A.    But --

9      Q.    Do you recall when trichloroethylene was

10   first found in groundwater at the Dickson site?

11     A.    That would be the first reported

12   incidence, reports of that were May 1988.

13     Q.    Okay.  What report are you referring to?

14     A.    The compliance -- what do they call it?

15   The CMI, the compliance management inspection

16   report that was prepared on behalf of U.S. EPA.

17     Q.    I'm going to hand Mr. Bauer first

18   through his attorney Exhibit 18 from the Brand

19   deposition, which I believe is the CMI report he

20   referred to without its appendices.

21          Is this the report you just referred to?

22          (The witness reviewed the document.)

100

1          THE WITNESS:  Yes.  Did I say it's the

2    compliance inspection and comprehensive

3    groundwater monitoring evaluation of the site

4    dated May 24th, 1988, but without, you know,

5    going through every page, I can't say whether

6    it's a complete copy or not, but yes, this is the

Page 90

Bauer1

7    report I was referring to.

8                BY MR. STEWART:

9        Q.    Okay.   And does it look complete to you?

10       A.    Do you want me to page through it and

11   like look at each page, or --

12       Q.    Do what you need to do.   Tell me --

13   we're on video, so we'll be able to see what you

14   did, and I don't think we'll hold it against you

15   if there is a missing page, but I would just like

16   you to tell me if it looks like a copy of the

17   complete report but without its appendices.

18                (The witness reviewed the document.)

19                THE WITNESS:   All the pages appear to be

20   here that are referenced in the Table of

21   Contents, including with the addition of the

22   references of appendices, as you mentioned, are

                                                        101

1    not included here.

2                BY MR. STEWART:

3        Q.    Okay.   So does it look like the report

4    itself that you have got in front of you is

5    complete?

6        A.    It appears to have all the pages that

7    are referenced, yes, except with the exception of

8    the appendices.

9        Q.    I understand.   Could you just turn to

                        Page 91

Bauer1

10      the Executive Summary?

11          A.    Um-hm.

12          Q.    And the second page of the Executive

13      Summary, do you see on item 3, the last sentence

14      says trichloroethylene concentration in the

15      groundwater downgrading of the sludge drawing

16      bed, open paren, W-3, comma, 15,000 UG/L, close

17      paren, is above the MCL limit for groundwater of

18      five UG/L, comma, which was promulgated on July

19      8th, 1987?

20              Do you see that?

21          A.    Yes.

22          Q.    Okay.  Is this one of the first findings

102

1       of the trichloroethylene in the groundwater at

2       the Dickson site that you were referring to when

3       I asked you for the first findings?

4           A.    This is the first finding that I'm aware

5       of of trichloroethylene in the groundwater at the

6       site.

7           Q.    Okay.  And that 15,000 UG/L figure, is

8       that the same measure of trichloroethylene as is,

9       as for the five UG/L limit that we discussed for

10      say public drinking water?

11          A.    Yes.

12          Q.    So just so we understand the relation,

Bauer1

13    the 15,000 UG/L is, is that 3,000 times the limit

14    for public drinking water we discussed earlier?

15        A.    Fifteen thousand would be 3,000 times

16    the five micrograms per liter MCL.

17        Q.    That's the one promulgated by the

18    Environmental Protection Agency?

19        A.    Yes.  It was proposed in July '87, and I

20    don't believe it was final until 1989.

21        Q.    It was final in 1989, okay.  Do you, do

22    you see now in the fifth paragraph, I believe it

103

1    is the second from the last sentence where it

2    says trichloroethylene was identified in the

3    groundwater at 15,000 UG/L, comma, open paren,

4    W-11, in the soil at 27,000 UGKG, open paren,

5    SW-11A, close paren, in the vicinity of the

6    former storage tank?

7        A.    Yes.

8        Q.    Okay.  Again, is that the other or one

9    of the other first findings of trichloroethylene

10    in the groundwater at the Dickson facility?

11        A.    Referring to well W-11, yes, that's the

12    groundwater.

13        Q.    And the other reference to SW-11A,

14    that's a soil boring, right?

15        A.    That's, yes, that's correct.

Q. So -- and I just wanted to -- actually I'm not going to take you through this document right now.

I just want to make sure when you refer to the first findings of trichloroethylene that we're talking about those findings in Wells 3 and Wells 11 in 1988.

A. Yes. That's what the document indicates. Those were the two wells that she mentioned.

Q. Did Scovill perform this test for trichloroethylene?

A. No.

Q. Okay. Who did?

A. This report was prepared by Camp, Dresser & McKee, prepared for the U.S. EPA.

Q. And that's the same Camp, Dresser & McKee that is the primary contractor working on the Puente Valley Operable Unit?

A. Actually this is CDM Federal Programs Corporation, which is a separate entity from Camp, Dresser & McKee.

They keep themself separate for conflict of interest reasons.

Q. I'm sure we could go to lunch just on

Bauer1

19        questions about that relationship, but I guess
20        Camp, Dresser & McKee, when they were conducting
21        the two well tests you just described, were they
22        working for the Environmental Protection Agency?

                                                        105

1             A.    Yes.
2             Q.    Okay.  And did they actually drill Well
3        11?
4             A.    I would have to refer to the document to
5        confirm that.
6             Q.    See if you can do it quickly, you know.
7             A.    Okay.
8             Q.    I, actually I can't lead you there, so
9        if you think you know where in the document you
10       can determine that, that would be --
11                  (The witness reviewed the document.)
12                  BY MR. STEWART:
13            Q.    Perhaps it's in Section C.  I'm looking
14       at page 33.  That might be useful.
15            A.    Um-hm.
16                  (The witness reviewed the document.)
17                  THE WITNESS:  Yes.  Monitoring well W-11
18       was one of the wells installed by CDM Federal
19       Programs.
20                  BY MR. STEWART:
21            Q.    Okay.  Was monitoring well W-3 installed

Bauer1

22      by the company?

106

1       A.    That was a previously existing well

2       prior to this study that CDM performed.

3       Q.    Is that described on page 29, existing

4       well construction and location?

5       A.    Page 30 of the document, yes, the Wells

6       1 through 4 were installed during June 1982.

7       Q.    Okay.  So Well 3 where they found the,

8       where there was a report of 15,000 UG/L

9       trichloroethylene was a 1982 well?

10      A.    That's correct.

11      Q.    Okay.  Mr. Bauer, do you know why -- I

12      believe you testified that at the, at the Ajax

13      Hardware facility in the Watertown, Connecticut,

14      facility and the Arrowhead Plating facility, the

15      company tested for and found trichloroethylene in

16      the groundwater, but the company did not test for

17      trichloroethylene in groundwater on the Dickson

18      site until 1988?

19      A.    I think the timeframes were probably

20      similar at those other facilities, and it was in

21      those late '80s as companies became more aware of

22      potential for chlorinated solvents in particular

Bauer1

107

```
1      to migrate and dissolve into groundwater.
2          Q.    But do you know why having drilled wells
3      at the Dickson facility as early as 1982, the
4      company did not test for trichloroethylene?
5          A.    The primary focus at that site -- again,
6      I was not actually present, as you're certainly
7      aware, but from reviewing the documents that I
8      have seen, the primary focus and concern at the
9      site related to the on-site disposal of the waste
10     water treatment plant material, the sludge from
11     the waste water treatment plant, and the on-site
12     landfill cells, and that waste material was
13     metals concern.
14             There wasn't any documentation of or
15     concern related to the use of trichloroethylene
16     at the facility.
17         Q.    What was done, just generally, what was
18     the operation at the Dickson facility?
19             What were they making?
20         A.    They were making tire valves and related
21     pneumatic kind of gauges and valves.
22         Q.    Was, could you characterize the process
```

108

Page 97

Bauer1

1      as a metal working process?

2          A.   Yes.

3          Q.   Okay.  The trichloroethylene was used to

4      what?

5          A.   To clean the metal parts prior to other

6      operations.

7          Q.   And what was the basic operation of the

8      Ajax Hardware facility?

9          A.   It was also metal working type of

10     facility.

11         Q.   And what was the trichloroethylene used

12     for?

13         A.   Also for cleaning purposes.

14         Q.   And what about the Watertown,

15     Connecticut, facility?

16              What was that facility?  Metal working.

17         A.   Yes.

18         Q.   And what was the trichloroethylene used

19     for?

20         A.   For cleaning purposes.

21         Q.   Okay.  And how about the Arrowhead

22     Plating facility?

109

1          A.   For cleaning purposes.

2          Q.   And that was a metal working facility?

Page 98

Bauer1

3      A.    Yes.   They -- yes.

4      Q.    Okay.   But just want to make clear, the

5   first awareness that, that the company had of

6   trichloroethylene poison -- excuse me -- the

7   first awareness that the company had of

8   trichloroethylene in the groundwater at the

9   Dickson facility came when the EPA did its own

10  investigation in 1988?

11     A.    That's correct.

12     Q.    The company had wells since 1982, is

13  that right?

14     A.    Yes.

15     Q.    Okay.   But it did not test for

16  trichloroethylene from 1982 until, until March I

17  guess 1988?

18          MR. LUCAS:   Objection.   Asked and

19  answered several times.

20          Answer once more.

21          BY MR. STEWART:

22     Q.    He is correct, but go ahead and answer.

110

1      A.    Could you restate the question, please?

2      Q.    I just want to make sure that the

3   company did not test for trichloroethylene in the

4   wells at the Dickson facility from 1982 until the

5   EPA came to the site in 1988.
               Page 99

Bauer1

6        A.    Based on my review of the documents,

7      that is correct, because trichloroethylene was

8      not viewed as a potential concern based on the

9      operations at the site.

10     Q.    Okay.  Is it fair to conclude that it

11    was a concern at the Ajax Hardware facility,

12    trichloroethylene?

13     A.    At the, at the time when that site

14    closure took place, the agencies there were, were

15    directed to sample for those materials, and --

16     Q.    And you did?

17     A.    And we did.

18     Q.    Okay.  And that's true for the -- it was

19    a concern at the Watertown, Connecticut,

20    facility?

21     A.    Whether it was a concern or not, again,

22    it was, it was sampled.

111

1      Q.    Okay.  And trichloroethylene was sampled

2    at the Arrowhead Plating facility?

3     A.    Yes, again, similar kind of timeframes,

4    in the mid-'80s.

5     Q.    Okay.

6     A.    And again, I can check with particular

7    dates on the closure of those facilities.

8     Q.    I understand.  Switch gears here and just

Bauer1

```
 9      ask you about the company.
10              Now Saltire, the official name of the
11      company is Saltire Industrial, Inc., is that
12      right?
13          A.  Yes.  That's correct.
14          Q.  Go ahead.
15          A.  There is a comma between the Saltire
16      Industrial and the Inc., as I recall.
17          Q.  So it's Saltire Industrial, comma, Inc?
18          A.  Um-hm.
19          Q.  Okay.  Where is that company located?
20      Where is the headquarters?
21          A.  In New York.
22          Q.  Where in New York?
```

112

```
 1          A.  In New York City.
 2          Q.  Okay.  What's the address, do you know?
 3          A.  800 Third Avenue.
 4          Q.  Okay.  And who are the officers of the
 5      company?
 6          A.  Robert Bertellotti is the managing
 7      director.
 8          Q.  How do you spell that?
 9          A.  B-E-R-T-E-L-L-O-T-T-I.
10          Q.  Okay.  And he is the?
11          A.  Managing director.
```
                        Page 101

Bauer1

```
12          Q.     Okay.  All right.

13          A.     Wayne Smith, senior vice president.

14          Q.     Okay.

15          A.     Chief Financial Officer and Chief

16     Financial Officer.

17          Q.     Okay.  He is CEO and CFO?

18          A.     No -- just CFO.

19          Q.     Chief Financial Officer?

20          A.     Yes.

21          Q.     Okay.

22          A.     And myself, Nicholas Bauer, vice
```

113

```
1      president, environmental affairs.

2           Q.     Who is the president?

3           A.     We do not have a president.

4           Q.     Who is the secretary?

5           A.     I don't believe we actually have a

6      corporate secretary as an officer.

7           Q.     Who is the treasurer?

8           A.     Not as a corporate officer, so it's --

9           Q.     Okay.  So you have listed for me all the

10     people you think are corporate officers?

11          A.     That's correct.

12          Q.     Do you know where Saltire Industrial

13     Corporation is incorporated?

14          A.     Delaware.
```
                      Page 102

Bauer1

15          Q.    Do you know how many employees Saltire
16    Industrial has?
17          A.    Yes.
18          Q.    How many?
19          A.    Zero.
20          Q.    Zero employees?
21          A.    Yes.
22          Q.    Are you not an employee of Saltire

114

1     Industrial?
2           A.    No, I am not an employee of Saltire
3     Industrial.
4           Q.    Okay.  We'll come back to that, but do
5     you know in what state, if any, Saltire
6     Industrial files tax, state tax returns?
7           A.    No.  I'm not aware.
8           Q.    Would Mr. Smith be the person who would
9     be responsible for tax returns in that company?
10          A.    He would know, yes.
11          Q.    Okay.  Do you know what accounting firm
12    does Saltire Industrial's audit every year?
13          A.    No, I do not.  I'm not sure.
14          Q.    Okay.  Do you know the names of any
15    outside accountants of that firm?
16          A.    No.
17          Q.    Okay.  Do you know if Saltire
                Page 103

Bauer1

18    Industrial, do you know what its revenues were
19    last year?
20          MR. LUCAS:  Objection.  What's the
21    relevance of that to anything?
22          And I understand the scope of discovery

115

1    and relevance, but I think you're getting into an
2    area dealing with potential post-judgment
3    remedies.  It's inappropriate for discovery.
4          MR. STEWART:  I believe that in our
5    state, I think you'll agree that our court has
6    been very precise about defining what is relevant
7    with regard to insurance information, and we have
8    had some recent decisions about that.
9          I think you would also agree that I'm
10   entitled to get a pretty good sense of the nature
11   of these companies.
12          However, let me just continue
13   questioning and you can pose your objections and
14   see how we proceed.
15          MR. LUCAS:  To make sure we're on the
16   same wavelength, I take it from your comments
17   we're in agreement that insurance information is
18   not discoverable?
19          MR. STEWART:  Other than that that
20   because of the environmental laws has been
                    Page 104

Bauer1

21    disclosed by you in discovery by your clients;

22    this is an unusual case obviously in which

116

1    certain insurance information is public as

2    opposed to a typical case where it's

3    confidential.

4         MR. LUCAS:  And I do agree with you

5    you're entitled to certain background information

6    on the companies, and I don't wish to object to

7    your asking questions on that type of general

8    information, but you understand where I'm coming

9    from on the objection.

10         MR. STEWART:  Yes.

11         BY MR. STEWART:

12    Q.    Mr. Bauer, who are the board members for

13    Saltire Industrial?

14    A.    I don't know.

15    Q.    Okay.  Who would know?

16    A.    I can't say for certain, but I think Mr.

17    Smith would.

18    Q.    Okay.  Do you know who owns the stock of

19    Saltire Industrial?

20    A.    No, I do not.

21    Q.    Are you, do you know if Saltire

22    Industrial is a subsidiary of another company?

Bauer1

117

```
 1          A.    Yes.  It's the subsidiary of Alper
 2     Holdings.
 3          Q.    That's Alper Holdings, Inc?
 4          A.    Alper Holdings, USA.
 5          Q.    Okay.
 6          A.    Like capital U capital S capital A,
 7     comma, Inc.
 8          Q.    Okay.  And do you know if Saltire
 9     Industrial owns any plants in the United States?
10          A.    Does not.
11          Q.    Do you know if Saltire Industrial makes
12     sales in the United States?
13          A.    Does not.
14          Q.    Do you know if Saltire Industrial owns
15     real estate in the United States?
16          A.    The company owns one parcel of land in
17     Dickson County, Tennessee.
18          Q.    That's quite a portfolio.  Is that the
19     only real estate you know that the company owns?
20          A.    Yes.
21          Q.    Do you know when the last board meeting
22     of Saltire Industrial was conducted?
```

Bauer1

118

```
 1          A.    No, I do not.

 2          Q.    Okay.  Do you know, well, do you know

 3    how much of your time personally you devote to

 4    Saltire Industrial activities?

 5          A.    Essentially a hundred percent.

 6          Q.    Okay.

 7          A.    Maybe, you know.

 8          Q.    Do you work in the office at 800 Third

 9    Avenue, New York City?

10          A.    No, I do not.

11          Q.    Where do you work?

12          A.    I work in Reston, Virginia.

13          Q.    And how many people are in your offices

14    in Reston?

15          A.    Just myself.

16          Q.    And do you know how much time Mr. Smith

17    devotes to Saltire Industrial operations?

18          A.    No, I don't.

19          Q.    Is it your impression that he is a

20    full-time employee of Saltire?

21                Well, I guess not.  Strike that.  Is it

22    your impression that he devotes most of his time
```

119

Bauer1

1      to Saltire Industrial, Inc. Activities?

2          A.    I don't know how his time is divided.

3          Q.    How often do you meet with Wayne Smith,

4      if ever?

5          A.    Approximately once a quarter.

6          Q.    Okay.  How often do you talk to him on

7      the telephone?

8          A.    Weekly.

9          Q.    Okay.  Does Mr. Smith receive copies of

10     your correspondence?

11         A.    Not routinely.

12         Q.    Okay.  Does Mr. Smith receive copies of

13     correspondence that you have, if any, with

14     federal and state agencies?

15         A.    Not routinely.

16         Q.    Okay.  You say not routinely.  Would Mr.

17     Smith receive say a copy of the final RFI report

18     whenever it's finalized?

19         A.    Probably not unless he specifically

20     requested it.

21         Q.    Okay.  Is there any person that under

22     your current procedures, you would forward a copy

120

1      of drafts or the final RFI to?

2          A.    Within our company?

3          Q.    Anyone.

Page 108

Bauer1

```
 4          A.   No.
 5          Q.   Okay.  So not within or without your
 6     company?
 7          A.   Outside of counsel, no.
 8          Q.   Okay.  Do you know how much time Mr.
 9     Bertellotti devotes to Saltire Industrial
10     activities?
11          A.   No, I do not.
12          Q.   Okay.  Do you believe he works, devotes
13     half his time to the company?
14          A.   I couldn't speculate.
15          Q.   Okay.  How often do you meet with Mr.
16     Bertellotti?
17          A.   Approximately once a quarter.
18          Q.   Do you, Mr. Smith and Mr. Bertellotti
19     get together once a quarter?
20               Do you have quarterly meetings?  Is
21     that --
22          A.   Not regularly scheduled, but I provide
```

121

```
 1     them with an update of the environmental matters
 2     specifically, and that usually works out to be
 3     approximately once a quarter.
 4          Q.   But the meetings you're referring to are
 5     you, Mr. Smith and Mr. Bertellotti all together?
 6          A.   Although sometimes it might be just with
```

Bauer1
```
 7    Mr. Smith.
 8        Q.   I understand.  How often do you speak on
 9    the phone with Mr. Bertellotti do you suppose?
10        A.   Perhaps once every couple of weeks.
11        Q.   Who are the primary decision-maker with
12    regard to environmental activities and activities
13    related to the Dickson site in Saltire
14    Industrial?
15             MR. LUCAS:  Sorry.  I couldn't hear what
16    you were saying.
17             BY MR. STEWART:
18        Q.   Who in Saltire Industrial, Mr. Bauer, is
19    the primary decision-maker that makes decisions
20    about the Dickson site?
21        A.   Routine matters, technical matters,
22    typically I will make those decisions.
```

122

```
 1             If there's something that I feel needs
 2    to be addressed at a higher level, I will consult
 3    Mr. Smith and Mr. Bertellotti about those kind of
 4    matters, and receive direction from them.
 5        Q.   Okay.  Do you know when -- okay.  Do you
 6    know when Saltire Industrial came into being?
 7        A.   Nineteen ninety-four I believe was the
 8    name change.
 9        Q.   You call it a name change.  Tell me
```

Bauer1

10      about that.

11            It was a name change from what to what?

12      A.    From Scovill, Inc. of Delaware to

13      Saltire Industrial, Inc.

14      Q.    And so that's why we're calling the

15      company Saltire and Scovill and its predecessors

16      because am I hearing you right that essentially

17      the name of Scovill was changed and it became

18      Saltire Industrial?

19      A.    That's correct.

20      Q.    Okay.  Do you know if, when that

21      occurred, or do you know if Saltire Industrial,

22      Inc. has maintained the liabilities relating to

123

1       the Dickson plant?

2       A.    Certain liabilities relating to the

3       environmental issues at the Dickson plant I

4       believe were retained by Saltire Industrial.

5       Q.    Okay.  Can you tell me what liabilities

6       would not have been retained and when?

7       A.    Yeah.  I'm not familiar with the

8       transactional documents that, you know, would

9       have specifically outlined, you know, the limits

10      or the scope of the liabilities assumed or

11      retained by Saltire.

12      Q.    But it's, I just want to make sure is

Bauer1

13    what you just said that it is, your understanding
14    is that Saltire did retain the liabilities with
15    regard to the Dickson plant environmental
16    matters?
17                MR. LUCAS:  Wait.  Wait.  Repeat -- you
18    kind of trailed off with the last part.
19                I think I have got an objection to the
20    form of the question, but I want to make sure.
21                BY MR. STEWART:
22        Q.    Okay.  I mean I just want to understand


124


1    that what you just said is that, that Saltire
2    Industrial, Inc. has maintained responsibility
3    for the Scovill, Inc. liabilities with regard to
4    the Dickson site?
5                MR. LUCAS:  I'm going to --
6                MR. STEWART:  I would like you to tell
7    me your objection because I actually want to get
8    a clear response.
9                MR. LUCAS:  I think you changed it, and
10    I was going to object.  I was covering that.
11    Could you hear me?
12                I was going to object to a lack of
13    foundation, but I think you have cured it in the
14    way you phrased it.
15                If you don't mind, just state it again

Bauer1

16    so we have got a clear understanding.

17              BY MR. STEWART:

18        Q.    I just want to make sure, Mr. Bauer,

19    what you're testifying to is that, is that

20    Saltire Industrial, Inc. has retained

21    responsibility for the Scovill, Inc. liabilities

22    relating to the Dickson plant?

125

1              MR. LUCAS:  Do you mind, just to cure my

2    foundation objection, phrasing that liabilities,

3    if any, relating to the Scovill plant?

4              BY MR. STEWART:

5        Q.    If any.

6              MR. LUCAS:   Thank you.

7              THE WITNESS:   The company, that is,

8    Saltire Industrial is, is and has been performing

9    the environmental investigation and remediation

10    activities at the site under the direction of

11    U.S. EPA.

12              BY MR. STEWART:

13        Q.    And I take it are you telling me that

14    you don't know of any liabilities that some other

15    entity has taken on with regard to the

16    environmental issues relating to the Dickson

17    site?

18        A.    That's correct.

Bauer1

19        Q.    Okay.  Who do you work for, Mr. Bauer?

20        A.    You mean who do I report to?

21        Q.    No.   Who are you?  You told me you were

22   not an employee of Saltire Industrial, Inc.,

126

1    right?

2         A.    Right.

3         Q.    Okay.  Well, who are you an employee of?

4         A.    I'm actually an employee of Alper

5    Holdings, USA, Inc.

6         Q.    Okay.

7               MR. LUCAS:  Mike, our lunch is here.  I

8    don't want to interrupt you if you're right in

9    the middle of a thought, but when you get to a

10   breaking point, we would like to break for lunch.

11              MR. STEWART:  I think it's fine.  I

12   think we're here.

13              BY MR. STEWART:

14        Q.    Okay.  Alper Holdings?

15        A.    Yes.

16              THE VIDEO SPECIALIST:  Off record, and

17   the time on the screen is 12:21:58.

18              (Whereupon, at approximately 12:20

19   o'clock, p.m., the deposition was recessed, to

20   reconvene 1:15 p.m. the same day.)

21                         *   *   *   *   *

Page 114

Bauer1
22

127

```
 1                    AFTERNOON SESSION
 2                         (1:23 p.m.)
 3            THE VIDEO SPECIALIST:  On the record,
 4      and the time on screen is 13:23:02.
 5            EXAMINATION BY COUNSEL FOR THE
 6            PLAINTIFFS  (Resumed)
 7            BY MR. STEWART:
 8      Q.    Mr. Bauer, we're back on record.  Before
 9      we talk about Alper Holdings, Inc., I wanted to
10      ask you just do you know whether Saltire
11      Industrial, Inc. has any subsidiaries?
12      A.    I don't believe that it has any
13      subsidiaries.
14      Q.    Okay.  Who would be the person that, in
15      the company with the best knowledge of that, do
16      you know?
17      A.    Mr. Smith probably could answer that
18      question definitively.
19      Q.    Okay.  What is it that Saltire
20      Industrial does?
21      A.    Saltire Industrial had a subsidiary, a
22      ink, water based primarily, well, packaging inc
```

Bauer1

128

```
 1        manufacturing company called Alper Ink Group, and
 2        that was its primarily subsidiary and operations.
 3               That group was sold last year, so you
 4        know, currently Saltire is a company in
 5        transition.
 6        Q.    Does it have then liabilities other than
 7        the Dickson liabilities you have discussed?
 8        A.    Yes.
 9        Q.    What are those?  Are they relevant to
10        this litigation?
11               MR. LUCAS:  Objection to the form.
12               THE WITNESS:  I don't know whether they
13        are.
14               BY MR. STEWART:
15        Q.    Okay.  I asked you, and you're
16        answering.  I didn't mean to interfere.
17               What other liabilities does it have?
18        A.    The company has other environmental
19        liabilities.
20               Their company also has pension and death
21        benefit liabilities.
22        Q.    Any others that you know of?
```

129

Bauer1

1      A.    No.
2      Q.    Does Saltire Industrial, Inc. have all
3   of the liabilities, if any, relating to those
4   administrative clean-up actions you have
5   described for me today?
6      A.    I mean to the extent, relative to --
7      Q.    To the extent activities by Scovill,
8   Inc. and its related entities created
9   environmental liabilities for those sites that
10  you listed earlier today, when I asked you about
11  administrative sites, are those liabilities
12  currently embraced by Saltire Industrial, Inc?
13     A.    Yes.
14     Q.    Okay.  And do you know of any, if any of
15  those liabilities for the Dickson or sore any
16  other site were ever assumed by any other company
17  in part?
18          MR. LUCAS:   Object to the form of the
19  question, and the foundation.
20          BY MR. STEWART:
21     Q.    Okay.  Let me rephrase.  Well, you know,
22  to the extent any liabilities exist relating to

130

1   those environmental matters, including Dickson,
2   do you know of any other company that has ever
                      Page 117

Bauer1

```
 3    assumed responsibility for any of those
 4    liabilities?
 5         A.   Well, for example, at the Dickson
 6    facility, to the extent that environmental issues
 7    might arise from releases or activities
 8    subsequent to the sale of the property to the
 9    current owner, the current owner would be
10    responsible for responding and addressing those
11    conditions.
12              So there may be some, you know,
13    exceptions along those lines.
14         Q.   But for Scovill's activities and the
15    Schrader division's activities, those liabilities
16    lie with Saltire Industrial, Inc?
17         A.   For the sites that we're talking about.
18         Q.   Including Dickson?
19         A.   Yes.
20         Q.   Okay.  The purchaser of the plant in
21    Dickson, is that Tennco, Inc?
22         A.   Tennsco, yes.
```

131

```
 1         Q.   Tennsco; and did they, do you know
 2    whether they have liabilities, do you know
 3    whether as part of buying the plant, they assumed
 4    liabilities for contamination that existed at the
 5    time they purchased the plant?
```
                              Page 118

Bauer1

 6        A.   I'm not familiar with the details of

 7     those transactional documents.

 8          My understanding personally is, my

 9     personal understanding of the situation is that

10     for the situation at the time of the, at the

11     sale, that they did not take on any liabilities

12     for conditions at the time of the sale.

13        Q.   So were you, in discussing Tennsco's

14     potential liability, were you referring to or

15     thinking of a scenario where Tennsco could

16     itself, through its own operations might create

17     environmental liabilities?

18        A.   Yes.  Correct.

19        Q.   Okay.  And your point was that obviously

20     they would be liable for their own actions?

21        A.   Yes.

22        Q.   Okay.  Alper Holdings, you work for

132

 1     them, is that right?

 2        A.   That's correct.  I'm an employee of

 3     Alper Holdings USA, Inc.

 4        Q.   Do you know where that company is

 5     incorporated?

 6        A.   I do not recall.

 7        Q.   Is that company a subsidiary of another

 8     company?

Bauer1

```
 9          A.    No.

10          Q.    That you know of -- okay.  Is there an

11    Alper Holdings that is not USA?

12          A.    No.

13          Q.    Okay.

14          A.    Well, I'm not aware of any.

15          Q.    Is Alper Holdings USA, Inc. a publicly

16    traded company?

17          A.    No.

18          Q.    Do you know whether Alper Holdings USA,

19    Inc. is owned by a single stockholder?

20          A.    I'm not aware.  I don't know the

21    identity or the, anything about the stockholder

22    or holders of the company.
```

                                                                    133

```
 1          Q.    Okay.  Do you know who the president of

 2    Alper Holdings, Inc. is?

 3          A.    There isn't a, anybody of that title.

 4          Q.    Okay.  Well, who is the top dog at Alper

 5    Holdings in your mind?

 6          A.    The.

 7                MR. LUCAS:  I'm trying to visualize the

 8    top dog in his mind.

 9                MR. STEWART:  Going back to the English

10    teacher.

11                THE WITNESS:  The managing director for
```
                                Page 120

Bauer1

```
12        Alper Holdings is also Mr. Bertellotti.
13                   BY MR. STEWART:
14        Q.    Okay.  Who are the other officers?
15        A.    Mr. Smith.
16        Q.    Um-hm.  What is he?
17        A.    He's the senior vice president, Chief
18   Financial Officer.
19        Q.    Okay.
20        A.    And myself, Nicholas Bauer.
21        Q.    And you are?
22        A.    Vice president, environmental affairs.
```

134

```
 1        Q.    Where is Alper Holdings USA
 2   headquartered?
 3        A.    Also in New York City.
 4        Q.    Same address?
 5        A.    Same address, yes.
 6        Q.    And does Alper Holdings USA, Inc. have
 7   any employees?
 8        A.    Yes.
 9        Q.    Who are they?
10        A.    In addition to -- you want the names of
11   the individual employees?
12        Q.    Well, why don't you tell me how many
13   there are first?
14        A.    Nine.
```
                              Page 121

Bauer1

15          Q.    Okay.  Are they all in the New York

16     office?

17          A.    No.

18          Q.    Do any of them work on environmental

19     matters?

20          A.    Not specifically, no.

21          Q.    Do any of them work for you?

22          A.    No.

135

1          Q.    Do any of them work in your office?

2          A.    No.

3          Q.    Okay.  Where are the locations of the

4     employees that don't work in New York?

5          A.    Other than myself, there are two

6     employees that work at an office in Connecticut.

7               I don't know the location of that

8     office.  I have never been there.

9          Q.    Is that related to environmental

10     activities in Connecticut?

11          A.    No.

12          Q.    Okay.  Does Alper Holdings hold any

13     subsidiaries other than Scovill or Saltire

14     Industrial, Inc. that you know of?

15          A.    I'm not, I'm not certain of the answer

16     to that question.

17               I manage the environmental issues for,
                              Page 122

Bauer1

18     you know, related to the work at Saltire, and you
19     know, the corporate structure of Alper, I'm not
20     certain of.
21          Q.   Do you know the names of any board
22     members of Alper?

136

1          A.   No, I do not.
2          Q.   Do you know the name of any stockholder
3      in Alper?
4          A.   No, I do not.
5          Q.   I take it you're not one?
6          A.   No.   That's correct.   I'm not a
7      stockholder.
8          Q.   Does Alper Industries, Inc. have any
9      relationship that you know of in terms of
10     ownership with IT Corporation?
11          MR. PERRY:   Mike, you'll need to speak
12     up.
13          BY MR. STEWART:
14          Q.   Certainly.   Do you know if Alper
15     Holdings, Inc. has any relationship in terms of
16     stock ownership or other type ownership with IT
17     Corporation?
18          A.   I don't believe so.
19          Q.   Do you know whether it has any, had any
20     relationship with ICF Kaiser, Inc?

Bauer1

21        A.    I don't believe so.

22        Q.    Do you know if Saltire Industrial, Inc.

137

1     has an ownership relationship with either IT or

2     ICF Kaiser?

3        A.    No.  No, sir.

4        Q.    Okay.

5              MR. LUCAS:  Excuse me one minute.  When

6     you asked earlier -- you just asked if they had a

7     relationship, and I assume you meant in that

8     question ownership relationship?

9              MR. STEWART:  Yes.

10             BY MR. STEWART:

11       Q.    When I say relationship with regard to

12    the engineering firms IT and ICF Kaiser, I'm just

13    trying to make sure that your understanding is

14    that there is no relationship other than one of

15    company and contractor between those companies.

16       A.    Between Alper Holdings USA and IT and

17    ICF Kaiser, yes, that's correct.

18       Q.    Okay.  And the same is true for Saltire

19    Industrial, Inc?

20       A.    Yes.

21       Q.    Okay.  Well, does Alper Holding operate

22    any plants in the United States?

Page 124

Bauer1

138

```
 1        A.    No, sir.

 2        Q.    Does it operate any plants anywhere?

 3        A.    No.

 4        Q.    Does it own real property?

 5        A.    I don't believe so.

 6        Q.    Does it sell anything?

 7        A.    No.

 8        Q.    Do you know if it doesn't sell anything,

 9   how it pays your salary?

10        A.    The company does have or either between

11   Alper Holdings and Saltire, you know, Saltire I

12   believe has some assets.

13        Q.    What are they?

14        A.    I'm -- not, I don't know.

15        Q.    Okay.  Who would know?

16        A.    Mr. Smith deals obviously as the Chief

17   Financial Officer with the financial matters of

18   the company.

19        Q.    Has Saltire Industrial, Inc. that you

20   know of ever been unable to conduct any

21   environmental work requested by a state or

22   government agency because it was financially
```

Bauer1

139

1     unable to do so?

2          A.    Not to my knowledge, no.

3          Q.    Have you ever been constrained in your

4     oversight of environmental activities because of

5     financial constraints of the company?

6          A.    Like any company, there are limited

7     resources, and so that's an issue that is, you

8     know, considered in decision-making processes, so

9     it's, it's, you know, it's a consideration

10    certainly.

11         Q.    Do you have a budget annually?

12         A.    Meaning a figure that I'm not supposed

13    to exceed for --

14         Q.    Yes?

15         A.    That year -- not specifically, no.

16         Q.    Do you make targets of your expenditures

17    for a given year?

18         A.    I make projections of my expenditures.

19         Q.    Do those projections include payments to

20    engineering firms conducting work for your

21    company?

22         A.    Yes.

140

Bauer1
1    Q.    So like payments to ICF Kaiser or I'll
2    say -- strike that -- payments to IT Corporation
3    for activities on the Dickson site would be made,
4    approved by you in part of your projections?
5    A.    Correct.
6    Q.    Okay?
7    A.    Yes, sir.
8    Q.    What are your projected expenditures for
9    environmental services for -- strike that.
10          What have you projected for your
11   expenditures for environmental compliance matters
12   this year?
13          MR. LUCAS:  Wait.  Can you tie that into
14   relevancy of something in this lawsuit so that we
15   don't tread on forbidden ground?
16          MR. STEWART:  Yes.  I understand -- I
17   mean the relevancy is two-fold.
18          First, it goes obviously -- well, I'll
19   ask about the Dickson site where relevancy is
20   obvious.
21          I think it's important for this lawsuit
22   for us to understand the extent of Saltire

                                                  141

1    Industrial's ongoing environmental compliance,
2    and I'll tell you I don't intend to follow up
3    with this question on the whole series of
                     Page 127

Bauer1

4    asset-based questions, but merely if I can get a
5    number here, I think that will solve my problem.
6           MR. LUCAS:  Give me a break then to talk
7    with him about that.
8           MR. STEWART:  That's fine.
9           MR. LUCAS:  And then we'll be right back
10          THE VIDEO SPECIALIST:  Off record, and
11    the time on screen is 13:39:48.
12          (A recess was taken.)
13          THE VIDEO SPECIALIST:  On record, and
14    the time on screen is 13:48:08.
15          MR. LUCAS:   I think we resolved my
16    concern based on what I understood your question
17    to be, and let me try to say it to make sure I do
18    understand.
19          Your question is does he have a
20    projection for what it would cost for the coming
21    year for investigation or for possible
22    investigation and remediation at this site?

142

1           MR. STEWART:  Mine was for all sites.
2           MR. LUCAS:  I thought you had limited to
3    this site.
4           MR. STEWART:  Well, that was my next
5    question.
6           MR. LUCAS:  Can we limit it to this site
                    Page 128

Bauer1

```
 7    since this is the subject of the litigation?
 8              MR. STEWART:  Yes.  I tell you, yes.
 9    That's fine.
10              THE WITNESS:  So I'm sorry -- one more
11    time.
12              BY MR. STEWART:
13        Q.    For Dickson?
14        A.    The question?
15        Q.    For the Dickson site, what is your
16    projection for remediation costs, investigation
17    costs?
18        A.    For the coming year?
19        Q.    Yes.
20        A.    I am not -- I don't recall specifically.
21    It's on the order of a few hundred thousand
22    dollars, say approximately $500,000.
```

                                                    143

```
 1        Q.    Okay.  What were your actual costs last
 2    year on that site?
 3        A.    I would have to go back and look.  I
 4    really don't know.
 5        Q.    Would they have been over a hundred
 6    thousand dollars?
 7        A.    Yes.
 8        Q.    Would they be in this same range of your
 9    projected costs?  I'm not holding you --
```

Bauer1

```
10          A.    Approximately, yes, few hundred thousand
11     dollars range.
12          Q.    Has that few hundred thousand dollars
13     range been the range of costs that have been
14     incurred by Saltire Industrial, Inc. on the
15     Dickson site since 1990?
16          A.    It has varied.  In very rough terms,
17     yes.
18          Q.    Okay.  Do you see a light at the end of
19     the tunnel as far as these costs?
20          A.    Meaning?
21          Q.    When do you think -- let me rephrase.
22     It's a very imprecise question.
```

144

```
1               Do you anticipate ceasing to have to
2      spend a few hundred thousand dollars per year at
3      the Dickson site in the next five years?
4           A.    Yes.
5           Q.    Okay.  Do you have a particular day at
6      which time you believe that your costs will
7      decline dramatically from the few hundred
8      thousand dollars a year amount that we're talking
9      very generally about now?
10          A.    I'm not certain they're going to decline
11     dramatically.
12               Projections, I would say by 2005.
```

Page 130

Bauer1

13          Q.     While we're here, Mr. Bauer, can you

14     tell me generally what the current remediation

15     efforts on the site in Dickson involve?

16          A.     The ones that are currently ongoing, or

17     ones that have occurred in the past?

18          Q.     No; the ones that are ongoing right now.

19          A.     There is a groundwater extraction and

20     treatment system that is currently operating at

21     the site.

22          Q.     Have you seen this system yourself?

145

1           A.     Yes, I have.

2           Q.     Can you describe it for me in terms of

3      size and complexity?

4           A.     There are two groundwater extraction

5      wells located on the site.  They are connected

6      with via pipelines, small, you know, pipes, to a

7      central treatment system that removes the

8      constituents of concern, the contaminants from

9      the water before it's discharged to a local

10     stream under a permit from the state.

11          Q.     How big is this central treatment

12     machine or system?

13          A.     The treatment system is housed in a

14     small building approximately 20, 30 feet long

15     and, you know, 10 feet wide.

Page 131

Bauer1

16          Q.    Is there a name for, is there a single

17    machine that is the central operating item in

18    this system?

19          A.    It is called an air stripper.

20          Q.    And how big is the air stripper?

21          A.    It's a flat plate model, so it is not

22    very tall, but fits inside a building of typical

146

1     ceiling heights, and ten feet by ten feet, ten

2     feet, you know, cubed maybe approximately.

3                It's handled as much water as those

4     wells can produce, which in the Year 2000 was

5     approximately 250,000 gallons.

6          Q.    A --

7          A.    Total for the year.

8          Q.    Okay.  The two wells, how much water do

9     they produce at a given time, do you know?

10         A.    Well, it's, if there are some down time

11    over the course of that year, I don't recall the

12    gallons per minute that they were, pumping went

13    on, but on average, we had 250,000 gallons over

14    the course of roughly a 12-month period.

15               You divide that out to give a, an

16    average, recognizing during some of that period,

17    equipment malfunctions, power outages, whatever,

18    the wells were not pumping.

Bauer1

19         Q.    Do you think, and I don't want to put

20    numbers in your head, but do you think 30 gallons

21    a minute, is it that kind of well, or is it less?

22         A.    It's less than that.  A few gallons a

147

1    minute is what they're able to pump.

2         Q.    Does the air stripper run on gasoline?

3         A.    No.

4         Q.    Electricity?

5         A.    Yes.  Yes.

6         Q.    Is this what's called at times a pump

7    and treat system for remediation?

8         A.    Yes, in that you're extracting

9    groundwater and treating it above ground.

10         Q.    Does it run -- I thought you said, did

11    you say that, that this stripper runs

12    continuously?

13         A.    Yes, except in the cases of equipment

14    malfunctions, power outages and the like.

15         Q.    But when things are going well, does it

16    run literally around the clock?

17         A.    As long as there is water to process, it

18    runs around the clock.

19              Sometimes the air stripper can process

20    more water than the wells are producing, in which

21    case it runs in a periodic fashion.

Page 133

Bauer1

22          Q.    Have you had discussions with either

148

1          Tennessee or federal environmental officials

2          about long-term remediation at the site?

3          A.    The, the study that would address the

4          long-term remediation at the site has not been

5          completed.

6               That would be called a corrective

7          measures study under the RCRA program.

8          Q.    Will that be completed after the final

9          RFI is approved?

10          A.    That's correct.

11          Q.    Have you started drafting a corrective

12          measures study?

13          A.    No, we have not.

14          Q.    Have you ever done any type of

15          remediation on the site other than pump and

16          treat?

17          A.    Well, certainly the initial closure

18          activities that were done when the site was, was

19          closed involved remediation activities,

20          excavation and disposal of waste materials for

21          clean closure of the landfill cells that were

22          located on a portion of the property, removal of

Bauer1

149

1    materials from the building itself, those kinds
2    of things involved in the usual closure of a
3    manufacturing facility.
4            In addition, there was a pilot test run
5    for soil vapor extraction at the site that was
6    found not to be effective and so was not expanded
7    into a full-scale remediation system.
8        Q.    Has the pump and treat method been at
9    least effective in a limited way?
10       A.    It has worked as designed.   The
11   effectiveness of it has not really, we don't have
12   enough data yet to really evaluate its
13   effectiveness.
14       Q.    Other than the pilot test and the pump
15   and treat, have you done any other remediation as
16   opposed to testing on the site?
17           This is post say 1990.
18           MR. PERRY:   Post 1990 what?
19           BY MR. STEWART:
20       Q.    Let me make it perfectly clear.   Setting
21   aside the activities relating to closure
22   involving the removal of the cells, have you

150

Bauer1

1      performed any other activities on the site to

2      clean the groundwater or the soil on the site

3      other than pump and treat and the pilot test?

4           A.    At the soil vapor extraction pilot test,

5      there was also a pumping test that preceded the

6      groundwater action that was, you know,

7      essentially part of that design and for the, for

8      the groundwater extraction system, and that is,

9      those are the actions for remediation on the

10     site.

11          Q.    Are you pumping now and using the pump

12     and treat because the pumping test was somewhat

13     successful?

14          A.    Yes.

15          Q.    Okay.  Have you had discussions in your

16     company or with environmental officials about

17     what you project will be the future clean-up

18     activities on the site?

19          A.    We have had discussions with Tennessee

20     and EPA, U.S. EPA, just in very preliminary

21     manners, and it's a very -- now in terms of what

22     the final remedy might be, it depends in part

151

1      upon how this pump and treat system as we have

2      called it performs, whether we can show that

Page 136

Bauer1

3     it's, you know, what kind of effect it's having

4     or, you know, whether some other type of system

5     might be warranted.

6        Q.   Can you tell me what options exist other

7     than pump and treat that you can think of?

8        A.   Well, there could be a variety of

9     remedial options depending on what the goals

10    might be, that there are many, many constraints

11    that the physical site, unfortunately, places

12    upon the potential remediation systems, but in

13    addition to pump and treat, there might be ways

14    of using more, using some newer technologies to

15    expand or increase the permeability of the

16    overlying soils to try to make a soil vapor

17    extraction system, for example, more effective.

18       Q.   Now with that system, the using newer

19    technologies to increase the, to improve soil

20    vapor extraction, would that go to cleaning the

21    ground, the soil, or would it also affect

22    groundwater?

152

1        A.   That would go toward cleaning up the

2     soil.

3        Q.   What about groundwater?  Are there any

4     other options that one would anticipate would be

5     considered for cleaning the groundwater on the

Bauer1

6    site other than pump and treat?

7         A.    The soil vapor extraction item could be

8    extended to work below the current water table.

9              That is, you know, an option that was

10   going to address, you know, constituents below

11   the current water table level.

12             You know, what other ones, what other

13   systems we might want to address would really be

14   something that is left to the corrective measures

15   study.

16        Q.    Yeah, but I take it if -- and we'll talk

17   about your work history.  I mean you, how long

18   have you been working with this Dickson site?

19        A.    Since January of 1996.

20        Q.    Okay.  And I take it when we go through

21   your work history in detail, will you be telling

22   me that you're a specialist if you will in

153

1    environmental remediation engineering or

2    matters -- please describe yourself for me

3    somehow.

4              MR. LUCAS:  I'm sorry?

5              BY MR. STEWART:

6         Q.    Rather than put words in his mouth, I

7    just want to know I mean do you feel that you

8    have a, a knowledge of environmental remediation?

Page 138

Bauer1

9        A.    You know, I feel --

10             MR. LUCAS:  I like that question better

11       than describe yourself to me -- tall, dark,

12       handsome, swift, light movements.

13             MR. STEWART:  All those things apply I'm

14       quite certain.

15             THE WITNESS:  In my role, I tend to be

16       more of a generalist rather than a specialist in

17       the particular area, so that, you know, we need

18       to rely on the guidance and advice of the

19       contractors, for example, that we retained for

20       the various sites.

21             Yes, I have worked in the environmental

22       field for a number of years and am generally

154

1        familiar with the various types of remedial

2        activities that are available and some of their

3        limitations.

4        Q.    Have you told me about all the types of

5        environmental remediation technologies that might

6        apply to this site?

7        A.    There might be other applicable ones.

8        There are many that are, that are largely

9        ineffective at a site like this because of its,

10       the hydrogeologic setting in which the site is

11       located.

Page 139

Bauer1

12      Q.    Are there any other that you think are
13   likely to be used as part of the remediation?
14      A.    I'll have to consider that.  Biological
15   treatment is a possibility that could be
16   potentially implemented at a site like this.
17           There are some, you know, limitations to
18   how effective it might be here.
19           There isn't a whole lot of evidence for
20   ongoing, you know, there is not a lot of ongoing
21   biological degradation that seems to be occurring
22   right now, so potentially an option, but one we

155

1   would have to look at hard to evaluate its
2   effectiveness.
3           There may be other variations on a pump
4   and treat kind of scenario that didn't use the
5   same kind of treatment system that we're looking
6   at, but -- and none of these remedies may end up
7   being particularly effective at this site.
8      Q.    Have you now given me probably within
9   your knowledge, a relatively exhaustive list of
10   the options that will be considered for the final
11   remediation plan?
12      A.    I suspect when we do go through the
13   process of a corrective measures study, a more
14   comprehensive list would be developed and

Bauer1

15    discussed in the course of that document,

16    screening out options that were, you know,

17    clearly inapplicable to the setting of the site,

18    and so the document probably will discuss a much

19    broader range of remedial, potential remedial

20    technologies.

21          To my knowledge, you know, that most of

22    those -- and the experts may, that, you know,

156

1    consultants that we have to perform this work,

2    you know, may come to different conclusions.

3          Sitting here today, my expectation is

4    that the options here at the site are very

5    limited, and we will end up coming back to the

6    ones we have discussed.

7          Q.    The pump and treat and the --

8          A.    Possibly some variations on that that

9    might involve --

10         Q.    Okay.

11         A.    Soil vapor extraction as well.

12         Q.    Okay.  Can you tell me briefly about the

13    newer technologies for soil extraction, what

14    those involve physically on the site?

15         A.    Physically fracturing the soils to

16    increase permeability.

17         Q.    So that you can then suck out --

Page 141

Bauer1

18          A.   So you can access the, you can get

19     better, better flow through the soils.  You're

20     able to extract more groundwater or more air

21     through these soils.

22          Q.   So do those technologies work

157

1      essentially in conjunction with the pump and

2      treat system to get you more to pump and treat?

3          A.   Yes.

4          Q.   Do those technologies use explosives to

5      do that?

6          A.   Typically, no.

7          Q.   Okay.  What do they use generally?

8          A.   Either a liquid, either gas or, you

9      know, a fluid, either a gas or a liquid to

10     inject, that's injected and creates fractures.

11         Q.   What kind of machines are used to inject

12     those big pumping devices or --

13         A.   Depends on the technology.  Talking

14     about small well borings with injection type

15     fittings on them.

16         Q.   Okay.

17              (There was a pause in the proceedings.)

18              BY MR. STEWART:

19         Q.   Can you tell me how Alper Holdings came

20     to own Saltire Industrial, Inc?

Page 142

Bauer1

21        A.    I'm not certain of the exact transaction

22    by any means.



                                                              158



 1                I don't know whether it was a, you know,

 2    whether it was a stock or asset purchase or, you

 3    know, what the nature of that acquisition was.

 4        Q.    Do you know when it occurred?

 5        A.    I don't remember.

 6        Q.    Do you know if any of, well, do you know

 7    if you worked for Saltire Industrial before it

 8    was acquired by Alper Holdings?

 9        A.    No.

10        Q.    Do you know whether either of your

11    co-workers, well, do you know whether any of the

12    corporate officers for Saltire Industrial were

13    with that company when it was acquired by Alper

14    Holdings, Inc?

15        A.    None of those people were with Saltire

16    before it was acquired, no.

17        Q.    Do you know how long Saltire has been in

18    existence?

19        A.    I believe the name change happened in

20    1994.   That's my recollection.

21            So Saltire Industrial, Inc. came into

22    existence I believe in 1994.

Bauer1

159

1          Q.    Do you know whether it was a name change
2      so there was no coming into existence, or was it
3      a, you call it a name change?
4          A.    I guess it, I guess it really was a name
5      change.
6          Q.    So Scovill, Inc. continued on as Saltire
7      Industrial, Inc?
8          A.    Effectively, yes.
9          Q.    Okay.  Let me make -- in 1994, had Alper
10     Holdings, Inc. Acquired Saltire Industrial?
11         A.    Some time prior to 1994, yes.
12         Q.    Alper Holdings had?
13         A.    Acquired Scovill.
14         Q.    Okay.  Do you know who it acquired
15     Scovill from?
16         A.    The former owner of Scovill was a
17     company by the name of First City Financial.
18         Q.    Since you have been with Saltire
19     Industrial, have you had any contact with anyone
20     at First City Financial?
21         A.    No.
22         Q.    Have you heard of any relationship

Bauer1

160

```
 1    ongoing between First City Financial and Alper

 2    Holdings?

 3        A.   No.

 4        Q.   Okay.  Do you know currently any, anyone

 5    connected with First City Financial?

 6        A.   No.

 7        Q.   Do you know what Alper Holdings, Inc.

 8    Paid for Scovill, Inc?

 9        A.   No, I do not.

10        Q.   Do you know who the principal of

11    Scovill, Inc. -- strike that.

12             Do you know anyone, the names of anybody

13    who was connected to Scovill, Inc. when it was

14    acquired by Alper Holdings?

15        A.   No, I do not.

16        Q.   Do you believe you have in your office

17    records that would demonstrate that?

18        A.   Demonstrate my lack of knowledge?

19        Q.   No.

20        A.   Oh.

21        Q.   That would demonstrate who the corporate

22    officers were for Scovill, Inc. when it was
```

161

Bauer1

1    acquired by Alper Holdings.

2        A.    Probably not, no.

3        Q.    Okay.    Now First City Properties, Inc.,

4    do you know how that company came to own Scovill,

5    Inc?

6        A.    First City Financial?

7        Q.    Yes.

8        A.    Again, I obviously was not present for

9    the review of the documents that I have made.

10        My understanding is that First City

11    Financial, you know, again, I don't know whether

12    it was a stock purchase or how it acquired, but

13    it, you know, it purchased or somehow acquired

14    Scovill, Inc.

15        Q.    And is it your understanding that it

16    acquired Scovill, Inc. from Scovill, I mean that

17    it is, Scovill was not owned by anybody prior to

18    that time?

19        A.    That's correct.

20        Q.    Okay.    And you talked about a review of

21    documents.

22        Have you ever reviewed this purchase

162

1    agreement among Arvin Industries and Scovill,

2    Inc.?

3            MR. LUCAS:    Do you care if we go off the

Page 146

Bauer1

4       record for about 30 seconds?

5               MR. STEWART:  Sure.

6               THE VIDEO SPECIALIST:  Off the record,

7       and the time on screen is 14:14:58.

8               (A recess was taken.)

9               THE VIDEO SPECIALIST:  On record, and

10      the time on screen is 14:23:50.

11              BY MR. STEWART:

12          Q.  Mr. Bauer, I handed you a document.  Do

13      you recognize it?

14          A.  Yes.  I have seen this or similar

15      document previously.

16          Q.  And what is that document?

17          A.  Purchase agreement dated March 10th,

18      1986, by Arvin Industries, Inc. Indiana

19      Corporation, the buyer, Scovill, Inc., a Delaware

20      corporation, the seller, and Scovill, Inc., a

21      Connecticut corporation, and indirect subsidiary

22      of the seller, old Scovill.

163

1               Again, I have not gone through to see.

2       I wouldn't even know whether it was a full and

3       complete copy of this agreement, but that's what

4       it's identified as at the beginning.

5           Q.  Well, what would you need to know

6       whether it was a full and complete copy?

Page 147

Bauer1

```
 7        A.   I'm not familiar enough with this
 8   document to be able to make that assessment.
 9        Q.   Would you have one in your corporate
10   files?
11        A.   Yes.
12        MR. STEWART:  Okay.  I would like to
13   mark that for identification.
14                      (Exhibit No. 32
15                       was marked for
16                       identification.) ^
17        BY MR. STEWART:
18        Q.   Mr. Bauer, you have this document in
19   front of you?
20        A.   Yes, sir.
21        Q.   Do you see where it says on the second
22   paragraph whereas seller owns all the issues and
```

                                                    164

```
 1   outstanding shares of capital stock of Schrader
 2   Automotive, Inc., a Delaware corporation?
 3        A.   Um-hm.
 4        Q.   Okay.  Now Schrader Automotive, Inc., do
 5   you know what relationship that entity had to the
 6   Dickson facility in 1986?
 7        A.   I believe Schrader Automotive, Inc. at
 8   that time was the owner and operator of the
 9   subject facility in Dickson.
```

                          Page 148

Bauer1

10          Q.    Are you pretty confident in that belief?

11    I mean is that --

12          A.    The corporate, my understanding and

13    belief having just, from the documents that I

14    looked at previously, is that there were a number

15    of changes made in Scovill, Inc. that related to

16    divestiture or splitting off of a number of

17    former operating divisions of Scovill into

18    separate companies, and in preparation for

19    selling those companies.

20                You know, what property or assets or

21    whatever went with what companies, you know, when

22    that transformation was occurring, I can't speak

165

1    for with confidence.

2          Q.    Would you agree with me that you don't

3    know of any reason to doubt this document's

4    characterization of Schrader Automotive, Inc. as

5    a wholly-owned subsidiary of Scovill, Inc. at the

6    time?

7          A.    No.    That's correct.

8          Q.    Okay.    And I would like to turn, you to

9    turn to page I think it's Bates stamp C4883 on

10    your copy to Section 220 of the document.    I

11    think it should be marked with a --

12          A.    Yes, it is.

Page 149

Bauer1

13          Q.    Sticky -- okay.  And do you see, do you

14    understand Section 220 to exclude the Dickson

15    plant that is the facility we have been talking

16    about today from the sale of Schrader Automotive,

17    Inc.?

18                MR. LUCAS:  Are you asking him to

19    interpret the document, or are you asking him if

20    he has a understanding?

21                MR. STEWART:  I'm asking if based on his

22    review of documents that he referred to, his

166

1    understanding is that Scovill's sale of Schrader

2    to Arvin Industries did not include the Dickson

3    plant.

4                THE WITNESS:  The business of Schrader

5    Automotive was sold to Arvin Industries.

6                The Dickson plant and real property

7    associated with that was not included in that

8    sale.

9                Yes, that's my understanding.

10                BY MR. STEWART:

11          Q.    Your understanding is that, that

12    after -- and correct me if I'm wrong.

13                Is it your understanding that after the

14    1986 sale of Schrader Automotive, the Scovill

15    subsidiary, that Scovill, Inc. continued to own

Page 150

Bauer1

16          the Dickson facility?

17                A.    Yes, that's my understanding.

18                Q.    Is it your understanding that Scovill, I

19          take it it is, that Scovill remained responsible

20          for any environmental issues relating to that

21          facility, if any?

22                A.    Backing up a second, I'm not sure


167


1          actually that Scovill, Inc. owned the Dickson

2          plant at the time that this transaction occurred.

3                The facility was actually being leased

4          is my recollection, from Dickson County or a

5          quasi-governmental body associated with Dickson

6          County.

7                Q.    That would be some form of industrial

8          development board?

9                A.    Yes.

10                Q.    Probably the co-defendant in this case,

11          the, I believe it's the Dickson County Industrial

12          Development Board?

13                A.    That's correct.

14                Q.    Okay.  But the, to the extent Scovill,

15          Inc. owned any assets or had any liabilities

16          relating to the Dickson plant, specifically

17          environmental liabilities, your understanding is

18          that those remained with Scovill and were not

Bauer1

19    transferred as part of the scale of Schrader

20    Automotive?

21        A.    That's correct.  They were not, my

22    understanding is those liabilities were not

168

1    transferred to Arvin Industries.

2        Q.    Okay.  I'm going to hand you another

3    document.

4            (The witness reviewed the document)?

5            BY MR. STEWART:

6        Q.    Do you recognize that document?

7        A.    No, sir.

8        Q.    Okay.  So as far as you know, you have

9    not seen that before?

10        A.    I do not recall this document, no.

11            MR. STEWART:  Okay.  I would like to

12    just have that marked for identification.

13                            (Exhibit No. 33

14                            was marked for

15                            identification.)  ^

16            BY MR. STEWART:

17        Q.    Mr. Bauer, I want to switch gears and

18    talk about your career.

19        A.    Okay.

20        Q.    Tell me first about your educational

21    background just starting with high school briefly

Page 152

Bauer1
22        and taking me through your education.

169

1         A.    High school, John Burroughs High School
2    in St. Louis, Missouri, graduated 1977, Bachelor
3    of Science in chemistry from University of
4    Virginia, 1981, finishing up educational, Master
5    of Science in environmental engineering science
6    from California Institute of Technology, 1986.
7         Q.    That's commonly known at Cal Tech?
8         A.    Commonly known as Cal Tech.
9         Q.    Is the Masters Degree from Cal Tech the
10   extent of your formal education?
11        A.    Yes.
12        Q.    Okay.  When you graduated from Cal Tech,
13   did you hold any permanent jobs through 1986?
14        A.    Yes.
15        Q.    Can you tell me what those were?
16        A.    I was, worked for a company called
17   National Engineering Products.
18        Q.    What did you do for them?
19        A.    Plant manager, technical production
20   manager.  I think it was actually the title
21   technical production manager.
22        Q.    And what were you making there?

Bauer1

1        A.     Making some specialty sealants and apoxy

2     compounds for military and electronic

3     applications.

4        Q.     And where were they located?

5        A.     In Washington, D.C.

6        Q.     And when did you work there?

7        A.     1981 to 1982.

8        Q.     And why did you leave?

9        A.     Chose to make a shift to doing

10     environmental work.

11        Q.     And how did you do that shift?

12        A.     In 1982, I started work at ICF,

13     Incorporated, and worked there until nineteen,

14     through nineteen, into 1985.

15        Q.     Okay.  ICF, Incorporated was the

16     predecessor to ICF Kaiser?

17        A.     Yes.

18        Q.     Okay.  And ICF, Incorporated from 1982

19     to 1985, what was your job title?

20        A.     Started out as a research assistant,

21     associate, senior associate.

22        Q.     And what did you generally do in those

Bauer1

1    capacities?

2         A.    Environmental regulatory compliance and

3    policy support.

4         Q.    What does that mean?

5         A.    An EPA contractor.

6         Q.    You worked for the EPA?

7         A.    Primarily, building regulatory policy

8    and assisting with regulatory development work.

9         Q.    Well, were you in the field at that

10   time, or in the office?

11        A.    In the office primarily.

12        Q.    Writing regs?

13        A.    Yes.

14        Q.    Okay.  Did, were those regulations

15   related to RCRA?

16        A.    RCRA, Superfund, TSCA -- Toxic

17   Substances Control Act.

18        Q.    Tell us what RCRA is.

19        A.    Resource Conservation and Recovery Act.

20        Q.    Okay.  Did you ever work for Scovill

21   during this period in your career in 1982 to

22   1985?

                                                  172

1         A.    I don't believe so.

2         Q.    Did you ever go to any of the sites that
                        Page 155

Bauer1

3          you have listed for me either involving

4          environmental regulatory liability or litigation?

5              A.    No.

6              Q.    Okay.  What happened next?  Where did

7          you head after Cal Tech?

8              A.    Cal Tech.

9              Q.    How long were you at Cal Tech?

10             A.    A little over a year.

11             Q.    Okay.

12             A.    Approximately a year.

13             Q.    When you got your Masters, what did you

14         do?

15             A.    Returned to ICF, which at that point,

16         yeah, ICF, Incorporated or ICF Technology.

17             Q.    Okay.  And --

18             A.    That was 1986.

19             Q.    And what was your -- were you a senior

20         associate?

21             A.    Senior associate I believe at that time.

22             Q.    Okay.  And what did you work on?

173

1              A.    Continued to work on some policy work

2          for EPA, transitioned into more private sector

3          work, field-related work related to hazardous

4          waste site, contaminated site investigation and

5          clean-up activities, some environmental
                              Page 156

Bauer1

6      permitting work.

7          Q.   When did you first get involved --

8      excuse me.

9          A.   Also, and also just regulatory

10     compliance support for principally private sector

11     clients.

12         Q.   Were you going out in the field at this

13     point doing field investigations?

14         A.   Doing some field work, yes.

15         Q.   For what companies were you doing that,

16     do you recall?

17         A.   No, I really don't recall; you know, the

18     specific clients.

19         Q.   Who was your supervisor during this

20     period, your direct supervisor?

21         A.   Several; I would say initially during

22     that period would be Steve, Steven Bailey, later,

174

1      Jeffrey Goodman, and later still, Steven Wendt.

2          Q.   Are any of those folks still at the

3      company?

4          A.   No.

5          Q.   Are any of them at IT?

6          A.   No.

7          Q.   Do you know where any of them are?

8          A.   Yes.

Bauer1

9      Q.    Where are they?

10     A.    Steven Bailey works for a company called

11  Hart Partners.

12     Q.    How about Jeffrey Goodman?

13     A.    Project Performance Corporation.

14     Q.    And how about Steven Wendt?

15     A.    Excalibur Group.

16     Q.    All environmental engineers?

17     A.    Or environmental professionals, not

18  necessarily engineers.

19     Q.    When did you first work on any project

20  involving Scovill Corporation that you know of?

21     A.    It would have been the late 1980s.

22     Q.    And in what capacity did you work for

175

1   Scovill Corporation in the late 1980s?

2      A.    As a project manager.

3      Q.    Of what project?

4      A.    Scovill owned a facility in

5   Clarkesville, Georgia, and I was engaged in

6   principally monitoring activities that were going

7   on at that site.

8      Q.    Okay.

9      A.    And you know, dealings with the

10  regulatory authorities, et cetera.

11     Q.    What kind of facility was it that

Bauer1

12    Scovill owned in Clarkesville, Georgia?

13         A.    They were manufacturing buttons,

14    zippers, fasteners of various kinds.

15         Q.    Similar to the Watertown, Connecticut,

16    plant?

17         A.    Yes.

18         Q.    Was there any contamination at the

19    Clarkesville, Georgia, plant?

20         A.    There was some groundwater contamination

21    identified.

22         Q.    Okay.  Do you remember what it was

176

1    contaminated with?

2         A.    I believe there were also volatile

3    organic compounds there.

4         Q.    Was trichloroethylene in the water?

5         A.    Yes.

6         Q.    Okay.  Can you tell me, Mr. Bauer, why

7    you didn't list that project as a project,

8    administrative project that was, that Scovill was

9    involved with when we went through that list

10   before?

11        A.    That was, you know, oversight on my

12   part.

13             It was a relatively small project in

14   terms of the environmental work that was, that

Page 159

Bauer1

15    was going on, and it's one that I hadn't worked

16    on for a number of years, so --

17        Q.    Okay.  Tell me --

18        A.    One I hadn't really ever worked on since

19    actually becoming part of Alper Holdings.

20        Q.    Okay.  Tell me how long you were project

21    manager.

22        A.    I don't recall the date when I was, you

177

1    know, went from being a senior associate to a

2    project manager, but I was a project manager

3    until I left ICF which became ICF Kaiser

4    Engineers, Inc. in January of 1986.  I mean 1996.

5    Excuse me.

6        Q.    There you're saying you were project

7    manager as in that was your title?

8        A.    Right.

9        Q.    That's a senior manager in charge of

10    entire projects?

11        A.    Or a -- no.  A manager, you know, not

12    necessarily senior manager, but somebody in

13    charge of a project, yes, or more.

14        Q.    Okay.  But how long were you project

15    manager on the Clarkesville, Georgia, site?

16        A.    Several years; I don't recall precisely.

17        Q.    Okay.

Bauer1

18        A.    And in response to your earlier

19   question, there were also, I may have done some

20   limited field work at the Watertown site and

21   perhaps even also the Dickson site, although I

22   don't really recall in that, you know, especially


178


1    in the late '80s time period.

2         Q.    Okay.  You said late '80s.  When in the

3    late '80s do you believe you first worked on the

4    Clarkesville, Georgia, project?

5         A.    Other than being after 1986, I don't,

6    can't give you a more specific date than that.

7         Q.    Well, I assume you can narrow it down as

8    between 1986 and 1990, you can get closer than a

9    four-year range on when you became project

10   manager?

11        A.    Well, in terms of title or in terms of

12   my functional duties with the Clarkesville site?

13        Q.    Yeah.  In terms of the first day you

14   opened up a document or walked down there and

15   stepped on the site.

16        A.    Well, it being 15 years ago,

17   unfortunately, it's, you know, I don't think I

18   can.

19        Q.    Okay.  So you know that some time

20   between 1986 and the year 1990, you became

Bauer1

21        involved with that site?

22              A.    Yes.

179

1         Q.    Okay.  Now did -- how is it that

2    volatile organic compounds were first identified

3    in the groundwater under that site?

4         A.    By the time I was involved with that

5    site, that had already occurred, and so I don't

6    know the details of what the triggering mechanism

7    was.

8         Q.    Was that a site that was clean closed?

9         A.    No.    That's a site that was never, to my

10   knowledge -- well, I don't know whether it had

11   any RCRA units.  It was a operating facility.

12        Q.    So again, the, the trichloroethylene in

13   the groundwater at that site, that would have

14   come from not a storage unit, but day-to-day

15   operations of that plant?

16        A.    I don't know the, I don't recall the

17   particular -- I don't think a particular source

18   was necessarily ever identified at that site.

19        Q.    Okay, but --

20        A.    As opposed to a, you know, a known

21   release or storage unit, no.

22        Q.    When you're telling me that there

Bauer1

180

1    weren't RCRA units, what you're telling me is

2    that there weren't storage devices, landfills,

3    tanks, that were regulated --

4        A.    By under RCRA as hazardous waste

5    management unit.

6        Q.    You had a plant that used volatile

7    organic compounds, is that right?

8        A.    Yes.    That's correct.

9        Q.    One of those was trichloroethylene?

10       A.    Yes.

11       Q.    Trichloroethylene got in the groundwater

12   under the plant, is that right?

13       A.    Yes.

14       Q.    And did you ever at that project when

15   you were project manager talk to anybody at that

16   plant who could tell you exactly how, how that

17   trichloroethylene got in that groundwater?

18       A.    Again, I simply just don't recall what

19   the, what the, what the route was if it was ever

20   even specifically identified.

21           It was primarily a monitoring project

22   and a permitting project when I was involved with

Bauer1

1     it, and -- okay.  That refreshes my memory.

2          There were RCRA units there.  There was

3     post-closure activities going on, so there were,

4     there was -- I'm gradually recalling this from

5     that site -- there were RCRA units there because

6     we did do post-closure permitting work, and that

7     was part of what I did at that site.

8     Q.    Okay.  Were, what kind of RCRA units

9     were they, do you remember?

10    A.    You know, whether it was a surface

11    impoundment or land, I think it was probably a

12    surface impoundment.

13    Q.    What is a surface impoundment?

14    A.    That's a, you know, pond or similar kind

15    of structure designed to hold residual materials,

16    waste products.

17    Q.    Okay.  And was that plant clean closed?

18    A.    Since we were doing a post-closure

19    permit work, then it would not have been clean

20    closed.

21    Q.    Okay.  Does that mean it was closed in

22    place?

182

Bauer1

```
 1          A.    Right, but as a surface impoundment.

 2          Q.    Okay.

 3          A.    Which has a different connotation

 4    obviously than closing in place a landfill.

 5          Q.    I understand.  Did, did you monitor

 6    groundwater off his site, the Clarkesville,

 7    Georgia, site?

 8          A.    No.

 9          Q.    You never put groundwater monitoring

10    devices outside the site?

11          A.    That's correct.

12          Q.    Okay.  Can you just tell me why that was

13    on that particular site?

14          A.    We didn't have evidence of groundwater

15    contaminants migrating off the property.

16          Q.    Okay.  Do you know when

17    trichloroethylene was first found in the

18    groundwater on that site?

19          A.    No, I do not.

20          Q.    It would have predated your arrival?

21          A.    It predated my role as project manager

22    for the site.
```

183

```
 1          Q.    Okay.  Can you tell me -- now I want to

 2    make sure I'm very clear about this.

 3                I want you to think very carefully, Mr.
```

Page 165

Bauer1

```
 4    Bauer, and I want you to tell me whether or not
 5    you think you overlooked any other sites like
 6    this where you were project manager.   Strike
 7    that.
 8            I want you to think very carefully.   We
 9    enumerated a list of sites that you understood
10    the company was involved with where there were
11    administrative or litigating environmental
12    issues, and I want you to let me know if there
13    are any other sites that you can recall like this
14    Clarkesville, Georgia, site which you forgot
15    about in your initial enumeration of those sites.
16            MR. LUCAS:   I'm going to object to the
17    form of the question.
18            It's argumentative.   I mean he earlier
19    testified that he was doing it from memory and
20    that to --
21            MR. STEWART:   Counsel, I'll rephrase
22    because I'm actually not trying to be
```

184

```
 1    argumentative.
 2            BY MR. STEWART:
 3       Q.   I just want to make sure we're clear.   I
 4    want to, I just want to take this moment and see
 5    whether or not you can recall any other sites
 6    that would have fit into that list?
```

Page 166

Bauer1

7          A.    Right.

8          Q.    Of either litigated or administratively

9     dealt with sites.

10         A.    You know, again, I know there were other

11    sites other than the ones that I have mentioned

12    in particular that were settled or otherwise, you

13    know, taken care of prior to my involvement with

14    Saltire as an employee, and so I, you know, I

15    know there are other sites out there.

16              I just, I'll think for a moment longer

17    and see if I can identify others.

18              (There was a pause in the proceedings.)

19              THE WITNESS:  I don't recall any others

20    to add to that list at the moment.

21              If, certainly, you know, if other, other

22    conversations trigger some recollection, I'll let

                                                    185

1     you know.

2               BY MR. STEWART:

3          Q.    Would you have documents at your company

4     that would enable you to come up with a more

5     comprehensive list?

6          A.    Yes.

7          Q.    Okay.  And what documents would those

8     be?

9          A.    Well, I have, you know, files on many of

                          Page 167

Bauer1

10      the sites, certainly not all of them, at my

11      office where most of them are organized by site.

12          Q.    Okay.

13          A.    I have to go back through and review

14      that.

15          Q.    Can you think of any site of a former

16      plant or facility or disposal made or owned by

17      the company on which there is possible

18      groundwater contamination but for which there has

19      been no administrative activity or litigation?

20          A.    I really don't know.  I mean there are

21      certainly facilities that have been formerly

22      owned by Scovill which at one time was a

                                                186

1       substantial, you know, company with numbers, with

2       a large number of plants that, you know, there

3       are many operating facilities around, around the

4       country, so there may be sites out there.

5               I'm, none that I'm aware of, you know,

6       you know, at the moment that, you know, there is,

7       the -- we mentioned before, for example, the site

8       that had disposed of, alleged to have disposed of

9       wastes at the, at the Calabrese property.  You

10      know, there is that site.

11              There may be others that, you know, were

12      former sites that were, we don't have any, you

                        Page 168

Bauer1

13    know, information about them.

14        Q.    But are you aware of any sites where

15    Scovill has tested the soil or done a soil boring

16    or a water sample which has turned up a hazardous

17    material or a, including a volatile organic

18    compound where there has neither been litigation

19    nor environmental administrative oversight?

20        A.    No.

21        Q.    Okay.  Tell me when was it at ICF Kaiser

22    that you started working at the Dickson site?

187

1        A.    Again, I don't recall.  I think that I

2    may have done some field work, miscellaneous, you

3    know, routine field tasks, collecting samples at

4    the Dickson site.

5            You know, I frankly don't recall

6    specifically, but I can't rule that out.

7            I was, didn't actually become really

8    actively involved with the Dickson site until

9    January -- well, excuse me -- October of 1994

10    when, around October 1994 when I took over

11    project management duties for that site as part

12    of ICF Kaiser.

13        Q.    I think the tape is going to run.

14            THE VIDEO SPECIALIST:  Off record; end

15    of Tape 2, and the time on screen is 14:57:42.

Page 169

Bauer1

16          (A recess was taken.)

17          THE VIDEO SPECIALIST:   On record; this

18     is Tape 3, and the time on screen is 15:11:42.

19          BY MR. STEWART:

20     Q.   Mr. Bauer, while you were a senior

21     associate and project manager at ICF, did you

22     work on any projects other than those you have

188

1      described to me for Scovill?

2           A.   I don't recall any other, no, no other

3      Scovill projects.

4           Q.   Okay.  While you were a project manager

5      of the project in Clarkesville, Georgia, did you

6      report to, your activities to Scovill?

7           A.   Yes.

8           Q.   To whom did you report, what human-being

9      at Scovill?

10          A.   John Coghlin, C-O-G-H-L-I-N I think.

11          Q.   What was John's title at Scovill?

12          A.   He was the general counsel.

13          Q.   And do you have any idea what John is

14     doing now?

15          A.   I don't remember the name of the company

16     that he is with now, no.

17          Q.   Okay.  Were you familiar with any of the

18     officers at Scovill during that time when you

Page 170

Bauer1

19      were project manager?

20          A.  No.

21          Q.  Did you ever meet with anyone at

22      Scovill, including Mr. Coghlin, personally?

189

1          A.  Met with Mr. Coghlin.  Met with Mr.

2      Smith at that time as well.

3          Q.  Who is Mr. Smith?

4          A.  Mr. Wayne Smith.

5          Q.  Who's that?

6          A.  He's the, currently Chief Financial

7      Officer and senior vice president.

8          Q.  So he was with Scovill at that time?

9          A.  Scovill/Saltire, you know, yes.

10          Q.  That would have been the late '80s?

11          A.  Well, I'm thinking in terms of probably

12      time period later than that.

13              Previous -- I don't remember

14      specifically when Mr. Smith joined.

15              I know I had some conversations with,

16      you know, with him especially toward the end of

17      my time at ICF.

18          Q.  Okay.  You had conversations with him,

19      Mr. Smith, relating to the Clarkesville.

20      Georgia --

21          A.  I would have had some, yes, with him.

Page 171

Bauer1
22          Q.    When did you cease working on the

190

1      Clarkesville, Georgia, project?
2           A.    I worked on that pretty much I believe
3      until I left -- no, before, before I left ICF, or
4      about the same -- a little before the time I left
5      ICF, that site was sold, and ICF was not retained
6      to continue the monitoring activities, et cetera,
7      there.
8           Q.    Okay.
9           A.    So I would have worked on the
10     Clarkesville, Georgia, site up until, you know,
11     roughly 1994, '95 timeframe, something like that.
12          Q.    And would you have talked to Mr. Smith
13     in the '80s?
14          A.    I don't recall, you know, in that,
15     whether he was at the company at that point or
16     not.  I don't think so.
17                And then the predecessor of Mr. Coghlin
18     was Mr. Scott Robbins, and so earlier time
19     periods, late '80s, would have been more directly
20     contacting Mr. Robbins, and he was also general
21     counsel.
22          Q.    Was he an officer of the company?

Bauer1

191

1          A.    I don't know.

2          Q.    Anybody else from Scovill that you

3     recall, any other human-beings with whom you met?

4          A.    No.

5          Q.    Anybody, any human-beings with whom you

6     had telephone calls?

7          A.    No.

8          Q.    Okay.  I take it you reported to Mr.

9     Scott Robbins prior to Mr. Coghlin taking over?

10         A.    That's correct.

11         Q.    Okay.  Did you ever talk to any of the

12    individuals you have just named for me about the

13    Dickson facility?

14         A.    Only, you know, subsequent to my

15    becoming the project manager having a role as

16    project manager for that site; again, it was

17    approximately October 1994.

18         Q.    Okay.  Tell me why in October 1994 you

19    were named project manager of the Dickson site.

20         A.    The previous project manager who had --

21    was Cynthia Dacre I believe at that time.

22               She left ICF to go to another firm.

192

Page 173

Bauer1

```
 1          Q.    And when you took over as project
 2     manager, did you have meetings to get
 3     familiarized with the site?
 4          A.    I don't recall specifically.  That would
 5     have been a typical procedure, yes.
 6          Q.    Do you recall any meetings you had to
 7     give you an overview of the site or anything like
 8     that?
 9          A.    Not specifically, no.
10          Q.    Do you recall your, well, do you recall
11     who, once you became project manager, you
12     reported to at Scovill or Saltire?
13          A.    At that time, it would have been, I
14     believe by that time it would have been Mr.
15     Coghlin.
16          Q.    This would have been '94?
17          A.    '94 timeframe, yes, late 1994.
18          Q.    How long did you work as project manager
19     of the Dickson site?
20          A.    For approximately October 1994 until
21     January 1996 at ICF Kaiser.
22          Q.    And who worked with you on that project?
```

                                                      193


```
 1          A.    Staff varied over time.  There were
 2     obviously people who performed field work and,
```
                              Page 174

Bauer1

3    you know, took samples.

4         There were a number of those folks.

5    Claudia Brand, you know, was working as a

6    part-time person for a part, at least a portion

7    of that period; Leslie Poirer, P-O-I-R-E-R.

8         Let's see.  Who else?  Perhaps Shelby

9    Walker.  There were a number of parties that

10    worked on the site.

11    Q.   Well, who were the associates, the

12    engineers working with you on this site while you

13    were project manager?

14    A.   In terms of the engineering work, well,

15    there wasn't a whole lot of engineering work

16    going on, primarily investigation work at that

17    time.

18         Nonyrem Anyanu; I don't know the

19    spelling.  I'm sorry -- did a lot of the work

20    there.

21         MR. LUCAS:  Just give her something

22    phonetic just so that she can try to get it down.

194

1         THE WITNESS:  N-O-N-Y-R-E-M A-N-Y-A-N-U;

2    I don't know; something along those lines, did,

3    was working on the site, working on the

4    documents.

5         Kathleen Huber was also working on the

Bauer1

```
 6     documents.
 7           There was a -- I'll try to recall other
 8     names, but I don't recall right now.
 9           BY MR. STEWART:
10     Q.    Okay.  Tell me briefly what Leslie was
11     doing for you at the time.
12     A.    She was coordinating a lot of the site
13     activities for the dye trace study working on an
14     analysis of the little packets that were used to
15     collect dye samples, doing some of the field work
16     out in the, at the site looking for springs, et
17     cetera.
18     Q.    How about Shelby?
19     A.    Similar work, more as, you know, just
20     more junior level associate person working on,
21     doing various miscellaneous tasks for the site.
22     Q.    Which of all these people actually went
```

195

```
 1     on the site?
 2     A.    I believe all of them were actually on
 3     the site at one time or another.
 4     Q.    Okay.  Were you working with DRE
 5     Technologies on the site as well?
 6     A.    No.
 7     Q.    Okay.  Were you working with any local
 8     contractor?
```

Page 176

Bauer1

9      A.   We sometimes used local contractors to

10     come out and provide field tech support.

11          You know, whether we used DRE at all or

12     some other local contractors, I don't recall

13     during that period, but it was primarily as sort

14     of field tech support kind of work as opposed to

15     anything more substantive than that.

16     Q.   Well, are you aware, is it your

17     understanding that DRE did a lot of the legwork

18     for the well, outside well finding and selection

19     when Claudia Brand was project manager?

20          Is that anything you know about?

21     A.   No, it's not something that I'm aware

22     of.  It wasn't during, during my work.

196

1      Q.   Okay.  Did you know anyone at DRE

2      Technologies with whom you had kind of an ongoing

3      working relationship?

4      A.   The other person would be Patricia

5      Thompson who was with I guess DRE for a while.

6          I'm not sure when she became ICF.  She

7      eventually, she is currently an ICF or an IT

8      employee.

9      Q.   Okay.

10     A.   Patricia I think actually was an IT

11     employee by the time I was working on the site.

Bauer1

12          Q.    Okay.  Who became project manager when

13     you left in January 1996?

14          A.    Brian Roberts.

15          Q.    Okay.  And is Brian Roberts still with

16     IT?

17          A.    No.

18          Q.    Do you know where he is?

19          A.    He's also with the Excalibur Group.

20          Q.    Also you say --

21          A.    Mr. Wendt we mentioned before was with

22     Excalibur Group.


197


1          Q.    How long was Brian Roberts the project

2     manager?

3          A.    Until he left the company; I don't

4     recall that date.  It was a couple of years.

5          Q.    Okay.  When you left, first of all, who

6     became project manager after Brian Roberts?

7          A.    Patricia Thompson is the current project

8     manager.

9          Q.    Okay.  And I think she was the one who

10     became project manager when you left?

11          A.    There may have been someone, you know,

12     in there briefly, but Ms. Thompson was the

13     principal person.

14          Q.    And generally speaking, Ms. Thompson,

Bauer1

15      has she been reporting to you as project manager?

16          A.   Yes.

17          Q.   Okay.  Can you give me a general opinion

18      or are you satisfied with her quality of work?

19          A.   Yes.

20          Q.   Okay.  Is that true for Brian Roberts as

21      well?

22          A.   Yes.

198

1           Q.   Okay.  Mr. Brand, when you left in

2       January 1996, what did you leave --

3               MR. LUCAS:   You didn't really mean Mr.

4       Brand.

5               THE WITNESS:   Bauer.

6               BY MR. STEWART:

7           Q.   Excuse me.   Thank you.

8           A.   That's okay.

9           Q.   I'm getting my engineers mixed up.   Mr.

10      Bauer, what did you go to do?

11              What position did you take when you left

12      ICF Kaiser?

13          A.   I went to work, my current position that

14      I hold is the vice president of environmental

15      affairs.

16          Q.   For?

17          A.   Well, for Alper Holdings.

Page 179

Bauer1

18          Q.    Okay.  Do you handle any matters for

19     Alper Holdings that do not relate to Saltire

20     Industrial?

21          A.    No, I do not.

22          Q.    Okay.  Who hired you?


                                                    199


1          A.    I'm not sure who made the decision.

2     Presumably Mr. Coghlin, Mr. Smith were probably

3     both involved in that decision.

4          Q.    So Mr. Coghlin was still at Saltire

5     Industrial?

6          A.    That's correct, while I was, when I was

7     hired.

8          Q.    Okay.  And that was in January 1996?

9          A.    That's right.

10          Q.    And do you know when he left Saltire

11     Industrial?

12          A.    I don't recall the date at this point.

13     It was a couple of years ago.

14          Q.    How long after you, after you got there?

15     Shortly thereafter?

16          A.    No.  It was, as I said, it was a couple

17     years ago, so it would have been perhaps, you

18     know, three years after I got there.

19          Q.    What was his title when you arrived at

20     Saltire?

Bauer1

21          A.    General counsel.

22          Q.    Who is general counsel now?

200

1          A.    We don't have a general counsel now.

2          Q.    Okay.  Use outside lawyers for all your

3     work?

4          A.    Yes, when we need legal assistance.

5          Q.    Now while you were project manager?

6          A.    Um-hm.

7          Q.    Did you send monthly reports to the

8     Environmental Protection Agency?

9          A.    I believe we were generating monthly

10    reports at that time, yes.

11         Q.    Okay.

12         A.    But I don't recall specifically, you

13    know, whether that was a requirement at this time

14    or not.

15         Q.    Did you send any other reports to the

16    Environmental Protection Agency and state

17    agencies?

18         A.    While it wasn't something that was

19    drafted, you know, really when I was, had that

20    role of project manager, the final version of the

21    Phase 1 RFI report I think went out under my

22    signature.

Page 181

Bauer1

201

1          I don't recall, you know, exactly, but I
2     think that did the final version of that Phase 1
3     report.
4          Q.    Can I hand you Exhibit 1 from the Brand
5     deposition and ask you to tell me whether that is
6     a accurate copy, an accurate copy of your Phase 1
7     report?
8          A.    Well --
9          (The witness reviewed the document.)
10         THE WITNESS:    Well, this is, appears to
11    be the cover letter for the final Phase 1 report,
12    and this did go out when Claudia was still the
13    project manager, so I take that back.
14         I guess that must have been the Phase 2
15    report that went out under my signature, and this
16    one did not.
17         BY MR. STEWART:
18         Q.    Okay.    While you're on the Phase 1, have
19    you referred to that Phase 1 while you, as part
20    of your work as project manager or later working
21    for Saltire?
22         A.    I certainly have referred to it.    As I

Bauer1

202

1    wasn't intimately involved with the preparation

2    of this report, you know, I'm certainly not, you

3    know, very, not familiar with all the details of

4    it, but -- and nor can I say that I probably even

5    read the whole thing, but I certainly have

6    referred to it.

7        Q.   Can you look at that and tell me whether

8    that appears to be a, an accurate copy of the

9    Phase 1?  Because we'll be referring to it.

10          (The witness reviewed the document.)

11          MR. LUCAS:  Flip back just a minute,

12    please.

13          THE WITNESS:  Um-hm.

14          (The witness reviewed the document.)

15          THE WITNESS:  Are the appendices present

16    in this version?

17          BY MR. STEWART:

18        Q.   No.

19        A.   Okay.  I mean I have looked at it enough

20    to say that it looks like all the sections that

21    are referenced in the Table of Contents appear to

22    be here.

203

Bauer1

```
 1                Just, you know, briefly glancing at it,
 2       I can't, you know, tell you any more than you
 3       know it appears to be.
 4           Q.    Appears to be the Phase 1?
 5           A.    It appears to be the Phase 1.
 6           Q.    Okay.
 7                MR. LUCAS:  Let me just ask you a
 8       question then.
 9                I think you told me this earlier, but
10       the pages that were missing at Ms. Brand's
11       deposition, have you put those pages in this
12       exhibit now?
13                MR. STEWART:  Yes, and you might want to
14       inspect it.  I believe we have a complete Phase 1
15       in front of the witness, but --
16                MR. LUCAS:  Other than the appendices
17       you mean?
18                MR. STEWART:  Other than the appendices,
19       yes.
20                BY MR. STEWART:
21           Q.    You mentioned that document, so I asked
22       you so you would have sent up the Phase 2 under
```

                                                204

```
 1       your signature?
 2           A.    Yes.  This was dated April '94, so that
 3       would have been several months before I actually
```

Page 184

Bauer1

4      became project manager for the site.

5          Q.    And as project manager, when you sent a

6      document to the EPA or to the Tennessee

7      regulators, would you have copied the company on

8      that document?

9          A.    Yes.

10         Q.    Okay.  And I just want to make sure when

11     you submitted as project manager and any other

12     capacity a document to the EPA or to a Tennessee

13     regulator, is it fair to assume that you intended

14     the statements in that document to be as true as

15     they could be at the time you made them?

16         A.    Yes.  Certainly things may change

17     subsequently, but at the time, we certainly

18     wouldn't add anything that we knew to be untrue

19     or misleading.  That's certainly true.

20         Q.    Okay.  And so with regard to reports,

21     your monthly reports, your Phase 2 report, and

22     similar reports sent to the EPA, those reports I

205

1      take it were part of your fulfilling your

2      disclosure duties to the Environmental Protection

3      Agency?

4              MR. LUCAS:  Object to the leading.

5              BY MR. STEWART:

6          Q.    Well, let me correct that then.  I mean

Page 185

Bauer1

```
 7    were those, do you file these reports in carrying
 8    out your duty to keep the public agency informed?
 9         A.   Yes, in general terms, although some of
10    them may have been, some reports were letters.
11    Other documents may have been submitted without
12    any particular requirement to do so.
13         Q.   But if you sent it to the EPA, would
14    that have meant that you felt that there was some
15    information that the EPA needed in its oversight
16    capacity or might use to review the Dickson site?
17              MR. LUCAS:   Object to the leading.
18              BY MR. STEWART:
19         Q.   Is that a fair characterization?
20         A.   I think that's fair.
21         Q.   Okay.  Is, would you have intended the
22    Environmental Protection Agency or state
```

206

```
 1    regulator to, to take the statements in your
 2    reports as accurate given the information
 3    available?
 4         A.   Given the information available at the
 5    time, the statements made in those reports were,
 6    you know, believed to be accurate at that time.
 7         Q.   You would have, would you have intended
 8    them to be trustworthy documents?
 9         A.   Yes.
```

Page 186

Bauer1

10      Q.   Okay.

11      A.   That is not to say, of course, that

12   errors might not have been made during the course

13   of production of those documents.

14      Q.   Certainly, but you wouldn't or would you

15   agree that you would not have intended to send a

16   document up to the Environmental Protection

17   Agency or to a state agency that would have, to

18   your knowledge, evidence of untrustworthiness?

19      A.   Everything we, data that we sent,

20   analysis that was included in, within the

21   reports, you know, was believed to be appropriate

22   and accurate at the time.

207

1      Q.   Okay.  And now if you sent a document as

2   project manager, would -- well, we'll move on

3   from that.

4           When you were working at the company

5   after you left ICF Kaiser, what documents would

6   you review that would have been sent regarding

7   the Dickson facility to the Environmental

8   Protection Agency?

9           MR. LUCAS:  I'm sorry.  Would you repeat

10   that?

11          BY MR. STEWART:

12      Q.   Certainly.  What documents, once you

Page 187

Bauer1

13    moved to the company --

14         A.    Um-hm.

15         Q.    What documents would you have reviewed

16    prior to there being sent to the Environmental

17    Protection Agency or the state regulators?

18         A.    I would not necessarily have looked at

19    routine correspondence and monthly reports prior

20    to their submittal.

21              Other documents I might have looked, I

22    would have looked at and, you know, reviewed to

208

1    various degrees of detail depending on the

2    document, my familiarity with the subject area

3    and ability to add anything, and you know, the

4    general importance of the document involved.

5         Q.    Would you have received and reviewed the

6    Phase 2 report, for example?

7         A.    The Phase 2 report was actually

8    generated while I was still a part at ICF Kaiser.

9         Q.    Okay.  While you were at, while you have

10    been at the company, to the extent the documents

11    have been provided to the EPA or to Tennessee

12    regulatory authorities, has it been your policy

13    to attempt to send documents that are trustworthy

14    to those agencies?

15         A.    Yes.

Bauer1

16       Q.    It's been your intent to send documents

17    that are, has it been your intent to send

18    documents that have been accurate given the state

19    of knowledge?

20       A.    Yes.

21       Q.    Okay.  Has it been your intent to, that

22    if you sent a document to the EPA, that they

209

1    would rely on it?

2       A.    Yes.  I mean we wouldn't try to provide

3    anything that wasn't accurate.

4       Q.    Okay.  And I take it when you were

5    project manager, you also assumed that the EPA

6    would rely on the documents you sent them?

7       A.    Yes.

8       Q.    And that's true for Tennessee regulators

9    as well?

10       A.    Yes.  I mean I assume that they will

11    also, you know, review, critically review the

12    information that was submitted and provide their

13    own thoughts, but --

14       Q.    Okay.  And is this one of the documents

15    that was provided by the company to the

16    Environmental Protection Agency?

17       A.    This is the groundwater monitoring

18    program report No. 3, December 1998 semiannual

Bauer1

19    sampling event, March 19th, 1999.

20         Q.    Okay.  Was that provided to the EPA?

21         A.    Yes.

22         Q.    And so were you at, were you at the

210

1     company when that was provided?

2          A.    Yes, I was.

3          Q.    Okay.  Would this have been something

4     you would have reviewed?

5          A.    I certainly looked at it before it was

6     submitted.

7               This particular document was a fairly

8     routine submittal, just a presentation of, of

9     sampling results, so you know, it depends on what

10    you mean by review.

11              If it meant that I, you know,

12    necessarily read every word of this document

13    before it went in, I can't guarantee you that.

14         Q.    Well, not every word, but would you have

15    intended your policies and systems and your

16    oversights to ensure that the document was, is

17    accurate as it could be?

18         A.    Yes.

19         Q.    Okay.  Is that, does that appear to be

20    an accurate copy of the document?

21              (The witness reviewed the document.)

Page 190

Bauer1
22          THE WITNESS:  Do you want me to review

211

1    it to determine whether every single page is

2    here, or just generally say yes, this appears to

3    be, you know, that was the document.

4               BY MR. STEWART:

5        Q.    That's fine.  Okay.  And we're looking

6    at the Brand exhibit what is it?

7        A.    Number 16.

8        Q.    Mr. Bauer, I'm going to hand you another

9    document as long as we're kind of running through

10   reports.

11             Can you tell me what that is?

12       A.    The hydrogeologic conceptual model

13   packet.

14       Q.    Are you familiar with that report?

15       A.    Draft January 2001 -- yes, I am.

16       Q.    Okay.  Is that a routine submission, or

17   how would you characterize that report?

18       A.    This is something that I reviewed prior

19   to submittal.

20       Q.    Okay.  Are the, are there letters

21   attached?

22             I'll tell you that those letters are

Bauer1

212

1         there because I believe they're included in the
2         packet that is with the regulatory authority.
3                   Does that make sense to you?
4         A.    Yes, it does.
5         Q.    Okay.  And those letters are in the, in
6         the pocket of the notebook?
7         A.    That's correct.
8         Q.    Would they be part of this submission?
9         A.    Yes.
10                  MR. STEWART:  Okay.  I would like to
11        make this document the next exhibit to this
12        deposition.
13                  MR. LUCAS:  You're talking about the
14        notebook?
15                  THE WITNESS:  Notebook including the
16        letters?
17                  MR. STEWART:  Yes.
18                  MR. LUCAS:  Okay.
19                  MR. STEWART:  And why don't we make the
20        letters which Mr. Brand has identified as part
21        this submission separate exhibits.
22                  MR. LUCAS:  Mr. Bauer.

213

Bauer1

1          MR. STEWART:  Mr. Bauer, excuse me.

2          THE WITNESS:  Shall I put aside these

3     documents for the time being?

4          MR. STEWART:  Certainly.

5          MR. LUCAS:  The letters, and there are

6     two of them, that were loose in the flap of the

7     notebooks, are these the ones you're going to

8     make as a separate exhibit?

9          MR. STEWART:  I think so, and the reason

10    is because I believe those loose letters are

11    actually in the notebook that's in the agency's

12    file as well.

13         MR. LUCAS:  What's our next number?

14         MR. LUCAS:  Since they go together, make

15    I suggest that we label one of them as 34 and

16    then 34A and B?

17         MR. STEWART:  That would be great; just

18    so we all know.

19         MR. LUCAS:  That will sort of tie them

20    together

21         MR. STEWART:  What we have got --

22         MR. LUCAS:  Why don't you just look at

214

1     it to make sure it's complete?

2               (The witness reviewed the document.)
                        Page 193

Bauer1

3              THE WITNESS:  There may have been a

4    couple of pages of text that subsequent to the

5    submittal of this to the agency, replacement

6    pages were provided.

7              I don't recall specifically which.

8    There were two pages.

9              I don't recall specifically which two

10   pages there were.

11             I think they were sort of minor edits

12   that were made, for example, that refer to the

13   wrong colors in this figure.

14             The text refers to the, to the wrong

15   colors essentially, and I don't recall whether

16   this was, which actual pages were updated when we

17   were, when it was sent to the agency.

18             BY MR. STEWART:

19   Q.   Okay.  Can you make the corrections

20   regarding the colors to reflect the late what I

21   would call the late filed correction pages?

22             MR. LUCAS:  I'll object to the form of

215

1    the question, specifically to the late filed.

2              BY MR. LUCAS:

3    Q.   Well, I mean can you fill in the right

4    colors for us so that we have a --

5    A.   In this case, yes.  I'm not sure I will

Page 194

Bauer1

6    catch the other changes that were made in those

7    subsequent modifications, but I will, I will, you

8    know, I can attempt to do that.

9        Q.    Okay.  Before you change the colors, can

10    you tell me is the document in front of you an

11    accurate copy of what was initially sent to the

12    agency?

13        A.    I believe so, yes.

14        Q.    Okay.  And were any of the -- you have

15    mentioned the changing of the colors.

16            Were the other changes that were made

17    essentially similar administrative or

18    typographical-type changes?

19        A.    Yes.

20        Q.    They were not conceptual changes?

21        A.    They weren't conceptual changes.  They

22    were more typographical kind of changes.

216

1        Q.    Why don't we, before you fully identify

2    the exhibit, why don't you change the color with

3    a pen?

4            Does that make sense?

5        A.    I can mark that again.  I'm not certain

6    I'm going to be catching all the changes that

7    were made in those subsequent submittals that

8    happened a day or two after the initial

Page 195

Bauer1

 9    submission to the agencies.

10         MR. STEWART:  Well, so counsel, I'll

11    give you the choice.

12         We could file those additional pages as

13    a late filed exhibit if you would like for

14    clarity sake, or I can just have him do it by

15    hand.

16         MR. LUCAS:  Your deposition, your

17    choice; I mean again, I'm not into the late filed

18    exhibits because I don't think that's authorized

19    under the rule.

20         The changes he's talking about I think

21    are cosmetic.

22         I have no objection to your asking him

217

 1    to make them on there or to circle them if you

 2    want and point them out because I think they're

 3    fairly obvious.

 4         BY MR. STEWART:

 5    Q.    I think that what you ought to do is

 6    just make the changes so that we just know the

 7    substance of the document that went to the, to

 8    the agencies?

 9    A.    Okay.

10         (The witness reviewed the document.)

11         THE WITNESS:  Let me just double-check
                    Page 196

Bauer1

12      others.

13              (The witness reviewed the document.)

14              THE WITNESS:  Yeah.  I don't recall the

15      second change that was made, but as we, perhaps

16      as we pursue the document, we'll identify it.

17              BY MR. STEWART:

18      Q.    So now when we mark this exhibit, this

19      appears to you to be a copy of the submission to

20      the Environmental Protection Agency that but for

21      one cosmetic change that you can't recall, is an

22      accurate copy of what was submitted?

218

1       A.    That's correct.

2       Q.    And that includes these letters in the

3       file which we'll, we will mark as exhibits I

4       guess what?

5       A.    Correct.

6       Q.    Mark the letters 34A and B.

7               MR. PERRY:  You're might state for the

8       report what changes he made.

9               THE WITNESS:  The change I made was on

10      Figure 18.  Let me double-check -- here.

11              (The witness reviewed the document.)

12              THE WITNESS:  Yes, Figure 18, which

13      refers to a polygon depicted on the figure and

14      some cross-hatched areas.

Bauer1

15          The text refers to alternatively a
16    red-colored polygon and violet box that actual
17    color in the final figure was green in that
18    situation, and in that case, the color of the
19    outside box and the text also refers to a black
20    hatched area.
21          In the final version of the figure, the
22    hatching is actually red, so I have made those

219

1    changes in the text just handwriting them in.
2          MR. STEWART:  Okay.  Now let's mark the
3    exhibit.
4                        (Exhibits Nos. 34, 34A
5                        and 34B were marked for
6                        identification.)^
7          BY MR. STEWART:
8    Q.    Now Mr. Bauer --
9    A.    Yes, sir.
10   Q.    What is this that you're looking at,
11   this Exhibit 34?
12         What is the purpose of this document?
13   This is entitled the hydrogeologic conceptual
14   model packet.
15         The purpose was to provide a basis for
16   discussion with the EPA and state agencies,
17   conceptual model of hydrogeologic conditions at
                    Page 198

Bauer1

18    the site so that in preparation of the final RFI

19    report before we, you know, submitted text and

20    developed that whole report, we would get some

21    feedback, get their agreement, or come to common

22    understanding of how we generally view the site

220

1     hydrogeology.

2          Q.     Does hydrogeology mean that this report

3     is intended to be used for discussions by showing

4     where the water flows on the site?

5          A.     Where, where water flows, the nature of

6     the matrix in which it flows.

7          Q.     Is that significant for, for your work

8     with the Environmental Protection Agency because

9     of the contaminants or because trichloroethylene

10    can flow with water?

11              Is that one of the reasons that one

12    would look at the hydrogeology of the site?

13         A.     Yes.   And in that -- yes.

14         Q.     And is this going to be part of the

15    final RFI for this site?

16         A.     No.    This is simply a, you know, sort of

17    a tool for discussion.

18              Some of the figures that are

19    incorporated in here might, you know, someone's

20    modified form make their way into the final RFI

Page 199

Bauer1

21    report.

22        I don't really know for certain.

221

1        Q.    Well, I guess what I'm asking is is this

2    report that we're looking at here, Exhibit 34,

3    right now kind of the final word on, on the, the

4    water flow on the site?

5        A.    No.   I would characterize it as our

6    consultant's view of the hydrogeology of the site

7    and its, you know, not, certainly I would not

8    describe it as the final word.

9        Q.    Well, if not the final word, I guess

10    what I'm getting at, do you believe the RFI that

11    you all are going to put out -- and I don't want

12    to put words in your mouth.

13        You're putting out a final RFI soon, is

14    that right?

15        A.    Yes.   That's correct.

16        Q.    Okay.   Would you be, would you expect

17    the final RFI to make, draw conclusions about the

18    flow of the groundwater on the site that are

19    significantly different than those that are put

20    out by your consultants in this report?

21        A.    We wanted to engage the agencies in

22    discussion to make sure that they concurred with

Bauer1

222

1        the, with IT's interpretation of the existing

2        data, so therefore, there may be changes based on

3        those discussions that, you know, aren't

4        reflected in this document.

5            Q.    So do I take it from what you just said

6        has the agency signed off yet on this version,

7        this view of how the water flows on the site?

8            A.    No, they have not.

9            Q.    So you all are going to have discussions

10       with the agency to --

11           A.    Yes.

12           Q.    See whether they agree?

13           A.    Right.

14           Q.    So are you saying that -- what will the

15       agency look at?

16               Will they look at your own data from

17       wells and what not to see if they believe that

18       you're reading the data the way they are?

19           A.    Um-hm, or data from our wells as well as

20       the regional setting and context for the site.

21           Q.    Okay.  So like in -- just tell me if I'm

22       wrong.

Bauer1

223

1            I mean the agency would sit down and
2    might say well, we think well, a certain well
3    means that you should, you should change this
4    figure, and you all would discuss that and decide
5    which was more accurate?
6            Is that the kind of sit-down you're
7    talking about?
8        A.   Yes.
9        Q.   Okay.
10       A.   That's fair.
11       Q.   Is this right now, though, the most
12   updated view of your consultants, the company's
13   consultants about where the water on this site is
14   going?
15       A.   Yeah.  This is IT's interpretation of --
16   again, it's not just -- it's groundwater flows
17   and the various materials in which groundwater is
18   found, you know, at the site, and just sort of
19   in, also regional setting in which the site is
20   found.
21       Q.   Does it also talk about where it's
22   thought that the trichloroethylene on the site is

224

Bauer1

1    in the groundwater?

2            Is that part of it?

3        A.    Yes.    There are some figures that taking

4    the existing data, attempt to extrapolate between

5    points and try to, you know, give them a, give

6    the agencies a picture of where the

7    trichloroethylene is located.

8        Q.    Okay.    And --

9        A.    Could we take a short, real short break

10   here for a moment, one last break before we --

11       Q.    Yeah.    We'll go into this.    I think it

12   would be a fine time for a break.

13           However, I would like to make this one

14   pretty short.

15           If we could keep it to five minutes?

16       A.    We can do that.

17           THE VIDEO SPECIALIST:    Off the record,

18   and the time on the screen is 16:00:18.

19           (A recess was taken.)

20           THE VIDEO SPECIALIST:    On record, and

21   the time on the screen is 16:08:05.

22           BY MR. STEWART:

                                                    225

1        Q.    Okay.    Mr. Bauer, while we're working

2    with this document, I want to try to get a sense

3    of your conclusions of the groundwater, and so I

                        Page 203

Bauer1

 4    have blown up two pages.

 5          A.   Okay.

 6          Q.   Of the document, and I'll hand them to

 7    your counsel.

 8               And I just want to ask you if you could

 9    look at the document and tell me whether what you

10    have got in front of you are Figure 12 and Figure

11    14 just exactly as they appear on the document

12    except on a hard back, and you may have to take

13    the figures out of the paper because they're

14    folded up.

15               (There was a pause in the proceedings.)

16               THE WITNESS:   Thank you.

17               (The witness reviewed the document.)

18               BY MR. STEWART:

19          Q.   Mr. Bauer, if you could just tell me if

20    those are accurate?

21          A.   Yeah, these appear to be the same

22    figures that are included in this draft packet.

226

 1          Q.   Okay.  And so if you mark on these

 2    boards, you know what you'll be marking on is

 3    essentially an exact copy of what's in the draft

 4    that you submitted to the EPA that we have got

 5    marked as Exhibit 34, is that right?

 6          A.   That's correct, sir.

Page 204

Bauer1

 7        Q.    Okay.   Well then, obviously these are
 8     demonstrative, but I would like to mark them as
 9     exhibits so we'll know what we're talking about.
10                            (Exhibits Nos. 35 and 36
11                            were marked for
12                            identification.)^
13             BY MR. STEWART:
14        Q.    Thirty five is the Figure 14 blow-up,
15     and 36 is the Figure 12 blow-up.
16             And what, I just I wanted to correct the
17     offhand statement I made.
18             I referred to these as demonstrative
19     exhibits except they're not true demonstrative
20     exhibits because they're copies of an actual
21     exhibit identified by the witness.
22             Mr. Brand, I wanted to start by working

                                                            227

 1     with --
 2             MR. LUCAS:  Mr. Bauer.
 3             BY MR. STEWART:
 4        Q.    Mr. Bauer; I'll do what I can to keep
 5     my --
 6        A.    That's quite all right.
 7        Q.    Scovill, former ICF Kaiser employees
 8     sorted out -- Mr. Bauer, I'm going to hand you
 9     Figure 12, and again, that's the same as the

                          Page 205

Bauer1

10    Figure 12 in this submission for the EPA, right?

11         A.    Yes.

12         Q.    Okay.  What I would like you to do first

13    if you remember, you identified this draft

14    report, okay?

15         A.    Yes.

16         Q.    Earlier Exhibit 16 to the Brand

17    deposition, and I would like you to turn, and I

18    think you'll find it where the stickies are, turn

19    to --

20         A.    Okay.

21         Q.    The Table 5, historical off-site VOC

22    results.

228

1         A.    I need to unclip this.

2         Q.    Sure.  We can clip it back.

3         A.    Okay.  Table 5, historical off-site VOC

4    results.

5         Q.    What does that table show.

6              (The witness reviewed the document.)

7              THE WITNESS:  This table shows wells and

8    springs located, based on the title, presumably

9    all of them are off the former Scovill Schrader

10    facility property, and for the listed locations

11    or sample IDs, there are sample dates listed as

12    well as analytical results for selected organic

Page 206

Bauer1

13    compounds.

14         BY MR. STEWART:

15         Q.   Do you see the, on the very left-hand

16    side of that table, do you see a reference to an

17    AA, a well AA?

18         A.   Yes.

19         Q.   Can you tell me do you see the date

20    that's says 23/10/98?

21         A.   Um-hm.

22         Q.   Do you see in the first column under the

229

1     word trichloroethylene you have got 469.3?

2          A.   That's correct.

3          Q.   What does that number mean?

4          A.   469.3 micrograms per liter or parts per

5     billion of trichloroethylene were detected in the

6     sample collected from that well on, Well AA on

7     12/10/98.

8          Q.   Okay.  And is that AA the same AA that

9     appears on this chart right here?

10         A.   That's correct.

11         Q.   Okay.  So does this mean that in the AA

12    appearing on that chart, you all took a sample of

13    water and it showed 469.3 UG/L of

14    trichloroethylene?

15         A.   Yeah, 469.3 micrograms per liter or

Bauer1

16    parts per billion of trichloroethylene.

17        Q.    Okay.  What I'm trying to do is just tie

18    your testing results to your map, and I would

19    just like to ask you to use this pen and just --

20        A.    Okay.

21        Q.    Draw an arrow out from AA and however

22    you would like to do it, indicate that that 1998

230

1    finding of 469.3, and you can put UG/L TCE,

2    however you want to be clear.

3        A.    Okay.  How many of these are we about to

4    be putting on these?  I don't want to --

5        Q.    I think four?

6        A.    So it won't be too difficult.

7            MR. LUCAS:    This is a finer pen.

8            BY MR. STEWART:

9        Q.    Perfect.

10        A.    Would this be better?

11            MR. LUCAS:    Yeah.

12            (There was a pause in the proceedings.)

13            BY MR. STEWART:

14        Q.    All I would ask is that you be very

15    clear about where the AA is.

16            (There was a pause in the proceedings.)

17            THE WITNESS:    Does that suffice?

18            BY MR. STEWART:

Page 208

Bauer1

19          Q.    You know, that's so fine, I think, don't

20     think people are going to be able to see it.

21                Can you use this big one?  See if you

22     can, but you can draw far back.  I won't be

231

1          filling in the whole screen with much.

2               A.    Okay.

3               Q.    So did you find -- you found 469.3 UG/L

4       of TCE right there?

5               A.    Right there on that date, that's

6       correct.

7               Q.    Okay.  Well, I guess would you put the

8       figure and perhaps maybe the date in parentheses

9       so we know?

10              Dates really are not critical I guess.

11              A.    Is that what you had in mind?

12              Q.    Yes.  So that's for AA.  Now I would

13      like to turn your attention on that chart to Well

14      DD.

15              A.    Okay.

16              Q.    Okay.  Is the most recent reading from

17      DD from 12/10/98 96.7 MGL of, UG/L of

18      trichloroethylene?

19              A.    That's not the most recent sampling

20      result we have.

21                It's the most recent result in this

Bauer1
22    table, yes.

232

1         Q.    Okay.  Well, that's what I got, but that

2    96.7 was tested on 12/10/98?

3         A.    Yes.  I was correcting a statement or

4    that was the most recent result that, that

5    exists, and that actually it is not the case.

6    There is one more sampling round since this was

7    done.

8         Q.    Okay.  Do you remember what that

9    sampling round showed?

10        A.    No, I don't.

11        Q.    To be accurate then, can you just mark

12   the DD well and do the same thing that you did

13   for AA?

14             (There was a pause in the proceedings.)

15             BY MR. STEWART:

16        Q.    Okay.  And then for EE, can you do that?

17   Just look at the chart.

18        A.    1.4 for EE.

19        Q.    Okay.  I'm sorry.  I've got the wrong

20   well.  Excuse me.

21             I was -- FF.  I don't know if that

22   will --

Page 210

Bauer1

233

```
 1        A.   Okay.  Here is FF.  Put EE down while
 2   we're at it?
 3        Q.   You're welcome to, yeah.
 4             (There was a pause in the proceedings.)
 5             THE WITNESS:  Is that the correct date?
 6             BY MR. STEWART:
 7        Q.   Looks like it's getting tight.  You can
 8   run those arrows out.  That's fine.
 9        A.   And FF was the other one, is that
10   correct?
11        Q.   What do we have there?  We have got,
12   right now, you've got DD?
13        A.   And FF was the one you, the second one
14   you asked me to put in?
15        Q.   Yeah.
16        A.   Okay.
17        Q.   And then the final one I wanted to look
18   at was L. Boren I guess the last, it looks to me
19   on the chart like the last samples you got on the
20   chart is 6/7/93?
21        A.   What page is that?
22        Q.   L. Boren, page 3.
```

234

Bauer1

1      A.   Okay.

2      Q.   And it says J.  Do you think that if you

3   read that J figure, would it be, would you think

4   a more accurate reading would be this 5/11/93

5   reading of 61?

6      A.   There's not a statistically significant

7   difference between those readings.

8      Q.   Well, choose, choose your reading.  I

9   just would like to identify finally the

10  trichloroethylene that was found in the L Boren

11  well on the chart.

12     A.   Recognizing that it's a different date.

13     Q.   Yeah.  And if you could put the date on

14  so it's clear?  I don't want to mix apples and

15  oranges.

16     A.   Okay.  We can use the unqualified result

17  from 5/11/93.

18     Q.   Okay.  And while you're at it, could you

19  put a hatch mark back so we can see where that

20  line is going?

21        Okay.

22        (There was a pause in the proceedings.)

235

1        THE WITNESS:  I don't actually see it

2   indicated on this map unless I'm overlooking it.
                        Page 212

Bauer1

 3          BY MR. STEWART:
 4     Q.    Is it marked Laura perhaps?
 5     A.    Yeah, I believe you're right actually.
 6     That would be the right --
 7     Q.    The name is Laura Boren.
 8     A.    Yeah, that's right.  That's correct.  It
 9     is marked Laura in this case.  I can find room
10     here.
11          Is it all right if I mark through the
12     Laura to the point that the well is?
13     Q.    That would be great because all the
14     others are on the point, yeah.  You can run it
15     out.  Okay.
16          (There was a pause in the proceedings.)
17          BY MR. STEWART:
18     Q.    Okay.  And Mr. Bauer, can you tell me is
19     the plant site identifiable on this map right
20     here?
21     A.    Yes, it is, sir.
22     Q.    So we can see the plant, could you mark

236

 1     it in this green right here, not the red, just so
 2     we can keep it kind of, just if you could
 3     highlight in the boundary of the plant, that
 4     would be great.
 5          A.    Sure.
                    Page 213

Bauer1

 6         Q.    Okay.  And what you have marked there is

 7    the actual building, right?

 8         A.    That's correct.

 9         Q.    Okay.  Then using this green marker,

10    could you show me the boundary of the site?

11         A.    The property boundary?

12         Q.    Well, what is this black hatch marked

13    line?

14              Is that the property boundary?

15         A.    That is the property boundary.

16    Basically what we have up here are some softball

17    fields that are, I don't know whether they have

18    actually been, ever been sold somehow to the

19    county or the city, but they're not used by, for

20    company purposes.

21         Q.    But you put a green line where those

22    hatch marks are that show where the traditional

237

 1    boundary of the site is, is that right?

 2         A.    That's correct.  But again, this area up

 3    here is, it's a softball field, and that,

 4    recreational facilities and that kind of thing.

 5         Q.    Why don't you mark the traditional

 6    boundary?  And if you want to make a note that

 7    there's a softball field up there, that would be

 8    great.

                    Page 214

Bauer1

 9      A.    Just wanted to point it out.  That's

10   all.

11      Q.    And you don't have to hatch mark.  It

12   you can just run it around.

13      A.    Okay.

14      Q.    And could you pull back and identify

15   that in some way, however you want to do it,

16   either site boundary or traditional boundary or

17   however you want to write it?  Okay.

18            (There was a pause in the proceedings.)

19            MR. LUCAS:  Let the record show the

20   witness has marked it as property boundary.

21            BY MR. STEWART:

22      Q.    Okay.  And I want to make sure for the


                                              238


 1   record, I don't know how this sounds, but where

 2   you have drawn arrows to these wells and then

 3   written down parts per billion numbers, could you

 4   just say what it is those indicate?

 5      A.    They indicate results from a particular

 6   sampling event, particular sampling date for

 7   groundwater samples collected from those wells,

 8   and the concentration of trichloroethylene in

 9   parts per billion identified by the analytical

10   laboratory.

11      Q.    Okay.  Now I would like to talk to you
                        Page 215

Bauer1

12    just generally about what this Figure 12 shows.

13                What are these blue lines that run out

14    on this figure?

15                And I'll show you one.  There's one

16    located kind of at the very edge of the plant

17    site with an 840 on it.

18                What does that mean?

19    A.    They're generalized groundwater levels

20    in the vicinity of this site based on well and

21    spring elevations data that we had available to

22    us at the time.

239

1     Q.    Okay.  And you said generalized, so

2     there -- does that mean that there were obviously

3     I guess within these, these generalized levels,

4     there are specific points that might be higher or

5     lower?

6     A.    Yeah, and that the, these are not based

7     on levels from, necessarily from monitoring wells

8     from which we have, you know, precise elevation

9     data.

10                Spring information, you know, is much

11    less precise in terms of indicating a groundwater

12    level, so it's interpolated based on often

13    imperfect data.

14    Q.    Okay.  So I don't want to hold you to
                        Page 216

Bauer1

15    something that it doesn't say.

16          This is an overview, but it's not --

17    A.    It's a regional map, and that's not

18    attempting to demonstrate particular, you know,

19    flow, just a conceptual model if you will of the

20    site in its regional context.

21    Q.    Okay.  And do, am I right does -- the

22    text you provided says there's a generalized

240

1    radial flow pattern away from the site.

2          And what is a generalized radial flow

3    pattern?

4          Does that mean it's flowing out in all

5    directions?

6    A.    Radial, yes, implies that it's, that

7    there's a potential for flow in all directions

8    from, you know, the general vicinity of the

9    center of that diagram or the center of those

10    contours, those blue contours that were shown.

11    Q.    Okay.  Radial being north, southeast,

12    west and all in between, is that right?

13    A.    Yes.  That's correct.

14    Q.    Okay.  Now you said the center of that

15    contour.

16          Is the general rule here that the water

17    is going to flow from the high numbers to the low

Page 217

Bauer1

18    numbers?

19        A.    Yeah.   Generally the water is going to

20    flow downhill, and in particular when we're

21    dealing with porous flow systems, that's going to

22    be the situation with that will more completely

241

1    hold.

2        Q.    Now is this a Karst system here?

3        A.    Correct.

4        Q.    Okay.   And --

5        A.    The bedrock underlying the site is

6    characterized as a, as a Karst system, yes.

7        Q.    Now we have talked a lot about that with

8    Ms. Brand, and is it fair to say that in a Karst

9    system, these general rules are subject to the

10    exception that well, in Karst systems, water can

11    be relatively unpredictable?

12        A.    That's a fair statement, yes.

13        Q.    Okay.   Now you talked about the general

14    flow pattern and the general nature of this map.

15            Could you turn to Figure 13, the next

16    figure in your books?

17            MR. PERRY:   Just one point of

18    clarification -- what you said this, you weren't

19    referring to exhibit number --

20            THE WITNESS:   Thirty-six.

Bauer1

21          BY MR. STEWART:

22          Q.    I'm not sure.  Could you --

242

1           A.    Could you perhaps read back the

2     statement that was just made so we can clarify

3     that?

4                 MR. PERRY:  My statement was with regard

5     to you made a statement this, I have forgotten

6     how exactly how you phrased it, but this is a

7     Karst system, and it's I just wanted to make sure

8     that you, what you were, that you were not -- you

9     were referring to Figure 12 or not.

10                MR. STEWART:  Yes.  Thank you.

11                MR. PERRY:  Or to the site in general.

12                BY MR. STEWART:

13          Q.    No.  I was referring to the, I guess at

14    first, I was referring to the general geology of

15    this entire area.

16                Is that a Karst system?

17          A.    Yes.  Generally, generally speaking, and

18    in particular in this area of the site itself.

19          Q.    Okay.  And now I would like you to turn

20    just briefly to Figure 13.

21                Do you see up in the upper kind of in

22    the middle of this document, do you see a symbol

Bauer1

243

1    that says MW-32?

2        A.    Yes.

3        Q.    Okay.   What is that?

4        A.    That's a location of a groundwater

5    Monitoring Well No. 32.

6        Q.    Is the monitoring well, is that, that is

7    the actual well right on that dot right there?

8        A.    Yes.

9        Q.    Could you draw on Figure 13 like a red X

10   on Monitoring Well 32 so we can see it?

11       A.    On this?  On this version here?

12       Q.    Certainly.

13       A.    Okay.

14       Q.    We're not going to mark this up much.

15       A.    You want just a cross MW-32?

16       Q.    If you want to put a red dot right on

17   the well, I just want to show where the actual

18   well is.

19       A.    Okay.   Make sure I get the right symbol.

20             (There was a pause in the proceedings.)

21             BY MR. STEWART:

22       Q.    Now is Figure 13 a blown-up picture of

Bauer1

244

1    the site itself?

2        A.    Yes.  It does not include the entire

3    contours that were marked on this map.

4            The northern-most portion of this site

5    is not included, northern-most portion of this

6    property boundary is not included on this map.

7        Q.    Could you just mark with a green pen --

8    I just want to make sure it's all, we understand

9    how these maps interrelate.

10           Could you mark with a green pen what

11   contour on Figure 13 is equivalent to the green

12   contour you marked on Figure 12?

13           MR. LUCAS:  Contour, you meant the

14   property boundary?

15           MR. STEWART:  Yes, the property boundary

16   that he has marked with a green line.

17           I just, I don't think the whole contour

18   is on this map, so I want him to show where the

19   contour exists on Figure 13.

20           MR. LUCAS:  Let me object to the form of

21   the question to the extent you're mixing apples

22   and oranges.

245

Bauer1

1      The contour, I mean the line that he's

2  marked here in green is a property boundary.

3  It's not a contour line.

4      THE WITNESS:  As opposed to a contour

5  for the groundwater elevation?

6      BY MR. STEWART:

7  Q.   Yes.

8  A.   I understand.  So you want me to mark

9  the property boundary on this figure?

10  Q.   Right.

11  A.   That corresponds to the property

12  boundary that we have marked in dark green on

13  Exhibit 36?

14  Q.   Exactly.  And we can put -- my English

15  teacher I hope doesn't watch this film.

16      MR. LUCAS:  I thought maybe the way you

17  phrased it, that you were in the Air Force!

18      MR. PERRY:  Just so we, so I understand

19  what's going on, you're marking the, what is the

20  present property, boundary property in the

21  northern section that's owned by Tennsco?

22      THE WITNESS:  Yes.  I'm marking

246

1  basically the property boundary that was

2  identified on this map which is the, includes

3  property not owned by Tennsco as well as property

Page 222

Bauer1

 4    owned by Tennsco.

 5          BY MR. STEWART:

 6      Q.   Okay.  So if I want to, to understand

 7    how Figure 13 ties in with Figure 12 in terms of

 8    what it shows, the green line on Figure 13 marks

 9    the same line that you have marked property

10    boundary on Figure 12?

11      A.   That's correct.

12      Q.   Okay.

13      A.   Should I label this line in a similar

14    fashion?

15      Q.   Please.

16      A.   So it's clear, okay.

17          (There was a pause in the proceedings.)

18          BY MR. STEWART:

19      Q.   Now Mr. Bauer, do you see that, that on

20    Figure 13, I guess is it fair to say this has a

21    more detailed set of contours for the property,

22    the actual site, than appears on Figure 12?

247

 1      A.   Yes.  It's based, these contours are

 2    inferred from the groundwater monitoring well,

 3    the groundwater elevations measured in monitoring

 4    wells on within this property boundary.

 5      Q.   Okay.

 6      A.   So it's based on more specific data.

Page 223

Bauer1

 7          MR. LUCAS:  Do you mind if I take a,

 8     literally a one-minute break?

 9          MR. STEWART:  No.  Just a minute.

10          MR. LUCAS:  Go off record for just one

11     minute.  It won't be five minutes.  It will be

12     one minute.

13          THE VIDEO SPECIALIST:  Off record, and

14     the time on screen is 16:34:35.

15          (A recess was taken.)

16          THE VIDEO SPECIALIST:  On record, and

17     the time on screen is 16:35:58.

18          BY MR. STEWART:

19     Q.   Mr. Bauer, back from Mr. Lucas'

20     one-minute break, do you see the line on Figure

21     13 that that says 845 that surrounds Monitoring

22     Well 32?

                                              248

 1     A.   Yes, I do.

 2     Q.   What does that mean?

 3     A.   That corresponds to a groundwater

 4     elevation of approximately 845 feet.

 5     Q.   Okay.  And so that means that, or does

 6     it mean that Monitoring Well 32 sits in the

 7     center of a small rise that goes to 845 feet?

 8     A.   Approximately, yes.  Having marked

 9     through the actual elevation written on the map,

                    Page 224

Bauer1

10    I can't read it anymore.

11         Q.    Okay.  Can you -- so the well itself has

12    an elevation?

13         A.    There is an elevation noted in

14    parentheses on this document.

15         Q.    I see.  And is it 848 can you tell?

16         A.    I can't read it on this document.

17         Q.    Okay.

18         A.    Having marked through it.

19         Q.    Since the well is in the middle of that

20    845 line, that means it's over 845?

21         A.    Somewhere along 845, or perhaps over.

22         Q.    Okay.

                                                    249

1          A.    And yes.

2          Q.    Okay.  Can you mark, can you tell me why

3     that 845 foot figure doesn't appear or if it

4     doesn't appear on Figure 12?

5          A.    Simply because this is more generalized

6     depiction.  Groundwater elevations change

7     substantially from time to time at the site.

8          Q.    What we're dealing with is you have got

9     a more specific outline here?

10         A.    Yeah, dealing with specific, a specific

11    measuring of time.

12         Q.    Okay.  Can you just show me -- and

Bauer1

13    obviously we're on video, and so it's general --
14    generally where Monitoring Well 32 would appear
15    on this map right here?
16        A.    Yes, I can do that.
17        Q.    Put the same red X up there.  And could
18    you mark, and maybe for groundwater, you can use
19    a blue pen?
20        A.    Want me to identify that X by drawing a
21    label to it?
22        Q.    Certainly if you want to put whatever

250

1    label you would like to indicate what it is.
2    Okay.
3            And now could you, since you couldn't
4    read the, you know, the exact number, could you
5    just with the blue perhaps draw a circle and show
6    let me, put it clear?
7            I don't want you, to hold you to this
8    circle.  I just want you to do whatever you need
9    to do to show us that Monitoring Well 32 is at
10    845 some feet high, the groundwater, like appears
11    on Figure 13 if that's what that means.
12        A.    I can, I'll be happy to write in a
13    circle around it that shows 845.
14            I'm concerned that it is mixing to a
15    certain extent different kinds of data.

Page 226

Bauer1

16          This map and the contours that are

17     depicted here take a broader view, and it may not

18     be entirely appropriate to say well, this area is

19     at 845, and therefore, the conclusions that would

20     be drawn from that is well, this must be the high

21     point, and things are growing outward from, from

22     there.


                                                    251


1          A.    So it's a mixing of two different data

2     sets with two different purposes, and you know, I

3     can make the mark on the figure, but it,

4     recognizing that it's, you know, it's mixing two

5     different kinds of data here.

6          Q.    Well, if you put -- you don't have any

7     doubt or do you have any doubt that, that this

8     line, this 845 figure on Figure 13 shows that

9     Monitoring Well 32 is at 845, isn't it?

10          A.    Based on the data and the sampling event

11     from which these contours were derived.

12          Q.    Okay.  So if you put 845 say by the

13     words Monitoring Well 32, without drawing a

14     circle, certainly that, that will not overstate

15     the, your finding as to, as to the groundwater

16     height at that spot, right?

17               MR. LUCAS:  At what time?

18               THE WITNESS:  That's the key question.

Page 227

Bauer1
19          BY MR. STEWART:
20          Q.    Oh, okay?
21          A.    Because the groundwater elevations do
22     vary seasonally and year to year fairly

252

1      substantially sometimes at this site, and so if
2      you're comparing a particular groundwater
3      elevation or particular time with others at
4      different times, it may not be a valid
5      comparison.
6          Q.    Okay.  Well, just so it's clear --
7          A.    And I don't have, I don't know the data
8      set from which this document or this figure was
9      derived.
10          Q.    Okay.  Do you see the date on the top of
11     this chart Figure 12?
12          A.    I'm sorry.  The date on top of the
13     figure?
14          Q.    Do you see where it says June 1999?
15          A.    Yes.
16          Q.    Do you see where it says June 1999 on
17     Figure 13?
18          A.    Right.  That indicates the date that the
19     maps were developed.
20              This, that is not necessarily the
21     particular timeframe that the data were, from

Page 228

Bauer1

22        which the data were derived.

253

1          Q.    I understand your problem.  How would
2    this be so we don't mix, so we don't have any
3    confusion?
4                What if you were to just mark the 845
5    figure and put in parentheses from Figure 13 so
6    we'll know where that figure came from, if --
7    that would be clearer, wouldn't it?
8          A.    We can do that.
9          Q.    Okay.  It looks like that pen is not
10   going to make a big enough mark.
11               Why don't you use this one, and you can
12   do it, you can mark that.  You can qualify it
13   however you would like.
14               (There was a pause in the proceedings.)
15               BY MR. STEWART:
16         Q.    Okay.  Could you -- okay.  I see.  And
17   so that 845 figure goes to the X that you have
18   marked here, is that right?
19         A.    That's correct.
20         Q.    Okay.  Now could you turn back to these
21   tables you were looking at in Exhibit 16 to the
22   Brand deposition?

Bauer1

254

```
 1          A.    Um-hm.
 2          Q.    And could you look -- I think it's a, at
 3    Table 3, do you see that you've got I think a
 4    summary of VOCs in groundwater samples on site?
 5          A.    Yes.
 6          Q.    Okay.  Can you look at Monitoring Well
 7    32 and tell me what your most recent reading is
 8    for trichloroethylene at least on this document?
 9                (The witness reviewed the document.)
10                THE WITNESS:  The 12/14/98 reading was
11    514,000 PPB.
12                BY MR. STEWART:
13          Q.    Okay.  Could you, however you want to do
14    it, could you mark, using that red pen, a similar
15    reading of PPB for Monitoring Well 32 that you
16    marked for all those wells we were talking about?
17    You can put the date and all.
18                (There was a pause in the proceedings.)
19                THE WITNESS:  What is the date?  12/14.
20                (There was a pause in the proceedings.)
21                MR. LUCAS:  I'm sorry.  Would you say
22    again the date that you're using?
```

255

Bauer1

```
 1              THE WITNESS:  This is 12/14/1998, which
 2      is the most recent sampling data on this table.
 3              MR. LUCAS:  I need to lodge an objection
 4      to the exhibits to the extent that you're
 5      attempting to construct an exhibit.
 6              My objection is to the foundation
 7      because you're mixing apples and oranges with
 8      different dates based on different samplings from
 9      '98 that he just referred to, to the various '97
10      dates referred to on these charts, and I don't
11      think it's an apples to apples comparison.
12              But with that objection, you may
13      continue.
14              BY MR. STEWART:
15          Q.   And Mr. Brand --
16          A.   Bauer -- that's okay.
17          Q.   I suppose it's getting late.  Mr. Bauer,
18      and I apologize for that.  I appreciate your
19      working with me.
20              You have put the dates of the samples
21      taken that you have marked on here, right?
22          A.   That's correct.
```

256

```
 1          Q.   So a person looking at this can look and
 2      see when you took the sample for a particular
```
Page 231

Bauer1

3          well sampling, is that right?

4                A.    Yes, that's correct.

5                Q.    Okay.  It looks like it's a little hard,

6          well, hard to read.

7                      Can you put the numbers, can you

8          highlight the numbers of those well samplings

9          just so we can look at them better?

10                     Do you want to highlight just the

11         number?  I'm just trying to lift the numbers out

12         from the --

13               A.    The number of the well or the number of

14         the sampling?

15               Q.    Trichloroethylene sampling results,

16         yeah, and then that's the last thing I'm going to

17         ask you to do I think on this map.

18                     (There was a pause in the proceedings.)

19                     THE WITNESS:  Before we leave this.

20                     BY MR. STEWART:

21               Q.    Before we leave this exhibit, okay; you

22         have marked 514,000.

257

1                      Now that's the amount of

2          trichloroethylene you found in Monitoring Well 32

3          on December 14th, 1998, is that correct?

4                A.    That's correct.

5                Q.    Can you tell me how many times the

Page 232

Bauer1

6       drinking water limit that is?

7                   And I'll give you a calculator.

8                   (There was a pause in the proceedings.)

9                   THE WITNESS:   That is 102,800 times the

10      maximum contaminant level of five.

11                  BY MR. STEWART:

12          Q.   Okay.   That maximum contaminant level is

13      what we talked about, the, the top level that the

14      EPA would allow a public drinking water provider

15      to have in drinking water, is that correct?

16          A.   That's right.

17          Q.   So you've got 102,800 times that in this

18      monitoring well that you have marked here?

19          A.   Yes.   That's correct.

20          Q.   Okay.   I would like to set this exhibit

21      aside now for a moment.

22          A.   How about do you need this table some

258

1       more?

2           Q.   I don't think we do.   You're welcome to

3       refer to it, but I think you can set it aside.

4                   You know, I almost forgot.   Could you

5       show me where Beaver Dam Creek is perhaps using a

6       blue pen to just mark it?

7                   We may have covered it up, but --

8           A.   Highlight the creek in with this pen?
                        Page 233

Bauer1

9        Q.    Yeah, if that's possible.

10       A.    We can do that.

11       Q.    Okay.  And then if you could just mark

12    that blue line you just drew so that I can,

13    people looking at this can see where Beaver Dam

14    Creek is?

15          (There was a pause in the proceedings.)

16          BY MR. STEWART:

17       Q.    Okay.  I would like to now set Figure 12

18    aside and hand you Exhibit No. 35.  Okay.

19          Actually I would like to identify, would

20    you all mind if I held it up so we can get it on

21    camera, see which exhibit it is for us to

22    understand what it is?

259

1          MR. LUCAS:   No objection.

2          MR. STEWART:   Okay.  Can you get that?

3          THE VIDEO SPECIALIST:  I have it, yes.

4          BY MR. STEWART:

5        Q.    Perfect.  Okay.  And now I would like to

6    hand you Figure 14.

7        A.    Thank you.

8        Q.    Okay.  This is from the same report?

9        A.    Um-hm.

10       Q.    Okay.  And what --

11          MR. LUCAS:   Excuse me.  Just for your
                        Page 234

Bauer1

12    planning purposes, he needs to leave at five, and
13    so we have got a little over ten minutes.
14            BY MR. STEWART:
15        Q.   Great.  Okay.  Can you push that out to
16    5:15 do you think?
17        A.   We'll see how long it takes.
18        Q.   Okay.  What are we looking at here on
19    Figure 14?
20        A.   This figure from, provides monitoring
21    well locations on, within the property boundary
22    that we have described, and TCE concentrations

260

1    detected in various monitoring wells during the
2    December 1998 timeframe, and also contours
3    interpolated from those data.
4            Contours represent TCE concentrations in
5    groundwater.
6        Q.   Okay.  So what -- for example, do you
7    see this number a hundred thousand that surrounds
8    and there is a circle surrounding Monitoring Well
9    32?
10        A.   That's correct.
11        Q.   Okay.  What does that hundred thousand
12    mean for that, inside that circle?
13        A.   Again, interpolating between the
14    existing data points, that's an approximation of
            Page 235

Bauer1

15      the TCE concentrations in groundwater.

16              Thus things along, groundwater around

17      that particular circle approximately would be

18      expected to have concentrations of approximately

19      a hundred thousand PPB, parts per billion of

20      trichloroethylene.

21          Q.    A hundred thousand?

22          A.    That's correct.

261

1           Q.    So -- and I won't make you do this

2       calculation many times, but --

3           A.    That would be a hundred, for example,

4       parts per million.

5           Q.    Well, for example, how many times the

6       safe drinking water limit we discussed would that

7       be, the hundred thousand?

8               MR. LUCAS:   Object to the form of the

9       question.

10              THE WITNESS:   The hundred thousand level

11      is 50.  No.  Excuse me.

12              MR. STEWART:  You're standing by a

13      lawyer, so it's up to you to do the division.

14              (There was a pause in the proceedings.)

15              THE WITNESS:  It would be 20,000 times

16      the maximum contaminant level that we discussed

17      earlier.

Page 236

Bauer1

18          BY MR. STEWART:

19          Q.    Okay.  And could you just mark

20    Monitoring Well 32 with the red X just so it's

21    consistent on this map?

22          And then could you mark as you did with

262

1    map Figure 13 that site boundary that you have

2    marked property boundary here on Figure 12?

3          (There was a pause in the proceedings.)

4          BY MR. STEWART:

5          Q.    Now Mr. Bauer, what is the, this line

6    that's got a ten on it?  Or even better --

7          A.    It's approximately the, again,

8    interpolated areas that would have, inside that

9    line would have ten or a greater PPB

10    trichloroethylene.

11          Outside that line would have fewer than

12    ten parts per billion trichloroethylene in the

13    groundwater based on the data here.

14          Q.    Okay.  Could you, could you circle that

15    ten with this pink highlighter just so we can see

16    the area?  And can you --

17          A.    Just the number, or the contour that's

18    involved?

19          Q.    What I would like you to do is draw the

20    contour and then fill it in with a hash mark or

Page 237

Bauer1

21          something so that, so that, so that we can see
22          where that whole area is that you have surrounded


                                                        263


1          by the ten.
2                A.     Recognizing that the contours are
3          approximate.
4                Q.     Yes.
5                       (There was a pause in the proceedings.)
6                       THE WITNESS:   Okay.
7                       BY MR. STEWART:
8                Q.     Now is that whole area inside of that
9          contour that you just drew an area where
10         according to the company, the company believes
11         there is trichloroethylene above ten PPB?
12               A.     Not necessarily at every point where
13         you, where you would, might draw something here.
14                      Unlike a system with more, the more
15         uniform hydrogeology, it's very complex.   You
16         might have areas adjacent to each other have
17         widely different concentrations, so this is a
18         great simplification of, you know, what it's like
19         in the subsurface, so if I put a point here, it
20         wouldn't necessarily come out at some
21         concentration between those, you know, indicated
22         by the contour lines.

                           Page 238

Bauer1

264

```
 1        Q.    But if the EPA were to look at this map
 2    and wonder what -- say if I drew a, a purple X
 3    right here, how would the EPA, how much
 4    trichloroethylene would the EPA be supposed to
 5    read as existing at that spot according to this
 6    map?
 7        A.    Well, again, it doesn't necessarily
 8    imply any amount of TCE at a particular spot.
 9            It's just giving a general depiction of
10    what the concentrations are based on the spots
11    where we actually do have data.
12        Q.    Okay.
13        A.    But given -- to say, you know, that this
14    particular spot has a particular concentration,
15    it's sort of beyond what you can interpret from
16    this map.
17        Q.    Well, is the, is the EPA supposed to
18    read this map as saying there is just ten, on
19    this exact dotted line right there, ten parts per
20    billion TCE?
21        A.    Again, this is, we have got a fair
22    number of data points here from which to work
```

Bauer1

265

```
 1    with, but you know, if we were to put a well
 2    exactly here, would it be ten parts per billion?
 3              I couldn't, I couldn't guarantee that.
 4         Q.   Well, Mr. Bauer, the reason I'm getting
 5    at this, because people I think are going to be
 6    looking at this map trying to figure out how much
 7    TCE you all think is down in the groundwater, and
 8    I want to make sure I understand properly that
 9    the way the map is supposed to be read, that
10    everything inside that pink line is supposed to
11    be represented on this map as having ten or more
12    PPB.
13              Is that what the map is supposed to
14    show?
15              MR. LUCAS:   Can you -- that was a kind
16    of a long convoluted question.
17              MR. STEWART:   I agree.
18              BY MR. STEWART:
19         Q.   Let me just ask him is what this map,
20    recognizing that, that you could drill on a
21    particular site in a Karst system and get one
22    amount or another, I don't want to mislead -- is
```

266

Bauer1

1    what this map is supposed to generally portray as
2    a general rule is that you have more than or you
3    have ten or more PPB inside of this pink line?
4        A.    In a very general way, yes, and there is
5    actually, you know, a number of places where, for
6    example, the lines are dashed because there's
7    less data, fewer data in those particular areas,
8    and it's not just the Karst system itself that's
9    complex.
10           Also the overburden material, the soils
11   on top of the bedrock, they're also complex, so
12   it's not just the bedrock system that's at issue
13   herein, but that's the general rule, I mean
14   generally what you're trying to show.
15       A.    You're trying to generally show a
16   relationship, relative, relative numbers as
17   opposed to absolute numbers at a particular
18   point.
19       Q.    I mean generally trying to show that?
20       A.    Generally trying to show patterns as
21   opposed to specific numbers at a particular
22   point.

267

1        Q.    And is that pattern that you're trying
2    to show here that inside this pink line with the
3    ten on it, that you, that you've got more than

Page 241

Bauer1

4    ten UG/L TCE inside that line?

5        That's the pattern?

6    A.   Yes.

7    Q.   Okay.  Now what about this ten over

8    here?

9        What is that line over there?

10    A.   This, based on this, it looks like there

11    is a separate, you know, maybe it's is there a

12    connection?

13        It's is not, it is not clear.

14    Apparently not, based on these fairly localized

15    here, so inside this line, based on these wells,

16    looks like higher than ten.  Outside this line

17    would be less than ten again.

18    Q.   Could you draw -- so that ten is the

19    same type of ten we have on that other pink line,

20    right?

21    A.   Yes, with the same caveats involved.

22    Q.   And we're not going to draw -- I just

268

1    ask you to do one more thing just so I can get a

2    real good sense of how these lines work.

3        Could you draw, say use this purple to

4    show where the map is supposed to depict areas

5    where there is more than say a thousand parts

6    UG/L?

Page 242

Bauer1

```
 7          A.    I will mark where thousand contour's
 8   located, yes.
 9          Q.    Okay.
10                (There was a pause in the proceedings.)
11                BY MR. STEWART:
12          Q.    Okay.
13          A.    Yes.   Thank you.
14          Q.    One more -- and so again, inside these
15   purple circles, what this map is supposed to show
16   is that, is that generally speaking, you have got
17   a thousand or more UG/L of trichloroethylene in
18   the groundwater in that area?
19                That's the best estimate?
20          A.    Yeah.   I mean again, not to belabor the
21   point, it's just, you know, again, it's more
22   showing patterns than it is specific.
```

269

```
 1          Q.    Right.
 2          A.    It's taking existing, a limited number
 3   of existing data points and trying to interpolate
 4   between those data points, and so it's a
 5   generalized depiction.
 6          Q.    And the pattern you're trying to show is
 7   inside that purple line you have got --
 8          A.    Generally higher concentrations you
 9   would expect than outside that purple line.
```

Page 243

Bauer1

10      Q.    Higher concentrations than a thousand

11   UG/L?

12      A.    Approximately.

13      Q.    Okay.  And that's, is that 200 times the

14   maximum contaminant level put out by the EPA?

15      A.    That is, yes.

16      Q.    Okay.  You know it's, five, and I know,

17   I bet you're going to pick up, do stuff, and so I

18   would be happy to stop at this point, but because

19   we're in the middle of questioning about this, I

20   really would like to ask that you all not discuss

21   these charts overnight until we get back together

22   tomorrow.

270

1         MR. LUCAS:   That's agreeable.

2         MR. STEWART:   Perfect.  All right.

3         THE VIDEO SPECIALIST:   Off record, end

4   of Tape 3, and the time on screen is 17:02:18.

5             (Whereupon, at approximately 5:02

6   o'clock, p.m., the deposition was recessed, to

7   reconvene at 8:30 a.m. on Friday, February 23,

8   2001.)

9                   *   *   *   *   *

10

11

12

Bauer1

13
14
15
16
17
18
19
20
21
22

271

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2              I, Catherine S. Boyd, the Notary Public
 3      before whom the proceeding occurred, pages 1 to
 4      270, do hereby certify that the witness was duly
 5      sworn, that the testimony of said witness was
 6      taken by me and thereafter reduced to this
 7      typewritten transcript under my supervision, that
 8      said transcript is a true record of the testimony
 9      given by said witness, that I am neither counsel
10      for, related to, nor employed by any of the
11      parties to this proceeding, and further, that I
12      am not a relative or an employee of any attorney
13      or counsel employed by the parties thereto, or
14      financially or otherwise interested in the
15      outcome of the proceeding, or any action involved
```

Page 245

Bauer1

16        therewith.

17                    Witness my signature and seal:

18                    _____

19                         CATHERINE S. BOYD

20                         Notary Public in and for

21                         The Commonwealth of Virginia

22        My commission expires:   February 28, 2002

```
</Transcript>
</TRN>
```

**EXHIBIT F**

# (Intentionally Omitted)

**EXHIBIT G**

# (Intentionally Omitted)

**EXHIBIT H**

**(Intentionally Omitted)**

**TAB 4**

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

4         In the Matter

5             of                    Case No.

                                    07-12148

6     ALPER HOLDINGS USA, INC.

7                         Debtors.

8   --------------------------------x

9                         January 8, 2008

10                        United States Custom House

                          One Bowling Green

11                        New York, New York 10004

12

13        Motion for Objection to Claim Numbers 20 and 21

14   Filed by Flake Plaintiffs; Objection of Debtor to Proof of

15   Claim Filed by Natural Resources; Debtor's Motion for Order

16   Authorizing Debtor to Object to Multiple Claims in Single

17   Objection.

18

19

20   B E F O R E:

21             HON. BURTON R. LIFLAND,

22                      U.S. Bankruptcy Judge

23

24

25

2

1    A P P E A R A N C E S:

2

3

            MILBANK, TWEED, HADLEY & McCLOY LLP

4

        Attorneys for the Debtors

5            One Chase Manhattan Plaza
            New York, New York 10005

6

        BY:  ANDREW M. LEBLANC, ESQ.,

7            JESSICA L. FINK, ESQ.

8

9

            STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

10

        Attorneys for the Flake Plaintiffs

11            2323 Bryan Street
            Dallas, Texas 75201

12

        BY:  CLIFF I. TAYLOR, ESQ.

13

14

15        DOUGLAS T. TABACHNIK, ESQ

16            Attorneys for the Flake Plaintiffs
                63 West Main Street

17    Freehold, New Jersey 07728

18

19

            ORRICK, HERRINGTON & SUTCLIFFE LLP

20

            Attorneys for the Harry Holt Plaintiffs

21            666 Fifth Avenue
            New York, New York 10103

22

        BY:  ALYSSA D. ENGLUND, ESQ.

23

24

25

3

1    P R O C E E D I N G S:

2              MR. LEBLANC:   Good morning, your Honor.

3    Andrew Leblanc on behalf of the debtor, Alper Holdings USA.

4              Your Honor, we're here on our motion to

5    disallow and expunge the claims filed by the Flake parties,

6    Ray and Kathy Flake, claims number 20 and 21 on the Alper

7    register.  Your Honor, just very briefly by way of

8    background, I know your Honor has held one hearing on this

9    matter, but these are the claims that were filed by a

10   husband and wife who acquired property in Dickson County,

11   Tennessee in 2002 with the now stated goal of creating some

12   sort of a water bottling enterprise thereon.  This was

13   apparently unbeknownst to them.

14             Dickson County, Tennessee is an area of

15   approximately 40 years of environmental contamination that

16   has been in remediation since sometime in the mid 80s.  And

17   it was in this particular area that they had this dream of

18   creating this water bottling enterprise both on their

19   property and then on a subsequent property they stated --

20   they have alleged an intention to purchase.

21             And apparently when they became aware of

22   the environmental contamination that was pervasive in

23   Dickson County, those dreams being essentially shattered,

24   they sued everyone they could find sometime in 2003,

25   including the debtors here, Alper, which the Flakes now

4

1  concede Alper did not cause or contribute to the initial

2  contamination of the Dickson plant, the contamination that

3  exists in Dickson County.

4              So, your Honor, we're here on our motion to

5  dismiss the Flake claims.  And fundamentally, your Honor,

6  as we put forth in our reply and in our papers, what is

7  significant here is the court need only credit well pleaded

8  factual allocations.  The court does not have to credit

9  legal conclusions, conclusory allegations or anything of

10  the like.  Viewed in that light, the Flake claim simply

11  cannot stand.  They haven't been pled against Alper in this

12  case.

13              THE COURT:  You use the term pled and

14  pleaded interchangeably, and I've always had a problem

15  myself as to what the proper term would be.

16              MR. LEBLANC:  I do use pled, but I know in

17  most of the cases it's well pleaded allegations of fact.

18              THE COURT:  I take them both ways, but I do

19  have that problem.

20              MR. LEBLANC:  I apologize, your Honor.

21              THE COURT:  No.  I apologize to all of you.

22  I write opinions and I use it either way.

23              MR. LEBLANC:  And I think that many courts

24  do the same.  The quote that I have in my notes is well

25  pleaded.

5

1          THE COURT:  That's a digression, forgive

2    me.

3          MR. LEBLANC:  I understand.

4          Your Honor, the proof of claim that was

5    actually filed in this case is willfully inadequate, the

6    substantiative allegation is one sentence, and in that one

7    sentence it essentially says that it is based on the,

8    "independent acts and/or omissions of Alper Holdings USA

9    Inc. in connection with said contamination," referring to

10   the contamination in Dickson County.  But of course, as I

11   mentioned a moment ago, we understand that the Flakes don't

12   actually contend that Alper had any connection with the

13   contamination itself.  We now understand, based only upon

14   their response, that what they are contending is some form

15   of negligent cleanup.

16          The complaint that they filed, the fourth

17   amended complaint, which was not attached to their

18   pleadings to their proof of claim in this case but which

19   has now been attached pursuant to an amendment order, or at

20   least an attempted amendment, is really where they have

21   pointed the court to in their response as the basis for

22   their allegations against Alper.  But even the points that

23   they make, what they lead the court to look at in their

24   pleading itself, the 4th amended complaint filed that

25   includes Alper amongst 21 other defendants, even looking at

6

1    that is woefully inadequate to plead a claim against Alper.

2                    In the response the Flakes tell the court

3    that they are alleging that Alper engaged in a cleanup.  It

4    didn't say that they had a duty to do so, but that they had

5    in fact engaged in a cleanup and that they did that cleanup

6    negligently.  That's what we now understand the Flakes to

7    be contending by virtue only of their response.

8                    If we look, though, at the complaint

9    itself, which is the operative set of allegations, what we

10   see, your Honor, is the only allegation that includes Alper

11   is in the description of Alper as a party.  And in that

12   description of Alper as a party they repeat this same line

13   that we see in the proof of claim.  That line being that

14   Alper is sued essentially -- the line from the complaint is

15   "Alper is also sued herein for its own direct acts and

16   omissions."  That's the line that names Alper that

17   identifies Alper.

18                    They then have a series of factual

19   contentions that begin on paragraph 17 and run through

20   paragraph 36 of the complaint.  None of those state the

21   word Alper at all, they refer to Saltire and Schrader and

22   other entities, none of them use the work Alper.  Those two

23   of those paragraphs use the word defendants, plural,

24   without referring to any one of the 21 defendants, but even

25   those factual allegations, when you look at them, are

7

1  clearly not referring to Alper because they are referring

2  to the people who caused the contamination which they have

3  now conceded are not Alper.

4          So their 19 paragraphs of factual

5  allegations don't contend that Alper did anything.  And we

6  know that's true because when they were asked to tell the

7  court, when we objected to their claims as legally

8  insufficient on their a face, they told the court, well

9  look at this particular paragraphs 44, 48, 73.  Your Honor,

10 those paragraphs come in their recitation of the counts, in

11 case of 44 and 48, and in their demand or their plea for

12 punitive damages in the case of paragraph 73.  Those are

13 the quintessential example of what are conclusory

14 allegations or legal conclusions which this court need not

15 credit for the purpose of a motion to dismiss.

16          They are in essence, and the language is

17 there and I would invite the court to look at it, I'm sure

18 the court has, but the language is, in essence, that the

19 defendants generally negligently cleaned up or negligently

20 contaminated or negligently did this.  Those are all legal

21 conclusions, which if we were answering the complainant, we

22 would contend correctly that we have no obligation to

23 respond to.  So fundamentally, your Honor, there are no

24 facts to alleged against Alper in the fact section, no

25 facts alleged against Alper -- no facts alleged against

8

1    Alper in any way other than in a conclusory legal

2    statement.

3              So we then look again at their response,

4    because what they've now tried to do in their response,

5    which is both not surprising or unexpected, they tried to

6    resurrect the claims recognizing apparently the woeful

7    inadequacy of the proof of claim that was actually filed,

8    they try to resurrect that by introducing to the court a

9    series of new allegations and new statements, and they rely

10   primarily on the deposition of a former Alper employee,

11   Nicholas Bauer.

12             Now what is striking about their references

13   to Mr. Bauer in their response is not what is said but what

14   isn't said, because they attached and presumably

15   incorporate into the complaint, the entirety of Mr. Bauer's

16   deposition.  The entirety of Mr. Bauer's deposition as

17   presented by them is grossly misleading, your Honor.

18   Fundamentally they say and they report to the court that

19   Mr. Bauer was not even an employee -- what they say is Mr.

20   Bauer was an employee of Alper, not Saltire.

21             What they don't report, your Honor, is that

22   in the very same deposition Mr. Bauer says he is an officer

23   of Saltire.  He is the vice president of environmental

24   affairs for Saltire.  Mr. Bauer says also he spent one

25   hundred percent of his time on Saltire affairs.  So what

9

1   they tell the court is he said he wasn't an employee of

2   Saltire, which may or my may not be technically true,

3   depending on your definition of employee.  His the paycheck

4   was from Alper.  But he testified, as did Mr. Bertellotti

5   in the deposition they attached, that Mr. Bauer was an

6   officer of both Alper and Saltire held the same position,

7   vice president of environmental affairs.

8            And when you read the deposition it's

9   really quite striking, because I've reread this deposition

10  in preparation for today's hearing.  It is astonishing to

11  me that they would point to this as evidence of Alper

12  having done something, or even as an allegation of Alper

13  having done some something, because the entire deposition

14  deals with what Saltire did.  Just by way of example -- as

15  I said, Mr. Bauer said he devoted one hundred percent of

16  his time to Saltire matters.

17           The entire deposition was about Saltire's

18  cleanup at various places, including in Dickson County.

19  And in fact, the questioning attorney, the attorney for the

20  Norman plaintiffs in that case, actually asked Mr. Bauer

21  for the purposes of the deposition, to assume that when he

22  said the company he meant Saltire.  They don't report that

23  at all in their summary of it.  Any faithful summary of the

24  deposition in full would conclude that Mr. Bauer was a

25  joint employee of Alper and Saltire and nothing more -- I'm

1  sorry, a joint officer of both.

2              Most importantly, though, nothing in the

3  cited paragraphs gives rise to any liability that can be

4  imposed on Alper, no even allegation of liability that can

5  be imposed on Alper.  Because, importantly, what the

6  Supreme Court has said, and it said so in a very similar

7  context in the Best Foods case which we cite in our reply,

8  "in the environmental context there's nothing unusual or

9  untoward about officers serving with dual hats, joint

10 officers of a parent and a subsidiary.  In fact, what the

11 Supreme Court said is, "The recognition that the corporate

12 personalities remain distinct has its corollary in the well

13 established principal of corporate law that directors and

14 officers holding positions with a parent and a subsidiary

15 can and do change hats to represent the two corporations

16 separately despite their common ownership."  And the court

17 went on to say, "Since courts generally presume that the

18 directors wearing the subsidiary hats and not their

19 parent's hats when acting for the subsidiary" -- excuse me,

20 "that the directors are wearing their subsidiary hats and

21 not the parent hats when acting for the subsidiary,"

22 skipping the cites, "it cannot be enough to establish

23 liability here that dual officers and directors made policy

24 decisions and supervised activities at the facility."

25              Now they haven't even alleged, gotten to

1    the point of alleging what was at issue in Best Foods, that

2    there wasn't any actions taken by Alper, but, your Honor,

3    what they have alleged is simply that there was a joint

4    employee and they try to mislead the court in believing

5    that he was solely an employee of Alper, but he was not, he

6    was an officer of both.  And that alone cannot be

7    sufficient to establish or even allege a proof of claim.

8    They have to allege something more; that's what the Supreme

9    Court has told us in Best Foods.

10              And similarly they point us to a management

11   agreement, but in US vs. Neumont, another case we cited in

12   our brief, the court there, and I believe that was the

13   Eastern District of Washington, said that a management

14   agreement standing alone is not enough.  What they have to

15   do, your Honor, is they have to alleged some act

16   attributable to Alper and not simply the status of dual

17   employee that could on possibly give rise to liability.

18              And, your Honor, in considering these

19   allegations it's fundamentally important that the court

20   recall that this is not the opening salvo of a plaintiff or

21   of a claimant in a bankruptcy.  This is a claimant who has

22   had access to tens and tens of thousands of pages of

23   documents, as we pointed out in our papers and they don't

24   dispute, it's a claimant who has had access to depositions

25   on these very topics, to discovery on these very topics,

12

1  who has had four amended pleadings in the underlying

2  litigation.  So we should understand this to be really

3  their best effort at presenting a proof of claim, and they

4  have woefully failed.  Your Honor, I want to talk briefly

5  -- that deals with their allegations directly against

6  Alper, the allegation that Alper was somehow negligent,

7  that they pled that Alper was somehow negligent.

8              Turning now to the alter ego claims.  They

9  contend or they allude to the potential for alter ego

10  claims in a couple of pages in their response.  Presumably

11  this is in response to the footnote that we included in our

12  brief that said to the extent they wanted to allege Alper

13  alter ego, because there isn't any suggestion that they

14  had, to the extent they wanted to alleged alter ego, those

15  have been released by the Saltire plan for a payment of a

16  substantial amount of cash.  And, in turn, they have

17  settled with the Saltire estate themselves.  So presumably

18  the cash is fungible, so that cash helped, at least in

19  part, to pay that settlement.

20              What they present -- there's a legal issue

21  here and then a factually issue or a pleading issue.  The

22  legal issue they are simply incorrect.  They contend,

23  applying Tennessee law in the Sixth Circuit cases, that the

24  settlement by Saltire of its alter ego claims against Alper

25  is not effective as against them.  That's not just the

13

1    case.  The law in the Second Circuit is directly the

2    opposite.  In the St. Paul fire case which we have cited in

3    our pleadings, your Honor, the Second Circuit noted a

4    difference in the circuits with respect to this issue, with

5    respect to whether a debtor or a company could sue its

6    parent.  And therefore, in those circuits that conclude or

7    in the states that conclude that a debtor can sue its

8    parent or an entity can sue its parent, then those claims

9    belong to the estate, are settleable by the estate and are

10   prosecutable only by the estate, except in the case where

11   they have been abandon, which is clearly not the case here

12   because they have been prosecuted and settled by the

13   Saltire estate.

14            They simply are wrong in suggesting that

15   the law of Tennessee is the law that applies here.  What's

16   clear in New York is that the law of Delaware applies when

17   you are dealing with a Delaware corporation, and the law of

18   Delaware cannot be more clear on this.  Alter ego claims

19   are the property of the estate, are prosecutable by the

20   estate, and they are settled by the estate.  So there

21   simply is no basis for them even to present, to the extent

22   that they were going to try to present an alter ego claim,

23   there's no base to do so because those claims have been

24   adjudicated.

25            And I'll note, your Honor, that we

14

1    presented to the court in the intervening motion their

2    discovery request.  Their discovery requests are -- I'll

3    estimate, don't hold me to this, but 90 percent of them

4    relate to alter ego type of claims, a very, very small

5    portion of those relate to what they are now contending to

6    be the arguments against Alper, the negligent cleanup.  So

7    it's vitally important that we consider both of these

8    things because alter ego claims simply cannot exist.

9              And also, I think, your Honor, you don't

10    even have to consider the question of whether the alter ego

11    claims are released however, because there's nothing

12    whatsoever in their pleadings that assert an alter ego

13    claim.  The words alter ego don't appear, the words

14    piercing the corporate veil don't appear, not in their

15    proof of claim, not even in their 4th amended complaint.

16    They haven't even tried to establish that.  And in their

17    response they don't try to defend the lack of factual

18    allegations, the lack of any allegations to support that.

19    So I think the court can simply conclude that that has not

20    been pled.

21              And to the extent that the court order

22    discovery on any matter, we can go forward on the matters

23    that remain, but we think the court should rule in any

24    event, that they were -- even if they were alleged, so that

25    we can deal with this definitively.  Even if they alleged,

15

1    those claims have been released by virtue of the Saltire

2    claim.

3                    Your Honor, I'm happy to answer any

4    questions the court has, or I would like an opportunity to

5    respond if necessary.

6                    THE COURT:  Thank you.

7                    MR. LEBLANC:  Thank you, your Honor.

8                    MR. TAYLOR:  Your Honor, Cliff Taylor of

9    Stutzman, Bromberg, Esserman & Plifka in Dallas, Texas on

10   behalf of the Flake plaintiffs.  I am admitted pro hac

11   vice.

12                   Counsel raised a number of issues that I

13   want to address, but I would urge your Honor to take

14   another look at the 4th amended complaint that was attached

15   to the proof of claim of the Flake plaintiffs.  In that

16   proof of claim and the pleadings attached thereto, it's

17   clear that the Flake plaintiffs are alleging that Alper may

18   not had have contributed to the initial contamination at

19   the Dickson plant in Tennessee.

20                   THE COURT:  Your claim then bottoms on the

21   complaint the 4th amended complaint.

22                   MR. TAYLOR:  I'm sorry?

23                   THE COURT:  Your claim bottoms on that

24   complaint.

25                   MR. TAYLOR:  I'm not sure I understand,

16

1    your Honor.  It relies on?

2                    THE COURT:  It relies on that complaint --

3                    MR. TAYLOR:  Yes, your Honor.

4                    THE COURT:  -- that's before the court.

5                    MR. TAYLOR:  Yes, your Honor.  At this

6    preliminary stage, yes.  We think that that enunciates the

7    bases upon which these claim result.

8                    THE COURT:  That was my inquiry.

9                    MR. TAYLOR:  Yes, your Honor.

10                   THE COURT:  Go ahead.

11                   MR. TAYLOR:  And in that complaint a couple

12   things I would like to address.  One is Alper is not

13   mentioned only once in the complaint, it's identified as a

14   party, and more importantly it is stated in paragraph 13

15   that defendants, meaning all of these parties, are jointly

16   and severally liable for plaintiffs' damages directly

17   and/or through their agents, alter egos, employees,

18   representatives and predecessors.  And so in that document,

19   in those supporting documents, it's clear that the Flake

20   plaintiffs are stating claims against Alper not only for

21   their own actions, their overt actions with regard to this

22   contamination, but to the extent that they controlled

23   whatever action Saltire took they are asserting alter ego

24   claims against Alper in that regard as well.

25                   When we look at the proof of claim

1     material, we see -- and granted, your Honor, it's not the

2     factual basis of these claims aren't well established.

3     Despite counsel's assertions to the contrary, there has not

4     been tens of thousands of pages of discovery produced in

5     this matter.  I've never seen tens of thousands of pages.

6     And to the extent that there has been limited discovery,

7     and he refers to depositions taken during what everyone

8     refers to as the Norman litigation, that's unrelated

9     litigation; it was not nuanced.  The discovery there was

10     not nuanced, it was not specifically tailored towards these

11     claims.

12             And, you know, one environmental claim does

13     not all environmental claims makes.  And therefore the

14     Flake plaintiffs would assert to this court that they are

15     entitled to develop the factual basis of their claims to

16     conduct proper discovery, to take depositions, so that they

17     can come before this court --

18             THE COURT:  We've already had this

19     deposition motion --

20             MR. TAYLOR:  Correct, your Honor.

21             THE COURT:  -- and I've determined it.

22             MR. TAYLOR:  But what you see in the

23     complaint, however, is that Saltire contaminated property,

24     groundwater and soil, in Dickson, Tennessee.  Okay?  I

25     don't think that Alper contests that there's contamination

1   in Tennessee.  What the Flake plaintiffs have alleged is

2   that during the course of that contamination, after the

3   contamination during the course of the remediation of that

4   contamination Alper became involved.  Alper stepped in and

5   started to control the remediation efforts in Dickson,

6   Tennessee.  It's by virtue of that control and those

7   actions that Alper was obliged to act --

8               THE COURT:  Where is the Flake property in

9   relation to the environmentally sensitive site?

10              MR. TAYLOR:  It's within eight miles, your

11  Honor, within eight miles.  I can't tell you specifically

12  the distance; however, the geography of Dickson, Tennessee

13  is such that contamination can travel broadly because it

14  goes into the ground water.

15              THE COURT:  And though these folks want to

16  put up a bottling plant using that water that can travel

17  ever since what, 1982 it's been recognized?

18              MR. TAYLOR:  Correct, your Honor.  The

19  contamination may have been known to a limited number of

20  people.  Alper has presented evidence which I urge the

21  court not to consider, but they have made allegations and

22  presented evidence showing that in 1985 there was some

23  indication that there was contamination.

24              THE COURT:  But 2002, or 19 --

25              MR. TAYLOR:  Your Honor --

19

1           THE COURT:  When did the --

2           MR. TAYLOR:  In 2002.

3           THE COURT:  When did the Flakes come in and

4    by the property?

5           MR. TAYLOR:  But the extent of the

6    contamination and the migration of the contamination --

7           THE COURT:  Did somebody put blinders on

8    them?

9           MR. TAYLOR:  -- and the extent was not

10   known.  To know that there's contamination --

11          THE COURT:  If you want to put up a water

12   bottling plant, wouldn't you be very sensitive as to the

13   sources of the water?

14          MR. TAYLOR:  It's possible, your Honor.

15   And to the extent the Flake plaintiffs can have an

16   opportunity to assert these claims and develop these

17   claims, I feel confident that we can ensure your Honor that

18   they endeavored in all due diligence to make a

19   determination as to whether or not their land was

20   contaminated.

21          I think you'll find, your Honor --

22          THE COURT:  That sounds like a lot of

23   wishful thinking.  Maybe they good a very, very, very good

24   deal and they were going to take a chance on it.  I can't

25   imagine somebody wanting to put up a bottling plant in an

20

1  area where it's well known that there is contamination and

2  that there's migration.

3          MR. TAYLOR:  Well I thank you for your

4  Honor's comments.  However one thing a clear, at least for

5  this preliminary stage, their land has been contaminated

6  and they have lost value on their land.

7          So without regard as to whether or not

8  their losses include this lost opportunity, I think for to

9  date --

10         THE COURT:  Has it been established in any

11 way that their land has been contaminated?

12         MR. TAYLOR:  Yes, your Honor.  If you'll

13 look at Exhibit Number B of the response, it is an

14 analytical --

15         THE COURT:  I have an old Manhattan

16 telephone book and it's not quite as big as the exhibit

17 that you are flipping through --

18         MR. TAYLOR:  Well, there's a number of

19 pleadings in there.

20         THE COURT:  -- but I will accept your

21 assertion that their land is contaminated, which kind of

22 buttresses my curiosity and wonderment about their getting

23 involved in the purchase of this property so long after was

24 well, well, well known that this was an environmentally

25 unsound area.

1            MR. TAYLOR:  Well, I would submit to your

2    Honor that because there's known contamination at the

3    Dickson plant, doesn't mean that it was well known in the

4    Dickson area that property eight miles away would also be

5    contaminated.  How far do you carry that?

6            THE COURT:  I don't know.  But if you are

7    going to open up a water bottling plant, I think you would

8    carry it pretty far.

9            MR. TAYLOR:  And we can explore that and we

10   can develop that, and --

11           THE COURT:  I don't think it's necessary.

12   Let's get to the issues that are before me.

13           MR. TAYLOR:  Well, your Honor, and in

14   further support of their claims, the Flake plaintiffs have

15   shown the court, one, there is contamination at the Dickson

16   plant.  Two, their property has been contaminated.  Three,

17   Alper, through its employee, Nick Bauer, was directly

18   involved.

19           Now Alper has played word games with the

20   employee/officer dichotomy, but it's clear, if you look at

21   these depositions, that Nick Bauer, when he was engaging in

22   cleanup efforts was not doing so as an officer of Alper --

23   or as an officer of Saltire, but as an employee of Alper.

24   And when he was asked, "Are you an employee of Saltire?

25   No, I'm not an employee of Saltire.  Who are you an

22

1    employee of?  I'm an employee of Alper."  He answered to

2    Alper officers.  Now granted they shared officers.  They

3    shared officers.  But when he was hired, he was hired by

4    Alper for the sole purpose of dealing with the soil

5    contamination.

6                If you look at the quote of Mr.

7    Bertellotti, he specifically says, "Mr. Bauer was hired

8    specifically, in effect, specifically for the purpose; if

9    it wasn't for Saltire's environmental issues, Nick Bauer

10   wouldn't have been hired.  He was hired for the purpose of

11   dealing with Saltire's environmental issues."  Now I submit

12   to your Honor that he may have been an officer of Saltire,

13   but that was an after thought, perhaps even an attempt to

14   position Alper and protect Alper in its endeavors to become

15   directly involved with the contamination in Dickson,

16   Tennessee.  And it's through that control, it's through

17   those endeavors that Alper has assumed a duty.  And it

18   breached that duty when it failed to conduct those

19   remediation efforts in a non negligent manner.

20               Going forward to the alter ego claims,

21   which are something that have been raised before this court

22   in the Saltire bankruptcy.  Alper has failed to make the

23   distinction between generalized alter ego claims and

24   peculiarized, if that's a word, alter ego claims.  And the

25   authority cited by Alper, they cite to general alter ego

23

1    claims, that once a claim, a general alter ego claim trying

2    to enforce debentures on a parent corporation.  Another one

3    is a general alter ego claim which tries to pierce the

4    corporate veil because the parent looted the subsidiary.

5              Well, that's not what we have here.  What

6    we have here is control of a subsidiary by a parent in

7    specific endeavors which have harmed these specific claims.

8    It's not something that any creditor of Saltire or Alper

9    could bring, it's something that the Flake plaintiffs can

10   bring.  And so I would urge your Honor to take a look at

11   the argument in our response and look at the authority

12   therein which makes that distinction, and then revisit the

13   authority cited by Alper, because it's simply

14   distinguishable.

15             And with regard to the applicable law, your

16   Honor, again, Alper has over simplified the issue.  They

17   would have this court believe that under New York choice of

18   law rules Delaware law automatically applies.  Well, no,

19   it's the jurisdiction with the most to lose, with the most

20   interest in the action.  I would submit to your Honor that

21   in general alter ego claims where there is actions in the

22   corporate level such as looting and, you know, complete

23   control, all encompassing control, well, perhaps that's

24   properly brought in the jurisdiction of incorporation.  But

25   here, where there's a tort committed and there's control of

24

1   a subsidiary by a parent for purposes of committing a tort,

2   then the jurisdiction in which the tort was committed is

3   the proper jurisdiction to look to for law and for law

4   governing causes of action arising out of that tort.  And

5   under Tennessee law, as I've argues, as the Flake

6   plaintiffs argued in their response --

7                    THE COURT:  I have a problem with some of

8   those arguments.  Number one, it's a public company

9   incorporated in Delaware.  And as far as that goes, I think

10  the citation to the law is correct.

11                   Number 2, the actor, where you would

12  possibly say that Tennessee has a greater interest in the

13  issue is Saltire.  And Saltire is not involved here at all.

14  You are not seeking any claims against Saltire.  Saltire is

15  the actor all the way in the environmental problem.  And --

16  may I finish, sir?

17                   MR. TAYLOR:  Yes.

18                   THE COURT:  And Saltire has been the

19  recipient of general releases from the Flakes, as I

20  understand it they have settled, and they have settled with

21  other parties here.  So to the extent that Saltire is an

22  actor through that, I don't know that you can necessarily

23  migrate to apply the law the same way against Alper, who is

24  an incidental owner of Saltire as understand it, and the

25  parties here can correct me.  Their ownership comes about

25

1    as a distributee, as a creditor of another company who

2    happened to have ownership of Saltire.  And it's a

3    distribution of stock in that company which you would like

4    to use as a fly paper document of adherence to impose some

5    liability here, successor liability on something to which

6    it's clearly admitted they had nothing to do with the

7    creation of the problem.

8              You've now migrated your argument to

9    concept of negligent remediation years and years and years

10   after the fact, I have somewhat of a problem.  But to that

11   extent, coming back to where I started this little

12   soliloquy, it was Saltire that was the actor, it's Alper, a

13   public company, and you've not shown any special

14   circumstances to, A, either pierce the corporate veil

15   against Alper, and you haven't shown that Delaware has less

16   of an interest than Tennessee in this particular instance.

17             MR. TAYLOR:  Well, I would urge your Honor

18   not to rely on --

19             THE COURT:  Of course you would.

20             MR. TAYLOR:  -- factual allegations made by

21   Alper when making a decision at this preliminary

22   injunction.

23             THE COURT:  Well Alper asserts the same

24   thing, that your generalizations are not to be given any

25   real credence.  I think what has come before me now is --

26

1    what is clear from all of these papers, that you bottom

2    your claim on the complaint, the fourth amended complaint.

3    To the extent that that would be subject to a motion to

4    dismiss, then your claim does not state any basis for

5    recovery.

6                    MR. TAYLOR:  May I respond?

7                    THE COURT:  Sure.

8                    MR. TAYLOR:  I think if you look at the

9    reply --

10                   THE COURT:  Perhaps you ought to wait until

11   your adversary gets up to respond, because that was just my

12   comments based upon everything that's been placed before

13   me.

14                   MR. TAYLOR:  I would like to address the

15   court's statements.

16                   THE COURT:  Sure.

17                   MR. TAYLOR:  I think it's clear that this

18   isn't merely a circumstance in which the Flake plaintiffs

19   are saying that Alper is liable merely by the fact that it

20   acquired an interest in Saltire.  I think the complaint is

21   clear, and the response clearly sets forth, and the

22   evidence that the Flake plaintiffs have presented to this

23   court clearly shows that the predicate of the causes of

24   action against Alper are instead based on the control of

25   Alper over remediation.

27

1          THE COURT:  Oh, it's agreed that that's

2   what your assertions are.

3          MR. TAYLOR:  Right.  Well, thank you, your

4   Honor.

5          MR. LEBLANC:  Your Honor, we agree with the

6   Flakes with respect to what the requirements are for

7   averring a cause of action, among which include averring

8   some duty.

9          What we now understand them to say is, it

10  sounds to me like we are dealing with a good Samaritan kind

11  of case where somebody comes along with no duty to do

12  anything but undertakes to do so and does so in a way that

13  they contend is negligent.  And what has to be clear is, I

14  don't think they could contest, is that Alper had no duty

15  to clean up the environmental waste in Dickson County.  It

16  had no duty.  They are not alleging that it had a duty

17  because of a piercing of the corporate veil, they are

18  alleging simply that it did so in a parent corporate

19  largess, and that it did so in a way that they found to be

20  actionable, and we'll deal with that in a second, your

21  Honor.

22          Secondly, it's clear that in light of the

23  fact that Alper had no duty to clean up, they could not

24  have had a duty to warn the Flakes of the existence of

25  environmental contamination.  In corporate parlance, Alper

28

1    is a stranger to that transaction because they are the

2    parent, and we cite the McGovern case from Tennessee

3    dealing with the parent of a company, 3M, the parent of a

4    company that was producing breast implants and was sued

5    because it was the parent of a an entity producing breast

6    implants and it failed to warn.  And the Tennessee court

7    there said, no, that's not a basis for liability because

8    you are the parent, you have no duty flowing to the

9    customers of your subsidiary.

10                Well the same could be said here, but if

11   what I understand now is that the Flakes are contending

12   that instead this is a good Samaritan case and we undertook

13   a duty that we didn't have and did so negligently, the law

14   is clear, your Honor, that in good Samaritan cases you need

15   reliance.  The plaintiffs need to rely on the duty that was

16   undertaken by the alleged tort feasor.  Well, what the

17   Flakes have told you today and told this court today and

18   said in their pleadings is that they didn't rely on

19   anybody.  As he said, I think the words were, it may have

20   been the known by some people that there was environmental

21   contamination in Dickson County, but apparently, to borrow

22   from Casablanca, the Flakes were shocked, shocked to find

23   that there was environmental contamination there.

24                It's simply not believable on its face, but

25   we'll leave that to one side, we'll take these allegations

1    as they are pled.  It was not known by a few people, it was

2    known by the EPA, it was known by the Norman plaintiffs who

3    had been in litigation with Saltire for ten years at that

4    point, it was known by the newspaper articles, but the

5    doesn't even need to take judicial notice of those.  But

6    even leaving those aside here, what we have here, what the

7    Flakes have made clear is that they didn't rely on Alper to

8    do the contamination remediation because they didn't know

9    it was being done.  Their act was to purchase this property

10   that has subsequently lost value.  They didn't rely on

11   Alper in any respect.

12            So there's a failing, even if they now want

13   to modify their complaint to that what we are dealing with

14   here is a good Samaritan case where Alper took upon itself

15   in an act of corporate largesse to do this clean up.  Your

16   Honor, what we submit is clear, however, from the

17   pleadings, what they have now incorporated, the Bauer

18   deposition, and I want to read a passage from this, because

19   I want to make sure that the court is not misled by their

20   attempts to mislead the court, because they said in their

21   pleading Mr. Bauer was an employee of Alper.

22            Well, Mr. Bauer said he was an employ of

23   Alper, he said he wasn't an employee of Saltire, but Mr.

24   Bauer also said he was an officer of Alper and an officer

25   of Saltire.  What he was asked is, and this is at page 112

30

1    of the deposition lines 10 through 11, he was asked the

2    question, this is a preface:

3                  "Q.  The official name of the company is

4    Saltire, Inc.; is that right?

5                  "A.  That's correct."

6                  And then a few lines down, and that was

7    just to show you that we are talking here about Saltire.

8    And this actually follows the attorney's instruction that

9    any time he uses the word company he's referring to

10   Saltire.  Question at line four and five of page 13:

11                 "Q.  And who are the officers of the

12   company.

13                 "A.  Robert Bertellotti is the managing

14   director."

15                 And he moves down, and Mr. Bauer is

16   continuing to answer, and he says:

17                 "A.  And myself, Nicholas Bauer, Vice

18   President Environmental Affairs."

19                 So for them to suggest in any way that

20   there was some subterfuge by Mr. Bauer being now somehow

21   created as an officer of Saltire is ridiculous.  What the

22   Supreme Court tells us in Best Foods, it is not actionable

23   standing alone for an employee or an officer, they actually

24   use officer or director in Best Foods.  What the Supreme

25   Court tells us in Best Foods is it is not objectionable for

1    an officer to be a joint employee.  In fact, quite to the

2    contrary, they are presumed to be acting in the corporate

3    hat for the corporation they are acting for at the time.

4    So if Mr. Bauer says he's doing one hundred percent of his

5    time with Saltire, the law presumes that he's wearing the

6    hat of Saltire when he does it.  They've alleged nothing to

7    the contrary, they haven't suggested anything to the

8    contrary.  Nothing in the Bauer deposition suggests

9    anything to the contrary.  It's for that reason, your

10   Honor, that their claims fail, because they have not

11   alleged of one iota of what anyone whose wearing the hat of

12   Alper did in remediation in Dickson County that could

13   possibly lead to any liable for Alper.

14                Now, your Honor, we didn't brief, because I

15   didn't appreciate that's what they were contending, the

16   good Samaritan line of cases.  We are happy to submit

17   something if your Honor would like it, because we didn't

18   brief that, not appreciating that they were contending that

19   Alper just undertook this obligation as an act of corporate

20   largess.  But what is clear, and I'm certain is clear in

21   Tennessee, we've looked at it although we haven't briefed

22   it, what is clear in Tennessee is that to allege this good

23   Samaritan kind of cause of action, you have to allege

24   reliance on the undertaken by the tort feasor, the alleged

25   tort feasor, and they can't do that and they haven't done

32

1    that.  It would contradict their fundamental complaint,

2    which is they didn't know there was contamination, they

3    just happened upon it sometime in the apparently less than

4    two years after they purchased their water bottling

5    facility land they happened upon the contamination without

6    knowing anything about it.  So they have no way they could

7    relied on Alper, it just isn't the case.  So there's no

8    cause of action there.

9                    It's for those reasons, your Honor, that we

10   submit -- I don't even think it's worth addressing.  If

11   your Honor would like me to -- they are just wrong about

12   alter ego.  The cases we cite, and in particular, your

13   Honor, the Southern District case I think mos clear on this

14   is the case of Murray v. Minor.  It's at 876 F Sup. 512, we

15   cite this in our response dealing with the question of

16   general versus specific allegations, and they are just

17   wrong about what it means to be a specific allegation.  It

18   isn't sufficient that they have suffered some harm by

19   virtue of their alleged piercing the corporate veil, that

20   to make it a cause of action belonging to them as opposed

21   to Saltire in this case.

22                    If their allegations of control, or

23   allegations of alter ego, or allegations of piercing the

24   corporate veil are such that it would give rise to a series

25   of liabilities, it's common to a whole group of creditors,

33

1    then that is sufficient.  And I'll read the passage from

2    the Murray case, your Honor.  It says, "Plaintiffs aver no

3    particularized injury flowing from MMA acts that are

4    district from those suffered from other gun boat company

5    creditors" and this is at page 517.  "Such wrongful acts

6    equally injure any other creditors of FBI and the gun

7    brokers companies.  Because plaintiff's claims are general

8    therefore, they are bound by the outcome of the trustees

9    actions."  In that case the trustee, like here, had settled

10   with the parent.

11            So, your Honor, what is the distinction

12   between a general and a specific allegation, or a general

13   and specific harm for the purposes of an alter ego

14   analysis, is not that they suffered a harm that is

15   particular to them, it's that the piercing of the corporate

16   veil is general.  What they are saying is that we control

17   the remediation.  There's a whole host of people who have

18   filed claims in this action who contend that we control --

19   who would benefit from a finding that we control the

20   remediation.  There's no distinction between the Flakes and

21   any other person.

22            So for that reason, your Honor, this is the

23   quintessential general alter ego allegation, and there's no

24   basis for the court to ignore the settlement that Saltire

25   appropriately entered into for a large sum of money and

34

1  which this court has already approved.  Your Honor, for

2  those reasons we submit that the Flakes have simply failed

3  to submit a claim or to allege a claim against Alper and we

4  would ask that the court disallow it and expunge it.

5                    Thank you, your Honor.

6                    MR. TAYLOR:  Briefly, your Honor?

7                    THE COURT:  Sure.

8                    MR. TAYLOR:  I would like to address two

9  comments made by counsel.  One is the mischaracterization

10  of the type of claim we are talking about here.  These

11  aren't necessarily good Samaritan claims.  This is an

12  example of a parent corporation controlling the actions of

13  its subsidiary, and doing so in a negligent manner.  That

14  makes Alper liable on two bases; one, for its direct

15  actions, for the actions of its employee, Nick Bauer, who

16  has been identified.  We don't know if there's other

17  employees at this point.  And, two, for an alter ego type

18  of liability.

19                    Secondly I would urge your Honor to go back

20  and look at the cases cited by Alper because they are

21  distinguishable.  There is a distinction between general

22  and specific alter ego claims, they recognize that.  But

23  what they don't recognize is that the cases upon which they

24  rely are general alter ego claims.  Those are examples of

25  general alter ego claims.  Sure, they belong to the estate.

35

1   But specific alter ego claims are the claims in which the

2   damage is peculiar to the claimant.  Saltire could not

3   have --

4               THE COURT:  So you rely upon the fourth

5   amended complaint to state that cause of action.

6               MR. TAYLOR:  I'm sorry, your Honor?

7               THE COURT:  You rely on the fourth amended

8   complaint to state that cause of action.

9               MR. TAYLOR:  Yes.  That cause of action is

10  stated.  This is not developed, as Alper has tried to

11  develop here in these early proceedings, which I remind

12  your Honor is a hearing on a motion to dismiss.  But there

13  is alter ego causes of actions in the fourth amended

14  complaint, and they are specific to the Flake plaintiffs.

15              Saltire could not have asserted a claim for

16  the Flake's damages against Alper; it couldn't have done

17  it, therefore it was not a general alter ego claim, it did

18  not belong to the estate, and it could not have been

19  released by Saltire during its bankruptcies proceedings.

20              Thank you.

21              THE COURT:  Thank you.

22              MR. LEBLANC:  Your Honor, one line.  The

23  last thing he said was just totally wrong.

24              What Saltire could have alleged is that

25  Alper controlled the remediation and did so in a negligent

1  way and therefore Saltire was damaged, or even that other

2  people were damaged, or that Saltire was liable to other

3  people for damage.  Saltire could have alleged any of those

4  things and it settled those.  That is what is meant by a

5  general allegation, the control of a remediation as opposed

6  to a specific allegation which this is simply is not.  I

7  would also urge your Honor to look at the complaint itself

8  to see if there is an alter ego complaint alleged, because

9  I frankly don't see it.

10                 THE COURT:  Thank you all.

11                 I'm going to grant the motion to dismiss

12  the claim.  I find, interestingly, that the parties now

13  agree that this is essentially a motion to dismiss and it's

14  grounded upon the fourth amended complaint which formed the

15  basis for the claims themselves.  And I don't find that

16  they stated an appropriate cause of action to survive this

17  motion.

18                 You've briefed it well.  There's a lot of

19  law that's been shown to the court, and I do not find that

20  in the record before me that I can charge Alper with

21  controlling the remediation, which is an essential

22  allegation here that supports this and other forms of

23  claims.

24                 The claimants here have tried to hide

25  behind a very broad form of complaint to assert several

1  different shifting forms of theory to support the claims.

2  I've looked at that.  I've looked at that in the context of

3  the prior motion with respect to discovery, and I've looked

4  at it in connection with the papers that have been

5  submitted here.  I do not find that Alper has any liability

6  to these claimants, and I'm going to grant the motion to

7  dismiss the proofs of claim.

8           I will issue a written opinion with respect

9  to that in due course.

10           MR. TAYLOR:  Your Honor, may I request

11  leave to amend the proof of claim with an addition?

12           THE COURT:  Denied.  You can't continually

13  throw different theories at me.

14           MR. TAYLOR:  Thank you, your Honor.

15           THE COURT:  With respect to the issue of

16  the latest one you've argued concerning good Samaritan, if

17  you want to issue a letter brief in that regard, the court

18  will entertain it.

19           MR. LEBLANC:  We can do so as early as

20  tomorrow morning, your Honor.

21           MR. TAYLOR:  Thank you.

22           MR. LEBLANC:  Thank you.

23           THE COURT:  Thank you all.

24           MR. TAYLOR:  Thank you, your Honor.

25           MR. LEBLANC:  Your Honor, also on the

38

1    docket today is Alper's motion under Rule 3007C, newly

2    enacted Rule 3007C for leave to file a group objection to

3    two groups of claimants.

4                    THE COURT:  That new rule leaves it up to

5    the court to decide whether or not to follow it.

6                    MR. LEBLANC:  It does, your Honor.

7                    THE COURT:  I don't think that rule was

8    well thought out, but nevertheless, to the extent that you

9    intend to parse out the omnibus objections, let me hear

10   your grounds and I'll tell you whether I accept them or

11   not.

12                   MR. LEBLANC:  Okay.  Thank you, your Honor.

13                   Your Honor, there are two groups of

14   plaintiffs who have filed groups of complaints, one is the

15   Holt claimants and one is the Atkin plaintiffs, and these

16   are groups of complaints that are identical.  They are form

17   complaints that are identical to one another, represented

18   by the same counsel and they assert the same allegations.

19                   What we would like to do is file one

20   objection vis a vis the Holts, one objection vis a vis the

21   Atkins, similar to what we did in Armstrong.

22                   THE COURT:  The application is granted.

23                   MR. LEBLANC:  Thank you, your Honor.

24                   We have an order, your Honor.

25                   THE COURT:  I'll entertain it.

39

1                MR. LEBLANC:  May I approach?

2           THE COURT:  Sure.

3           I've approved the order.

4                MR. LEBLANC:  Thank you, your Honor.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1              C E R T I F I C A T E

2

3     STATE OF NEW YORK       }

                              }    ss.:

4     COUNTY OF WESTCHESTER    }

5

6              I, Denise Nowak, a Shorthand Reporter

7         and Notary Public within and for the State of

8         New York, do hereby certify:

9              That I reported the proceedings in the

10        within entitled matter, and that the within

11        transcript is a true record of such proceedings.

12             I further certify that I am not

13        related, by blood or marriage, to any of the

14        parties in this matter and that I am in no way

15        interested in the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto

17        set my hand this _____ day of

18        _____, 2008.

19

20             _____

               DENISE NOWAK

21

22

23

24

25