**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RAY AND CATHY FLAKE**

        **Appellants,**

    **v.**                    **Civil Case No. 08 cv 2489 (CM)**
                               **(Consolidated)**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

**HARRY HOLT, et al.,**

        **Appellants,**

    **v.**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

**JON AND CHARLOTTE ARMSTRONG,**

        **Appellants,**

    **v.**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

**THE ADKINS CLAIMANTS,**

        **Appellants,**

    **v.**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

---

### JOINT SUPPLEMENTAL BRIEF OF JON AND CHARLOTTE ARMSTRONG AND THE ADKINS CLAIMANTS

---

Douglas T. Tabachnik, Esq. (DT6337)
**LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.**
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
Telephone: (732) 792-2760
Facsimile: (732) 792-2761

and

Sander L. Esserman, Esq.  (SE0356)
Cliff I. Taylor, Esq. (CT4711)
STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

**ATTORNEYS FOR
JON AND CHARLOTTE ARMSTRONG
AND THE ADKINS CLAIMANTS**

**I.**
**TABLE OF CONTENTS**

I.    TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    i

II.    TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

    A.    CASES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

    B.    STATUTES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

III.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

IV.    STATEMENT OF APPELLATE JURISDICTION. . . . . . . . . . . . . .    1

V.    STATEMENT OF ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . .    2

VI.    STATEMENT OF THE CASES AND THE FACTS ALLEGED. . .    2

    A.    THE ARMSTRONG PROOFS OF CLAIM AND THE BANKRUPTCY
        COURT'S TREATMENT THEREOF. . . . . . . . . . . . . . . . . . . . . . . . . . .    2

        1.    *The Armstrongs filed proofs of claim in Alper's*
            *Bankruptcy Case.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

        2.    *Alper objected to the Armstrong Proofs of Claim and*
            *the Bankruptcy Court subsequently disallowed the*
            *proofs of claim after quashing the Armstrongs'*
            *discovery requests.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

    B.    THE ADKINS CLAIMANTS' PROOFS OF CLAIM AND THE
        BANKRUPTCY COURT'S TREATMENT THEREOF. . . . . . . . . . . . . .    6

        1.    *The Adkins Claimants filed proofs of claim in Alper's*
            *Bankruptcy Case.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

        2.    *Alper objected to the Adkins Proofs of*
            *Claim and the Bankruptcy Court subsequently*
            *disallowed the Adkins Claimants' claims while the*
            *Adkins Claimants' Motion to Withdraw the Reference*
            *was pending in the District Court.* . . . . . . . . . . . . . . . . . . .    9

VII.    SUPPLEMENTAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

**A.**  THE CLAIMANTS ADOPT THE LEGAL ARGUMENTS SUBMITTED TO THE COURT IN THE FLAKE BRIEF . . . . . . . . . . . . . . . . . . . . . . .  10

**B.**  ALPER'S EMPLOYMENT OF NICHOLAS BAUER FOR THE SOLE PURPOSE OF MANAGING SALTIRE'S ENVIRONMENTAL REMEDIATION ACTIVITIES MAKES IT PLAUSIBLE THAT ALPER CONTROLLED AND DIRECTED THE DICKSON REMEDIATION . . . .  10

**C.**  THE CLAIMANTS' VEIL PIERCING CLAIMS AGAINST ALPER WERE NOT, AND COULD NOT HAVE BEEN, RELEASED BY SALTIRE DURING SALTIRE'S BANKRUPTCY BECAUSE THE CLAIMS WERE NOT PROPERTY OF SALTIRE'S BANKRUPTCY ESTATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

   *1.  Only veil piercing claims that are general and common to the debtor and creditors become property of a debtor's bankruptcy estate* . . . . . . . . . . . . . . . . . . . . . . .  15

   *2.  The Adkins Claimants' veil piercing claims against Alper were not Saltire's claims to release* . . . . . . . . . . . . .  17

**D.**  TO THE EXTENT THE BANKRUPTCY COURT ENTERTAINED ALPER'S ARGUMENTS REGARDING THE MERITS OF THE ADKINS CLAIMANTS' PERSONAL INJURY CLAIMS, THE BANKRUPTCY COURT EXCEEDED ITS SUBJECT MATTER JURISDICTION IN CONTRAVENTION OF 28 U.S.C. §§157(b)(2) AND 157(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

**VIII.**  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

## II.
## <u>TABLE OF AUTHORITIES</u>

**A.    CASES CITED**

*Bell Atlantic Corp. v. Twombly*,
127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **11, 12**

*In re Chateaugay Corp.*,
146 B.R. 339 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **2**

*In re Del-Met Corp.*,
322 B.R. 781 (Bankr. M.D. Tenn. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .    **15, 16**

*In re Enron Corp.*,
No. 01816034AJG, 2003 WL 1889040 (Bankr. S.D.N.Y. April 17, 2003). .    **15**

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **11**

*Koch Ref. v. Farmers Union Ctr. Exch., Inc.*,
831 F.2d 1339 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **15**

*Raine v. Lorimar Productions, Inc.*,
71 B.R. 450 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **11**

*Serio v. Ardra Ins. Co.*,
761 N.Y.S.2d 1 (N.Y. App. Div. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **14**

*United States v. Bestfoods*,
118 S.Ct. 1876 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **13**

*Variable-Perameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*,
945 F.Supp. 603 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **15, 16, 17**

**B.    STATUTES CITED**

28 U.S.C. § 158(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **2**

28 U.S.C. § 157(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **18**

28 U.S.C. § 157(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **19**

**III.**

**INTRODUCTION**

Pursuant to the Court's instructions at a May 9, 2008, status conference held in the above captioned appeals, Jon and Charlotte Armstrong (the "Armstrongs") and the Adkins Claimants[1] (collectively referred to as the "Claimants"), hereby file this Joint Supplemental Brief of Jon and Charlotte Armstrong and the Adkins Claimants (the "Supplemental Brief"), supplementing the Brief of Appellants Ray and Cathy Flake filed in Case No. 08-cv-02489-CM as Docket Number 6 (the "Flake Brief"). As ordered by the Court, this Supplemental Brief is submitted for the limited purpose of completing the appellate record for the respective appeals of the Armstrongs and Adkins Claimants and to provide the Court with a discussion of those factual allegations made in the Bankruptcy Court by the Claimants that are particular to the Claimants' respective claims. The Claimants hereby adopt the factual representations, where applicable, and legal arguments asserted in the Flake Brief and incorporate such representations and arguments herein. Capitalized terms used but not defined herein have the meaning ascribed to them in the Flake Brief.

**IV.**

**STATEMENT OF APPELLATE JURISDICTION**

These appeals are brought under Title 28, United States Code, Section 158(a)(1), which gives district courts of the United States jurisdiction to hear appeals "from final

---

[1] Adkins Claimants are as follows: Donald, Kristi and Hunter Adkins; David, Jodie, Kassidy, Dawson & Mason Heimbach; Travis, Amy and Lauren Wood; Priscilla Fowler, Jason and James Stewart; Barry, Christie and Luke Piland; Steven, Melissa and Mya Jones; Scott, Darcie and Samuel Herkimer; Anthony, Keysha and Autumn Fambrough; Timothy, Kimberly and Paxton DeLoach; Eric and Peyton Christian and Jennifer Casteel; Chad, Patricia and Emily Beard; Shonda Heflin, John, Christopher and Sydney Stivers; Charity Comeaux and Joshua Campbell.

1

judgments, orders, and decrees" of the bankruptcy courts.  28 U.S.C. § 158(a)(1).  The

Armstrongs' appeal arises from the Memorandum Decision and Order Granting

Objections of Alper Holdings USA, Inc. to Proofs of Claim Filed by (i) Armstrong

Plaintiffs and (ii) Holt Plaintiffs (the "<u>Armstrong Order</u>"), entered by the Bankruptcy

Court, which disallows and expunges the Armstrongs' bankruptcy claims against Alper.

The Adkins Claimants' appeal arises from the Bankruptcy Court's April 3, 2008,

Memorandum Decision and Order on Objection of Alper Holdings USA, Inc. to Proofs of

Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by the Adkins

Claimants (the "<u>Adkins Order</u>"), entered by the Bankruptcy Court, which disallows and

expunges the Adkins Claimants' claims against Alper.   Orders disallowing claims are

final orders and, therefore, appealable under Title 28, United States Code, Section

158(a)(1).  *In re Chateaugay Corp.*, 146 B.R. 339, 342 n. 7 (S.D.N.Y. 1992).

**V.**
**<u>STATEMENT OF ISSUES PRESENTED</u>**

The issues presented to the Court in the Flake Brief are also applicable to the

respective appeals of the Armstrongs and the Adkins Claimants.

**VI.**
**<u>STATEMENT OF THE CASES AND THE FACTS ALLEGED</u>**

A.     **THE ARMSTRONG PROOFS OF CLAIM AND THE BANKRUPTCY COURT'S TREATMENT  THEREOF**

1.     *The Armstrongs filed proofs of claim in Alper's Bankruptcy Case*

On September 19, 2007, Jon and Charlotte Armstrong each submitted proofs of

claim in Alper's bankruptcy case, seeking payment of property damages incurred due to

the migration of TCE contaminants onto the Armstrongs' property.  On February 6, 2008,

the Armstrongs submitted amended proofs of claim, which contained a more particular

2

description of their claims against Alper (as amended, the "Armstrong Proofs of Claim") (*See* Armstrong Proofs of Claim, Bankr. Dkt. No. 147, Exhibit A).[2]  In the Armstrong Proofs of Claim, the Armstrongs alleged that they are tort victims with claims against Alper for damages stemming from the contamination of their real property located at 125 Robinson Road, Dickson, Tennessee (the "Armstrong Property") by TCE (Armstrong Proofs of Claim at Exhibit A, pg. 1).

The Armstrongs alleged that Saltire, an Alper subsidiary since 1992, operated an industrial plant in Dickson, Tennessee (Armstrong Proofs of Claim at Exhibit A, pg. 1). Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill (Armstrong Proofs of Claim at Exhibit A, pg. 1).  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and ground water at and around the Dickson plant site (Armstrong Proofs of Claim at Exhibit A, pg. 1).  In the Armstrong Proofs of Claim, the Armstrongs alleged that the contamination of the Armstrong Property was the direct result of the migration of TCE contaminants from one or more of these dump sites (Armstrong Proofs of Claim at Exhibit A, pg. 1).

The Armstrongs alleged that Alper can and should be held directly liable for their damages, because Alper negligently controlled the remediation of the various Saltire dump sites after 1992, failing to prevent the migration of TCE onto the Armstrong Property (Armstrong Proofs of Claim at Exhibit A, pg. 6).  Like the Flakes, the

---

[2] In the bankruptcy court proceedings, Alper filed an objection to the Armstrongs' amended proofs of claim.  However, Alper's objection was implicitly overruled by the Bankruptcy Court, which, after identifying Alper's outstanding objection, (Armstrong Order, at p. 4, n. 4), proceeded to consider the allegations in the Armstrongs' amended proofs of claim when ruling on Alper's claim objection (Armstrong Order, at p. 4-6).

Armstrongs alleged that Alper undertook the management and control of the

environmental and remediation endeavors in Dickson, Tennessee on behalf of Saltire

(Armstrong Proofs of Claim at Exhibit A, pg. 3).  The Armstrongs alleged that such

management and control was effectuated by two means: (i) the Management Agreement

under which Alper managed the Dickson remediation and pursuant to which Alper was

immunized from litigation initiated by Saltire, and (ii) Nicholas Bauer's (an officer of

Alper and Saltire who was employed by Alper for the sole purpose of managing Saltire's

environmental remediation) assumption of the actual management of the remediation of

the Dickson contamination (Armstrong Proofs of Claim at Exhibit A, pg. 2-3).

The Armstrongs further alleged that the remediation controlled by Alper was

negligently conducted as follows:

> Alper failed to exercise reasonable care when carrying out
> this undertaking.  Alper's failure to exercise reasonable care
> increased the risk of harm to the Armstrongs and their
> property by way of an environmental investigation and
> remediation that was improperly limited in geographical
> scope relative to the diverse expanse, varied location and
> continuing migration of the subject TCE contaminant.

(Armstrong Proofs of Claim at Exhibit A, pg. 5).  In support of the allegation that Alper

failed to exercise reasonable care in undertaking the environmental and remediation

activities in Dickson, Tennessee, the Armstrongs pleaded the following in their Proofs of

Claim:   (1) Alper did not follow an appropriate and extensive enough sampling or

remediation plan; (2) Alper used inadequate equipment in its investigation of TCE, thus

undermining the remediation efforts; (3) Alper failed to determine the scope of

remediation required to cure the contamination for which Saltire was responsible; (4)

Alper failed to remediate contamination on and around the Armstrong Property; and  (5)

Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination to surrounding properties such as the Armstrong Property (Armstrong Proofs of Claim at Exhibit A, pg. 6).

> 2.    *Alper objected to the Armstrong Proofs of Claim and the Bankruptcy Court subsequently disallowed the proofs of claim after quashing the Armstrongs' discovery requests*

On January 9, 2008, Alper filed its Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 12 and 13) Filed by Armstrong Plaintiffs (the "Armstrong Claim Objection") (Armstrong Claim Objection, Bankr. Dkt. No. 115). At the same time, Alper filed a Declaration of Jessica L. Fink in Support of Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 12 and 13) Filed by Armstrong Plaintiffs (the "Armstrong Fink Declaration"), which had attached to it several pages of evidentiary material. (Armstrong Fink Declaration, Bank. Dkt. No. 116). In the Armstrong Claim Objection and the Armstrong Fink Declaration, Alper introduced numerous factual allegations that did not appear in the Armstrong Proofs of Claim.

As with the Claim Objection filed by Alper with respect to the Flake Claims, the Armstrong Claim Objection purported to be a motion to dismiss, but included factual allegations and argument that was not appropriate for a motion to dismiss. Therefore, out of an abundance of caution, the Armstrongs determined that it was necessary to treat the Armstrong Claim Objection as an objection on the factual and substantive merits of their claims. Accordingly, the Armstrongs attempted to conduct discovery before responding to the Armstrong Claim Objection.

The Armstrongs' response to the Armstrong Claim Objection was due on or before February 15, 2008.  The Armstrongs sought to depose Nicholas Bauer and two current officers of Alper (Robert Bertellotti and Wayne Smith) before such due date.  The Armstrongs noticed such depositions to take place prior to the February 15, 2008, deadline.  However, after a February 7, 2008 chambers conference among counsel for the Armstrongs, counsel for Alper and the Bankruptcy Court, the Bankruptcy Court quashed all outstanding subpoenas and delayed or denied all deposition notices pending the outcome of the court's determination of Alper's claim objection (Feb. 7, 2008, Chambers Conference Transcript, Bankr. Dkt. No. 191, p. 14:11—14:22).

The Armstrongs, after being denied discovery by the Bankruptcy Court, filed their Response of Jon and Charlotte Armstrong to Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 12 and 13) Filed by Armstrong Plaintiffs, on February 15, 2008 (the "Armstrong Response") (Armstrong Response, Bankr. Dkt. No. 147).   After a February 21, 2008, hearing, the Bankruptcy Court disallowed the Armstrongs' claims in the Armstrong Order (Armstrong Order, Bankr. Dkt. No. 157).

**B.     THE ADKINS CLAIMANTS' PROOFS OF CLAIM AND THE BANKRUPTCY COURT'S TREATMENT THEREOF**

*1.     The Adkins Claimants filed proofs of claim in Alper's Bankruptcy Case*

On September 14, 2007, the Adkins Claimants each submitted proofs of claim in Alper's bankruptcy case, seeking payment of personal injury damages caused by exposure to TCE through the consumption of drinking water from the Dickson County area.  On March 19, 2008, the Adkins Claimants submitted amended proofs of claim,

which contained a more particular description of their claims against Alper (as amended, the "Adkins Proofs of Claim") (*See* Adkins Proofs of Claim, Bankr. Dkt. No. 193).[3]

The Adkins Claimants alleged that each of the Child Claimants'[4] respective mothers consumed TCE-contaminated water from one or more sources in Dickson, Tennessee, during the early stages of her pregnancy with the Child Claimant (Adkins Proofs of Claim at Exhibit A, pg. 2). Prior to birth and in the early stages of gestation, Child Claimants were exposed to TCE consumed by their respective mothers and sustained deformities as a consequence of this exposure (Adkins Proofs of Claim at Exhibit A, pg. 2). The Adkins Claimants alleged that the Child Claimants have suffered serious congenital deformities, including unilateral and bilateral cleft lip, palate, and soft palate, submucus cleft, defective palate known as a velopharyngeal insufficiency or velopharyngeal incompetence, undeveloped Eustachian tube, severe heart murmur, congenital heart disease, and chronic lung disease due to their prenatal exposure to TCE (Adkins Proofs of Claim at Exhibit A, pg. 1-2).

---

[3] Each of the Adkins Proofs of Claim has attached thereto a "Statement of Claim," which contains a description of the factual and legal basis for each claim. These Statements of Claim are substantively identical, other than the names of the particular claimants and the deformities associated with the particular Child Claimant to which the Statement of Claim pertains. These differences in the content of the Statements of Claim have resulted in pagination differences. For purposes of citation in this Supplemental Brief, and in an effort to avoid confusion or the need for cumbersome string cites, citations to the Adkins Proofs of Claim will contain page numbers applicable to the proof of claim of David, Jodie, Kassidy, Dawson & Mason Heimbach, but such references apply equally to all other Adkins Claimants' Proofs of Claim.

[4] The "Child Claimants" consist of Hunter Adkins, Dawson Heimbach, Kassidy Heimbach, Mason Heimbach, Sydney Stivers, Emily Beard, Peyton Christian, Paxton DeLoach, Autumn Fambrough, Samuel Herkimer, Mya Jones, Luke Piland, James Dakota Stewart, Joshua Campbell, Lauren Wood.

The Adkins Claimants, like the Armstrongs and Flakes, alleged in their proofs of claim that Alper controlled and managed the Dickson contamination remediation on behalf of Saltire (Adkins Proofs of Claim at Exhibit A, pg. 3, 5-6).  The Adkins Claimants alleged that, in doing so, Alper failed to exercise reasonable care because its environmental investigation and remediation were improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the TCE contaminants (Adkins Proofs of Claim at Exhibit A, pg. 6).  Moreover, the Adkins Claimants alleged that their injuries were caused, at least in part, by Alper's failure to warn the Child Claimants' mothers and the public of the existence of TCE contamination in multiple areas of Dickson, County, including contamination that was migrating over large swathes of the county (Adkins Proofs of Claim at Exhibit A, pg. 6).  Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site.  The Adkins Claimants alleged that, despite this knowledge, Alper negligently limited its investigation of contamination to a narrow area around the Dickson Plant, despite indicia of widespread contamination over different areas, which in turn limited information that could have assisted in the issuance of a public health warning. (Adkins Proofs of Claim at Exhibit A, pg. 6).  The Adkins Claimants alleged that Alper's negligent management of Saltire's environmental affairs and its failure to warn of the presence of TCE in Dickson area water supplies was a direct cause of the Child Claimants' injuries (Adkins Proofs of Claim at Exhibit A, pg. 2).

The Adkins Claimants alleged that the physical defects suffered by the Child Claimants have resulted in physical harm to the Child Claimants, as well as a host of other impacts to Child Claimants, including emotional distress resulting from the rigorous

medical evaluation and/or treatment as well as the psychological and social consequences

of their deformities (Adkins Proofs of Claim at Exhibit A, pg. 2).

> 2.   *Alper objected to the Adkins Proofs of Claim and the Bankruptcy Court
> subsequently disallowed the Adkins Claimants' claims while the Adkins
> Claimants' Motion to Withdraw the Reference was pending in the District
> Court*

On February 28, 2008, Alper filed its Objection of Alper Holdings USA, Inc. to

Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by

Adkins Claimants (the "Adkins Claim Objection") (Adkins Claim Objection, Bankr. Dkt.

No. 158).  At the same time, Alper filed a Declaration of Jessica L. Fink in Support of

Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 14, 15, 16, 17,

18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by Adkins Claimants (the "Adkins Fink

Declaration"), which had several pages of evidentiary material attached.  (Adkins Fink

Declaration, Bank. Dt. No. 159).  In the Adkins Claim Objection and the Adkins Fink

Declaration, Alper introduced numerous factual allegations that did not appear in the

Adkins Proofs of Claim.  The Adkins' response to the Adkins Claim Objection was due

on or before March 31, 2008.

The Adkins Claims are all personal injury claimants.  Therefore, on March 7,

2008, the Adkins Claimants filed their Motion of the Personal Injury Claimants to

Withdraw the Bankruptcy Reference for Debtor's Objection of Alper Holdings USA, Inc.

to Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by

Adkins Claimants (the "Motion for Withdrawal of Reference") (Motion for Withdrawal

of Reference, Bankr. Dkt. No. 169).  Such Motion for Withdrawal of Reference is

currently pending before the Court in Case No. 08-02428.  In connection with their

Motion for Withdrawal of Reference, the Adkins Claimants also filed in Alper's

Bankruptcy Case a Motion for Stay Regarding the Objection of Alper Holdings USA, Inc. to Proofs of Claim (the "Motion for Stay") (Motion for Stay, Bankr. Dkt. No. 173). The Court subsequently denied the Adkins Claimants' Motion for Stay (Stay Order, Bankr. Dkt. No. 188). The Adkins Claimants filed their Response to Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by Adkins Claimants (the "Adkins Response") on March 31, 2008, without having their Motion for Withdrawal of Reference decided and without the benefit of discovery (*See* Adkins Response, Bankr. Dkt. Nos. 192 and 193).

The Adkins Claimants' claims were disallowed by the Adkins Order on April 13, 2008 (Adkins Order, Bankr. Dkt. No. 199).

## VII.
## SUPPLEMENTAL ARGUMENT

**A.    THE CLAIMANTS ADOPT THE LEGAL ARGUMENTS SUBMITTED TO THE COURT IN THE FLAKE BRIEF.**

The Adkins Claimants and the Armstrongs hereby adopt and incorporate by reference the arguments submitted by the Flakes in the Flake Brief, and supplement such arguments as follows.

**B.    ALPER'S EMPLOYMENT OF NICHOLAS BAUER FOR THE SOLE PURPOSE OF MANAGING SALTIRE'S ENVIRONMENTAL REMEDIATION ACTIVITIES MAKES IT PLAUSIBLE THAT ALPER CONTROLLED AND DIRECTED THE DICKSON REMEDIATION**

For each of the Armstrong Order and the Adkins Order, the crux of the Bankruptcy Court's holding was its conclusion that the Claimants "failed to provide any support either to rebut the legal presumption [provided for in *United States v. Bestfoods,* 118 S.Ct. 1876 (1998)] that Mr. Bauer was acting on behalf of Saltire and not Alper in overseeing the Dickson County remediation or to support their claim that Alper

participated (negligently or otherwise) in the remediation" (Adkins Order, at p. 13; *see also,* Armstrong Order at p. 6). This conclusion was in error. Although the Bankruptcy Court correctly recognized that the presumption provided for in *Bestfoods* was rebuttable, it erred in concluding that the Claimants did not allege sufficient facts to show that it was plausible the Claimants could rebut such presumption at trial.

The Claimants acknowledge that Mr. Bauer was an officer of both Alper and Saltire. However, in their proofs of claim, the Claimants allege that Mr. Bauer was employed by Alper for the sole purpose of managing the remediation of the Dickson contamination and that it was in his capacity as an Alper employee that Mr. Bauer conducted such remediation (Armstrong Proofs of Claim at Exhibit A, pg. 3-4; Adkins Proofs of Claim at Exhibit A, pg. 4-5)[5]. Arguably, these allegations were alone sufficient for the Claimants to survive Alper's motion to dismiss. As the United States Supreme Court has recently recognized, "[s]pecific facts are not necessary [for a pleading that satisfies Rule 8(a)(2)]; the statement need only "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[6] *Erickson v. Pardus*, 127 S.Ct.

---

[5] In their proofs of claim, the Claimants also pointed out that on at least one occasion, in *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist. Lexis 14183, at **14 (D. N.J. 1998), Mr. Bauer appeared in a judicial proceeding as an official of Alper but on behalf of Saltire (Armstrong Proofs of Claim at Exhibit A, pg. 3-4 and Adkins Proofs of Claim at Exhibit A, pg. 4). This type of conduct also supports the conclusion that Mr. Bauer customarily acted as an employee of Alper, even when ostensibly acting on behalf of Saltire.

[6] In the Flake Brief, the Flakes cite *Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 454 (S.D.N.Y. 1987), for the proposition that, to avoid dismissal under Rule 12, the Flakes were merely required to "allege facts from which an inference could be drawn that evidence on the material points for their claims would be introduced at trial." (Flake Brief at p. 19). In a parenthetical to this citation, the Flakes quote language relied upon by the *Raine* court, language which had its origins in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99 (1957). In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the United States Supreme Court abandoned the language used in the parenthetical as an inaccurate

2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007))

(omission in original); *see also*, *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007).

However, the Claimants went a step further and provided the testimony of Robert

Bertellotti (Alper's President) who had previously testified that:

> [Mr. Bauer] was hired [by Alper] specifically—in effect, specifically for
> the purpose—if it wasn't for Saltire's environmental issues, Nick Bauer
> wouldn't have been hired.  He was hired for the purpose of dealing with
> Saltire's environmental issues.

(Bankr. Dkt. No. 105, Ex. F, p. 88, lines 4-10).  This testimony, alone, is sufficient to

raise an issue of fact as to on whose behalf Mr. Bauer was acting when controlling and

managing the Dickson remediation.  If Mr. Bauer managed and controlled the

remediation of Saltire's environmental liabilities in his capacity as Saltire's Vice

President of Environmental Affairs, as Alper incongruously contends and the Bankruptcy

Court erroneously concluded, then there would have been no need for Alper to employ

Mr. Bauer for that sole purpose.  Alper's employment of Mr. Bauer for the purpose of

remediating the Dickson contamination indicates that, for whatever reason, Alper felt it

necessary for Mr. Bauer's management of the Dickson remediation to be conducted as an

employee of Alper—as opposed to an officer of Saltire.  While acting as an employee of

Alper, Mr. Bauer was answerable to Alper and under the direction of Alper.

Appropriate "parental influence" includes "monitoring of the subsidiary's

performance, supervision of the subsidiary's finance and capital budget decisions, and

---

articulation of the traditional pleading standard.  127 S.Ct. 1955, 1968-69 (2007).
However, in doing so, the Supreme Court made clear that it was not changing in any way
the traditional pleading standard, opining "we do not require heightened fact pleading of
specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id.*
at 1974.  Thus, although the language appearing in the parenthetical has been abandoned
by the Supreme Court, the principle for which the Flakes cite *Raine* remains accurate and
applicable.

articulation of general policies and procedures." *United States v. Bestfoods,* 524 U.S. 51, 72, 118 S.Ct. 1876 (1998). Appropriate "parental influence" does not include hiring an employee to manage and control the environmental remediation activities of a subsidiary. Alper has provided no explanation as to why Mr. Bauer was employed by Alper specifically for the purpose of "dealing with" Saltire's environmental issues if it was the intention of Saltire and Alper that he deal with such environmental issues in his capacity as an officer of Saltire, as they now, in hindsight, contend. In light of Mr. Bertellotti's testimony, the Bankruptcy Court erred in concluding that, as a matter of law, Mr. Bauer was acting on behalf of Saltire and not Alper. The relationship between Alper, Mr. Bauer and Saltire, at the very least, raises fact issues that make the Claimants' claims against Alper plausible and that preclude disallowance of the claims as a matter of law.

**C.    THE CLAIMANTS' VEIL PIERCING CLAIMS AGAINST ALPER WERE NOT, AND COULD NOT HAVE BEEN, RELEASED BY SALTIRE DURING SALTIRE'S BANKRUPTCY BECAUSE THE CLAIMS WERE NOT PROPERTY OF SALTIRE'S BANKRUPTCY ESTATE**

In the Armstrong Order, the Bankruptcy Court ruled on the Armstrongs' veil piercing claims on the same erroneous basis upon which it had earlier ruled on the Flakes' claims—*i.e.*, "Alper had no indirect liability to the Flake Plaintiffs on either a theory of alter ego or piercing the corporate veil because neither the existence of a management agreement between Alper and Saltire nor a common employee between the parent and subsidiary would justify the extraordinary remedy of piercing the corporate veil as argued by the Flake Plaintiffs" (Armstrong Order, Bankr. Dkt. No. 157 at p. 3). As discussed in the Flake Brief, this conclusion was in error because, like the Flakes, the Claimants presented sufficient allegations—and even evidence—to raise an issue of fact

as to whether Alper controlled the remediation of the Dickson contamination to such an extent that Saltire was merely an alter ego of Alper with regard to such activities.

In the Adkins Order, however, the Bankruptcy Court referenced its ruling with regard to the Holts'[7] veil piercing claims—*i.e.*, the Holts' veil piercing claims against Alper were property of the Saltire estate and released pursuant to Saltire's plan of reorganization. The Adkins Order is unclear as to whether the Bankruptcy Court ruled on the Adkins Claimants' veil piercing claims on this ground or merely referenced its ruling on the Holt claims as dicta. To the extent that the Bankruptcy Court disallowed the Adkins Claimants' claims based upon a conclusion that the claims were released as part of Saltire's bankruptcy, the Bankruptcy Court erred.

Under both Tennessee state law and bankruptcy law[8], the Adkins Claimants' veil piercing claims, which are peculiar and personal to the Adkins Claimants, did not constitute property of Saltire's bankruptcy estate. Because a debtor cannot release claims

---

[7] The "Holts" consist of Harry Holt, Beatrice Holt, Sheila Holt-Orsted, Jasmine Orsted, Bonita Holt, O'Brian Holt, Brandon Holt, Patrick Holt, Bianca Bentley, Demetrius Holt and David Brown. Like the Claimants, the Holts asserted claims in Alper's bankruptcy case for damages stemming from the contamination in Dickson, Tennessee. The Bankruptcy Court disallowed the Holts' claims in the Armstrong Order. The Holts' appeal of the Armstrong Order [Dist. Case No. 08-3344] has been consolidated with these appeals.

[8] Under New York choice of law principles, which are applicable here, courts need not exclusively apply the law of the state of incorporation to the issue of whether a cause of action belongs to a defendant's bankruptcy estate. In circumstances such as these, where a defendant's contacts with the state of incorporation are minimal and the tortious conduct complained of occurred in another jurisdiction, it has been determined that the law of the state in which the tortious conduct occurred has the greatest interest in the litigation. *See Serio v. Ardra Ins. Co.*, 761 N.Y.S. 2d 1, 1-2 (N.Y. App. Div. 2003). Thus, the state law of the state where the tort was committed would apply. *See id.* Such a result would be especially appropriate in environmental contamination cases such as this one, where the tortious conduct occurred over a period of years and resulted in widespread and long term environmental contamination in the state where such conduct occurred.

that do not belong to it, the Bankruptcy Court erred to the extent that it disallowed the Adkins Claimants' claims based on a conclusion that the claims had been released as part of Saltire's bankruptcy.

> 1.    *Only veil piercing claims that are general and common to the debtor and creditors become property of a debtor's bankruptcy estate*

Bankruptcy courts recognize that a veil piercing claim is only the property of a debtor's bankruptcy estate if the claim is generalized, "with no particularized injury stemming from it and where the claim may be brought by any creditor." *In re Enron Corp.*, No. 01816034AJG, 2003 WL 1889040, at *4 (Bankr. S.D.N.Y. April 17, 2003); *Variable-Perameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 608 (S.D.N.Y. 1996). Consequently, the court must determine whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors. *Koch Ref. v. Farmers Union Ctr. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987) (recognizing that "[t]o determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors"). To make this determination, a court must look to applicable state law. *In re Del-Met Corp.*, 322 B.R. 781, 830 (Bankr. M.D. Tenn. 2005) (recognizing that "[w]hether a particular cause of action is available to the debtor, and thus constitutes 'property of the estate,' is determined by state law").

In *Del-Met Corp.*, the bankruptcy court for the Middle District of Tennessee held that, under Tennessee state law, an action to disregard corporate form belongs to individual creditors, and not the debtor, when the wrong from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation. *In*

*re Del-Met Corp.*, 322 B.R. at 833-34.  In so holding, the bankruptcy court quoted extensively from the only Tennessee state court case addressing alter ego claims in the context of bankruptcy as follows:

> [T]he majority rule is to the effect that [an action to pierce the corporate veil and reach the assets of another corporation as its alter ego] is a right vested in the individual creditors.  It is not a right which belongs to the bankrupt and under the Bankruptcy Act the trustee has no authority to maintain such action….  The doctrine of alter ego does not create assets for or in the corporation.  It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business.  The liability springs from fraud.  The fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation.  And the doctrine has been invoked only at the behest of such third parties as have suffered injury by reason of the fraud.

*Id.* at 833 (quoting *Brown v. Vencap Inv. Corp.*, 1984 Tenn. App. LEXIS 3424, at *9-25 (Tenn. Ct. App. March 31, 1984)).

Similarly, in *Variable-Parameter*, Variable sued Morpheus for damages relating to certain patent infringement allegations.  945 F. Supp. at 604.  Variable also sued John Richardson, the sole shareholder of Morpheus, based on an alter ego theory.  Subsequently, Morpheus filed for bankruptcy relief and Richardson sought the protection of the automatic stay provided by virtue of Morpheus's bankruptcy.  Richardson asserted that the claims against him were "generalized alter ego" claims and that, under California law, a generalized alter ego claim was exclusively the property of the debtor.  The court, however, found that Variable's alter ego claims alleged a "particularized injury" and therefore the claim was not property of Morpheus's bankruptcy estate.  In so holding, the court recognized that under California law there were two types of alter ego claims:

> The first type alleges general injury to the corporation and gives rise to a right of action on the part of the corporation against the "alter ego."  In the second type, the creditor or other third party files suit claiming that an

16

> opposing party is "using the corporate form unjustly and in derogation of the plaintiff's interests."

*Variable*, 945 F. Supp. at 607 (internal citations omitted).  The court recognized that Variable's complaint alleged acts by Richardson that caused harm directly to Variable. "In other words, Variable has alleged a 'particularized injury' and not solely injury to the corporation." *Id*. at 608.

   2.   *The Adkins Claimants' veil piercing claims against Alper were not Saltire's claims to release.*

This case is similar to *Del-Met Corp*, in which the court held that, under Tennessee law, veil piercing claims such as the Adkins Claimants' claims against the Alper do not constitute property of a debtor's estate.

The Adkins Claimants are claiming damages particular to them—*i.e.*, personal injuries resulting from the failure of Alper to take proper measures to prevent the migration of TCE contamination from the Dickson Plant into the Dickson County water supply.  The Adkins Claimants' claims are not claims that could have been brought by Saltire; nor could Saltire's general creditor body have sought recovery on such grounds. The Adkins Claimants' veil piercing claims are based on actions that are specific to the contamination resulting from the operation of the Dickson Plant and the ongoing migration of that contamination into the Dickson County water supply that Alper failed to adequately address after assuming control over the remediation of such contamination.

These claims, on their face, are peculiar and personal to the Adkins Claimants. Neither Saltire nor any other creditor of Saltire could have asserted these claims against Alper.  An action belongs to the debtor-in-possession only where the harm suffered by the claimant is no different than the harm suffered by all creditors.  Such is not the case

here. Thus, the Adkins Claimants' claims were not property of Saltire's bankruptcy estate and could not have been released by Saltire during as part of its bankruptcy.

**D.**    **TO THE EXTENT THE BANKRUPTCY COURT ENTERTAINED ALPER'S ARGUMENTS REGARDING THE MERITS OF THE ADKINS CLAIMANTS' PERSONAL INJURY CLAIMS, THE BANKRUPTCY COURT EXCEEDED ITS SUBJECT MATTER JURISDICTION IN CONTROVENTION OF 28 U.S.C §§ 157(b)(2) AND 157(B)(5).**

To the extent the Bankruptcy Court considered the evidentiary material included in the Adkins Fink Declaration or based its ruling on what it perceived to be the substantive merits of the Adkins Claims, the Bankruptcy Court exceeded its subject matter jurisdiction in contravention of 28 U.S.C. §§ 157(b)(2) and 157(b)(5).

Adjudication of personal injury claims such as those asserted by the Adkins Claimants is outside the core jurisdiction of the bankruptcy courts. The United States Code contains few categorical exclusions of matters from the core jurisdiction of the bankruptcy courts. However, Section 157(b)(2)(B) expressly provides that allowance or disallowance of claims is a core proceeding, "but not the liquidation or estimation of *contingent or unliquidated personal injury tort or wrongful death claims* against the estate for purposes of distribution in a case under title 11." 28 U.S.C. §157(b)(2)(B) (emphasis added). The Adkins Claimants' claims are wholly comprised of such unliquidated personal injury claims. By clear statutory language, they are outside the core jurisdiction of the Bankruptcy Court. Moreover, the claims may not be tried in the Bankruptcy Court (although certain pre-trial matters may be heard, subject to withdrawal of the reference), because the United States Code confers exclusive jurisdiction over personal injury claims on the district court. Title 28 United States Code, Section 157(b)(5) provides, in mandatory language, that "[t]he district court *shall* order that personal injury tort and wrongful death claims *shall* be tried in the district court in which

the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5) (emphasis added). This provision clearly and unequivocally prevented the Bankruptcy Court from deciding the merits of the Adkins Claimants' personal injury claims—not only are they not within the core jurisdiction of the bankruptcy courts, district courts are commanded to order that such claims be tried in district court.

By the clear and unequivocal language of the Bankruptcy Code, the factual and substantive merits of the Adkins Claimants' claims were required to be tried in the District Court with the full protections afforded to personal injury claims in bankruptcy. They were not to be prosecuted as garden-variety claims objections before a bankruptcy court. To the extent that the Bankruptcy Court disallowed the Adkins Claimants' claims based on what it perceived to be the substantive merits of the claims, the Bankruptcy Court erred.

## VIII.
## CONCLUSION

As elaborated in the Flake Brief and as supplemented herein, the Bankruptcy Court committed reversible error in (1) relying on facts outside the face of the Claimants' proofs of claim and the materials submitted with the Claimants' responses to Alper's claims objections, thereby converting Alper's claims objections to improper motions for summary judgment; (2) applying a preponderance of the evidence burden of proof to the Claimants' proofs of claim; (3) concluding that, as a matter of law, Alper did not control the remediation of the Dickson TCE contamination through its employee, Nicholas

19

Bauer; and (4) misapplying Tennessee state law regarding Alper's assumption of liability for the remediation of the Dickson TCE contamination.

For the foregoing reason, the Claimants respectfully pray: (1) that the Bankruptcy Court's Memorandum Decision and Order Granting Objections of Alper Holdings USA, Inc. to Proofs of Claim Filed by (i) Armstrong Plaintiffs and (ii) Holt Plaintiffs be VACATED to the extent such order applies to the Claimants; (2) that the Bankruptcy Court's Memorandum Decision and Order on Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) be VACATED; (3) that this contested matter be REMANDED to the Bankruptcy Court for further proceedings; and (4) that the Claimants be granted such other and further relief to which they may be entitled.

Dated: May 21, 2008.

/s/ Douglas T. Tabachnik
Douglas T. Tabachnik, Esq. (DT 6337)
**LAW OFFICES OF**
**DOUGLAS T. TABACHNIK, P.C.**
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
Telephone: (732) 792-2760
Facsimile: (732) 792-2761
and

Sander L. Esserman, Esq.
Cliff I. Taylor, Esq.
STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

**ATTORNEYS FOR JON AND**
**CHARLOTTE ARMSTRONG AND**
**THE ADKINS CLAIMANTS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**RAY AND CATHY FLAKE**

        **Appellants,**

   **v.**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

**Civil Case No. 08 cv 2489 (CM)**
**(Consolidated)**

---

**HARRY HOLT, et al.,**

        **Appellants,**

   **-against-**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

---

**JON AND CHARLOTTE ARMSTRONG,**

        **Appellants,**

   **-against-**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

**THE ADKINS CLAIMANTS,**

        **Appellants,**

     **-against-**

**ALPER HOLDINGS USA, INC.,**

        **Appellee.**

### APPENDIX OF ITEMS INCLUDED IN JOINT SUPPLEMENTAL BRIEF OF JON AND CHARLOTTE ARMSTRONG AND THE ADKINS CLAIMANTS

Douglas T. Tabachnik, Esq. (DT6337)
**LAW OFFICES OF**
**DOUGLAS T. TABACHNIK, P.C.**
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
Telephone: (732) 792-2760
Facsimile: (732) 792-2761

and

Sander L. Esserman, Esq.  (SE0356)
Cliff I. Taylor, Esq. (CT4711)
STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

**ATTORNEYS FOR**
**JON AND CHARLOTTE ARMSTRONG**
**AND THE ADKINS CLAIMANTS**

**APPENDED PLEADING OR EVIDENCE**                                              **TAB**

1.    Exhibit A to Response of Jon and Charlotte Armstrong to Objection
      of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 12 and
      13) Filed by Armstrong Plaintiffs [Bankr. Dkt. No. 147] . . . . . . . . . . .        1

2.    Exhibit 1 to Response to Objection of Alper Holdings USA, Inc. to
      Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26,
      27, 28) Filed by Adkins Claimants . . . . . . . . . . . . . . . . . . . . . . . . . . . .        2

# TAB 1

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>ALPER HOLDINGS USA, INC. | Case Number:<br>07-12148 (BRL) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Armstrong, Jon | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br><br>Armstrong, Jon<br>c/o Barrett Law Office, PA, One Burton Hills Blvd., Ste 380, Nashville, TN  37215<br><br>Telephone number:<br>(615) 665-9990 | Court Claim Number: __00013__<br>*(If known)*<br><br>Filed on:__09/19/2007__ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:       $Contingent/Unliquidated/Disputed<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
|---|---|
| 2. **Basis for Claim:**  __Property Damage__<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 3. **Last four digits of any number by which creditor identifies debtor:** _____<br><br>    3a. Debtor may have scheduled account as: _____<br>      (See instruction #3a on reverse side.) |  |
| 4. **Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:**$_____ **Annual Interest Rate**___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>if any: $_____   **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).|
| 6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>02/06/2008 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Patrick Barrett, Attorney for Creditor | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) — Cont.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

**EXHIBIT A**

## STATEMENT OF CLAIM
## FOR JON AND CHARLOTTE ARMSTRONG

**A.      The Armstrong Property has been contaminated by Trichloroethylene**

Jon and Charlotte Armstrong (the "Armstrongs") reside at property located at 125

Robinson Road, Dickson, Tennessee (the "Armstrong Property"). The Armstrongs have

lived on the Armstrong Property since 1992. The Armstrongs have suffered damages due

to the contamination of the soil and ground water of the Armstrong Property by

trichloroethylene ("TCE").

**B.      Alper's subsidiary caused environmental contamination in Dickson County**
**Tennessee, polluting the soil and ground water with TCE, which**
**contaminants migrated on to the Armstrong Property**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products. Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and ground water at and around the Dickson Plant site.    The contamination of

the Armstrong Property is the direct result of migration of TCE contaminants from one or

more of these dump sites.

1

**C.    Alper controlled the remediation of the Dickson County contamination**

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992
acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its

direct parent. Alper was an active corporation and thus was not a rudimentary, barebones

holding company established as a mere formality. Upon information and belief, the real

company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson,

Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of

November 30, 1992. On January 1, 1995, Alper and Saltire terminated their 1992

management agreement and entered into a new management agreement (the

"Management Agreement").  Under the Management Agreement, Alper agreed to

provide "***supervision and management of various environmental matters***, including risk

assessment, risk management, technical assessment, ***remediation***, legal and compliance"

(emphasis added).  The Management Agreement also immunized Alper from any

litigation initiated by Saltire against Alper under the agreement.  The combination of

management powers ceded to Alper under the Management Agreement and Alper's

immunity from suits by Saltire put Alper in a completely dominant position relative to

Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and

environmental affairs were managed and controlled by Alper.  By controlling both

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees
and therefore was a shell entity. On the other hand, Alper, Saltire's parent, at one time
had 25 employees in a building in New York City.

2

Saltire's finances and environmental affairs, Alper controlled and managed the handling

of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged

environmental contamination, possibly among others). Such control was facilitated by

the existence of a common President, common CFO and common Vice President for

Environmental Affairs.

    2.    *The remediation of the Dickson County contamination was conducted by*
          *Nicholas Bauer in his capacity as an Alper official*

    Not long after the execution of the Management Agreement, an Alper employee

and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which

included investigations and remediation in Dickson, Tennessee. While he was also a

Saltire officer, Bauer's management of environmental affairs for Saltire with respect to

contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official.

Through Bauer, Alper had a direct role in controlling Saltire's compliance with

environmental cleanup endeavors conducted under the scope of governmental regulators.

The Management Agreement specifically provided Alper a role in managing Saltire's

environmental compliance.

    Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as

needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the

purpose of "dealing with" the contamination problems at the Dickson Plant and other

sites. When engaging in work relevant to environmental investigation and remediation in

Dickson County, Bauer sometimes overtly represented himself as an Alper official who

had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v.*

*Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u>

(which this Plaintiff believes to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf

of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at

**14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only

Alper—not Saltire—was authorized to do business in the Commonwealth of Virginia.[2]

Thus, when Bauer was engaged in remediation endeavors at the Dickson Plant, he was

technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's

role predominated over that of Saltire with respect to environmental investigation and

remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the remediation in Dickson, Tennessee, which it breached by conducting such remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its

control over its subsidiary, Alper controlled the remediation of the Dickson Plant

contamination by placing an Alper employee in charge of the remediation. Alper is liable

to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been

accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965)

provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or the property of third parties. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Armstrongs and their property by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations and continuing migration of the subject TCE contaminant.

Because TCE is heavier than water, it tends to sink until it pools on an relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

5

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that the geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of property in different areas of Dickson County and exposed residents therein to serious health risks.

Alper used inadequate equipment in its investigation of TCE, thus undermining remediation efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to remediate contamination on and around the Armstrong Property. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination to surrounding properties such as the Armstrong Property.

6

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Jon Armstrong ("Claimant") reserves the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should she deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (ii) charges and (iii) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (h) an admission by Claimant that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimant does not waive any other right or rights of action that she has or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

1

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT     Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>ALPER HOLDINGS USA, INC. | Case Number:<br>07-12148 (BRL) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 303.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Armstrong, Charlotte | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br><br>Armstrong, Charlotte<br>c/o Barrett Law Office, PA, One Burton Hills Blvd., Ste 380, Nashville, TN  37215<br><br>Telephone number:<br>(615) 665-9990 | Court Claim Number:  00012<br>*(If known)*<br><br>Filed on:  09/19/2007 |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. **Amount of Claim as of Date Case Filed:**     $Contingent/Unliquidated/Disputed<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
|---|---|
| 2. **Basis for Claim:**  Property Damage<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. **Last four digits of any number by which creditor identifies debtor:** _____<br><br>3a. **Debtor may have scheduled account as:** _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. **Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:**$_____  **Annual Interest Rate**___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>if any: $_____  **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>02/06/2008 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Patrick Barrett, Attorney for Creditor | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) — Cont.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court. .

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR JON AND CHARLOTTE ARMSTRONG

**A.    The Armstrong Property has been contaminated by Trichloroethylene**

Jon and Charlotte Armstrong (the "Armstrongs") reside at property located at 125 Robinson Road, Dickson, Tennessee (the "Armstrong Property"). The Armstrongs have lived on the Armstrong Property since 1992. The Armstrongs have suffered damages due to the contamination of the soil and ground water of the Armstrong Property by trichloroethylene ("TCE").

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminants migrated on to the Armstrong Property**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products. Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and ground water at and around the Dickson Plant site. The contamination of the Armstrong Property is the direct result of migration of TCE contaminants from one or more of these dump sites.

1

C.    **Alper controlled the remediation of the Dickson County contamination**

   *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  Alper was an active corporation and thus was not a rudimentary, barebones holding company established as a mere formality.  Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "***supervision and management of various environmental matters***, including risk assessment, risk management, technical assessment, ***remediation***, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others). Such control was facilitated by the existence of a common President, common CFO and common Vice President for Environmental Affairs.

> 2. *The remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation in Dickson County, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which this Plaintiff believes to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf

of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at

**14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only

Alper—not Saltire—was authorized to do business in the Commonwealth of Virginia.[2]

Thus, when Bauer was engaged in remediation endeavors at the Dickson Plant, he was

technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's

role predominated over that of Saltire with respect to environmental investigation and

remediation in Dickson, Tennessee.

**D.     Alper assumed a duty of care by controlling the remediation in Dickson, Tennessee, which it breached by conducting such remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its

control over its subsidiary, Alper controlled the remediation of the Dickson Plant

contamination by placing an Alper employee in charge of the remediation. Alper is liable

to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been

accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965)

provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or the property of third parties. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Armstrongs and their property by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations and continuing migration of the subject TCE contaminant.

Because TCE is heavier than water, it tends to sink until it pools on an relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

5

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that the geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of property in different areas of Dickson County and exposed residents therein to serious health risks.

Alper used inadequate equipment in its investigation of TCE, thus undermining remediation efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to remediate contamination on and around the Armstrong Property. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination to surrounding properties such as the Armstrong Property.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Charlotte Armstrong ("Claimant") reserves the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should she deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (ii) charges and (iii) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (h) an admission by Claimant that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimant does not waive any other right or rights of action that she has or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

# **TAB 2**

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>David,Jodie, Kassidy, Dawson&MasonHeimbach | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>David, Jodie, Kassidy, Dawson & Mason<br>Heimbach c/o Barrett Law Office, P.A., One<br>Burton Hills Blvd. Ste. 380 Nashville, TN  37215<br>Telephone number:  (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends    a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim | | |
|---|---|---|
| ☐ Goods sold | ☑ Personal injury/wrongful death | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed |
| ☐ Services performed | ☐ Taxes | |
| ☐ Money loaned | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) | From _____ to _____<br>(date)            (date) |
| | ☐ Other_____ | |

| 2. Date debt was incurred:  02/04/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed.
See reverse side for important explanations.

Unsecured Nonpriority Claim $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority  $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate        ☐ Other_____
☐ Motor Vehicle

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured, if any:  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| 5. Total Amount of Claim at Time Case Filed: | $ | contingent/ | unliquidated/ | disputed | unknown |
|---|---|---|---|---|---|
| | | (unsecured) | (secured) | (priority) | (total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br><br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## STATEMENT OF CLAIM
## FOR DAVID HEIMBACH, JODIE HEIMBACH,
## DAWSON HEIMBACH, KASSIDY HEIMBACH,
## AND MASON HEIMBACH

**A.    Trichloroethylene has caused the personal injury of Dawson Heimbach, Kassidy Heimbach, and Mason Heimbach.**

David Heimbach and Jodie Heimbach are the parents of Dawson Heimbach, Kassidy Heimbach, and Mason Heimbach.  Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Dawson Heimbach, Kassidy Heimbach, and Mason Heimbach ("Child Claimants") have suffered serious congenital deformities and/or ailments.  Dawson Heimbach has congenital heart disease.  Kassidy Heimbach has suffered from a defective palate, known as a velopharyngeal insufficiency or velopharyngeal incompetence.  Mason Heimbach has chronic lung disease.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimants**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products.  Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area. This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21. Child Claimants' mother consumed TCE-contaminated water from one or more of these sources during the early stages of her pregnancy with Child Claimants. Prior to birth and in the early stages of gestation, Child Claimants were exposed to the TCE consumed by the mother and sustained the subject deformities and/or ailments as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimants' congenital deformities described herein. These defects have resulted in physical harm to Child Claimants, as well as a host of other impacts to Child Claimants, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

### C. Alper controlled the investigation and remediation of the Dickson County contamination

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was Alper, as Saltire had become a partial shell.[1] With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992. On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement"). Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added). The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement. The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper. By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others). The decisions of how to deal with

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity. On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

Saltire's environmental issues – financially and otherwise – were left in the hands of Alper. Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

2.   *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia.

Only Alper—not Saltire—was authorized to do business in the Commonwealth of Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimants by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimants' mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation

plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of

soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimants were born on May 26, 1999, which indicates that Child Claimants conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

David, Jodie, Kassidy, Dawson and Mason Heimbach (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

1

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT **SOUTHERN** DISTRICT OF **NEW YORK** | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Travis, Amy and Lauren Wood | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Travis, Amy and Lauren Wood<br>c/o Barrett Law Office, P.A. One Burton Hills<br>Blvd. Ste. 380 Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)        (date) |
|---|---|---|

| 2. Date debt was incurred: 02/04/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed.
See reverse side for important explanations.

Unsecured Nonpriority Claim $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate          ☐ Other_____
☐ Motor Vehicle

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| 5. Total Amount of Claim at Time Case Filed: | $_____<br>(unsecured) | contingent/_____<br>(secured) | unliquidated/_____<br>(priority) | disputed_____<br>(total) | unknown |
|---|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

STATEMENT OF CLAIM
FOR TRAVIS WOOD, AMY WOOD,
AND LAUREN WOOD

A.    **Trichloroethylene has caused the personal injury of Lauren Wood.**

Travis and Amy Wood are the parents of Lauren Wood.  Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Lauren Wood ("Child Claimant") has suffered serious congenital deformities in the form of a bilateral cleft lip and palate.

B.    **Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products.  Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area.  This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21.  Child Claimant's mother consumed TCE-contaminated water from one or more of these sources during the early stages of her pregnancy with Child Claimant.  Prior to birth and

in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C. Alper controlled the investigation and remediation of the Dickson County contamination**

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of Alper Holdings, Inc. (which claimants believe to be a short form of Alper Holdings U.S.A, Inc.) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on September 15, 1999, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Travis, Amy and Lauren Wood (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Priscilla Fowler, Jason, James Stewart | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Priscilla Fowler, Jason, James Dakota Stewart<br>c/o Barrett Law Office, P.A. One Burton Hills<br>Blvd. Ste. 380 Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)      (date) |
|---|---|---|

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ contingent/ unliquidated/ disputed unknown<br>(unsecured) (secured) (priority) (total) |
|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**STATEMENT OF CLAIM
FOR JASON STEWART, PRISCILLA MILES FOWLER,
AND JAMES DAKOTA STEWART**

A.    **Trichloroethylene has caused the personal injury of James Dakota Stewart.**

Jason Stewart and Priscilla Miles Fowler are the parents of James Dakota Stewart.

Because of exposure to trichloroethylene ("TCE") through drinking water from the area

of Dickson County, Tennessee, James Dakota Stewart ("Child Claimant") has suffered

serious congenital deformities in the form of a bilateral cleft lip and palate.

B.    **Alper's subsidiary caused environmental contamination in Dickson County
Tennessee, polluting the soil and ground water with TCE, which
contaminated local private and public sources of drinking water and caused
physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products.  Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area.  This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21.  Child

Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant.  Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein.  These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates.  The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.    Alper controlled the investigation and remediation of the Dickson County contamination**

> *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality.  Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of Alper Holdings, Inc. (which claimants believe to be a short form of Alper Holdings U.S.A., Inc.) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> > (b) he has undertaken to perform a duty owed by the other to the third person, *or*
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on February 16, 2000, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Priscilla Fowler and Jason and James Dakota Stewart (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

1

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Barry, Christie and Luke Piland | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Barry, Christie and Luke Piland<br>c/o Barrett Law Office, P.A. One Burton Hills<br>Blvd. Ste. 380 Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim | | |
|---|---|---|
| ☐ Goods sold | ☑ Personal injury/wrongful death | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:___<br>Unpaid compensation for services performed |
| ☐ Services performed | ☐ Taxes | |
| ☐ Money loaned | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) | From ____ to ____<br>(date)      (date) |
| | ☐ Other_____ | |

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate     ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ contingent/ | unliquidated/ | disputed | unknown |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of all interest or additional charges.

| 6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| 7. Supporting Documents: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 8. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | |

| Date<br><br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR BARRY PILAND, CHRISTIE PILAND,
## AND LUKE PILAND

**A.    Trichloroethylene has caused the personal injury of Luke Piland.**

Barry and Christie Piland are the parents of Luke Piland.  Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Luke Piland ("Child Claimant") has suffered serious congenital deformities in the form of a cleft lip and palate.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products.  Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area.  This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21.  Child Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

### C.    Alper controlled the investigation and remediation of the Dickson County contamination

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.  Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant.  This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation.  Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee.  The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> > (b) he has undertaken to perform a duty owed by the other to the third person, *or*
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on April 30, 1998, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Barry, Christie and Luke Piland (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Steven, Melissa and Mya Jones | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Steven, Melissa and Mya Jones<br>c/o Barrett Law Office, P.A. One Burton Hills Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here if this claim ☐ replaces ☑ amends a previously filed claim, dated: 09/14/2007 | |

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☑ Personal injury/wrongful death
- ☐ Taxes
- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Other_____

- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #:____
  Unpaid compensation for services performed
  From _____ to _____
  (date)        (date)

**2. Date debt was incurred:** 02/27/2004

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $_____**

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
- ☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate    ☐ Other_____
- ☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

- ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $ contingent/ unliquidated/ disputed unknown
(unsecured)  (secured)  (priority)  (total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | |

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**STATEMENT OF CLAIM**
**FOR STEVEN JONES, MELISSA JONES,**
**AND MYA JONES**

A.    **Trichloroethylene has caused the personal injury of Mya Jones.**

Steven and Melissa Jones are the parents of Mya Jones. Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Mya Jones ("Child Claimant") has suffered serious congenital deformities in the form of a cleft palate and lip including the soft palate.

B.    **Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products. Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area. This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21. Child Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.    Alper controlled the investigation and remediation of the Dickson County contamination**

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of Alper Holdings, Inc. (which claimants believe to be a short form of Alper Holdings U.S.A., Inc.) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.** **Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
>> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>>
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on October 13, 2000, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Steven, Melissa and Mya Jones (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Scott, Darcie and Samuel Herkimer | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Scott, Darcie and Samuel Herkimer<br>c/o Barrett Law Office, P.A. One Burton Hills<br>Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends   a previously filed claim, dated: 09/14/2007 | |

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☑ Personal injury/wrongful death
- ☐ Taxes
- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Other_____

☐ Wages, salaries, and compensation (fill out below)
   Last four digits of your SS #:____
   Unpaid compensation for services performed
   From _____ to _____
        (date)          (date)

**2. Date debt was incurred:** 02/27/2004

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $ contingent/ unliquidated/ disputed unknown
                                                      (unsecured)  (secured)  (priority)  (total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br><br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**STATEMENT OF CLAIM**
**FOR SCOTT HERKIMER, DARCIE HERKIMER,**
**AND SAMUEL HERKIMER**

A.     **Trichloroethylene has caused the personal injury of Samuel Herkimer.**

    Scott and Darcie Herkimer are the parents of Samuel Herkimer.  Because of

exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson

County, Tennessee, Samuel Herkimer ("Child Claimant") has suffered serious congenital

deformities in the form of a submucas cleft.

B.     **Alper's subsidiary caused environmental contamination in Dickson County**
        **Tennessee, polluting the soil and ground water with TCE, which**
        **contaminated local private and public sources of drinking water and caused**
        **physical injury to Child Claimant**

    From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products.  Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

    Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area.  This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21.   Child

Claimant's mother consumed TCE-contaminated water from one or more of these sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.    Alper controlled the investigation and remediation of the Dickson County contamination**

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.     *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
>> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>>
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on November 24, 1998, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Scott, Darcie and Samuel Herkimer (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Anthony, Keysha, Autumn Fambrough | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Anthony, Keysha, Autumn Fambrough<br>c/o Barrett Law Office, P.A., One Burton Hills Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here<br>if this claim | ☐ replaces<br>☑ amends | a previously filed claim, dated: 09/14/2007 |
|---|---|---|---|

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)        (date) |
|---|---|---|

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

4. **Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate        ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ contingent/ | unliquidated/ | disputed | unknown |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

7. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br><br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**STATEMENT OF CLAIM
FOR ANTHONY FAMBROUGH, KEYSHA FAMBROUGH,
AND AUTUMN FAMBROUGH**

A.    **Trichloroethylene has caused the personal injury of Autumn Fambrough.**

Anthony and Keysha Fambrough are the parents of Autumn Fambrough. Because

of exposure to trichloroethylene ("TCE") through drinking water from the area of

Dickson County, Tennessee, Autumn Fambrough ("Child Claimant") has suffered serious

congenital deformities in the form of a cleft palate.

B.    **Alper's subsidiary caused environmental contamination in Dickson County
Tennessee, polluting the soil and ground water with TCE, which
contaminated local private and public sources of drinking water and caused
physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products. Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area. This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21. Child

Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant.   Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein.  These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates.  The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

### C.    Alper controlled the investigation and remediation of the Dickson County contamination

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality.  Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination
was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee

and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which

included investigations and remediation in Dickson, Tennessee. While he was also a

Saltire officer, Bauer's management of environmental affairs for Saltire with respect to

contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official.

Through Bauer, Alper had a direct role in controlling Saltire's compliance with

environmental cleanup endeavors conducted under the scope of governmental regulators.

The Management Agreement specifically provided Alper a role in managing Saltire's

environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as

needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the

purpose of "dealing with" the contamination problems at the Dickson Plant and other

sites. When engaging in work relevant to environmental investigation and remediation

on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official

who had responsibility for environmental matters at Saltire. For instance, in the case of

*U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper</u>

<u>Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A., Inc.</u>)

on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis

14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia.

Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.** **Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

_____

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on March 15, 2000, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Anthony, Keysha and Autumn Fambrough (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) | |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Timothy, Kimberly and Paxton DeLoach | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Timothy, Kimberly and Paxton DeLoach<br>c/o Barrett Law Office, P.A., One Burton Hills<br>Blvd., Ste. 380, Nashville, TN  37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends    a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)          (date) |
|---|---|---|

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority  $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Other_____
☐ Motor Vehicle

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $    contingent/<br>(unsecured) | unliquidated/<br>(secured) | disputed<br>(priority) | unknown<br>(total) |
|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| 7. **Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 8. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | |

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**STATEMENT OF CLAIM
FOR TIMOTHY DELOACH, KIMBERLY DELOACH,
AND PAXTON DELOACH**

**A.    Trichloroethylene has caused the personal injury of Paxton DeLoach.**

Timothy and Kimberly DeLoach are the parents of Paxton DeLoach.  Because of

exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson

County, Tennessee, Paxton DeLoach ("Child Claimant") has suffered serious congenital

deformities in the form of a cleft lip consisting of a visible line from the base of the nose

to the upper lip on the left side.

**B.    Alper's subsidiary caused environmental contamination in Dickson County
Tennessee, polluting the soil and ground water with TCE, which
contaminated local private and public sources of drinking water and caused
physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products.  Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area.  This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21.   Child

Claimant's mother consumed TCE-contaminated water from one or more of these sources during the early stages of her pregnancy with Child Claimant.   Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein.   These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates.   The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.    Alper controlled the investigation and remediation of the Dickson County contamination**

> *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.   Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality.   Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee.  While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries.  Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites.  When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire.  For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf of Saltire.  *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998).  Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on September 15, 1997, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Timothy, Kimberly, and Paxton DeLoach (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor **ALPER HOLDINGS USA, INC.** | Case Number **07-12148 (BRL)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): **Eric & Peyton Christian and Jennifer Casteel** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent: **Eric & Peyton Christian and Jennifer Casteel c/o Barrett Law Office, P.A., One Burton Hills Blvd., Ste. 380, Nashville, TN 37215** Telephone number: **(315) 665-9990** | ☐ Check box if you have never received any notices from the bankruptcy court in this case. ☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here if this claim  ☐ replaces  ☑ amends  a previously filed claim, dated: **09/14/2007** | |

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☑ Personal injury/wrongful death
- ☐ Taxes
- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Other_____

☐ Wages, salaries, and compensation (fill out below)
Last four digits of your SS #:____
Unpaid compensation for services performed
From _____ to _____
(date)      (date)

**2. Date debt was incurred:** 02/27/2004

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed.
See reverse side for important explanations.

Unsecured Nonpriority Claim $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority  $_____

Specify the priority of the claim:

- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
- ☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate    ☐ Other_____
- ☐ Motor Vehicle

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

- ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:**
$ **contingent/** **unlikuidated/** **disputed** **unknown**
(unsecured)  (secured)  (priority)  (total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date **03/19/2008** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): **Patrick Barrett, Attorney for Creditor** |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR ERIC CHRISTIAN, JENNIFER CASTEEL,
## AND PEYTON CHRISTIAN

**A.    Trichloroethylene has caused the personal injury of Peyton Christian.**

Eric Christian and Jennifer Casteel are the parents of Peyton Christian.  Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Peyton Christian ("Child Claimant") has suffered serious congenital deformities, including a bilateral cleft lip and palate and a severe heart murmur.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products.  Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area.  This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21.  Child Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant.  Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein.  These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates.  The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

### C. Alper controlled the investigation and remediation of the Dickson County contamination

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality.  Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of Alper Holdings, Inc. (which claimants believe to be a short form of Alper Holdings U.S.A., Inc.) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> > (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on May 8, 1998, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Eric and Peyton Christian and Jennifer Casteel (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**Chad, Patricia and Emily Beard** | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>**Chad, Patricia and Emily Beard**<br>c/o Barrett Law Office, P.A., One Burton Hills Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends     a previously filed claim, dated: 09/14/2007 |
|---|---|

| **1. Basis for Claim**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br><br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:___<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)          (date) |
|---|---|---|

| **2. Date debt was incurred:** 02/27/2004 | **3. If court judgment, date obtained:** |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Other_____
☐ Motor Vehicle

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| **5. Total Amount of Claim at Time Case Filed:** | $ | contingent/<br>(unsecured) | unliquidated/<br>(secured) | disputed<br>(priority) | unknown<br>(total) |
|---|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>**Patrick Barrett, Attorney for Creditor** |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

## STATEMENT OF CLAIM
## FOR CHAD BEARD, PATRICIA BEARD,
## AND EMILY BEARD

**A.    Trichloroethylene has caused the personal injury of Emily Beard.**

Chad and Patricia Beard are the parents of Emily Beard.  Because of exposure to

trichloroethylene ("TCE") through drinking water from the area of Dickson County,

Tennessee, Emily Beard ("Child Claimant") has suffered serious congenital deformities,

including a cleft palate.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products.  Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area.  This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21.  Child

Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

C.  **Alper controlled the investigation and remediation of the Dickson County contamination**

1.  *Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.   *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.      Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> > (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on October 25, 1998, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Chad, Patricia and Emily Beard (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

1

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Shonda Heflin, John Christopher, Sydney Stivers | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Shonda Heflin, John Christopher, Sydney Stivers,c/o Barrett Law Office, P.A., One Burton Hills Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends a previously filed claim, dated: 09/14/2007 |
|---|---|

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br><br>☐ Taxes<br><br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br><br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:___<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)        (date) |
|---|---|---|

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

4. **Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ | contingent/<br>(unsecured) | unliquidated/<br>(secured) | disputed<br>(priority) | unknown<br>(total) |
|---|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

7. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR JOHN CHRISTOPHER STIVERS, SHONDA HEFLIN, AND SYDNEY STIVERS

**A.    Trichloroethylene has caused the personal injury of Sydney Stivers.**

John Christopher Stivers and Shonda Heflin are the parents of Sydney Stivers. Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Sydney Stivers ("Child Claimant") has suffered serious congenital deformities, including a cleft palate and her Eustachian tube did not develop.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products.  Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill.  Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area.  This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21.  Child Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.    Alper controlled the investigation and remediation of the Dickson County contamination**

> *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson,

Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of

November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992

management agreement and entered into a new management agreement (the

"Management Agreement").  Under the Management Agreement, Alper agreed to

provide "*supervision and management of various environmental matters*, including risk

assessment, risk management, technical assessment, *remediation*, legal and compliance"

(emphasis added).  The Management Agreement also immunized Alper from any

litigation initiated by Saltire against Alper under the agreement.  The combination of

management powers ceded to Alper under the Management Agreement and Alper's

immunity from suits by Saltire put Alper in a completely dominant position relative to

Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and

environmental affairs were managed and controlled by Alper.  By controlling both

Saltire's finances and environmental affairs, Alper controlled and managed the handling

of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged

environmental contamination, possibly among others).  The decisions of how to deal with

Saltire's environmental issues – financially and otherwise – were left in the hands of

Alper.  Such control was facilitated by the existence of a common senior/primary

executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> > (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on February 10, 2000, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Shonda Heflin, John Christopher Stivers and Sydney Stivers (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Donald, Kristi and Hunter Adkins | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>**Donald, Kristi and Hunter Adkins**<br>c/o Barrett Law Office, P.A., One Burton Hills<br>Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: **(315) 665-9990** | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends    a previously filed claim, dated: _09/14/2007_ |
|---|---|

| 1. Basis for Claim | | |
|---|---|---|
| ☐ Goods sold | ☑ Personal injury/wrongful death | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:___ |
| ☐ Services performed | ☐ Taxes | Unpaid compensation for services performed |
| ☐ Money loaned | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) | From _____ to _____ |
| | ☐ Other_____ | (date)            (date) |

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed.
See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority  $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Other_____
☐ Motor Vehicle

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| 5. Total Amount of Claim at Time Case Filed: | $ | contingent/<br>(unsecured) | unliquidated/<br>(secured) | disputed<br>(priority) | unknown<br>(total) |
|---|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| **7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| **8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | |

| Date<br><br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>**Patrick Barrett, Attorney for Creditor** | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

### STATEMENT OF CLAIM
### FOR DONALD ADKINS, KRISTI ADKINS,
### AND HUNTER ADKINS

A.    **Trichloroethylene has caused the personal injury of Hunter Adkins.**

Donald and Kristi Adkins are the parents of Hunter Adkins. Because of exposure

to trichloroethylene ("TCE") through drinking water from the area of Dickson County,

Tennessee, Hunter Adkins ("Child Claimant") has suffered serious congenital

deformities, including a bilateral cleft lip and palate

B.    **Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a

major industrial company, operated an industrial plant in Dickson, Tennessee (the

"Dickson Plant"), producing automotive tire valves and associated products. Saltire used

TCE at the Dickson Plant and dumped TCE-laden waste at various locations around

Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a

public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of

the soil and groundwater at and around the Dickson Plant site and in other places in or

about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in

the Dickson County area. This course of conduct also led to the introduction of TCE into

the public water supply, including a City of Dickson well labeled DK-21. Child

Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

**C.  Alper controlled the investigation and remediation of the Dickson County contamination**

> *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others).  The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper.  Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2. *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.      Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on December 12, 2002, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

# EXHIBIT B TO AMENDED PROOF OF CLAIM

Donald, Kristi and Hunter Adkins (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

B 10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC. | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Charity Comeaux and Joshua Campbell | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>Charity Comeaux and Joshua Campbell<br>c/o Barrett Law Office, P.A., One Burton Hills Blvd., Ste. 380, Nashville, TN 37215<br>Telephone number: (315) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☑ amends a previously filed claim, dated: 09/14/2007 | |

| 1. Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☑ Personal injury/wrongful death<br><br>☐ Taxes<br><br>☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br><br>☐ Other_____ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)         (date) |
|---|---|---|

| 2. Date debt was incurred: 02/27/2004 | 3. If court judgment, date obtained: |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate      ☐ Other_____
☐ Motor Vehicle

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ contingent/ | unliquidated/ | disputed | unknown |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>03/19/2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Patrick Barrett, Attorney for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR CHARITY COMEAUX AND JOSHUA CAMPBELL

**A.    Trichloroethylene has caused the personal injury of Joshua Campbell.**

Charity Comeaux is the parent of Joshua Campbell. Because of exposure to trichloroethylene ("TCE") through drinking water from the area of Dickson County, Tennessee, Joshua Campbell ("Child Claimant") has suffered serious congenital deformities in the form of a cleft palate.

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminated local private and public sources of drinking water and caused physical injury to Child Claimant**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products. Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and groundwater at and around the Dickson Plant site and in other places in or about Dickson County.

Saltire's introduction of TCE into the environment contaminated private wells in the Dickson County area. This course of conduct also led to the introduction of TCE into the public water supply, including a City of Dickson well labeled DK-21. Child Claimant's mother consumed TCE-contaminated water from one or more of these

sources during the early stages of her pregnancy with Child Claimant. Prior to birth and in the early stages of gestation, Child Claimant was exposed to the TCE consumed by the mother and sustained the subject deformities as a consequence of this exposure.

Alper's negligent management of Saltire's environmental affairs, including a failure to warn of the dangers of TCE and its presence in Dickson County area water supplies, was a direct and proximate cause of Child Claimant's congenital deformities described herein. These defects have resulted in physical harm to Child Claimant, as well as a host of other impacts to Child Claimant, including emotional distress resulting from the rigorous medical evaluation and/or treatment as well as the psychological and social consequences of these deformities.

Beyond its carcinogenic properties, TCE is closely associated with a variety of congenital birth defects, including but not limited to heart defects, cleft lips, and cleft palates. The incidence of cleft lips, cleft palates, heart defects, and certain other birth defects among children in and around Dickson County is abnormally high, which Claimants aver is a direct consequence of exposure to TCE.

C. **Alper controlled the investigation and remediation of the Dickson County contamination**

   *1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company existing as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was

Alper, as Saltire had become a partial shell.[1] With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992. On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement"). Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added). The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement. The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper. By controlling both Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others). The decisions of how to deal with Saltire's environmental issues – financially and otherwise – were left in the hands of Alper. Such control was facilitated by the existence of a common senior/primary executive officer, common CFO, and common Vice President for Environmental Affairs.

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity. On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2.    *The investigation and remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation on behalf of Saltire, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which claimants believe to be a short form of <u>Alper Holdings U.S.A, Inc.</u>) on behalf of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at **14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only Alper—not Saltire—was authorized to do business in the Commonwealth of

Virginia.[2] Thus, when Bauer was engaged in remediation or other environmental endeavors at the Dickson Plant or otherwise in connection with the Dickson Plant, he was technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's role predominated over that of Saltire with respect to environmental investigation and remediation in Dickson, Tennessee.

**D.     Alper assumed a duty of care by controlling the investigation and remediation in Dickson, Tennessee, which it breached by conducting such investigation and remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its control over its subsidiary, Alper controlled the investigation and remediation of the TCE contamination resulting from Saltire's operation of the Dickson Plant. This was achieved, in part, by placing an Alper employee in charge of the environmental investigation and remediation. Alper is liable to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
>    (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
>    (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or their property. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Child Claimant by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations, and continuing migration of the subject TCE contaminant.

Alper also failed to warn Child Claimant's mother and the public of the existence of TCE contamination in multiple areas of Dickson County, including contamination that was migrating over large swathes of the County. Alper had extensive knowledge of contamination in Dickson County, including beyond the confines and periphery of the Dickson Plant site. Further, Alper limited its investigation of contamination to a narrow area around the Dickson Plant Site, despite indicia of widespread contamination over different areas, which in turn limited information (that could have assisted in the issuance of a public health warning) concerning existing public health risks resulting from TCE contamination in or about Dickson County.

Because TCE is heavier than water, it tends to sink until it pools on a relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including but not limited to the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's investigation and remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that a key geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of soil and groundwater in different areas of Dickson County and exposed residents therein to serious health risks.

Alper conducted its environmental activities in Dickson County in a manner generally lacking thoroughness. Alper used inadequate equipment in its investigation of TCE, thus undermining investigative and remedial efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination.

Child Claimant was born on February 20, 1998, which indicates that Child Claimant's conception occurred well after Alper assumed responsibility for management of Saltire's environmental affairs.

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Charity Comeaux and Joshua Campbell (collectively, "Claimants") reserve the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should they deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (2) charges and (3) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimants from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimants to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants, (c) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimants to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimants to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimants to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimants, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimants are or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimants, or (h) an admission by Claimants that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimants do not waive any other right or rights of action that they have or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.