**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re:                                          :          Chapter 11
                                                :          Case No. 07-12148 (BRL)
ALPER HOLDINGS USA, INC.,                        :
                                                :
                     Debtor.                     :

———————————————————————— x

                                                :
JON AND CHARLOTTE ARMSTRONG,                     :
                                                :
                     Appellants,                 :          District Court
                                                :          Case No. 08-cv-02489-CM
          v.                                     :          (Consolidated)
                                                :
ALPER HOLDINGS USA, INC.,                        :
                                                :
                     Appellee.                   :

———————————————————————— x

                                                :
HARRY HOLT, et al.,                              :
                                                :
                     Appellants,                 :
                                                :
          v.                                     :
                                                :
ALPER HOLDINGS USA, INC.,                        :
                                                :
                     Appellee.                   :

———————————————————————— x

                                                :
RAY AND CATHY FLAKE,                             :
                                                :
                     Appellants,                 :
                                                :
          v.                                     :
                                                :
ALPER HOLDINGS USA, INC.,                        :
                                                :
                     Appellee.                   :

———————————————————————— x

```
————————————————————————— x
                                    :
THE ADKINS CLAIMANTS,               :
                                    :
                   Appellants,      :
                                    :
        v.                          :
                                    :
ALPER HOLDINGS USA, INC.,           :
                                    :
                   Appellee.        :
————————————————————————— x
```

## APPENDIX OF ITEMS INCLUDED IN BRIEF OF APPELLEE

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Counsel for Debtor-Appellee Alper Holdings USA, Inc.*

| **Description of Pleading/Evidence** | **Tab** |
|---|---|
| Memorandum Decision and Order Granting Objection of Alper Holdings USA, Inc. to Proofs of Claim Filed by (i) Armstrong Plaintiffs and (ii) Holt Plaintiffs (Docket No. 157) | 1 |
| Memorandum Decision and Order Granting Objection of Alper Holdings USA, Inc. to Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by Adkins Claimants (Docket No. 199) | 2 |
| Management Agreement (Docket No. 147, Exhibit C) | 3 |
| Original Armstrong Claims (Docket No. 116, Exhibit A) | 4 |
| New Armstrong Claims (Docket No. 152, Exhibits A and B) | 5 |
| Bertellotti Deposition (Docket No. 147, Exhibit D) | 6 |
| Bauer Deposition (Docket No. 145, Exhibit 12) | 7 |
| United States v. Kramer, Civil Action No. 89-4340, 1998 U.S. Dist. LEXIS 14183 (D.N.J. 1998) | 8 |

**TAB 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter:    11 |
| ALPER HOLDINGS USA, et al. | Case No.:  07-12148 (BRL)<br>Jointly Administered |
| Debtors. | |

## MEMORANDUM DECISION AND ORDER GRANTING OBJECTIONS OF ALPER HOLDINGS USA, INC. TO PROOFS OF CLAIM FILED BY (i) ARMSTRONG PLAINTIFFS AND (ii) HOLT PLAINTIFFS

Alper Holdings USA, Inc. ("Alper"), the debtor, seeks entry of an order disallowing and expunging (i) claim numbers 12 and 13 (the "Armstrong Claims") filed by the Armstrong Plaintiffs[1] (the "Armstrong Objection") and (ii) claim numbers 35 through 45 (the "Holt Claims," and together with the Armstrong Claims, the "Claims") filed by the Holt Plaintiffs[2] (the "Holt Objection," and together with the Armstrong Objection, the "Objections"), pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Armstrong Plaintiffs and the Holt Plaintiffs oppose the Objections.

For the reasons set forth below and at oral argument, and in accordance with this Court's previous Memorandum Decision on Objection of Alper to Proofs of Claim (Claim Nos. 29 and 21) filed by Flake Plaintiffs dated January 15, 2008 (the "Flake Opinion"), the Court finds Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire Industrial, Inc.'s ("Saltire") alleged contamination or remediation in Dickson County, Tennessee. Therefore, the Claims are disallowed.

---

[1]     The Armstrong Plaintiffs include Charlotte Armstrong and Jon Armstrong (together, the "Armstrong Plaintiffs").

[2]     The Harry Holt Plaintiffs include Harry Holt, Beatrice Holt, Sheila Holt-Orstead, Jasmine Orsted, Bonita Holt, O'Brian Holt, Brandon Holt, Patrick Holt, Bianca Bentley, Demetrius Holt and David Brown (collectively, the "Holt Plaintiffs").

## BACKGROUND

This Court has previously discussed the facts and circumstances preceding Alper's bankruptcy at length in the Flake Opinion, including a discussion of Saltire and the contamination in Dickson County, Tennessee, and the Court generally refers all parties to the Flake Opinion.  Briefly, the Armstrong Claims and Holt Claims, much like other claims this Court has had the opportunity to address in these proceedings, both arise in connection with groundwater contamination and environmental problems that arose as far back as the mid-1960's in Dickson County, Tennessee, that were allegedly caused, in part, by Saltire (an incidental and indirect subsidiary of Alper).  From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the "Dickson Plant") where it made automotive tire valves and associated products and where trichloroethylene ("TCE") was used as a degreaser.  The Dickson Plant ceased operations in March 1985.  Since filing for bankruptcy on July 13, 2007, numerous parties have filed claims against Alper based on, among other things, Saltire's alleged contamination in Dickson County.

## The Flake Opinion

On January 15, 2008, this Court issued the aforementioned Flake Opinion, which granted Alper's objection to certain claims asserted by Cathy and Ray Flake (together, the "Flake Plaintiffs") arising out of claims similar to those presently at issue for personal and property damages based upon the alleged contamination in Dickson County.  *In re Alper Holdings USA*, 07-12148 (BRL), 2008 WL 160203 (Bankr. S.D.N.Y. Jan. 15, 2008).  In that instance, the Flake Plaintiffs claimed (the "Flake Claims") to have suffered personal and property damage due to the intentional or negligent failing of Alper (along with 20 other defendants) to "adequately monitor, control, supervise and/or maintain the disposal of the TCE at all locations throughout Dickson."

As is also presently the case, the Flake Plaintiffs alleged theories of both direct and indirect liability against Alper.

This Court granted Alper's objection and disallowed the Flake Claims based in large part upon the facts that (i) Alper's ownership interest in Saltire was not only indirect but also incidental as Alper only became the controlling shareholder of Saltire in connection with the reorganization of Saltire's parent First City Industries, Inc.[3] ("First City") and (ii) Alper had no connection or relationship to Saltire or Dickson County prior to obtaining an indirect ownership interest in Saltire in 1992 – nearly two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant was closed. Specifically, this Court found that Alper had no direct liability to the Flake Plaintiffs because (a) it was Saltire and not Alper that operated the Dickson Plant and, therefore, Alper owed no duty of care to the Flake Plaintiffs, and (b) the Flake Plaintiffs failed to set forth any facts that Alper actually participated in or oversaw Saltire's remediation in Dickson County that would support a finding that Alper may have assumed a duty of care to the Flake Plaintiffs. *Id.* at *4-5.

This Court also found that Alper had no indirect liability to the Flake Plaintiffs on either a theory of alter ego or piercing the corporate veil because neither the existence of a management agreement between Alper and Saltire nor a common employee between the parent and subsidiary would justify the extraordinary remedy of piercing the corporate veil as argued by the Flake Plaintiffs. *Id.* at *5-6. In so holding, the Court clearly held that "Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee." *Id.* at *7. With that introduction in mind, the Court now proceeds with the claims presently at issue.

---

[3]     As a creditor of First City, Alper received shares of stock as a stock-for-debt distribution in the reorganized First City on account of its allowed claim pursuant to First City's plan of reorganization. *See* Transcript of January 8, 2008 Hearing, at 25-26.

## THE ARMSTRONG CLAIMS

On or about September 19, 2007, the Armstrong Plaintiffs filed their original proofs of claim (the "Original Proofs of Claim") asserting contingent, unliquidated, and disputed property damage claims against Alper.  The Original Proofs of Claim were based entirely upon a complaint filed by the Armstrong Plaintiffs against Alper (along with 18 other named defendants) on or about April 8, 2004 (the "Armstrong Complaint"), in which the Armstrong Plaintiffs claim to have suffered a "diminution" in the value of certain real property as a direct result of the "defendants" alleged contamination in Dickson County.  The Armstrong Complaint alleged that Alper was liable for the property damages asserted based upon (a) Alper's own "direct acts and omissions" and (b) a theory that Alper was Saltire's successor-in-interest.  While the Armstrong Complaint alleged that Alper was liable for its own direct acts, the complaint failed to detail with any specificity what those direct acts might actually entail; rather, the Armstrong Plaintiffs relied on broadly pled causes of action asserted generally against the "defendants."

On February 6, 2008, however, the Armstrong Plaintiffs, undoubtedly daunted by the Flake Plaintiffs' holding, amended the Original Proofs of Claims (the "Amended Proofs of Claim").[4]  In the Amended Proofs of Claim, the Armstrong Plaintiffs contend for the first time that they were not alleging that Alper caused or contributed to the initial contamination in Dickson County, but rather, that Alper assumed control of the remediation efforts in Dickson

---

[4]     Alper has objected to the filing of the Amended Proofs of Claim contending that the filing of the Amended Proofs of Claim some five months after the expiration of the September 21, 2007 bar date is "an impermissible amendment to the Original Armstrong Claims because they are based on a set of facts and theory of liability completely different than those asserted in the Original Armstrong Claims and there is no equitable reason to permit the late-filed claims."  Objection of Alper Holdings USA to Amendment of Proofs of Claim (Claim Nos. 12 and 13) Filed by Armstrong Plaintiffs dated February 20, 2008, at ¶ 3.

- 4 -

County and conducted such remediation in a negligent manner. The pleadings attached to the Amended Proofs of Claim sought to build upon the theory first introduced by the Flake Plaintiffs that Alper controlled the remediation in Dickson County (and assumed a duty to the Armstrong Plaintiffs) by further alleging that Nicholas Bauer, the same common employee of Saltire and Alper previously discussed in the Flake Opinion, oversaw the remediation in Dickson County on behalf of Alper.[5] More precisely, the Amended Proofs of Claim allege that Mr. Bauer: (a) considered himself an employee of Alper and not Saltire, (b) was hired by Alper for the sole purpose of overseeing the remediation in Dickson County, (c) represented himself as an Alper official who had responsibility for environmental matters at Saltire, and (d) operated from an office in Virginia, a jurisdiction where only Alper and not Saltire was authorized to do business.

Alper objects to the Armstrong Claims arguing that they (as reformulated in the Amended Proofs of Claims) are fundamentally the same negligent remediation claims that the Court previously dispensed with in the Flake Opinion. Additionally, Alper contends that even if all of the allegations regarding Mr. Bauer are taken as true, the Flake Plaintiffs have still failed to "allege a plausible basis for liability against Alper." Alper further contends that any claims for alter ego or successor liability must be disallowed because such claims were property of Saltire's bankruptcy estate and were released under Saltire's plan of reorganization (the "Saltire Plan").

In contrast, the Armstrong Plaintiffs claim that the Armstrong Claims should not be dismissed because *inter alia* (a) the Armstrong Plaintiffs' proofs of claim contained sufficient allegations to survive what they contend is a motion to dismiss, and (b) the Armstrong Plaintiffs'

---

[5]    The Flake Plaintiffs previously alleged that Mr. Bauer was not an employee of Saltire at all, but rather was hired solely by Alper to deal with the remediation in Dickson County. The Court, however, previously held that not only was Mr. Bauer clearly an employee of Saltire (specifically, vice president of environmental affairs), but also that that he was acting on behalf of Saltire and not Alper in overseeing or participating in the remediation in Dickson County. *In re Alper Holdings,* 2008 WL 160203, at *6.

alter ego claims against Alper could not have been released under the Saltire Plan because the Armstrong Plaintiffs' alter ego claims were not property of the estate.

As previously discussed in the Flake Opinion, the fact that a parent company and its subsidiary share common employees is insufficient to impose liability on the part of the parent for acts of the subsidiary.  *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.") (internal quotations omitted); *see In re Alper Holdings*, 2008 WL 160203, at *5-6.  Regarding the roles of common or overlapping employees, the United States Supreme Court in *United States v. Bestfoods* stated that "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," absent a situation where a common employee might "depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility."  524 U.S. at 69-71; *see also In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560, 588 (S.D.N.Y. 2007).

Like the Flake Plaintiffs before them, the Armstrong Plaintiffs have failed to allege any facts that would justify imposing liability on the part of Alper.  Alper's ownership interest in Saltire came about merely as a result of a debt to equity swap in First City's then pending chapter 11 bankruptcy – and the Court will not make use of this incidental ownership interest to hold Alper indirectly liable for events that predated Alper's ownership interest in Saltire by nearly two decades.  *See e.g., Da Silva v. Kinsho Intern. Corp.*, 210 F. Supp. 2d 241, 244 (S.D.N.Y. 2000) ("This Court agrees that a parent company should not lightly be held responsible for the acts of its subsidiaries absent proof that the parent was involved in the particular circumstances giving rise to the litigation.").  Most notably, as Alper suggests in its reply, even if all of the allegations

- 6 -

regarding Mr. Bauer and Alper are taken as true, the conduct alleged still falls well short of the "depart[ing] so far from the norms of parental influence" standard set forth by the Supreme Court in *Bestfoods* as the Armstrong Plaintiffs have failed to allege any acts by Mr. Bauer that would overcome the legal presumption that he was acting on behalf of Alper and not Saltire.

Accordingly, as the conduct alleged is insufficient to overcome the legal presumption that Mr. Bauer was acting on behalf of Saltire and not Alper, the Court sees no reason to part ways with the reasoning and rationale previously set forth in the Flake Opinion. *See, e.g., In re Manhattan Invest. Fund Ltd.*, 343 B.R. 63, 67 (S.D.N.Y. 2006) ("The law of the case is a discretionary doctrine, providing 'that where a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" While the law of the case is "a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided," nevertheless, the situations justifying reconsideration are generally limited to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal citations omitted); *641 Ave. of Americas Ltd. Partnership v. 641 Associates, Ltd.*, 189 B.R. 583, 588 (S.D.N.Y. 1995) ("[U]nder the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation."). The Court finds no basis to impose a duty on the part of Alper – direct, indirect, assumed or otherwise – and therefore, the Armstrong Claims are disallowed.

## THE HOLT CLAIMS

Similar to the Armstrong Claims and the Flake Claims before them, the Holt Claims, which are based upon a separate complaint filed on or about December 3, 2003 (the "Holt Complaint"), assert various claims for both personal and property damage based upon, *inter alia*, Saltire's negligent contamination at the Dickson Plant and surrounding area. Unlike the

Armstrong Plaintiffs, however, the Holt Plaintiffs allege damages based entirely upon injuries caused by the original contamination in Dickson County and not by any subsequent remediation or negligence.  Accordingly, the Holt Plaintiffs' allegations as they pertain to Alper are based entirely on a theory of alter ego liability.  In particular, the Holt Plaintiffs assert that Alper is liable as the alter ego of Saltire because (a) Alper was not merely an indirect or incidental parent of Saltire as had been previously contended, but rather was formed for the sole purpose of acquiring First City during its then pending chapter 11 proceeding, (b) Alper dominated and controlled the management and direction of Saltire to a much greater extent than previously suggested, and (c) Alper and First City diverted assets away from Saltire, which left Saltire grossly undercapitalized and eventually necessitated Saltire filing for bankruptcy protection under chapter 11 of the Bankruptcy Code in August 2004.[6]

Alper objects to the Holt Plaintiffs' alter ego and successor liability claims charging that such claims must be disallowed because (i) alter ego claims that Saltire may have had against Alper were property of the estate and were released under the Saltire Plan and (ii) even if such claims were not released pursuant to the Saltire Plan, no alter ego claims could be asserted against Alper because Saltire was a publicly traded company during the entire time that it operated the Dickson Plant and Alper did not exercise any dominion or control over Saltire's operations as required to support such claims.

In response, the Holt Plaintiffs contend that their alter ego claims against Alper were not property of the estate but rather were nondebtor third party claims that Saltire was unable to release under the Saltire Plan because *inter alia* (a) Tennessee law and not Delaware should control the analysis of alter ego claims and under Tennessee law, a debtor does not have the ability to pierce its own corporate veil, and (b) the claims asserted by the Holt Plaintiffs in the

---

[6]    *In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004).

Holt Complaint are personal to the Holt Plaintiffs and could not have been brought by any creditor of Alper.

As previously set forth in the Flake Opinion, courts are very reluctant to disregard the corporate form.[7] *See Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 233 F.R.D. 143, 145 (D. Del. 2005) ("[T]he separate and distinct corporate identities of a parent and its subsidiary are not readily disregarded, except in rare circumstances justifying the application of the alter ego doctrine to pierce the corporate veil of the subsidiary."); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("It is only the exceptional case where a court will disregard the corporate form…"); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) ("Since it is the exceptional instance where a court will disregard the corporate form, the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'").  Under Delaware law, a corporate veil will not be pierced absent a showing of "fraud or something like it."  *Mobile Oil Corp.*, 718 F. Supp. at 268; *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) ("[T]o pierce the corporate veil based on an agency or 'alter ego' theory, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (internal quotations omitted).

Under Delaware law, an alter ego cause of action constitutes a corporate right.  *See, e.g.*, *In re Enron Corp.*, 2003 WL 1889040, at *3 ("Based on the fact that Delaware law allows a

---

[7]    While the Holt Plaintiffs suggest otherwise, it is clear under New York law that the law of the state of incorporation controls the analysis of alter ego claims and, accordingly, Delaware law controls our analysis.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (internal quotations omitted); *Kalb v. Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("[b]ecause a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003).

subsidiary to maintain an action against a corporate parent, a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil"); *Pereira v. Cogan*, 00-CIV-619, 2001 WL 243537, at *19-20 (S.D.N.Y. Mar. 8, 2001) ("It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporation fiction, or an involuntary tort creditor. However piercing the corporate veil and alter ego actions are allowed to prevent unjust or inequitable results; they are not based solely on a policy of protecting creditors..... [Therefore] it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.") *citing Phar-Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1240 n. 20 (3d Cir. 1994); *Murray v. Miner*, 876 F. Supp. 512, 516 -17 (S.D.N.Y. 1995) ("One can only conclude that for purposes of applying federal bankruptcy law, Delaware courts would permit a debtor corporation to 'assert[ ] an alter ego claim to pierce its own corporate veil….'") (internal citations omitted). The law permits a debtor to pierce its own corporate veil because "[a]llowing the trustee or debtor-in-possession to pursue the claim avoids the prospect of creditors seeking to gain advantage over other creditors by pursuing the alter ego claims on a first-come, first-serve basis." *In re Enron Corp.*, 2003 WL 1889040, at *4.  As the Second Circuit stated in *Kalb, Voorhis & Co. v. American Fin. Corporation*, 8 F.3d 130 (2d Cir. 1993):

> [G]ranting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of ensuring that all similarly situated creditors are treated fairly; the alter ego action is based upon allegations that if proven would benefit all [the debtor's] creditors, i.e., making more assets available to satisfy [the debtor's] debts.... If [the individual creditor's] action is not stayed it would collect its claim from a pool of assets that should be available to all creditors.

*Id*. at 132.

"Where a claim is generalized, with no particularized injury stemming from it and where the claim may be brought by any creditor, the trustee or debtor-in-possession is the appropriate

party to assert the claim and creditors are subject to the outcome of the action brought by the trustee or debtor-in-possession." *In re Enron Corp.*, 2003 WL 1889040, at *4; *see also Murray v. Miner*, 876 F. Supp. 512, 516 (S.D.N.Y. 1995) (An alter ego claim "belongs to the trustee if (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, and (2) plaintiffs' claim is a general one, of the type that could be brought by any creditor of the debtor.").

While the Holt Plaintiffs have further expounded upon the successor liability and alter ego theories previously dispensed with in the Flake Opinion,[8] the Court is not persuaded. Among other things, the Holt Plaintiffs assert that (a) Alper and Saltire operated as a single economic unit maintaining the same office space and over lapping employees, and (b) Alper and First City diverted assets away from Saltire and sold of many of Saltire's most profitable businesses, leaving it grossly undercapitalized and forcing Saltire to file for bankruptcy. Clearly, claims of gross undercapitalization and fraudulent transfer such as those averred in the Holt Complaint are of a generalized nature and do not allege a "particularized injury" specific to the Holt Plaintiffs only and not Saltire's body of creditors at large. While this Court previously did not address whether Saltire's alter ego claims were property of the estate, *see In re Alper Holdings*, 2008 WL 160203, at * 6, it is clear based upon the conduct presently alleged that such alter ego claims were in fact property of Saltire's bankruptcy estate and, accordingly, that those alter ego claims were released under section 13.1 of the Saltire Plan.[9] Accordingly, the Holt Claims are disallowed.

---

[8]    The same, however, cannot be said of the Armstrong Plaintiffs, where counsel for the Armstrong Plaintiffs – who previously served as counsel for the Flake Plaintiffs – essentially restated the very same arguments dismissed by the Court in the Flake Opinion.

[9]    Section 13.1(b) of the Saltire Plan states, in pertinent part:

## <u>CONCLUSION</u>

For the reasons set forth above and at the hearing, and for the reasons set forth in the

Flake Opinion, the Court finds that Alper cannot be held liable, directly or indirectly, for claims

arising out of or relating to Saltire's alleged contamination or remediation in Dickson County,

Tennessee.  Therefore, the Claims are disallowed and expunged.

IT IS SO ORDERED.

Dated:  New York, New York
        February 25, 2008

                                        _/s/ Burton R. Lifland_____
                                        The Honorable Burton R. Lifland
                                        United States Bankruptcy Judge

---

The Debtor . . . acquits and forever discharges Alper . . . from any
and all actions, causes of action, [and] liabilities . . . in any way
relating to the Debtor . . . that the Debtor could assert directly or
any Holder of a Claim . . . could assert derivatively or on behalf of
the Debtor or its estate . . . . Notwithstanding the foregoing, the
above release does not release claims any nondebtor third party
may hold against any of the Released Parties, except to the extent
any nondebtor third party is asserting a claim that is property of the
Debtor's Estate.

17584135\V-1

**TAB 2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

ALPER HOLDINGS USA, et al.

                              Debtors.

FOR PUBLICATION

Chapter:   11

Case No.:  07-12148 (BRL)
           Jointly Administered

### MEMORANDUM DECISION AND ORDER ON OBJECTION OF ALPER HOLDINGS USA, INC. TO PROOFS OF CLAIM (CLAIM NOS. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) FILED BY THE ADKINS CLAIMANTS

Before the Court is the objection (the "Adkins Objection") of Alper Holdings USA, Inc.

("Alper" or the "Debtor") to certain claims (the "Adkins Claims") filed by the Adkins

Claimants[1], pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Adkins Claimants oppose the Adkins Objection asserting that their claims have been

sufficiently pled to put Alper on notice.  For the reasons set forth below and in accordance with

this Court's previous Memorandum Decision on Objection of Alper to Proofs of Claim (Claim

Nos. 29 and 21) filed by Flake Plaintiffs dated January 15, 2008 (the "Flake Opinion") and

---

[1]     The Adkins Claimants include Donald Adkins, Kristi Adkins, Hunter Adkins, Chad Beard, Patricia Beard, Emily Beard, Eric Christian, Peyton Christian, Jennifer Casteel, Timothy DeLoach, Kimberly DeLoach, Paxton DeLoach, Anthony Fambrough, Keysha Fambrough, Autumn Fambrough, Shonda Heflin, John Christopher Stiver, Sydney Stiver, David Heimbach, Jodie Heimbach, Kassidy Heimbach, Dawson Heimbach, Mason Heimbach, Scott Herkimer, Darcie Herkimer, Samuel Herkimer, Steven Jones, Melissa Jones, Mya Jones, Barry Piland, Christie Piland, Luke Piland, Travis Wood, Amy Wood and Lauren Wood (collectively, the "Adkins Plaintiffs") as well as Priscilla Fowler and Jason Stewart -- who together filed proof of claim number 17 -- and James Dakota Stewart, Charity Comeaux, and Joshua Campbell -- who together filed proof of claim 27 (collectively, the "Non-Plaintiff Adkins Claimants" and, together with the Adkins Plaintiffs, the "Adkins Claimants").  The Non-Plaintiff Adkins Claimants are represented by the same counsel, and have filed substantially identical proofs of claim for personal injury/wrongful death claims, as the Adkins Plaintiffs. On information and belief, the Non-Plaintiff Adkins Claimants are asserting substantially similar claims as those asserted by the Adkins Plaintiffs and, accordingly, this Objection addresses the claims of all of the Adkins Claimants.

Memorandum Decision on Objection of Alper to Proofs of Claim Filed by (i) the Armstrong

Plaintiffs and (ii) Holt Plaintiffs dated February 28, 2008 (the "Holt/Armstrong Opinion"),[2] this

Court *once again* finds Alper cannot be held liable, directly or indirectly, for claims arising out

of or relating to Saltire Industrial, Inc.'s ("Saltire") alleged contamination or remediation in

Dickson County, Tennessee.  Therefore, the Adkins Claims are disallowed.

## BACKGROUND

The Adkins Objection is the latest installment in a series of omnibus claims objections

concerning claims based upon groundwater contamination that occurred in Dickson County,

Tennessee in the mid-1960's allegedly caused, in part, by Saltire (an indirect and incidental

subsidiary of Alper).  Having previously discussed the facts and circumstances preceding Alper's

bankruptcy at length not once, but twice, in both the Flake Opinion and the Holt/Armstrong

Opinion, the Court presumes all parties are familiar with the facts and generally refers all parties

to those opinions.  Briefly, the Adkins Claimants, like the Flakes, Holts and Armstrongs before

them, claim to have suffered personal injuries as a result of Saltire's alleged contamination.

From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the

"Dickson Plant") where it made automotive tire valves and associated products and where

trichloroethylene ("TCE") was used as a degreaser.  The Dickson Plant ceased operations in

March 1985.  Since filing for bankruptcy on July 13, 2007, numerous parties have filed claims

against Alper based on, among other things, Saltire's alleged contamination in Dickson County.

---

[2]    The parties stipulated at oral argument that in lieu of holding additional argument on the
Adkins Claims, the parties would rely on the presentations made in connection with the
hearing held on Alper's objection to the claims of the Armstrong Plaintiffs (as defined
below), which the parties mutually agreed consisted of substantially similar legal
arguments to those presently at issue.

**The Flake Opinion**

On January 15, 2008, this Court issued the aforementioned Flake Opinion, which granted Alper's objection to certain claims asserted by Cathy and Ray Flake (together, the "Flake Plaintiffs") for personal and property damages based upon the alleged contamination in Dickson County.[3]  *In re Alper Holdings USA*, 07-12148 (BRL), 2008 WL 160203 (Bankr. S.D.N.Y. Jan. 15, 2008).  In that instance, the Flake Plaintiffs claimed (the "Flake Claims") to have suffered personal and property damage due to the intentional or negligent failing of Alper (along with 20 other defendants) to "adequately monitor, control, supervise and/or maintain the disposal of the TCE at all locations throughout Dickson."  As is presently the case, the Flake Plaintiffs alleged theories of both direct and indirect liability against Alper.

This Court granted Alper's objection and disallowed the Flake Claims based in large part upon the facts that (i) Alper's ownership interest in Saltire was not only indirect but also incidental as Alper only became the controlling shareholder of Saltire in connection with the reorganization of Saltire's parent First City Industries, Inc.[4] ("First City") and (ii) Alper had no connection or relationship to Saltire or Dickson County prior to obtaining an indirect ownership interest in Saltire in 1992 – nearly two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant was closed.  Specifically, this Court found that Alper had no direct liability to the Flake Plaintiffs because (a) it was Saltire and not Alper that operated the Dickson Plant and, therefore, Alper owed no duty of care to the Flake Plaintiffs, and (b) the Flake Plaintiffs failed to set forth any facts that Alper actually participated in or oversaw

---

[3]     Curiously, despite the well-publicized contamination in Dickson County, the Flake Plaintiffs purchased property within 8 miles of the Dickson Plant in 2002 for use as a *water bottling facility*.

[4]     As a creditor of First City, Alper received shares of stock as a stock-for-debt distribution in the reorganized First City on account of its allowed claim pursuant to First City's plan of reorganization.  *See* Transcript of January 8, 2008 Hearing, at 25-26.

Saltire's remediation in Dickson County that would support a finding that Alper may have assumed a duty of care to the Flake Plaintiffs. *Id.* at *4-5.

This Court also found that Alper had no indirect liability to the Flake Plaintiffs on either a theory of alter ego or piercing the corporate veil because neither the existence of a management agreement (the "Management Agreement") entered into between Saltire and Alper in 1995 whereby Alper agreed to oversee certain environmental issues nor a common employee between the parent and subsidiary would justify the extraordinary remedy of piercing the corporate veil as argued by the Flake Plaintiffs. *Id.* at *5-6.  In so holding, the Court clearly held that "Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee." *Id*. at *7.

**The Holt/Armstrong Opinion**

Despite the clear and unambiguous holding set forth in the Flake Opinion, this Court was compelled to issue another decision on claims stemming out of the Dickson County contamination on February 25, 2008.[5]  In the Holt/Armstrong Opinion, *In re Alper Holdings USA*, 07-12148 (BRL), 2008 WL 541154 (Bankr. S.D.N.Y. Feb. 25, 2008), the Court was presented with two separate groups of claimholders, the Armstrong Plaintiffs[6] and the Holt Plaintiffs[7], both of whom sought to impose liability on Alper for both personal and property damages but under different theories of liability.

---

[5]     With the exception of the Holt Plaintiffs, the same law firm has represented each of the separate plaintiff groups.

[6]     The Armstrong Plaintiffs include Charlotte Armstrong and Jon Armstrong (together, the "Armstrong Plaintiffs").

[7]     The Harry Holt Plaintiffs include Harry Holt, Beatrice Holt, Sheila Holt-Orsted, Jasmine Orsted, Bonita Holt, O'Brian Holt, Brandon Holt, Patrick Holt, Bianca Bentley, Demetrius Holt and David Brown (collectively, the "Holt Plaintiffs").

A. The Armstrong Plaintiffs – Assumption of Duty Theory of Liability

In their amended pleadings,[8] the Armstrong Plaintiffs sought to build upon the theory first introduced by the Flake Plaintiffs that Alper controlled the environmental remediation efforts in Dickson County (and assumed a duty to the Armstrong Plaintiffs) by further alleging that Nicholas Bauer, the same common employee of Saltire and Alper previously discussed in the Flake Opinion, oversaw the remediation on behalf of Alper.[9]  More precisely, the Armstrong Plaintiffs alleged that Mr. Bauer: (a) considered himself an employee of Alper and not Saltire, (b) was hired by Alper for the sole purpose of overseeing the remediation in Dickson County, (c) represented himself as an Alper official who had responsibility for environmental matters at Saltire, and (d) operated from an office in Virginia, a jurisdiction where only Alper and not Saltire was authorized to do business.  Like the Flake Plaintiffs before them, the Armstrong Plaintiffs also pointed to the existence of the Management Agreement as proof that Alper had assumed control of the Dickson County remediation.

Alper objected to the Armstrong Plaintiffs' claims arguing that they were fundamentally the same negligent remediation claims the Court previously dispensed with in the Flake Opinion.  Additionally, Alper contended that any claims for alter ego or successor liability should be

---

[8]    Apparently recognizing that their claims as originally filed (which only set forth damages stemming from the original contamination) would ultimately fail in light of the Flake Opinion, the Armstrong Plaintiffs' subsequently attempted to amend their proofs of claim to include allegations that Alper voluntarily assumed Saltire's remediation efforts in Dickson County and that Alper was negligent in conducting that remediation.

[9]    The Flake Plaintiffs previously alleged that Mr. Bauer was not an employee of Saltire at all, but rather was hired solely by Alper to deal with the remediation in Dickson County. The Court, however, previously held that not only was Mr. Bauer clearly an employee of Saltire (specifically, vice president of environmental affairs), but also that that he was acting on behalf of Saltire and not Alper in overseeing or participating in the remediation in Dickson County.  *In re Alper Holdings,* 2008 WL 160203, at *6.

disallowed because such claims were property of Saltire's bankruptcy estate and were released under Saltire's plan of reorganization (the "Saltire Plan").

In contrast, the Armstrong Plaintiffs argued that their claims should not be dismissed because, *inter alia*, (a) the Armstrong Plaintiffs' proofs of claim contained sufficient allegations to survive what they contend was a motion to dismiss, and (b) the Armstrong Plaintiffs' alter ego claims against Alper could not have been released under the Saltire Plan because their claims were not property of the estate.

This Court held that the Armstrong Plaintiffs, like the Flake Plaintiffs before them, had failed to allege any facts that would justify imposing liability on the part of Alper. Once again, this Court stressed that (a) the fact that a parent company (Alper) and its subsidiary (Saltire) shared common employees was insufficient to impose liability on the part of the parent for acts of the subsidiary; and (b) Alper's ownership interest in Saltire came about merely as a result of a debt to equity swap in First City's then pending chapter 11 bankruptcy – and the Court would not make use of such an incidental ownership interest to hold Alper indirectly liable for events that predated Alper's ownership interest in Saltire by nearly two decades. *In re Alper Holdings*, 2008 WL 541154, at *3-*4.

### B. The Holt Plaintiffs – Alter Ego Theory of Liability

In contrast to the assumption of duty theory pursued by the Flake and Armstrong Plaintiffs, the Holt Plaintiffs alleged personal injury damages based entirely upon injuries caused by the original contamination in Dickson County and not by any subsequent remediation or negligence. Accordingly, the Holt Plaintiffs' allegations as they pertained to Alper were based entirely on a theory of alter ego liability.[10]

---

[10]    In addition to the causes of action asserted against Alper, the Holt Plaintiffs also alleged various causes of action against the city and county of Dickson, the commissioner of the Tennessee Department of Environment and Conservation, and the commissioner of the

The Holt Plaintiffs claimed that Alper was liable as the alter ego of Saltire because (a) Alper was not merely an indirect or incidental parent of Saltire as had been previously contended, but rather was formed for the sole purpose of acquiring First City during its then pending chapter 11 proceeding, (b) Alper dominated and controlled the management and direction of Saltire to a much greater extent than previously suggested, and (c) Alper and First City diverted assets away from Saltire and sold of many of Saltire's most profitable businesses, which left Saltire grossly undercapitalized and eventually necessitated Saltire filing for bankruptcy protection under chapter 11 of the Bankruptcy Code in August 2004.[11]

Alper objected to the Holt Plaintiffs' alter ego and successor liability claims in the same fashion it had previously objected to similar claims by the Flake Plaintiffs charging that such claims should be disallowed because (i) any alter ego claims that Saltire may have had against Alper were property of the estate and were released under the Saltire Plan and (ii) even if such claims were not released pursuant to the Saltire Plan, no alter ego claims could be asserted against Alper because Saltire was a publicly traded company during the entire time that it operated the Dickson Plant and Alper did not exercise any dominion or control over Saltire's operations as required to support such claims.

The Holt Plaintiffs argued that their alter ego claims were not property of the estate but rather were nondebtor third party claims that Saltire was unable to release under the Saltire Plan because, *inter alia*, (a) under Tennessee law (which the Holt Plaintiffs argued controlled the analysis of alter ego claims rather than Delaware, the state of incorporation), a debtor did not have the ability to pierce its own corporate veil, and (b) the claims asserted by the Holt Plaintiffs

---

Tennessee Department of Health for, among other things, battery, nuisance and numerous civil rights violations.

[11]    *In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004).

- 7 -

were personal to the Holt Plaintiffs and could not have been brought by Alper's body of creditors at large.

Although the Court previously declined to address whether Saltire's alter ego claims were property of the estate in the Flake Opinion, *see In re Alper Holdings*, 2008 WL 160203, at * 6, it was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a "particularized injury" specific only to the Holt Plaintiffs.  Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.[12] *In re Alper Holdings*, 2008 WL 541154, at *6.  As can be seem from the following, the prior holding regarding the Holt Plaintiffs' alter ego claims applies equally to the current Adkins Claimants.

---

[12]    Section 13.1(b) of the Saltire Plan states, in pertinent part:

> The Debtor . . . acquits and forever discharges Alper . . . from any and all actions, causes of action, [and] liabilities . . . in any way relating to the Debtor . . . that the Debtor could assert directly or any Holder of a Claim . . . could assert derivatively or on behalf of the Debtor or its estate . . . . Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

## THE ADKINS CLAIMS

On or about September 19, 2007, the Adkins Claimants filed their original proofs of claim asserting contingent, unliquidated, and disputed personal injury and wrongful death claims (the "Original Adkins Claims"). The Original Adkins Claims were based entirely upon a complaint (the "Adkins Complaint") filed by the Adkins Claimants on or about January 9, 2006 against Alper, asserting various claims for personal injuries based upon both direct and indirect theories of liability. Before proceeding, the Court notes the following: (a) despite counsel for the Adkins Claimants' (the "Esserman Firm") repeated efforts at differentiating the physical injuries sustained by his clients, the personal injuries allegedly suffered by the Adkins Claimants are nearly identical in all respects to those previously before the Court; and (b) the Adkins Complaint is completely devoid of any allegations of negligent remediation on the part of Alper or claims that Alper assumed a duty of care to the Adkins Claimants. In fact, except for the statements that Alper was liable for its "own direct acts and omission" and as a "successor-in-interest" to Saltire, the Adkins Complaint does not set forth a single specific allegation that would warrant imposing liability on the part of Alper.

On February 28, 2007, Alper filed the Adkins Objection alleging that the Original Adkins Claims were both baseless and facially deficient for all of the same reasons set forth in their previous claims objections, namely that: (a) Alper had no connection or relationship to Dickson County or the Dickson Plant prior to becoming Saltire's indirect and incidental parent and, therefore, Alper owed no duty of care to the Adkins Claimants; (b) the Adkins Claimants had made no showing aside from the general statement that Alper was being sued based on its "own direct acts and omission" that Alper had engaged in any negligent remediation efforts in Dickson County; and (c) to the extent that the Adkins Claimants were attempting to assert alter ego claims against Alper (like the Flakes, Holts and Armstrong Plaintiffs before them), such claims must be

- 9 -

disallowed because (i) the Court had previously ruled in the Holt/Armstrong Opinion that such claims were property of the estate and released under the Saltire Plan; and (ii) even if such claims were not released under the Saltire Plan, Alper did not exercise any dominion or control over Saltire's operations.

Following the previous dismissal of the Flake and Armstrong Claims as a matter of law, the Esserman Firm reacted on behalf of the Adkins Claimants by attempting to amend the Original Adkins Claims nearly one month after Alper filed the Adkins Objection (the "New Adkins Claims").[13]  In the New Adkins Claims and the Adkins Claimants' response to the Adkins Objection (the "Adkins Response"), the Esserman Firm attempts *once again* to resurrect the very same assumption of duty theory this Court previously put to rest in the Flake Opinion and the Holt/Armstrong Opinion.  Specifically, the Adkins Response states as follows:

> While the Debtor was not involved in the initial contamination in Dickson, the Debtor assumed control of the TCE remediation efforts after its acquisition of Saltire in 1992.  The Debtor conducted such remediation in a negligent manner by failing to properly contain the contamination and by allowing the ongoing migration of TCE contaminants to Dickson-area drinking water— thereby causing the Adkins Claimants' injuries.

*See* Adkins Response, at p. 2.

In addition to the assumption of duty theory (which by the Adkins Claimants own admission is their sole bases for imposing direct liability on Alper), the Adkins Claimants also contend – in direct contravention to this Court's holding in the Holt/Armstrong Opinion – that their alter ego claims against Alper were not property of Saltire's bankruptcy estate and could not be released under the Saltire Plan.

---

[13]     Alper has objected to the filing of the New Adkins Claims as an impermissible amendment to the Original Adkins Claims as they were filed nearly six months after the expiration of the September 21, 2007 bar date.  *See* Objection of Alper Holdings USA to Amendment of Proofs of Claim (Claim Nos. 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 27, 28) Filed by Adkins Claimants dated April 2, 2008, at ¶ 3.

It is clear from the pleadings before the Court that the Adkins Claimants intend to rely exclusively on the new allegations as set forth in the New Adkins Claims. In response, Alper argues in well grounded fashion that exclusive reliance on the New Adkins Claims is tantamount to a concession that the Original Adkins Claims were deficient as pled. Regardless, the New Adkins Claims may very well be impermissible amendments to the Original Adkins Claims because they are based on a set of facts and theories of legal liability completely different than those asserted in the Original Adkins Claims and there is no equitable reasons to permit the late-filed claims because the Adkins Claims "whether in the amended form or in [their] essential form still [do] not state a plausible, cognizable legal claim under the prevailing law." *See* Transcript of Hearing Regarding Alper Holdings USA, Inc.'s Objection to Claims of the Harry Holt Plaintiffs and the Armstrong Plaintiffs, dated February 21, 2007, at p. 17.

## DISCUSSION

### Alper Has No Direct Liability to the Adkins Claimants

To establish a direct cause of action against Alper, the Adkins Claimants must prove that Alper owed a duty to the Adkins Claimants, that the duty was breached, and that the breach was the cause in fact and proximate cause of the Adkins Claimants' injuries. *See Ham v. Hospital of Morristown, Inc.*, 917 F. Supp. 531, 534 (E.D. Tenn. 1995) ("The law is well settled in Tennessee that, in a cause of action for negligence, there must first be a duty of care owed by the defendant to the plaintiff."). Recognizing that Alper had no connection or relationship to Saltire or Dickson County prior to obtaining an indirect ownership interest in Saltire nearly two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant closed, the Adkins Claimants now rely solely on their theory that Alper controlled the remediation in Dickson County and assumed a duty of care to the Adkins Claimants to impose direct liability on Alper.

- 11 -

Under Tennessee law, the so-called "Good Samaritan" rule is embodied in Section 324A of the Restatements, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

It is on the second prong of this test – that Alper undertook to perform a duty of Saltire when it assumed control over the remediation in Dickson County – that the Adkins Claimants rest their hat.

In support of this theory, however, the Esserman Firm (who previously served both as counsel for the Flake Plaintiffs and the Armstrong Plaintiffs) does not offer a single shred of new evidentiary support.  Indeed, the Adkins Claimants rely on the same arguments previously submitted by the Flake and Armstrong Plaintiffs which were reviewed and dispensed with by this Court, namely the mere existence of the Management Agreement and a common employee (Mr. Bauer) involved in the remediation.  As previously discussed in the Flake Opinion and the Holt/Armstrong Opinion, however, these facts alone are insufficient to impose liability on Alper.  *See In re Alper Holdings*, 2008 WL 160203, at *5-6; *In re Alper Holdings*, 2008 WL 541154, at *3.

The fact that a parent company and its subsidiary share common employees is insufficient to impose liability on the part of the parent for acts of the subsidiary.  *See United States v.*

*Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent

corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the

parent corporation to liability for its subsidiary's acts.") (internal quotations omitted).  Courts

generally presume overlapping directors are acting on behalf of the subsidiary and not the parent

company when acting for the subsidiary absent extraordinary circumstances.  *Bestfoods*, 524

U.S. at 69-71.

  Despite the fact that the Esserman Firm is now attempting this argument for the third

time, the Court remains unpersuaded.  The Adkins Claimants have failed to provide any support

either to rebut the legal presumption that Mr. Bauer was acting on behalf of Saltire and not Alper

in overseeing the Dickson County remediation or to support their claim that Alper participated

(negligently or otherwise) in the remediation.  Accordingly, the Court sees no reason to part

ways with the rationale set forth in the Flake and Holt/Armstrong Opinions.  *See, e.g., In re*

*Manhattan Invest. Fund Ltd.*, 343 B.R. 63, 67 (S.D.N.Y. 2006) ("The law of the case is a

discretionary doctrine, providing 'that where a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case.'"  While the

law of the case is "a discretionary doctrine which does not constitute a limitation on the court's

power but merely expresses the general practice of refusing to reopen what has been decided,"

nevertheless, the situations justifying reconsideration are generally limited to "an intervening

change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice.") (internal citations omitted); *641 Ave. of Americas Ltd. Partnership*

*v. 641 Associates, Ltd.*, 189 B.R. 583, 588 (S.D.N.Y. 1995) ("[U]nder the law of the case

doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the

same litigation.").

**Alper Has No Indirect Liability to the Adkins Claimants**

Despite this Court's prior opinions, the Adkins Claimants argue in the alternative that Alper is indirectly liable to the Adkins Claimants on the basis that Saltire was an alter ego of Alper during the negligent remediation of the Dickson Plant.  The Court does not see any benefit in revisiting this issue again except to draw the Adkins Claimants'' attention to that portion of the Holt/Armstrong Opinion which states as follows:

> While this Court previously did not address whether Saltire's alter ego claims were property of the estate, *see In re Alper Holdings*, 2008 WL 160203, at * 6, it is clear based upon the conduct presently alleged that such alter ego claims were in fact property of Saltire's bankruptcy estate and, accordingly, that those alter ego claims were released under section 13.1 of the Saltire Plan. Accordingly, the Holt Claims are disallowed.

*In re Alper Holdings*, 2008 WL 541154, at *4.

 "Where a claim is generalized, with no particularized injury stemming from it and where the claim may be brought by any creditor, the trustee or debtor-in-possession is the appropriate party to assert the claim and creditors are subject to the outcome of the action brought by the trustee or debtor-in-possession."  *In re Enron Corp*., 2003 WL 1889040, at *4; *see also Murray v. Miner*, 876 F. Supp. 512, 516 (S.D.N.Y. 1995) (An alter ego claim "belongs to the trustee if (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, and (2) plaintiffs' claim is a general one, of the type that could be brought by any creditor of the debtor.").

Despite their contentions, the injuries asserted by the Adkins Claimants are not particularized or unique and could have properly been brought by Saltire or Saltire's general body of creditors.  Accordingly, Alper has no indirect liability to the Adkins Claimants on a theory of alter ego liability.

17584135\V-1

**28 U.S.C. §§ 157(b)(2) and (b)(5)**

Finally, the Adkins Claimants argue that the Debtor's Motion to Dismiss is an impermissible attempt to bypass Congress's command that personal injury claims be tried in the District Court. This argument is without merit.

Section 157(b)(2) of title 28 of the United States Code, which outlines a non-exhaustive laundry list of matter that fall within the category of "core" proceedings, specifically excludes from the definition of core the "liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of distribution in a case under title 11." 11 U.S.C. § 157(b)(2). Section 157(b)(5) goes to say that "the district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending…." 11 U.S.C. § 157(b)(5). However, as previously stated on the record at the hearing denying the Adkins Claimants' application for a stay pending the determination of their motion before the District Court to withdraw the bankruptcy reference, this matter <u>does not concern</u> "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" so as to implicate Section 157(b)(2)(B), but rather merely concerns the allowance or disallowance of timely filed proofs of claim <u>as a matter of law</u>. *See* Transcript from Hearing on Motion for Stay Pending Motion of the Personal Injury Claimants dated March 25, 2008, at pp. 25-26 (emphasis supplied).

Alper has objected to the Adkins Claims (as reformulated in the New Adkins Claims) as legally insufficient, and courts in this Circuit have repeatedly held that proceedings to determine the allowance or disallowance of claims are core matters. *See Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1389 (2d Cir. 1990); *Enron Power Mktg., Inc. v. Nevada Power Co. (In re Enron Corp.)*, No. 03-09332, 2004 WL 3015256, at *5 (S.D.N.Y. Dec. 28, 2004); *In re Chateaugay Corp.*, 111 B.R. 67, 76 (Bankr.

- 15 -

S.D.N.Y. 1990) ("the bankruptcy court must have jurisdiction to make the threshold determination of whether <u>as a matter of law</u>, a claim exists which can be asserted against the debtor, even if that claim sounds in personal injury or wrongful death") (emphasis supplied).

Therefore, as this matter is clearly within this Court's "core" jurisdiction, the Adkins Claimants' argument that the Debtor is attempting to impermissibly side-step the District Court is without merit.

## <u>CONCLUSION</u>

For the reasons set forth above and for the reasons set forth in the Flake Opinion and the Holt/Armstrong Opinion, the Court finds that Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee.  Therefore, the Adkins Claims are disallowed and expunged.

IT IS SO ORDERED.


Dated:  New York, New York
        April 3, 2008


           /s/ Burton R. Lifland_____
          The Honorable Burton R. Lifland
          United States Bankruptcy Judge

**TAB 3**

MANAGEMENT AGREEMENT

AGREEMENT, dated as of January 1, 1995 by and among Alper Holdings USA, Inc., a Delaware corporation ("Alper Holdings") and Saltire Realty Holdings, Inc. a Washington corporation ("Realty Holdings"), Saltire Realty, Inc., a Washington corporation ("Realty"), Saltire Industrial, Inc., a Delaware corporation ("Saltire Industrial"), First City Diversified Inc., a Delaware corporation ("Diversified"), Alper Development, Inc., a Delaware corporation ("Alper Development"), Alper Northwest, Inc., a Washington corporation ("Alper Northwest"), First City Capital Corporation, a New York corporation ("FCC") and Alper Securities, Inc., a Nevada corporation ("Alper Securities"); (Realty Holdings, Realty, Saltire Industrial, Diversified, Alper Development, Alper Northwest, FCC and Alper Securities sometimes are referred to collectively as the "Companies").

Whereas, the Companies require certain management, supervisory and advisory services; and

Whereas, Alper Holdings is in the business of providing such services; and

Whereas, the Companies are among numerous affiliated entities which require various types and levels of management, supervisory and advisory services, and the Companies acknowledge that such services can be provided more effectively and efficiently by Alper Holdings than if each such entity were to engage its own personnel and other elements necessary to receive the services required; and

Whereas, Alper Holdings and the affiliated entities to which such services are to be provided by Alper Holdings have attempted in good faith to determine the type and level of services required by each such entity and the various personnel and other elements of overhead of Alper Holdings necessary to deliver the aggregate level of services required by such entities; and

Whereas, Alper Holdings and the Companies hereby terminate their previous Management Agreement, dated as of November 30, 1992.

Now, therefore, the parties hereto agree as follows:

(1)     Management. Each of the Companies hereby retains Alper Holdings to provide certain management, supervisory and advisory services to be agreed upon by Alper Holdings and each such Company. Such services may include, without limitation, the following:

(a)     Business - formulation and review of business plans in collaboration with line managers; periodic reviews of operations and results;

U:\950002

(b)    Personnel - advice on retention and dismissal of employees; review of staffing plans; design and administration of benefit plans;

(c)    Investment - analyses and selection of investment; management of investment; cash management;

(d)    Accounting - maintenance of books and records and preparation of all financial and statistical information (including financial statements), management reports and all other operating, accounting, and financial data reasonably necessary for management of the business; selection and retention of auditors and consultants; management of auditors and consultants;

(e)    Legal - supervision and provision of legal services, including, selection and retention of counsel for various matters; management of retained law firms;

(f)    Tax - tax planning; preparation of tax returns; conduct of tax audits; and

(g)    Environmental - supervision and management of various environmental matters, including risk assessment, risk management, technical assessment, remediation, legal and compliance.

(2)    Direct Expenses. Each of the companies shall be responsible for all direct out of pocket expenses reasonably incurred by Alper Holdings in connection with the performance of its responsibilities to such Company hereunder (which shall include all services rendered to any direct or indirect subsidiaries of such Company which is not a signatory to this agreement), as well as any taxes and other transaction-related fees imposed. Each of the Companies hereby authorizes Alper Holdings to incur and pay for such reasonable expenses (including, without limitation, the retention of all lawyers, accountants and other advisors and professionals if not engaged by any Company) on behalf of such Company and such Company agrees promptly to reimburse Alper Holdings for any such expenses.

(3)    Compensation.

(a)    As compensation for the services rendered pursuant to this Agreement for the period January 1, 1995 through December 31, 1995, each Company shall pay to Alper Holdings an aggregate annual fee to be agreed upon by Alper Holdings and such Company no later than January 31, 1995 equal to the product of (i) Alper Holdings' budgeted overhead and operating expenses for such period (the "Period Budget") and (ii) the quotient resulting

U:\950002

from a fraction of the numerator of which is (x) the portion of the Period Budget reasonably allocable to the management of each such Company based upon a review by each such Company and Alper Holdings of Alper Holdings' budgeted overhead and operating expenses and the nature and level of services anticipated to be required by each such Company, and the denominator of which is (y) the sum of the portions of the Period Budget allocable to Companies other than Alper Holdings. Such fee shall be paid in advance in four equal quarterly payments. The first payment shall be payable on or prior to January 31, 1995.

(b)    For each succeeding one year period for which this Agreement is renewed following the completion of the initial period, on or before the December 15 of the immediately preceding year Alper Holdings shall submit (i) a budget of Alper Holdings' anticipated overhead and operating expenses for the next calendar year, (ii) the portion of such budgeted overhead and expenses reasonably allocable to each of the Companies on the basis described in 3(a) above (the "Annual Fee") and (iii) the basis for such allocation. As compensation for the services rendered pursuant to this agreement for such calendar year, the Companies shall pay to Alper Holdings the Annual Fee in advance, no later than the first business day of the quarter, in four equal quarterly payments.

(c)    If the nature and level of services actually required by any Company differs materially from the anticipated nature and level of services indicated by such Company, such Company and Alper Holdings agree to modify the Annual Fee (or the fee payable for the year ending December 31, 1995) by an amount appropriate under the circumstances.

(4)    <u>Term</u>. This agreement shall be effective until December 31, 1995 (the "Primary Term") and shall be automatically renewed each year for subsequent one year terms. Each of Alper Holdings and the Companies may terminate this agreement prior to the scheduled termination date by giving written notice of termination; provided however, upon a termination by any Company, such Company shall pay to Alper Holdings an amount equal to the unpaid portion of the management fee that would have been payable in respect of the remainder of the year in which the Agreement is terminated.

(5)    <u>Other Transaction by Alper Holdings; Conflicts</u>. Until such time as this agreement is terminated pursuant to the immediately preceding section, Alper Holdings shall use its best efforts in connection with the management of the Companies and the employees of Alper Holdings shall devote such time and activity during business days and hours as is reasonably necessary for the management of the Companies. Alper Holdings shall be free to act as manager, management adviser, financial adviser, or consultant to any person or account, or to participate in

U:\950002

any other business, including those substantially similar to the business of the Companies. Alper Holdings and each of the Companies recognize and accept that they may have common directors, officers, employees, consultants, agents and advisors. Alper Holdings and each of the Companies hereby waive any consequent conflict of interest or breach of fiduciary responsibility, confidence or other duty against each other and against each of their officers, directors, employees, agents and representatives unless there is a final judicial determination that such entity or person did not act in a manner it or he reasonably believe to be in or not opposed to the best interest of such corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was lawful.

(6)     Liability.   Neither Alper Holdings nor any of its directors, officers, employees, agents or representatives shall be liable to any of the Companies and neither the Companies nor any of their respective directors, officers, employees, agents or representatives shall be liable to Alper Holdings for any action, omission, error of judgment or mistake of law except to the extent that there is a final judicial determination that (i) any of the foregoing results solely from willful misfeasance or gross negligence of the party seeking exculpation and (ii) the party seeking exculpation did not act in a manner he reasonably believed to be in or not opposed to the best interest of such other Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was lawful.

(7)     Indemnification.

(a)     Each of the Companies hereby respectively agrees to indemnify and hold harmless Alper Holdings and its directors, officers, employees, agents and representatives (an "indemnified party") form any and all loss, damage, claim or liability ("Liability") of any nature (including, but not limited to, investigating, preparing or defending any litigation, commenced or threatened, or any claim whatsoever and the fees and expenses of counsel selected by such indemnified party and approved by the Companies (which approval shall not be withheld unreasonably)) arising out of services provided to such Company pursuant to this Agreement or the transactions contemplated hereby except to the extent that there is a final judicial determination that (i) such Liability results solely from the willful misfeasance or gross negligence of the indemnified party and (ii) the indemnified party did not act in good faith and in a manner it or he reasonably believed to be in or not opposed to the best interest of the Company to whom the services were provided and, with respect to any criminal action, had no reasonable cause to believe that the conduct of such party out of which such Liability arose, if any, was lawful. Each Company agrees to advance all costs and expenses for the indemnified party as incurred, subject to the agreement of the indemnified party to repay such advance upon a final determination that indemnification was not owed.

U:\950002

(b)    Alper Holdings hereby agrees to indemnify and hold harmless the Companies and their officers, directors, employees, agents and representatives (an "indemnified party") from any and all Liability of any nature (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending any litigation, commenced or threatened, or any claim whatsoever and the fees and expenses of counsel selected by such indemnified party and approved by Alper Holdings (which approval shall not be withheld unreasonably)) arising out of this agreement or the transactions contemplated hereby to the extent that there is a final judicial determination that (i) such Liability results solely from the willful misfeasance or gross negligence of Alper Holdings and (ii) Alper Holdings did not act in good faith and in a manner it reasonably believed to be in or not opposed to the best interest of the party seeking such indemnification and, with respect to any criminal action, had no reasonable cause to believe that the conduct of such party out of which such Liability arose, if any, was lawful. Alper Holdings agrees to advance all costs and expenses of the indemnified party as incurred, subject to the agreement of the indemnified party to repay all such advances upon a final determination that indemnification was not owed.

(8)    <u>Amendment and Modification</u>.  This agreement may be modified or amended only by written agreement executed by Alper Holdings and the Companies.

(9)    <u>Successors and Assigns</u>.  Neither the Companies nor Alper Holdings shall assign or otherwise transfer any of its rights under this agreement without the written consent of the other party.

(10)    <u>Captions; Severability</u>.  Section titles contained in this agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this agreement or the intent of any provision hereof.  Each provision of this agreement is severable.  If any provision or term hereof is determined, for any reason whatsoever, to be illegal or otherwise unenforceable, (i) such provision shall be reformed and constructed in such a manner as to fulfill the intent of the parties hereto to the greatest possible extent and (ii) such determination shall not affect the validity of the remaining provisions and terms of this agreement.

(11)    <u>Governing Law</u>.  This agreement shall be construed in accordance with and governed by the laws of the State of New York without regard to the conflicts of law rules thereof.

(12)    <u>Counterparts; Effectiveness</u>.  This agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By: _____

ALPER HOLDINGS USA, INC.

By: _____

ALPER DEVELOPMENT, INC.

By: _____

SALTIRE REALTY, INC.

By: _____

ALPER NORTHWEST, INC.

By: _____

SALTIRE INDUSTRIAL, INC.

By: _____

FIRST CITY CAPITAL CORPORATION

By: _____

FIRST CITY DIVERSIFIED INC.

By: _____

ALPER SECURITIES, INC.

By: _____

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By: _____

ALPER HOLDINGS USA, INC.

By: _____

ALPER DEVELOPMENT, INC.

By: _____

SALTIRE REALTY, INC.

By: _____

ALPER NORTHWEST, INC.

By: _____
Kenneth V. Bellamy, President
By: _____
Dean R. Erickson, Secretary

SALTIRE INDUSTRIAL, INC.

By: _____

FIRST CITY CAPITAL CORPORATION

By: _____

FIRST CITY DIVERSIFIED INC.

By: _____

ALPER SECURITIES, INC.

By: _____

U:\950002

signatures thereto and hereto were upon the same instrument. This agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement, or caused this agreement to be executed by their respective authorized officers, as of the day first above written.

SALTIRE REALTY HOLDINGS, INC..

By:

ALPER HOLDINGS USA, INC.

By:

ALPER DEVELOPMENT, INC.

By:

SALTIRE REALTY, INC.

By:

ALPER NORTHWEST, INC.

By:

SALTIRE INDUSTRIAL, INC.

By:

FIRST CITY CAPITAL CORPORATION

By:

FIRST CITY DIVERSIFIED INC.

By:

ALPER SECURITIES, INC.

By:

**TAB 4**

B 10 (Official Form 10) (04/07)

| UNITED STATES BANKRUPTCY COURT __SOUTHERN__ DISTRICT OF __NEW YORK__ | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC | Case Number<br>07-12148 (BRL) | |
|---|---|---|

NOTE  This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A "request" for payment of an administrative expense may be filed pursuant to 11 U S C  § 503

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br>ARMSTRONG, CHARLOTTE | ✔ Check box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars | FILED 080612 |
|---|---|---|
| Name and address where notices should be sent<br>Armstrong, Charlotte<br>c/o Barrett Law Office, P A , One Burton Hills Blvd , Ste 380, Nashville, TN 37215<br>Telephone number  (615) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court | SDNY<br>ALPER HOLDINGS USA, INC<br>07-12148 (BRL)<br><br>THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor | Check here  ☐ replaces<br>if this claim  ☐ amends     a previously filed claim, dated _____ | |

| 1  Basis for Claim<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned | ☐ Personal injury/wrongful death<br>☐ Taxes<br>☐ Retiree benefits as defined in 11 U S C  § 1114(a)<br>✔ Other  __Property Damage__ | ☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS # ____<br>Unpaid compensation for services performed<br>From _____ to _____<br>(date)          (date) |
|---|---|---|

| 2  Date debt was incurred   04/08/2004 | 3  If court judgment, date obtained |
|---|---|

4  Classification of Claim   Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed
See reverse side for important explanations

**Unsecured Nonpriority Claim** $_____

☐ Check this box if  a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority

Amount entitled to priority  $_____

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C  § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U S C  § 507(a)(4)

☐ Contributions to an employee benefit plan - 11 U S C  § 507(a)(5)

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff)

Brief Description of Collateral
☐ Real Estate     ☐ Other_____
☐ Motor Vehicle

Value of Collateral  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C  § 507(a)(7)

☐ Taxes or penalties owed to governmental units - 11 U S C  § 507(a)(8)

☐ Other – Specify applicable paragraph of 11 U S C  § 507(a)(___)

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

CITY OF NY, INC.
SEP 20 2007

| 5  Total Amount of Claim at Time Case Filed | $_____<br>(unsecured) | ( Contingent/<br>Unliquidated/Disputed | unknown<br>(total)<br>Amount of all interest or additional |
|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim  Attach itemized statement of all interest or additional charges

6  Credits   The amount of all payments on this claim has been credited and deducted for the purpose of  making this proof of claim

7  Supporting Documents  Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien  DO NOT SEND ORIGINAL DOCUMENTS  If the documents are not available, explain  If the documents are voluminous, attach a summary

8  Date-Stamped Copy   To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
SEP 19 2007
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>9/14/2007 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>Patrick Barrett, Attorney for Creditor |
|---|---|

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C  §§ 152 and 3571

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------

ALPER HOLDINGS USA, INC ,                          .

               Debtor

               Chapter 11

               Case No  07-12148 (BRL)

vs

CHARLOTTE ARMSTRONG
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380                          .
Nashville, TN 37215

               Creditor
-----------------------------------------------------------

### SUPPORTING DOCUMENT ATTACHMENT

      Creditor's  property and personal damage claim arises from contamination by hazardous waste including Trichloroethylene ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc  in connection with said contamination

### POWER OF ATTORNEY

      A Power of Attorney authorizing Barrett Law Office P A  to file this claim is attached hereto

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------

ALPER HOLDINGS USA, INC ,

                           Debtor

vs

CHARLOTTE ARMSTRONG
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                           Creditor
-----------------------------------------------------------

Chapter 11

  Case No  07-12148 (BRL)


### STATEMENT OF RELATED CLAIMS

Filed simultaneously herewith are 18 other Proof of Claims arising out of contamination by hazardous waste including Trichloroethylene ("TCE"), an industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc  in connection with said contamination

## CONTRACT OF EMPLOYMENT BETWEEN ATTORNEY AND CLIENT

This agreement made this 17th day of September, 2003, by and between Jon Armstrong and wife, Charlotte Armstrong, client, and Henry F Todd, Jr and Lynn Agee, Attorneys at Law, is as follows

The Client hereby retains and employs Todd & Agee, to bring suit upon and/or to otherwise represent them in the prosecution and recovery and settlement of their claim and cause of action against Schrader and others responsible for T C E for damages arising from certain personal injuries and/or property damage sustained by them through the negligence of that company and/or person on a continuing basis, in the State of Tennessee

The Client agrees to pay Todd & Agee for services rendered pursuant to this contract of employment, a sum equal to ██████ the amount recovered in this case, whether such recovery be by way of settlement, compromise or judgment

It is understood that Todd & Agee are not specialized in toxic tort and are authorized to seek with the client's approval additional counsel to pursue the claims of clients Any additional counsel included will be paid from the ████ amount recovered in this case

Further the parties acknowledge that the client has given Todd & Agee certain documents relevant to the claim and that these documents are attorney clients privileged only for Todd and Agee. Todd & Agee agrees to consult the clients prior to releasing said documents to other attorneys or representatives of the potential claimants

Clients specifically understand that there may be defenses of potential defendants relating to alleged statute of limitations. Any fees forthcoming will be included in the ▮▮▮ settlement fees.

Clients and Todd & Agee agree to seek other counsel who will agree to pay necessary expenses for the prosecution of the claim.

It is understood and agreed that if no recovery is made that the Client will not owe said Todd & Agee or any other counsel hired by them any sum of money for services rendered in this case except for such expenses as court reporter's charges, cost of photographs, maps, etc. Any and all charges that the Armstrongs will be liable for will be approved by the Armstrongs prior to services being preformed. It is understood and agreed that no final settlement of the Client's claim or suit is to be made without the Client's permission and consent.

It is understood and agreed between the ▮▮▮ and Todd & Agee that in the case of settlement or no settlement that the clients will ▮▮▮ required to pay or be responsible for payment of more than ▮▮▮ of the settlement sum approved by the clients for the above mentioned expenses after approval by the clients but the clients understand that expenses approved by the client may be in addition he 40% attorneys fees

_____        _____
CLIENT                           CLIENT

_____        _____
HENRY F TODD, JR                 LYNN AGEE



## PROVOST ✦ UMPHREY

L A W   F I R M,   L. L. P.

**MICHAEL HAMILTON, Esq**
ATTORNEY

ADMITTED TO PRACTICE IN TENNESSEE AND ARKANSAS

September 17, 2007

United States Bankruptcy Court
Southern District of New York
Alper Holdings USA, Inc Claims
One Bowling Green
New York, New York 10004-1408

       Re    Alper Holdings USA, Inc
             Chapter 11 Case No  07-12148(BRL)

Dear Sir/Madam

      Enclosed for filing are Proofs of Claim on behalf of the following individuals

Charlotte Armstrong
Jon Armstrong
Donald, Kristi and Hunter Atkins
Chad, Patricia and Emily Beard
Eric and Peyton Christian  and
Jennifer Casteel
Charity Comeaux and Joshua Campbell
Timothy, Kimberly and Paxton DeLoach
Anthony, Keysha and Autumn
Fambrough
Cathy Flake

Ray Flake
Chanda Heflin, John Christoper and
Sydney Stiver
David, Jodie, Kassidy, Dawson and
Mason Heimbach
Scott, Darcie and Samuel Herkimer
Steven, Melissa and Mya Jones
Barry, Christie and Luke Piland
Priscilla Fowler, Jason and James
Stewart
Travis, Amy and Lauren Wood

      Thank you for your attention to this matter  Please let us know if there are any questions

             Sincerely

             *Michael Hamilton*

             Michael Hamilton

RECEIVED
SEP 1 9 2007
CLAIMS PROCESSING CENTER
USBC, SDNY        1

MH lh
cc     Patrick Barrett,  Barrett Law Office, P A

One Burton Hills Boulevard, Suite 380 • Nashville, Tennessee 37215
615-242 0199 • FAX 615 256-5922
mhamilton@provostumphrey com • www provostumphrey com

Beaumont, TX • Houston, TX • Dallas, TX •  Tyler, TX • Nashville, TN • Memphis, TN • North Little Rock, AR

B 10 (Official Form 10) (04/07)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN  DISTRICT OF  NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>ALPER HOLDINGS USA, INC | Case Number<br>07-12148 (BRL) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case A "request" for payment of an administrative expense may be filed pursuant to 11 U S C § 503

**FILED - 00013**

| Name of Creditor (The person or other entity to whom the debtor owes money or property)<br>Armstrong, Jon | ☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars ~~ALPER HOLDINGS USA, INC~~ 07-12148 (BRL) | |
|---|---|---|
| Name and address where notices should be sent<br>Armstrong, Jon<br>c/o Barrett Law Office, PA , One Burton Hills Blvd , Ste 380, Nashville, TN 37215<br>Telephone number  (615) 665-9990 | ☐ Check box if you have never received any notices from the bankruptcy court in this case<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor | Check here ☐ replaces<br>if this claim ☐ amends  a previously filed claim, dated _____ | |

| 1  Basis for Claim | | |
|---|---|---|
| ☐ Goods sold | ☐ Personal injury/wrongful death | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Services performed | ☐ Taxes | Last four digits of your SS # ____<br>Unpaid compensation for services performed |
| ☐ Money loaned | ☐ Retiree benefits as defined in 11 U S C § 1114(a) | From _____ to _____ |
| | ☑ Other_ Property Damage | (date)        (date) |

| 2.  Date debt was incurred  04/08/2004 | 3  If court judgment, date obtained. |
|---|---|

4  Classification of Claim  Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time the case was filed
See reverse side for important explanations

**Unsecured Nonpriority Claim** $_____

☐ Check this box if a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority

Amount entitled to priority  $_____

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan - 11 U S C § 507(a)(5)

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff)

Brief Description of Collateral
☐ Real Estate        ☐ Other_____
☐ Motor Vehicle

Value of Collateral  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any  $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units - 11 U S C § 507(a)(8)

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(___)

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

| 5  Total Amount of Claim at Time Case Filed | $_____ (unsecured) | Contingent/ Unliquidated/Disputed | unknown (total) |
|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal statement of all interest or additional charges

6  Credits  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim

7  Supporting Documents  Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien  DO NOT SEND ORIGINAL DOCUMENTS  If the documents are not available, explain  If the documents are voluminous, attach a summary

8  Date-Stamped Copy  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
SEP 1 9 2007
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>9/14/2007 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>Patrick Barrett, Attorney for Creditor |
|---|---|

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

THE GARDEN CITY GROUP, INC
SEP 20 2007

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

ALPER HOLDINGS USA, INC ,

                          Debtor

vs

JON ARMSTRONG
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                          Creditor
------------------------------------------------------------

Chapter 11

Case No  07-12148 (BRL)

:

:

## STATEMENT OF RELATED CLAIMS

Filed simultaneously herewith are 18 other Proof of Claims arising out of contamination by hazardous waste including Trichloroethylene ("TCE"), an industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc. in connection with said contamination

;

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------

ALPER HOLDINGS, USA, INC ,

                          Debtor

vs

JON ARMSTRONG
c/o Barrett Law Office, P A
One Burton Hills Blvd , Suite 380
Nashville, TN 37215

                          Creditor
-----------------------------------------------------------

.  Chapter 11

.  Case No  07-12148 (BRL)

## SUPPORTING DOCUMENT ATTACHMENT

Creditor's  property and personal damage claim arises from contamination by hazardous waste including Trichloroethylene ("TCE"), and industrial solvent used at a manufacturing facility in Dickson, Tennessee and is based on the independent acts and/or omissions of Alper Holdings USA, Inc  in connection with said contamination

## POWER OF ATTORNEY

A Power of Attorney authorizing Barrett Law Office P A  to file this claim is attached hereto

## CONTRACT OF EMPLOYMENT BETWEEN ATTORNEY AND CLIENT

This agreement made this 17th day of September, 2003, by and between Jon Armstrong and wife, Charlotte Armstrong, client, and Henry F Todd, Jr and Lynn Agee, Attorneys at Law, is as follows·

The Client hereby retains and employs Todd & Agee, to bring suit upon and/or to otherwise represent them in the prosecution and recovery and settlement of their claim and cause of action against Schrader and others responsible for T C E for damages arising from certain personal injuries and/or property dama, sustained by them through the negligence of that company and/or person on a continuing basis, in the State of Tennessee

The Client agrees to pay Todd & Agee for services rendered pursuant to this contract of employment, a sum equal to ██ the amount recovered in this case, whether such recovery be by way of settlement, compromise or judgment

It is understood that Todd & Agee are not specialized in toxic tort and are authorized to seek with the client's approval additional counsel to pursue the claims of clients  Any additional counsel included will be paid from the ██ amount recovered in this case

Further the parties acknowledge that the client has given Todd & Agee certain documents relevant to the claim and that these documents are attorney clients privileged only for Todd and Agee  Todd & Agee agrees to consult the clients prior to releasing said documents to other attorneys or representatives of other potential claimants

Clients specifically understand that there may be defenses of potential defendants relating to alleged statute of limitations  Any fees forthcoming will be included in the ██████ settlement fees

Clients and Todd & Agee agree to seek other counsel who will agree to pay necessary expenses for the prosecution of the claim

It is understood and agreed that if no recovery is made that the Client will not owe said Todd & Agee or any other counsel hired by them any sum of money for services rendered in this case except for such expenses as court reporter's charges, cost of photographs, maps, etc. Any and all charges that the Armstrongs will be liable for will be approved by the Armstrongs prior to services being preformed  It is understood and agreed that no final settlement of the Client's claim   suit is to be made without the Client's permission and consent

It is understood and agreed between the _____ and Todd & Agee that in the case of settlement or no settlement that the clients w_____ required to pay or be responsible for payment of more than ██████ of the settlement  sum approved by the clients for the above mentioned expenses after approval by the clients  but the clients understand that expenses approved by the client may be in addition  he 40% attorneys fees

_____  _____
CLIENT                      CLIENT

_____  _____
HENRY F TODD, JR            LYNN AGEE

**TAB 5**

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | Southern District of New York | PROOF OF CLAIM |
| --- | --- | --- |

| Name of Debtor: ALPER HOLDINGS USA, INC. | Case Number: 07-12148 (BRL) |
| --- | --- |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property): Armstrong, Charlotte | ☑ Check this box to indicate that this claim amends a previously filed claim. |
| --- | --- |
| Name and address where notices should be sent: Armstrong, Charlotte c/o Barrett Law Office, PA, One Burton Hills Blvd., Ste 380, Nashville, TN 37215 | **Court Claim Number:** 00012 (*If known*) |
| Telephone number: (615) 665-9990 | Filed on: 09/19/2007 |

| Name and address where payment should be sent (if different from above): | ☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| --- | --- |
| Telephone number: | ☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $Contingent/Unliquidated/Disputed

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Property Damage
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property:$_____   Annual Interest Rate___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: 02/06/2008 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  Patrick Barrett, Attorney for Creditor | FOR COURT USE ONLY |
| --- | --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court. .

**EXHIBIT A**

## STATEMENT OF CLAIM
## FOR JON AND CHARLOTTE ARMSTRONG

**A.    The Armstrong Property has been contaminated by Trichloroethylene**

Jon and Charlotte Armstrong (the "Armstrongs") reside at property located at 125 Robinson Road, Dickson, Tennessee (the "Armstrong Property"). The Armstrongs have lived on the Armstrong Property since 1992. The Armstrongs have suffered damages due to the contamination of the soil and ground water of the Armstrong Property by trichloroethylene ("TCE").

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminants migrated on to the Armstrong Property**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products. Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and ground water at and around the Dickson Plant site. The contamination of the Armstrong Property is the direct result of migration of TCE contaminants from one or more of these dump sites.

1

**C.**    **Alper controlled the remediation of the Dickson County contamination**

*1.    Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent.  Alper was an active corporation and thus was not a rudimentary, barebones holding company established as a mere formality.  Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was Alper, as Saltire had become a partial shell.[1]  With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992.  On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement").  Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added).  The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement.  The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper.  By controlling both

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity.  On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others). Such control was facilitated by the existence of a common President, common CFO and common Vice President for Environmental Affairs.

2.    *The remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation in Dickson County, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which this Plaintiff believes to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf

of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at

**14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only

Alper—not Saltire—was authorized to do business in the Commonwealth of Virginia.[2]

Thus, when Bauer was engaged in remediation endeavors at the Dickson Plant, he was

technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's

role predominated over that of Saltire with respect to environmental investigation and

remediation in Dickson, Tennessee.

**D.    Alper assumed a duty of care by controlling the remediation in Dickson, Tennessee, which it breached by conducting such remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its

control over its subsidiary, Alper controlled the remediation of the Dickson Plant

contamination by placing an Alper employee in charge of the remediation. Alper is liable

to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been

accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965)

provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or the property of third parties. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Armstrongs and their property by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations and continuing migration of the subject TCE contaminant.

Because TCE is heavier than water, it tends to sink until it pools on an relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that the geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of property in different areas of Dickson County and exposed residents therein to serious health risks.

Alper used inadequate equipment in its investigation of TCE, thus undermining remediation efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to remediate contamination on and around the Armstrong Property. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination to surrounding properties such as the Armstrong Property.

## **EXHIBIT B TO AMENDED PROOF OF CLAIM**

Charlotte Armstrong ("Claimant") reserves the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should she deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (ii) charges and (iii) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (h) an admission by Claimant that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimant does not waive any other right or rights of action that she has or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

1

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>ALPER HOLDINGS USA, INC. | Case Number:<br>07-12148 (BRL) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Armstrong, Jon | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br><br>Armstrong, Jon<br>c/o Barrett Law Office, PA, One Burton Hills Blvd., Ste 380, Nashville, TN 37215<br><br>Telephone number:<br>(615) 665-9990 | Court Claim Number: __00013__<br>*(If known)*<br><br>Filed on: __09/19/2007__ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:    $Contingent/Unliquidated/Disputed | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
|---|---|
| If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 2. Basis for Claim:  Property Damage<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).<br><br>Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>02/06/2008 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Patrick Barrett, Attorney for Creditor | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), and any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## EXHIBIT A

## STATEMENT OF CLAIM
## FOR JON AND CHARLOTTE ARMSTRONG

**A.    The Armstrong Property has been contaminated by Trichloroethylene**

Jon and Charlotte Armstrong (the "Armstrongs") reside at property located at 125 Robinson Road, Dickson, Tennessee (the "Armstrong Property"). The Armstrongs have lived on the Armstrong Property since 1992. The Armstrongs have suffered damages due to the contamination of the soil and ground water of the Armstrong Property by trichloroethylene ("TCE").

**B.    Alper's subsidiary caused environmental contamination in Dickson County Tennessee, polluting the soil and ground water with TCE, which contaminants migrated on to the Armstrong Property**

From approximately 1964 until March 1985, Saltire Industrial, Inc. ("Saltire"), a major industrial company, operated an industrial plant in Dickson, Tennessee (the "Dickson Plant"), producing automotive tire valves and associated products. Saltire used TCE at the Dickson Plant and dumped TCE-laden waste at various locations around Dickson County, Tennessee, including, but not limited to, the Dickson Plant site and a public landfill. Saltire's use of TCE at the Dickson Plant resulted in the contamination of the soil and ground water at and around the Dickson Plant site.  The contamination of the Armstrong Property is the direct result of migration of TCE contaminants from one or more of these dump sites.

C.      **Alper controlled the remediation of the Dickson County contamination**

1.      *Alper controlled Saltire's activities in Dickson, Tennessee, after its 1992 acquisition of Saltire*

In 1992, Alper became the indirect parent company of Saltire and later became its direct parent. Alper was an active corporation and thus was not a rudimentary, barebones holding company established as a mere formality. Upon information and belief, the real company involved in and controlling the Dickson County contamination after 1992 was Alper, as Saltire had become a partial shell.[1] With regard to the remediation in Dickson, Tennessee, Saltire was the alter ego of Alper.

In 1992, Alper and Saltire entered into a management agreement, dated as of November 30, 1992. On January 1, 1995, Alper and Saltire terminated their 1992 management agreement and entered into a new management agreement (the "Management Agreement"). Under the Management Agreement, Alper agreed to provide "*supervision and management of various environmental matters*, including risk assessment, risk management, technical assessment, *remediation*, legal and compliance" (emphasis added). The Management Agreement also immunized Alper from any litigation initiated by Saltire against Alper under the agreement. The combination of management powers ceded to Alper under the Management Agreement and Alper's immunity from suits by Saltire put Alper in a completely dominant position relative to Saltire with regard to the remediation in Dickson, Tennessee.

Furthermore, under the Management Agreement, Saltire's finances and environmental affairs were managed and controlled by Alper. By controlling both

---

[1] In 2001, three years before Saltire filed for bankruptcy relief, Saltire had no employees and therefore was a shell entity. On the other hand, Alper, Saltire's parent, at one time had 25 employees in a building in New York City.

2

Saltire's finances and environmental affairs, Alper controlled and managed the handling of Saltire's extensive legacy liabilities (*i.e.*, post-retiree employee benefits and alleged environmental contamination, possibly among others). Such control was facilitated by the existence of a common President, common CFO and common Vice President for Environmental Affairs.

2. *The remediation of the Dickson County contamination was conducted by Nicholas Bauer in his capacity as an Alper official*

Not long after the execution of the Management Agreement, an Alper employee and officer, Nicholas Bauer, undertook to manage Saltire's environmental affairs, which included investigations and remediation in Dickson, Tennessee. While he was also a Saltire officer, Bauer's management of environmental affairs for Saltire with respect to contamination in Dickson, Tennessee, was carried out in his capacity as an Alper official. Through Bauer, Alper had a direct role in controlling Saltire's compliance with environmental cleanup endeavors conducted under the scope of governmental regulators. The Management Agreement specifically provided Alper a role in managing Saltire's environmental compliance.

Mr. Bauer was an employee of Alper, which paid his salary and tasked him out as needed to various subsidiaries. Mr. Bauer was hired by Alper specifically for the purpose of "dealing with" the contamination problems at the Dickson Plant and other sites. When engaging in work relevant to environmental investigation and remediation in Dickson County, Bauer sometimes overtly represented himself as an Alper official who had responsibility for environmental matters at Saltire. For instance, in the case of *U.S. v. Helen Kramer*, Nicholas Bauer represented himself as an official of <u>Alper Holdings, Inc.</u> (which this Plaintiff believes to be a short form of <u>Alper Holdings U.S.A., Inc.</u>) on behalf

3

of Saltire. *U.S. v. Kramer*, Civil Action No. 89-4340, 1998 U.S. Dist Lexis 14183, at

**14 (D. N.J. 1998). Also, Nicholas Bauer operated from an office in Virginia. Only

Alper—not Saltire—was authorized to do business in the Commonwealth of Virginia.[2]

Thus, when Bauer was engaged in remediation endeavors at the Dickson Plant, he was

technically doing so as an official of Alper, not as an officer of Saltire; therefore, Alper's

role predominated over that of Saltire with respect to environmental investigation and

remediation in Dickson, Tennessee.

**D.**    **Alper assumed a duty of care by controlling the remediation in Dickson, Tennessee, which it breached by conducting such remediation in a negligent manner**

Under the auspices of the Management Agreement or by merely exerting its

control over its subsidiary, Alper controlled the remediation of the Dickson Plant

contamination by placing an Alper employee in charge of the remediation. Alper is liable

to plaintiffs under Restatement (Second) of Torts, Section 324A (1965), which has been

accepted as law in Tennessee. The Restatement (Second) of Torts, Section 324A (1965)

provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, *or*
>
> (b) he has undertaken to perform a duty owed by the other to the third person, *or*
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

---

[2] The dates for which Alper was authorized to do business in the Commonwealth of Virginia closely parallel Nicholas Bauer's employment at Alper.

Restatement (Second) of Torts, § 324A (1965) (emphasis added).

Alper undertook to render environmental services on behalf of Saltire and manage Saltire's environmental affairs in general, including with respect to environmental matters in Dickson, Tennessee. Alper did recognize, or should have recognized, that this undertaking was necessary for the protection of third parties and/or the property of third parties. Alper failed to exercise reasonable care when carrying out this undertaking. Alper's failure to exercise reasonable care increased the risk of harm to the Armstrongs and their property by way of an environmental investigation and remediation that was improperly limited in geographical scope relative to the diverse expanse, varied locations and continuing migration of the subject TCE contaminant.

Because TCE is heavier than water, it tends to sink until it pools on an relatively impervious layer of rock. This is one reason it is such a persistent ground water contaminant and why it requires an extensive and appropriate sampling and remediation plan (e.g., deep sampling wells, long-term pumping, etc.). Alper did not follow an appropriate and extensive enough sampling or remediation plan.

These problems were compounded by the nature of the local geology. Unlike many areas which are underlain with relatively homogeneous layers of rock with consistent permeability, the Dickson area was known a "karst" zone. Karst geology has significant subsurface water flow in eroded limestone conduits (think of small to large caves). This results in a very heterogeneous flow of water underground. Water can flow in great amounts and in great distances. A well sunk in one location can test relatively clean while one just a short distance away can test positive for contaminants. Similarly, wells close to the source may be cleaner than ones farther away.

5

Alper knew or had reason to know that Saltire (then operating under the name of Scovill, Inc.) had improperly disposed of waste in multiple locations, including the Dickson Plant and the Dickson County landfill, in Dickson County, Tennessee.

Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's remediation of the TCE contamination in Dickson, Tennessee was Alper—which, itself, acted directly on behalf of its subsidiary. Alper limited its investigation and remediation to the area of the Dickson Plant and a limited area around it. Alper failed to investigate alternative sources of TCE contamination. Alper knew, or had reason to know, that the geological characteristic of the Dickson area is a karst system susceptible to spreading contaminants through groundwater over a widely scattered area. Alper knew, or should have known, that improper disposal of TCE by Saltire in Dickson County led to the contamination of property in different areas of Dickson County and exposed residents therein to serious health risks.

Alper used inadequate equipment in its investigation of TCE, thus undermining remediation efforts. Alper failed to implement a remediation plan comprehensive enough in scope. Alper failed to determine the scope of remediation required to cure the contamination for which Saltire was responsible. Alper failed to remediate contamination on and around the Armstrong Property. Alper failed to take reasonable steps to determine the full scope of the contamination caused by Saltire and failed to take reasonable steps to prevent the unnecessary, preventable and continuing migration of the TCE contamination to surrounding properties such as the Armstrong Property.

6

## EXHIBIT B TO AMENDED PROOF OF CLAIM

Jon Armstrong ("Claimant") reserves the right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time (i) to restate liquidated and unliquidated components of the Claim, (ii) to update the total estimated exposure with respect to any unliquidated claims asserted herein, or (iii) for any other lawful reason should she deem it appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or postpetition (1) professional fees and/or expenses (ii) charges and (iii) interest.

This Proof of Claim is filed under the compulsion of the bar date established in this Chapter 11 case and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after *de novo* review by a District Court judgment, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (h) an admission by Claimant that any property held by Debtor (or any debtor affiliate) is property of the estate.

In executing and filing this Proof of Claim, Claimant does not waive any other right or rights of action that she has or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

**TAB 6**

                              Bertellotti
```
<?xml version="1.0"?>
<TRN>
<DocType>Summation Transcript Export File</DocType>
<Version>0.9</Version>
<Source_Loc>I:\SW52\NORMAN\TRAN\</Source_loc>
<Transcript_Name>9d0885ea.txt</Transcript_Name>
<Transcript_Description>BERTELLOTTI 10/22/2003</Transcript_Description>
<Notes>
</Notes>
<Transcript Info>
-1,1,5,0,0
</Transcript Info>
<Transcript>
0001
   1
   2        IN THE CIRCUIT COURT FOR THE TWENTY-THIRD
   3                   JUDICIAL DISTRICT
   4             DICKSON COUNTY, TENNESSEE
   5                   Case No. 383
   6      ------------------------------------
         ONA M. NORMAN, widow of GEORGE
   7     HAROLD NORMAN, Deceased; et al,
                        Plaintiffs,
   8           vs.
         SCOVILL, INC., (n/k/a) Saltire
   9     Industrial, Inc.; ALPER
         HOLDINGS USA, INC., and THE
  10     INDUSTRIAL DEVELOPMENT BOARD
         OF THE COUNTY OF DICKSON,
  11     TENNESSEE,
                        Defendants.
  12     ------------------------------------
  13
  14
  15                   DEPOSITION OF
  16                ROBERT BERTELLOTTI
  17                NEW YORK, NEW YORK
  18                 OCTOBER 22, 2003
  19
  20     ATKINSON-BAKER, INC.
  21     1-800-288-3376
  22     E-mail: www.depo.com
  23
  24     REPORTER:  S. ARIELLE SANTOS, CSR.
  25     FILE NO. 9DO885E
0002
   1
   2        IN THE CIRCUIT COURT FOR THE TWENTY-THIRD
   3                   JUDICIAL DISTRICT
   4             DICKSON COUNTY, TENNESSEE
   5                   Case No. 383
   6      ------------------------------------
         ONA M. NORMAN, widow of GEORGE
   7     HAROLD NORMAN, Deceased; et al,
                        Plaintiffs,
   8           vs.
         SCOVILL, INC., (n/k/a) Saltire
   9     Industrial, Inc.; ALPER
         HOLDINGS USA, INC., and THE
  10     INDUSTRIAL DEVELOPMENT BOARD
         OF THE COUNTY OF DICKSON,
  11     TENNESSEE,
                        Defendants.
```

```
                            Bertellotti
12   -----------------------------------
13
14
15
16
17
18       Testimony of ROBERT BERTELLOTTI, taken
19   on behalf of the Plaintiffs, at ANGEL &
20   FRANKEL, PC, 460 Park Avenue, New York,
21   New York, taken on Wednesday, October 22,
22   2003, commencing at 9:00 in the morning.
23
24
25
0003
 1
 2   A P P E A R A N C E S:
 3   FOR THE PLAINTIFFS:
 4
 5   BY - MICHAEL G. STEWART, ESQ.
 6   WALLER LANSDEN DORTCH & DAVIS
 7   Nashville City Center
 8   511 Union Street, Suite 2100
 9   P.O. Box 198966
10   Nashville, Tennessee  37219-8966
11   1-615-850-8856
12
13   FOR THE DEFENDANTS:
14
15   BY - TOM SCOTT, ESQ.
16   BALL & SCOTT
17   550 West Main Street, Suite 750
18   Knoxville, Tennessee  37902
19   1-865-525-7028
20
21   BY - JOHN A. LUCAS, ESQ.
22   HUNTON & WILLIAMS, LLC
23   900 South Gay Street, Suite 2000
24   Knoxville, Tennessee  37902
25   1-865-549-7750
0004
 1
 2   A P P E A R A N C E S (Cont.):
 3
 4   BY - LAURENCE MAY, ESQ.
 5   ANGEL & FRANKEL
 6   460 Park Avenue
 7   New York, New York  10022
 8
 9   ALSO PRESENT:
10   John Cohlin
11   Wayne R. Smith
12
13
14
15
16
17
18
19
20
21
22
```

Bertellotti

```
23
24
25
```
0005
```
 1
 2                        I N D E X
 3
 4   WITNESS - ROBERT BERTELLOTTI
 5
 6   EXAMINATION                          PAGE
 7   BY:  MR. STEWART                     7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
0006
```
 1
 2   E X H I B I T S
 3
 4   NUMBER     DESCRIPTION                PAGE
 5   1      Notice to Take Deposition     23
 6   2      Affidavit                 47
 7   3      10-9-03 Ball & Scott Letter  48
 8   4      Affidavit                 49
 9   5      Certificate of Incorporation  51
10   6      Interest & Fees Document  51
11   7      Management Agreement          117
12   8      Independent Auditors Report  125
13   9      The Associated Press          153
14   10     Chattanooga Times         153
15   11     The Associated Press          153
16   12     The Tennessean            153
17   13     Defendants' Reply         196
18   14     Plaintiffs' Notebook          241
19              (EXHIBITS ATTACHED)
20
21
22
23
24
25
```
0007
```
 1
 2         R O B E R T     B E R T E L L O T T I
 3         c/o  Alper Holdings USA, Inc.
 4                800 Third Avenue
 5            New York, New York  10022
 6              Having been duly sworn,
 7               Testifies as follows:
                              Page 3
```

Bertellotti
```
 8
 9                    EXAMINATION
10   BY MR. STEWART:
11        Q.   State your name.
12        A.   Robert Bertellotti.
13        Q.   Mr, Bertellotti, what do you do for
14   a living?
15        A.   I am the president of Alper
16   Holdings and also the president of Saltire
17   Industrial.  In general, I am a corporate
18   executive.
19        Q.   How long have you been president of
20   Alper?
21        A.   I have been -- the specific title
22   "president" of Alper, probably since 2000.
23   I have been a senior officer of Alper
24   since approximately mid-year 1997.  Title
25   before was managing director, but I have
0008
 1
 2   been the senior officer of Alper since
 3   approximately July of 1997.
 4        Q.   During the time you were managing
 5   director, did Alper have a president?
 6        A.   No, it did not.
 7        Q.   Did you perform all the roles of a
 8   president?
 9        A.   Yes.  That's why it was the senior
10   officer position for corporate.
11        Q.   What did you do before that?
12        A.   Prior to 1997, I was simply an
13   employee of Alper Holdings.
14        Q.   And in what capacity?
15        A.   I was essentially a financial
16   advisor, do financial advisory work.
17        Q.   How long were you in that position?
18        A.   I joined -- since the time I joined
19   Alper, which was September of 1993.
20        Q.   What did you do before that?
21        A.   I worked for Nomura Securities
22   International in corporate
23   finance/investment banking, if you want to
24   call it that.
25        Q.   How long did you work for Nomura?
0009
 1
 2        A.   Approximately four years.
 3        Q.   Starting when?
 4        A.   1989.
 5        Q.   Why did you leave?
 6        A.   I just decided to leave and took a
 7   sabbatical and moved to Europe.
 8        Q.   How long were you in Europe?
 9        A.   Approximately seven months.
10        Q.   When was that sabbatical?  What
11   date?
12        A.   It was in 1992.  Began summer of
13   1992.
14        Q.   And before Nomura, where did you
15   work?
16        A.   I was with Security Pacific
17   National Bank, which is now Bank of
18   America.
```
Page 4

                                    Bertellotti
19        Q.   Was Nomura -- was that work in New
20   York?
21        A.   Yes, I did work in New York City.
22        Q.   Okay.  How about Security Pacific?
23        A.   That was in Los Angeles.
24        Q.   How long did you work at Security
25   Pacific?
0010
1
2         A.   Probably five years.  I would have
3    to look at a calendar.  Four to five
4    years, probably closer to five years.
5         Q.   When did you start working there?
6         A.   Approximately 1985.
7         Q.   Why did you leave?
8         A.   To join Nomura Security.
9         Q.   What did you do prior to working at
10   Security Pacific?
11        A.   I worked for IBM Corporation.
12        Q.   Now you look pretty young.
13        A.   You can ask me how long I am.  You
14   look very young, as well.
15        Q.   Okay, how long did you work at IBM?
16        A.   Approximately three years.
17        Q.   Starting when?
18        A.   When I graduated from college in
19   1981.
20        Q.   Where did you go to college?
21        A.   University of California.
22        Q.   What was your degree?
23        A.   I have a Bachelor of Science in
24   biology with an emphasis in biochemistry.
25        Q.   Do you have any other formal
0011
1
2    education?
3         A.   No.
4         Q.   Have you ever been arrested?
5         A.   I have not.
6         Q.   Have you ever -- I take it you
7    haven't been convicted of a crime?
8         A.   No.
9         Q.   Have you ever been investigated by
10   any sort of administrative authority?
11        A.   No.
12        Q.   Ever been investigated by the SEC?
13        A.   No.
14        Q.   Have you ever been deposed?
15        A.   Yes, once.
16        Q.   In what case?
17        A.   I wouldn't recall the case
18   specifically, but it was in relation to
19   Saltire subsidiary Alper Development, Inc.
20   We were not defendants.  I was called, I
21   don't remember the term, some type of
22   third party witness.  There was a Saudi
23   Prince suing some advisor and they called
24   us as a third party witness.
25        Q.   When was that deposition, would
0012
1
2    have been taken?
3         A.   I don't recall specifically.
                                    Page 5

Bertellotti
```
 4    Approximately four years ago.
 5         Q.   So, 1999 time frame?
 6         A.   Approximately.
 7         Q.   What was the outcome of that
 8    lawsuit?
 9         A.   I have no idea; we never heard
10    anything.
11         Q.   Who were the attorneys representing
12    Alper Development?
13         A.   I was represented when I went in by
14    Pircher, Nichols & Meeks of Los Angeles.
15         Q.   What actual attorney?
16         A.   I believe it was a gentleman named
17    Michael Burke.
18         Q.   How about Alper Development?
19              MR. SCOTT:   Object to the
20         form of the question.
21              THE WITNESS:   Alper
22         Development was not a defendant.
23    BY MR. STEWART:
24         Q.   Okay.  Explain that.
25              MR. SCOTT:   What is the
0013
 1
 2         question?
 3              MR. STEWART:   I said, how
 4         about Alper DevelopmentMR. SCOTT:
 5         What about it?
 6              THE WITNESS:   Who was
 7         representing them?
 8    BY MR. STEWART:
 9         Q.   Yes.
10         A.   I believe Michael Burke and
11    Pircher, Nichols & Meeks.
12         Q.   So was Alper Development a
13    defendant in that lawsuit?
14         A.   No.
15         Q.   Who was the defendant, do you know?
16         A.   I don't know.  It was a -- yes, I
17    believe the name was Joseph Trimarki and I
18    am not absolutely certain about that, but
19    I probably, within 9 out of 10
20    probability, I think it was Joseph
21    Trimarki evidently some type of financial
22    advisor to a Saudi Prince and I don't know
23    the name of the Saudi Prince.
24         Q.   Have you ever testified in court?
25         A.   I have not.
0014
 1
 2         Q.   Have you ever testified in an
 3    administrative proceeding?
 4         A.   I have not.
 5         Q.   Have you ever been fired from a
 6    job?
 7         A.   I have not.
 8         Q.   Do you recognize that person
 9    sitting there in the blue shirt?
10         A.   Yes, I do.
11         Q.   Who is that?
12         A.   John Coghlin.
13         Q.   How do you know John Coghlin?
14         A.   John Coghlin is a former colleague
```
Page 6

Bertellotti

```
15  of mine.
16      Q.   Former colleague where?
17      A.   At Alper Holdings.
18      Q.   And what did John Coghlin do at
19  Alper Holdings?
20      A.   He was the general counsel or
21  assistant general counsel, depending what
22  year you are speaking of.
23      Q.   When was he general counsel?
24      A.   Either position or specifically the
25  general counsel position?
0015
 1
 2      Q.   The general counsel.
 3      A.   Again, without referring to the
 4  corporate records I couldn't tell you
 5  specifically.  Would you like me to
 6  estimate?
 7      Q.   I would like to you give me your
 8  best estimate, yes.
 9      A.   Would say, approximately, between
10  1996 and 1998.
11      Q.   And when was John Coghlin the
12  assistant general counsel?
13      A.   Approximately, from 1994 to 1996.
14      Q.   When he was assistant general
15  counselor, who was the general counsel?
16      A.   Gentleman named Scott Robbins.
17      Q.   So he worked with Scott Robbins?
18      A.   Yes.  Scott Robbins, I assume, was
19  his boss, was the general counsel.  John
20  was the assistant counsel.
21      Q.   Was Scott Robbins the general
22  counsel of Alper?
23      A.   For a period of time, I believe so.
24      Q.   Do you know when he was general
25  counsel of Alper?
0016
 1
 2      A.   I wouldn't know specifically,
 3  without referring to the corporate
 4  records.
 5      Q.   Why don't you give me your best
 6  understanding?
 7      A.   Well, I joined the company in 1993
 8  and again, not knowing precisely which
 9  titles and roles Mr. Robbins held, I would
10  assume or guess that he was the general
11  counsel.  Certainly from the time I
12  arrived in 1993 to approximately 1995 or
13  1996, when John Coghlin became the general
14  counsel.
15      Q.   When was the last time you talked
16  to Scott Robbins?
17      A.   I have not spoken to Scott Robbins
18  in seven or eight years, since the time he
19  left the company, that might have been.
20      Q.   Do you know if anybody at the
21  company, including any of the company's
22  agents or attorneys, have talked to Scott
23  Robbins any time recently?
24      A.   I have no idea.
25      Q.   You have no knowledge?
```

Page 7

Bertellotti

0017
```
 1
 2        A.  I have no knowledge.
 3        Q.  When was the last time you spoke to
 4   John Coghlin?
 5        A.  I said hello to him this morning.
 6        Q.  Have you spoken to him prior to
 7   that about this deposition?
 8        A.  Speak to -- John Coghlin is
 9   currently consultant to Alper Holdings and
10   we have spoken regarding this litigation
11   in general.
12        Q.  What is he a consultant on?
13        A.  For a variety of matters.  He
14   worked for the company for several years.
15   He is very familiar with our operations,
16   the corporate history.
17        Q.  Why did Scott Robbins leave the
18   company?
19        A.  I don't know specifically.  I
20   wasn't an officer at the time.  I wasn't
21   involved in hiring, personnel decisions,
22   compensation decisions at that time.
23        Q.  Do you know whether he was
24   terminated or whether he left voluntarily?
25        A.  I suspect he left voluntarily.  He
```
0018
```
 1
 2   was a very capable individual who was in
 3   good standing, to my knowledge.
 4        Q.  What specific subjects did you talk
 5   about with John Coghlin regarding this
 6   deposition?
 7             MR. SCOTT:  I will instruct
 8        him not to answer that on the
 9        grounds of attorney-client
10        privilege.
11             MR. STEWART:  Counsel --
12             MR. SCOTT:  He's not going
13        to answer.
14             MR. STEWART:  Maybe you
15        need to state your privilege,
16        because I am asking him.
17             MR. SCOTT:  I just did.
18             MR. STEWART:  No, you
19        didn't.  I am asking him what
20        conversations he had with --
21             MR. SCOTT:  With John
22        Coghlin.  I told him not to
23        answer on the grounds of
24        attorney-client privilege.
25             MR. STEWART:  You need to
```
0019
```
 1
 2        state the basis of your
 3        privilege.
 4             MR. SCOTT:  I just did.
 5             MR. STEWART:  No, you
 6        didn't.  The attorney-client
 7        privilege covers discussions
 8        between a client and his counsel.
 9             MR. SCOTT:  That is -- I
10        understand that.  John Coghlin in
```
Page 8

```
                              Bertellotti
11              these discussions was acting as a
12              consultant of one of the counsel
13              to Alper Holdings, so I assert
14              the attorney-client privilege.
15                   MR. STEWART:  The reason
16              you are asserting the privilege?
17                   MR. SCOTT:  I am not going
18              to argue with you.  I am not
19              going to say one more word.  I
20              instruct him not to answer.  If
21              you wish to continue speaking you
22              may, but I am not.
23                   MR. STEWART: Well, Counsel,
24              I actually thank you for that
25              explanation because it's exactly
0020
 1
 2              what I wanted.
 3                   As you know, typically the
 4              attorney-client privilege only
 5              applies to statements made to an
 6              attorney, okay, representing a
 7              client.  Your witness did not
 8              indicate Mr. Coghlin was
 9              representing him at the time that
10              he had these conversations.
11                   MR. LUCAS:  I incorporate
12              on my client Mr. Scott's
13              objection and add that the
14              question also attempts to invade
15              items protected by the work
16              product doctrine.
17    BY MR. STEWART:
18         Q.  Now, in your conversations with
19    Mr. Coghlin, did you have any
20    conversations with him about this
21    deposition in which Mr. Scott was not
22    present?
23         A.  No, I did not.
24         Q.  I think we need to invoke the rule.
25    I think Mr. Coghlin has to leave.  He is
0021
 1
 2    obviously a witness to deposition.
 3                   MR. SCOTT:  Depositions are
 4              public.
 5                   MR. STEWART:  Depositions
 6              are open just like the courtroom
 7              proceedings are open, and you can
 8              invoke the rule in depositions.
 9              You can --
10                   MR. SCOTT:  He's not going
11              to leave.
12                   MR. LUCAS:  What rule are
13              you invoking?
14                   MR. STEWART:  I am invoking
15              the rule I can ask the witnesses
16              to leave the court so they can
17              testify.  I know that can be
18              applied in depositions, as well.
19                   MR. SCOTT:  The rule
20              requires sequestration of
21              witnesses; does not apply to
```

```
                                    Bertellotti
22          discovery depositions.  He's
23          here, he is not going to leave.
24          You can go on with your
25          deposition or whatever you want
0022
 1
 2          to do, but he's not going to
 3          leave.
 4                  MR. STEWART:  I just state
 5          for the record, however, if you
 6          attempt to use him as a witness
 7          we will move to strike his
 8          testimony.
 9                  MR. SCOTT:  You can move to
10          do whatever you like but he is
11          here, he is going to stay here,
12          and I suggest you go on with the
13          deposition and we ought to get to
14          the issues.
15                  MR. STEWART:  Mr. Scott,
16          don't worry.  We will get to the
17          issues.
18                  MR. SCOTT:  I think you are
19          here to tell us the veracity
20          of --
21                  MR. STEWART:  I am here to
22          take a deposition, Mr. Scott, and
23          I will take the deposition as I
24          want to.
25                  MR. SCOTT:  Correct.
0023
 1
 2                  MR. STEWART:  You brought a
 3          witness to this deposition.  I
 4          have raised the issue.  You have
 5          chosen not to have him leave; you
 6          can bear the consequences of that
 7          decision.
 8                  MR. LUCAS:  Two things:
 9          Try not to talk over him because
10          it makes it difficult for the
11          court reporter to take it down,
12          and let's get on with the
13          deposition about the
14          jurisdictional issues.  We are
15          wasting time.
16                  MR. STEWART:  Are you
17          having any difficulty taking down
18          his testimony so far?
19                  (Whereupon Exhibit 1 is
20          Marked.)
21   BY MR. STEWART:
22          Q.  I have handed you a document; do
23   you recognize it?
24          A.  Yes.
25          Q.  Do you see it's marked Exhibit 1?
0024
 1
 2          A.  Yes, I do.
 3          Q.  What is it?
 4          A.  It's a Notice to Take Deposition
 5   Duces Tecum.
 6          Q.  Have you seen this document before?
                    Page 10
```

                                   Bertellotti
      7        A.   Yes, I have.
      8        Q.   Now, I would like you to turn to
      9   the second page.  Do you see a list of
     10   documents?
     11        A.   Yes, I do.
     12        Q.   Now, have you brought me a plan of
     13   reorganization?
     14             MR. SCOTT:   Let me answer.
     15        He's not brought any of these
     16        documents to the deposition, and
     17        this is an improper notice.  Mr.
     18        Bertellotti is not a party.  And
     19        this document is ineffective to
     20        require him to do anything.  He
     21        is here as a witness.  You
     22        noticed us to take his deposition
     23        and he has not brought any
     24        documents.  He didn't have to
     25        bring any documents, and he ain't
0025
      1
      2        going to produce any documents.
      3        So with that said, I think that's
      4        the position that you are going
      5        to have to live with.  You can
      6        ask him for the next two hours
      7        each one of these nine things,
      8        but I will stipulate he did not,
      9        will not, and is not in
     10        accordance with this notice
     11        producing these documents.
     12   BY MR. STEWART:
     13        Q.   Mr. Bertellotti, where would I find
     14   the plan of reorganization that is
     15   referred to in Exhibit 1?
     16        A.   I would assume you can find it with
     17   the Federal Bank of New York, Federal
     18   Bankruptcy Court.  I assume it's a matter
     19   of public record.
     20        Q.   Would the copy exist at Alper
     21   Holdings?
     22        A.   Yes.
     23        Q.   Can you give me the address of
     24   those officers?
     25        A.   800 Third Avenue.
0026
      1
      2        Q.   800 Third Avenue, where?
      3        A.   In New York City.
      4        Q.   And where are we sitting right now,
      5   as we speak?
      6        A.   Sitting at 460 Park Avenue.
      7        Q.   Okay.  Are both of these addresses
      8   on Manhattan in New York?
      9        A.   Yes, they are.
     10        Q.   How many minutes would you take
     11   from -- take ride one cab to the other?
     12             MR. SCOTT:   You are wasting
     13        time.
     14             MR. STEWART:   Mr. Scott,
     15        your objections are totally --
     16        speaking objections are totally
     17        prohibited.
                                        Page 11

Bertellotti
```
18              MR. SCOTT:  No, not.
19              MR. STEWART:  I am taking
20         the deposition.  Your witness has
21         shown up here without any of the
22         requested documents.  You made no
23         effort to verify this.
24              MR. SCOTT:  You need to
25         read Rule 26 and 34.
0027
 1
 2              MR. STEWART:  You know, we
 3         have had plenty of time to get
 4         these documents and come right
 5         back up here to New York.  Not a
 6         problem.  I am trying to find out
 7         where they are.
 8   BY MR. STEWART:
 9         Q.  Tell me, now, where would I find a
10   disclosure statement?
11              Do you have that at your office?
12         A.  I would assume so.  I believe
13   there's an entire set.  I believe there's
14   an entire set.
15         Q.  At your offices?
16         A.  Yes.
17         Q.  When I say your offices, being we
18   agree, I am talking the offices of Alper
19   Holdings USA here in New York.
20         A.  Agreed.
21         Q.  How about the stock purchase
22   agreement schedules and disclosures
23   described in Paragraph 2 of this notice?
24         A.  I am not aware of any stock
25   purchase agreement.  There is no such
0028
 1
 2   thing, to my knowledge.
 3         Q.  No such thing with regard to Alper
 4   exchange of debt for 55 percent of the
 5   common stock of First City?
 6              MR. SCOTT:  Object to the
 7         form of the --
 8              MR. LUCAS:  Object to the
 9         form of the question.  It's not
10         what you asked him.
11   BY MR. STEWART:
12         Q.  Is there no such thing as that
13   document?
14         A.  There's -- to my knowledge, there
15   is no such thing as a stock purchase
16   agreement evidencing Alper exchange of its
17   debt for First City.
18         Q.  What document -- what is the
19   critical document, whether it be an asset
20   purchase agreement, a stock purchase
21   agreement, or other similar document that
22   memorializes that transaction whereby
23   Alper was compelled to exchange its debt
24   for 55 percent of the common stock of
25   First City?
0029
 1
 2         A.  I believe it would be the plan of
```
Page 12

Bertellotti
```
 3   reorganization and the plan of
 4   confirmation.
 5        Q.  The plan of confirmation.  And is a
 6   copy of that located at your offices?
 7        A.  It should be.
 8        Q.  What sort of disclosures or
 9   schedules would have been created as part
10   of the transaction whereby Alper was
11   compelled to exchange its debt for 55
12   percent of the common stock of First City?
13               MR. SCOTT:  Object to the
14           form of the question.
15               MR. STEWART:  State your
16           objection.
17               MR. SCOTT:  I just did.  I
18           objected to the form.
19               MR. STEWART:  I am giving
20           you a chance to tell me what
21           it is so I can correct.
22               MR. SCOTT:  You asked for
23           an opinion.
24               MR. STEWART:  I am asking
25           for --
0030
 1
 2               (Whereupon Question is Read
 3           Back.)
 4               THE REPORTER:   Question,
 5           What sort of disclosures or
 6           schedules would have been created
 7           as part of the transaction
 8           whereby Alper was compelled to
 9           exchange its debt for 55 percent
10           of the common stock of First
11           City?
12   BY MR. STEWART:
13        Q.  Can you answer that question?
14               MR. SCOTT:  Same objection.
15               THE WITNESS:  I can't.  I
16           am not a bankruptcy attorney.  I
17           have never been through a
18           bankruptcy.  I wouldn't know
19           specifically -- numerous
20           schedules, too numerous for me to
21           speculate as to.
22   BY MR. STEWART:
23        Q.  But there are schedules?
24        A.  There's a lot of documents.
25        Q.  And are those documents in files at
0031
 1
 2   your offices?
 3        A.  Yes, they would be.
 4        Q.  Now, let's turn to Paragraph 3, the
 5   documents memorializing the auction of
 6   Scovill Fasteners.
 7               Where would I find those?
 8        A.  Those are in my office.
 9        Q.  Do those include the document
10   price, any payments to officers, directors
11   or related parties, the allocation
12   environmental and tort liabilities, and
13   the parties' representations and
```
Page 13

Bertellotti

```
14   warranties?
15        A.   To answer your question, the
16   auction would probably not show those
17   things, but there's a stock purchase
18   agreement that would show that.
19        Q.   Is that at your office, as well?
20        A.   Yes, it is.
21        Q.   For Paragraph 4, tell me, where
22   would I find a copy of the note related to
23   the Realty Holdings, Inc. loan you refer
24   to in your affidavit?
25        A.   There would be a copy of that in
0032
1
2    our office.
3         Q.   Okay.  Are there any other
4    documents relating to that loan that you
5    know of, at your offices?
6         A.   Such as -- when you say other
7    documents --
8         Q.   I don't know.  Are there any other
9    documents that were created in connection
10   with that loan?
11        A.   Yes, I believe so.  There's the
12   note itself.  I believe the note is
13   further evidence that is referenced in the
14   bankruptcy agreements, probably
15   resolutions and things, part of the -- its
16   genesis was in the bankruptcy
17   reorganization.  It was approved by the
18   court.  Those other documents, I believe,
19   relate to this loan.
20        Q.   Are those to be found at your
21   offices?
22        A.   Yes.
23        Q.   Let's turn to Paragraph 5, the
24   documents related -- rather, turn to
25   Paragraph 6, Realty Holdings, Inc.'s
0033
1
2    financial statements.
3              Are those located at your offices?
4         A.   I believe so, they may be.  Realty
5    Holdings has been dissolved.  They may be
6    in storage.  Don't know precisely what
7    would exist.
8         Q.   Would financial statements have
9    been created for 1992 through the time of
10   Realty Holdings' dissolution for that
11   entity?
12        A.   Sir, I assume certainly so.
13        Q.   And would financial statements on
14   an annual basis have been created for all
15   of Alper's first, second, third, forth
16   tier subsidiaries?
17        A.   Yes.  Independent books and records
18   are kept for all of Alper's subsidiaries.
19        Q.   Are all those books and records
20   kept at your offices?
21        A.   To the extent the company is
22   active, yes, they would be kept at our
23   office.  Well, no, not necessarily.  It
24   depends when you are speaking of -- which
```
                                        Page 14

Bertellotti
```
  25  corporation you are speaking of.
0034
   1
   2          We had corporations in Los Angeles,
   3  Seattle, you know, other locations around
   4  the country with independent managements
   5  and those books would have been kept
   6  there.  So there are certain records that
   7  are in Alper's records, many records
   8  probably in storage in various places
   9  around the country.
  10      Q.   Would the annual financial
  11  statements of Scovill and Saltire be kept
  12  at your offices?
  13      A.   In recent years, yes.
  14      Q.   By recent years, does that mean
  15  1992 forward?
  16      A.   Well, sir, I have been there since
  17  1993.  Officer since 1997.  Clearly, I
  18  think recent financial statements would be
  19  in the offices; prior years may have been
  20  sent off to storage.  I don't know
  21  specifically.
  22      Q.   Where is storage?
  23      A.   There's, I believe, I don't know
  24  specifically.  I know of a storage
  25  location in Connecticut, others in Los
0035
   1
   2  Angeles, but I think the primary storage
   3  area for New York office is in
   4  Connecticut.
   5      Q.   If you turn to Paragraph 7, how
   6  about the document showing the payment of
   7  $3.1 million referenced in Paragraph 15 to
   8  Bertellotti?
   9      A.   Yes?  What about those documents?
  10      Q.   Would they be found at your
  11  offices?
  12      A.   Yes, they would.
  13      Q.   And is there a board resolution
  14  whereby Saltire made Mr. Bauer
  15  vice-president of environmental affairs?
  16      A.   Yes, annual board resolutions
  17  dating to 1995.
  18      Q.   Where would those be found?
  19      A.   Those would be found in the minute
  20  books.
  21      Q.   Where are those kept?
  22      A.   Those are kept at the offices in
  23  New York.
  24      Q.   And the employment agreements of
  25  Nicholas Bauer and Patricia Thomson; could
0036
   1
   2  those be found in Alper's offices?
   3      A.   I would -- don't know who Patricia
   4  Thompson is.  Never heard the name before.
   5  But Nicholas Bauer's employment agreement
   6  should be found in Alper's offices.
   7      Q.   Are all employment agreements,
   8  written employment agreements, for Alper's
   9  employees found at those offices?
```
Page 15

Bertellotti

```
10              MR. SCOTT:  Object to the
11        form.  Seems that all Alper's
12        employees have employee
13        agreements.
14   BY MR. STEWART:
15        Q.  Answer the question.
16        A.   To the extent Alper employees have
17   employment agreements, they would be found
18   in the offices of Alper.
19        Q.   Mr. Bertellotti, during the month
20   of November, are you leaving the country?
21        A.   Of this year?
22        Q.   Yes?
23        A.   Possibly.
24        Q.   Where do you think you'll go?
25        A.   Argentina.
0037
 1
 2        Q.   For how long?
 3        A.   Only for a few days.
 4        Q.   Otherwise, you are going to be in
 5   the United States?
 6        A.   At this point in time, I expect to
 7   be.
 8        Q.   Well, obviously you received our
 9   notice of deposition and you were to
10   actually turn over the documents relating
11   to these affidavits on the 13th of October
12   and you elected not to, Counsel, despite
13   what we said to the Judge.  Now we are
14   here in New York a thousand meters --
15              MR. SCOTT:  I hate to
16        interrupt you.  I am not going to
17        sit here and be lectured.  If you
18        wish to ask a question, if you're
19        wanting to off the record and
20        discuss this with me, fine.  But
21        I am not going to sit here and
22        let you lecture me.
23              MR. STEWART:  I am not
24        lecturing you.
25              MR. SCOTT:  I am too old
0038
 1
 2        for that.  You can do whatever
 3        you want.  You don't need to tell
 4        me you can do it.
 5              MR. STEWART:  You have the
 6        opportunity today to cure this
 7        problem.  You can go get all
 8        these records right now and then
 9        we wouldn't have to return to New
10        York City in November and retake
11        this deposition at your client's
12        expense.
13              MR. SCOTT:  Why says it,
14        that you think that you can serve
15        us with a totally ineffective
16        notice, served us with notice
17        addressed to an individual
18        deposition --
19              MR. STEWART:  An individual
20        who is president.
```

Page 16

Bertellotti

21        MR. SCOTT:  Are you going
22   to let me finish?
23        MR. STEWART:  Yes, go
24   ahead.
25        MR. SCOTT:  And not serve,
0039
1
2    serve a subpoena on him.  When
3    you -- if that was to a party,
4    would I not have 30 days to
5    respond under Rule 34?  I think
6    if you will read the rule, you
7    will see that it is.
8         So why do you think when
9    you elect to use an erroneous
10   form, not follow the rules, that
11   we should break our backs to give
12   you documents that we haven't
13   been properly asked for?
14        MR. STEWART:  Mr. Scott,
15   were you supposed to give these
16   documents to us voluntarily on
17   the 13th?
18        MR. SCOTT:  No, sir.
19        MR. STEWART:  Pursuant to
20   our discussion in court?
21        MR. SCOTT:  No, sir.  Now
22   listen.
23        MR. STEWART:  I am.  You
24   listen to me.
25        MR. SCOTT:  The Judge said
0040
1
2    I had to give you documents that
3    these gentlemen relied on.  That
4    was his order.  Period.
5         MR. STEWART:  Mr. Scott, I
6    am telling you what I am going to
7    do.
8         MR. SCOTT:  Last night,
9    during our deposition
10   preparation, we realized for the
11   first time that one document was
12   relied upon by Mr. Bertellotti.
13   And that's the document that
14   reflects the September 16
15   formation date for Alper
16   Acquisition Corporation and
17   Mr. Lucas delivered that to you,
18   and I will ask this be marked
19   Exhibit 2 to the deposition.
20   That is the only document that I
21   was ordered to give you.  I gave
22   it to you through Mr. Lucas last
23   night.
24        The second document we gave
25   you last night was one page that
0041
1
2    was relied upon by Mr. Smith with
3    respect to some figures.  So we
4    gave you that last night.  If you
5    will read that order --

Page 17

Bertellotti

```
 6          MR. STEWART:  Mr. Scott,
 7     what are you talking about?  You
 8     said you gave me some documents
 9     last night.
10          MR. SCOTT:  Yes.
11          MR. STEWART:  You didn't
12     give me documents last night.
13          MR. SCOTT:  Mr. Lucas
14     delivered them to you.
15          MR. LUCAS:  I left them at
16     the Hyatt before you checked in.
17     There's an envelope with your
18     name on it.  And they said they
19     would deliver it to you when you
20     checked in.
21          MR. SCOTT:  There's two
22     documents.  Let's mark it Exhibit
23     2.
24          MR. STEWART:  This is my
25     deposition.  I will mark the
0042
 1
 2     Exhibits if you hand them to me.
 3     Those that I haven't seen yet,
 4     hand them to me.
 5          MR. SCOTT:  Let's go back
 6     to the transcript.
 7          MR. STEWART:  You know,
 8     Mr. Scott, you're right.  You
 9     don't need a lecture.  I am
10     telling you what I am going to do
11     so you have an opportunity today
12     to cure this problem that you
13     have created.
14          MR. SCOTT:  Oh, no, I
15     didn't create it.  You created
16     it.
17          MR. STEWART:  You had these
18     notices.  The purpose of
19     discovery is to provide
20     information in an efficient form,
21     and you have these notices.  You
22     made no effort to contact our
23     firm and clarify the notices or
24     do anything else.  Not a problem.
25     We will simply file a document
0043
 1
 2     request with you and return in
 3     November at your expense to
 4     retake these depositions, which
 5     is a complete waste of
 6     everybody's time.
 7          MR. SCOTT:  We may return
 8     in November; we may not.  It may
 9     be some other date, depending on
10     scheduling.  We will be happy --
11          MR. STEWART:  I am telling
12     you what we are going to do.  I
13     just wanted to make sure you had
14     the opportunity to cure this
15     problem today.  Let's move on.
16          MR. STEWART:  I am going to
```

Page 18

Bertellotti

```
17        hand you a letter.
18             MR. SCOTT:  Before you hand
19        them that letter, I want to put
20        on the record the Judge's
21        statement in the September 19
22        hearing in rebuttal to Mr.
23        Stewart's assertion that I was
24        ordered or agreed or anything
25        else to turn over any documents
0044
1
2         other than is relied on by these
3         witness preparation of affidavit.
4              On Page 13 of that
5         transcript the Court stated,
6         quote, well, I assume Mr.
7         Durant's oral motion to produce,
8         comma, so you will produce any
9         documents that anybody relied on
10        in preparation of their
11        affidavit.
12             Now, that was the court
13        order, Mr. Stewart.  And if you
14        choose to, you can look at the
15        transcript and confirm that or
16        you can take issue with it.  But
17        I resent the idea that we have
18        created a problem.  We did what
19        the Court ordered us to do.
20             Admittedly, we didn't serve
21        you with those three pages until
22        last night; and if you didn't get
23        them last night, then we gave
24        them to you this morning and I am
25        sorry you didn't get them, that
0045
1
2         the hotel didn't give them to
3         you.  It's kind of like the
4         documents you served me the night
5         before the September 19 hearing.
6              MR. STEWART:  The day after
7         you refiled your relying 50
8         pages.
9              MR. STEWART:  Please hand
10        it to the witness.  Mark that as
11        Exhibit 2 and let's proceed.
12             MR. LUCAS:  Mike, please
13        don't waste all of our time
14        arguing this morning.  Let's get
15        on.
16             MR. STEWART:  I am not
17        wasting the time.
18             MR. LUCAS:  Stop --
19             MR. STEWART:  You know,
20        Mr. Lucas, we are wasting time.
21             MR. LUCAS:  I will not have
22        you interrupting me.  I am going
23        to talk and then you are going to
24        talk.
25             MR. STEWART:  I agree with
0046
1
```

Page 19

```
                              Bertellotti
 2        you.  Go ahead.
 3               MR. LUCAS:  All I am
 4        saying, we are here to take a
 5        deposition on jurisdictional
 6        issues.  Please stop arguing with
 7        Mr. Scott and just take your
 8        deposition.  That is all I am
 9        asking.
10               MR. STEWART:  First of all,
11        obviously your comments should be
12        directed at both Mr. Scott and I.
13        And what I will tell you, John,
14        is that if we wanted to take an
15        efficient deposition and not
16        waste everyone's time, these
17        documents would have been
18        provided so we don't have to go
19        through this charade.  But in any
20        event --
21               MR. SCOTT:  Why is it --
22        Mr. Stewart, let me ask you, why
23        is it that you think we shouldn't
24        have the right to object to the
25        scope or the breadth of the
0047
 1
 2        proper document requests?  I
 3        mean, you have chosen not to
 4        follow the rules and you are
 5        blaming that on us, and I don't
 6        think that is appropriate or
 7        fair.
 8               When I said we would be
 9        happy to come back here, I am
10        going to take that back.  You are
11        going to have to make me come
12        back up here for these documents.
13  BY MR. STEWART:
14        Q.  Do you recognize the document in
15  front of you?
16        A.  I haven't been given another.
17               MR. STEWART:  Can you mark
18        that as Exhibit 2 and hand it to
19        him?
20               (Whereupon Exhibit 2 is
21        Marked.)
22               THE WITNESS:  Yes, I
23        recognize this.
24  BY MR. STEWART:
25        Q.  What is it?
0048
 1
 2        A.  It's an affidavit.  It was prepared
 3  by my behalf.  It was my affidavit.  I
 4  don't know what else.
 5        Q.  Does it reflect your statements?
 6        A.  Yes, it does.
 7        Q.  And have you reviewed it recently?
 8        A.  Yes, I have.
 9        Q.  And do you have any changes to make
10  that would make it more accurate?
11        A.  I do not.
12        Q.  So does it reflect your views
                                     Page 20
```

Bertellotti

```
13    accurately, to your mind?
14        A.    Everything in there, I believe, is
15    accurate.
16            MR. STEWART:  Mark this
17        letter as Exhibit 3.
18            (Whereupon Exhibit 3 is
19        Marked.)
20    BY MR. STEWART:
21        Q.    Are you familiar with Exhibit 3?
22        A.    Yes, I am.
23        Q.    Now, did you in fact review your
24    affidavit with Mr. Scott?
25        A.    Yes, I did.
0049
 1
 2        Q.    And when we talk about the
 3    affidavit, is that the affidavit that is
 4    Exhibit 2?
 5        A.    Yes, it is.
 6        Q.    Is that the affidavit that
 7    Mr. Scott refers to in this letter that is
 8    Exhibit 3?
 9        A.    I believe so, but I think what this
10    filing -- I believe there were 2
11    affidavits filed that had been filed in a
12    previous response, but I think technically
13    there were 2 affidavits of mine.  I think
14    there was an affidavit with our motion to
15    dismiss for lack of personal jurisdiction,
16    and I think that affidavit was filed yet
17    again with this affidavit and that
18    response.  I think.
19            MR. STEWART:  I would like
20        to mark that as Exhibit 4.
21            (Whereupon Exhibit 4 is
22        Marked.)
23    BY MR. STEWART:
24        Q.    Did you -- I have handed you
25    Exhibit 4.
0050
 1
 2            Do you recognize that?
 3        A.    Yes, I do.
 4        Q.    What is it?
 5        A.    It's my affidavit.
 6        Q.    Is that the second affidavit you
 7    referred to?
 8        A.    That is -- it's the second
 9    affidavit I referred to just now.  I
10    believe it's the first affidavit that
11    was filed in this case on my behalf.
12        Q.    So did you review both affidavits
13    with Mr. Scott?
14        A.    Yes, I did.
15        Q.    And did you determine that, in
16    fact, you did not rely on any documents in
17    preparing those affidavits?
18        A.    Well, what we focused on
19    specifically was the second affidavit in
20    terms of stating that we did not
21    produce -- that we did not rely on any
22    documents.
23        Q.    When you say the second affidavit,
```

Page 21

Bertellotti
24    you focused on Exhibit 2 in determining
25    you did not rely on any documents?
0051
1
2         A.   Yes.  I believe you are talking in
3     the context of Mr. Scott, the October 9
4     letter he wrote to you?
5         Q.   Yes.
6         A.   Principally, we focused on this
7     Exhibit 2 affidavit.
8         Q.   So for your Exhibit 2 affidavit,
9     did you consult any documents in
10    connection with the creation of that
11    affidavit?
12        A.   Yes.  In hindsight, it turns out I
13    consulted a single document, document
14    relating to the specific date of
15    incorporation of Alper Acquisition
16    Corporation.  It was a technical
17    oversight.  It doesn't seem to be a fact
18    in general within dispute and seems to be
19    immaterial to the affidavit in its --
20        Q.   I would like to mark that as an
21    Exhibit.
22                 (Whereupon Exhibit 5 and
23            Exhibit 6 are Marked.)
24    BY MR. STEWART:
25        Q.   You are now looking at another
0052
1
2     Exhibit.
3                 Do you recognize that document?
4         A.   Yes, I do.
5         Q.   What is that document?
6         A.   That document is also a document
7     that I had prepared on my behalf in
8     preparation for our response, our reply
9     brief.  That was filed -- I can't
10    remember.  I think it was prepared in
11    response to the first reply brief.
12               I did not rely on this in my
13    affidavit, but I had this prepared in
14    preparation for one of our two responses
15    in this lawsuit.
16        Q.   You had Exhibit 6 prepared in
17    preparation for your responses?
18        A.   Yes.
19        Q.   And Exhibit 5, is that the document
20    you did rely on?
21        A.   Yes.
22        Q.   On preparing the affidavit?
23        A.   Yes, that's the document I did rely
24    on.
25        Q.   Other than Exhibit 5, did you
0053
1
2     consult any documents in connection with
3     preparation of the affidavit to Exhibit 2?
4         A.   I did not, in preparation for the
5     affidavit.
6         Q.   For periods predating your
7     employment, what did you rely on in
8     creating the statements in your affidavit?
Page 22

Bertellotti

```
 9        A.  Do you want to be specific?  For an
10   example?
11        Q.  Well, let me put it this way.
12   Before September 1993, did you have any
13   connection at all with Alper Holdings USA?
14        A.  I did not.
15        Q.  Did you know anybody that worked
16   there before that day?
17        A.  Generally speaking, no.
18        Q.  So, generally speaking.  Why do you
19   qualify?
20        A.  There was a gentleman named
21   Nicholas Combemale who I knew who was
22   working there.
23        Q.  Did you and Mr. Combemale discuss
24   Alper's business prior to your going to
25   Alper in September '93?
```
0054
```
 1
 2        A.  Yes.
 3        Q.  Did any of those discussions inform
 4   your affidavit?
 5                  MR. SCOTT:  I beg your
 6             pardon.  Let me object to the
 7             form.
 8                  MR. STEWART:  Read back the
 9             question, please.
10                  (Whereupon Question is Read
11             Back.)
12                  THE REPORTER:  Question,
13             Did any of those discussions
14             inform your affidavit?
15                  MR. SCOTT:  Object to the
16             form.
17                  THE WITNESS:  To a minimal
18             extent, yes.  He was involved in
19             the First City bankruptcy and he
20             explained to me his involvement
21             with the company, how they came
22             about to own 55 percent interest,
23             but --
24   BY MR. STEWART:
25        Q.  For any statements in your
```
0055
```
 1
 2   affidavit that cover periods prior to
 3   1993, where would you have gotten that
 4   information?
 5        A.  Please understand, I have worked
 6   for the company over ten years now.  And
 7   in the course of working for this company
 8   for over ten years and conducting these
 9   business affairs, I have had numerous
10   occasions to review numerable historical
11   documents relating to periods prior to my
12   involvement in the company.  There's been
13   reasons to familiarize myself with the
14   documents with ongoing issues, and so I
15   couldn't even begin to tell you all the
16   different historical documents I have come
17   across in the course of the last ten years
18   and that I have become familiar with and
19   to some personal level with respect to --
```
Page 23

Bertellotti

20      Q.   So when you say personal knowledge
21  for periods prior to September '93, does
22  that mean knowledge from these historical
23  documents you referred to?
24      A.   Yes, it could have been historical
25  documents, it could have been verbal
0056
1

2  recitations, news accounts, variety of
3  documents.  Legal documents, contracts,
4  magazine articles, any number of things
5  that I have come across.  I didn't look at
6  any of those in preparing my affidavit,
7  but generally that is how I gained
8  knowledge with regard to historical
9  statements, as through my tenure of the
10  company and reviewing, as I said, numerous
11  conversations with now former employees
12  but were employees of Scovill.
13      Q.   Just to be clear, can you think of
14  any other source of information, other
15  than these discussions with former
16  employees, news accounts and these
17  historical documents?
18              MR. LUCAS:  Any?
19              MR. SCOTT:  I am going to
20          object on the form, if you
21          intended that to be a complete
22          recitation of the things he said,
23          because you left out some things.
24              MR. STEWART:  I will
25          rephrase to make it clear.
0057
1

2  BY MR. STEWART:
3      Q.   Can you tell me whether your
4  statements regarding periods prior to
5  September '93 are based on anything other
6  than statements of former employees, news
7  accounts, or these historical documents
8  that you have referenced?
9              MR. SCOTT:  Including all
10          that he referenced and, if so, I
11          won't object.
12              THE WITNESS:  Including all
13          that I referenced, whether it's
14          contracts, financial statements,
15          SEC filings.  I would have to go
16          on and on and think for a few
17          minutes.  Over the ten years,
18          literally thousands of documents
19          in existence.
20  BY MR. STEWART:
21      Q.   I don't mean to be obtuse, Mr.
22  Bertellotti.  I want to make sure that
23  when we are talking about the category of
24  information that you would have relied on,
25  it would have been statements of former
0058
1

2  employees; is that one category?
3      A.   Certainly.
4              MR. SCOTT:  Object to the
                    Page 24

Bertellotti

```
 5            form.
 6  BY MR. STEWART:
 7       Q.   Another category would be
 8  statements in these historical documents,
 9  all of which you have listed?
10                MR. SCOTT:   Object to the
11            form of the immediately preceding
12            question.
13                He started to answer it
14            before I can get my objection
15            out.  So make it clear to you, he
16            did not rely on any other single
17            document in preparation of the
18            affidavit.
19                He gained his personal
20            knowledge through his work over
21            the years, so I want to make that
22            objection.
23  BY MR. STEWART:
24       Q.   Okay.  I think that is a speaking
25  objection, which is prohibited.  But I am
0059
 1
 2  trying to find out where you got your
 3  information.
 4                Now, is one source of the
 5  information for periods -- for statements
 6  that address periods prior to the time you
 7  were employed at Alper, news accounts?
 8       A.   Yes, it could be.
 9       Q.   Is another source what you refer to
10  as historical documents, including SEC
11  filings, corporate documents, and the
12  like?
13       A.   Yes.
14       Q.   Is another source statements of
15  former employees?
16       A.   Yes.
17       Q.   Can you list for me every other
18  source, if there are any, of information
19  that you would have relied on in making
20  statements that address periods prior to
21  your employment?
22                MR. SCOTT:   Same objection.
23                MR. LUCAS:   I object to the
24            form of the question.
25  BY MR. STEWART:
0060
 1
 2       Q.   Go ahead and answer the question.
 3       A.   Mr. Stewart, without thinking here,
 4  I can't think of every type of document,
 5  every document that I have seen in the
 6  course of ten years that I would have
 7  gained knowledge from.  But generally
 8  speaking, those are the principal kind of
 9  documents that I have come across and have
10  gained personal knowledge from.
11                MR. SCOTT:   At a convenient
12            time, I would like to take a
13            break.
14                MR. STEWART:   That is fine.
15                (Whereupon a Recess is
```

Page 25

Bertellotti

16        Taken.)
17 BY MR. STEWART:
18     Q.  Mr. Bertellotti, back on the record
19 after a break.
20       Do you see the statement on your
21 affidavit, Paragraph 1, I believe such
22 information is true?
23         MR. LUCAS:  Which
24     affidavit?
25         MR. STEWART:  Exhibit 2.
0061
1
2         THE WITNESS:  Exhibit 2.
3     Yes, I do.
4 BY MR. STEWART:
5     Q.  And what does that statement refer
6 to?
7     A.  It says precisely what it says.  I
8 believe such information was true.
9     Q.  Is that referring to the
10 information assembled by Alper Holdings
11 and subsidiaries?
12     A.  I am making this affidavit based on
13 my personal knowledge and information
14 assembled by Alper subsidiaries.  It says
15 what it says.  I don't know.
16     Q.  Here, let me make it more clear.
17 Does the statement, I believe such
18 information is true, does that refer to
19 every statement in this affidavit that you
20 make, that you believe it's true?
21     A.  Yes.  To my knowledge, all of these
22 statements are true.
23     Q.  Okay.  It doesn't refer or does it
24 refer, also, to what you state the
25 information -- the underlying information
0062
1
2 assembled by Alper and/or its
3 subsidiaries?
4     A.  I have every reason to believe that
5 is accurate, as well.
6     Q.  You believe that information is
7 true?
8     A.  Yes.
9     Q.  Let's talk about the companies you
10 are involved in.
11       Are you president of any company
12 other than Alper Holdings USA, Inc.?
13     A.  Yes, I am the president of Saltire
14 Industrial, Inc.
15     Q.  Any other companies?
16     A.  Yes, there is one other company
17 that I am currently the president of,
18 which is Saltire subsidiary Alper
19 Development, Inc.
20     Q.  Are those the only companies that
21 you are currently president of?
22     A.  Yes.
23     Q.  And since you have been at Alper --
24 since September '93, have you been
25 president of any other companies?
0063

Page 26

Bertellotti

```
 1
 2        A.   I have.
 3        Q.   Can you tell me what companies you
 4   have been president of since you have been
 5   at Alper?
 6        A.   I could recite some, probably not
 7   all.
 8        Q.   Why don't you recite the ones you
 9   know?
10        A.   I think it's probably best to give
11   you some historical context.  Because it
12   changes year by year, depending on status
13   of the operations.
14           In 1997, when I was first made an
15   officer, I was senior officer of both
16   Alper Holdings and Saltire Industrial.  To
17   my recollection, I don't know what else I
18   would have been the senior officer of at
19   that point in time.  Again, at that
20   particular point in time, we had other
21   operations.  They were active.  They had
22   their independent presidents.  Alper
23   Development had its own president.  There
24   was a company called the Alper Ink Group,
25   which had its own senior officer.  There
0064
 1
 2   was a company in Seattle, Alper Northwest,
 3   Inc., which had its own president.
 4           So you know, this is all relative
 5   to a specific time and status of the
 6   company.  But as it started out, I was
 7   made the president of Alper Holdings and
 8   Saltire Industrial.  Any other active
 9   subsidiaries, I was not the president of.
10   There are other subsidiaries beginning in
11   that time frame I was probably president
12   of, but I was inactive -- they were
13   inactive companies, but under California
14   law they were required to have officers,
15   so I may very well have been the senior
16   officer of other entities that were
17   inactive at the time.
18        Q.   Can you recall those entities at
19   the moment?
20        A.   I certainly couldn't recall
21   specifically what they were.  I would
22   suggest I was probably the president of
23   Alper Securities at that point in time,
24   but I wouldn't know for certain without
25   checking the records.
0065
 1
 2           I wouldn't want to speculate
 3   precisely as to where I was not president
 4   at the time, but what happens in the later
 5   years is the company -- I think as we said
 6   in our affidavit -- in 2000 we sold off
 7   all of the active businesses, the active
 8   operations, and we were left with a number
 9   of corporations.  And in some instances,
10   we sold stock in corporations.  We no
11   longer had it.
```

                                    Page 27

Bertellotti
12          In other instances, with the sale
13  of real estate in Seattle, we sold assets.
14  And there were a number of corporations
15  that were left until their time of
16  dissolution under law that were required
17  to have officers, so I was probably made
18  the senior officer of those corporations.
19  So it's fairly dynamic, depending on the
20  particular time as well as the status of
21  the corporation.
22          Q.   Did the period in which you were
23  the senior officer for Saltire Industrial
24  and Alper Development, Inc. run from '97
25  to 2000?
0066
 1
 2          A.   No, would I not have been -- those
 3  would not have been simultaneously.
 4  Again, let me make sure I understand.
 5  Saltire Industrial, Inc. and Alper
 6  Development, Inc.  No, I was made
 7  president of Saltire in 1996 -- I was made
 8  managing director, senior officer of
 9  operations at the time September of
10  mid-'97, and I did not become the senior
11  officer of Alper Development, Inc. until
12  1990 or 1999.  Once that business had been
13  developed, the majority of its operations
14  and the acting president was gone.
15          Q.   And you became managing -- when did
16  you become managing director of Alper?
17                  MR. SCOTT:   Object to the
18          form.
19                  THE WITNESS:   I believe I
20          answered that.
21  BY MR. STEWART:
22          Q.   When did you become managing
23  director of Alper Holdings USA, Inc.?
24          A.   I believe it was approximately July
25  of 1997.
0067
 1
 2          Q.   Okay.  Now can you tell me in 2000,
 3  briefly for me, the active operations that
 4  were sold off that you referred to?
 5                  MR. SCOTT:   Object to the
 6          form.  Can you be more specific,
 7          please?
 8  BY MR. STEWART:
 9          Q.   Let me rephrase.  I believe you
10  stated that in 2000, Alper Holdings sold
11  off a number of its active operations.
12  Was that --
13          A.   I was speaking generically, but we
14  sold the Alper Ink -- Saltire sold off
15  Alper Group in May 2000.
16          Q.   Was -- were there any other active
17  operations that were sold off in 2000?
18          A.   We also sold a company called Alper
19  Northwest.
20          Q.   When was that sale completed?
21          A.   I believe it was April of 2000.
22          Q.   Now, did you take on the role of
Page 28

Bertellotti

23    president of any corporation in 2000, any
24    new corporations?
25         A.   Again, Mr. Stewart, without
0068
1
2    referring to corporate documents and
3    specific records it's very hard for me to
4    sit here, precisely what happened at what
5    point in time.
6         Q.   Tell me, if I wanted to know when
7    you were president of the various
8    affiliates of Alper Holdings USA, Inc.
9    during the period '93 through the present,
10    what documents I would look at?
11         A.   We would have to look at the
12    corporate records, minute books.
13         Q.   Would it be the minute books?
14         A.   Generally speaking, yes.
15         Q.   Minute books of director meetings?
16         A.   Well, the minute books appointing
17    the officers and directors, or the
18    resolutions appointing the officers and
19    directors.
20         Q.   Can you tell me, are all -- since
21    you have been at Alper Holdings USA, have
22    all of its subsidiaries had the same
23    governing structure?
24         A.   I don't understand what you mean by
25    same governing structure.
0069
1
2         Q.   Why don't we go company by company?
3              Have you ever been an officer of
4    any company in the capacity other than
5    president, president or senior executive?
6         A.   Again, without referring to the
7    documents, maybe.  I don't know off the
8    top of my head.  I suspect I may have been
9    secretary of a corporation.
10              Again, under various state laws,
11    you are required to have specific
12    officers; and in the latter years, when
13    there were only a few employees left and
14    there were these inactive corporations
15    prior to the dissolution, it's possible
16    that I was made not just president but
17    possibly the secretary as well, for
18    example, and again that would be because
19    the companies are inactive, waiting for
20    dissolution.
21         Q.   But can you, sitting here without
22    reference to the corporate records, tell
23    me what companies you served as an officer
24    for?
25         A.   Specifically?
0070
1
2         Q.   Yes.
3         A.   And accurately in its entirety,
4    probably not.
5         Q.   Without those records, can you tell
6    me what companies you are president of?
7         A.   I can tell you of the active -- in
                                    Page 29

Bertellotti

```
 8   what period are you talking about?
 9       Q.   1993 to the present.
10       A.   I have told you several times, from
11   1993 to 1997 I wasn't an officer of any
12   company.  Okay.
13       Q.   From 1997 to the present?
14       A.   In 1997, I was certainly made the
15   officer of Alper -- senior officer of
16   Alper Holdings, as well as Saltire
17   Industrial.   It's also possible I was
18   made the senior officer of a couple of
19   other inactive companies.  An example
20   might be Alper Securities, Inc., which
21   held -- it was inactive.  It held a couple
22   of securities partnerships but for the
23   most part they -- they were not engaged in
24   active operations.  But they were
25   companies that were awaiting dissolution,
0071
 1
 2   and we were required by law to have
 3   officers and directors.
 4       Q.   I just wonder if can you tell me,
 5   without reference to corporate documents
 6   and records, which one of those various
 7   companies you were president of?
 8            MR. SCOTT:   Asked and
 9            answered.
10   BY MR. STEWART:
11       Q.   Please answer the question.
12       A.   I believe I answered it.
13       Q.   Please answer it again.
14       A.   I could tell you with a reasonable
15   degree of accuracy which companies, and I
16   probably wouldn't get everything right
17   without having access to the corporate
18   records.
19       Q.   Why don't you, to a reasonable
20   degree of accuracy, tell me what those
21   companies are?
22       A.   President of Alper Holdings.
23   President of Saltire Industrial.  I became
24   at one point in time the president of
25   Alper Development, Inc. Approximately 1998
0072
 1
 2   or 1999, as I told you.  Then beyond that,
 3   I don't want to speculate.
 4       Q.   Do you have an employment agreement
 5   with Alper Holdings USA?
 6       A.   I have, in a sense.  I have what I
 7   call a letter agreement.
 8       Q.   It's written?
 9       A.   It's written.
10       Q.   It's at the company headquarters?
11       A.   Yes.
12       Q.   Do you have an employment agreement
13   with any other company?
14       A.   The employment agreement is written
15   with Alper Holdings.
16       Q.   And is there any other employment
17   agreement with any other company?
18       A.   No, there's not.
```

Page 30

Bertellotti
```
19        Q.   Right now, can you tell me how you
20   divide your time amongst the companies?
21   Amongst Saltire and Alper Holdings USA?
22             MR. LUCAS:  Object to the
23        form of the question.
24             MR. STEWART: Well, I think
25        you are objecting to the temporal
0073
1
2        component.
3   BY MR. STEWART:
4        Q.   Can you tell me in 2003, how you
5   divide your time between Saltire
6   Industrial and Alper Holdings USA?
7             MR. LUCAS:   I object to the
8        form of the question.
9   BY MR. STEWART:
10        Q.   Please answer the question.
11        A.   Yes, I understand the question, I
12   believe so.  I do it on a need basis and
13   in 2003, I spent the vast majority of my
14   time dealing with the business affairs of
15   Saltire Industrial.
16        Q.   What do you mean by vast majority
17   in terms of percentage?
18        A.   Probably upwards of 90 percent,
19   currently.
20        Q.   Can you tell me when Saltire
21   Industrial operations began to take up
22   over 75 percent of your time?
23        A.   I have always devoted a substantial
24   amount of time to Saltire Industrial.  I
25   would say over 50 percent since I have
0074
1
2   been with the company.  But it has
3   increased in recent years.  It has been
4   the sole company with activities going on
5   in the last couple of years.  And it
6   varies, depending on what is going on with
7   regard to litigation, various
8   environmental issues, retiree issues, but
9   it's increased in the late -- in the last
10   couple of years.
11        Q.   How long has Saltire been, as you
12   said, the sole company with things going
13   on in Alper?
14        A.   In effect, since we sold off
15   operations.  Since late 2000, the majority
16   of our activities have been focused on
17   Saltire.
18        Q.   Are you shareholder of any
19   privately held company?
20        A.   None whatsoever.
21        Q.   Were you an officer, director, or
22   agent of any company other than companies
23   affiliated with Alper Holdings USA, Inc.?
24        A.   I am an officer -- I am sorry, I am
25   a director of a company called CashX, Inc.
0075
1
2   C-a-s-h- X, with a big X.
3        Q.   Does that have any relationship to
```
Page 31

Bertellotti
```
 4   Alper Holdings USA, Inc.?
 5        A.   No.
 6        Q.   Does it have any relation to any
 7   subsidiaries of Alper Holdings?
 8        A.   What do you mean by affiliates?
 9        Q.   Does it have affiliates to Group?
10        A.   No.
11        Q.   Does it have any relation to Carlos
12   Peralta?
13        A.   I believe it has connections to
14   some of the direct share.
15        Q.   Who do you think it -- which
16   indirect shareholders do you believe CashX
17   has a direct relationship with?
18        A.   Gentleman named Alejo Peralta.
19        Q.   You serve as director of that
20   company?
21        A.   I am director.
22        Q.   How many directors are there?
23        A.   There are four.
24        Q.   Who are they?
25        A.   Peter Ax, A-X, is his last name.
```
0076
```
 1
 2   Peter Ax, Alejo Peralta, and a gentleman
 3   named Juan Santaja.
 4        Q.   Do you receive compensation for
 5   your director job?
 6        A.   I do not.
 7        Q.   What business is CashX in?
 8             MR. SCOTT:  I object to the
 9          relevance of this on the
10          jurisdictional questions.
11   BY MR. STEWART:
12        Q.   What business is CashX in?
13        A.   They issue prepaid Visa cards.
14        Q.   Where are they incorporated?
15        A.   I believe Delaware.
16        Q.   Is it public?
17        A.   No, it's not.
18        Q.   Let's turn to Alper Holdings USA,
19   Inc.  How many employees does Alper have
20   today?
21        A.   We have six direct employees.
22        Q.   What are their names?
23        A.   You have myself; Wayne Smith,
24   who is in the room -- actually we have
25   five. I misspoke.  We have five.  Marjorie
```
0077
```
 1
 2   Alexander, Mark Silverman, and Wayne.
 3   Trish's name is escaping me.  Can I ask?
 4   Marjorie's daughter.  It's escaping me for
 5   the minute.
 6        Q.   What does Ms. Alexander do?
 7        A.   She administers the retiree
 8   benefits associated with Saltire
 9   Industrial.
10        Q.   What does Mark Silverman do?
11        A.   He is the vice-president of
12   administration.
13        Q.   What does Trish do?
14        A.   She also administers the retiree
```
Page 32

                              Bertellotti
15  benefits.
16      Q.  Which of these employees have
17  employment contracts?  We talked about
18  you.
19      A.  Only Mr. Smith.
20      Q.  The others at-will?
21      A.  Yes.
22      Q.  So you never heard of a person
23  named Patricia Thompson?
24      A.  I don't know who that is.
25      Q.  Now, how many employees did Alper
0078
1
2   Holdings have when you arrived in 1993?
3       A.  I don't know.  Again, I wasn't
4   involved in corporate governance and
5   administration of the company.  There were
6   more than there are today.
7       Q.  Well, when you became president or
8   the chief executive officer in 1997, how
9   many employees did Alper have?
10      A.  I would say approximately 20 to 25.
11      Q.  Can you give me a general breakdown
12  of those employees?  Not by name, but what
13  they did?
14      A.  Function -- there was legal,
15  accounting, accounts payable, benefits
16  administration, management of information
17  systems, tax, clerical, insurance
18  administrator, human resources.  That
19  pretty much covers it.  That probably
20  catches most of it.
21      Q.  In 2000 when -- after Alper Ink was
22  sold, how many employees did Alper have?
23      A.  Immediately following the sale?
24      Q.  Sure.
25              MR. SCOTT:  Are we are
0079
1
2              talking Alper Holdings USA?  Is
3              that the question?
4                  MR. STEWART:  In fact, that
5              is a good clarification.  Can we
6              agree, during the deposition if I
7              refer to Alper without
8              qualifications, I am referring to
9              Alper Holdings USA, Inc.
10                 MR. SCOTT:  I prefer not.
11             There are still -- that leaves
12             open confusion, so we would
13             prefer --
14                 THE WITNESS:  It's probably
15             safe.
16  BY MR. STEWART:
17      Q.  Then for Alper Holdings USA, Inc.,
18  I take it, it was for that entity, was it,
19  that you said there were 20 to 25
20  employees in '97?
21      A.  That's correct.
22      Q.  For that entity, Alper Holdings
23  USA, Inc., how many employees in, say, May
24  of 2000?
25      A.  2000, I would say 10 to 14.
                              Page 33

Bertellotti

0080
```
 1
 2        Q.  Can you now tell me from 2000, four
 3   and how we got to five?
 4        A.  Yes.  As the corporate structure
 5   had become simpler in terms of selling
 6   off, for example, the operating group,
 7   realizing -- generally speaking, the
 8   corporate business got less complicated
 9   with various businesses and various
10   subsidiaries that were sold.  Lot of
11   things matured.  We came about owning --
12   this current ownership came about in 1992,
13   1993 as the various issues worked
14   themselves out over the years.  The issues
15   facing us became more complex.  We needed
16   less people.
17        Q.  How many employees did you have in
18   2001, say, December 2001?
19        A.  Seven.
20              MR. LUCAS:  You mean Alper
21        Holdings USA, Inc.
22              THE WITNESS:  Alper
23        Holdings, I would say six to
24        eight.
25   BY MR. STEWART:
```
0081
```
 1
 2        Q.  Alper Holdings USA had six to eight
 3   in December 2001?
 4        A.  Yes.  I mean, you are asking
 5   specific questions to which I am just
 6   reluctant to speculate and answer with
 7   nine or seven.  I mean --
 8        Q.  Well, could you speculate -- strike
 9   that.
10              In December 2002, how many
11   employees would you say Alper Holdings USA
12   included?
13        A.  End of last year?
14        Q.  Yes.
15        A.  There were six.
16        Q.  Who is left?  Who has left the
17   company since December of last year?
18        A.  Nick Bauer.
19        Q.  When did Nick leave?
20        A.  Nick left in September of this
21   year.
22        Q.  Was he fired?
23        A.  No, he was not.
24        Q.  Do you know what he is doing now?
25        A.  He's been retained by Saltire
```
0082
```
 1
 2   Industrial, Inc. as a consultant.  I
 3   believe he does other independent
 4   consulting work.
 5        Q.  Before Nick Bauer left, did he have
 6   an -- I think you answered that.  He had
 7   an employment agreement?
 8        A.  He had a letter agreement, we
 9   called it.
10        Q.  Did he have that for all the years
```
Page 34

Bertellotti
```
11   he work at Alper?
12       A.   I believe so.
13       Q.   Did he have a letter agreement with
14   any other entity?
15       A.   Not to my knowledge.
16       Q.   How much time did he devote to
17   environmental issues relating to Saltire
18   Industrial?
19       A.   There's a temporal element to that
20   question but would I say the vast --
21   anywhere between 90 to 95 percent of his
22   time.  As much as 100 percent of his time.
23       Q.   And does that 90 to 95 percent of
24   his time apply to the years '95 through
25   his leaving that company this year?
0083
1
2        A.   Yes.
3        Q.   To whom did he report?
4        A.   He report -- reports to, most
5    commonly to Wayne Smith.  We don't have
6    a -- it's a small company.  We don't have
7    a formal reporting structure, but he
8    routinely reported to Wayne Smith,
9    although he speaks to me on a regular
10   basis.
11       Q.   Okay.  What do you mean by regular
12   basis?
13       A.   There is no specific routine or
14   scheduled call, but Nick contacts us as
15   needed to discuss the status and issues of
16   various of Saltire's environmental issues.
17       Q.   How many times a year would you say
18   you talked to Nick Bauer during the time
19   he was employed at Alper?
20       A.   I would say anywhere between 30 and
21   60 times.  I would speak to him anywhere
22   between -- I would say in my case, maybe
23   25 to 40 times a year.
24       Q.   And?
25       A.   May speak to Mr. Smith more often
0084
1
2    than that.
3        Q.   Would the majority of these calls
4    be formally scheduled meetings, or contact
5    as needed?
6        A.   Combination of the two.
7        Q.   Was Nick Bauer free to call you
8    directly to discuss issues?
9        A.   Any time he would like, he can call
10   me as president of Saltire.
11       Q.   You said as the president of
12   Saltire.  Tell me what -- whether you'd
13   take any formal action at the time you
14   contacted Nick Bauer to talk to
15   distinguish yourself as the president of
16   Saltire, as opposed to the president of
17   Alper.
18       A.   That was very clear.  Because it's
19   always very obvious to us whose business
20   is before us.  I think -- as we said in my
21   affidavit, we maintain separate books and
```
Page 35

Bertellotti
22    records, separate accounts, separate
23    minutes, separate officers and directors.
24    Granted, there's overlap.  Whatever
25    business is in front of you, it is very
0085
1
2    clear to us what business that relates to.
3    And so we take all actions and discuss all
4    things in the context of that corporation,
5    its specific interests, and there is no
6    confusion.  It's very straightforward.
7        Q.   Did Nick Bauer file written reports
8    of his activities?
9        A.   Yes.
10        Q.   How often?
11        A.   Nick Bauer would send what would be
12    a weekly, biweekly -- on average, probably
13    every two weeks and, again, it wasn't
14    formal, but roughly every two weeks he
15    would send a brief environmental update
16    where he would update us to specific
17    activities on sites when there was
18    something to speak about.  You also asked
19    if I had certain other, more substantive
20    reports.  Certainly there was an annual
21    review, other reviews in the interim
22    period as needed.
23        Q.   What did Nick Bauer do, in your
24    mind, exclusively for Alper Holdings USA?
25        A.   Well, when he wasn't dedicating 100
0086
1
2    percent of his time to Saltire, if there
3    were acquisitions -- for example, when
4    Saltire subsidiary, the operating group,
5    was in the process of acquiring other
6    businesses, he may have conducted due
7    diligence Phase 1 environmental surveys
8    with respect to some of those
9    acquisitions.  He may have consulted
10    Saltire's other subsidiary ADI with
11    respect to some of its property land
12    development activities in California.
13        Q.   In your mind, was any of the time
14    he spent on activities unrelated to
15    Saltire Industrial, Inc.'s contaminated
16    sites billed or charged to Alper Holdings
17    USA, Inc.?
18        A.   I don't think so.  To my
19    recollection, there would be no occasion,
20    for Alper would not have any environmental
21    problems.  If there were any environmental
22    issues, they would be at the subsidiary
23    level.  Nick is nothing more than of a
24    direct employee for Alper Holdings for
25    convenience.  That is where the payroll
0087
1
2    and benefits and withholding is.  He is
3    loaned out as needed to various
4    subsidiaries.
5        Q.   And just so I am clear, other than
6    your understanding as to who Nick Bauer
Page 36

Bertellotti

```
 7    was working for, was there any document or
 8    any other -- well, was there a document
 9    memorializing when Nick Bauer was working
10    for, in your mind, a subsidiary as opposed
11    to working in his capacity as an employee
12    of Alper?
13            MR. SCOTT:  Object to the
14        form.
15    BY MR. STEWART:
16        Q.  Go ahead and answer.
17        A.  Document memorializing, such as
18    time records or like a lawyer might keep?
19        Q.  That would be an example.
20        A.  Not to my knowledge.  I think it
21    was quite obvious because he was spending
22    so much time -- of his time with respect
23    to Saltire.  That is where he was spending
24    his time.
25        Q.  Was it understood when he was
0088
 1
 2    working, in your mind, as a lone servant
 3    and when he was not?
 4        A.  He was hired specifically -- in
 5    effect, specifically for the purpose -- if
 6    it wasn't for Saltire's environmental
 7    issues, Nick Bauer wouldn't have been
 8    hired.  He was hired for the purpose of
 9    dealing with Saltire's environmental
10    issues.  The payroll, the benefits,
11    withholding of taxes; all that done -- was
12    done at the Alper Holdings level.  Saltire
13    did not maintain its own employee benefit.
14            It, Alper, was making a holding --
15    making investments.  It was also agreed we
16    would utilize his services on an as-needed
17    basis to address other environmental
18    problems that may arise at other
19    subsidiaries, also.  The intended purpose
20    was primarily to deal with Saltire.  And
21    there's other documents.  I mean, if you
22    were simply to look at his correspondence
23    files over the years, you would find
24    virtually all his correspondence relates
25    to Saltire activities.
0089
 1
 2            There may not be time records but
 3    there are other type of records that would
 4    indicate his role almost exclusively with
 5    Saltire.
 6        Q.  But when he would work for a
 7    different subsidiary, how would that be
 8    memorialized?
 9        A.  Only in the context of whatever
10    records he created in that process.
11    Whether he was conducting, for example, a
12    Phase 1 environmental survey with some
13    acquisition, possibly, or something to
14    evidence the time he spent there.
15        Q.  Basically, if he wrote a document
16    relating to an entity, would you then
17    assume that time was exclusively devoted
```

Page 37

Bertellotti

```
18   to that entity?
19        A.  Yes.
20        Q.  If he called you about a particular
21   entity, would you just assume, therefore,
22   he was working on behalf of that entity?
23        A.  If he calls specifically regarding,
24   for example, activities of Alper Ink
25   Group, if he had a reason to call me -- I
0090
1
2   don't recall that he did -- yes, he would
3   be working with respect to some issue
4   regarding the Alper Ink Group.
5        Q.  Was Nick Bauer authorized to file
6   documents with environmental authorities
7   without review by either you or Mr. Smith
8   or someone else at the headquarters?
9             MR. LUCAS:  What kind of
10            documents, Mike?
11            MR. SCOTT:  What
12            headquarters?  I would object to
13            the form.
14            MR. STEWART:  That is an
15            objection to the form?
16            MR. SCOTT:  Object to the
17            form.
18   BY MR. STEWART:
19        Q.  I think you can answer the question
20   and make it clear.
21        A.  I can answer it.  We made -- ever
22   since 1995, every year during the annual
23   elections, Nick is elected officer of
24   Saltire, vice-president of environmental
25   affairs, specifically giving him the
0091
1
2   authority to bind the corporation, to
3   engage in negotiations on behalf of the
4   corporation.  I would say more often than
5   not, Nick may enter into agreements or
6   make decisions with respect to certain
7   environmental issues on his own.  If they
8   raise to a certain level, if they are a
9   certain magnitude, certain complexity, he
10   may very well call us. Certain things
11   regarding settlements, for example.
12        Q.  Would you have expected a
13   settlement to be run through you and
14   approved by you?
15        A.  Yes, he would call Wayne and I as
16   senior officers of Saltire to discuss
17   settlement issues.
18        Q.  Would you have expected a
19   document -- a report filed with the
20   Environmental Protection Agency relating
21   to a contaminated site to be run by you or
22   Mr. Smith prior to its filing?
23        A.  If it was of a certain magnitude,
24   certainly, although my understanding is
25   there hasn't been any of that type of
0092
1
2   activity in the last few years.  Most of
```

Page 38

Bertellotti
```
 3   these sites are subject to consent orders
 4   and agreements that were reached some time
 5   ago.
 6        Q.   When you say magnitude, what
 7   magnitude?
 8        A.   There is no specific hard and fast
 9   rule.  It's a judgment issue as to the
10   amount of money involved.  Routine
11   contracts to continue monitoring, to
12   engage in some type of remediation, he
13   would enter into.  He would review some of
14   that stuff and another thing, if it was
15   relatively routine.  If not on a scale and
16   scope he felt necessary to discuss with
17   us, he had the necessary authority to bind
18   the corporation and take actions that he
19   thought were in Saltire's interest.
20        Q.   Did he have the authority to hire
21   and fire without your approval?
22        A.   Absolutely not. Hire and fire
23   employees, well, in the sense of
24   employees --
25        Q.   Yes?
0093
 1
 2        A.   No.
 3        Q.   Did he have the authority to hire
 4   and fire independent contractors without
 5   your approval?
 6        A.   He could have done that.  I think
 7   again, in any material instance, he would
 8   discuss that with us also.
 9        Q.   Was he entitled to make -- to take
10   on, develop new strategies regarding
11   environmental sites without your approval
12   or input?
13        A.   He would develop -- I mean, he is a
14   very skilled engineer with a long history
15   of involvement in environmental issues, so
16   we defer to Nick's judgment in terms of
17   the scope of the investigation, evaluating
18   remediation alternatives, and he is the
19   one that would come up with strategies,
20   alternatives.  He would make
21   recommendations to us.  We would defer to
22   his judgment.  Again, he is a very skilled
23   engineer.
24        Q.   But with regard to those kinds of
25   decisions, is it your testimony he would
0094
 1
 2   refer those to you for approval or review
 3   before execution?
 4        A.   In most instances, to the extent
 5   they are material, I would say yes.  But
 6   again, there hasn't been that much
 7   activity in the last few years.  There are
 8   instances where there are substantial
 9   things going on and he reviews us to,
10   throughout the scope of the remediation,
11   the type of things going on.  So he does
12   bring that to our attention.
13        Q.   Did Nick, Nick Bauer, his
```
Page 39

Bertellotti

```
14   activities -- strike that.
15         Was Nick Bauer, during the time he was
16   an employee of Alper Holdings USA, Inc.,
17   ever supervised by a human being who was
18   not an officer of Alper Holdings USA,
19   Inc.?
20         A.  Probably not.  But again, the point
21   being -- people, he was supervised by
22   people -- you clearly understand the dual
23   role.
24         There are people at Alper Holdings
25   USA, Inc. who are also officers of Saltire
0095
1
2    Industrial; and so to the extent he's
3    being supervised with respect to Saltire's
4    affairs, he's being supervised by somebody
5    who may be a direct employee of Alper but
6    is also a senior officer, above Nick, of
7    Saltire Industrial.  That's the context in
8    which he's being supervised.
9          Q.  Does -- I think you mentioned an
10   annual meeting.
11         When would Alper hold its annual
12   meeting?
13              MR. SCOTT:  Alper would
14         be --
15              THE WITNESS:  Alper
16         Holdings.
17   BY MR. STEWART:
18         Q.  Alper Holdings USA, Inc.
19         A.  The meeting doesn't take place in
20   the sense of a physical meeting.  The
21   meetings take place in the sense they are
22   a written consensus.  Unanimous written
23   consensus.
24         Q.  Does it occur at the same time
25   every year?
0096
1
2          A.  Occurs roughly the same time every
3    year.
4          Q.  When is that?
5          A.  I believe it's in the spring.
6          Q.  Could you be more specific?
7          A.  I can't.
8          Q.  When does, or does Saltire hold a
9    stockholders/shareholders meeting?
10         A.  Yes, it does.
11         Q.  When is that held?
12         A.  It's held -- most of the
13   corporations are held at the same time,
14   generally, orchestrated by the legal
15   department.  Obviously I sign certain
16   documents associated with this, but the
17   legal department knows what the calendar
18   is and annual election is and when things
19   are due.
20         Q.  Now, at the shareholders meeting,
21   are directors elected for Alper Holdings
22   USA, Inc.?
23         A.  Yes.
24         Q.  And do the shareholders elect the
```

Page 40

Bertellotti
```
 25   officers of the company of Alper Holdings
0097
  1
  2   USA?
  3        A.   The shareholders?
  4        Q.   Yes.
  5        A.   They do not.
  6        Q.   Do the directors elect the
  7   officers?
  8        A.   Directors appoint the officers of
  9   the corporation, Alper Holdings USA.
 10        Q.   And how long have you been familiar
 11   with how the shareholder and directors --
 12   shareholders and directors meetings were
 13   orchestrated at Alper Holdings USA, Inc.?
 14             MR. LUCAS:   Object to the
 15        form of the question.
 16   BY MR. STEWART:
 17        Q.   Let me rephrase.  We have talked
 18   about directors meetings or shareholders
 19   meetings held by Alper Holdings USA, Inc.
 20             How long have you been familiar
 21   when those meetings were held and how
 22   held?
 23        A.   I have certainly been involved as
 24   an officer/director since 1997.
 25        Q.   And does that -- is your knowledge
0098
  1
  2   of that corporate governance -- does it
  3   encompass the years 1997 forward for
  4   Saltire Industrial as well?
  5        A.   Yes, it does.
  6        Q.   Now, do you know whether Alper
  7   Holdings USA, Inc. has held a special
  8   directors meeting other than the annual
  9   meeting -- let me step back for a minute.
 10             Do the directors hold their
 11   meetings, a single meeting each year, at
 12   the same time that the shareholders hold
 13   their meeting?
 14        A.   Not necessarily.
 15        Q.   When do the Alper Holdings USA
 16   directors meet?
 17        A.   There is no routine schedule.
 18        Q.   How many times a year do they meet?
 19        A.   It would depend on the given year
 20   and what the activities of the corporation
 21   are.  Generally meet in the context of
 22   some event or corporate activity that
 23   requires it.  But again, it depends on the
 24   year.  We have had, some years, many more
 25   meetings than others.
0099
  1
  2        Q.   Well, when do they appoint the
  3   officers of the corporation?
  4        A.   At the same time, approximately the
  5   same time, that the directors were
  6   appointed.  The annual elections are made
  7   about the same time.
  8        Q.   Do the directors of Saltire
  9   Industrial, Inc. meet at the same time
```
Page 41

Bertellotti

10      that the shareholders do?
11          A.    Which shareholders?
12          Q.    When do the directors of Saltire
13      Industrial meet to appoint the officers of
14      Saltire Industrial?
15          A.    Again, it's generally relatively
16      early in the calendar year.  When the
17      legal department orchestrates these things
18      or outside counsel, if necessary, sets
19      them.
20          Q.    Does Saltire Industrial -- do
21      Saltire Industrial directors or director
22      meet at the same time and appoint officers
23      on roughly the same date that the annual
24      shareholders meeting's held?
25          A.    Yes.  I mean, in a sense, that's
0100
 1
 2      the purpose of it.  If you are talking
 3      about the annual shareholders meeting,
 4      it's held in order to appoint the
 5      directors.
 6          Q.    And then at that same time, do the
 7      directors then appoint the officers?
 8          A.    It would be approximately the same
 9      time, is my recollection.
10          Q.    Are the directors of Saltire
11      Industrial, Inc. paid?
12          A.    They are not.
13          Q.    Are the directors of Alper Holdings
14      USA paid?
15          A.    They are not.  They were paid at
16      some point in the early '90s, although
17      that was cut off in the mid-'90s.
18          Q.    Do you know when it was cut off?
19          A.    1996 or 1997.
20          Q.    Why was it cut off?
21          A.    The board was, in effect,
22      reconstituted in 1997 and we decided to
23      terminate those payments.
24          Q.    What were the payments prior to
25      that time?
0101
 1
 2          A.    The amounts?
 3          Q.    Yes?
 4          A.    I believe they were $30,000
 5      annually per director.
 6          Q.    Okay.  Prior to 1997, who were the
 7      board members of Alper Holdings USA, Inc.?
 8          A.    Prior to 1997, they would have been
 9      Nicholas Combemale, Ernesto Canales, and
10      Alberto Geociatucci.
11          Q.    How long did they serve as the
12      directors of Alper Holdings USA, Inc.?
13          A.    To my knowledge, it would have been
14      approximately 1993 to mid-1997.
15          Q.    Do you know who served as its
16      directors prior to 1993?
17          A.    I do not.
18          Q.    Post-'97, who served as the
19      directors of Alper Holdings USA, Inc.?
20          A.    Luis Felipe Gonzalez; Luis Felipe
                              Page 42

Bertellotti
```
 21   Sanchez; Victor Barreiro, B-a-r-r-e-i-r-o;
 22   and Rodolfo Garcia.
 23       Q.   Are these currently the directors
 24   of Alper Holdings USA, Inc.?
 25       A.   Yes, they are.
0102
  1
  2       Q.   They have been the directors --
  3   have they been the directors since 1997?
  4       A.   There may have been one -- no, Luis
  5   Felipe Sanchez probably was added in 1998
  6   or 1999.
  7       Q.   Is the office of vice-president of
  8   environmental affairs specifically
  9   referenced in Alper Holdings USA, Inc.'s
 10   charter?
 11       A.   Not to my knowledge.
 12       Q.   Is the office of vice-president of
 13   environmental affairs specifically
 14   referenced in Alper Holdings USA's
 15   incorporation bylaws?
 16       A.   Not to my knowledge. I don't know
 17   is really a better answer.  I simply don't
 18   know.
 19       Q.   Does Alper Holdings USA, Inc. have
 20   bylaws?
 21       A.   Yes, it does.
 22       Q.   And where can those be found?
 23       A.   In our offices.
 24       Q.   Would that be the best place to
 25   look to answer that question?
0103
  1
  2       A.   Yes.
  3       Q.   Have the bylaws been amended since
  4   1993 when you have been at the company?
  5       A.   I would have to consult with the
  6   general counsel.
  7       Q.   Can you recall an amendment?
  8       A.   I don't recall.
  9       Q.   In your mind, has the structure of
 10   Alper Holdings USA changed, that you would
 11   think the bylaws had been amended at that
 12   time?
 13       A.   You are talking very specific legal
 14   issues regarding things that I don't have
 15   an intimate familiarity with as president.
 16   Specifically, that's why we generally
 17   always had in the position of general
 18   counsel as many as two lawyers on the
 19   staff.  That's why we generally refer
 20   these people to outside counselors to
 21   address these issues.
 22       Q.   I take it -- well, have minutes
 23   been taken at all of the shareholders
 24   meetings since 1993 for Alper Holdings
 25   USA, Inc.?
0104
  1
  2       A.   To the extent minutes were
  3   required, yes.
  4       Q.   To the extent minutes are required,
  5   have they been taken at directors meetings
```
Page 43

Bertellotti

```
 6   since 1993 when you arrived at the
 7   company?
 8        A.  I believe so.
 9        Q.  Have minutes of directors meetings
10   and of shareholders meetings been taken to
11   the extent required at Saltire director
12   and shareholder meetings?
13        A.  That is standard practice.
14        Q.  So the answer is yes?
15        A.  Yes.
16        Q.  Is the office of vice-president of
17   environmental affairs specifically
18   referenced in the charter of Saltire
19   Industrial, Inc.
20        A.  Without reviewing that document, I
21   don't know.  If it's required by law, I
22   assume it is.  I assume general counsel
23   would have modified that to reflect that,
24   if it's required.
25        Q.  Do you know if the office of
0105
 1
 2   vice-president of environmental affairs is
 3   specifically referenced in the bylaws of
 4   Saltire Industrial, Inc.
 5        A.  I do not know, sitting here.
 6        Q.  To answer that question, would you
 7   want to refer to the charter and bylaws of
 8   Saltire Industrial, Inc.
 9        A.  Yes.
10                MR. SCOTT:  Object to the
11           form.
12   BY MR. STEWART:
13        Q.  Are those located at the company?
14        A.  Yes, they are.
15        Q.  Did you say that Nicholas Bauer is
16   appointed to the vice-president of
17   environmental affairs by the board of
18   directors of Alper Holdings USA, Inc.?
19        A.  No, I did not say that.
20        Q.  Who does appoint him?
21        A.  Vice-president of environmental
22   affairs of Saltire.
23        Q.  Of Alper Holdings?
24        A.  Repeat the whole question.  I maybe
25   misunderstood you.
0106
 1
 2        Q.  Who appoints Alper Holdings USA
 3   Inc.'s vice-president of environmental
 4   affairs?
 5        A.  Alper's board of directors.
 6        Q.  And who appoints Saltire
 7   Industrial, Inc.'s vice-president of
 8   environmental affairs?
 9        A.  Saltire's board of directors.
10        Q.  Has that been true since 1993 when
11   you joined Alper Holdings USA, Inc.?
12        A.  Again, Mr. Stewart, from 1993 to
13   1997 I wasn't involved in the corporate
14   governance issues.  But Nick Bauer joined
15   in 1995 and I have seen indications that
16   each year since 1995, Saltire's board of
```

Page 44

Bertellotti

17    directors appointed Nick Bauer
18    vice-president of environmental affairs of
19    Saltire.  So since 1995, I believe that is
20    true.
21        Q.   Have you seen those documents
22    recently?
23        A.   I have not seen them in months.
24        Q.   And have you seen them in
25    connection with reviewing the briefs filed
0107
1
2    in this case?
3        A.   I don't recall looking.  I believe
4    I asked somebody who works for me to look
5    at it, but I didn't specifically review
6    it.  But I believe it could be true.
7        Q.   Who did you ask to look at it?
8        A.   Mr. Smith.
9        Q.   And did you talk to him about that?
10        A.   Yes, sometime in the course of the
11    last five or six months.
12        Q.   About what those documents said?
13        A.   Yes.  Again, you are asking
14    questions over a long period of time.
15        Q.   Well, the question I am asking,
16    though, did you and Mr. Smith talk about
17    the records relating to Mr. Bauer's
18    appointment as vice-president of
19    environmental affairs?
20                MR. SCOTT:   When?
21                MR. LUCAS:   When?
22    BY MR. STEWART:
23        Q.   Have you discussed that with
24    Mr. Smith?
25        A.   Only in passing.
0108
1
2        Q.   Have you discussed it within the
3    past four months in connection --
4        A.   I believe we discussed it once in
5    the last five months.
6        Q.   What was that in connection with?
7        A.   We were just verifying precisely --
8    I didn't remember specifically when
9    Mr. Bauer joined the company, whether it
10    was '94, '95, or '96, and we were
11    verifying what year he joined and what
12    year he was made vice-president of
13    environmental affairs of Saltire.
14        Q.   He got that information -- did he
15    get that information from the corporate
16    documents you referred to?
17        A.   Yes.
18        Q.   Under the bylaws of Alper Holdings
19    USA, Inc., are there are any particular
20    activities that must be approved by the
21    board of directors?
22        A.   I would have to refer to the
23    specific bylaws.
24        Q.   You would have to look at the
25    bylaws?
0109
1

Page 45

Bertellotti

```
 2          A.   I would have to look at the bylaws.
 3          Q.   For Saltire, are there any specific
 4   activities that must be approved by the
 5   board of directors?
 6          A.   There may be, but would I need to
 7   review the specific bylaws.
 8          Q.   You talked about directors meetings
 9   for Alper Holdings USA, Inc.
10          A.   Yes.
11          Q.   Tell me the directors meetings that
12   have been held this year.
13          A.   To my knowledge, it was just one.
14   That would be to make the annual election
15   of the officers.
16          Q.   How about in 2002?
17          A.   There would certainly have been the
18   annual election of the officers.
19          Q.   Can you remember any special
20   meetings?
21          A.   2002, I don't recall any, sitting
22   here.
23          Q.   How about 2001?
24          A.   Again, the annual election.
25          Q.   Now, 2000?
0110
 1
 2          A.   Yeah.
 3          Q.   Tell me about the meetings of the
 4   board of directors of Alper Holdings USA,
 5   Inc. that occurred in 2000.
 6          A.   Mr. Stewart, without checking all
 7   the minute books, I couldn't specifically
 8   remember each and every meeting that took
 9   place, whether it was one or more and what
10   they were.  If you have something specific
11   in mind, ask me.
12          Q.   Well, was a meeting held relating
13   to the sale of Alper Ink?
14          A.   Meeting at what level?  Certainly
15   we would have sought shareholder approval.
16   We -- the practice would have been, again,
17   if it was required by the bylaws or not.
18   I can't tell you, sitting here.  The
19   practice would have been -- Saltire
20   developed its major subsidiary, a
21   transaction of such scope and magnitude,
22   we would have thought it prudent to get a
23   shareholder resolution on that standard
24   governance.  You see it all the time in
25   the public sector; people getting approval
0111
 1
 2   for stock option plans, mergers, and major
 3   divestitures.
 4          Q.   For that, you get a shareholder
 5   approval?
 6          A.   Yes.  If it's a scope of magnitude,
 7   we go to the shareholders, more often than
 8   not.  It doesn't happen very often
 9   officially.
10          Q.   Can you think of any time when you
11   have gone to the shareholders of Alper
12   Holdings USA, Inc. in 2001 to 2003?
```

Page 46

Bertellotti
13      A.   It's probable you are aware of the
14  $25 million loan that was made to Grupo
15  IUSA. It's probable -- again, without
16  having the records to late 2000/2001 in
17  front of me, it's probable we reviewed --
18  we viewed that as loaning a large sum of
19  Saltire's assets; and we would have, as I
20  said, with all probability, high degree of
21  certainty, we would have requested a
22  shareholder approval on that.  Again, the
23  transaction being such in scope and
24  magnitude that we wanted shareholder
25  involvement.
0112
1
2      Q.   Would you have requested
3  shareholder approval of the sale of Alper
4  Ink?
5      A.   I believe -- didn't we talk about
6  that a minute ago?
7      Q.   I want to make sure I am clear.
8      A.   Yeah, I believe so.
9               MR. SCOTT:  For the court
10         reporter, it's spelled Alper Ink,
11         I-n-k.
12  BY MR. STEWART:
13      Q.   Does the divestiture of Alper
14  Development have been the sort of activity
15  that would have -- that you would have
16  sought shareholder approval of?
17      A.   That in a way predates -- the
18  decision to divest Alper Development, Inc.
19  predates my position of an officer,
20  although I was clearly involved in the
21  subsequent, so that decision being made, I
22  don't know.  It seems possible, maybe
23  likely, that would be the type of
24  transaction that sought shareholder
25  approval, but I wasn't involved.
0113
1
2      Q.   Who is the shareholder of Alper
3  Holdings USA, Inc.?
4      A.   It has two corporate shareholders.
5      Q.   Who are they?
6      A.   I don't know the name off the top
7  of my head.  I would have to review
8  records.
9      Q.   What records would you review?
10      A.   I would probably look at the stock
11  registry.  I just don't know.  I could
12  find it easily enough.  I don't know the
13  names off the --
14      Q.   Do you know who Grupo IUSA is?
15      A.   It's not -- it's not a
16  shareholder -- direct shareholder of Alper
17  Holdings.
18      Q.   Is it an indirect holder of Alper
19  Holdings?
20      A.   I don't believe.
21      Q.   Is Carlos Peralta a direct
22  shareholder of Alper Holdings?
23      A.   Common knowledge -- commonly
Page 47

Bertellotti
24    believe that he is, although I have not
25    seen any certificates or anything
0114
 1
 2    evidencing his ownership or his
 3    percentage.
 4        Q.    Is that your understanding?
 5        A.    Yes.
 6        Q.    Has that been true during the time
 7    that you have been at Alper?
 8        A.    I know that at one point in time
 9    his father was a shareholder.
10        Q.    Is that Alejo Peralta?
11        A.    His father is passed away.  Carlos'
12    father passed away, but his name was
13    Alejo, yes.  You spoke of Alejo with
14    regard to the CashX board of directors.
15        Q.    Since you became president has
16    Carlos been -- to your knowledge, Carlos
17    Peralta's primary indirect shareholder of
18    Alper Holdings?
19        A.    I am sure, although I haven't seen
20    anything evidencing his ownership.
21        Q.    When you talk about seeking
22    shareholder approval, would you talk
23    directly with Carlos Peralta about those
24    decisions?
25        A.    No.
0115
 1
 2        Q.    Who would you talk to?  How are
 3    shareholders' approval sought?
 4        A.    For Saltire?
 5        Q.    For Alper Holdings USA, Inc.
 6        A.    There's contact with the corporate
 7    shareholders.
 8        Q.    What human being is contacted? How
 9    are they contacted?
10        A.    By telephone call.
11        Q.    Well, who would make such a contact
12    to tell them about, say, the Alper Ink
13    deal?
14        A.    You are making a mistake in your
15    assumptions.  You are assuming --
16        Q.    Please correct me.
17        A.    You are assuming that what I
18    specifically said -- maybe I misspoke, I
19    don't think I did.
20            What I specifically said, if
21    Saltire decided to sell Alper Ink, if
22    Saltire Industrial decided to sell its
23    subsidiary of Alper Ink, it would ask for
24    its shareholder approval, which is Alper
25    Holdings.  It would never go further than
0116
 1
 2    that.
 3        Q.    Okay, let's get back.  So, for
 4    Alper Holdings USA, Inc. for the year
 5    2000, how many special -- how would I find
 6    out how many special directors meetings
 7    were held?
 8        A.    For Alper Holdings, we would have
                        Page 48

Bertellotti
```
 9    to refer to the minute books.
10         Q.   And are you saying now that Alper
11    Holdings USA, Inc. -- and to your
12    knowledge, has Alper Holdings USA, Inc.
13    sought shareholder area approval for any
14    action since the year 2000?
15              MR. SCOTT:   Object to the
16         form of the question.
17    BY MR. STEWART:
18         Q.   Go ahead and answer.
19         A.   Is Alper -- let me repeat, has
20    Alper Holdings USA, Inc. ever sought
21    shareholder approval with respect to any
22    action?
23         Q.   Right.
24         A.   I believe only with respect to the
25    appointment, the selection of board of
0117
 1
 2    directors.
 3              MR. SCOTT:   Could we crack
 4         one of the doors a little more?
 5    BY MR. STEWART:
 6         Q.   Saltire Industrial, Inc.  Have any
 7    special board meetings been held by
 8    Saltire Industrial, Inc.'s board from 2000
 9    to present?
10         A.   2000 to the present, I would say
11    yes.  Certainly with respect to the sale
12    of the Alper Ink Group.  Obviously the
13    election -- you are making the distinction
14    between special and routine.
15         Q.   Yes?
16         A.   Special, meaning not the annual.
17    Certainly there would have been a board
18    resolution authorizing the sale.
19         Q.   And I think -- did you just say
20    that resolution would have occurred after
21    Alper Holdings gave its approval?
22         A.   Yeah, that's right.
23         Q.   I am going to --
24              (Whereupon Exhibit 7 is
25         Marked.)
0118
 1
 2    BY MR. STEWART:
 3         Q.   Do you recognize this document?
 4         A.   I do.
 5         Q.   What is it?
 6         A.   It's the management agreement.
 7         Q.   If you look at it, it's an accurate
 8    copy of the management agreement?
 9         A.   It's certainly accurate as of 1995.
10    It's possible it's been amended since
11    then, but I suspect it's probably very
12    consistent.
13         Q.   Do you know if it's been amended
14    since then?
15         A.   Off the top of my head, I do not.
16         Q.   All right.  Do you see a statement,
17    whereas Alper Holdings is in the business
18    of providing such services?  That's the
19    third paragraph.
```
                              Page 49

Bertellotti

```
20        A.  Yes.
21        Q.  You see, whereas the companies
22   require certain management supervisory and
23   advisory services.  Do you see that?
24        A.  Where are you looking?
25        Q.  The first -- second paragraph?
```
0119
```
 1
 2        A.  I see it.  Got it.
 3        Q.  Is this -- are those two
 4   statements, combined with the companies in
 5   the first paragraph, an accurate
 6   description of what Alper's business is?
 7        A.  Not in its entirety, no.
 8        Q.  What other businesses does Alper
 9   have, other than providing services to
10   related entities?
11        A.  Well, first and foremost, I think a
12   traditional holding company is set up and
13   designed specifically to hold interests in
14   other companies, to manage in the sense of
15   monitor, supervise, evaluate the various
16   businesses that it owns.  I think that is
17   first and foremost of its role, and
18   depending on the nature of the business,
19   it may or may not provide services to the
20   extent there seems to be efficiency or
21   benefit in doing so.  First and foremost,
22   it's a traditional holding company.
23        Q.  Let's turn back to your affidavit
24   that is Exhibit 2.
25        Now do you see paragraph -- I will say
```
0120
```
 1
 2   the second paragraph, Number 1 on your
 3   affidavit?
 4        A.  Yes.
 5        Q.  Prior to 1993, any personal
 6   involvement with any of the activities
 7   described here?
 8        A.  Prior to 1993, what are you calling
 9   activities?
10        Q.  Any personal involvement with
11   Saltire or any of the activities that are
12   stated on your affidavit, Paragraph 1?
13        A.  No, no personal activity.
14        Q.  Okay.  For Paragraph Number 2, did
15   you have any personal involvement with the
16   transaction you describe in Paragraph 2?
17        A.  No.  I am not familiar with the
18   documents, but not -- I was not directly
19   involved.
20        Q.  Did you have any personal
21   involvement with the divestiture and other
22   activities that you described in Paragraph
23   3?
24        A.  I did not have any personal
25   involvement, although I have personal
```
0121
```
 1
 2   knowledge of those divestiture agreements
 3   and what they represent.
 4        Q.  Is your personal knowledge based on
```
Page 50

Bertellotti

```
 5   your reading of the divestiture agreements
 6   themselves?
 7         A.   I have had occasion to familiarize
 8   myself with certain sections of the
 9   divestiture agreements.
10         Q.   Are -- is there any other source of
11   your knowledge for the activities in
12   Paragraph 3 other than those divestiture
13   agreements?
14         A.   Well, I have personal knowledge.  I
15   mean, we are still administering, funding
16   a lot of these liabilities, these legacy
17   liabilities.  Clearly we have personal
18   involvement that exists and continues to
19   this day.
20         Q.   Do you know whether any liabilities
21   for environmental contamination that had
22   been Scovill's liability based on
23   historical activities were transferred to
24   other entities as part of the divestitures
25   described in Paragraph 3?
0122
 1
 2                 MR. SCOTT:  Object to the
 3           form.
 4   BY MR. STEWART:
 5         Q.   Go ahead and answer the question.
 6         A.   With respect to these specific --
 7   yeah, we have one, I believe, one set
 8   of -- repeat the question, please.
 9         Q.   I am.  You mentioned a bunch of
10   divestitures?
11         A.   Yeah.
12         Q.   In Paragraph 3; do you see that?
13         A.   Yes.
14         Q.   And there were divestitures of
15   Saltire subsidiaries based on divestiture
16   agreements, is that?
17         A.   That's correct, and they retain
18   certain liabilities I got.
19         Q.   Were there any divestitures -- were
20   any divestiture made to your knowledge
21   which Saltire did not retain liabilities
22   for any environmental contamination
23   created by the developed entity?
24         A.   I don't think so.  I believe with
25   the sale of Scovill Fasteners, which
0123
 1
 2   occurred much later than what we are
 3   referring to, occurred in 1995 I believe,
 4   we may have divested in that transaction
 5   some of Scovill Fasteners' specific
 6   liability, but I have to read the
 7   representations, warranties, and
 8   indemnification agreement to be specific.
 9   I think the -- a distinct possibility, we
10   may have transferred some liabilities
11   associated with Scovill Fasteners'
12   operations specifically.
13         Q.   Is that the only instance in which
14   you can recall liabilities passing or
15   being divested with the divestiture of a
```

Page 51

Bertellotti

```
16   Scovill subsidiary?
17        A.   It's the only one I am aware of,
18   sitting here right now.
19        Q.   Otherwise, it's your understanding
20   Saltire Industrial, the renamed Scovill,
21   retains all of the environmental and the
22   contamination liabilities from all the
23   activities described in Paragraph 1 of
24   your affidavit?
25        A.   Paragraph 1?  You mean Paragraph 3?
0124
 1
 2        Q.   I am referring to Paragraph 1,
 3   Number 2.  The second Paragraph 1 on Page
 4   1.
 5             MR. LUCAS:  Can you repeat
 6        the question?
 7             MR. STEWART:  I think that
 8        is fair.
 9   BY MR. STEWART:
10        Q.   It's just a simple question.  I
11   want to make sure I understand.  Other
12   than Scovill Fasteners, you don't have any
13   other instance in which Scovill or Saltire
14   divested a subsidiary but did not retain
15   the environmental liabilities?
16        A.   I am not aware of any.  You are
17   making an absolute statement, and without
18   reviewing those documents line by line and
19   veting all of the reps and warranties and
20   indemnification provisions, I wouldn't
21   make a statement like that.  My general
22   recollection, they maintained the vast
23   majority if not all of the liabilities
24   associated with the former operations.
25        Q.   Paragraph 5, you see that on your
0125
 1
 2   affidavit.
 3             Did you have any involvement with
 4   the pre-packaged Chapter 11 bankruptcy?
 5        A.   I did not have any direct
 6   involvement with it, although I have
 7   reviewed certain documents and have gained
 8   certain personal knowledge of the certain
 9   aspects of the bankruptcy.
10             MR. STEWART:  Make this
11        whatever the next Exhibit is.
12             (Whereupon Exhibit 8 is
13        Marked.)
14             (Whereupon a Recess is
15        Taken.)
16   BY MR. STEWART:
17        Q.   Do you recognize the document in
18   front of you?
19        A.   Yes.
20        Q.   What is it?
21        A.   Saltire Industrial, Inc. and
22   Subsidiaries, Independent Auditors' Report
23   for fiscal year December 31, 2000 and
24   1999.
25        Q.   Could you briefly turn to Page 12?
0126
```

Page 52

Bertellotti

```
1
2         A.   Yes.
3         Q.   Do you see the related-party
4    transactions?
5         A.   Yes, I do.
6         Q.   Tell me what were the management
7    and advisory fees for 2000 paid by Saltire
8    to Alper Holdings USA, Inc.
9         A.   Shows four and a half million
10   dollars.
11        Q.   Now, can you look at the management
12   agreement which is also in Exhibit --
13             MR. SCOTT:   Seven.
14   BY MR. STEWART:
15        Q.   -- 7?
16        A.   Yes.
17        Q.   Can you tell me what the $4.5
18   million is for, what is called
19   compensation under Part 3 of the
20   management agreement?
21        A.   Yes, it is.
22        Q.   Okay.  So the $4.5 million, that's
23   the management and advisory fees for 2000
24   on Exhibit 8?
25        A.   That's correct.
0127
1
2         Q.   Does that $4.5 million include any
3    direct expenses as set out in Paragraph 2
4    of the management agreement?
5         A.   Yes, it would cover the direct
6    expenses, as well.  I don't think we make
7    a separate billing for the direct
8    expenses.  But let me finish reading this,
9    though.  (Reading.)
10        Q.   Take your time.
11        A.   Go ahead.
12        Q.   Well, would that 4 -- now that you
13   have looked at Part 2, would direct
14   expenses be included in this $4.5 million
15   figure for 2000?
16        A.   To the extent -- the way I read
17   this, to the extent Alper Holdings incurs
18   direct expenses, out-of-pocket expenses,
19   for all direct out-of-pocket expenses
20   reasonably incurred by Alper Holdings in
21   connection with his performance of
22   responsibilities to such companies, I
23   don't believe the four and a half million
24   dollars would include these direct
25   expenses.  And I also don't believe there
0128
1
2    are a lot of direct expenses that meet
3    this definition that we would seek
4    reimbursement for.
5         Q.   But the $4.5 million, it would
6    include the compensation that is set out
7    in Part 3 of the management agreement,
8    which is --
9         A.   Yeah.
10        Q.   Which is Exhibit 7.
11        A.   In respect to the management issues
```

Page 53

Bertellotti
```
12   listed as A through G on Pages 1 and 2.
13       Q.   Can you tell me, looking at Page 12
14   of the financial statement that is Exhibit
15   8, what the director -- what the
16   compensation and the management agreement
17   paid by Scovill for 1999 was?
18       A.   $4.5 million.
19       Q.   So did we have a payment of $4.5
20   million in '99, and then another payment
21   of $4.5 million in 2000?
22           MR. SCOTT:   Object to the
23       form.
24   BY MR. STEWART:
25       Q.   Let me rephrase.  I think we can
0129
1
2   address the objection.
3           Did we have payments totaling $4.5
4   million for 2000, management advisory
5   fees; and then another set of payments
6   totaling $4.5 million for '99?
7       A.   Yes, it appears that way.  These
8   are probably accrual numbers.  Whether the
9   payments were actually effected in that
10   year is also hard to say.  I think you are
11   talking whether there was accrual for
12   management fees of those amounts in those
13   years, and I think the answer is yes.
14       Q.   $4.5 million accrued in 2000, and
15   then another $4.5 million accrued in 1999?
16       A.   That's correct.
17       Q.   Let's turn back to your affidavit.
18   Do you see Paragraph 7 in that affidavit,
19   where it says Alper was compelled to
20   exchange its debt for 55 percent of the
21   common stock in the First City?
22       A.   Yes.
23       Q.   At the time of that transaction,
24   were you personally involved with Alper?
25       A.   That was in October, November of
0130
1
2   1992.  No, I was not.
3       Q.   Did you have any direct involvement
4   with that transaction?
5       A.   I did not have any direct
6   involvement with it but I have knowledge
7   of that transaction.
8       Q.   And what is your knowledge based
9   on?
10       A.   Review of certain of the documents
11   associated with that transaction, as well
12   as discussions with lawyers and business
13   people who did have some direct
14   involvement.
15       Q.   What documents are you referring
16   to?
17       A.   It would be the bankruptcy plan of
18   reorganization and plan of confirmation.
19       Q.   For all these activities that
20   occurred before you got to Alper, would
21   you defer to statements made by officers
22   and directors of Alper -- let me rephrase
```
Page 54

                                         Bertellotti
23    that.
24            As between your understanding and
25    the understanding of an officer or
0131
1
2    director of Alper who was personally
3    involved with the events described in
4    Paragraph 7?
5        A.  Hm-hm.
6        Q.  Who would you believe would have
7    the more accurate personal knowledge?
8                MR. LUCAS:  As to what?
9                THE WITNESS:  As to what,
10            exactly?
11   BY MR. STEWART:
12       Q.  The events in Paragraph 7 that you
13   described in your affidavit.
14                MR. SCOTT:  I also object
15            to the form of the question.
16                MR. LUCAS:  Object --
17            excuse me, I didn't mean to
18            interrupt.  Go ahead.  I object
19            to it as overly broad.
20                THE WITNESS:  To the extent
21            people were directly involved in
22            the bankruptcy, it's lawyers
23            drafting the documents.  They
24            would clearly have more
25            exhaustive personal knowledge
0132
1
2            than I have.
3                I have never represented
4            that I understand all of the
5            intimate and painstaking details
6            of bankruptcy.  I do understand
7            certain aspects of it.  I
8            understand when it occurred.  I
9            understand how it came about to
10           have our equity interest and
11           those type of things, I know.
12                I reviewed the documents; I
13           have seen those figures; I know
14           those things happened, but I
15           don't have an intimate knowledge
16           of all the details of a very
17           complex bankruptcy.
18   BY MR. STEWART:
19       Q.  For periods before September of
20   1993, would Nick Combemale have knowledge
21   of Alper Holdings USA's activities as
22   compared to your knowledge?
23                MR. LUCAS:  Object to form
24            of the question as overly broad.
25                MR. SCOTT:  Also requires
0133
1
2            speculation of somebody's else's
3            knowledge and recollection and so
4            forth.
5    BY MR. STEWART:
6        Q.  Just answer the question.
7        A.  Can you be more specific in terms
                                         Page 55

Bertellotti
```
 8   of regarding, what, the bankruptcy?
 9       Q.  Can you think of a single subject
10   relating to Alper Holdings USA, Inc.'s
11   activities prior to 1993 in which your
12   knowledge of those activities would be
13   superior to those of Nicholas Combemale?
14              MR. SCOTT:  Again, object
15          to the form of the question.
16   BY MR. STEWART:
17       Q.  Go ahead and answer.
18              MR. LUCAS:  Same objection.
19              THE WITNESS:  Not to be
20          difficult, but just phrase it
21          again.  Or repeat the same
22          question; just let me listen
23          carefully.
24   BY MR. STEWART:
25       Q.  I want to know if you can think of
0134
 1
 2   any activities conducted by Alper Holdings
 3   USA, Inc. that occurred before September
 4   of '93 that would be more familiar to you
 5   than to Nicholas Combemale?
 6              MR. SCOTT:  Object to the
 7          form of the question.
 8   BY MR. STEWART:
 9       Q.  Go ahead and answer.
10       A.  Just sitting here, I can't
11   speculate as to what Mr. Combemale knows
12   and what he doesn't know.  It would be
13   completely guessing.  I don't know what
14   Mr. Combemale knows.  He may have slightly
15   incremental knowledge of the bankruptcy
16   and specifics of the bankruptcy, but
17   beyond that, I am not sure what he would
18   know more about.
19       Q.  But I take it, or would you --
20   there was a legal document that
21   contradicted your affidavit -- strike
22   that.
23       Who knows more about Alper's legal
24   affairs prior to September of 1993:  You
25   or Mr. Coghlin over there?
0135
 1
 2              MR. SCOTT:  Objection to
 3          the form of the question.
 4   BY MR. STEWART:
 5       Q.  Go ahead and answer.
 6       A.  I can't speculate to Mr. Coghlin's
 7   knowledge.
 8       Q.  Tell me how Alper was compelled to
 9   exchange his debt for the common stock of
10   First City.  How compelled?
11       A.  Well, the word compelled, as used
12   here, simply meant it was a condition of
13   the bankruptcy.  Alper was a creditor and
14   held certain bonds.  It had no choice but
15   to have the bonds converted.  It didn't
16   have a choice of being repaid.  Its choice
17   was to take equity, 55 percent of the
18   equity in the company.  Compelled in the
```
Page 56

Bertellotti
19  context that this is what the Judge
20  ordered; this is what the Judge approved.
21      Q.  But was Alper -- is it fair to say
22  Alper voluntarily elected to participate
23  in the bankruptcy in order to gain control
24  of First City?
25      A.  Again, I was not involved prior to
0136
 1
 2  1992.  I don't know what the motives and
 3  intents are.  I don't know when they
 4  originally acquired all of the bonds that
 5  led to the conversion.  It's a
 6  possibility, but I can't speculate.  I
 7  don't have any personal knowledge as to
 8  what the intent was at the time.  I simply
 9  know they had data that was converted into
10  the 55 percent of the equity.  As to the
11  intent, I don't know.
12      Q.  The First City referred to in
13  Paragraph 5 and 7; what First City entity
14  is that?
15      A.  That would be First City
16  Industries.
17      Q.  Okay.
18              MR. SCOTT:  Incorporated.
19              THE WITNESS:  Incorporated.
20          Specifically, the companies
21          subject to the 1992 bankruptcy.
22  BY MR. STEWART:
23      Q.  And how did Alper become a major
24  creditor for First City?
25      A.  How did Alper become a major
0137
 1
 2  creditor of First City?  Alper, you are
 3  referring to who -- Alper is successor to
 4  a couple of companies.
 5      Q.  Here is what I am referring to.
 6  Paragraph 6, you say Alper, which was
 7  initially incorporated as Alpha
 8  Acquisition Corporation on September 16,
 9  '92, was a large creditor of First City.
10  Do you see that?
11      A.  Yes.
12      Q.  Okay.  How had Alper Acquisition
13  Corporation become a large creditor of
14  First City at that time?
15      A.  Without being directly involved, I
16  would assume they either acquired the
17  bonds from a third party, or the bonds may
18  have been contributed to them to
19  capitalize the corporation from some other
20  entity which held them prior.  Individual,
21  maybe, I don't know.  But one way or the
22  other, Alper either bought the bonds or
23  contributed to this part of the
24  capitalization.  That is how it came to
25  get its interest.
0138
 1
 2      Q.  What documents would show that
 3  transaction whereby Alpha Acquisition
                    Page 57

Bertellotti
```
 4  became a large creditor of First City?
 5      A.   I don't know.
 6      Q.   Who would know?
 7      A.   Again, I don't know specifically.
 8  There may be some advisor to the Peralta
 9  family, someone who knows.  But I don't
10  know.
11      Q.   Do you know who conducted due
12  diligence to First City on behalf of Alper
13  Acquisition Corporation?
14      A.   Who conducted due diligence on
15  behalf of First City?
16      Q.   What human being -- do you know
17  what human being was responsible for
18  analyzing First City on behalf of Alper?
19          MR. SCOTT:  Object to the
20      form.
21          MR. LUCAS:  For what
22      purpose?
23          MR. SCOTT:  Object to the
24      use of the word First City unless
25      we are clearly understanding
0139
 1
 2      you are referring to First City
 3      Industries, Inc. as referred to
 4      in Paragraph 7 of Mr.
 5      Bertellotti's affidavit.
 6          MR. LUCAS:  Are you going
 7      to clarify what you are asking
 8      about?
 9  BY MR. STEWART:
10      Q.   I am going to clarify to these
11  myriad objections.  We are still talking,
12  Mr. Bertellotti, about your sworn
13  statements in your affidavit Alper
14  Acquisition initially incorporated on
15  September 16, 1992 and was a large
16  creditor of First City -- First City if
17  it's convenient for you -- strike that.
18  Let me clean this up.
19          I think you already testified that
20  by First City, you meant First City
21  Industries, Inc.?
22      A.   Subject to the bankruptcy, correct.
23      Q.   What I want to know in connection
24  with First City -- when Alper Acquisition
25  Corporation was becoming a large creditor
0140
 1
 2  of First City, did Alper conduct a due
 3  diligence into First City's  assets and
 4  liabilities?
 5      A.   I assume, absolutely, they would
 6  have.
 7      Q.   Do you know the human beings that
 8  would have been involved?
 9      A.   I believe they hired a financial
10  advisor to do so.
11      Q.   Who would that have been?
12      A.   I think it was a company called
13  Valmex International.
14      Q.   Why do you think?
```
                                        Page 58

Bertellotti

15       A.  It was a subsidiary of a large
16  Mexican bank that had a U.S. office, a
17  brokerage/investment banking arm.
18       Q.  Is it your understanding that
19  Alper -- is it your understanding Alper
20  analyzed First City and decided from an
21  investment standpoint to acquire its stock
22  as part of this bankruptcy?
23       A.  I told you, I don't know what the
24  intent was.  Don't know how they came to
25  acquire the bonds.  I remember something
0141
1
2   about something being called Valmex that
3   was involved in advising them.  But what
4   the intent was, I simply don't know.  I
5   wasn't involved.  I simply don't know what
6   happened.  I know what the result was.
7   But I can't sit here and speculate as to
8   the intent.
9        Q.  Was -- do you know the human being
10  that made the decision to make that
11  acquisition that is described in Paragraph
12  6 of your deposition -- of your affidavit?
13       A.  Specifically, I do not.  I suspect
14  at some level, Peralta family members were
15  informed.  There's a gentlemen named
16  Roberto Labreha.
17       Actually, I think I can be more
18  specific.  As I sit here, there's a
19  gentleman named Roberto Labreha who works
20  in Mexico who was somehow involved in this
21  decision.
22       Q.  You say somehow involved, meaning
23  he is an advisor?
24       A.  He is some type of financial
25  advisor down there.
0142
1
2        Q.  Works with Carlos Peralta?
3        A.  I don't know specifically who he
4   works for but he is in Mr. Peralta's
5   organization somewhere in Mexico.
6        Q.  Is it your assumption Carlos
7   Peralta was the decision-maker that
8   decided to invest in First City by
9   assuming control?
10       A.  Not necessarily.
11            MR. SCOTT:  Object to the
12       form of question.
13  BY MR. STEWART:
14       Q.  Who else would have been involved?
15            MR. SCOTT:  Just a minute.
16            THE WITNESS:  I don't know.
17            MR. SCOTT:  Just a minute,
18       please, Bob.  Trying to make an
19       objection here.  Object to the
20       form of that question; totally
21       mischaracterizes this witness's
22       prior answer that you tried to
23       incorporate into the immediate
24       question.  Object to the form.
25  BY MR. STEWART:

Page 59

Bertellotti

0143
```
 1
 2       Q.   You referred to bonds.  What are
 3  bonds are you referring to?
 4       A.   Specifically I can't recite the
 5  specific bonds, the maturity, the interest
 6  rate.  I can't do that sitting here.
 7       Q.   Okay.  What would you refer to, to
 8  do that?
 9       A.   Plan of reorganization, plan of
10  confirmation.
11       Q.   Okay.  Who -- do you see you state
12  in Paragraph 7 Alper was compelled to
13  exchange its debt for 55 percent of the
14  common stock of First City?
15       A.   Yes.
16       Q.   Who owned the other 45 percent in
17  October '92?
18       A.   You mean specifically, I can't
19  answer.  But I know in general it was a
20  group of institutional investors,
21  companies like Wellington Management, I
22  think the State Pension of New York.  I
23  have documents that I can refer to but I
24  don't have them here with me.  It was a
25  group of institutional investors who
```
0144
```
 1
 2  happened to have been -- the reason I know
 3  that, one of the first things I did when I
 4  got to Alper in 1993 was worked on
 5  acquiring the remainder of the stock; and
 6  it was a group of institutional investors
 7  who were generally high-yield-investor
 8  type institutions who held the bonds and
 9  unfortunately, probably for them, had
10  their debt converted  to equity.
11       Q.   Would these have been investors
12  that had been creditors of First City
13  preceding the pre-packaged bankruptcy?
14       A.   Yeah, clearly.  But for how long, I
15  have no idea.
16       Q.   And how much did you purchase their
17  45 percent interest for?
18       A.   I can't recall specifically, but
19  probably approximately $7 million, give or
20  take a few several hundred thousand.
21       Q.   Is there a stock purchase
22  agreement?
23            MR. SCOTT:  Sorry, I didn't
24        hear that.  Could you repeat it?
25  BY MR. STEWART:
```
0145
```
 1
 2       Q.   Was there a stock purchase
 3  agreement?
 4       A.   No, there was not.
 5       Q.   What kind of document memorandum
 6  organized that transaction?
 7       A.   I would have to review it first.  I
 8  don't know.  If I recall, it was simply a
 9  direct transaction of stock.  There may
10  have been some minor letter agreement but
```
Page 60

Bertellotti
11   conducted through brokerage firm.
12        Q.   Do you know the investment bankers
13   who were involved with the pre-packaged
14   bankruptcy referred to in Paragraphs 5, 6,
15   7 of your affidavit?
16        A.   I do not.  I know the law firm but
17   not the investment banking firm.
18        Q.   Who is the law firm?
19        A.   Skadden Arps.
20        Q.   Do you know how it was that the
21   Peralta family came to know about First
22   City?
23                MR. SCOTT:  Object to the
24           form of the question and the
25           assumption is win it.
0146
 1
 2                THE WITNESS:  I mean, it
 3           goes back to -- I don't
 4           understand the intent.  I don't
 5           know -- understand how it came to
 6           hold the position.
 7   BY MR. STEWART:
 8        Q.   The Peralta family -- at some
 9   point, did the Peralta family become
10   interested in holding a position in First
11   City?
12                MR. LUCAS:  Object to the
13           form of the question.
14   BY MR. STEWART:
15        Q.   Did they?
16        A.   First of all, I don't know who
17   originally held the bonds, but one
18   might -- there must have been some reason
19   for acquiring the bonds.  What that reason
20   was, I don't know.  Maybe they simply
21   thought it was a good investment and they
22   would be repaid with principal and
23   interest.
24        Q.   When you say they?
25        A.   Whoever held the bonds; whoever
0147
 1
 2   made the acquisition of the bonds.  Don't
 3   know what their intent was.  There's a lot
 4   of vulture funds come in, a lot of wealthy
 5   individuals -- lot of wealthy individuals
 6   to buy them, hope they are restructured
 7   revenue, more equity, more likely to
 8   receive cash.  Cash is king.  Even if you
 9   get 60 cents on the dollar, whatever
10   it is, they may have looked at it as a
11   financial transaction.  I don't know
12   specifically.
13        Q.   We agree about the cash.  Here is
14   my question.  I am trying to figure out --
15   I mean, when Alper became a creditor of
16   First City, okay, Alper was controlled by
17   the Peralta family; is that correct?
18                MR. SCOTT:  Object to the
19           form of the question.
20   BY MR. STEWART:
21        Q.   Or let me rephrase that.  Was Alper
                    Page 61

Bertellotti
22    at that time, the time referred to in
23    Paragraph 6 of your affidavit, controlled
24    by the Peralta family?
25        A.  Again, I wasn't involved in 1992.
0148
1
2    I don't know specifically.  I believe it
3    probably was.
4        Q.  Was it by the time you got directly
5    involved in 1993?
6        A.  You say, controlled by the Peralta
7    family.  Controlled.  Not necessarily by
8    the Peralta family.  They are far removed
9    from the day-to-day involvement of the
10    business.  They don't control anything in
11    that sense.  They ultimately may have been
12    indirect shareholders, but you know, I
13    don't want to be tripped up with the word,
14    control.  The company obviously is
15    represented.  The shareholders are
16    represented by the board of directors.
17    The company is represented by its senior
18    officers who make the day-to-day
19    decisions.
20        Q.  That gets me back to the question I
21    asked you before.  Okay.  So you are --
22    you are president of Alper Holdings USA,
23    Inc.
24        As president, do you know who your
25    direct shareholders are of Alper Holdings
0149
1
2    USA, Inc.?
3        A.  Yes.  It's two corporate
4    shareholders; at one time, four.  I don't
5    remember the names right now.  I will get
6    them confused.
7        Q.  Do you remember the names of the
8    presidents of those companies?
9        A.  I do not.  No occasion to deal with
10    them.  I deal with the board of directors
11    of Alper Holdings.  Board of directors
12    deals with the shareholders.
13        Q.  Do you know the presidents of any
14    of those companies or the name of the
15    directors of any of those companies?
16        A.  I do not.
17        Q.  Okay. By contrast -- well, strike
18    that.
19        Do you know who the officers of
20    First City were immediately prior to the
21    October 1992 bankruptcy?
22        A.  First City Industries?
23        Q.  Yes.
24        A.  I do not.
25        Q.  Do you know who the officers of
0150
1
2    First City were immediately following the
3    1992 bankruptcy?
4        A.  Specifically, I do not, without
5    referring to records.
6        Q.  What records would you refer to?
Page 62

Bertellotti

```
 7        A.   To the extent minute books exist
 8   for that period of time, I suspect that
 9   would be the best place to look.
10        Q.   Do you know who the officers of
11   Alper were when it was incorporated in
12   September 1992?
13        A.   I do not.
14        Q.   Do you know who the directors were
15   when it was incorporated in 1992?
16        A.   At the date of incorporation, I do
17   not.
18             (Whereupon a Recess is
19        Taken.)
20   BY MR. STEWART:
21        Q.   Couple of loose ends.  Do you know
22   why Nick Bauer decided to leave the
23   company and cease being an employee?
24        A.   Do I know precisely what his
25   motivations were?
0151
 1
 2        Q.   Yeah.
 3        A.   I think he it was a mutual decision
 4   between the company and Nick Bauer.  His
 5   services weren't required to the same
 6   extent they had been required in the past
 7   and that he could serve Saltire Industries
 8   in a consulting capacity.
 9        Q.   The decision with him to leave,
10   anything to do with the litigation?
11        A.   No.
12        Q.   When was it made?
13        A.   We had been talking about it for a
14   couple of years.  It was made early this
15   summer.
16        Q.   Do you know when exactly?
17        A.   I believe in the -- approximately
18   May or June.  Again, as these
19   environmental sites, some of them mature,
20   some of them are in further stages of
21   remediation.  His day-to-day activity has
22   been reduced somewhat in recent years.
23        Q.   So he would have left by the end of
24   June?
25        A.   No, he left -- the decision was
0152
 1
 2   made in the May - June time frame.  He
 3   left, I believe, effective approximately
 4   September 1st.
 5        Q.   September 1st?
 6        A.   Approximately.
 7        Q.   It would have been before -- okay.
 8             Another loose end before we break
 9   for lunch.
10             MR. SCOTT:  I'm sorry, I
11        didn't hear what you just said.
12   BY MR. STEWART:
13        Q.   I saw in the National Tennessean an
14   article in which it was stated that you
15   were contacted but did not talk to a
16   reporter.
17             Do you recall being contacted by a
```
Page 63

Bertellotti
18  reporter?
19       A.  She called me, I believe, on a
20  Friday.  I was out of town, or I think I
21  was out of town both Thursday and Friday
22  and returned to my office Monday, and
23  Tuesday I received the message.
24       Q.  You never spoke to her?
25       A.  I never spoke to her.
0153
1
2               MR. STEWART:  I would like
3          to make this document an Exhibit
4          to the deposition.
5               (Whereupon Exhibit 9 is
6          Marked.)
7               MR. SCOTT:  If you are
8          going to ask any questions about
9          it, we need to read it.
10          (Reading.)
11               MR. STEWART:  Why don't you
12          put them all in, and then you can
13          take a break and read them?
14               (Whereupon Exhibit 10,
15          Exhibit 11 and Exhibit 12 are
16          Marked.)
17               (Whereupon a Recess is
18          Taken.)
19  BY MR. STEWART:
20       Q.  All right.  We are back on the
21  record.  Mr. Bertellotti, coincidentally,
22  I spoke to my secretary.  We received a
23  call that Johnny Cochran's firm had
24  solicitors going from door-to- door in
25  Dickson County, lining up for a class
0154
1
2  action related to trichlorethylene
3  contamination.
4               Could you tell me generally if you
5  have any awareness of the activity
6  occurring relating to the Dickson fill in
7  Dickson, Tennessee right now?
8       A.  I don't know anything specific.
9       Q.  Did you look at these articles I
10  handed you?  The Exhibits?
11       A.  I haven't read every four, but I
12  perused all four.
13       Q.  Have you seen any of these articles
14  before I handed them to you?
15       A.  I have seen a couple of articles.
16  I don't know that I have seen any of these
17  precisely.  I don't think I have seen any
18  of these precise articles.
19               MR. SCOTT:  Let's go off
20          the record.  I want to consult
21          before you answer any further
22          questions.
23               (Whereupon a Recess is
24          Taken.)
25  BY MR. STEWART:
0155
1
2       Q.  All right.  We are back on the

Bertellotti

```
 3    record.  Mr. Bertellotti, can you tell me
 4    what your understanding is, if any, of the
 5    current investigating going on in Dickson
 6    relating to the Dickson fill --
 7              MR. LUCAS:  What does this
 8         have to do with the
 9         jurisdictional issues with regard
10         to this deposition?
11              MR. SCOTT:  Or with this
12         litigation?  It's irrelevant.
13              MR. STEWART:  It's a
14         discovery deposition.  I am here
15         on a discovery deposition.
16              MR. SCOTT:  It's our
17         position -- we know, obviously,
18         what you want to do. I am afraid
19         what you are trying to do is do
20         something here that you can
21         poison the jury further, the jury
22         pool with.
23              If you intend to give this
24         deposition to some other person
25         unrelated to this lawsuit, we are
0156
 1
 2         going -- we can do one or two
 3         things.
 4              Our position is, you should
 5         not ask these questions and then
 6         go and finish your other
 7         questions.  Save these for the
 8         end, at which time we will
 9         instruct the witness not to
10         answer those questions and seek a
11         protective order from the Court
12         unless we can enter into an
13         agreement.  And we would be happy
14         to discuss with you off the
15         record some agreement as to
16         confidentiality or whatever.
17              MR. STEWART:  I don't think
18         that will be necessary, because
19         let me ask you this.  I think you
20         are concerned --
21              MR. SCOTT:  Can we go off
22         the record?
23              MR. STEWART:  Let's go off
24         the record.
25              (Whereupon a Recess is
0157
 1
 2         Taken.)
 3              MR. STEWART:  Let the
 4         record reflect, I think
 5         Mr. Scott's approach to this
 6         particular issue which he
 7         addressed while we were off the
 8         record is something that I will
 9         agree to, and we will put these
10         questions to the heels of time.
11         At the end of deposition, I will
12         decide whether I even need to
13         further inquire into this area.
```

Page 65

Bertellotti
```
14                MR. SCOTT:  Fair enough.
15   BY MR. STEWART:
16        Q.   Let's turn to Realty Holdings, Inc.
17   Have you ever heard of that company?
18        A.   Yes, I have.
19        Q.   Was it dissolved?
20        A.   Yes, it was dissolved.
21        Q.   And can you look at your affidavit,
22   perhaps, and tell me when it was
23   dissolved?
24        A.   It was dissolved earlier in 2003.
25        Q.   Any idea as to the exact date?
0158
1
2        A.   April or May.
3        Q.   And why was it dissolved?
4        A.   It has no operations and no assets.
5        Q.   When was the last time it had
6    operations or assets?
7        A.   To my knowledge, it has not had
8    operations.  It was, in effect, a holding
9    company, as far as I can recall.
10        Q.   So certainly, back through 1993, is
11   that what your recollection would be?
12        A.   Approximately, yes.
13        Q.   So you said it was a holding
14   company.  Can you explain that?
15        A.   It had subsidiaries.  Specifically,
16   I don't recall which ones right now.
17        Q.   You can't recall which subs it had?
18        A.   Right.
19        Q.   Other than holding those
20   subsidiaries, can you recall any other
21   operations it was involved in?
22        A.   No.
23        Q.   Do you recall whether it had any
24   line of business in and of itself?
25        A.   Again, when?
0159
1
2        Q.   From '93 forward.
3        A.   Certainly in the last several
4    years, I remember a holding company.
5    Going back to my -- prior to 1997, when I
6    was not the senior officer of Alper
7    Holdings, I wouldn't have been familiar
8    with specifically what assets it held.  I
9    never would have reviewed the financial
10   statements.  All of these corporations
11   existed for a purpose at one point in
12   time.  The businesses change over time.
13        Q.   Where would I determine -- first of
14   all, can you tell me a single asset that
15   Realty Holdings held between 1993 and the
16   present?
17        A.   I would need to review the
18   corporate structures precisely to know
19   what assets it held.  But it certainly
20   held an interest in another entity.
21        Q.   What entity is that?
22        A.   I suspect -- I am pretty sure it
23   held direct ownership interest in a
24   company called Alper Securities.  Again,
```
Page 66

Bertellotti
25     this is all relevant to time because the
0160
1
2     corporate structure changes as a business
3     changes.  It's very difficult to answer
4     this without talking about specific
5     periods of time; and again, it wasn't
6     noticed to talk about this level of detail
7     of these subjects.  It's very difficult to
8     sit here and answer these questions off
9     the top of my head without, again, having
10    a more specific sense of time and access
11    to records.
12         Q.    Can you tell me if you can think of
13    a single business activity that Realty
14    Holdings conducted between 1993 and the
15    present, other than holding stock in
16    another business?
17         A.    Specifically, at this time I can't
18    answer that.
19         Q.    Do you know whether you have ever
20    been an officer of Realty Holdings?
21         A.    I was senior officer at the time of
22    the dissolution.
23         Q.    Do you know when you became a
24    senior officer?
25         A.    Precisely, no.
0161
1
2         Q.    Generally?
3         A.    It's likely that I became a senior
4     officer in 1997.
5         Q.    Would we have to refer to documents
6     to know for sure?
7         A.    It would be better to refer to
8     documents.
9         Q.    Would minutes of directors meetings
10    and shareholders meetings be those
11    documents?
12        A.    They would reflect that, yes.
13        Q.    To know its line of businesses and
14    assets, would we look at Realty Holdings'
15    financial statements?
16        A.    That would be a place to start.
17        Q.    Have you looked at those anytime
18    recently?
19        A.    There had been no occasion to look
20    at them for the last couple of years
21    because as I said, it had no assets.
22        Q.    You haven't looked at them
23    recently?
24        A.    I haven't looked at them recently.
25        Q.    As of the time you were president
0162
1
2     of Alper Holdings, Inc. in 1997, is that
3     the period when you are certain Realty
4     Holdings had no assets?
5         A.    I said it had no operations.
6         Q.    No operations?
7         A.    Yes.
8         Q.    Okay.  From 1997 to 2003?
9         A.    With relatively high confidence.  I
Page 67

Bertellotti
10  don't want to make any absolute statements
11  sitting here.
12       Q.  Do you know when Realty Holdings,
13  Inc. was incorporated?
14       A.  Off the top of my head I do not,
15  but I believe it's in your filing to the
16  court.  You submitted a variety of
17  corporate documents that trailed its
18  origin.
19       Q.  Did you review those documents?
20       A.  Yes.
21       Q.  Did they accurately trace the
22  origin?
23       A.  They appear to.  I didn't vet every
24  last thing.  They appear to.
25       Q.  Are you referring to the documents
0163
1
2  that were filed by the plaintiffs just
3  prior to the hearing on your motion to
4  dismiss?
5       A.  Correct.  It would be filed around
6  September 18.
7       Q.  In reviewing those documents, did
8  you see any description of corporate
9  origination and successorship that was
10  incorrect?
11            MR. SCOTT:  Object to the
12       form of the question, unless --
13            MR. STEWART:  I agree.
14  BY MR. STEWART:
15       Q.  Did you see -- did you notice any
16  statements made in the document describing
17  the evolution of First City Industries and
18  its subsidiaries that were, in your mind,
19  wrong?
20            MR. LUCAS:  Point of
21       clarification.
22            Are you asking him about
23       statements in your brief, or are
24       you asking him about the
25       documents that were attached?
0164
1
2            MR. MAY:  Are you asking
3       about the summary?
4            MR. STEWART:  You know, I
5       have been generous with speaking
6       objections.  I don't have
7       problems with clarifications.  I
8       think the question is clear
9       because he specifically referred
10       to the documents, but so we are
11       clear --
12  BY MR. STEWART:
13       Q.  Mr. Bertellotti, what documents did
14  you look at that you just referred to?
15       A.  I looked at the plaintiffs' entire
16  filing and I was referring to the
17  corporate documents, meaning the various
18  filings with secretaries of state, merger
19  documents, successor incorporation
20  documents, that type of thing.

Page 68

Bertellotti

```
21        Q.   Those that were filed by the
22   plaintiffs?
23        A.   Those were filed by the plaintiffs,
24   those documents that were official state
25   records.
0165
 1
 2        Q.   Did you find any discrepancies in
 3   those official state records?
 4             MR. SCOTT:  Object to the
 5        form of the question.
 6   BY MR. STEWART:
 7        Q.   Go ahead and answer.
 8        A.   As I said earlier, I didn't review
 9   each of those documents and vet each of
10   them for accuracy and test all of your
11   assumptions.  I will say, your transmittal
12   or notice of filing the three-page
13   pleading was filled with inaccuracies and
14   misrepresentations as to what those
15   documents said.
16        Q.   Well, let me ask you this.  What is
17   the corporate predecessor of Realty
18   Holdings, Inc.?
19        A.   I would have to refer to the
20   specific documents at this time.
21        Q.   You couldn't tell me off the top of
22   your head?
23        A.   The corporate predecessor of Realty
24   Holdings, Inc.?  There may be several.  It
25   may be a successor to more than one
0166
 1
 2   entity.
 3        Q.   Do you know whether Saltire Realty
 4   Holdings, Inc. changed its name to Realty
 5   Holdings, Inc. In 2001?
 6        A.   I believe it did.
 7        Q.   Do you know whether First City US
 8   Corp. Changed the name to Saltire
 9   Industries Holdings, Inc. in 1994?
10        A.   I wouldn't have been involved in
11   1994.
12        Q.   Do you know whether or not First
13   City U.S. Corporation, Inc. is the
14   corporate predecessor to Realty Holdings,
15   Inc.?
16        A.   Sitting here off the top of my head
17   without the documents, I couldn't answer
18   that.
19        Q.   Do you know who the officers --
20   make this short.  Has there ever been a
21   time, to your knowledge, when the
22   directors of Realty Holdings were not a
23   subset of the directors of Alper Holdings
24   USA, Inc.?
25             MR. SCOTT:  Object to the
0167
 1
 2        form of the question.
 3             THE WITNESS:  I don't know.
 4        It's possible they were at some
 5        point in time, possible there was
```

Page 69

Bertellotti

```
 6           overlap.  It's possible.  They
 7           were distinctly different at
 8           periods of time.  I don't know.
 9  BY MR. STEWART:
10      Q.   When would have been the first time
11  you became aware of the directors of
12  Realty Holdings, Inc.?
13      A.   1997.
14      Q.   Okay.  Who are those directors, do
15  you know?
16      A.   The -- precisely, 1997, sitting
17  here right now, I do not recall.  I deal
18  with hundreds of issues; environmental
19  issues, financial issues.  I simply can't
20  recall those specific details sitting
21  here.
22      Q.   We would have to look at the
23  corporate documents?
24      A.   You have to look at some type of
25  record to indicate that.
0168
 1
 2      Q.   Is there anything here for any year
 3  that indicates who the directors of Realty
 4  Holdings were?
 5      A.   Yes, I could tell you, certainly.
 6  I am currently director of Realty
 7  Holdings.
 8      Q.   Any other directors?
 9      A.   I believe in the last couple of
10  years, at least, I've been the sole
11  director.  Prior to that there have --
12  there may have been another director.
13      Q.   Okay.  Who?
14      A.   These -- there are state filings
15  that show who the directors are.
16      Q.   Who other than you are the
17  officers?
18      A.   Wayne Smith is an officer.
19      Q.   What is he?
20      A.   Probably the senior vice-president
21  of finance or the vice-president -- chief
22  financial officer, whatever the official
23  positions are according to the bylaws.
24      Q.   Any other officers?
25      A.   Not that I know of.
0169
 1
 2      Q.   Do you know whether Realty Holdings
 3  ever had a director or vice-president of
 4  environmental affairs?
 5      A.   I believe it did not.
 6      Q.   Do you know if -- whether Realty
 7  Holdings, Inc. ever had any, ever owned
 8  any sites that had environmental
 9  contamination?
10      A.   I don't know.  It is history.  I
11  have no idea.
12      Q.   Do you know whether Realty
13  Holdings, Inc. or any of its predecessor
14  ever had involvement with the Dickson
15  contaminated site that's the subject of
16  this lawsuit?
```

                                    Page 70

Bertellotti
```
17        A.   I don't know, but I find it highly
18   unlikely.
19        Q.   Do you think of any time when
20   Realty Holdings or any of its subsidiaries
21   was in a business that would have created
22   that kind of -- would have created ground
23   water contamination?
24        A.   I don't know of any but I find it
25   highly unlikely.  I doubt -- seriously
0170
 1
 2   doubt it was ever a manufacturing company.
 3        Q.   Are you familiar with Alper
 4   Securities, Inc.?
 5        A.   Yes, I am.
 6        Q.   And is it currently ongoing?
 7        A.   Dissolved corporation.
 8        Q.   When did it dissolve?
 9        A.   I don't specifically recall.  Some
10   time in the last two years.
11        Q.   Why did it dissolve?
12        A.   It had no longer had any assets or
13   operations.
14        Q.   Okay.  When was the last time, to
15   your knowledge, that Alper Securities,
16   Inc. had any ongoing operations?
17        A.   Over two to three years ago.
18        Q.   What were its operations when it
19   had operations?
20        A.   It held investments in a variety of
21   securities partnerships. Predates current
22   ownership's involvement.
23        Q.   Were these securities partnerships
24   all from the First City pre-1992 era?
25             MR. SCOTT:  Object to the
0171
 1
 2        form of the question.
 3   BY MR. STEWART:
 4        Q.   Do these partnerships -- were these
 5   partnerships created or entered into prior
 6   to the bankruptcy that you referred to in
 7   your affidavit?
 8        A.   It's my belief that it's true.
 9        Q.   Do you know if First -- Alper
10   Securities, Inc. ever took on additional
11   business lines other than maintaining
12   those securities?
13        A.   Yes, in approximately 2000/2001, it
14   created a subsidiary, capitalized
15   subsidiary which subsidiary then made an
16   investment in the -- I'm sorry, the
17   magazine retail industry.
18        Q.   What was the sub?
19        A.   The name of the sub, I believe it
20   was -- shoot -- Caper, C-a-p-e-r, and I am
21   not certain I am right but I think it's
22   something along those lines.
23        Q.   In 2000, 2001, who was president of
24   Realty Holdings -- I'm sorry, strike that.
25             In 2000, 2001, who was president of
0172
 1
```

Page 71

                              Bertellotti
2    Alper Securities, Inc.?
3         A.   Most likely, I was.
4         Q.   Do you know who its directors were
5    at that time?
6         A.   Myself, I am certain I was probably
7    a  director, and possibly Luis Felipe
8    Sanchez.
9         Q.   Can you remember any time when the
10   directors of Alper Securities weren't a
11   subset of the directors of Alper Holdings
12   USA, Inc.?
13                  MR. SCOTT:   Object to the
14            form.
15                  THE WITNESS:   Well, I am
16            not a subset of the Alper
17            Holdings.  I have never been on
18            the Alper Holdings board.
19   BY MR. STEWART:
20        Q.   Can you remember a time when the
21   directors of Alper Securities, Inc. were
22   not also either directors or officers of
23   Alper Holdings USA, Inc.?
24        A.   Repeat the question.
25        Q.   Can you remember any time when the
0173
1
2    directors of Alper Securities, Inc. were
3    not also either directors or officers of
4    Alper Holdings USA, Inc.?
5         A.   No.
6         Q.   What happened with the Caper
7    subsidiary?
8         A.   Caper was a subsidiary of Alper
9    Securities and made investments in the
10   magazine retailing business, and that
11   business failed.
12        Q.   How large was the investment?
13        A.   Five and a half million.
14        Q.   Does Alper Securities, Inc. -- has
15   that ever been a subsidiary of Scovill,
16   Inc.?
17        A.   Not to my knowledge.
18        Q.   Has it ever been a subsidiary of
19   Saltire, Inc., I should say?
20        A.   Not to my knowledge.
21        Q.   Has Realty Holdings, Inc. ever been
22   a subsidiary of Saltire, Inc.?
23        A.   Not to my knowledge.
24        Q.   Are you familiar with the corporate
25   predecessors of Alper Securities, Inc.?
0174
1
2         A.   Not precisely, without reviewing
3    records.
4         Q.   Do you know whether it is the
5    corporate successor to First City
6    Corporation?
7         A.   I believe it is.
8         Q.   When it dissolved, did it have any
9    assets?
10        A.   When did what dissolve?
11        Q.   Alper Securities, Inc. dissolved?
12        A.   At the time of dissolution, no, it
                              Page 72

Bertellotti
```
13   didn't have any assets.
14        Q.   Did it have any liabilities?
15        A.   None.
16        Q.   When Realty Holdings dissolved, did
17   it have any assets?
18        A.   It did not have any assets.
19        Q.   Did it have any liabilities?
20        A.   Yes, it had obligation to Saltire
21   and it owed the parent maybe -- owed Alper
22   Holdings $22 million which was written
23   off.
24        Q.   Was there any time, to your
25   knowledge, that Alper Securities was --
0175
 1
 2   owned any properties subject to
 3   environmental investigation?
 4        A.   Quite confident that it never did.
 5   As my understanding, it was set up solely
 6   for the purpose of making investments in
 7   securities.
 8        Q.   Are you confident that Alper -- are
 9   you confident that Alper Securities, Inc.
10   and its predecessors were never involved
11   with the Dickson County contamination
12   that's the subject of this lawsuit?
13        A.   I have no knowledge that they were
14   ever and no reason to believe they ever
15   would have been involved.
16        Q.   You have no knowledge of them,
17   Alper Securities, Inc. or its
18   predecessors, being involved in
19   manufacturing operations?
20        A.   None.
21        Q.   Is Alper Securities involved in any
22   lawsuit that you're involved in?
23        A.   I have no knowledge.
24        Q.   Was Realty Holdings involved in any
25   lawsuits?
0176
 1
 2        A.   Not to my knowledge.
 3        Q.   Do you know if -- strike that.
 4             (Whereupon a Recess is
 5        Taken.)
 6   BY MR. STEWART:
 7        Q.   Mr. Bertellotti, I would like you
 8   to refer back to Exhibit 7.  Do you
 9   know --
10        A.   I haven't found 7 yet.
11        Q.   It's the management agreement.
12        A.   I have it.
13        Q.   Do you know whether there was a
14   management agreement that predated this
15   agreement?
16        A.   I believe there was.
17        Q.   Do you know when that agreement was
18   signed, the prior agreement?
19        A.   I do not.
20        Q.   Do you know if there is such an
21   agreement in your records at the
22   headquarters of Alper?
23        A.   The agreement that predates this
```
Page 73

Bertellotti

24  agreement?
25       Q.  Yes.  Is there a copy of the
0177
 1
 2  management agreement that predates the
 3  agreement that is Exhibit 7 at your
 4  headquarters?
 5       A.  I do not know.
 6       Q.  Who would know that?
 7       A.  I don't know that anybody would
 8  know that off the top of their heads.  You
 9  have to search the files.
10       Q.  Can you tell me whether this
11  management agreement accurately reflects
12  your actual procedures for charging Alper
13  Holdings USA subsidiaries for
14  administrating expenses provided by Alper
15  Holdings USA?
16       A.  When you say -- again, it would
17  be -- by administrative service, are you
18  talking about the management services, the
19  services that are detailed in this
20  agreement?
21       Q.  Let me make it more clear.  If I
22  look at this agreement that is Exhibit 7,
23  does it tell me the procedures whereby
24  from January 1, 1995 forward, Alper
25  Holdings USA, Inc. calculated and billed
0178
 1
 2  its management administrative charges to
 3  its subsidiaries?
 4                    MR. SCOTT:  Object to the
 5            form.
 6                    THE WITNESS:  I apologize.
 7            Repeat the question one more
 8            time.
 9  BY MR. STEWART:
10       Q.  Well, was there any aspect of this
11  agreement that was not adhered to by the
12  parties to the agreement that you know of,
13  while it was in force?
14       A.  Not that I know of.
15       Q.  I mean, if I want to know how Alper
16  Holdings USA calculated the administrative
17  and management charges it charged to its
18  subsidiaries -- from 1990 -- from January 1,
19  1995 to the present, could I look to this
20  agreement to determine that?
21       A.  I think this accurately represents
22  the procedure we go through.
23       Q.  Did Alper, that you know of, ever
24  have administrative expenses that were not
25  billed to some subsidiary?
0179
 1
 2       A.  Did Alper have administrative
 3  expense that were not billed to some
 4  subsidiary?  Yes, it is possible in
 5  certain years there's a portion of Alper's
 6  expenses that are not billed specifically
 7  to a subsidiary but, in turn, absorbed by
 8  Alper.

Page 74

Bertellotti

```
 9        Q.   When would you have become familiar
10   with the specific amounts charged by Alper
11   to its subsidiaries for the types of
12   expenses governed by the agreement that
13   was Exhibit 7?
14        A.   When would I be informed -- with
15   respect to any given year, I assume you
16   are asking.
17        Q.   Yes.  When would you have learned
18   about this process and known about those
19   charges?
20        A.   Well, I have known about the
21   process in general for many years,
22   although the procedure in the
23   implementation of the agreement is left to
24   the chief financial officer of Alper.
25        Q.   Do you see on Paragraph 3-B which
0180
 1
 2   is on the third page, do you see it talks
 3   about a budget of operative holdings and
 4   anticipated holdings and operation
 5   expenses for the next calendar year being
 6   prepared before December 15?
 7        A.   Yes.
 8        Q.   Do you know if those budgets were
 9   created on an annual basis during the time
10   that you were president of Alper Holdings
11   USA?
12        A.   Yes, I believe I am quite confident
13   Mr. Smith goes through this process each
14   year.  Whether he completes it precisely
15   by December 15 or not, I can't say.
16        Q.   You don't know of any year in which
17   the process was abandoned altogether?
18        A.   I do not know of any year we
19   abandoned it.
20        Q.   And are these -- the records of
21   these budgets, are they maintained at
22   Alper's headquarters here in New York?
23        A.   To the extent they still exist,
24   yes, I don't know what the financial
25   people do in terms of keeping specific
0181
 1
 2   records such as this, but there certainly
 3   should be some records.
 4        Q.   Would Mr. Smith be the one to ask?
 5        A.   He would be a better person to ask.
 6        Q.   Tell me what kind of legal expenses
 7   would be included in the amounts described
 8   as compensation in the management
 9   agreement that is Exhibit 8.
10        A.   Would primarily be legal expenses.
11   Many of the legal expenses, for example,
12   legal expenses such as relating directly
13   to the environmental affairs of Saltire,
14   are billed directly to Saltire by
15   Saltire's counsel.
16        The primary legal expenses at Alper
17   would allocate those of general counsel or
18   any outsider serving in that capacity to
19   the extent they were reviewing documents;
```

Page 75

Bertellotti

```
20   providing advice, subject to the
21   management agreement, on contingent
22   liabilities; pending litigation; things
23   that we hadn't hired direct attorneys for.
24   If it was the business affairs of Saltire
25   that involved somebody needing -- the
0182
1
2    affairs were such that some legal advice
3    was needed, the Alper general counsel
4    would provide those services subject to
5    the management agreement.
6         Q.   But would outside attorneys bill
7    their charges directly to Saltire for work
8    performed?
9         A.   Ones, if they were retained by
10   Saltire, billed directly to Saltire.
11        Q.   So would the charges of outside
12   attorneys be anywhere included in the
13   compensation set out?
14        A.   They should not be.
15        Q.   Would charges for outside
16   accountants' services be included in the
17   compensation outline in Part 3?
18        A.   This is better question to ask
19   Mr. Smith.  Can I -- for example, the
20   outside, this is my understanding of how
21   it works.  For example, outside
22   accountants such as the auditors Deloitte
23   & Touche, they send us a single bill, and
24   I am going to defer to Mr. Smith on that
25   question as to precisely how that works
0183
1
2    with the auditors. I simply can't recall
3    at this moment after what we have been
4    through today.
5         Q.   Tell me, for outside environmental
6    consultants, are their charges related to
7    Saltire activities billed directly to
8    Saltire?
9         A.   My experience has been always
10   billed directly to Saltire.
11        Q.   So in your experience, would any of
12   them be included in this compensation that
13   is Part 3?
14        A.   They would not.
15        Q.   Currently, do you know what
16   environmental consultants are being used
17   on the Dickson site which is the subject
18   of this lawsuit?
19        A.   I believe primarily ICF Kaiser, but
20   they are known by another name, successor
21   name.
22        Q.   Is there currently a contract in
23   existence with ICF Kaiser, its successor,
24   and Alper Holdings USA, Inc.?
25        A.   It's my understanding, with Alper
0184
1
2    Holdings.
3              No, my understanding the contract
4    is with Saltire Industrial, Inc.
```

Page 76

Bertellotti

```
 5        Q.   So to your knowledge, you don't
 6   believe there's a contract; or I take it,
 7   your testimony is you don't believe
 8   there's a contract between Alper Holdings
 9   USA, Inc. and ICF Kaiser?
10        A.   No.  As you asked the question, it
11   does not exist to my knowledge.
12        Q.   Do you know if there has ever been
13   such a document?
14        A.   Not to my knowledge, no.
15   Specifically with regard to Alper Holdings
16   USA, Inc., that is what we are talking
17   about.
18        Q.   Do you know currently what ICF
19   Kaiser is charging for the services
20   related to the Dickson contaminated site
21   subject to this lawsuit on an annual
22   basis?
23        A.   Are you asking -- you mean roughly
24   what their total expenses are on an annual
25   basis?
0185
 1
 2        Q.   Yes.
 3        A.   I don't know precisely but in
 4   reviewing, we spend as much as between --
 5   somewhere between three and five hundred
 6   thousand per year total expenses, is a
 7   rough estimate related to the Dickson
 8   site.  How much of that precisely is with
 9   ICF Kaiser, I couldn't say.  I would
10   suggest a large portion of it is.
11        Q.   Okay.  For 2003, do you know what
12   the fee charged for Scovill pursuant to
13   the compensation Section 3 of the
14   management agreement?
15        A.   2003?
16        Q.   Yes.
17        A.   It's approximately $2 million.
18        Q.   And for 2002, do you know the
19   approximate?
20        A.   Again, $2 million, $2 million I
21   believe.
22        Q.   And for 2001?
23        A.   2001, I also believe it's
24   approximately $2 million.
25        Q.   And for 1997?
0186
 1
 2        A.   I do not know without looking at
 3   the records.
 4        Q.   Okay.  For 1998?
 5        A.   It's somewhere between two and
 6   three and a half million dollars.  I would
 7   assume it is approximately the same for
 8   1997, as well.
 9        Q.   Do you have any reason -- strike
10   that.
11             Now, let's talk about Section 2 of
12   your management agreement.
13             Do you see the description of
14   direct expenses?
15        A.   Yes.
```

Page 77

Bertellotti
```
16        Q.   Okay.   Can you describe for me some
17   examples of direct expenses that would be
18   covered by Part 2?
19        A.   What this says, direct expenses
20   such as out of direct -- out-of-pocket
21   expenses reasonably incurred by Alper
22   Holdings.
23             You know what, Mr. Stewart, I would
24   need to read this agreement carefully.
25             Do you want me to take ten minutes
0187
 1
 2   to read it carefully?
 3        Q.   No.   Do you, just looking at it
 4   right now, are you comfortable giving me
 5   some examples of direct expenses, just the
 6   knowledge that you brought to this
 7   deposition in your head?
 8        A.   Again, I do not implement this
 9   agreement on an annual basis.   CFO does
10   this.   My interpretation, my belief that
11   we practice, direct expenses as defined
12   here in this agreement are talking about
13   things like out-of-pocket expenses
14   reasonably incurred by Alper Holdings.
15   The compensation is different to the
16   extent those were shared expenses, shared
17   services.   I don't know, there would be an
18   awful lot of direct expenses under this
19   agreement.
20             An example as I referred to
21   earlier, an example, maybe the accounting
22   fees, the audit fees, those I do not
23   believe Deloitte & Touche bills each
24   company independently.   I believe there's
25   a single bill.   The lease for the office
0188
 1
 2   space may be under the covered expenses,
 3   but I would direct those inquiries to the
 4   CFO who implements this agreement.
 5        Q.   Who are the primary outside counsel
 6   for Alper Holdings USA, Inc.?
 7        A.   Primary outside counsel for Alper
 8   Holdings?  Alper Holdings does not have a
 9   primary counsel at this point in time.
10        Q.   What office are we sitting in right
11   now?
12        A.   We are sitting in the offices of
13   Angel & Frankel.
14        Q.   What does Angel & Frankel have to
15   do with Alper Holdings USA?
16        A.   As we were told in the beginning of
17   the deposition, here as counsel for
18   Saltire.
19        Q.   And what kind of services do they
20   perform for Saltire?
21        A.   They provide --
22             MR. LUCAS:   Wait.   Hold on.
23             You can answer that generally,
24             very generally, but I would
25             caution you not to give any
0189
```
Page 78

Bertellotti

1
2      specific answers.  That would
3   disclose.
4          MR. STEWART:  Let me
5      rephrase the question; I think
6      you will see where we are going.
7   BY MR. STEWART:
8      Q.  Are they counsel for Saltire's
9   bankruptcy issues?
10      A.  Not necessarily.
11      Q.  Are they counsel in the bankruptcy
12   issues specifically?
13      A.  Their counsel is regarding
14   corporate issues in general.  It may
15   include bankruptcy.  Includes a variety of
16   other things.
17      Q.  Is Saltire as we sit here today
18   planning to declare bankruptcy any time in
19   the near future?
20          MR. LUCAS:  Hold on.  I
21      don't know that he can answer
22      questions about the scope of any
23      law firm's representation without
24      invading attorney-client
25      privilege, and you shouldn't do
0190
1
2      that.
3          MR. STEWART: My question is
4      no longer directed at what the
5      attorneys are doing.  I want to
6      know if he, as an     officer of the
7      company, has discussed
8      declaring bankruptcy in the near
9      future.
10          MR. LUCAS:  Hold on.  I am
11      going to object to that again on
12      the same grounds that when you
13      start asking him questions,
14      that you start off by saying,
15      well, have you discussed this
16      with your attorneys?  And then
17      you change to it a general
18      question.
19          It invades the
20      attorney-client privilege, I
21      think.  I didn't mean to
22      interrupt if you wanted to add
23      something.
24          MR. MAY:  I wanted to at
25      this point, even though I am
0191
1
2      representing the witness in
3      connection directly with the
4      deposition, say that I think we
5      are intruding on privileged
6      areas.  And I would direct him
7      not to answer.
8          MR. SCOTT:  I object to
9      that on the grounds it's totally
10      irrelevant.  You can't lead to
11      any physical evidence.  What

Page 79

Bertellotti

```
12          their plans are or may be or may
13          not with respect to any legal
14          remedy that the company might
15          have.
16                  MR. STEWART:  The reference
17          to bankruptcy in the deposition
18          that we have right now is, to say
19          the least, obvious on its face.
20                  MR. SCOTT:  If you were a
21          judgment creditor, it may be
22          different.
23                  MR. STEWART:  It's an
24          element of the issue we are
25          talking about.  I just want to
```
0192
```
 1
 2          know.
 3                  MR. SCOTT:  I don't think
 4          so.
 5  BY MR. STEWART:
 6          Q.  If Saltire -- let me phrase it
 7  differently.  I don't want to know about
 8  your discussions with any counsel.  What I
 9  want to know -- internally, with Mr.
10  Smith, have you ever had a discussion
11  without counsel present about when Saltire
12  will declare bankruptcy, if ever?
13                  MR. LUCAS:  Wait, because
14          hypothetically if there were such
15          discussions, it could reveal
16          attorney-client privileges.
17                  Give us a minute on this to
18          consult with the witness and see
19          where we are on the privilege
20          issues and then we will --
21                  MR. STEWART:  Tell you
22          what.  Let's put it to the heels,
23          all right?  We will come back.
24                  MR. LUCAS:  Okay.
25                  MR. STEWART:  You all can
```
0193
```
 1
 2          discuss it at the next break.  I
 3          think there will be one more
 4          break before we finish with this
 5          witness.
 6  BY MR. STEWART:
 7          Q.  What were the combined salaries of
 8  Alper Holdings USA employees in 2003?
 9          A.  Combined salaries?
10          Q.  Generally.
11          A.  Generally would be somewhere of the
12  magnitude of $1 million to $1.2 million on
13  an aggregate basis.
14          Q.  Tell me what document I can look
15  at, if any, to show me the combined
16  salaries for Alper Holdings employees for
17  all for the years 1992 through 2003.
18          A.  Clearly, in the corporate records.
19  In the financial statements.
20          Q.  I mean, would those salaries be
21  totaled in the budgets that Alper would
22  produce pursuant to Section 3 of the
```
Page 80

Bertellotti
23    management agreement?
24        A.    They may be in there individually;
25    they may be there in aggregate.    They
0194
 1
 2    should be reviewed in preparation for the
 3    management fee.
 4        Q.    And do you know what Alper's total
 5    administrative expenses were for 2003?
 6        A.    2003, I would guess roughly $2
 7    million, plus or minus a couple hundred
 8    thousand.    Maybe two, three, four at the
 9    most.    I would estimate the maximum Alper
10    expenses for 2003 were at the most, $2.3
11    to $2.4 million in aggregate.
12        Q.    What were the total expenses for
13    2002?
14        A.    They would be somewhere in the same
15    order of magnitude.    Somewhere north of $2
16    million, certainly less than three.
17        Q.    How about 2001?
18        A.    I am trying to think who was on the
19    payroll in 2001; they would have been
20    similar.
21        Q.    How about '97?
22        A.    '97, they may have been as high as
23    eight to nine, $10 million I am not sure.
24        Q.    How about '98?
25        A.    They would have been -- again,
0195
 1
 2    sitting here, more than six, less than
 3    ten.  Repeat -- just repeat back the years
 4    for me.  Let me think this through
 5    clearly.
 6        Q.    I gave you '98, '97, 2001, 2003.
 7        A.    Can we take them chronologically?
 8    '98 was the first year.    You said '97.
 9        Q.    Sure.
10        A.    '97, they would have been again
11    north of six million; as high as ten
12    million in '97.
13        Q.    '98?
14        A.    '98, they certainly would have been
15    in excess of five million; between five
16    and eight million.
17        Q.    '99?
18        A.    '99, five to six million.
19        Q.    2001-2-3, stand by two million?
20        A.    2000 -- I don't think I said two
21    million for 2000.    2000, I believe, would
22    have been higher.    2000 would have been
23    probably in the magnitude of three, four
24    million, four and a half, maybe five
25    million.    2000 was -- is a little more
0196
 1
 2    complicated to guess at, because it was a
 3    year with a lot of change.    Certain people
 4    dropped off the payroll in 2000.    It's
 5    hard for me to estimate.
 6        Q.    I would like to hand you another
 7    document.
                                    Page 81

Bertellotti

```
 8              (Whereupon Exhibit 13 is
 9          Marked.)
10   BY MR. STEWART:
11        Q.  Could you turn to Page 33, and look
12   at Footnote 25?  Actually, Footnote 24.
13        A.  Yes.
14        Q.  Okay.  Can you read that Footnote
15   for me, not in the record, just read it?
16        A.  While irrelevant to this Court's
17   analysis, the Plaintiffs states the $4.5
18   million paid in 2000 represents 10 percent
19   of Saltire's assets.  However, this
20   statement does not account for the fact
21   that $4.5 million was paid on a
22   consolidated basis and included
23   substantial fees and services related to
24   the Alper Ink sale.  Thus, to correctly
25   determine the percentage, the Plaintiffs
0197
 1
 2   should have looked at the consolidated
 3   assets which would have revealed the
 4   percentage of 2.6 percent.
 5        Q.  Okay.  Do you know what
 6   consolidated assets that it's referring
 7   to?
 8        A.  Yes, I do.
 9        Q.  Tell me what they are.
10        A.  Saltire, at the end of 1999 and the
11   beginning of 2000, had consolidated assets
12   of approximately $172 million.  It also
13   had consolidated revenues of approximately
14   170 to $175 million dollars.
15        Q.  Consolidated; tell me what you mean
16   by consolidated?
17        A.  Consolidated is a concept of
18   financial accounting.  It's required by
19   GAAP, to consolidate subsidiaries that
20   have significant control over  It was the
21   sole shareholder or owner of Alper Ink
22   Group as well as Alper Development, Inc.
23   Most of these assets and sales relate to
24   the Alper Ink Group and are required by
25   generally accepted accounting principals
0198
 1
 2   to be consolidated into Saltire's results.
 3   What you saw, though, I believe in the
 4   financial statements GAAP also states that
 5   to the extent you determined to divest
 6   yourself of the business, you are required
 7   to account for on a discontinued
 8   operations business.  Meaning they no
 9   longer consolidate but show, in effect,
10   the equity method with the reserve to
11   close.  So GAAP makes it a little bit
12   difficult to understand, with respect to
13   those specific years.
14        Q.  When you say consolidated, is what
15   you are saying that consolidated financial
16   statements would reflect the assets of
17   Scovill and some subsidiaries
18   consolidated?
```

Page 82

Bertellotti

```
19      A.   Yes.
20      Q.   For tax purposes?
21      A.   Pardon?
22      Q.   As for tax purposes?
23      A.   I was using the concept of
24   accounting purposes.
25      Q.   I take it, if you look at the
0199
 1
 2   actual financial statements that you have
 3   been provided today as an exhibit, that
 4   the $4.5 million paid in 2000 did
 5   represent 10 percent of the assets listed
 6   for Saltire on those financial statements?
 7      A.   On unconsolidated basis, yes.
 8      Q.   Now, tell me something.  Do you see
 9   the statement that says that the $4.5
10   million was paid on a consolidated basis
11   and included substantial fees and services
12   related to the Alper Ink sale?
13      A.   That's correct.
14      Q.   Whose fees and service are we
15   talking about there?
16      A.   Well, primarily it relates -- there
17   were several individuals who were direct
18   employees of Alper Holdings whose sole
19   purpose at that particular point in time
20   was to perform services on behalf of Alper
21   Ink Group, and so their salaries and
22   associated expenses were allocated to
23   Alper Ink Group.  The problem was, Alper
24   Ink Group was subject to a variety -- it
25   was a leveraged transaction or leveraged
0200
 1
 2   company subject to certain bank covenants
 3   where they put restrictions on the ability
 4   to Alper Ink Group to pay management fees.
 5   Regardless of their legitimacy, they put
 6   restrictions like banks do on intercompany
 7   transfers; and so for that reason,
 8   Saltire, who had the equity interest in
 9   Alper Ink Group, paid the expenses of the
10   Alper Ink Group to the extent direct Alper
11   employees were provided services to Alper
12   Ink Group, and they were substantial in
13   the years 1999, 2000.
14      Q.   They were substantial in 2000
15   because of the Alper Ink sale?
16      A.   Let me read this.  They were
17   substantial in the sense these people were
18   providing substantial services to Alper
19   Ink Group in respect to its ongoing
20   operations as well as the sale, but they
21   were very, very involved with the Alper
22   Ink Group in the ordinary course as well
23   with respect to the sale.
24      Q.   Just the operating sale, it was
25   included in 2000?
0201
 1
 2      A.   May of 2000.
 3      Q.   When were the initial negotiations
```

Page 83

                                    Bertellotti
 4    related to the Alper sale begun?
 5         A.   Decision to sell the Alper Group
 6    was made in the second quarter, I believe,
 7    of 1999.  It was initially made in
 8    approximately April/May of 1999.
 9    Obviously it went on for approximately a
10    year.
11         Q.   The payments under the management
12    agreement booked by Alper's income on its
13    financial statements?
14         A.   I mean, you need to be more
15    specific as an accountant.  They are
16    booked in net income revenues.  It's an
17    inflow of cash, inflow of money, accrual
18    under some section under the revenues
19    before you get to the expenses, yes.
20         Q.   And what was Alper's total income
21    from all activities?  2003, Alper Holdings
22    USA total income?
23              MR. SCOTT:  Object to the
24         form of the question.
25              MR. STEWART:  State your
0202
 1
 2         objection.
 3              MR. SCOTT:  Is it gross,
 4         net --
 5              THE WITNESS:  Talking about
 6         revenues.
 7    BY MR. STEWART:
 8         Q.   Why don't you tell me the revenues?
 9         A.   I would have to estimate more than
10    $4 million, probably less than $5 million.
11         Q.   How about for 2002?
12         A.   2002, roughly $4 million.
13         Q.   How about 2001?
14         A.   2001, without reviewing the
15    financial statements and again, I am
16    hesitant to -- without a specific
17    definition of revenue and looking at the
18    accounting statements.
19         Q.   Why don't you give me your
20    definition of revenue?
21         A.   Well, when -- it's very simple in a
22    business that has ongoing operations.  In
23    a business like Alper or Saltire where you
24    don't have any manufacturing operations,
25    are not providing services on a routine
0203
 1
 2    basis such as IBM corporation or General
 3    Electric corporation, nothing -- for the
 4    most part, nothing is recurring in the
 5    ordinary.
 6         Q.   Let me ask you this.  Do you have a
 7    statement of revenues in your financial
 8    statements?
 9         A.   Certainly there's a revenue line.
10         Q.   Okay.  Now what would the revenue
11    line be for 2003?
12         A.   I don't know precisely, because
13    without having this in front of me, I
14    can't recall if we book interest income
                                    Page 84

Bertellotti
15  and advisory income as revenue, other
16  income, interest income.  There's three or
17  four different ways to classify these
18  different types of income.
19        Q.   Tell me the documents you would
20  refer to to get to those numbers.
21        A.   I would refer to the audited
22  financial statements.
23        Q.   Of Alper Holdings USA?
24        A.   Alper Holdings USA, Inc.
25        Q.   Are the payments under the
0204
1
2   management agreement, Section 3, made by
3   Saltire Industrial part of the revenue you
4   just described of Alper Holdings USA?
5         A.   Certainly in some classification
6   relating to income.  Specifically whether
7   it's identified as management fees, other
8   income or revenues, I am not certain,
9   sitting here.
10        Q.   What did Carlos Peralta to do to
11  earn $480,000 in business expenses in
12  2000?
13        A.   Mr. Peralta's consultant agreement
14  with Alper Holdings.
15        Q.   Is that a written agreement?
16        A.   Written agreement.
17        Q.   How much is he paid?
18        A.   I think you know that, it's in
19  your --
20        Q.   I know he was paid $480,000 in the
21  year 2000.
22             Has he been paid money under that
23  agreement in other years?
24        A.   I believe so.
25        Q.   Could you describe those payments?
0205
1
2         A.   Payments would be consistent with
3   what the agreement said, which is
4   approximately $480,000 a year.
5         Q.   How long has that agreement been in
6   force?
7         A.   I don't know precisely.  The board
8   evaluated that agreement in their
9   judgment.  They believe that was a good
10  use of funds.  It was a good idea for
11  corporations to enter into a consultant
12  agreement.
13             Mr. Peralta is one of the prominent
14  businessmen in Mexico.  He has routinely
15  brought investment opportunities to the
16  United States and Mexico and around the
17  world by a variety of advisors and
18  investment banks.
19             Alper Holdings was an investment
20  company designed to make investments in
21  other companies.  It was believed that
22  Mr. Peralta could help evaluate, bring
23  these opportunities to the company and
24  evaluate them once they were there. The
25  board's judgment that was a good use -- it
Page 85

Bertellotti

0206
```
 1
 2   was a prudent thing to enter into that
 3   agreement.
 4        Q.   Has this agreement that you are
 5   referring to, new business consultant
 6   agreement, has that been in force since
 7   you have been president of Alper Holdings
 8   USA, Inc.?
 9        A.   I believe it's a approximately the
10   same amount of time.
11        Q.   Okay.  Do you know if Carlos
12   Peralta has received payments from Alper
13   or any of the subsidiaries during that
14   period, other than those payments you just
15   described?
16        A.   Has Mr. Peralta -- say that?
17        Q.   Has Mr. Carlos Peralta received
18   payments from Alper Holdings USA, Inc. or
19   its subsidiaries in addition to the
20   $480,000 a year he has received under his
21   consultant agreement?
22        A.   None whatsoever.
23        Q.   How many new businesses did -- has
24   Alper purchased since 2000?
25        A.   Purchased since 2000?
```
0207
```
 1
 2        Q.   Since December 2000.
 3        A.   Well, we made an investment.  It
 4   was a minor investment for our position in
 5   the magazine we tailored to earlier.
 6        Q.   Was it Mr. Peralta's idea?
 7        A.   It was.
 8        Q.   How often do you meet with
 9   Mr. Peralta personally, face-to-face?
10        A.   Very infrequently.
11        Q.   Like, how many times a year?
12        A.   Depends on the year.
13        Q.   Well?
14        A.   Anywhere from zero to seven, if you
15   go back over a several year period.
16        Q.   How many times have you discussed
17   this particular lawsuit with Mr. Peralta?
18        A.   Never.
19        Q.   How many times have you discussed
20   or how often -- you said zero to seven.
21   Can you give me an idea, from 2000 to
22   2003, how many times would you meet with
23   Mr. Peralta?
24        A.   Without referring to a calendar I
25   couldn't give you a precise estimate.  If
```
0208
```
 1
 2   you say 2000, that is approximately a
 3   four-year period this time.  In aggregate,
 4   less than six times, less than seven
 5   times.
 6        Q.   What calendar would you refer to?
 7   Do you keep a personal calendar?
 8        A.   I do.  It's only for the current
 9   year.
10        Q.   How many times a year do you talk
```
Page 86

Bertellotti

11    to Mr. Peralta on the phone?
12         A.   Infrequently.
13         Q.   Ten times a year?
14         A.   Less than that.
15         Q.   Five times a year?
16         A.   Somewhere between zero and five
17    times a year.
18         Q.   How many years have you spoken to
19    him not at all?
20         A.   Pardon me?
21         Q.   Since you have been president, how
22    many years have there been which you have
23    not spoken to Mr. Peralta?
24         A.   How many years of which I have not
25    spoken -- I am trying to think.  Again,
0209
1
2    you are asking very specific questions
3    regarding extended period of time, and I
4    can't recall specifically when I have
5    spoken to Mr. Peralta.  Again, I report to
6    the board of directors.
7         Q.   Okay.  Would you have spoken to
8    Mr. Peralta about the Alper Ink sale?
9         A.   Yes.  There was at least one
10    meeting, possibly two meetings, with our
11    financial advisors relating to the Alper
12    Ink Group sale where he was present,
13    along -- the purpose of the meeting was to
14    present issues to the board of directors
15    of Alper Holdings.  Mr. Peralta was
16    present at least one, possibly two, of
17    those occasions.
18         Q.   Would you have spoken to
19    Mr. Peralta relating to the sale of
20    Scovill Fasteners?
21         A.   I would not have -- I was very
22    involved in the sale of Scovill Fasteners
23    but that was 1995.  I was neither an
24    officer or director of any of these
25    companies.  I was, again, a kind of
0210
1
2    financial expert, corporate finance
3    expert.  I effected the sale of Scovill
4    Fasteners, along with a colleague.
5         Q.   Would you have spoken to
6    Mr. Peralta about the dissolution of
7    Realty Holdings?
8         A.   No.
9         Q.   Would you have spoken to him about
10    the dissolution of Alper Securities?
11         A.   No.
12         Q.   Would you have spoken to him about
13    environmental liabilities of Scovill --
14    Saltire?
15         A.   No.  There would be no reason to do
16    so.  Speak to the board of directors about
17    that.  Of Saltire.
18         Q.   Are you saying you don't speak to
19    the board of directors of Alper Holdings
20    USA, Inc. about Saltire's activities?
21         A.   It depends.  On a day-to-day
                              Page 87

Bertellotti
22   basis -- as officer of Saltire, I have the
23   authority divested in me under the bylaws
24   and charter to effect its day-to-day
25   business.  With respect to certain
0211
1
2   transactions, I bring it to the attention
3   of the board of directors and seek their
4   advice for counsel.  Certain transactions,
5   we seek their approval.
6          In the context of discussing Alper
7   Holdings business and its investments in
8   various subsidiaries, I often talk about
9   specific subsidiaries, including Saltire,
10  which is a subsidiary, obviously, with
11  substantial liabilities.  I would discuss
12  with the Alper Holdings board its
13  investment in Saltire Industrial and the
14  issues facing Saltire Industrial.
15        Q.   I think you have already said --
16  just correct me if I am wrong, when
17  you are talking to the board, that is, a
18  meeting of the board where minutes are
19  taken, whether it be the board of Saltire
20  or the board of Alper?
21        A.   No.  If I said that, I misspoke,
22  and I don't think I said that.  There
23  are -- the board of Saltire Industrial is
24  a single individual Luis Felipe Sanchez.
25  I routinely speak to him by telephone as
0212
1
2   simply as a board member, not in the
3   context of a formal meeting.  Not in the
4   context of a specific decision but just
5   seeking his counsel, keeping him
6   up-to-date with respect to Saltire's
7   business issues.
8         Q.   Including this lawsuit?
9         A.   I have spoken to him about --
10  informed him of the lawsuit.
11        Q.   What does Mr. Sanchez live?
12        A.   Mexico City.
13        Q.   Does he have a personal friend of
14  Carlos Peralta?
15        A.   No.
16        Q.   Is he involved in the Grupo IUSA
17  organization?
18        A.   I believe he is.
19        Q.   What is his office, if he has one
20  in that organization?
21        A.   He is a senior financial executive.
22  Precise title, I don't know.
23        Q.   So when you talk to the board of
24  Saltire, minutes may not be taken,
25  depending?
0213
1
2         A.   It depends.
3         Q.   Okay.  When you have spoken to the
4   board of Alper Holdings USA, Inc., is that
5   always done in the context of a board
6   meeting in which minutes are taken?

Page 88

Bertellotti

```
 7        A.   In recent years, more often than
 8   not, that is not the case.  More often
 9   it's my contacting with the liaison.  Luis
10   Felipe Sanchez acts as primary liaison for
11   the Alper Holdings board.  I speak to him
12   quite routinely with regard to Alper
13   Holdings business affairs.
14        Q.   As you speak to him as director,
15   minutes are not taken?
16        A.   Generally not.  Normally when
17   there's a decision to be taken by the
18   board, it's reflected unanimous written
19   consent.
20        Q.   How long has that been going on,
21   the speaking to the board member of Alper
22   without the other board members present,
23   without minutes being taken?
24             MR. SCOTT:  Object to the
25        form of the question.
0214
 1
 2   BY MR. STEWART:
 3        Q.   How long have you been speaking
 4   just directly with Mr. Sanchez about Alper
 5   Holdings USA business?
 6        A.   On and off since he has been there.
 7   I also speak to other board members.  What
 8   I said, my primary contact in the board
 9   and primary liaison with the board, rather
10   than trying to contact all four people in
11   Mexico simultaneously, I communicate more
12   often than not through Mr. Sanchez.
13        Q.   Scovill Fasteners, do you see in
14   your affidavit that you say in Paragraph
15   4, by 1987 Saltire was primarily engaged
16   in the manufacturing of garment and
17   industrial fasteners through its
18   subsidiary named Scovill Fasteners, Inc.
19        A.   Yes.
20        Q.   Can you tell me, at that point was
21   that the only profitable business Saltire
22   was engaged in, that you know of?
23        A.   Generally speaking, that is my
24   understanding of 1997.  The reason I
25   believe that, between becoming familiar
0215
 1
 2   with the other divestiture agreements that
 3   are referenced in Section 3, that the
 4   majority -- my understanding reading those
 5   agreements, as well as the history of
 6   Scovill Fasteners, is that was Saltire's
 7   sole operating business.  It was conducted
 8   through subsidiary.
 9        Q.   Now, Scovill Fasteners sale, what
10   was your personal involvement with that?
11        A.   Again, as kind of a corporate
12   finance expert, I guess, an investment
13   banking person.  The vast majority of my
14   career has been spent as a corporate
15   finance executive, an investment banking
16   executive, and I have experience in
17   mergers and acquisition, capital markets
```

Page 89

Bertellotti

18   transactions, arranging bank loans, that
19   type of thing.
20        So my involvement in the Scovill
21   Fasteners sale was effecting the sale of
22   Scovill Fasteners in such a way that we
23   would maximize the value of Scovill
24   Fasteners through the process and then
25   complete the sale itself.
0216
 1
 2        Q.   Were you the person inside Alper
 3   Holdings USA, Inc. who is primarily
 4   responsible for making that deal happen?
 5        A.   Well, I was a direct employee of
 6   Alper Holdings USA, Inc..  I was a lone --
 7   I was -- again, in 1995, I was a direct
 8   employee of Alper Holdings USA, Inc. and I
 9   was a lone servant. I was lent to Saltire
10   to help effect the sale of subsidiaries,
11   Scovill Fasteners.  I think your point --
12   I was the primary person.
13        Q.   Were you intimately involved with
14   that sale?
15        A.   I was intimately involved with the
16   sale.
17        Q.   Who are the investment bankers that
18   conducted the competitive auction, if any?
19        A.   We did not hire investment banking
20   for the transaction; we conducted the
21   auction ourselves.
22        Q.   Who bid?
23        A.   I have precisely -- well, there
24   were approximately eight bidders.  I
25   believe there were at least eight bidders.
0217
 1
 2   They were primarily financial bidders,
 3   such as LBO firms.  We ultimately sold the
 4   company to Kohlberg & Company.  I would
 5   have to review the records to recall the
 6   names of the other seven builders who
 7   didn't succeed.
 8        Q.   Did Kohlberg & Company have any
 9   ties at that time to Alper Holdings USA,
10   Inc.?
11        A.   None whatsoever.
12        Q.   Did Kohlberg & Company have any
13   ties to any of the owners, direct or
14   indirect, of Alper Holdings USA, Inc.?
15        A.   Not -- none that I am aware of.
16        Q.   Following the sale of Scovill
17   Fasteners -- who are the owners of Scovill
18   Fasteners, do you know?
19        A.   Following the sale of Scovill
20   Fasteners?
21        Q.   At auction.
22        A.   Yes.  Kohlberg & Company set up an
23   acquisition vehicle called Kisco, I
24   believe it's called Kisco Acquisition.
25   They acquired the stock of Scovill
0218
 1
 2   Fasteners and why they structured a
                          Page 90

Bertellotti

```
 3  particular way relates to how they run
 4  their leveraged buyout firm.
 5       Q.   Can you turn your attention to Page
 6  7 of the financial statements that are
 7  Exhibit 8?
 8       A.   Page again?
 9       Q.   Page 7.  Actually, before we get to
10  that, did any Scovill or Alper officers --
11  strike that.
12            Did any Saltire Industrial, Inc. or
13  Alper Holdings USA, Inc. officers or
14  directors receive any payments in
15  connection with the sale of Scovill
16  Fasteners?
17       A.   No.
18       Q.   Do you know of any Alper or Saltire
19  director or officer who owned any stock of
20  Scovill Fasteners or stock option in
21  Scovill Fasteners before you became
22  president?
23       A.   Of Scovill Fasteners?
24       Q.   Yes.
25       A.   Again, I was an employee, not
0219
 1
 2  officer.  But I am not aware at that time.
 3       Q.   How about right now or during the
 4  entire time you have been at Alper
 5  Holdings USA?
 6       A.   Repeat the question.
 7       Q.   Okay.  Since Scovill Fasteners was
 8  sold, rather, at competitive auction?
 9       A.   Yes.
10       Q.   As you described it in your
11  affidavit, has any officer or director of
12  Saltire owned any stock in Scovill
13  Fasteners that you know of?
14       A.   None whatsoever.
15       Q.   Okay.
16       A.   Do you know whether any evaluation
17  was done of Scovill Fasteners prior to the
18  1995 auction, as described in paragraph 8
19  of your affidavit?
20            I would say there probably was not
21  a formal evaluation in the sense we hired
22  investment bank or commercial bank to do
23  something like that.  But as I said, my
24  experience as corporate finance executive,
25  I conducted -- my colleague and I, Jeffrey
0220
 1
 2  Holdsberg, valuated what the approximate
 3  value was by looking at the comparable
 4  companies as to which came up with the
 5  range of value designed the auction,
 6  two-step process, and probably there was a
 7  third bid to try to maximize the value.
 8  We relied largely on the auction.
 9       Q.   You said a third bid.  There were
10  only three bids?
11       A.   I'm sorry; a third round of
12  bidding.  I misspoke.  There were at least
13  eight bids, to my recollection.  Three
```

Page 91

Bertellotti

```
14    rounds of bidding.
15        Q.    Who found Kohlberg & Company as the
16    buyer?
17        A.    Who found them as the buyer?
18        Q.    Yes.
19        A.    My colleague, Jeff Holdsberg, was
20    the one primarily responsible.  Sitting
21    here, I can't recall how many books we
22    sent out or invitations  to bid.
23    Certainly more than the eight people who
24    bid.  But Mr. Holdsberg would have been
25    the primary one responsible for listing
0221
 1
 2    potential bidders.
 3        Q.    Do you know whether Scovill
 4    Fasteners management got ownership in
 5    Scovill Fasteners?
 6        A.    During our period or after we sold
 7    it?
 8        Q.    After you sold it.
 9        A.    I have no personal knowledge as to
10    who did.  I understand they probably
11    participated.  Would be standard in that
12    type of transaction if they would have
13    gotten some type of equity-linked
14    incentive with respect to the new
15    ownership, but I don't know precisely.
16    Very possible.
17        Q.    But did anyone at Alper, whether
18    director or an employee, retain any
19    ownership in Scovill Fasteners after the
20    '95 auction?
21        A.    None whatsoever.  It was a sale of
22    100 percent.
23        Q.    Do you know anything about Scovill
24    Fasteners operations after the sale
25    referred to in your affidavit?
0222
 1
 2        A.    I know very general facts.
 3        Q.    Do you know whether it was later
 4    sold?
 5        A.    I do know that.
 6        Q.    Do you know what price it was sold
 7    for?
 8        A.    I know approximately the price it
 9    was sold for.
10        Q.    What was that?
11        A.    When you say price, you want to
12    define -- equity value, enterprise value,
13    what are you thinking?
14        Q.    Well, I mean, was it sold to
15    Mr. Kohlberg's company for about $41
16    million?
17        A.    The equity value was approximately
18    $41 million.
19        Q.    Was it later sold, approximately
20    two years later, to an investment group
21    for approximately $140 million?
22        A.    I don't think your numbers are
23    correct.  It was sold.  My understanding,
24    Kohlberg sold it to a company, an
```

Page 92

Bertellotti
25  investment group called Saratoga Partners.
0223
1
2   And, again, I think you need to compare
3   equity value to enterprise value,
4   potential appraisal value.  It was sold
5   for a substantially higher price.
6   Frankly, it was quite surprising.
7            I also had the opportunity to
8   review the bond-offering document
9   associated with Saratoga Partners' sale,
10  and clearly what Kohlberg had done, they
11  had done, I believe, two and possibly
12  three acquisitions subsequent to their
13  purchase from us, which substantially
14  changed the business and altered Scovill
15  Fasteners.
16           Furthermore, I understand Kohlberg
17  & Company may have been sued with respect
18  to the sale to Saratoga Partners --
19       Q.   What was the equity value of that
20  sale?
21              MR. LUCAS:   Wait.  Don't
22           interrupt him.  Go ahead and
23           finish your answer.
24  BY MR. STEWART:
25       Q.   Go ahead.
0224
1
2       A.   I lost my train of thought. Also,
3   my understanding is that Saratoga Partners
4   may have sued Kohlberg & Company with
5   respect to the sale precisely because they
6   felt they had overpaid.
7       Q.   Do you know the equity that was in
8   that deal?
9       A.   In which deal?
10      Q.   In the deal whereby Scovill
11  Fasteners was sold to Saratoga Partners?
12      A.   It appears -- again, it's
13  impossible to answer that question but I
14  don't know precisely how Kohlberg &
15  Company capitalized the company.  I do
16  have, as I said, this bond offering
17  document that goes through some of that
18  stuff but very difficult to tell you
19  precisely what they may have received.
20      Q.   So you don't have any idea?
21      A.   I am not going to speculate.
22      Q.   Go ahead and speculate.
23      A.   Well, on the condition that it's
24  speculation; I am not absolutely certain.
25  Kohlberg may have received as much as $100
0225
1
2   million with respect to their equity.
3       Q.   And the equity that Scovill
4   received was $41.5 million?
5       A.   That is approximately right.
6       Q.   Can you look now on Page 7 of the
7   financial statements -- wait a minute.
8   Hold on.
9              Okay.  Who came up with the
Page 93

Bertellotti

10  strategy for purchasing Alper Ink?
11         Let me rephrase that.  Who came up
12  with the strategy for taking funds and
13  purchasing incorporated companies to roll
14  them up into what became Alper Ink?
15      A.  The officers of the prior --
16  officers prior to my tenure of Saltire
17  Industrial.
18      Q.  You are not for sure which person?
19      A.  I believe it was Nicholas Combemale
20  and Jeffrey Holdsberg.
21      Q.  And do you know which companies
22  were purchased?
23      A.  Do I know which companies were
24  purchased?
25      Q.  Yes.
0226
 1
 2      A.  Roughly, I probably remember five
 3  of the six or seven.
 4      Q.  Can you quickly run down --
 5      A.  Company purchased RKR Graphics.
 6      Q.  Okay?
 7      A.  Progressive Ink, CZ Ink.  There are
 8  others and they are escaping me for the
 9  moment.
10      Q.  Do you know what the total amount
11  paid for these various purchases by Alper
12  Ink was?
13      A.  Enterprise value, equity value,
14  what are you talking about?
15      Q.  Equity value.
16      A.  I don't, sitting here right now.
17      Q.  How would I find that out?
18      A.  We should be able to find that
19  through the financial statement, audited
20  financial statements.  I would say
21  probably in the order of, magnitude of 30,
22  $50 million in the aggregate.
23      Q.  In those various deals in which
24  incorporated groups were purchased, who
25  was the buyer?
0227
 1
 2         Was it Alper Holdings USA, Inc.?
 3      A.  No.  Well, it was Saltire
 4  Industrial -- was probably the Alper Ink
 5  Group.  It was Saltire who created a
 6  subsidiary.  The subsidiary did the
 7  acquisition.
 8      Q.  Did Alper Holdings USA, Inc.
 9  acquire these companies and then transfer
10  to Alper Ink?
11      A.  Not to my knowledge, never.
12      Q.  Did they ever -- Alper Holdings
13  USA, Inc. -- ever acquire one of these
14  companies and transfer to Saltire?
15      A.  Never to my knowledge.
16      Q.  Okay.  Did Alper USA, Inc. execute
17  any of the documents whereby Scovill
18  Fasteners was auctioned?
19      A.  Scovill Fasteners was auctioned?
20      Q.  Yes.

Page 94

Bertellotti
```
21        A.   Not to my knowledge.  It never
22   should have done that.
23        Q.   Are all the purchase agreements
24   related to the Alper Ink acquisitions that
25   we discussed at your headquarters?
0228
 1
 2        A.   Yes, they are.
 3        Q.   By headquarters, I mean --
 4        A.   800 Third Avenue.
 5        Q.   Okay.  All the subsidiaries we are
 6   talking about, has any -- strike that.
 7             Could you tell me now, referring to
 8   the financial statements, Page 7, could
 9   you look at H, Paragraph H?
10        A.   Yes.
11        Q.   Could you just explain to me what
12   these compensation agreements involve?
13        A.   Yes, this is -- let me finish
14   reading it.  (Reading.)
15             Yes.  Specifically this is relating
16   to an agreement that Mr. Holdsberg,
17   Jeffrey Holdsberg had; that it was some
18   type of equity incentive program related
19   to Alper Ink Group.
20        Q.   Okay.  How much was he paid?
21        A.   I believe he was paid approximately
22   $300,000 in respect to that agreement.
23        Q.   Were any other officers or
24   directors paid any money out of the
25   operating sale?
0229
 1
 2        A.   Not with respect to these
 3   agreements.
 4        Q.   Okay.  Well, when Alper Ink was
 5   sold in 2000, did you receive any
 6   compensation directly to the Alper Ink
 7   sale?
 8        A.   I did not receive any compensation
 9   directly tied to the Alper Ink Group sale.
10        Q.   Did any officer director of Alper
11   Holdings USA, Inc. receive any
12   compensation related to the Alper Ink
13   sale?
14        A.   Yes, two or three individual --
15   well, only two of them were officers.
16   There were two other individuals that were
17   not officers, that I had referred to them
18   earlier as people who were lone servants
19   acting as senior officers of Alper Ink
20   Group.  They received compensation
21   relating to the Alper Ink Group sale.
22        Q.   Who are they and how much did they
23   get?
24        A.   Jeffrey Holdsberg, David Rankin,
25   Robert Van Liederkirke, Christopher Beck,
0230
 1
 2   and Christopher Locke.
 3        Q.   Were these all employees of Alper
 4   Holdings USA, Inc.?
 5        A.   They were direct employees.  They
```
Page 95

Bertellotti

```
 6    were on the payroll for administrative
 7    purposes of Alper Holdings USA, Inc.,
 8    although as I said earlier, they -- the
 9    vast majority of their time and service
10    were dedicated to the Alper Ink Group.
11         Q.   And how much did they receive, sum
12    total as a group, out of the proceeds of
13    the Alper Ink sale in 2000?
14         A.   Somewhere in excess of a million
15    dollars in aggregate, and some were
16    probably less than $1.5 million.
17         Q.   Okay.  Let's turn to Paragraph 13
18    of your affidavit.
19         What was your personal involvement
20    with the Realty Holdings, Inc. loan
21    referred to in that paragraph?
22         A.   In terms of what I say in 13, none
23    whatsoever.
24         Q.   What's the basis for your statement
25    there?
0231
 1
 2         A.   What is the factual basis? Factual
 3    basis, it's part of the bankruptcy record.
 4    It's clear in the bankruptcy documents
 5    that loan originated in the plan of the
 6    reorganization.
 7         Q.   Do you have any idea what the
 8    underlying impetus for the loan was?
 9         A.   I do not. I also might add that
10    loan is not originally made.  Saltire
11    never advanced a penny with respect to
12    that loan.  The predecessor corporation
13    did.
14         Q.   Which predecessor corporation was
15    that?
16         A.   I believe it's called First City
17    Diversified, but Saltire did not make that
18    loan.  Saltire succeeded to its position
19    through merger.  It's all in the
20    bankruptcy documents.
21         Q.   But the loan became the debt from
22    Realty Holdings -- as a liability for
23    Realty Holdings and asset of Saltire?
24         A.   That's correct.  They're both
25    succeeded to their respective interests.
0232
 1
 2         Q.   Do you know the terms of the note?
 3         A.   Specifically, sitting here, I do
 4    not.
 5         Q.   Okay.  Was Saltire entitled to call
 6    the note?
 7         A.   I do not know.
 8         Q.   So you don't know whether Saltire
 9    was entitled to a demand of the funds that
10    had been loaned?
11         A.   Not without referencing the note
12    specifically.
13         Q.   How much was the loan for -- was
14    the face value of the loan?
15         A.   My recollection is approximately
16    $5.6 million.
```

Page 96

Bertellotti

```
17        Q.   $5.6 million loaned, at least, back
18   in '92?
19        A.   Yes.
20        Q.   What was the interest rate?
21        A.   I don't recall specifically.
22        Q.   Do you know if it was fixed or
23   variable?
24        A.   I don't recall.
25        Q.   Do you know whether it required
0233
1
2    payments over time?
3         A.   I believe it did but I don't recall
4    a specific term.
5         Q.   Okay.  Do you know -- were you
6    personally involved in the $3.1 million
7    payment described in Paragraph 15 of your
8    affidavit?
9         A.   I was not an officer of the
10   companies at that time because that was
11   1995, if I recall, and so I was not privy
12   to those kind of things.  But I have since
13   reviewed documents where I have seen
14   evidence the $3.1 million was paid in
15   1995.
16        Q.   What documents have you reviewed?
17        A.   Financial statements.
18        Q.   Of what company?
19        A.   Saltire Industrial.
20        Q.   And do you know the exact date when
21   that $3.1 million was paid by Realty
22   Holdings?
23        A.   It was paid -- I don't know the
24   precise dates.  There were two payments
25   during the course of 1995 aggregating $3.1
0234
1
2    million.
3         Q.   Do you know what approximate dates
4    of those payments were?
5         A.   Within the year 1995, I do not.
6         Q.   Do they coincide with purchases
7    relating to the entities that became Alper
8    Ink?
9         A.   No idea.
10        Q.   Do you know what --
11        A.   It's unlikely because Alper --
12   Scovill Fasteners was sold in 1995.  I
13   think the first acquisition with respect
14   to Alper Ink Group was -- may have been
15   '95, but most of it certainly took place
16   subsequent to '95.  But I don't know.
17        Q.   Do you have any idea why Realty
18   Holdings paid that $3.1 million in 1995?
19        A.   They owed the money, and evidently
20   had liquidity sufficient to pay.
21        Q.   Do you know where that liquidity
22   came from?
23        A.   I do not.
24        Q.   Do you know what business Realty
25   Holdings, Inc. was involved in at the
0235
1
```

Page 97

Bertellotti
```
 2   time?
 3        A.   No.  At that point in time it did
 4   not seem to have any operations or assets.
 5   It certainly existed for a purpose,
 6   probably dates well back to my involvement
 7   with the company.
 8        Q.   Do you know whether -- let me make
 9   sure I understand.  For example, didn't
10   Alper Ink buy Bagcraft in 1995?
11        A.   It never bought Bagcraft.
12        Q.   It never did?
13        A.   No.
14        Q.   Did Realty Holdings make any
15   payments other than the $3.1 million
16   listed in Paragraph 15 of your affidavit?
17        A.   With respect to this loan we are
18   talking about?
19        Q.   Yes.
20        A.   Not to my knowledge.
21        Q.   Do you know what it did -- okay.
22   Do you know what the money had been used
23   for after it was loaned, what the loan
24   that you referred to in Paragraph 14 and
25   15?
```
0236
```
 1
 2        A.   That originated in 1992 as part of
 3   the bankruptcy?
 4        Q.   Yes.
 5        A.   No, I do not.
 6        Q.   Did you as president of Saltire
 7   ever analyze that asset of Saltire?
 8        A.   Yes, prior to writing, and yes, and
 9   decided to wait.  It was insolvent.
10        Q.   Can you tell me -- I take it Realty
11   Holdings -- did Realty Holdings ever have
12   an address other than Al -- other than the
13   address that's the same address as that
14   for Alper Holdings USA, Inc.?
15        A.   Possibly, I don't know.
16        Q.   You don't know.  Have you ever
17   known that Realty Holdings had lawyers or
18   accountants different than those that
19   represented Alper Holdings USA, Inc.?
20        A.   It's possible they did.
21        Q.   But you don't know?
22        A.   I don't know.
23        Q.   Tell me what U.S. GAAP provision
24   you are referring to in Paragraph 16 of
25   your affidavit.
```
0237
```
 1
 2        A.   I am not going to cite it.  In
 3   general, I am not a certified public
 4   accountant.  I am familiar with the
 5   accounting practices as well as financial
 6   statements.  GAAP requires that you record
 7   various assets at the lower of cost or
 8   market.  Okay.  It also requires that you
 9   take a reserve for doubtful accounts, such
10   as accounts receivables that you don't
11   think you can collect.  This was a loan
12   which was doubtful as to its collection.
```
Page 98

Bertellotti

13    The company that owed the money was
14    insolvent.  Eventually paid it all, it
15    being paid $3.1 million and, therefore,
16    took a reserve against the amount
17    reflecting its uncollectibility and its
18    diminished and impaired value.
19         Q.   Okay.  Want you to refer to the
20    financial statements.  When you wrote off
21    the Realty Holdings loan -- strike that.
22              When you wrote off the Realty
23    Holdings loan, what was the value of the
24    asset before you wrote it off?
25         A.   I believe $5.2 million.  It's in
0238
1
2    here, 5.1.
3         Q.   Is it $5.138 million?
4         A.   I believe so.
5         Q.   On Saltire's 1998, '99 financial
6    statements, would that have stood as an
7    asset worth somewhere upwards of $5.1
8    million?
9         A.   I believe so.
10         Q.   Can you tell me whether or not your
11    financial statement at Page 6, Section F,
12    impairment of loan life assets articulates
13    your understanding of GAAP insofar as it
14    relates to the Realty Holdings, Inc. loan?
15              MR. SCOTT:   Object to the
16              form of that question.
17    BY MR. STEWART:
18         Q.   You can go ahead and answer it.
19         A.   What is your question?  It says
20    precisely what it says.  What is the
21    question?
22         Q.   When you are talking about U.S.
23    GAAP, is the U.S. GAAP you are referring
24    to in Paragraph 16 of your affidavit, is
25    that essentially articulated, that
0239
1
2    principal you are referring to,
3    articulated in Section F Section 2-F of
4    your financial statements?
5         A.   Not necessarily.  It may very well
6    be.  As I said before, I am not a
7    certified public accounts.  I have been
8    working with accountants and financial
9    statements for a long time.  I gave you my
10    general understanding of GAAP without
11    citing the specific provision.  I consult
12    with the CFO who is a public accountant.
13    Write it out in accordance with GAAP
14    whichever FASB pronouncement or APB that's
15    relevant is what is done in accordance
16    with --
17         Q.   But you can't tell me what that
18    FASB pronouncement is?
19         A.   Specifically, I don't know.
20         Q.   Do you really think there's a FASB
21    pronouncement addressing the writing off
22    of loans of this type?
23         A.   Absolutely.

Page 99

Bertellotti
```
24        Q.   Can you tell me why that investment
25   wasn't written off prior to 2000?
0240
 1
 2        A.   I don't have an answer to that
 3   question.  It's entirely possible it
 4   wouldn't have been appropriate to write it
 5   off earlier.
 6        Q.   Did you ever have any discussions
 7   with anyone, any officer or director of
 8   Saltire or Alper Holdings USA, Inc., in
 9   which you discussed calling that loan and
10   getting Saltire's money back?
11        A.   No.  We obviously reviewed the
12   financial condition of Realty Holdings and
13   it was unable to pay.  It was insolvent.
14        Q.   When did you review the financial
15   condition of Realty Holdings?
16        A.   We review it routinely, annual
17   basis, and the financial statements.  We
18   certainly reviewed at the end of 2000 and
19   made that decision.
20        Q.   Would you agree Realty Holdings was
21   not insolvent in 1995?
22        A.   I believe -- in 1995?  Why are you
23   picking 1995?
24        Q.   Because Realty Holdings paid,
25   according --
0241
 1
 2        A.   They could have easily been
 3   insolvent in '95.  Simply because they
 4   have money doesn't mean they aren't
 5   insolvent.
 6        Q.   Well, I guess what I would say, if
 7   I were to look at Saltire Industrial,
 8   Inc.'s financial statements for 1995,
 9   would I have found anything to indicate
10   that Realty Holdings, Inc. was insolvent
11   at that time?
12        A.   Without seeing the specific
13   statements, I cannot answer that question.
14        Q.   I am going to hand you --
15             MR. STEWART:  Will you mark
16        this as an exhibit?
17             (Whereupon Exhibit 14 is
18        Marked.)
19   BY MR. STEWART:
20        Q.   We may have already addressed it.
21   I would like to you look at the documents
22   and tell me if you ever reviewed them.
23        A.   I reviewed them subsequent to your
24   filing.
25        Q.   Do you have any direct personal
0242
 1
 2   knowledge about the letters and documents
 3   that are listed in that binder?
 4             MR. LUCAS:  Object to the
 5        form; it's too broad.
 6             THE WITNESS:  Since I said
 7        I reviewed these subsequent
 8        to your filing, I don't recall
```

Bertellotti
```
 9              seeing these letters before.
10              It's possible.  But to my
11              knowledge, I don't have any
12              direct personal knowledge of
13              these documents.
14  BY MR. STEWART:
15         Q.   Now, did you see -- I will turn
16  your attention -- I am afraid I only have
17  one copy -- did you see, for example, the
18  master agreement that is at Tab 3, Bates
19  Number SO4125?
20         A.   Yes, I do.
21         Q.   Do you see it's between First City
22  US Corp. And ICF Kaiser Engineers?
23         A.   Yes.
24         Q.   Do you have -- first of all, did
25  you, before you saw this document when we
0243
 1
 2  filed it, have any familiarity with this
 3  particular agreement?
 4         A.   No, I did not.
 5         Q.   Were you involved in entering into
 6  the agreement?
 7         A.   Obviously not.
 8         Q.   Do you know -- can you tell me
 9  whether First City US Corp. is a
10  corporation that exists today?
11         A.   First City Corporation does not
12  exist today; it's been dissolved.
13         Q.   Was it dissolved in the form of
14  Realty Holdings, Inc.
15         A.   I believe so.
16         Q.   Your understanding, First City US
17  Corp. was Realty Holdings' predecessor?
18         A.   I believe so, based on the
19  corporate documents you filed.
20         Q.   Do you see on Tab 4 a reference to
21  First City Capital Corporation?
22         A.   Yes, I do.
23         Q.   Is that a company you are familiar
24  with?
25         A.   I believe so.
0244
 1
 2         Q.   Do you know what the current status
 3  of First City Capital Corporation is?
 4         A.   I believe it's dissolved.
 5         Q.   Now, do you know anything about the
 6  relationship between First City Capital
 7  Corporation and First City Industries at
 8  the time this letter was written on May
 9  26, 1992?
10              MR. MAY:  Object to the
11              form.
12              THE WITNESS:  Other than
13              the corporation separate and
14              distinct.  They are separate
15              corporations.  First City
16              Capital -- first City Industries
17              is not a successor  of these
18              industries.
19  BY MR. STEWART:
```
Page 101

Bertellotti

```
20        Q.   Do you know if First City Capital
21   Corporation was a first or second -- do
22   you know whether or not First City Capital
23   Corporation in May 26, 1992 was a
24   subsidiary of First City Industries?
25        A.   I believe it was a subsidiary for
0245
 1
 2   First City Industries.
 3        Q.   Do you know if First City US Corp.
 4   referred to in the agreement that is at
 5   Tab 3, was a subsidiary of First City
 6   Industries on January 1, 1992?
 7        A.   That date, I do not know.  That
 8   specific date, I don't know specifically.
 9        Q.   Do you know what the corporate
10   officers of First City US Corp. were in
11   1992?
12             MR. SCOTT:  Who they were
13        or what they were?
14             MR. STEWART: What they
15        were.
16             THE WITNESS:  Where they
17        were?  What is --
18             MR. SCOTT:  Object to the
19        form.
20             MR. STEWART: I will repeat
21        myself.
22             MR. SCOTT:  I think you
23        misspoke.  But you might not
24        have.
25   BY MR. STEWART:
0246
 1
 2        Q.   What I want to know, do you know
 3   where the headquarters of First City US
 4   Corp. was located in January '92?
 5        A.   I do not.
 6        Q.   Do you know where?
 7             MR. LUCAS:  Excuse me just
 8        one minute, Michael.  I would ask
 9        you to go ahead and resume your
10        seat.  I don't think you need to
11        be hovering over the witness
12        asking him.
13             MR. STEWART:  Mr. Lucas,
14        you of all people should hardly
15        be criticizing an attorney
16        hovering over the witness, and I
17        will sit down in a moment.
18             MR. SCOTT:  You are also
19        between the Court Reporter and
20        witness.  She is having trouble,
21        I think, following.
22             MR. LUCAS:  You can ask him
23        these questions referring to the
24        document.  You don't have to be
25        standing at his shoulder.
0247
 1
 2             MR. MAY:  Here is a set of
 3        documents you can sit in the seat
 4        and use the same.
```

                                    Page 102

                              Bertellotti
    5            MR. STEWART:  We are almost
    6        done with the line of
    7        questioning.
    8  BY MR. STEWART:
    9        Q.  Tell me if you know where First
   10  City Capital Corporation was headquartered
   11  at the time, May 26, '92, this was
   12  written?
   13            MR. LUCAS:  Will you honor
   14        my question and go ahead and sit
   15        down?
   16            MR. STEWART:  Once I finish
   17        this question I will, Mr. Lucas,
   18        yes.
   19            THE WITNESS:  I do not
   20        where their headquarters was.
   21  BY MR. STEWART:
   22        Q.  Okay.  Do you know what the
   23  officers -- who the officers of First City
   24  US Corp. were in May 1992?
   25        A.  I do not.
0248
    1
    2        Q.  Do you know who the officers of
    3  First City Industries were in May 1992?
    4        A.  I do not.
    5        Q.  Do you know who the officers of
    6  First City Capital Corporation were in
    7  1992?
    8        A.  I do not.
    9        Q.  Do you know who the directors for
   10  First City Industries were in -- in May of
   11  1993?
   12        A.  May of -- no, I do not.
   13        Q.  Do you know who the directors for
   14  First City Capital Corporation were at
   15  that time?
   16        A.  May of '93, First City Capital
   17  Corporation, I do not.
   18        Q.  Do you know who the directors of
   19  First City US Corp. Were at that time?
   20        A.  I do not.
   21            MR. STEWART:  Let's take a
   22        three minute break.
   23            (Whereupon a Recess is
   24        Taken.)
   25  BY MR. STEWART:
0249
    1
    2        Q.  Back on the record. Mr.
    3  Bertellotti, with regard to the documents
    4  that you looked at on Exhibit 14, is it
    5  fair to say that you do not know whether
    6  in the period prior to September '93,
    7  First City Industries' subsidiaries were
    8  actually independent of First City in a
    9  true sense, or were they acting as First
   10  City alter egos?
   11            MR. SCOTT:  Objection to
   12        the form of the question.  It's
   13        asking for legal opinion and
   14        legal --
   15            MR. STEWART:  No, it's
                              Page 103

Bertellotti

```
16          asking for a factual analysis.  I
17          want to know.
18              THE WITNESS:  My opinion,
19          they are all separate, distinct,
20          independent organizations that
21          acted in their own interest.
22  BY MR. STEWART:
23      Q.  Is that, for the period at least
24  before September '93, opinion simply based
25  on the fact that you have seen documents
0250
1
2   that suggest they have separate corporate
3   form?
4       A.  Yes.  I know Mr. Crum and
5   Mr. Robbins also exercised appropriate
6   procedures.  We succeeded in the
7   management positions to some of these
8   people.  To my knowledge, they always did
9   things correctly.
10      Q.  Do you know of any time in Saltire
11  Industrial's history in which it has had
12  the power to direct First City U.S. or
13  First City Corporation to do anything on
14  its behalf?
15      A.  I would never do some --
16      Q.  Has it had the power?
17              MR. STEWART:  Don't coach
18          the witness.
19              I do mind.  You certainly
20          can make the objection,
21          Mr. Scott.
22              MR. SCOTT:  If you be
23          quiet, I will.
24              Object to the form of the
25          question, because it calls for
0251
1
2           opinions and he's not qualified
3           to make --
4               MR. LUCAS:  Well, while we
5           are at a pause, don't interrupt
6           me.  When you keep interrupting
7           people -- Tom was trying to make
8           an objection, you start talking
9           over his objection, and she can't
10          get the answer or anything else
11          while everybody is talking.
12          Don't interrupt me, Mike.
13              MR. STEWART:  John --
14              MR. LUCAS:  Mike, don't
15          interrupt.
16              MR. STEWART:  I think we
17          are done.
18              MR. LUCAS:  Try to develop
19          the habit for the rest of the
20          afternoon of not interrupting
21          people when they are in the
22          middle of an answer or making
23          objection.  Let's go on.
24              MR. STEWART:  Frankly, I
25          don't think I have interrupted
0252
```

Page 104

Bertellotti

```
 1
 2          anyone, and certainly didn't
 3          interrupt the witness.
 4                Other than people making
 5          speaking objections, of course,
 6          that is inappropriate.
 7                MR. LUCAS:  I'm not going
 8          to argue with that on the record,
 9          but just get on with the factual
10          questions sometime before the end
11          of the day.
12                MR. SCOTT:  Factual basis
13          of an opinion objection is not.
14                MR. STEWART:  You are
15          wasting our time here.  If you
16          will, let the deposition
17          continue.  State your objections
18          or don't.  Let's proceed.
19  BY MR. STEWART:
20      Q.  All I am saying, do you know of any
21  time when Saltire had parental control
22  over First City U.S.?
23      A.  No.
24      Q.  Do you know of any time when
25  Saltire had parental control over Realty
0253
 1
 2  Holdings, Inc.?
 3      A.  No, I do not.
 4      Q.  Do you know of any time First City
 5  Industries had parental control -- excuse
 6  me, strike that.
 7          Do you know of any time which
 8  Saltire Industrial, Inc. had parental
 9  control over First City Capital
10  Corporation?
11                MR. SCOTT:  Object to the
12          form of the question.
13  BY MR. STEWART:
14      Q.  Answer the question.
15      A.  I do not know of a time when
16  Saltire Industrial, Inc. had parental
17  control over First City Capital, Inc.
18      Q.  You don't know, or do you know of
19  any time when Saltire Industrial, Inc. had
20  parental control over First City Capital
21  Corporation?
22                MR. SCOTT:  Object to the
23          form.
24  BY MR. STEWART:
25      Q.  Answer the question.
0254
 1
 2      A.  I do not.
 3      Q.  Let's turn quickly to your
 4  affidavit, your first affidavit, which is
 5  an Exhibit before you.
 6      A.  Turn to where?
 7      Q.  The first affidavit that you
 8  provided, which I believe is Exhibit 3 or
 9  4?
10      A.  Number 4.
11      Q.  Let me ask you this.  For any
```
                                    Page 105

Bertellotti

12  statements that refer to periods prior to
13  your employment at Alper Holdings USA,
14  Inc. in 1993, can we assume that your
15  statement is based on the same type of
16  discussions and documents that you
17  described in relation to the affidavit
18  that is Exhibit 2?
19       A.  Generally, I think we are safe to
20  assume that.
21       Q.  Now turn to the second page of the
22  affidavit, Paragraph 9.  You are saying
23  November 1992, Alper acquired control of
24  the indirect parent of Scovill; do you see
25  that?
0255
1
2       A.  Yes, I do.
3       Q.  Now that you're thinking about
4  that, is the correct statement that Alper
5  acquired the direct parent of Scovill?
6  Hm?
7       A.  I would need to refer to a
8  corporate or -- corporate structure for
9  1992.  I assume this statement is true.
10       Q.  When you say indirect, what do you
11  mean?
12       A.  There could be a legal corporation
13  in between.
14       Q.  So in other words, is what you are
15  saying in Paragraph 9 that you believed
16  that Scovill acquired control of a parent
17  company of a subsidiary which controlled
18  another subsidiary, which was Scovill?
19       A.  Your question is nonsensical.  I
20  have no idea what you are talking about.
21       Q.  It's not nonsensical. Did you -- I
22  will phrase it more simply.
23       When you say that Alper acquired
24  control of the indirect parents of
25  Scovill, when you say indirect parent, do
0256
1
2  you mean a parent separated from Scovill
3  by another wholly owned subsidiary?
4       A.  That is what this statement says,
5  yes, implies.
6       Q.  Okay.  So if, in fact, First City
7  Industries was the direct parent of
8  Scovill, then this statement would be
9  incorrect; is that right?
10       A.  It's possible that would make it
11  incorrect.  Again, without reviewing the
12  precise bankruptcy recordings, it's -- I
13  couldn't answer that absolutely.  It's a
14  possibility.
15       Q.  I know -- are you referring to the
16  bankruptcy documents that you described a
17  number of times during the deposition?
18       A.  The bankruptcy documents relating
19  to First City Industries' 1992 bankruptcy.
20       Q.  Tell me, do you see on Paragraph 11
21  you say, I never participated or exercised
22  control over the finances, human

Page 106

Bertellotti
```
23   resources, and general business practices
24   of Scovill?
25       A.  Yes.
0257
 1
 2       Q.  I am confused.  Aren't those very
 3   activities the activities that are
 4   specifically described in your management
 5   agreement as performed by Alper?
 6       A.  Yes.  Alper never exercised control
 7   over the finances, human resources, or
 8   general practices of resource -- Alper
 9   didn't do that; lone servants did that on
10   behalf of Saltire.  We effected those
11   things as officers of Saltire, separate
12   and district from Alper.
13       Q.  Mr. Bertellotti, can you tell me
14   why in your sworn affidavit, you didn't
15   feel the need to mention the management
16   agreement or this new answer?
17              MR. LUCAS:  Objection.
18              MR. SCOTT:  Argumentative.
19              MR. LUCAS:  Argumentative.
20              THE WITNESS:  It's in the
21          record.
22              MR. STEWART:  The question
23          is argumentative.  I object to --
24   BY MR. STEWART:
25       Q.  I would like you to answer.
0258
 1
 2       A.  Management agreement was in your
 3   records well in advance of this affidavit.
 4   You discovered it, I believe, in December
 5   2001.
 6       Q.  Have you provided to the court with
 7   this affidavit?
 8       A.  Did not.
 9       Q.  Tell me, have you talked to Mr.
10   Crum lately?
11       A.  No.
12       Q.  Have you talked to any other formal
13   employees of Alper Holdings USA, Inc.
14   within the last five months about this
15   case?
16       A.  No, with the exception of
17   Mr. Coghlin.
18       Q.  Is Saltire planning to declare
19   bankruptcy in the near future?  We are
20   back to that issue.
21              MR. LUCAS:  We are back to
22          that issue.  Give us a break.  I
23          want to discuss that with people
24          involved.
25              MR. STEWART:  That is fine.
0259
 1
 2              MR. LUCAS:  Privilege
 3          issues.
 4              (Whereupon Question is Read
 5          Back.)
 6              THE REPORTER:  Question, Is
 7          Saltire planning to declare
```
Page 107

                                     Bertellotti
```
 8            bankruptcy in the near future?
 9            We are back to that issue.
10                    THE WITNESS:  Saltire has
11            no plans to declare bankruptcy at
12            this time.
13    BY MR. STEWART:
14        Q.   Have you retained counsel to plan
15    the bankruptcy at Saltire?
16                    MR. LUCAS:  You are
17            invading the attorney-client
18            privilege on that.
19                    MR. STEWART:  Don't think I
20            am, but I will tell you what.
21            Obviously, we are going to
22            provide you written discovery to
23            get all the documents which we
24            received today.  I think we can
25            address this in written discovery
0260
 1
 2            and you can respond and assert
 3            your privilege.  That way, we can
 4            pull the cases to see who is
 5            correct.
 6    BY MR. STEWART:
 7        Q.   Let's move on to Mr. Smith's
 8    deposition.  I am going to leave this
 9    deposition open.  Obviously, the documents
10    weren't provided, and once we get the
11    documents we will review it and I assume
12    we will be coming back to New York in
13    November.
14                    But I will say, as long as we are
15    making statements I want to designate this
16    deposition under protective order and if I
17    had -- under our protective order as
18    confidential under the protective order.
19                    MR. STEWART:  We have no
20            objection.
21                    MR. LUCAS:  So when you
22            prepare the deposition, it should
23            be in a sealed envelope and
24            treated as confidential.  In view
25            of Mr. Stewart's statement on the
0261
 1
 2            record, I am compelled to say we
 3            view the deposition as closed.
 4            We have been very lenient today
 5            in not holding you to the
 6            representations that were made in
 7            court to the effect this was
 8            going to be one of three
 9            depositions taken in half a day
10            and that it was going to be under
11            the jurisdictional issues.  You
12            have obviously gone far afield
13            from that from objections from
14            us, so we view this deposition as
15            complete.
16                    MR. SCOTT:  And I want to
17            say there was absolutely and was
18            no requirement for us to produce
```
                                       Page 108



Bertellotti

19    any documents pursuant to that
20    defective notice of a deposition
21    duces tecum, not to the party but
22    to the individual, that issue in
23    addition having a subpoena or
24    even giving us a Rule 34 request
25    and asking to have the time, the
0262
1
2    notion we were supposed to
3    produce documents is ridiculous.
4              (The Deposition was
5    Concluded at 2:54 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0263
1
2    STATE OF _____
3    COUNTY OF _____
4
5    I, the undersigned, declare under penalty
6    of perjury that I have read the foregoing
7    transcript, and I have made any
8    corrections, additions or deletions that I
9    was desirous of making; that the foregoing
10    is a true and correct transcript of my
11    testimony contained therein.
12    EXECUTED this _____ day of
13    _____,
14    20__, at _____, _____.
15              (City)          (State)
16
17
18
19    _____
20    ROBERT BERTELLOTTI
21
22
23
24
25
0264
1
2              C E R T I F I C A T E
3

Page 109

Bertellotti

```
 4            I, SANDIE ARIELLE SANTOS, a Notary
 5    Public and Certified Shorthand Reporter,
 6    do hereby certify that the foregoing is a
 7    true and accurate transcript of the
 8    testimony as taken stenographically by and
 9    before me at the time, place and on the
10    date hereinbefore set forth.
11            I DO FURTHER CERTIFY that I am neither
12    a relative nor employee nor attorney nor
13    counsel of any of the parties to this
14    action, and that I am neither a relative
15    nor employee of such attorney or counsel,
16    and that I am not financially interested
17    in the action.
18
19    _____
20
21    SANDIE ARIELLE SANTOS
22    Certified Shorthand Reporter
23
24
25
0265
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
</Transcript>
</TRN>
```

**TAB 7**

Bauer1
<?xml version="1.0"?>
<TRN>
<DocType>Summation Transcript Export File</DocType>
<Version>0.9</Version>
<Source_Loc>I:\SW52\NORMAN\TRAN\</Source_loc>
<Transcript_Name>022201.001</Transcript_Name>
<Transcript_Description>N. Bauer 2/22/2001</Transcript_Description>
<Notes>
</Notes>
<Transcript Info>
0,1,10,0,0
</Transcript Info>
<Transcript>

1

```
 1            IN THE CIRCUIT COURT FOR THE TWENTY THIRD
                          JUDICIAL DISTRICT
 2                    DICKSON COUNTY, TENNESSEE
             _____
 3
     GEORGE HAROLD NORMAN, et al.,    x
 4                                    :
                         Plaintiffs,  :
 5           vs.                      : No. 383A-CV
                                      :
 6   SCOVILL, INC., et al.,           :
                                      :
 7                       Defendants.  x
             _____
 8
 9                    McLean, Virginia
10                    Thursday, February 22, 2001
11   VIDEOTAPED DEPOSITION OF:
12                    NICHOLAS B. BAUER,
13   a witness, was called for examination by counsel
14   for the plaintiffs, pursuant to Notice and
15   agreement of the parties as to time and date,
16   beginning at approximately 9:14 o'clock, a.m., in
17   the law offices of Hunton & Williams, Esquires,
18   1751 Pinnacle Drive, McLean, Virginia 22102,
19   before Catherine S. Boyd, a Court Reporter and
20   Notary Public in and for the Commonwealth of
21   Virginia, when were present on behalf of the
```

Page 1

Bauer1
22    respective parties:

⬚

2

1    APPEARANCE OF COUNSEL:

2        For the Plaintiffs:

3            WALLER LANSDEN DORTCH & DAVIS, ESQUIRES
             BY:  MICHAEL G. STEWART, ESQUIRE
4            Nashville City Center
             511 Union Street, Suite 2100
5            Nashville, Tennessee  37219-8966

6        For the Defendants:

7            HUNTON & WILLIAMS, ESQUIRES
             BY:  JOHN A. LUCAS, ESQUIRE
8            900 S. Gay Street, Suite 2000
             Knoxville, Tennessee 37902
9     and
             HUNTON & WILLIAMS, ESQUIRES
10           BY:  CHARLES A. PERRY, ESQUIRE
             Bank of America Plaza
11           Suite 4100
             600 Peachtree Street, N.E.
12           Atlanta, Georgia  30308-2216

13    ALSO PRESENT

14           STEPHEN CRITER, Video Specialist

15                  - 0 -

16                I-N-D-E-X

17    Witness:                          Page:

18    Nicholas B. Bauer

19           Examination by Mr. Stewart        5

20                  - 0 -

21

22

⬚

3

Bauer1

1       Exhibits: (Not included with transcript) Page:

2       Exhibit No. 31 for Identification
        to the Bauer Deposition
3       (Notice of Deposition)                          6

4       Exhibit No. 32 for Identification
        to the Bauer Deposition
5       (Agreement)                                    163

6       Exhibit No. 33 for Identification
        to the Bauer Deposition
7       (Document)                                     168

8       Exhibit No. 34 for Identification
        to the Bauer Deposition
9       (Packet of documents)                          219

10      Exhibits Nos. 34A & 34B for
        Identification to the Bauer Deposition
11      (Letters)                                      219

12      Exhibits Nos. 35 & 36 for
        Identification to the Bauer Deposition
13      (Blow-ups of maps)                             226

14                           -  0  -

15

16

17

18

19

20

21

22

4

1                    P-R-O-C-E-E-D-I-N-G-S

2               THE VIDEO SPECIALIST:   This is the

Page 3

Bauer1

3    deposition of Nicholas B. Bauer noticed by the

4    plaintiffs in the case number 373A-CV in the case

5    of George Harold Norman, et al. versus Scovill,

6    Incorporated, et al, in the Circuit Court for the

7    23rd Judicial District, Dickson County,

8    Tennessee.

9         This deposition is taken on February 22,

10    2001, at the offices of Hunton & Williams, 1751

11    Pinnacle Drive in Virginia.

12         The time is noted on the bottom portion

13    of the television screen.

14         The videographer operating the videotape

15    equipment for this deposition is Steven Criter of

16    Carol J. Thomas Reporting.

17         The court reporter is Kathy Boyd of

18    Carol J. Thomas Reporting.

19         Will counsel please identify themselves

20    and the parties they represent?

21         MR. STEWART:  Mike Stewart of Waller

22    Lansden Dortch & Davis for the plaintiffs.

1         MR. LUCAS:  John Lucas of Hunton &

2    Williams for the defendant.

3         MR. PERRY:  Charles Perry of Hunton &

4    Williams for the defendant.

5         THE VIDEO SPECIALIST:  Swear the

Bauer1

6    witness, please.

7    Whereupon,

8              NICHOLAS B. BAUER,

9    having been duly sworn by the Notary Public, was

10   called as a witness herein, and testified as

11   follows:

12             THE VIDEO SPECIALIST:  Okay.

13             EXAMINATION BY COUNSEL FOR THE

14             PLAINTIFFS

15             BY MR. STEWART:

16        Q.   Please state your name.

17        A.   Nicholas Bauer.

18        Q.   Mr. Bauer, I'm Mike Stewart, and could

19   we agree that as I'm asking you questions today,

20   if you don't understand a question, you'll tell

21   me before you answer?

22        A.   Okay.


                                        6



1         Q.   And that way, if you do answer a

2    question, we'll know that you thought you

3    understood it?

4         A.   Yes, sir.

5         Q.   Okay.  I'm going to hand you a notice to

6    take deposition.

7              MR. LUCAS:  Can we similarly agree that

8    if he doesn't understand the question, he can ask

                         Page 5

Bauer1

9    you for clarification?

10          MR. STEWART:  Oh, certainly.

11          BY MR. STEWART:

12    Q.    I just want to hand you a Notice of

13   Deposition.

14          Is that the notice that you were

15   provided for this deposition?

16          (The witness reviewed the document.)

17          THE WITNESS:  I believe so.  To the best

18   of my recollection, yes.

19          MR. STEWART:  Okay.  I'll just make that

20   Exhibit 31.

21                          (Exhibit No. 31

22                          was marked for

7

1                          identification.)

2          BY MR. STEWART:

3    Q.    Mr. Bauer, pursuant to that notice or

4    for any other reason, have you brought any

5    documents today?

6    A.    No, I have not.

7    Q.    Before we get into the details of your

8    deposition, are you appearing today or are you

9    appearing as the representative, the 3006

10   representative of Scovill, Inc., the defendant?

11   A.    No.  My notice was for myself as an

Bauer1

12    individual, and that is how I am appearing today.

13          THE COURT REPORTER:  Was that 3006

14    representative?

15          MR. LUCAS:  30 point 02 paren 6.

16          MR. STEWART: Let's go off the record for

17    a moment.

18          THE VIDEO SPECIALIST:  Off record, and

19    the time on screen is 09 and 19:32.

20          (A discussion was held off the record.)

21          THE VIDEO SPECIALIST:  On record, and

22    the time on screen is 09:22:47.

8

1          BY MR. STEWART:

2      Q.   So Mr. Bauer, you're appearing as an

3    individual?

4      A.   Yes.

5      Q.   And are you right now planning to

6    provide expert testimony in this case?

7      A.   No, I'm not.

8      Q.   Okay.  Have you  --

9          MR. LUCAS:  Let me ask you this.

10    Expert, as you and I know as lawyers use it, is a

11    term of art.

12          Can you clarify for him what you mean by

13    that?

14          MR. STEWART:  Well, perhaps the best way

Page 7

Bauer1

15    to do this, I mean I'll ask you, we, during

16    Claudia Brand's deposition, Scovill, Inc. was

17    very clear to make its position known that Mrs.

18    Brand was to be considered a non-testifying

19    expert, and therefore, we were careful to

20    question her about facts and not about opinions

21    that an expert might give in the case.

22            And so the question is is, is Mr. Bauer

9

1    or are you taking the same position with Mr.

2    Bauer, that he is a non-testifying expert and he

3    is not here to give or will not be giving at

4    trial expert testimony?

5            MR. LUCAS:  I cannot say that at trial,

6    that he might not, may or may not offer an

7    opinion on something.

8            He is certainly not an expert, you know,

9    an outside expert within the meaning of the rule.

10           But I just, I don't want to tell you and

11    I don't want his answer to be interpreted that at

12    trial, he might not express an opinion on whether

13    or not it's going to snow tomorrow or something

14    that would be within the normal scope of his

15    duties, but that's not why he is here.

16           I mean he is here as an individual

17    witness, and you know, and hasn't been obviously

Bauer1

18    retained or prepared as an expert witness.

19         MR. STEWART:  Okay.  And we would expect

20    to receive the appropriate report and information

21    if he was going to provide testimony about his

22    opinions other than those expressed in the

□

10

1    environmental documents that have been provided

2    to the EPA, as with Ms. Brand, separate from

3    those documents.

4         MR. LUCAS:  We will certainly provide

5    you with whatever you're entitled to receive

6    under the rules.

7         BY MR. STEWART:

8         Q.    Let me ask about that, Mr. Bauer.  I

9    mean are you right now intending to come to trial

10   or preparing for the possibility of coming to

11   trial to testify about the source of

12   trichloroethylene in various wells and points

13   throughout around the site of the former Scovill

14   Dickson Schrader Automotive plant facility?

15        A.    I have not discussed that with my

16   attorneys.

17             I don't know.

18        Q.    Mr. Bauer, have you ever taken your

19   deposition before?

20        A.    Yes, I have.

Bauer1

```
21      Q.   Tell me when.

22      A.   I don't recall precise dates.
```

□

11

```
1            Q.   Well, tell me generally when and for

2       what you were deposed.

3            A.   Approximately a year ago, I was deposed

4       in another matter relating to waste disposal

5       issues, and approximately eight years ago, I was

6       deposed in a bankruptcy matter.

7            Q.   See if we can take the bankruptcy matter

8       off the table.

9                 Did that have any relationship to this

10      case?

11           A.   No.

12           Q.   Was that involving some personal issue

13      for you?

14           A.   No.  It was a issue where I was working

15      for a consulting firm, and we had done some work

16      for a company that had since gone into

17      bankruptcy, and it was tangential to the case, as

18      I understand it, but my deposition was taken

19      relating to the work we had done for the debtor.

20           Q.   And who is we at the time?

21           A.   ICF Kaiser Engineers.

22           Q.   Okay.  Did you give any opinions about
```

Page 10

Bauer1

12

```
 1    anything relating to environmental issues or
 2    hazardous waste issues?
 3        A.    Not that I recall.
 4        Q.    Okay.  Were you primarily testifying
 5    about billing issues, that sort of thing?
 6        A.    Testifying about the work we had
 7    performed and the cost of that work.
 8        Q.    What kind of work was it?
 9        A.    I believe it was a Phase 1 audit.
10        Q.    For whom was the work performed?
11        A.    I don't even recall.
12        Q.    Okay.  Do you remember where that case
13    was being litigated?
14        A.    No, I don't.  The deposition was taken
15    locally in Washington or Northern Virginia, but I
16    don't know where the case was being litigated.
17        Q.    Did that case involve any EPA regulated
18    site, CERCLA site, or anything like that?
19        A.    Not to my knowledge.
20        Q.    Okay.  Tell me about your year ago
21    deposition about disposal issues.
22        A.    What in particular would you like to
```

Bauer1

13

```
 1    know?
 2         Q.   Well, who was deposing you, what party
 3    or agency?
 4         A.   The counsel for Mr. Calabrese.
 5         Q.   And who is Mr. Calabrese?
 6         A.   He is a property owner, current property
 7    owner.
 8         Q.   An owner of property where?
 9         A.   In Connecticut.
10         Q.   And -- excuse me.
11         A.   Go ahead.
12         Q.   Continue.
13         A.   In Waterbury, Connecticut.
14         Q.   And what did Mr. Calabrese's counsel
15    want to ask you?
16              MR. LUCAS:  Object to the form.  Let me
17    explain the reason for that.
18              Let me explain the reason for that.
19              MR. STEWART:  I understand.
20              MR. LUCAS:  Unless you don't want me to.
21              MR. STEWART:  I'll be happy to rephrase.
22              BY MR. STEWART:
```

14

```
                              Bauer1
 1        Q.   What is the nature -- put it this way.
 2   Is the deposition an outgrowth of current
 3   litigation?
 4        A.   Yes.
 5        Q.   Okay.  Who are the parties to that
 6   litigation?
 7        A.   Mr. Calabrese, to the best of my
 8   recollection, all the parties involved, Mr.
 9   Calabrese, the estate of a Mr. McHugh, Saltire
10   Industrial, and Scovill Fasteners, Inc.
11        Q.   Is Mr. Calabrese the plaintiff or the
12   defendant?
13        A.   The plaintiff.
14        Q.   And what claims has he made against
15   Saltire Industrial that you know of?
16        A.   The specific claims, I don't recall in
17   terms of the legal jargon that was involved.
18        Q.   Well, what do you recall about the
19   factual nature of the claims?
20        A.   The case involved a dispute about past
21   disposal practices on the property in Connecticut
22   of which Mr. Calabrese is the current owner.
```

                                                          15

```
 1        Q.   Whose disposal practices?
 2        A.   Scovill Manufacturing, Inc. or Scovill
 3   Manufacturing Corporation.
```

Bauer1

4    Q.    Which one?

5    A.    I believe that's Scovill Manufacturing,

6    Inc., but the exact title of that company, I

7    don't, I'm not sure.

8    Q.    Disposal practices by the same Scovill

9    that is the defendant in this lawsuit?

10    A.    A -- yes.  It's related, yes.

11    Q.    Related how?  A subsidiary, or tell me

12    how Scovill Manufacturing, Inc. relates to

13    Scovill, Inc.

14    A.    There was, through a series of mergers,

15    acquisitions, et cetera, Scovill Manufacturing

16    eventually, eventually the name changed to

17    Scovill, Inc.  It became Scovill, Inc.

18    Q.    Scovill, Inc. and Scovill Manufacturing,

19    Inc. had the same owners?

20    A.    I'm not sure of that.

21    Q.    Okay.  Scovill, Inc. was a successor

22    corporation to Scovill Manufacturing, Inc., is

16

1    that what you just described?

2    A.    I'm not sure in terms of term of art

3    here, but they, Scovill Manufacturing I believe

4    was the original name or one of the original

5    names of the company that ultimately became

6    Scovill, Inc.

Page 14

Bauer1

7      Q.    Okay.  Do you know when that would have

8   happened?

9      A.   No.  I don't recall the dates of those

10   transitions.

11      Q.    When did the disposal on the Calabrese

12   property we have talked about occur or when was

13   it alleged to have occurred?

14      A.    Alleged to have occurred from

15   approximately 1919 through 1974.

16      Q.    And what was allegedly disposed of?

17      A.    Cinders, ash, clean fill, and related

18   materials; there was also, there were also

19   capacitors found at the site.

20      Q.   PCBs?

21      A.    Containing PCBs.

22      Q.    Were there any, were there any volatile

17

1   organic compounds disposed of at the Calabrese

2   site?

3      A.    None have been detected there, nor do we

4   have any information of any such compounds being

5   disposed of there.

6      Q.    Were any heavy metals disposed of there?

7      A.    There were some metals identified in

8   sampling results.

9            The, to the best of my knowledge, there

Page 15

Bauer1

10    were no heavy metal wastes disposed of there.

11        Q.    Where did Mr. Calabrese think the waste

12    came from, that is, literally what manufacturing

13    operation?

14            MR. LUCAS:  Object to the form where

15    you're asking him what someone else thinks.

16            BY MR. STEWART:

17        Q.    Fair enough.  Do you know where it's

18    alleged the materials disposed of at Mr.

19    Calabrese's property came from?

20        A.    The allegation is that there is a former

21    Scovill Manufacturing Company facility in

22    Watertown -- Waterbury -- excuse me -- Waterbury,

□

18

1    Connecticut, and wastes were allegedly, from that

2    operation of the type we just described, were

3    disposed of in that area.

4        Q.    What was made at the Waterbury site?

5        A.    Many different types of metal-related

6    products, brass-related products.

7        Q.    Products similar to the products

8    manufactured at the Scovill facility in Dickson,

9    Tennessee?

10        A.    I don't recall whether such, whether

11    there was a period where similar items may have

12    been manufactured at that, at that, at that

                                    Bauer1
13    Waterbury facility.

14              I'm not sure.

15         Q.    At the Waterbury plant, it was a metal

16    finishing plant, is that right?

17         A.    There were many metal-type operations

18    that went on.

19              There was forming and finishing

20    operations there at various times.

21         Q.    Do you know where this case brought by

22    Mr. Calabrese is being litigated, what court?

                                                      19

1          A.    No.  I don't recall.

2          Q.    Okay.  Did you have your deposition

3     taken here?

4          A.    No.  It was taken in Connecticut.

5          Q.    Were you a company representative?

6          A.    In that case, yes, I was.

7          Q.    And were you representing Saltire

8     Industrial?

9          A.    Yes.

10         Q.    Were you also representing Scovill

11    Manufacturing, Inc?

12         A.    Well, Scovill Manufacturing, Inc.

13    doesn't currently exist.

14         Q.    Were you noticed as a representative of,

15    30(b)(6) representative for Scovill

                        Page 17

Bauer1

16    Manufacturing, Inc. in that case?

17         A.   I don't recall.

18         Q.   Well, were you providing the company's

19    position based on not only activities of Saltire

20    Industrial, Inc. during its existence, but also

21    activities of Scovill Manufacturing, Inc?

22         A.   Yes.


                                                    20


1          Q.   Okay.  Do you have a copy of that

2    deposition transcript?

3          A.   Not with me, no.

4          Q.   I understand.  Do you have one in your

5    offices or in your possession as an officer for

6    Saltire Industrial, Inc?

7          A.   As an individual, I have a copy.

8          MR. STEWART:  I would like to make that

9    an exhibit to this deposition.

10         MR. LUCAS:  We'll entertain the request.

11   I don't think it's appropriate to make a document

12   that's not here an exhibit.

13         MR. STEWART:  So I would like to make it

14   a late filed exhibit.

15         Is that problematic?

16         MR. LUCAS:  Yeah.  I mean I just don't

17   think the rules provide for late filed exhibits

18   for a document that's not here, not been

Bauer1
19    requested.
20          If you all want a copy of it, we'll, you
21    know, my procedure --
22          MR. STEWART:  You just want us to make a

21

1     request formally in writing later?
2           MR. LUCAS:  Yeah, and you know, if -- my
3     procedure when someone requests a document during
4     a deposition that I hadn't seen before is I want
5     to, you know, consider the request, and if it's
6     responsive and you're entitled to it, you will
7     get it.
8           BY MR. STEWART:
9       Q.    Is the Environmental Protection Agency
10    involved with the site at issue in what I'll call
11    the Calabrese litigation?
12      A.    Yes.
13      Q.    Is it a Superfund site?
14      A.    Yes.
15      Q.    How long has it been a Superfund site?
16      A.    A few months.
17      Q.    Okay.  How long has the Environmental
18    Protection Agency been involved with the site?
19      A.    Similarly, you know, an order of months.
20    I don't recall precisely.
21      Q.    Why is the estate of Mr. McClure
                          Page 19

Bauer1
22        interested in, or McHugh interested in the

0

22

1        litigation?
2                MR. LUCAS:  Object to the form of the
3        question.
4                BY MR. STEWART:
5            Q.    Let me rephrase.  What has the -- first
6        of all, is the estate of Mr. McHugh a party to
7        that litigation?
8            A.    My understanding is they are also a
9        defendant in that litigation.
10           Q.    Is Mr. McHugh a former independent
11       contractor who worked for Scovill Industrial,
12       Inc?
13           A.    No.
14           Q.    What has been alleged as to Mr. McHugh's
15       involvement with the litigation surrounding the
16       Calabrese site?
17           A.    Mr. McHugh was a former owner of the
18       property.
19           Q.    Do you know what damages have been
20       alleged in that lawsuit?
21           A.    No, I don't.
22           Q.    Do you know who the attorneys are that

Page 20

Bauer1

23

1    deposed you?

2        A.    Nick Harding; I don't recall the name of

3    the firm.

4        Q.    Did Saltire Industrial at your

5    deposition admit to contaminating the property

6    owned by Mr. Calabrese?

7        A.    No.

8        Q.    Did you admit to placing, not you

9    personally, but to Scovill Manufacturing, Inc.'s

10   placement of waste or materials or anything on

11   the Calabrese site?

12       MR. LUCAS:    Counsel, let me ask you just

13   that's a compound question rolled into one.

14       If the question, the last question was

15   did they admit to placing anything on the site?

16   Is that the question you want to ask?

17       MR. STEWART:    That's fine.

18       THE WITNESS:    Okay.    The response then

19   to that question did we place anything on the

20   site or the company admit to placing anything on

21   the site, the answer is that our understanding is

22   that ashes, cinders, clean fill, similar kinds of

24

Page 21

Bauer1

1    materials, were disposed of by Scovill
2    Manufacturing at that location.
3        BY MR. STEWART:
4        Q.   Is the -- well, then did you testify in
5    your deposition that Scovill Manufacturing and
6    Saltire Industrial took the position that there
7    wasn't anything, there were no hazardous
8    constituents in that, in those items disposed?
9        A.   I would have to review my testimony to
10   see what I actually, you know, specific responses
11   to questions.
12       Q.   Well, I understand, my understanding is
13   you just told me that you for the company,
14   conceded having placed cinders and what not on
15   the site?
16       A.   Um-hm.
17       Q.   And did you, was that, did you concede
18   having placed those items on the site through
19   1974?
20       A.   The end date is not clearly known.
21       Q.   And you didn't set an end date?
22       A.   That's correct.

☐

25

1        Q.   Okay.  Is the distinction you're making
2    that, is your recollection that you for the
                        Page 22

Bauer1

3    company have not conceded that what was disposed

4    on the site contained hazardous materials?

5        A.   Yeah.  We only know in general terms the

6    nature of the materials in terms of, you know, no

7    specific analysis were available as far as we

8    know relating to the contents or characterization

9    of those materials.

10       Q.   Has the Environmental Protection Agency

11   ordered Saltire Industrial or Scovill

12   Manufacturing, Inc. to clean up the Calabrese

13   site?

14           MR. LUCAS:  Mike, let me just -- the

15   court reporter is having trouble hearing you

16   because your voice is real low.

17           If you could speak up just a little bit,

18   I think it will help her.

19           THE COURT REPORTER:  I am, yes.

20           MR. STEWART:  I'll do what I can.  Do

21   you need her to read back the question?

22           THE WITNESS:  I believe I already

26

1    answered.

2           No is the response.

3           BY MR. STEWART:

4        Q.   What has the Environmental Protection

5    Agency, what has the Environmental Protection

Page 23

Bauer1

6    Agency's involvement been to date with the
7    Calabrese site litigation?
8                MR. LUCAS:  Object to the form of the
9    question.
10               THE WITNESS:  Specifically what kind of,
11   what are you interested in?
12               BY MR. STEWART:
13        Q.   Well, you have told me the EPA was
14   involved, and I want to know just in your own
15   words what that involvement has amounted to up to
16   this point.
17               MR. LUCAS:  I'm going to again object to
18   the form of the question. It's overly-broad.
19               You may answer.
20               BY MR. STEWART:
21        Q.   Please.
22        A.   Okay.  The .EPA had sent an information

                                                    27

1    request.
2                As to whether it was actually to Scovill
3    or whether it was to Saltire, I don't frankly
4    remember -- an information request relating to
5    the site, as well as a general notice letter.
6         Q.   And has Saltire Industrial responded to
7    the information request yet?
8         A.   No.
                    Page 24

Bauer1

9       Q.   When is it going to respond to the
10   information request by the Environmental
11   Protection Agency relating to the Calabrese site?
12       A.   Responses are due in early March.
13       Q.   Have you given me an exhaustive
14   description of the depositions that you have had
15   taken in your career?
16       A.   Yes.
17       Q.   Okay.  Have you ever sued anyone, Mr.
18   Bauer?
19       A.   No, sir.
20       Q.   Okay.  Has anyone ever sued you before
21   personally?
22       A.   No.

                                                    28

1       Q.   Okay.  Has anyone sued Saltire
2   Industrial, Inc. other than Mr. Calabrese and the
3   litigation in that case and Scovill, Inc. and --
4   pardon me -- the plaintiffs in this case?
5       A.   Perhaps; I don't know.
6       Q.   Do you know of any litigation currently
7   pending against Saltire Industrial other than the
8   litigation we're here to talk about today and the
9   Calabrese litigation you have discussed?
10       A.   No.  I don't recall any others.
11       Q.   Do you recall any litigation against
                        Page 25

Bauer1

12    Saltire Industrial or Scovill, Inc. at any time

13    other than the litigation involving the Calabrese

14    property and, and the litigation we're here to

15    talk about today?

16        A.    I understand there was allegations of

17    asbestos exposure due to product manufacturing,

18    you know, years past.

19            I don't know the status or anything

20    about those cases that are outside of my realm.

21            I believe there was also a case relating

22    to the Stringfellow site in California.

☐

29

1            Again, the nature, the exact extent of

2    that case I'm not aware of.

3            There certainly may be others, but I

4    don't recall at this time.

5        Q.    You have told me every item of

6    litigation that you do recall?

7        A.    Yes.

8        Q.    Well, then can you tell me what you do

9    know about, first of all, whether any asbestos

10    exposure cases are still pending against Saltire

11    Industrial?

12        A.    I'm not, I'm not aware of any, but I --

13    I don't know is the better answer.

14        Q.    Do you know who in the company would

Bauer1

15    know?

16         A.   Wayne Smith, Chief Financial Officer

17    that handled those matters.

18         Q.   Does --

19         A.   And we were one of the many parties, and

20    it wasn't the case that it was a big deal.

21         Q.   Does Mr. Smith work at Saltire

22    Industrial today?

30

1          A.   He is in the New York office.

2          Q.   So the answer to my question is yes?

3          A.   Mister, Mr. Smith is an officer of

4     Saltire Industrial.

5          Q.   Okay.  Tell me about the Stringfellow

6     site.

7               Is that a CERCLA site?

8          A.   Yes.

9          Q.   Okay.  Is that, has that been remediated

10    that you know of?

11         A.   There has been substantial remedial work

12    on that site.

13              As a player in that site, Saltire was a

14    de minimis party, but there have been subsequent

15    personal injury kind of cases that have been

16    filed, and all of the potentially responsible

17    parties associated with the site typically have

Page 27

Bauer1

18    been named.

19         Q.   Do you know how many personal injury

20    lawsuits Saltire Industrial, Scovill or any of

21    Scovill's subsidiaries have been named in in

22    California?

31

1          A.   No, I do not.

2          Q.   Do you think it's more than one?

3          A.   That's the only one that I know of that

4    I can recall at the moment.

5          Q.   A single personal injury lawsuit filed

6    relating to the Stringfellow site?

7          A.   I believe there were actually two.

8          Q.   Are these class action lawsuits?

9          A.   Whether they were class action or

10   whether they were simply multi-party suits, I'm

11   not aware.

12         Q.   Are you aware of whether those had been

13   settled?

14         A.   I don't believe those have been settled.

15         Q.   Do you know who the attorneys are that

16   have brought those lawsuits or claims?

17         A.   No.  I don't recall.

18         Q.   Do you know where those cases are being

19   litigated?

20         A.   In California, but I don't know where.

Bauer1

21      Q.   How long has the EPA been involved with

22      the Stringfellow site?

32

1      A.   Many years; I don't -- you know, it's

2      one of the early Superfund sites.

3      Q.   Are you aware of any, who -- is Mr.

4      Smith the person in the company who would have

5      the most detailed knowledge -- and by company, I

6      mean Saltire Industrial -- most detailed

7      knowledge about those lawsuits not settled in

8      California that you just described?

9            MR. LUCAS:   I object to the form of the

10      question.

11            MR. STEWART:   I think you're objecting

12      because I included information -- well, I won't

13      speculate.

14            MR. LUCAS:   If you want me to clarify

15      the basis, I'll be glad to.

16            MR. STEWART:   No.   Let me just rephrase

17      so we're perfectly clear.

18            BY MR. STEWART:

19      Q.   Who in the company or related to Saltire

20      Industrial, Inc. could provide the most

21      information about the two lawsuits?

22            MR. LUCAS:   I'm sorry.   I didn't quite

Page 29

Bauer1

33

```
 1    get that question.
 2             Would you mind repeating it?
 3             MR. STEWART:  Not at all.
 4             BY MR. STEWART:
 5        Q.   Who in the company, by which I mean
 6    Saltire Industrial, would be able to provide the
 7    most information about those lawsuits in
 8    California?
 9        A.   Probably myself, but I would simply have
10    to, you know, refresh my recollection of those
11    sites.
12        Q.   What would you need to refresh your
13    recollection of those sites?  What documents?
14        A.   Take a look at the complaints that were,
15    that were filed.
16        Q.   Do you have copies of those complaints
17    at Saltire Industrial, Inc.'s offices?
18        A.   I believe so.
19        Q.   Okay.  Do you know of any -- first of
20    all, have you given me an exhaustive list of
21    every item of litigation that you know of that
22    Saltire Industrial or Scovill have been involved
```

Bauer1

34

1    with?

2        A.    Yes.  Litigation meaning, you know,

3    court ordered.

4        Q.    Right.

5        A.    Or type of actions; those are all that I

6    recall at the moment.

7        Q.    Okay.  Well, do you recall any purely

8    administrative disputes or hearings or matters

9    that Saltire Industrial, Inc. Or Scovill was

10   involved in?

11       A.    Relating to environmental matters, or

12   related to a broader question than that?

13       Q.    Well, why don't we say relating to

14   environmental matters?

15       A.    Yes.  The company is involved in other

16   administrative environmental issues.

17       Q.    Why don't you tell me which ones the

18   company is involved in?

19            Before you do that, can we agree that

20   when we're talking about the company, that we're

21   talking about Saltire Industrial, Inc., which I

22   take it is the successor entity to the various

0

35

Page 31

Bauer1

1  Scovill Manufacturing entities that you

2  described?

3      A.  That's okay.  That was my -- yes.

4      Q.  That's what we're talking about when we

5  say the company, right?

6      A.  That's a good clarification.

7      Q.  Okay.  Now tell me the environmental

8  administrative issues that the company has been

9  involved in.

10     A.  So you're interested in a list of

11  issues, sites?

12     Q.  That's right.

13     A.  Et cetera, that the company has been

14  involved in, or is that encompassing all time or

15  sort of more currently active sites or issues or

16  what's your focus?

17     Q.  My focus is everything you know about,

18  but you might start from --

19     A.  How many days do you have?

20     Q.  Okay.  Well, why don't you start, and

21  I'll tell you when I'm no longer interested?

22     A.  Okay.

36

1          MR. LUCAS:  When you say why don't you

2  start, can you kind of narrow the focus of the

3  question for me?

Bauer1

4              MR. STEWART:  Certainly.

5              BY MR. STEWART:

6          Q.    I would just like you to just start

7    listing for me the administrative I think you

8    said environmentally-related actions, hearings,

9    proceedings, that Scovill or that the company has

10    been involved in.

11          A.    Okay.  And by administrative, I assume

12    you mean any kind of agency agreements, or is

13    . that --

14          Q.    Yes.  And let me help clarify.  What I'm

15    interested in from you, Mr. Bauer, is just to

16    describe for me the, the, the proceedings, so for

17    a clarification, you could describe the

18    proceeding we're involved in as working with the

19    Tennessee and federal regulatory officials to

20    remediate the Dickson site understanding that

21    there are hundreds of documents that you have

22    provided me about that.


37

1              I don't want you to list every document.

2    I just want you to tell me about each, each

3    occurrence or site that you're dealing with.

4              Does that clarify that?

5              MR. LUCAS:  It doesn't.  That's why I'm

6    going to object to the form.

Bauer1

```
 7              MR. STEWART:  Fair enough.

 8              MR. LUCAS:  Do you want to ask him

 9      about, for example, each site?

10              MR. STEWART:  Yeah, why don't we start

11      that way?

12              I'm just trying to provide a framework

13      whereby he can describe fairly the company's

14      environmentally-related administrative actions.

15              I don't want him to take me through at

16      this point Phase 1, Phase 2, and so forth.

17              MR. LUCAS:  Yeah, that was my concern.

18      When you said, when you mixed together in your

19      question you said tell me about each occurrence

20      or each site.

21              Each occurrence, I mean I don't know

22      what mean by occurrence.  That's every time they
```

38

```
 1      write a letter back and forth or what?

 2              MR. STEWART:  Well, given our time

 3      constraints, I'll start with sites.

 4              MR. LUCAS:  That's what I thought.

 5      That's what I thought you wanted, so can we agree

 6      he's going to tell you about sites that are the

 7      subject of administrative actions?

 8              MR. STEWART:  For this question, yes.

 9              MR. LUCAS:  Sure.
```

Bauer1

10          THE WITNESS:   Okay.  There's a -- okay.

11     Dealing with the Regional Water Quality Control

12     Board in southern California, remediation and

13     ongoing monitoring of site in the City of

14     Industry, California.

15          MR. LUCAS:  I'm sorry.  City of what?

16          THE WITNESS:  City of Industry,

17     California; working with the Environmental, U.S.

18     Environmental Protection Agency, remediation and,

19     remediation of the Caldwell Trucking Superfund

20     site, Fairfield, New Jersey, U.S. EPA Region 9,

21     and investigation and remediation of the Puente

22     Valley Operable Unit -- Puente Valley Operable

□

39

1     Unit of the San Gabriel Valley Superfund site.

2          And for this matter, related to this

3     matter, working with the U.S. EPA in the State of

4     Tennessee on investigation, remediation of the

5     former Schrader Automotive site in Dickson,

6     Tennessee.

7          BY MR. STEWART:

8     Q.   And can we agree for clarification that

9     when we refer to the site or the facility today,

10     that we'll be referring to the site you just

11     described in Dickson, Tennessee?

12     A.   Agreed at least except as I may be

Page 35

Bauer1

13     perhaps doing this listing, I may occasionally
14     refer to the current site that we're talking
15     about.
16          Q.   Certainly.
17          A.   With the State of Connecticut DEP,
18     Department of Environmental Protection,
19     investigation and remediation of facility in
20     Watertown, Connecticut.
21               Let's see.  What are the others?  We
22     were a party with the Stringfellow case as we

40

1      mentioned before, Stringfellow Superfund site, so
2      that was an investigation and remediation again
3      with the U.S. EPA.
4               Okay.  Other sites also with
5      environmental, U.S. Environmental Protection
6      Agency include the solvent recovery services of
7      New England site, Southington, Connecticut, again
8      investigation and remediation activities, the old
9      Southington landfill, also in Southington,
10     Connecticut, investigation and remediation
11     activities.
12               Enterprise Recovery Systems, and that's,
13     I don't recall the location.  What's the location
14     of that site?  It was also working with U.S. EPA
15     investigation and remediation activities.

Bauer1

16           Can I see the list so far that we have?

17      Q.   Certainly.  This is a handwritten list I

18   have been making since we started the proceeding.

19   You're welcome to refer to it.

20           (The witness reviewed the document.)

21           MR. STEWART:  It's on two pages.

22           (The witness reviewed the document.)

41

1           THE WITNESS:  Okay.  Another site is the

2   Arrowhead Plating site, Montrose, Virginia, with,

3   under the auspices of the U.S. EPA,

4   investigation, remediation activities.

5           (The witness reviewed the document.)

6           THE WITNESS:  Those are the sites, the

7   active sites that I remember at the moment.

8           I may be leaving out some of the less

9   significant sites, but those are the ones that I

10   remember at the moment.

11           BY MR. STEWART:

12      Q.   Where could I find a list of those, all

13   of the sites?

14           Does one exist at Saltire Industrial,

15   Inc?

16      A.   I don't believe we have a comprehensive

17   list of all sites.

18      Q.   You said active sites.  Can you tell me

Bauer1

19     about any inactive sites?

20          A.   There are sites that have been settled

21     over the years, Stringfellow, for example, being,

22     you know, one of them, although we still have

⊔

42

1     other litigation as a result of that site.

2               There was the Auburn Road landfill, PJP

3     landfill.  There are many others.

4               Enterprise Recovery, we already

5     mentioned that one.  That's still ongoing.  Saad

6     site, S-A-A-D, Superfund site.

7          Q.   If you went back to your office, what

8     would you look at to, to develop a comprehensive

9     list of every inactive site and active site?

10          A.   Have to go back and look at my files.

11          Q.   What documents in those files would tell

12     you, allow you a way to comprehensively establish

13     all of your inactive and active sites?

14          A.   I would have to go back and piece that

15     together from probably several different sources

16     to come up with such a list, just going through

17     and looking, categorizing and going through the

18     list of each site that I have got, that I have

19     files on.

20          Q.   Would you be able to do that, though, if

21     you went back to your office, actually come up

Bauer1

22      with a complete list of all the active and

                                                        43

1       inactive sites that the company has been involved

2       with environmentally?

3           A.    It may not be entirely comprehensive.  I

4       could put together a more comprehensive list than

5       I can simply by recollection.

6           Q.    Okay.  So are you saying it's possible

7       that, that even with your records at your office,

8       the list that you would come up with of all the

9       sites active and inactive might not be totally

10      comprehensive?

11          A.    That's correct.

12          Q.    There might be some for which records no

13      longer exist?

14          A.    That's correct.

15          Q.    Okay.  Before we talk about these, have

16      you settled any litigation involving any of the

17      sites that you talked about, any of the

18      administrative sites you just described?

19              By you, I mean the company.

20          A.    I don't believe any of those settled.

21      Well, some of those past matters may have

22      involved litigation.

Bauer1

44

```
1            The ones I just mentioned do not
2    involve, you know, settled litigation.  I think
3    actually to go back, correct one thing on the
4    Caldwell Trucking site, there is litigation with
5    other potentially responsible parties and their
6    insurance carriers in terms of other sites where
7    there is active litigation.
8        Q.   Do you know has any litigation been
9    initiated relating to personal injuries or damage
10   to neighboring properties relating to any of
11   those sites?
12       A.   I don't recall.
13       Q.   Who in the company would be most likely
14   to recall any litigation relating to any of those
15   sites by which I mean all of the administrative
16   sites that you just described?
17            MR. LUCAS:  I'm going to object to the
18   form, object to the lack of foundation.
19            BY MR. STEWART:
20       Q.   Answer the question.
21       A.   Could you restate the question?
22       Q.   Certainly.  Do you know of anyone in the
```

45

Bauer1

```
 1     company other than you who would be more likely
 2     than you to have information about litigation
 3     that would have arisen, if any, about these
 4     sites?
 5             MR. LUCAS:  Based on that rephrasing, I
 6     will withdraw my objection.
 7             THE WITNESS:  No, I don't.
 8             MR. LUCAS:  Do you mind if we take a
 9     short break?
10             MR. STEWART:  Let me -- I just have a
11     few questions on this line, and then I will
12     break.
13             MR. LUCAS:  Okay.
14             BY MR. STEWART:
15      Q.    I want to make sure.  Am I clear do you
16     not recall any settlements of any litigation
17     involving Saltire Industrial, Inc. or the
18     companies we described other than -- well, I
19     guess --
20      A.    There have been administrative
21     settlements associated with some of these other
22     sites.
```

46

```
 1             Whether some of these settled matters
 2     may have also involved settlements of litigation,
                        Page 41
```

Bauer1

3    that's what I'm struggling to, you know, to

4    separate at the moment, and I don't recall

5    specifically sites where it was a settlement of a

6    litigated matter.

7        Q.    And I want to make sure you understand

8    that my question did not just involve the

9    question about any settlements, you know, about,

10    did not just relate to the specific sites you

11    mentioned, but any such settlements.

12        MR. LUCAS:   By settlement, you mean a

13    settlement of litigation as opposed to a

14    agreement, agreement with EPA to do such and such

15    on a site?

16        MR. STEWART:   Let me clarify, I mean a

17    settlement with a private party, not a

18    governmental body, relating to any of the sites

19    you have mentioned.

20        MR. LUCAS:   Thank you for the

21    clarification.

22        THE WITNESS:   And again, yes, my answer

47

1    is I don't recall there being any, any such

2    settlements at the moment.

3        BY MR. STEWART:

4        Q.    And do you recall any settlements

5    involving anything else with private parties not

Page 42

Bauer1

6      specifically related to those sites?

7          A.   Relating to litigation, no.

8          Q.   How about relating to any claims,

9      whether litigated or not, involving property

10     damage or personal injuries?

11             MR. LUCAS:  I'm sorry.  What's the

12     question?

13             MR. STEWART:  The question is whether he

14     remembers the company entering into any

15     settlements regardless of whether litigation was

16     initiated that stem from accusations of personal

17     injuries or property damage.

18             MR. LUCAS:  And again, you mean

19     settlements with private individuals --

20             MR. STEWART:  Yes.

21             MR. LUCAS:  As opposed to administrative

22     matter with the government?


⬜

48


1              MR. STEWART:  Yes.

2              THE WITNESS:  Yeah.  No, I don't, I

3      don't recall any such matters.

4              BY MR. STEWART:

5          Q.   Is it possible that Wayne Smith has also

6      had information or has any information about such

7      matters?

8          A.   While Mr. Smith was dealing with, for
                    Page 43

Bauer1

9     example, the asbestos cases, you know, I can't

10    speculate as to, you know, what he knows and

11    doesn't, you know, doesn't recall.

12         I would be the one still in the company

13    probably with the best understanding of the

14    environmental matters anyway.

15    Q.   If you went back to your office, would

16    your files enable you to know for certain whether

17    any settlements had been made?

18    A.   Not comprehensively; certainly given the

19    long history of operation of including

20    predecessor companies, you know, it might shed

21    some light on, you know, materials that I, I have

22    dealt with in my term here in the company.


49


1     Q.   Do you think your files would reveal any

2     settlements of the companies entered in the last

3     decade from today?

4     A.   I would have records on environmental

5     matters certainly over the last five years.

6          In the preceding five years, I can't

7     suggest that I would necessarily have them all.

8          MR. STEWART:  Okay.  This is a good time

9     for a break.

10         THE VIDEO SPECIALIST:  Off record, and

11    the time on screen is 10:17:28.

Bauer1

12          (A recess was taken.)

13          THE VIDEO SPECIALIST:  On record, and

14     the time on screen is 10:30:48.

15          BY MR. STEWART:

16          Q.   Mr. Bauer, has the company ever been

17     accused of a crime?

18          A.   Not to my knowledge.

19          Q.   I take it you personally have not?

20          A.   No.

21          Q.   Has the company ever been assessed civil

22     fines by an administrative agency?

☐

50

1          A.   There may have been fines for

2     environmental, alleged environmental violations.

3               I don't recall any specifics.

4          Q.   Do you know who at the company would be

5     in the best position to know about fines that

6     have been paid out on, to regulators relating to

7     environmental claims?

8          A.   You know, I probably would be, actually

9     be in the best position to know, but I just

10     don't, you know, don't recall there being any.

11          Q.   Okay.  I want to make sure.  So you

12     don't recall there being any fines over the last

13     five years?

14          A.   That's correct.

Bauer1

15    Q.    Okay.  Do you know of documents in your

16    files that would reveal whether or not the

17    company has been fined by the Environmental

18    Protection Agency or a state environmental

19    authority?

20    A.    Yeah.  I could review those files to

21    confirm my recollection.

22    Q.    Okay.  And would those files also enable

51

1    you to determine whether such fines had been

2    assessed prior to five years ago?

3    A.    My files are in  --

4    MR. LUCAS:  I'm going to object to the

5    form of the question to the extent that it, it

6    seems to assume or imply that there are fines.

7    I think he has testified that he doesn't

8    recall any fines.

9    BY MR. STEWART:

10    Q.    It's my intention have -- tell me about

11    your files, five years -- if you looked at your

12    files relating to periods prior to five years

13    ago, would they reveal if the company had been

14    fined for environmental-related activities?

15    A.    I would suggest that they are not

16    comprehensive, that there may have been, you

17    know, activities that would not be, not be

Page 46

Bauer1

18    reflected in the files.

19        Q.   Can you tell me what would account for

20    any non-comprehensiveness in your files relating

21    to environmental matters?

22        A.   In particular, former transactions,

52

1    sales of former businesses, typically the records

2    associated with those businesses would go with

3    the sale.

4        Q.   Are any of the environmental sites the,

5    where administrative activity has been initiated

6    that you listed, in the State of Tennessee?

7        A.   Other than the Dickson property that we

8    are, we talked about the site -- let's see.

9        Q.   I'm not trying to trick you.  I'll

10    mention you have a Saad --

11        A.   The Saad site is also in Tennessee.

12        Q.   Okay.  Can you tell me where the Saad

13    site is?

14        A.   I don't recall the name of the town.

15        Q.   Okay.  What do you recall about the

16    administrative action that occurred in that site?

17        A.   That actually really predated my

18    involvement with the company.

19             To my understanding, that was settled

20    and there was no, you know, no further

Bauer1

21      involvement by the company.

22          Q.   Do you know whether or not it involved



53



1       contaminated land, the Saad site?

2           A.   The Saad site, to the best of my

3       knowledge, there was issue about, you know,

4       contamination or potential contamination at that

5       property.

6           Q.   Do you know if that involved potential

7       contamination to groundwater?

8           A.   I don't know the details of the Saad

9       site.

10          Q.   Okay.

11          A.   You know, that kind of information

12      presumably would be available through U.S. EPA or

13      similar kind of sources.

14          Q.   Do you know whether ICF Kaiser or IT

15      Corporation were involved with the Saad site?

16          A.   I don't believe so.

17          Q.   Okay.  Can you tell me which of the

18      sites that you listed, and I'll hand you the list

19      if it would help --

20          A.   Sure.

21          Q.   Are sites about which you have personal

22      knowledge.

Page 48

Bauer1

54

```
1              (The witness reviewed the document.)
2              THE WITNESS:  I have some degree of
3     personal knowledge relating to all of those
4     listed sites.
5              BY MR. STEWART:
6         Q.   Okay.  Does the City of Industry site
7     that you mentioned involve contaminated or
8     accusations of contaminated land?
9         A.   Yes.
10         Q.   Does it involve a site that was operated
11     by the company?
12         A.   Yes.
13         Q.   So I take it that it is not a site where
14     the company simply was one of many companies
15     depositing potential waste?
16         A.   That's correct.
17         Q.   And was, was the Stringfellow site one
18     in which the company was involved as a company
19     that deposited waste with a landfill?
20         A.   Yes, one of many hundreds of others.
21         Q.   Okay.  What facility or factory does the
22     City of Industry, California, matter relate to?
```

Bauer1

55

```
1        A.    The former Ajax Hardware facility.

2        Q.    And was that owned by the company?

3        A.    Yes.

4        Q.    And does, does that environmental action

5   involve contaminated groundwater?

6        A.    Yes.

7        Q.    Does it involve volatile organic

8   compounds?

9        A.    Yes.

10       Q.    Does it involve trichloroethyene?

11       A.    Yes.

12       Q.    Does it involve also other contaminants

13  like heavy metals?

14       A.    The groundwater contamination does not

15  involve heavy metals.

16             There were some metals identified in

17  soils that had been remediated.

18       Q.    Has the company conceded that the Ajax

19  Hardware facility contaminated the groundwater in

20  that area that you know of?

21       A.    The company is pursuing and it continues

22  to perform cleanup and monitoring activities at
```

56

Bauer1

1    that site.

2         Whether there has been any kind of

3    actual admission of contamination, I don't know.

4         Q.   Is any other company performing

5    remediation or monitoring activities at that

6    site?

7         A.   No.

8         Q.   Have any monitoring activities been

9    conducted off the property on which the Ajax

10   Hardware facility sat?

11        A.   Yes.

12        Q.   And have any monitoring wells or soil

13   samples or soil borings revealed contamination of

14   off-site property?

15        A.   Yes.  It's a regional groundwater

16   problem.

17        Q.   So have wells off site revealed that the

18   aquifer in the area has trichloroethylene in it?

19        A.   Yes.

20        Q.   Okay.  Do you know if the company has

21   used any environmental specialists or engineers

22   in that site or with regard to that site?

57

1         MR. LUCAS:  Question -- are you asking

2    about people as, they have used as consultants on

3    that site?

Page 51

Bauer1

4          MR. STEWART:  Yeah.  Let me clarify.

5          BY MR. STEWART:

6      Q.   First of all, has any person, employee

7  of ICF Kaiser Engineers worked at the or with

8  regard to the Ajax Hardware facility site?

9      A.   No.

10     Q.   Okay.  Has any person related to or

11  employed by IT Corporation worked at that site?

12     A.   No.

13     Q.   Okay.  Do you know the name of any

14  environmental engineers or other environmental

15  specialists who have been retained by the company

16  to work on that site?

17         MR. LUCAS:  Hold on.  Here is my concern

18  over that question.

19         MR. STEWART:  Please.

20         MR. LUCAS:  I don't know personally

21  whether there's potential litigation over that

22  site or not.

☐

58

1          If there is, and if there are people who

2  have been retained as consultants, as you know,

3  non-testifying consultants --

4          MR. STEWART:  I understand your concern.

5  I think we can agree that, that what I'm entitled

6  to know and really all I'm interested in knowing

Page 52

Bauer1

7    is the name of the environmental engineering firm

8    that is operating on that site rather than the

9    particular potentially non-testifying experts.

10        MR. LUCAS:  If there's an environmental

11   consulting firm working on that that's publicly

12   known, then you can disclose that.

13        Is that fair enough, counsel?

14        MR. STEWART:  It is, although I would

15   say I think, I believe that the fact that the

16   experts are non-testifying in another case

17   probably does not exclude discovery of them in

18   this case, but I don't really care at this

19   juncture because I don't  --

20        MR. LUCAS:  If you don't care, then it's

21   probably not an issue, but let me tell you my

22   concern so that I'm not trying to hide a ball

0

59

1    from you.

2        If there were in the future litigation

3    over that, and if there were people who were

4    retained as consultants in anticipation of

5    litigation, then we would not want to disclose

6    them publicly unless you might have waived it,

7    and I don't know if that's the case here or not,

8    but I think, I think that based upon our

9    agreement and the focus of your question, you can

Page 53

Bauer1

10      go ahead and answer for publicly known project

11      engineers.

12              THE WITNESS:  So the question, could you

13      repeat it?

14              BY MR. STEWART:

15      Q.    I just want to know if the company's

16      retained an engineering firm similar to ICF

17      Kaiser if you will to deal with the regional

18      groundwater problem relating to the Ajax Hardware

19      facility?

20      A.    Meredith Boli, B-O-L-I, and Associates,

21      has been the firm assisting the company at the

22      Ajax site.

                                                        60

1       Q.    And how long has the Environmental

2       Protection Agency been interested in that site?

3       A.    Actually this is a site that's being,

4       work is being done under the auspices of the

5       Regional Water Quality Control Board.

6               It's a state agency.

7       Q.    How long have they been involved with or

8       curious about contamination on the Ajax Hardware

9       facility?

10              MR. LUCAS:  Object to the form of the

11      question.

12              BY MR. STEWART:

                    Page 54

Bauer1

13      Q.   Well, put it this way.  How long, when

14   was the first time that you know of that the

15   company met with or wrote to officials of the

16   California or the Regional Water Quality Control

17   Board about this site?

18           MR. LUCAS:  Based on that clarification,

19   I withdraw the objection.

20           THE WITNESS:  Mid-1980s.

21           BY MR. STEWART:

22      Q.   Okay.  When did the site close or cease

61

1   operations?

2      A.   Similar timeframe.

3      Q.   Okay.  Was that site clean closed?

4      A.   There were no hazardous waste units on

5   the site, so there really wasn't an issue of

6   clean closure or not.

7      Q.   So no RCRA clean closure documents were

8   ever filed?

9      A.   That's right.

10     Q.   Okay.

11     A.   There is a, no further action letter

12   from the Regional Water Quality Control Board

13   relating to the remedy, remediation that was

14   done, so while it's not exactly a clean closure,

15   it's similar.

Bauer1

16        Q.    What would the letter, when would that

17    letter have been dated?

18        A.    I don't recall the, I don't recall the

19    date of that.

20              That would have been late 1980s

21    probably.

22        Q.    When or do you know when concerns were

62

1    first raised by anyone that the groundwater near

2    the Ajax Hardware facility was contaminated?

3        A.    I don't believe there was any concern

4    raised about the Ajax site contamination or

5    constituents were identified during the process

6    of closure of the facility.

7              Now the regional, the other half of your

8    question about, related to the regional problem

9    and the groundwater, and that, I don't know when

10   that, that regional problem was identified, but

11   it was prior to then in the 1970's.

12       Q.    When was, do you know when anyone first

13   attempted to link the problem of regional

14   contamination of the groundwater to the Ajax

15   facility?

16       A.    Not specifically; I would say that was

17   some time starting in the 1990s.

18       Q.    Okay.  Do you know whether or not the

Page 56

Bauer1

19    first person or entity to raise that concern was

20    the company?

21            MR. LUCAS:  What concern?

22            MR. STEWART:  I'll rephrase.

63

1            BY MR. STEWART:

2       Q.   Do you know whether or not the first

3    person or entity to raise concerns that the Ajax

4    hardware facility was a source of contamination

5    of groundwater was the company?

6       A.   No, I don't know.

7       Q.   You don't know, or it wasn't?

8       A.   I don't know whether, what the mechanism

9    was, what the initiation was for linking, linking

10   the two.

11      Q.   Do you know if the Regional Water

12   Quality Control Board or anyone else conducted an

13   investigation on site at the Ajax Hardware

14   facility?

15      A.   No.  We have always worked with the,

16   with the Regional Water Quality Control Board and

17   done the worked with the board to design

18   monitoring remediation work that was done, so we

19   were following the directions of the Regional

20   Water Quality Control Board.

21      Q.   Do you know what fact came to light in

Page 57

Bauer1

22        the 1990s that raised concerns that the Ajax

64

1    Hardware facility was a source of contamination

2    of the regional aquifer?

3        A.   To try to clarify the earlier response,

4    it's a matter really of just greater

5    understanding of the regional problem itself I

6    would say and the scope of the regional

7    groundwater, the scope of the regional

8    groundwater problem.

9        Q.   Well, what fact about the scope of the

10   regional groundwater problem raised concerns in

11   the nineties that the Ajax Hardware facility was

12   a source of groundwater contamination?

13       A.   I don't think I can speculate on to what

14   the specifics, you know, were because I don't

15   know.

16       Q.   Did you personally have any involvement

17   with this site, the Ajax Hardware facility, from

18   1990 to 1995?

19       A.   No.

20       Q.   The remediation of the Caldwell Trucking

21   Superfund site, did that involve a site that had

22   been operated by the company?

Page 58

Bauer1

65

1      A.   No.

2      Q.   Is that a Superfund site where the

3  company is alleged to have deposited waste?

4      A.   That's correct.

5      Q.   Was the company one among many companies

6  that is involved with that site?

7      A.   Yes.

8      Q.   Does that site involve contaminated

9  groundwater?

10      A.   Yes, it does.

11      Q.   Does that site involve contamination of

12  groundwater with volatile organic compounds?

13      A.   That's correct.

14      Q.   And do the volatile organic compounds of

15  concern at that site include trichloroethylene?

16      A.   They do.

17      Q.   Okay.  Has anyone alleged that the

18  company is one of the sources of that

19  trichloroethylene that is in the groundwater?

20  I'll restate.

21          Has it been alleged that the company is

22  a source of any volatile organic compounds in the

66

Bauer1

1    groundwater near the Fairfield, New Jersey,
2    Superfund site.
3         A.    In terms of because of the waste
4    disposal at the Caldwell Trucking site?
5         Q.    Yes.
6         A.    Yes.
7         Q.    Is there a particular facility that was
8    owned by the company that supposedly placed
9    contaminants in the Caldwell Trucking Superfund
10   site?
11        A.    Yes.
12        Q.    Which facility is that?
13        A.    General Hose Products.
14        Q.    And where is that located?
15        A.    It is also in Fairfield, New Jersey.
16        Q.    Did the General Hose Products Company
17   dispose of volatile organic compounds in that
18   landfill that you know of?
19        A.    Not to our knowledge.  There -- we don't
20   believe that the company was a source of volatile
21   organic compounds.
22        Q.    Okay.  The EPA Region 9 investigation at

67

1    the Puente Valley Operable Unit, does that
2    involve a site that was once operated by the
                      Page 60

Bauer1

3  company?

4      A.  That relates back to the Ajax Hardware

5  property.

6      Q.  Tell me about that relation so I can

7  understand the relation between the Puente Valley

8  Operable Unit and the Ajax Hardware facility?

9      A.  The Puente Valley  --

10         MR. LUCAS:  I'm sorry.  Would you mind

11  repeating that question for me?

12         BY MR. STEWART:

13     Q.  What is the relationship between the

14  Puente Valley Operable Unit and the Ajax Hardware

15  facility?

16     A.  The Ajax facility is located in Puente

17  Valley.

18         It's a, it's just a region in California

19  that encompasses several towns, including the

20  City of Industry, so as one of, as being

21  physically located within this valley in this

22  area of regional groundwater contamination, it's

□

68

1  one of many potentially responsible parties

2  associated with the Puente Valley site.

3         The Puente Valley, work for the Puente

4  Valley Operable Unit is being overseen by the

5  U.S. EPA, and involves regional groundwater

Bauer1

6    monitoring and remediation, whereas the work at

7    the Ajax site and other site-specific work of

8    other potentially responsible parties is overseen

9    by the Regional Water Quality Control Board, the

10   state agency.

11       Q.   Did -- maybe I missed it.  What

12   physically happened at the Puente Valley Operable

13   Unit with regard to the Ajax Hardware facility?

14          Was waste disposed there?

15       A.   The Puente Valley Operable Unit is

16   simply a regional groundwater contaminated area

17   with an area of many industries located in the

18   Valley, and commingled groundwater plumes from

19   many facilities, creating a regional groundwater

20   problem.

21       Q.   Where is the Puente Valley?  That is

22   where is the San Gabriel Valley I guess?

0

69

1        A.   It's southern California.

2        Q.   Where?

3        A.   North of and east of Los Angeles.

4        Q.   Okay.  Is, is the involvement of the

5    company in the EPA Region 9 investigation solely

6    based on occurrences at the Ajax Hardware

7    facility plant?

8        A.   Yes.

                        Page 62

Bauer1

9      Q.    Okay.  Is Meredith Boli & Associates

10    working independently on the Puente Valley

11    Operable Unit cleanup?

12      A.    No.

13      Q.    Are any other engineers working for the

14    company relating to the Puente Valley Operable

15    Unit separate and apart from the Ajax Hardware

16    facility?

17      A.    The Camp, Dresser & McKee is the

18    consulting firm working on the Puente Valley

19    issue.

20      Q.    The State of Connecticut, Watertown,

21    Connecticut, issue, does that involve a plant or

22    facility or factory operator owned by the

70

1      company?

2      A.    Yes.

3      Q.    What factory or facility is that?

4      A.    It was a, a Scovill facility in

5      Watertown.

6      Q.    What was produced there?

7      A.    Buttons, snaps, zippers, all kinds of

8      products.

9      Q.    Was it a metal working factory?

10    A.    Primarily.

11    Q.    By the way, was the Ajax Hardware

Page 63

Bauer1

12    facility a metal working factory?

13        A.    Primarily.

14        Q.    Okay.  Does the Watertown, Connecticut,

15    site involve groundwater contamination?

16        A.    Yes.

17        Q.    And does it involve contamination of the

18    groundwater with volatile organic compounds?

19        A.    Yes.

20        Q.    And among the volatile organic compounds

21    found in the groundwater, does it involve

22    trichloroethylene?

0

71

1        A.    Yes, it does.

2        Q.    How long has -- well, is the company

3    currently involved in groundwater testing or

4    remediation at that site?

5        A.    Involved in ongoing monitoring at the

6    site.

7        Q.    Has the company installed groundwater

8    monitors off the site?

9        A.    No.

10        Q.    Has the company conducted any

11    groundwater monitoring or soil testing or soil

12    boring off the site?

13        A.    No.

14        Q.    Okay.  Is there any evidence that, well,
                              Page 64

Bauer1

15    has trichloroethylene been found in monitoring

16    wells on site?

17        A.   Yes.

18        Q.   Okay.  Has trichloroethylene or any

19    other compound of concern been found off site?

20        A.   No.

21        Q.   How long has the monitoring on this

22    site, the Connecticut site, been performed?

72

1        A.   I don't recall when that, when that

2    started.

3        Q.   Would it have been before 1990?

4        A.   Yes.

5        Q.   Okay.

6        A.   I expect that site to be, you know,

7    closed -- not physically closed, but the

8    environmental issues to be closed shortly.

9        Q.   Was that site ever clean closed?

10        A.   Again, it was not, there weren't any

11    RCRA units for clean closure to be applicable.

12        Q.   Can you just, so we'll have it clear on

13    the record, can you tell me what you mean by a

14    RCRA unit?

15        A.   A storage treatment or disposal facility

16    handling hazardous wastes.

17        Q.   And is that, was the contamination on

Page 65

Bauer1

18    this site a result not of storage of waste but

19    perhaps leaks or that sort of thing?

20        A.   The source of contamination was never

21    explicitly identified.

22        Q.   Is the, but I guess is what you're

1     saying that there were no RCRA storage units,

2     there was no landfill or established storage area

3     for waste on the site?

4         A.   That's correct.

5         Q.   Okay.  So -- but trichloroethylene, was

6     that used at that facility?

7         A.   Yes.

8         Q.   Okay.  Do you know when facts came to

9     light that revealed contamination in the

10    groundwater?

11        A.   I don't recall when that, when that

12    occurred.

13        Q.   Would it have been before 1990?

14        A.   Yes.

15        Q.   Do you have any knowledge as to what

16    person or entity discovered the facts that

17    revealed contaminated groundwater?

18        A.   The company identified the, those facts

19    in the course of closure of the, of the facility.

20        Q.   At that time, was the company working

Page 66

Bauer1

21    with the EPA or the state officials?

22        A.    State officials.

74

1        Q.    Okay.

2        A.    And back on similar questions relating

3    to the Ajax Hardware site, all the data related

4    to the site was data generated by the company

5    working with, under the direction of the regional

6    water control, Water Quality Control Board.

7            There wasn't, you know, other

8    independent investigations by other parties or

9    the government.

10        Q.    When the information at Ajax was

11    provided to regulators, the Water Quality Control

12    Board, was the Water Quality Control Board

13    already, had it already raised concerns about

14    potential contamination on the site?

15        A.    We're doing, as I understand it, doing

16    routine closure activities and monitoring

17    associated with closure of the facility, so there

18    weren't any other more specific concerns raised

19    prior to that time.

20            There weren't any understanding or were,

21    there weren't any knowledge or expectation of

22    finding contamination or contaminants.

Page 67

Bauer1

75

1 Q. And so was the, as part of closure, was
2 the company trying to monitor groundwater to show
3 that there wasn't contamination so it could close
4 the site?  Is that --
5 A. Just performing monitoring to fulfill
6 the requests of the Regional Water Quality
7 Control Board.
8 Q. I see.  And is that what happened in the
9 Watertown, Connecticut, site, too, basically?
10 A. Yes.
11 Q. Okay.  Okay.  You mentioned a Solvent
12 Recovery Services of New England site in
13 Southington, Connecticut.
14 Is that different from the Watertown,
15 Connecticut, site?
16 A. Yes.
17 Q. Does that involve a factory facility or
18 plant that was owned or operated by the company?
19 A. No.
20 Q. Is that a Superfund site at which the
21 company deposited or is alleged to have deposited
22 waste?

Bauer1

76

1      A.    Yes.

2      Q.    Okay.   Is the company one of a number of

3   companies that were involved?

4      A.    Yes.

5      Q.    Is the, does that case, does that

6   matter, the Southington, Connecticut, Solvent

7   Recovery Services of New England matter involve

8   poisoned -- I'll restate that -- involve

9   contaminated groundwater?

10     A.    Yes.

11     Q.    Does it involve groundwater contaminated

12   with volatile organic compounds?

13     A.    Yes.

14     Q.    Does it involve groundwater contaminated

15   with trichloroethylene?

16     A.    Yes.

17     Q.    Is it alleged that the company

18   contributed to the volatile organic compounds and

19   trichloroethylene in the groundwater?

20     A.    It's alleged that the company sent waste

21   materials to Solvent Recovery Systems for

22   recycling.

77

Bauer1

1      Q.  Is it alleged that a particular

2  operation of the company was responsible for

3  sending those waste materials, a particular

4  factory?

5      A.  I don't recall which facilities were

6  involved with sending materials or alleged to

7  have sent materials to that site.

8      Q.  Do you know how many facilities Scovill

9  had or the company I'll say, was operating in

10  Connecticut at that time?

11      A.  No, I do not know.

12      Q.  Do you know the timeframe when the waste

13  was allegedly generated that went into the

14  Solvent Recovery Services of New England site?

15      A.  I don't recall.  I would have to review

16  that material.

17      Q.  Was it before 1985?

18      A.  Again, I don't recall.

19      Q.  Okay.  Now is the old Southington

20  landfill a different site from the Recovery

21  Services of New England site?

22      A.  Yes.

78

1      Q.  Is that a site involving a plant or

2  facility or operation owned by the company?

3      A.  No.

Bauer1

```
 4        Q.   Is that a CERCLA site where the company
 5   allegedly deposited waste?
 6        A.   Indirectly, yes.
 7        Q.   Okay.  Tell me what you mean by
 8   indirectly.
 9        A.   Waste from the Solvent Recovery site
10   were disposed of at old Southington landfill.
11        Q.   I see.  And so is there groundwater
12   contamination at the old Southington landfill?
13        A.   Yes.
14        Q.   Is that contamination with volatile
15   organic compounds?
16        A.   Yes.
17        Q.   And is that contamination with
18   trichloroethylene?
19        A.   That's a constituent there, yes.
20        Q.   Okay.  Has the company accepted or
21   admitted that trichloroethylene from its
22   operations got into the groundwater at the old
```

☐

79

```
 1   Southington landfill site?
 2        A.   No.  I don't believe we have ever made
 3   such an admission.
 4        Q.   Had the company ever admitted that any
 5   of its trichloroethylene or other hazardous
 6   materials got into the groundwater at the Solvent
```

Page 71

Bauer1

7  Recovery Services of New England site?

8      A.    No.  Again, I don't think we have ever

9  made such an admission.

10          You know, we're participating at those

11  sites, but in terms of legal issues of having

12  made such an admission, I don't believe so.

13      Q.    Okay.  You said you're participating at

14  the site.

15          How are you participating at the New

16  England Solvent Recovery Systems of New England

17  site?

18      A.    As part of a potentially responsible

19  party group.

20      Q.    Do you know how many potentially

21  responsible parties there are in that group?

22      A.    There are many dozens.  I don't remember

80

1  the number.

2      Q.    Has one firm been retained to work with

3  the environmental agencies to clean up that site

4  by this group?

5      A.    Yes.

6      Q.    Is that ICF Kaiser?

7      A.    No.

8      Q.    Is it IT?

9      A.    No.

Page 72

Bauer1

10    Q.   Do you know who it is?

11    A.   The sort of management consultant is

12   American Environmental Consultants.

13    Q.   Do you know where they're located?

14    A.   No.  I don't recall.

15    Q.   Do you know who the project manager,

16   other person in charge of that site is?

17    A.   Randy Smith.

18    Q.   Okay.  Do you know a name of the project

19   manager involved at the Ajax site?

20    A.   William Hass.

21    Q.   Okay.  And the manager at the Watertown,

22   Connecticut, site, do you know who that is?

81

1    A.   Mike Lowe.

2    Q.   Okay.  Did I ask you -- I don't think

3   so -- who the -- is ICF Kaiser involved with the

4   Watertown, Connecticut, site, or have they been?

5    A.   Yes.

6    Q.   Is IT Corporation now responsible for

7   that site?

8    A.   Yes.

9    Q.   Okay.  The Enterprise Recovery Systems

10   site, where is that?

11    A.   Mississippi.

12    Q.   Does that involve a plant or facility

Bauer1

13    that had been operated by the company?

14        A.    No.

15        Q.    Is that a CERCLA site where the company

16    is alleged to have deposited waste?

17        A.    Yes.

18        Q.    What facility of the company is alleged

19    to have participated in depositing waste?

20        A.    I do not recall which facilities are

21    involved there.

22        Q.    Do you know if the company has over time

0

82

1    had more than one facility in Mississippi?

2        A.    No, I do not know.

3        Q.    Do you know of any facilities in

4    Mississippi?

5        A.    No, I don't.

6        Q.    Okay.  Do you know if the Enterprise

7    Recovery Systems site involves a contaminated

8    groundwater?

9        A.    I don't recall.  I think, I believe it

10    does, yes.

11        Q.    Do you recall whether or not the

12    groundwater is contaminated with volatile organic

13    compounds?

14        A.    We're a minor player at the site, and I

15    just don't, I don't remember.

Page 74

Bauer1

16          Q.   Okay.  Do you know who the engineering
17     firm that is handling that site remediation is?
18          A.   I don't recall.
19          Q.   Okay.  You say you're a minor player.
20     Is that because of the amount of waste deposited?
21          A.   Yes.
22          Q.   Okay.  In the, in the New England site,

☐

83

1      Recovery Services' New England site, is Scovill,
2      is the company a major player?
3          A.   No.
4          Q.   Is the company a major player at
5      Southington, Connecticut?
6               MR. LUCAS:  Object to the form of the
7      question.
8               MR. STEWART:  Okay.
9               THE WITNESS:  We are considered, you
10     know, very small players in and contributors to
11     the, to either one of those sites.
12               BY MR. STEWART:
13          Q.   Either one meaning the --
14          A.   Old Southington or the Solvent Recovery
15     site.
16          Q.   Okay.  Caldwell Trucking, are you a
17     significant player in your mind?
18               MR. LUCAS:  Object to the form.

Bauer1

19          THE WITNESS:  What do you mean by

20   significant in that case?

21          BY MR. STEWART:

22      Q.   I was kind of keying off your

1    terminology.

2          I mean is your involvement in that

3    Caldwell Trucking matter more substantial than in

4    the New England Solvent Recovery Services?

5      A.   Yes, that's fair to say.

6      Q.   Okay.  And who are the, who are the

7    engineers involved with the remediation of the

8    Caldwell Trucking Superfund site?

9      A.   By engineers, you mean the sort of

10   design and construction?

11      Q.   ICF Kaiser equivalent, if that helps

12   you.

13      A.   Okay.  Golder Associates.

14      Q.   And who is the project manager?

15      A.   Grant Hocking.

16      Q.   Okay.  Okay.  You mentioned an Arrowhead

17   Plating site in Montrose, Virginia.

18          Does that involve a facility plant or

19   operation that was owned or operated by the

20   company?

21      A.   Yes.

Bauer1

22        Q.    Okay.  Does that involve a contaminated

85

1    groundwater?

2         A.    Yes.

3         Q.    Is the groundwater contaminated with

4    volatile organic compounds?

5         A.    Yes.

6         Q.    Is one of the volatile organic compounds

7    in the groundwater trichloroethylene?

8         A.    Yes.

9         Q.    Okay.  Is -- how long has it been known

10   that there are volatile organic compounds in

11   groundwater at that site?

12        A.    Closure of that site again occurred in

13   mid-1980s, and at that time, monitoring, initial

14   monitoring was conducted, and volatile organic

15   compounds were identified.

16        Q.    Okay.  The monitoring was conducted by

17   the company?

18        A.    Yes.

19        Q.    Okay.  At that time, was this a site

20   where there were RCRA units?

21        A.    I don't recall whether there were RCRA

22   units at that site or not.

Bauer1

86

1          It was, the actual closure of the
2     facility was prior to my time, and I don't recall
3     whether there were any RCRA units there.
4          I don't believe so.
5          Q.   Okay.  So was the site clean closed, or
6     do you recall?
7          A.   No, I don't recall.  I mean I don't
8     recall.
9          Q.   But closure, was closure being conducted
10     with environmental authorities?
11          A.   Yes.
12          Q.   And at that time, groundwater testing
13     was done?
14          A.   That's correct.
15          Q.   And that's when the trichloroethylene
16     was found?
17          A.   Yes.
18          Q.   And I think that you said this, but and
19     that's what occurred essentially at the Ajax
20     Hardware facility?
21          A.   Yes.
22          Q.   And that's what occurred at the

87

Page 78

Bauer1

1    Watertown, Connecticut, facility?

2        A.  That's correct.

3        Q.  Okay.  And now at Arrowhead Plating,

4    were groundwater monitoring devices, soil samples

5    or soil borings taken off the site grounds?

6        A.  Yes,

7        Q.  Okay.  Has any contamination with

8    volatile organic compounds been revealed to exist

9    off the site grounds?

10       A.  Yes.

11       Q.  Okay.  Can you tell me the nature of the

12    contamination that you know of that has occurred

13    at the Arrowhead Plating facility off the site

14    grounds?

15       A.  Nature meaning the type of constituents

16    or --

17       Q.  Well, I would like to know the type of

18    the constituents and how far off the site they

19    have traveled.

20       A.  The constituents are volatile organic

21    compounds.

22          Migration is limited by natural surface

☐

88

1    features.

2         I don't recall exact distances.  It's in

Bauer1

3      the order of a few hundred feet at the most.

4          Q.   Would there be public records that would

5      show exactly how many feet, that sort of thing,

6      and the exact nature of it?

7          A.   Yes.

8          Q.   By the way, as long as we're talking

9      about these things, you mentioned a plume when we

10     were talking earlier.

11             Can you tell me what a plume is just

12     when you use that term.

13         A.   It's probably not a very precise term,

14     so I'll try to be more precise in the answers.

15         Q.   Sure.

16         A.   But I would generally describe a plume

17     as a region of groundwater in which particular

18     compounds, substances have been detected.

19         Q.   Okay.  Does a plume mean all the

20     contaminants in the ground, or just the kind of

21     the source area?

22         A.   I wouldn't describe it as either.

☐

89

1          Q.   Okay.

2          A.   You can define a plume at some

3      particular concentration level, and you know,

4      there are going, there are going to be molecules

5      beyond what you draw as a, as a, as a plume, but

Bauer1

6       it is basically a concentration defined area.

7           Q.   So if I say, if I were to describe, is

8       this right, a plume of trichloroethylene at ten

9       UG/L, then that means this is where we think

10      trichloroethylene at that level has flowed?

11              Is that what that means?

12          A.   Or whether it has flowed or not,

13      whatever, that's where it has been identified and

14      it's extrapolated to from a limited number of

15      data points to be within that area, and if by

16      UG/L micrograms per liter, is that the -- parts

17      per billion?

18          Q.   Um-hm.

19          A.   Sort of concentration level, whatever it

20      happens to be?

21          Q.   Okay.  Yeah, and because we'll be

22      referring to this a lot, parts per billion and

90

1       UG/L, we can use those terms interchangeably, is

2       that correct?

3           A.   Micrograms per liter, I mean it's, a U

4       is actually a mew I think.  It's one of those

5       little, you know, Roman kind of --

6           Q.   Right.

7           A.   Or Greek letters; that is the symbol for

8       micro, so it's a microgram per liter.

Page 81

Bauer1

9      Q.   If I say five UG/L TCE in the

10    groundwater and you say five PPB in the

11    groundwater of TCE, are we talking about the same

12    thing?

13       A.   Approximately, yes.

14       Q.   Okay.  Do you know if that's the maximum

15    contaminant level of, level for TCE in

16    groundwater?

17       A.   Five micrograms per liter is the maximum

18    contaminant level for TCE.

19          It has no particular bearing on

20    groundwater.

21       Q.   Oh, okay, but that's the maximum

22    contaminant level for trichloroethylene?

91

1       A.   Yeah.  For maximum, right, that's

2    correct.

3       Q.   What does the maximum contaminant level

4    mean?

5       A.   It's a EPA established level that

6    applies to, applies at the drinking water tap,

7    and is a level that water purveyors with a

8    certain, of a certain size are required to have,

9    to monitor and to ensure that the water provided

10    to their customers is at or below that level.

11       Q.   Okay.  And so public water, public water

Bauer1

12    for the City of Washington can't have over five

13    UG/L of trichloroethylene in it?

14        A.    That's correct.

15        Q.    Okay.  The inactive sites, the Auburn

16    Road landfill, was that involving a plant or

17    facility run or owned by the company?

18        A.    No.

19        Q.    Was that a CERCLA site where the company

20    was alleged to have deposited materials?

21        A.    Again, one of, you know, one of many

22    potentially responsible parties, generators.

⬜

92

1        Q.    Does that site involve contaminated

2    groundwater?

3        A.    Yes.

4        Q.    Does that site involve groundwater

5    contaminated with volatile organic compounds?

6        A.    I don't recall the constituents of

7    concern there.

8        Q.    Okay.  How about the PGP landfill?

9        A.    Similar question?

10        Q.    Yeah.  Does that, is that a CERCLA site

11    where the company is alleged to have contributed

12    hazardous materials?

13        A.    This site at which, yes, the company is

14    alleged to have arranged for the disposal of

Bauer1

15    wastes there.

16        Q.   Is that a site where the company is

17    alleged to be the primary source of waste?

18        A.   No.

19        Q.   Okay.  Are any of the sites that we have

20    described so far that have not involved a

21    company-owned facility, have any of those sites

22    been sites in which the company is alleged to

⬚

93

1     have been the primary source of contamination?

2         A.   No.

3         Q.   Is the -- where is the Auburn Road

4     landfill?

5         A.   I don't recall.  I have to check.

6         Q.   Okay.  Where is the PGP landfill?

7         A.   It's in New Jersey.

8         Q.   Where at?

9         A.   North Jersey some place; I don't

10    remember the name of the town.

11        Q.   Hopefully my English teacher will never

12    watch this tape!

13            MR. LUCAS:  Can I object to the form of

14    the dangling preposition?!

15            Do you want me to object ever time you

16    dangle a preposition?

17            MR. STEWART:  Please no.  It would make

                    Page 84

Bauer1

18      the tape impossible to watch!

19          BY MR. STEWART:

20          Q.  Is this, the Saad Superfund site, was

21      the company alleged to have been the primary

22      source of materials deposited at that site?



0

                                        94



1           A.  I don't know.  Again, I wasn't really

2       involved in that site.

3           Q.  Okay.  Do you know whether or not that

4       site involved contamination of groundwater?

5           A.  No, I don't.

6           Q.  Okay.  Do you know what engineers were

7       involved with remediating that site?

8           A.  No, I do not.

9           Q.  Okay.  Do you know -- I take it that

10      site is not a site where the company owned a

11      plant or operation?

12          A.  That's correct.

13          Q.  Okay.  Do you receive reports on the

14      Ajax site on a monthly basis?

15          A.  No.

16          Q.  Do you receive reports on any of the

17      sites that we have discussed or that you have

18      listed as having administrative activities

19      ongoing or past on a monthly basis?

20          A.  Yes.

                        Page 85

Bauer1

21    Q.    What sites do you receive reports on?

22    A.    There are reports filed with the

95

1    Environmental Protection Agency at the, for the

2    Arrowhead Plating site and the Dickson site and

3    the Caldwell Trucking site, all in, on a monthly

4    basis, and I receive copies of those reports.

5        Q.    Okay.  How about the Watertown site?

6        A.    No.

7        Q.    Why are there no reports being filed at

8    Ajax, well, I don't want to put words in your

9    mouth.

10            What reporting is going on at the Ajax

11    Hardware facility?

12        A.    Semi-annual groundwater monitoring

13    report.

14        Q.    Okay.  And at the Watertown,

15    Connecticut, facility?

16        A.    Monitoring reports, and we are currently

17    working toward closure of that facility.

18            MR. LUCAS:  Excuse me.  We have got one

19    minute left on the tape according to the

20    videographer.

21            THE WITNESS:  Can we take a break?

22            MR. LUCAS:  Why don't we go ahead and

Bauer1

96

```
 1    take a short break?  And we'll resume with a new
 2    tape.
 3              THE VIDEO SPECIALIST:  Off record, end
 4    of Tape 1, and the time on screen is 11:26:52.
 5              (A recess was taken.)
 6              THE VIDEO SPECIALIST:  On record; this
 7    is Tape 2, and the time on screen is 11:45:36.
 8              BY MR. STEWART:
 9         Q.   Mr. Bauer, back on the record; I have a
10    few questions about these administrative actions.
11         A.   Yes, sir.
12         Q.   Do you know if the -- I don't know if we
13    tried to assign a date to the Ajax Hardware
14    facility.
15              Do you know when contamination was first
16    discovered there?
17         A.   Again, it was mid, mid-1980s.
18         Q.   Do you think it predated say the closure
19    of the Dickson plant?
20         A.   It's similar kind of timeframe.  I would
21    say perhaps.  You know, it's similar timeframe.
22         Q.   Okay.  How about the Watertown,
```

Bauer1

97

1   Connecticut, site?  Did that --
2       A.   I would have to check on the exact
3   dates; similar, similar timeframe.
4       Q.   Mid-'80s?
5       A.   Mid to late '80, yes.
6       Q.   That's for Watertown?
7       A.   Yeah.
8       Q.   Okay.  And how about the Arrowhead
9   Plating, which I notice is now, did you say
10  it's -- well, no.  I won't put words in your
11  mouth.
12          Do you know the date timeframe for the
13  discovery of contaminants at Arrowhead Plating?
14      A.   Again, closure there was in a similar
15  timeframe, mid-1980s.
16      Q.   I take it for all three of those sites,
17  could we look at, you know, I mean would you
18  assume there would be public, would you assume
19  there would be company records that would show,
20  you know, the first time that volatile organic
21  compounds were discovered in groundwater near
22  those sites?

98

Bauer1

1    A.   Yes.

2    Q.   Okay.  Have there been Phase 1 reports

3    of the sort performed or created for the Dickson

4    facility created relating to the Arrowhead

5    Plating facility?

6    A.   There have been investigation reports

7    not titled similarly, but with investigation

8    results.

9    Q.   So I could go to the EPA you think and

10   find an investigative report that would probably

11   tell me when the date was that you or that say

12   trichloroethylene was first discovered in the

13   groundwater at Arrowhead Plating?

14   A.   I would think so.

15   Q.   And the same would be true for the

16   Watertown, Connecticut, site?

17   A.   Yes.

18   Q.   And the same would be true for the Ajax?

19   A.   At Ajax, you would need to go to the

20   Regional Water Quality Control Board.

21   Q.   Okay.  And you probably have records of

22   that sort at your company for all three sites?

99

1    A.   Yes.  I have the investigation reports,

2    and to the extent that they document, you know,

3    initial findings, I have those.

Page 89

Bauer1

4      Q.    Okay.

5      A.    I may not have every report that was

6    filed certainly for some of these sites.

7      Q.    Okay.

8      A.    But --

9      Q.    Do you recall when trichloroethylene was

10   first found in groundwater at the Dickson site?

11     A.    That would be the first reported

12   incidence, reports of that were May 1988.

13     Q.    Okay.  What report are you referring to?

14     A.    The compliance -- what do they call it?

15   The CMI, the compliance management inspection

16   report that was prepared on behalf of U.S. EPA.

17     Q.    I'm going to hand Mr. Bauer first

18   through his attorney Exhibit 18 from the Brand

19   deposition, which I believe is the CMI report he

20   referred to without its appendices.

21          Is this the report you just referred to?

22          (The witness reviewed the document.)

100

1           THE WITNESS:  Yes.  Did I say it's the

2    compliance inspection and comprehensive

3    groundwater monitoring evaluation of the site

4    dated May 24th, 1988, but without, you know,

5    going through every page, I can't say whether

6    it's a complete copy or not, but yes, this is the

Page 90

Bauer1

7       report I was referring to.

8              BY MR. STEWART:

9       Q.   Okay.  And does it look complete to you?

10      A.   Do you want me to page through it and

11      like look at each page, or --

12      Q.   Do what you need to do.  Tell me --

13      we're on video, so we'll be able to see what you

14      did, and I don't think we'll hold it against you

15      if there is a missing page, but I would just like

16      you to tell me if it looks like a copy of the

17      complete report but without its appendices.

18             (The witness reviewed the document.)

19             THE WITNESS:  All the pages appear to be

20      here that are referenced in the Table of

21      Contents, including with the addition of the

22      references of appendices, as you mentioned, are

101

1       not included here.

2              BY MR. STEWART:

3       Q.   Okay.  So does it look like the report

4       itself that you have got in front of you is

5       complete?

6       A.   It appears to have all the pages that

7       are referenced, yes, except with the exception of

8       the appendices.

9       Q.   I understand.  Could you just turn to

Page 91

Bauer1

10    the Executive Summary?

11        A.    Um-hm.

12        Q.    And the second page of the Executive

13    Summary, do you see on item 3, the last sentence

14    says trichloroethylene concentration in the

15    groundwater downgrading of the sludge drawing

16    bed, open paren, W-3, comma, 15,000 UG/L, close

17    paren, is above the MCL limit for groundwater of

18    five UG/L, comma, which was promulgated on July

19    8th, 1987?

20            Do you see that?

21        A.    Yes.

22        Q.    Okay.  Is this one of the first findings

102

1    of the trichloroethylene in the groundwater at

2    the Dickson site that you were referring to when

3    I asked you for the first findings?

4        A.    This is the first finding that I'm aware

5    of of trichloroethylene in the groundwater at the

6    site.

7        Q.    Okay.  And that 15,000 UG/L figure, is

8    that the same measure of trichloroethylene as is,

9    as for the five UG/L limit that we discussed for

10    say public drinking water?

11        A.    Yes.

12        Q.    So just so we understand the relation,

Page 92

Bauer1

13    the 15,000 UG/L is, is that 3,000 times the limit

14    for public drinking water we discussed earlier?

15        A.    Fifteen thousand would be 3,000 times

16    the five micrograms per liter MCL.

17        Q.    That's the one promulgated by the

18    Environmental Protection Agency?

19        A.    Yes.  It was proposed in July '87, and I

20    don't believe it was final until 1989.

21        Q.    It was final in 1989, okay.  Do you, do

22    you see now in the fifth paragraph, I believe it

103

1    is the second from the last sentence where it

2    says trichloroethylene was identified in the

3    groundwater at 15,000 UG/L, comma, open paren,

4    W-11, in the soil at 27,000 UGKG, open paren,

5    SW-11A, close paren, in the vicinity of the

6    former storage tank?

7        A.    Yes.

8        Q.    Okay.  Again, is that the other or one

9    of the other first findings of trichloroethylene

10    in the groundwater at the Dickson facility?

11        A.    Referring to well W-11, yes, that's the

12    groundwater.

13        Q.    And the other reference to SW-11A,

14    that's a soil boring, right?

15        A.    That's, yes, that's correct.

Page 93

Q. So -- and I just wanted to -- actually I'm not going to take you through this document right now.

I just want to make sure when you refer to the first findings of trichloroethylene that we're talking about those findings in Wells 3 and Wells 11 in 1988.

A. Yes. That's what the document indicates. Those were the two wells that she mentioned.

Q. Did Scovill perform this test for trichloroethylene?

A. No.

Q. Okay. Who did?

A. This report was prepared by Camp, Dresser & McKee, prepared for the U.S. EPA.

Q. And that's the same Camp, Dresser & McKee that is the primary contractor working on the Puente Valley Operable Unit?

A. Actually this is CDM Federal Programs Corporation, which is a separate entity from Camp, Dresser & McKee.

They keep themself separate for conflict of interest reasons.

Q. I'm sure we could go to lunch just on

Bauer1

19    questions about that relationship, but I guess
20    Camp, Dresser & McKee, when they were conducting
21    the two well tests you just described, were they
22    working for the Environmental Protection Agency?

105

1        A.    Yes.
2        Q.    Okay.  And did they actually drill well
3    11?
4        A.    I would have to refer to the document to
5    confirm that.
6        Q.    See if you can do it quickly, you know.
7        A.    Okay.
8        Q.    I, actually I can't lead you there, so
9    if you think you know where in the document you
10    can determine that, that would be --
11              (The witness reviewed the document.)
12              BY MR. STEWART:
13        Q.    Perhaps it's in Section C.  I'm looking
14    at page 33.  That might be useful.
15        A.    Um-hm.
16              (The witness reviewed the document.)
17              THE WITNESS:  Yes.  Monitoring well W-11
18    was one of the wells installed by CDM Federal
19    Programs.
20              BY MR. STEWART:
21        Q.    Okay.  Was monitoring well W-3 installed

Page 95

Bauer1

22    by the company?

106

1       A.    That was a previously existing well
2    prior to this study that CDM performed.
3       Q.    Is that described on page 29, existing
4    well construction and location?
5       A.    Page 30 of the document, yes, the Wells
6    1 through 4 were installed during June 1982.
7       Q.    Okay.  So Well 3 where they found the,
8    where there was a report of 15,000 UG/L
9    trichloroethylene was a 1982 well?
10      A.    That's correct.
11      Q.    Okay.  Mr. Bauer, do you know why -- I
12   believe you testified that at the, at the Ajax
13   Hardware facility in the Watertown, Connecticut,
14   facility and the Arrowhead Plating facility, the
15   company tested for and found trichloroethylene in
16   the groundwater, but the company did not test for
17   trichloroethylene in groundwater on the Dickson
18   site until 1988?
19      A.    I think the timeframes were probably
20   similar at those other facilities, and it was in
21   those late '80s as companies became more aware of
22   potential for chlorinated solvents in particular

Page 96

Bauer1

107

1   to migrate and dissolve into groundwater.

2       Q.   But do you know why having drilled wells

3   at the Dickson facility as early as 1982, the

4   company did not test for trichloroethylene?

5       A.   The primary focus at that site -- again,

6   I was not actually present, as you're certainly

7   aware, but from reviewing the documents that I

8   have seen, the primary focus and concern at the

9   site related to the on-site disposal of the waste

10  water treatment plant material, the sludge from

11  the waste water treatment plant, and the on-site

12  landfill cells, and that waste material was

13  metals concern.

14          There wasn't any documentation of or

15  concern related to the use of trichloroethylene

16  at the facility.

17      Q.   What was done, just generally, what was

18  the operation at the Dickson facility?

19          What were they making?

20      A.   They were making tire valves and related

21  pneumatic kind of gauges and valves.

22      Q.   Was, could you characterize the process

108

Page 97

Bauer1

1    as a metal working process?

2        A.    Yes.

3        Q.    Okay.  The trichloroethylene was used to

4    what?

5        A.    To clean the metal parts prior to other

6    operations.

7        Q.    And what was the basic operation of the

8    Ajax Hardware facility?

9        A.    It was also metal working type of

10   facility.

11       Q.    And what was the trichloroethylene used

12   for?

13       A.    Also for cleaning purposes.

14       Q.    And what about the Watertown,

15   Connecticut, facility?

16             What was that facility?  Metal working.

17       A.    Yes.

18       Q.    And what was the trichloroethylene used

19   for?

20       A.    For cleaning purposes.

21       Q.    Okay.  And how about the Arrowhead

22   Plating facility?

109

1        A.    For cleaning purposes.

2        Q.    And that was a metal working facility?

Page 98

Bauer1

3       A.   Yes.  They -- yes.

4       Q.   Okay.  But just want to make clear, the

5   first awareness that, that the company had of

6   trichloroethylene poison -- excuse me -- the

7   first awareness that the company had of

8   trichloroethylene in the groundwater at the

9   Dickson facility came when the EPA did its own

10  investigation in 1988?

11      A.   That's correct.

12      Q.   The company had wells since 1982, is

13  that right?

14      A.   Yes.

15      Q.   Okay.  But it did not test for

16  trichloroethylene from 1982 until, until March I

17  guess 1988?

18          MR. LUCAS:  Objection.  Asked and

19  answered several times.

20          Answer once more.

21          BY MR. STEWART:

22      Q.   He is correct, but go ahead and answer.

⬚

110

1       A.   Could you restate the question, please?

2       Q.   I just want to make sure that the

3   company did not test for trichloroethylene in the

4   wells at the Dickson facility from 1982 until the

5   EPA came to the site in 1988.

Bauer1

6      A.   Based on my review of the documents,
7   that is correct, because trichloroethylene was
8   not viewed as a potential concern based on the
9   operations at the site.
10      Q.   Okay.  Is it fair to conclude that it
11   was a concern at the Ajax Hardware facility,
12   trichloroethylene?
13      A.   At the, at the time when that site
14   closure took place, the agencies there were, were
15   directed to sample for those materials, and --
16      Q.   And you did?
17      A.   And we did.
18      Q.   Okay.  And that's true for the -- it was
19   a concern at the Watertown, Connecticut,
20   facility?
21      A.   Whether it was a concern or not, again,
22   it was, it was sampled.

0

111

1      Q.   Okay.  And trichloroethylene was sampled
2   at the Arrowhead Plating facility?
3      A.   Yes, again, similar kind of timeframes,
4   in the mid-'80s.
5      Q.   Okay.
6      A.   And again, I can check with particular
7   dates on the closure of those facilities.
8      Q.   I understand.  Switch gears here and just

Bauer1

9     ask you about the company.

10            Now Saltire, the official name of the

11    company is Saltire Industrial, Inc., is that

12    right?

13        A.   Yes.  That's correct.

14        Q.   Go ahead.

15        A.   There is a comma between the Saltire

16    Industrial and the Inc., as I recall.

17        Q.   So it's Saltire Industrial, comma, Inc?

18        A.   Um-hm.

19        Q.   Okay.  Where is that company located?

20    Where is the headquarters?

21        A.   In New York.

22        Q.   Where in New York?

112

1         A.   In New York City.

2         Q.   Okay.  What's the address, do you know?

3         A.   800 Third Avenue.

4         Q.   Okay.  And who are the officers of the

5     company?

6         A.   Robert Bertellotti is the managing

7     director.

8         Q.   How do you spell that?

9         A.   B-E-R-T-E-L-L-O-T-T-I.

10        Q.   Okay.  And he is the?

11        A.   Managing director.

Page 101

Bauer1

12        Q.    Okay.  All right.

13        A.    Wayne Smith, senior vice president.

14        Q.    Okay.

15        A.    Chief Financial Officer and Chief

16    Financial Officer.

17        Q.    Okay.  He is CEO and CFO?

18        A.    No -- just CFO.

19        Q.    Chief Financial Officer?

20        A.    Yes.

21        Q.    Okay.

22        A.    And myself, Nicholas Bauer, vice

113

1     president, environmental affairs.

2         Q.    Who is the president?

3         A.    We do not have a president.

4         Q.    Who is the secretary?

5         A.    I don't believe we actually have a

6     corporate secretary as an officer.

7         Q.    Who is the treasurer?

8         A.    Not as a corporate officer, so it's --

9         Q.    Okay.  So you have listed for me all the

10    people you think are corporate officers?

11        A.    That's correct.

12        Q.    Do you know where Saltire Industrial

13    Corporation is incorporated?

14        A.    Delaware.

Page 102

Bauer1

15          Q.   Do you know how many employees Saltire

16   Industrial has?

17          A.   Yes.

18          Q.   How many?

19          A.   Zero.

20          Q.   Zero employees?

21          A.   Yes.

22          Q.   Are you not an employee of Saltire

114

1    Industrial?

2           A.   No, I am not an employee of Saltire

3    Industrial.

4           Q.   Okay.  We'll come back to that, but do

5    you know in what state, if any, Saltire

6    Industrial files tax, state tax returns?

7           A.   No.  I'm not aware.

8           Q.   Would Mr. Smith be the person who would

9    be responsible for tax returns in that company?

10          A.   He would know, yes.

11          Q.   Okay.  Do you know what accounting firm

12   does Saltire Industrial's audit every year?

13          A.   No, I do not.  I'm not sure.

14          Q.   Okay.  Do you know the names of any

15   outside accountants of that firm?

16          A.   No.

17          Q.   Okay.  Do you know if Saltire

Page 103

Bauer1

18    Industrial, do you know what its revenues were

19    last year?

20            MR. LUCAS:  Objection.  What's the

21    relevance of that to anything?

22            And I understand the scope of discovery

115

1     and relevance, but I think you're getting into an

2     area dealing with potential post-judgment

3     remedies.  It's inappropriate for discovery.

4             MR. STEWART:  I believe that in our

5     state, I think you'll agree that our court has

6     been very precise about defining what is relevant

7     with regard to insurance information, and we have

8     had some recent decisions about that.

9             I think you would also agree that I'm

10    entitled to get a pretty good sense of the nature

11    of these companies.

12            However, let me just continue

13    questioning and you can pose your objections and

14    see how we proceed.

15            MR. LUCAS:  To make sure we're on the

16    same wavelength, I take it from your comments

17    we're in agreement that insurance information is

18    not discoverable?

19            MR. STEWART:  Other than that that

20    because of the environmental laws has been

Bauer1

21    disclosed by you in discovery by your clients;

22    this is an unusual case obviously in which

□

116

1    certain insurance information is public as

2    opposed to a typical case where it's

3    confidential.

4        MR. LUCAS:  And I do agree with you

5    you're entitled to certain background information

6    on the companies, and I don't wish to object to

7    your asking questions on that type of general

8    information, but you understand where I'm coming

9    from on the objection.

10       MR. STEWART:  Yes.

11       BY MR. STEWART:

12    Q.    Mr. Bauer, who are the board members for

13    Saltire Industrial?

14    A.    I don't know.

15    Q.    Okay.  Who would know?

16    A.    I can't say for certain, but I think Mr.

17    Smith would.

18    Q.    Okay.  Do you know who owns the stock of

19    Saltire Industrial?

20    A.    No, I do not.

21    Q.    Are you, do you know if Saltire

22    Industrial is a subsidiary of another company?

Page 105

Bauer1

117

1      A.   Yes.  It's the subsidiary of Alper
2  Holdings.
3      Q.   That's Alper Holdings, Inc?
4      A.   Alper Holdings, USA.
5      Q.   Okay.
6      A.   Like capital U capital S capital A,
7  comma, Inc.
8      Q.   Okay.  And do you know if Saltire
9  Industrial owns any plants in the United States?
10     A.   Does not.
11     Q.   Do you know if Saltire Industrial makes
12  sales in the United States?
13     A.   Does not.
14     Q.   Do you know if Saltire Industrial owns
15  real estate in the United States?
16     A.   The company owns one parcel of land in
17  Dickson County, Tennessee.
18     Q.   That's quite a portfolio.  Is that the
19  only real estate you know that the company owns?
20     A.   Yes.
21     Q.   Do you know when the last board meeting
22  of Saltire Industrial was conducted?

Bauer1

118

```
 1        A.   No, I do not.
 2        Q.   Okay.  Do you know, well, do you know
 3   how much of your time personally you devote to
 4   Saltire Industrial activities?
 5        A.   Essentially a hundred percent.
 6        Q.   Okay.
 7        A.   Maybe, you know.
 8        Q.   Do you work in the office at 800 Third
 9   Avenue, New York City?
10        A.   No, I do not.
11        Q.   Where do you work?
12        A.   I work in Reston, Virginia.
13        Q.   And how many people are in your offices
14   in Reston?
15        A.   Just myself.
16        Q.   And do you know how much time Mr. Smith
17   devotes to Saltire Industrial operations?
18        A.   No, I don't.
19        Q.   Is it your impression that he is a
20   full-time employee of Saltire?
21             Well, I guess not.  Strike that.  Is it
22   your impression that he devotes most of his time
```

119

Page 107

Bauer1

1    to Saltire Industrial, Inc. Activities?

2         A.   I don't know how his time is divided.

3         Q.   How often do you meet with Wayne Smith,

4    if ever?

5         A.   Approximately once a quarter.

6         Q.   Okay.  How often do you talk to him on

7    the telephone?

8         A.   Weekly.

9         Q.   Okay.  Does Mr. Smith receive copies of

10   your correspondence?

11        A.   Not routinely.

12        Q.   Okay.  Does Mr. Smith receive copies of

13   correspondence that you have, if any, with

14   federal and state agencies?

15        A.   Not routinely.

16        Q.   Okay.  You say not routinely.  Would Mr.

17   Smith receive say a copy of the final RFI report

18   whenever it's finalized?

19        A.   Probably not unless he specifically

20   requested it.

21        Q.   Okay.  Is there any person that under

22   your current procedures, you would forward a copy

120

1    of drafts or the final RFI to?

2         A.   Within our company?

3         Q.   Anyone.

Page 108

Bauer1

4      A.   No.

5      Q.   Okay.  So not within or without your

6   company?

7      A.   Outside of counsel, no.

8      Q.   Okay.  Do you know how much time Mr.

9   Bertellotti devotes to Saltire Industrial

10   activities?

11      A.   No, I do not.

12      Q.   Okay.  Do you believe he works, devotes

13   half his time to the company?

14      A.   I couldn't speculate.

15      Q.   Okay.  How often do you meet with Mr.

16   Bertellotti?

17      A.   Approximately once a quarter.

18      Q.   Do you, Mr. Smith and Mr. Bertellotti

19   get together once a quarter?

20           Do you have quarterly meetings?  Is

21   that --

22      A.   Not regularly scheduled, but I provide

121

1   them with an update of the environmental matters

2   specifically, and that usually works out to be

3   approximately once a quarter.

4      Q.   But the meetings you're referring to are

5   you, Mr. Smith and Mr. Bertellotti all together?

6      A.   Although sometimes it might be just with

Page 109

Bauer1

7    Mr. Smith.

8        Q.    I understand.  How often do you speak on

9    the phone with Mr. Bertellotti do you suppose?

10       A.    Perhaps once every couple of weeks.

11       Q.    Who are the primary decision-maker with

12   regard to environmental activities and activities

13   related to the Dickson site in Saltire

14   Industrial?

15            MR. LUCAS:  Sorry.  I couldn't hear what

16   you were saying.

17            BY MR. STEWART:

18       Q.    Who in Saltire Industrial, Mr. Bauer, is

19   the primary decision-maker that makes decisions

20   about the Dickson site?

21       A.    Routine matters, technical matters,

22   typically I will make those decisions.

122

1            If there's something that I feel needs

2    to be addressed at a higher level, I will consult

3    Mr. Smith and Mr. Bertellotti about those kind of

4    matters, and receive direction from them.

5        Q.    Okay.  Do you know when -- okay.  Do you

6    know when Saltire Industrial came into being?

7        A.    Nineteen ninety-four I believe was the

8    name change.

9        Q.    You call it a name change.  Tell me

Page 110

Bauer1

10    about that.

11                    It was a name change from what to what?

12        A.    From Scovill, Inc. of Delaware to

13    Saltire Industrial, Inc.

14        Q.    And so that's why we're calling the

15    company Saltire and Scovill and its predecessors

16    because am I hearing you right that essentially

17    the name of Scovill was changed and it became

18    Saltire Industrial?

19        A.    That's correct.

20        Q.    Okay.  Do you know if, when that

21    occurred, or do you know if Saltire Industrial,

22    Inc. has maintained the liabilities relating to

□

                                                123

1     the Dickson plant?

2         A.    Certain liabilities relating to the

3     environmental issues at the Dickson plant I

4     believe were retained by Saltire Industrial.

5         Q.    Okay.  Can you tell me what liabilities

6     would not have been retained and when?

7         A.    Yeah.  I'm not familiar with the

8     transactional documents that, you know, would

9     have specifically outlined, you know, the limits

10    or the scope of the liabilities assumed or

11    retained by Saltire.

12        Q.    But it's, I just want to make sure is

Bauer1

13    what you just said that it is, your understanding

14    is that Saltire did retain the liabilities with

15    regard to the Dickson plant environmental

16    matters?

17         MR. LUCAS:  Wait.  Wait.  Repeat -- you

18    kind of trailed off with the last part.

19         I think I have got an objection to the

20    form of the question, but I want to make sure.

21         BY MR. STEWART:

22    Q.   Okay.  I mean I just want to understand

124

1    that what you just said is that, that Saltire

2    Industrial, Inc. has maintained responsibility

3    for the Scovill, Inc. liabilities with regard to

4    the Dickson site?

5         MR. LUCAS:  I'm going to --

6         MR. STEWART:  I would like you to tell

7    me your objection because I actually want to get

8    a clear response.

9         MR. LUCAS:  I think you changed it, and

10    I was going to object.  I was covering that.

11    Could you hear me?

12         I was going to object to a lack of

13    foundation, but I think you have cured it in the

14    way you phrased it.

15         If you don't mind, just state it again

Bauer1

16    so we have got a clear understanding.

17            BY MR. STEWART:

18        Q.    I just want to make sure, Mr. Bauer,

19    what you're testifying to is that, is that

20    Saltire Industrial, Inc. has retained

21    responsibility for the Scovill, Inc. liabilities

22    relating to the Dickson plant?

125

1            MR. LUCAS:  Do you mind, just to cure my

2    foundation objection, phrasing that liabilities,

3    if any, relating to the Scovill plant?

4            BY MR. STEWART:

5        Q.    If any.

6            MR. LUCAS:    Thank you.

7            THE WITNESS:  The company, that is,

8    Saltire Industrial is, is and has been performing

9    the environmental investigation and remediation

10    activities at the site under the direction of

11    U.S. EPA.

12            BY MR. STEWART:

13        Q.    And I take it are you telling me that

14    you don't know of any liabilities that some other

15    entity has taken on with regard to the

16    environmental issues relating to the Dickson

17    site?

18        A.    That's correct.

Page 113

Bauer1

19     Q.    Okay.  Who do you work for, Mr. Bauer?

20     A.    You mean who do I report to?

21     Q.    No.  Who are you?  You told me you were

22   not an employee of Saltire Industrial, Inc.,

126

1    right?

2          A.    Right.

3          Q.    Okay.  Well, who are you an employee of?

4          A.    I'm actually an employee of Alper

5    Holdings, USA, Inc.

6          Q.    Okay.

7                MR. LUCAS:  Mike, our lunch is here.  I

8    don't want to interrupt you if you're right in

9    the middle of a thought, but when you get to a

10   breaking point, we would like to break for lunch.

11               MR. STEWART:  I think it's fine.  I

12   think we're here.

13               BY MR. STEWART:

14         Q.    Okay.  Alper Holdings?

15         A.    Yes.

16               THE VIDEO SPECIALIST:  Off record, and

17   the time on the screen is 12:21:58.

18               (Whereupon, at approximately 12:20

19   o'clock, p.m., the deposition was recessed, to

20   reconvene 1:15 p.m. the same day.)

21                       *   *   *   *   *

Page 114

Bauer1

22

127

```
 1              AFTERNOON SESSION
 2                  (1:23 p.m.)
 3         THE VIDEO SPECIALIST:  On the record,
 4   and the time on screen is 13:23:02.
 5         EXAMINATION BY COUNSEL FOR THE
 6         PLAINTIFFS  (Resumed)
 7         BY MR. STEWART:
 8         Q.   Mr. Bauer, we're back on record.  Before
 9   we talk about Alper Holdings, Inc., I wanted to
10   ask you just do you know whether Saltire
11   Industrial, Inc. has any subsidiaries?
12         A.   I don't believe that it has any
13   subsidiaries.
14         Q.   Okay.  Who would be the person that, in
15   the company with the best knowledge of that, do
16   you know?
17         A.   Mr. Smith probably could answer that
18   question definitively.
19         Q.   Okay.  What is it that Saltire
20   Industrial does?
21         A.   Saltire Industrial had a subsidiary, a
22   ink, water based primarily, well, packaging inc
```

Bauer1

128

1       manufacturing company called Alper Ink Group, and
2       that was its primarily subsidiary and operations.
3              That group was sold last year, so you
4       know, currently Saltire is a company in
5       transition.
6          Q.   Does it have then liabilities other than
7       the Dickson liabilities you have discussed?
8          A.   Yes.
9          Q.   What are those?  Are they relevant to
10      this litigation?
11             MR. LUCAS:  Objection to the form.
12             THE WITNESS:  I don't know whether they
13      are.
14             BY MR. STEWART:
15         Q.   Okay.  I asked you, and you're
16      answering.  I didn't mean to interfere.
17             What other liabilities does it have?
18         A.   The company has other environmental
19      liabilities.
20             Their company also has pension and death
21      benefit liabilities.
22         Q.   Any others that you know of?

129

Page 116

Bauer1

1       A.   No.

2       Q.   Does Saltire Industrial, Inc. have all

3    of the liabilities, if any, relating to those

4    administrative clean-up actions you have

5    described for me today?

6       A.   I mean to the extent, relative to --

7       Q.   To the extent activities by Scovill,

8    Inc. and its related entities created

9    environmental liabilities for those sites that

10   you listed earlier today, when I asked you about

11   administrative sites, are those liabilities

12   currently embraced by Saltire Industrial, Inc?

13      A.   Yes.

14      Q.   Okay.  And do you know of any, if any of

15   those liabilities for the Dickson or sore any

16   other site were ever assumed by any other company

17   in part?

18          MR. LUCAS:  Object to the form of the

19   question, and the foundation.

20          BY MR. STEWART:

21      Q.   Okay.  Let me rephrase.  Well, you know,

22   to the extent any liabilities exist relating to

130

1    those environmental matters, including Dickson,

2    do you know of any other company that has ever

Bauer1

3    assumed responsibility for any of those

4    liabilities?

5        A.    Well, for example, at the Dickson

6    facility, to the extent that environmental issues

7    might arise from releases or activities

8    subsequent to the sale of the property to the

9    current owner, the current owner would be

10   responsible for responding and addressing those

11   conditions.

12        So there may be some, you know,

13   exceptions along those lines.

14       Q.    But for Scovill's activities and the

15   Schrader division's activities, those liabilities

16   lie with Saltire Industrial, Inc?

17       A.    For the sites that we're talking about.

18       Q.    Including Dickson?

19       A.    Yes.

20       Q.    Okay.  The purchaser of the plant in

21   Dickson, is that Tennco, Inc?

22       A.    Tennsco, yes.

131

1        Q.    Tennsco; and did they, do you know

2    whether they have liabilities, do you know

3    whether as part of buying the plant, they assumed

4    liabilities for contamination that existed at the

5    time they purchased the plant?

Bauer1

6      A.    I'm not familiar with the details of

7      those transactional documents.

8            My understanding personally is, my

9      personal understanding of the situation is that

10     for the situation at the time of the, at the

11     sale, that they did not take on any liabilities

12     for conditions at the time of the sale.

13     Q.    So were you, in discussing Tennsco's

14     potential liability, were you referring to or

15     thinking of a scenario where Tennsco could

16     itself, through its own operations might create

17     environmental liabilities?

18     A.    Yes.    Correct.

19     Q.    Okay.    And your point was that obviously

20     they would be liable for their own actions?

21     A.    Yes.

22     Q.    Okay.    Alper Holdings, you work for

132

1      them, is that right?

2      A.    That's correct.    I'm an employee of

3      Alper Holdings USA, Inc.

4      Q.    Do you know where that company is

5      incorporated?

6      A.    I do not recall.

7      Q.    Is that company a subsidiary of another

8      company?

Page 119

Bauer1

9      A.   No.

10      Q.   That you know of -- okay.  Is there an

11   Alper Holdings that is not USA?

12      A.   No.

13      Q.   Okay.

14      A.   Well, I'm not aware of any.

15      Q.   Is Alper Holdings USA, Inc. a publicly

16   traded company?

17      A.   No.

18      Q.   Do you know whether Alper Holdings USA,

19   Inc. is owned by a single stockholder?

20      A.   I'm not aware.  I don't know the

21   identity or the, anything about the stockholder

22   or holders of the company.

☐

133

1      Q.   Okay.  Do you know who the president of

2   Alper Holdings, Inc. is?

3      A.   There isn't a, anybody of that title.

4      Q.   Okay.  Well, who is the top dog at Alper

5   Holdings in your mind?

6      A.   The.

7          MR. LUCAS:  I'm trying to visualize the

8   top dog in his mind.

9          MR. STEWART:  Going back to the English

10   teacher.

11          THE WITNESS:  The managing director for
                              Page 120

Bauer1

12    Alper Holdings is also Mr. Bertellotti.

13              BY MR. STEWART:

14        Q.    Okay.  Who are the other officers?

15        A.    Mr. Smith.

16        Q.    Um-hm.  What is he?

17        A.    He's the senior vice president, Chief

18    Financial Officer.

19        Q.    Okay.

20        A.    And myself, Nicholas Bauer.

21        Q.    And you are?

22        A.    Vice president, environmental affairs.

134

1         Q.    Where is Alper Holdings USA

2    headquartered?

3         A.    Also in New York City.

4         Q.    Same address?

5         A.    Same address, yes.

6         Q.    And does Alper Holdings USA, Inc. have

7    any employees?

8         A.    Yes.

9         Q.    Who are they?

10        A.    In addition to -- you want the names of

11    the individual employees?

12        Q.    Well, why don't you tell me how many

13    there are first?

14        A.    Nine.

Page 121

Bauer1

15        Q.   Okay.  Are they all in the New York
16   office?
17        A.   No.
18        Q.   Do any of them work on environmental
19   matters?
20        A.   Not specifically, no.
21        Q.   Do any of them work for you?
22        A.   No.


0

135


1        Q.   Do any of them work in your office?
2        A.   No.
3        Q.   Okay.  Where are the locations of the
4   employees that don't work in New York?
5        A.   Other than myself, there are two
6   employees that work at an office in Connecticut.
7             I don't know the location of that
8   office.  I have never been there.
9        Q.   Is that related to environmental
10   activities in Connecticut?
11        A.   No.
12        Q.   Okay.  Does Alper Holdings hold any
13   subsidiaries other than Scovill or Saltire
14   Industrial, Inc. that you know of?
15        A.   I'm not, I'm not certain of the answer
16   to that question.
17             I manage the environmental issues for,

Page 122

Bauer1

18    you know, related to the work at Saltire, and you

19    know, the corporate structure of Alper, I'm not

20    certain of.

21         Q.   Do you know the names of any board

22    members of Alper?

136

1         A.   No, I do not.

2         Q.   Do you know the name of any stockholder

3    in Alper?

4         A.   No, I do not.

5         Q.   I take it you're not one?

6         A.   No.  That's correct.  I'm not a

7    stockholder.

8         Q.   Does Alper Industries, Inc. have any

9    relationship that you know of in terms of

10    ownership with IT Corporation?

11              MR. PERRY:  Mike, you'll need to speak

12    up.

13              BY MR. STEWART:

14         Q.   Certainly.  Do you know if Alper

15    Holdings, Inc. has any relationship in terms of

16    stock ownership or other type ownership with IT

17    Corporation?

18         A.   I don't believe so.

19         Q.   Do you know whether it has any, had any

20    relationship with ICF Kaiser, Inc?

Page 123

Bauer1

21    A.    I don't believe so.

22    Q.    Do you know if Saltire Industrial, Inc.

137

1    has an ownership relationship with either IT or

2    ICF Kaiser?

3         A.    No.  No, sir.

4         Q.    Okay.

5              MR. LUCAS:  Excuse me one minute.  When

6    you asked earlier -- you just asked if they had a

7    relationship, and I assume you meant in that

8    question ownership relationship?

9              MR. STEWART:  Yes.

10             BY MR. STEWART:

11        Q.    When I say relationship with regard to

12   the engineering firms IT and ICF Kaiser, I'm just

13   trying to make sure that your understanding is

14   that there is no relationship other than one of

15   company and contractor between those companies.

16        A.    Between Alper Holdings USA and IT and

17   ICF Kaiser, yes, that's correct.

18        Q.    Okay.  And the same is true for Saltire

19   Industrial, Inc?

20        A.    Yes.

21        Q.    Okay.  Well, does Alper Holding operate

22   any plants in the United States?

Page 124

Bauer1

138

```
 1        A.    No, sir.
 2        Q.    Does it operate any plants anywhere?
 3        A.    No.
 4        Q.    Does it own real property?
 5        A.    I don't believe so.
 6        Q.    Does it sell anything?
 7        A.    No.
 8        Q.    Do you know if it doesn't sell anything,
 9   how it pays your salary?
10        A.    The company does have or either between
11   Alper Holdings and Saltire, you know, Saltire I
12   believe has some assets.
13        Q.    What are they?
14        A.    I'm -- not, I don't know.
15        Q.    Okay.  Who would know?
16        A.    Mr. Smith deals obviously as the Chief
17   Financial Officer with the financial matters of
18   the company.
19        Q.    Has Saltire Industrial, Inc. that you
20   know of ever been unable to conduct any
21   environmental work requested by a state or
22   government agency because it was financially
```

Bauer1

139

1      unable to do so?

2          A.   Not to my knowledge, no.

3          Q.   Have you ever been constrained in your

4      oversight of environmental activities because of

5      financial constraints of the company?

6          A.   Like any company, there are limited

7      resources, and so that's an issue that is, you

8      know, considered in decision-making processes, so

9      it's, it's, you know, it's a consideration

10     certainly.

11         Q.   Do you have a budget annually?

12         A.   Meaning a figure that I'm not supposed

13     to exceed for --

14         Q.   Yes?

15         A.   That year -- not specifically, no.

16         Q.   Do you make targets of your expenditures

17     for a given year?

18         A.   I make projections of my expenditures.

19         Q.   Do those projections include payments to

20     engineering firms conducting work for your

21     company?

22         A.   Yes.

140

Bauer1

1      Q.   So like payments to ICF Kaiser or I'll
2    say -- strike that -- payments to IT Corporation
3    for activities on the Dickson site would be made,
4    approved by you in part of your projections?
5      A.   Correct.
6      Q.   Okay?
7      A.   Yes, sir.
8      Q.   What are your projected expenditures for
9    environmental services for -- strike that.
10         What have you projected for your
11   expenditures for environmental compliance matters
12   this year?
13         MR. LUCAS:  Wait.  Can you tie that into
14   relevancy of something in this lawsuit so that we
15   don't tread on forbidden ground?
16         MR. STEWART:  Yes.  I understand -- I
17   mean the relevancy is two-fold.
18         First, it goes obviously -- well, I'll
19   ask about the Dickson site where relevancy is
20   obvious.
21         I think it's important for this lawsuit
22   for us to understand the extent of Saltire

141

1    Industrial's ongoing environmental compliance,
2    and I'll tell you I don't intend to follow up
3    with this question on the whole series of

Page 127

Bauer1

 4    asset-based questions, but merely if I can get a

 5    number here, I think that will solve my problem.

 6            MR. LUCAS:  Give me a break then to talk

 7    with him about that.

 8            MR. STEWART:  That's fine.

 9            MR. LUCAS:  And then we'll be right back

10            THE VIDEO SPECIALIST:  Off record, and

11    the time on screen is 13:39:48.

12            (A recess was taken.)

13            THE VIDEO SPECIALIST:  On record, and

14    the time on screen is 13:48:08.

15            MR. LUCAS:   I think we resolved my

16    concern based on what I understood your question

17    to be, and let me try to say it to make sure I do

18    understand.

19            Your question is does he have a

20    projection for what it would cost for the coming

21    year for investigation or for possible

22    investigation and remediation at this site?

                                                    142

 1            MR. STEWART:  Mine was for all sites.

 2            MR. LUCAS:  I thought you had limited to

 3    this site.

 4            MR. STEWART:  Well, that was my next

 5    question.

 6            MR. LUCAS:  Can we limit it to this site

                            Page 128

                                   Bauer1
7    since this is the subject of the litigation?

8            MR. STEWART:  Yes.  I tell you, yes.

9    That's fine.

10           THE WITNESS:  So I'm sorry -- one more

11   time.

12           BY MR. STEWART:

13       Q.   For Dickson?

14       A.   The question?

15       Q.   For the Dickson site, what is your

16   projection for remediation costs, investigation

17   costs?

18       A.   For the coming year?

19       Q.   Yes.

20       A.   I am not -- I don't recall specifically.

21   It's on the order of a few hundred thousand

22   dollars, say approximately $500,000.


                                                   143


1        Q.   Okay.  What were your actual costs last

2    year on that site?

3        A.   I would have to go back and look.  I

4    really don't know.

5        Q.   Would they have been over a hundred

6    thousand dollars?

7        A.   Yes.

8        Q.   Would they be in this same range of your

9    projected costs?  I'm not holding you --

                        Page 129

**TAB 8**

LEXSEE



Positive
As of: Jun 10, 2008

UNITED STATES OF AMERICA, Plaintiff, v. HELEN KRAMER, et al., Defendant. STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff, v. ALMO ANTI-POLLUTION SERVICES CORP., et al., Defendants.

Civil Action No. 89-4340 (JBS), Civil Action No. 89-4380 (JBS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

19 F. Supp. 2d 273; 1998 U.S. Dist. LEXIS 14183; 47 ERC (BNA) 1645; 29 ELR 20294

September 3, 1998, Decided
September 3, 1998, Original Filed

**SUBSEQUENT HISTORY:**   As Corrected September 21, 1998.

**DISPOSITION:**   [**1] Federal Consent Decree, the State Consent Decree, and the State Natural Resource Damages Consent Decree, approved and entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs United States and the New Jersey Department of Environmental Protection (the governments) filed a hazardous waste action, pursuant to CERCLA, 42 U.S.C.S. § 9601 et seq., and the New Jersey Spill Compensation and Control Act, N.J. Stat. Ann. § 58:10-23.11 et seq., against defendants landfill and numerous companies. The governments requested approval of federal and state consent decrees resolving all direct claims against defendants.

**OVERVIEW:** In connection with remedying conditions at a superfund site, plaintiffs United States and the State of New Jersey Department of Environmental Protection (the governments), filed motions for entry of federal and state consent decrees resolving all direct claims against defendants landfill and numerous companies arising under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.S. § 9601, et seq., and the New Jersey Spill Compensation and Control Act, N.J. Stat. Ann. § 58:10-23.11, et seq.,

(the Spill Act). The proposed decrees were published and no comments were received. While the decrees were under consideration, one third-party defendant company objected, arguing that more discovery was needed before the court could undertake CERCLA's fairness determination. The court, after considering the statutory requirements and the overwhelming evidence that sufficient discovery and negotiations occurred between the parties, held that the procedural and substantive requirements of CERCLA and the Spill Act were satisfied by the circumstances, and that the consent decrees were reasonable for all parties involved, including nonsettlors.

**OUTCOME:** The court approved and entered the proposed federal consent decree, state consent decree, and state natural resource damages consent decree.

**CORE TERMS:** settlement, consent decrees, site, settlement process, settling, protocol, settling parties, environmental, landfill, equitable, decree, non-settlor, negotiation, natural resource, reasonableness, remedial, discovery, liaison, hazardous, allocated, proposed settlements, bargaining, assigned, wetlands, global, de minimis, responsible parties, remediation, negotiated, paying

**LexisNexis(R) Headnotes**

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN1]A court should approve entry of a consent decree when it is satisfied that the decree is fair, reasonable, and consistent with the Constitution and the mandate of law. The standard to be applied is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objective of the governing statute.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN2]A court's task is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of the liability approximately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolution.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
*Environmental Law > Litigation & Administrative Proceedings > Consent Decrees*
[HN3]The policy favoring settlement, articulated in CERCLA, is especially strong where a consent decree has been negotiated by the Department of Justice on behalf of the EPA. The quality of the negotiators on behalf of the settlement process participants is likewise notable where a crew of sophisticated players, with sharply conflicting interests, sit at the table representing so may affected parties, themselves knowledgeable.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN4]Disclosure and judicial analysis of the individual participants' shares is irrelevant where the proposed global settlement is not colored by individual party characteristics, such as inability to pay or severability of harm of particular settlors.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*

*Environmental Law > Litigation & Administrative Proceedings > Consent Decrees*
[HN5]Settling parties need not include in the consent decrees their individual monetary settlement shares, their bases of settlement allocation, or their individual proportions of site liability as determined by the settlement process among potentially responsible parties. It is sufficient that the terms, rationales, and bases of the consent decrees have been disclosed on a groupwide basis including all settling parties, from which the court may determine whether the group's proposed settlement is fair, reasonable, and faithful to CERCLA.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
*Torts > Negligence > Defenses > Comparative Negligence > General Overview*
[HN6]Substantive fairness goes to the fairness of the result, and requires that the settlement terms are based upon and roughly correlated with some acceptable measure of comparative fault. This requires the government to demonstrate a plausible explanation for measuring comparative fault and allocating liability in the amount set forth in the consent decree. Substantive fairness includes the concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > Enforcement > General Overview*
*Environmental Law > Litigation & Administrative Proceedings > Consent Decrees*
[HN7]Where a settlement is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice, a presumption of validity attaches to that agreement.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
*Environmental Law > Litigation & Administrative Proceedings > Consent Decrees*
[HN8]The court is also required to consider whether the consent decrees are fair to nonsettlors.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN9]CERCLA imposes joint and several liability for all response costs only upon direct defendants in § 107(a) claims.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > Enforcement > Contribution Actions > Elements*
*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > Enforcement > Contribution Actions > Settlements*
*Torts > Negligence > Defenses > Comparative Negligence > Multiple Parties > Contribution*
[HN10]All nonsettlors will occupy the position of a contribution defendant upon the claims for contribution brought on behalf of the offerors group of settling defendants, pursuant to § 113(f)(1) of CERCLA. The liability of contribution defendants under § 113(f) may be several, but it may not be joint. As a contribution defendant, a non-settlor's liability must first be proved by the contribution plaintiffs, and, if liable, then a suitable allocation of the non-settlor's share must be determined taking into account such equitable factors as the court deems appropriate under CERCLA § 113(f)(1), applying federal common law including the factors reasonably calculated to assess the non-settlor's proportionate fault. It has also been determined that contribution defendants which are found liable may be called upon to bear an equitable share of the "orphan share" of past and future remedial and response costs in this case.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN11]Section 113(g)(2) of CERCLA permits the United States to commence a subsequent action against new defendants until three years following the completion of all response action at the site.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN12]A district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculation. To ascertain reasonableness, the court must make an independent determination of the technical adequacy of the work to be performed in cleansing and protecting the environment, whether the compensation to the public for response costs is satisfactory, and the risks and delays inherent in continuing the litigation.

*Environmental Law > Hazardous Wastes & Toxic Substances > CERCLA & Superfund > General Overview*
[HN13]Allegations that the United States' costs were unreasonable and excessive did not provide a defense to cost recovery.

**COUNSEL:** Deborah M. Reyber, Esq., Senior Attorney, U.S. Department of Justice, Washington, DC, FOR UNITED STATES OF AMERICA, Plaintiff.

Beverly Kolenberg, Esq., Assistant Regional Counsel, U.S.Environmental Protection Agency, Office of Regional Counsel, New York, NY, FOR UNITED STATES OF AMERICA, Plaintiff.

Emerald Erickson Kuepper, Esq., Deputy Attorney General, State of New Jersey, Dept. of Law & Public Safety, William Brown, Esq., Dept. of Law & Public Safety, Trenton, New Jersey, FOR THE STATE OF NEW JERSEY, Plaintiff.

James L. McKenna, Esq., Cherry Hill, NJ, for LIAISON COUNSEL FOR PARTIES WHO SETTLED WITH DIRECT DEFENDANT "OFFERORS" GROUP AND WHO ARE RECEIVING INDEMNIFICATION.

John F. Strazzullo, Esq., Pennsauken, NJ, for G.& S., Co., G&S, Inc.

Franklin J. Riesenburger, Esq., Riesenburger & Kizner, Vineland, New Jersey, FOR THIRD-PARTY PLAINTIFFS GROUP.

Glenn A. Harris, Esq., Levin & Hluchan, Voorhees, NJ, for Direct Defendant.

Joseph A. Manfredi, Esq., Connelly & Manfredi, L.L.C., Bedminster, NJ, for A.J. Mitchell, DIRECT [**2] DEFENDANT.

Barbara Hopkinson Kelly, Esq., Eric L. Probst, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, NJ, for Almo Anti-Pollution Services Corp., Chemlime Manor Care, Portfolio One, DIRECT DEFENDANTS.

Joseph V. Karaganis, Esq., A. Bruce White, Esq., Karaganis & White, Ltd., Chicago, Illinois, for American National Can Company, DIRECT DEFENDANT.

Glenn Harris, Esq., Levin & Hluchan, Voorhees, NJ, for Elf Atochem North America, Inc., DIRECT DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Philip J. Katauskas, Esq., Pepper, Hamilton & Scheetz, Philadelphia, PA, for Bechtel Power Corporation, DIRECT DEFENDANT.

Christopher Gibson, Esq., Archer & Greiner, Haddonfield, NJ, for Bridgestone/Firestone Corporation, Morton International, Inc., DIRECT DEFENDANTS.

Lois Godfrey Wye, Willkie Farr Gallagher, Washington, DC, for Chemical Leaman Tank Lines, Inc., DIRECT DEFENDANT.

Gregory J. Castano, Esq., Patricia M. Forsythe, Esq., Waters, McPherson & McNeill Meadowlands Office, Secaucus, NJ, for Continental Can Company, DIRECT DEFENDANT.

William H. Hyatt, Jr., Esq., David W. Payne, Esq., Pitney, Hardin, Kipp & Szuch, Morristown, New Jersey, for Cytec, E.I. du Pont de Nemours and Company, [**3] Monsanto Company, Rohm and Haas Co., DIRECT DEFENDANTS.

Laurel Bedig, Esq., Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Ford New Holland, Inc., Unisys Corp., DIRECT DEFENDANTS.

John F. Strazzullo, Esq., Pennsauken, NJ, for G.& S., Co., G&S, Inc., DIRECT DEFENDANTS.

James L. McKenna, Esq., Arnold Capriotti, Esq., Woodcrest Pavilion, Cherry Hill, NJ, for General Metalcraft, DIRECT DEFENDANT.

David F. Michelman, Esq., Michelman & Bricker, P.C., Philadelphia, PA, for Globe Disposal Company, Inc., DIRECT DEFENDANT.

Michael Dillon, Esq., Dennis V. Brenan, Esq., Morgan, Lewis & Bockius, Philadelphia, PA, for ICI Americas, Inc., DIRECT DEFENDANT.

Edward O. Kenlan, Jr., Esq., Verona, NJ, for Joyce International, Inc., DIRECT DEFENDANT.

Fred Wagner, Esq., Beveridge & Diamond, P.C., Washington, DC, for Mobil Research & Development Corp., DIRECT DEFENDANT.

Christine A. Picker, Esq., Raymond T. Reott, Esq., Jenner & Block, Chicago, IL, for Mobile Dredging & Pumping Company, DIRECT DEFENDANT.

Andrew R. Running, Esq., Diane K. Moore, Esq., Kirkland & Ellis, Chicago, IL, for NL Industries, Inc., DIRECT DEFENDANT.

Louis A. Naugle, Esq., [**4] Reed, Smith, Shaw & McClay, Pittsburgh, PA, for NVF Company, Inc., DIRECT DEFENDANT.

Todd O. Maiden, Esq., Baker & McKenzie, Chicago, IL, for NVF Company, Inc., DIRECT DEFENDANT.

Marylinn Greenberg, Esq., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Nabisco, Inc., DIRECT DEFENDANT.

Angelo A. Cuonzo, Esq., Mattson & Madden, Newark, NJ, for Occidental Chemical Corp., DIRECT DEFENDANT.

John P. Stockli, Jr., Esq., Crane, Kelley, Greene & Parente, Albany, NY, for Olin, DIRECT DEFENDANT.

John M. Armstrong, Esq., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, for The Lehigh Press, Inc., DIRECT DEFENDANT.

Samuel B. Boxerman, Esq., Sidley & Austin, Washington, DC, for W.R. Grace & Company, DIRECT DEFENDANT.

Samuel H. Israel, Esq., Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for A.C. Kissling Co., Inc., THIRD PARTY DEFENDANT.

David Michelman, Esq., Michelman & Bricker, P.C., Philadelphia, PA, for 20th Century Refuse Removal, A. Mariainni's Sons, Inc., Jones & Johnson Enterprise, Hancock Waste Removal Co., Richard N. Alburger, THIRD PARTY DEFENDANTS.

Carol A. Schuler, Esq., Earp, Cohn & Pendery, Westmont, NJ, for Alice [**5] M. Alburger, Richard F. Alburger, & Donald Alburger, THIRD PARTY DEFENDANTS.

Judith I. Gleason, Esq., Drinker Biddle & Reath LLP, Princeton, NJ, for Air Products and Chemicals, Inc., Pfizer Inc., Union Carbide Corporation, THIRD PARTY DEFENDANTS.

Patricia A. Shaw, Esq., LeBoeuf, Lamb, Greene & MacRae, Pittsburgh, PA, for Alcoa, THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Kenneth E. Stroup, Jr., Esq., Assistant General Counsel, Allied Signal, Inc., Law Department, Morristown, NJ, for Allied Corp., THIRD PARTY DEFENDANT.

Bradford Whitman, Esq., Marilyn Heffley, Esq., Reed, Smith, Shaw & McClay, Philadelphia, PA, for Alumax, Inc., THIRD PARTY DEFENDANT.

Carl Everett, Esq., Saul, Ewing, Remick & Saul, Philadelphia, PA, for American Packaging Corporation, Betz Laboratories, Inc., Chevron U.S.A., Inc., Lukens, Inc., THIRD PARTY DEFENDANTS.

Robert D. Farber, Esq., Law Offices of Stephen E. Gertler, Wall, New Jersey, for Anthony P. Lieze, Lippincott Cesspool Service, Orville Moore, THIRD PARTY DEFENDANTS.

Michael Krancer, Esq., Blank, Rone, Comisky & McCauley, Philadelphia, PA, for Akzo Chemicals, B.P. America, Inc., Litton, THIRD PARTY DEFENDANTS.

Larry D. Silver, Esq., [**6] Duane, Morris & Heckscher, Philadelphia, PA, for Armstrong World Industries, Inc., THIRD PARTY DEFENDANT.

Sandford F. Schmidt, Esq., Law Offices of Sandford F. Schmidt, Medford, NJ, for Atlantic Disposal Service, Inc., THIRD PARTY DEFENDANT.

Howard M. Klein, Esq., Conrad, O'Brien, Gellman, DeStefano & Rohn, Philadelphia, PA, for AT&T, Lilly Industrial Coating Inc., THIRD PARTY DEFENDANTS.

Sean P. Fahey, Esq., Conrad, O'Brien, Gellman, DeStefano & Rohn, Moorestown, NJ, for AT&T, Lilly Industrial Coating Inc., THIRD PARTY DEFENDANTS.

Kim Hollaender, Esq., Wilbraham, Lawler & Buba, Philadelphia, PA, for Atlantic County Utilities Authority, THIRD PARTY DEFENDANT.

Lanny S. Kurzweil, Esq., McCarter & English, Newark, NJ, for Atlantic Richfield Company (ARCO), Owens-Illinois, Inc., THIRD PARTY DEFENDANTS.

Edward O'Connell, Esq., Beazer East, Inc., Pittsburgh, PA, for Beazer East, Inc., THIRD PARTY DEFENDANT.

Bonnie A. Barnett, Esq., William V. Roeder, Esq., Drinker, Biddle & Reath, Philadelphia, PA, for Beecham, Inc., Progressive Lighting, Selas Corp. of America, SCM Corp., Hygrade Food Products, THIRD PARTY DEFENDANTS.

Kenneth J. Warren, Esq., Madeline [**7] Cozine, Esq., Manko, Gold & Katcher, Bala Cynwyd, PA, for Bell Atlantic, New Jersey, Inc., Bell Atlantic, Pennsylvanis, Inc., The Franklin Mint, GE, THIRD PARTY DEFENDANTS.

Mark R. Rosen, Esq., Mesirov Gelman Jaffe Cramer & Jamieson, Cherry Hill, NJ, for Bernhard Brenner, THIRD PARTY DEFENDANT.

Tom Waite, Esq., The Boeing Company, Seattle, WA, for The Boeing Company, Vertol Division, THIRD PARTY DEFENDANT.

Harry M. Baumgartner, Esq., Shanley & Fisher, Morristown, NJ, for Borden, Inc., THIRD PARTY DEFENDANT.

Eugene J. McCaffrey, Jr., Esq., McCaffrey & Renner, Woodbury, NJ, for Borough of Audubon, THIRD PARTY DEFENDANT.

Robert Messick, Esq., Haddonfield, NJ, for Borough of Brooklawn, Borough of Mt. Ephraim, THIRD PARTY DEFENDANTS.

Jeffrey D. Light, Esq., Attorney At Law, Linwood, NJ, for Borough of Collingswood, THIRD PARTY DEFENDANT.

Timothy D. Scaffidi, Esq., Woodbury, NJ, for Borough of Glassboro, THIRD PARTY DEFENDANT.

Mr. Ralph J. Kmiec, Esq., Cherry Hill, NJ, for Borough of Hi-Nella, THIRD PARTY DEFENDANT.

James W. Burns, Esq., Zeller & Bryant, Cherry Hill, NJ, for Borough of Lawnside, THIRD PARTY DEFENDANT.

Steven F. Dorry, Esq., [**8] Hurley & Vasios, P.C., Short Hills, NJ, for Borough of Magnolia, Borough of National Park, Borough of Pine Hill Municipal Utilities Authority, THIRD PARTY DEFENDANTS.

John P. Jansen, Esq., Jansen, Bucco & DeBona, Boonton, NJ, for Borough of Mendham, THIRD PARTY DEFENDANT.

Lila W. Williams, Esq., Marshall, Dennehey, Warner, Coleman and Goggin, Marlton, NJ, for Borough of Princeton, Princeton Sewer Operating Committee, THIRD PARTY DEFENDANTS.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Michael J. O'Mara, Esq., Crawshaw, Mayfield, Riordan, Turner, O'Mara, Donnelly, Thomas & McBride, Cherry Hill, NJ, for Borough of Stone Harbor, Borough of Bellmawr, Borough of Berlin Sewer Department, Stoney Brook Regional Sewarage Authority, Cherry Hill Township, THIRD PARTY DEFENDANTS.

Mary L. Russell, Esq., Manta and Welge, Cherry Hill, NJ, for Borough of Swedesboro, Laurel Springs Sewage Authority, THIRD PARTY DEFENDANTS.

Raymond J. Zane, Esq., Zane & Lozuke, Woodbury, NJ, for Borough of Woodbury Heights, THIRD PARTY DEFENDANT.

Mark E. Squires, Esq., Abrahams Loewenstein, Philadelphia, PA, for Brandywine Paper Co., THIRD PARTY DEFENDANT.

Lori Singer, Esq., Sills, Cummis, Zuckerman, Radin, Tischman, Epstein [**9] & Gross, Newark, NJ, for Bristol-Myers Squibb Co., Z & W Enterprises (Mazda), THIRD PARTY DEFENDANTS.

Mary F. Platt, Esq., Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Bundy Corporation, THIRD PARTY DEFENDANT.

Marlene W. Jackson, Esq., Westinghouse Electric Corporation, Pittsburgh, PA, for CBS, Inc., THIRD PARTY DEFENDANT.

Michael R. Dillon, Esq., Morgan, Lewis & Bockius, Philadelphia, PA, for Camden Iron & Metal, Mannington Mills, Petro, THIRD PARTY DEFENDANTS.

Linda A. Toepel, Paralegal, Campbell Soup Legal Dept., Camden, NJ, for Campbell Soup Company, THIRD PARTY DEFENDANT.

Peter Bonfiglio, Esq., Higgins Slachetka & Long, PA, Laurel Springs P.O., NJ, for Cape May County Municipal Utilities Authority, THIRD PARTY DEFENDANT.

Kevin Kehner, Esq., Martin, Gunn & Martin, Westmont, NJ, for Carosella, THIRD PARTY DEFENDANT.

Michael A. Bogdonoff, Esq., Dechert, Price & Rhoads, Philadelphia, PA, for Carpenter Technology Corp., THIRD PARTY DEFENDANT.

Robert Greenbaum, Esq., Budd, Larner, Short Hills, NJ, for Central Jersey Disposal, THIRD PARTY DEFENDANT.

Susan Jacobucci, Esq., Township of Cherry Hill, Law Department, Cherry Hill, [**10] NJ, for Cherry Hill Sewerage Authority, THIRD PARTY DEFENDANT.

Jonathan Eron, Esq., Law Office of Jonathan Eron, Collingswood, NJ, for Chubb's Cesspool (Fred Hess), THIRD PARTY DEFENDANT.

Nancy Scott, Esq., Camden County Municipal Utilities Authority, Camden, NJ, for Camden County Municipal Utilities Authority, THIRD PARTY DEFENDANT.

Michael F. Dolan, Esq., Jane Kravick, Esq., Jones, Day, Reavis & Pogue, Chicago, IL, for Chamberlain Manufacturing Corp., THIRD PARTY DEFENDANT.

John T. Curtin, Esq., Philips, Curtin & DiGiacomo, Philadelphia, PA, for Chantecler Investments, Inc., William B. Wire, THIRD PARTY DEFENDANTS.

Samuel D. Lashman, Esq., City of Atlantic City, Office of the City Solicitor, Atlantic City, NJ, for City of Atlantic City, THIRD PARTY DEFENDANT.

Richard Hunt, Esq., Frank Cavallo, Esq., Parker, McKay & Criscuollo, Marlton, NJ, for City of Bordentown, THIRD PARTY DEFENDANT.

Robert A. Sutton, Esq., Chief Assistant City Solicitor, City of Philadelphia Law Department, Philadelphia, PA, for City of Philadelphia, THIRD PARTY DEFENDANT.

Robert P. Becker, Esq., Hannold, Marshall & Becker, Woodbury, NJ, for Borough of Westville, Borough [**11] of Wenonah, City of Woodbury, THIRD PARTY DEFENDANTS.

John Gercke, Esq., Gercke, Dumser, Feld, Cherry Hill, NJ, for Clementon Sewage Authority, THIRD PARTY DEFENDANT.

Tracey V. Baaset, Esq., The Coca-Cola Company, Atlanta, GA, for Coca-Cola Company for Tenco, THIRD PARTY DEFENDANT.

Jerry M. Lonabaugh, Esq., Thatcher, Lonabaugh, Thatcher & Passarella, Runnemede, NJ, for Continental Vanguard, Inc., THIRD PARTY DEFENDANT.

Kevin G. Corliss, Esq., Corning Incorporated, Legal Department, Corning, NY, for Corning Incorporated, THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Howard Crystal, Esq., Lynch, Rowin, Novack, Burnbaum & Crystal, P.C., New York, NY, for Croda Inks Corporation (predecessor -Richardson Ink), THIRD PARTY DEFENDANT.

James P. DeMaria, Esq., DeMaria & Associates, Boston, MA, for AMS Industries, Inc., THIRD PARTY DEFENDANT.

Michael J. Naughton, Esq., Kumer, Knox, Haughton & Hansbury, Parsippany, NJ, for DW Window Coverings, Inc., THIRD PARTY DEFENDANT.

Paul Fudaez, Esq., Lisa A. Wurster, Esq., Dana Corporation, Toledo, OH, for Dana Corporation, THIRD PARTY DEFENDANT.

Mark L. First, Esq., Reed, Smith, Shaw & McClay, Princeton, NJ, for Del Val Ink & Color, [**12] Inc., THIRD PARTY DEFENDANT.

Kenneth N. Klass, Esq., Blank, Rome, Comisky & McCauley, Philadelphia, PA, for DELCORA, THIRD PARTY DEFENDANT.

Robert Orr, Esq., Albertson Ward, Woodbury, NJ, for Derr & Sons, Inc., William D. Wynne, THIRD PARTY DEFENDANTS.

Joel L. Herz, Esq., Tucson, AZ, for DeSoto, Inc., THIRD PARTY DEFENDANT.

Michael G. Mullin, Esq., McGrath, North, Mullin & Kratz, P.C., Omaha, NB, for Dri-Print Foils, Inc., THIRD PARTY DEFENDANT.

Anton Marzano, Esq., Manta & Welge, West Trenton, NJ, for Eastern Industrial Corporation, THIRD PARTY DEFENDANT.

Steven J. Lemon, Esq., Jones & Lemon, Geneva, IL, for Ellwood Ivins Tube Co. (Plymouth Tube), THIRD PARTY DEFENDANT.

Melvyn H. Bergstein, Esq., Carl R. Woodward, III, Esq., Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Engelhard Corporation, THIRD PARTY DEFENDANT.

Mark Tucker, Esq., The Dow Chemical Company, Midland, MI, for Essex Chemical Corp., THIRD PARTY DEFENDANT.

Linda Mack, Esq., Fox, Rothchild, O'Brien & Frankel, Lawrenceville, NJ, for Essex Chemical Corp., THIRD PARTY DEFENDANT.

John J. Carlin, Jr., Esq., Arthur G. Warden III, Esq., Carlin, [**13] Maddock, Fay & Cerbone, P.C., Florham Park, NJ, for Exxon Corporation, THIRD PARTY DEFENDANT.

Sandra C. Hymowitz, Esq., Naulty, Scaricamazza & McDevitt, Cherry Hill, NJ, for F.H. Carting, William Reimer, THIRD PARTY DEFENDANTS.

Sandra C. Hymowitz, Esq., Naulty, Scaricamazza & McDevitt, Philadelphia, Pa, for F.H. Carting, William Reimer, THIRD PARTY DEFENDANTS.

Robert P. Frank, Esq., Reed Smith Shaw & McClay, Philadelphia, PA, for FKI Industries, THIRD PARTY DEFENDANT.

John F. Stillmun, Esq., FMC Corporation, Philadelphia, PA, for FMC Corporation, THIRD PARTY DEFENDANT.

David B. Hird, Esq., Rebecca G. Ellis, Esq., Weil, Gotshal & Manges, Washington, DC, for Food Haulers, Inc., Denny, THIRD PARTY DEFENDANTS.

Gino J. Bennedetti, Esq., Miller Alfano & Raspanti, P.C., Philadelphia, PA, for Frank Costobile, THIRD PARTY DEFENDANT.

Joseph K. Cooney, Esq., Widman, Cooney & Barrett, Oakhurst, NJ, for Frank Kull, Inc., THIRD PARTY DEFENDANT.

Kenneth J. Warren, Esq., Manko, Gold & Katcher, Bala Cynwyd, PA, for GTE Operations Support Incorporated, THIRD PARTY DEFENDANT.

John R. Mayo, Esq., Coltec Industries Inc, Charlotte NC, for Garlock Bearings, Inc., [**14] THIRD PARTY DEFENDANT.

Truly Bracken, Esq., Hunton & Williams, Atlanta, GA, for Saltire Industrial, Inc., THIRD PARTY DEFENDANT.

Nicholas B. Bauer, Alper Holdings, Inc., Reston, VA, for Saltire Industrial, Inc., THIRD PARTY DEFENDANT.

Lewis Adler, Esq., Woodbury, NJ, for George Harvey, THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Ann T. Weiss, Esq., Timony, Knox, Hasson & Weand, Fort Washington, PA, for Geppert Bros., Inc., THIRD PARTY DEFENDANT.

John J. Delany, III, Esq., Callahan, Delany & O'Brien, Philadelphia, PA, for Gilbert Spruance, THIRD PARTY DEFENDANT.

James J. Gruccio, Esq., Edward Baumann, Esq., Gruccio, Pepper, Giovinazzi & DeSanto, PA, Vineland, NJ, for Gloucester County Utilities Authority, THIRD PARTY DEFENDANT.

Irvin M. Freilich, Esq., Hannoch Weisman, Roseland, NJ, for Grumman Aerospace Corp., THIRD PARTY DEFENDANT.

John P. Montemurro, Esq., Tomlin, Clark & Hopkins, Haddonfield, NJ, for Gus Bittner, THIRD PARTY DEFENDANT.

Diane M. Helland, Esq., Briggs & Morgan, Minneapolis, MN, for H.B. Fuller Company, THIRD PARTY DEFENDANT.

John B. Kearney, Esq., Carol R. Cobb, Esq., Kearney, Castillo & Blake, Haddon Heights, NJ, for Lindenwold Municipal [**15] Authority, Haddon Heights Sewerage Authority, THIRD PARTY DEFENDANTS.

Robert A. Muccilli, Esq., Capehart & Scatchard, Mount Laurel, NJ, for Hangsterfer Laboratories, THIRD PARTY DEFENDANT.

Richmond L. Williams, Esq., Hercules Incorporated, Wilmington, DE, for Hercules, THIRD PARTY DEFENDANT.

John F. Lynch, Jr., Esq., Steven Santarsiero, Esq., Carpenter, Bennett & Morrissey, Newark, NJ, for Hercules, Inc., General Motors Corporation, THIRD PARTY DEFENDANTS.

David B. Graham, Esq., Howrey & Simon, Washington, DC, for Hexcel Corporation, Nalco Chemical Company, THIRD PARTY DEFENDANTS.

James Guerin, Esq., IBM Corporation, Somers, NY, for IBM, THIRD PARTY DEFENDANT.

Dana Wilt Mayo, Esq., Hoagland, Longo, Moran, Marc S. Gaffrey, Esq., Hoagland, Longo, Moran, Dunst & Doukas, New Brunswick, NJ, for J.L. Patterson, THIRD PARTY DEFENDANT.

William E. Haddix, Jr., Esq., Haddon Heights, NJ, for John Teesdale Trash Removal, THIRD PARTY DEFENDANT.

John T. Bazzurro, Esq., Wolff, Helies & Duggan, Red Bank, NJ, for Kasper Brothers, THIRD PARTY DEFENDANT.

Marcia Cowan, Esq., Kimberly-Clark Corporation, Roswell, GA, for Kimberly-Clark Corporation, THIRD PARTY [**16] DEFENDANT.

Mark V. Burns, Esq., Westport, CT, for King Industries, THIRD PARTY DEFENDANT.

Joseph M. Suarez, Esq., Suarez & Suarez, Jersey City, NJ, for Leksi, Inc. (Sartomer Resins, Inc.), THIRD PARTY DEFENDANT.

Arnold S. Block, Esq., Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Lenmar, Spray Products, Technitrol, Inc., THIRD PARTY DEFENDANTS.

Christopher J.I. Gannon, Lord Corporation, Cary, NC, for Lord Corporation, Chemical Products Division, THIRD PARTY DEFENDANTS.

Thomas Spiesman, Esq., Porzio, Bromberg & Newman, P.C., Morristown, NJ, for MBH Chemical Corporation, THIRD PARTY DEFENDANT.

John E. Harrington, Esq., Medford, NJ, for Maple Shade Township, THIRD PARTY DEFENDANT.

Michael F. McBride, Esq., Linda Breggin, Esq., LeBoeuf, Lamb, Greene & MacRae, Washington, DC, for Marisol, Inc., THIRD PARTY DEFENDANT.

C. Douglas Jarrett, Esq., Arthur S. Garrett III, Esq., Keller & Heckman, Washington, DC, for Mars, Inc., THIRD PARTY DEFENDANT.

Dennis A. Durkin, Esq, Suzanne Harris, Esq., Durkin & Durkin, Newark, NJ, for Mayco Oil & Chemical Company, THIRD PARTY DEFENDANT.

Benne C. Hutson, Esq., Smith Helms Mulliss & Moore, L.L.P., [**17] Charlotte, NC, for McCorquodaie Process Company, THIRD PARTY DEFENDANT.

Beryl M. Kuder, Esq., Merck & Co., Inc., Whitehouse Station, NJ, for Merck & Co., Inc., THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Allen Miller, President, Miller & Son, Belleville, NJ, for Miller & Son, THIRD PARTY DEFENDANT.

Beth Johnson Barnard, Esq., Millipore Corporation, Bedford, MA, for Millipore Corporation, THIRD PARTY DEFENDANT.

Max Spinrad, Esq., Miele, Cooper & Spinrad, Millburn, NJ, for Modern Transportation, THIRD PARTY DEFENDANT.

John R. Gercke, Esq., Gercke, Dumser & Feld, Cherry Hill, NJ, for Modern Way Refuse Container Service, THIRD PARTY DEFENDANT.

James W. Daly, Esq., Deasey, Mahoney & Bender, Ltd., Philadelphia, PA, for Moore Products Company/National Standard, THIRD PARTY DEFENDANT.

Bruce G. Campbell, Esq., Regulatory Affairs, National Starch and Chemical Co., Bridgewater, NJ, for National Starch and Chemical Co., THIRD PARTY DEFENDANT.

Mary Fletcher, Esq., Cambrex Corporation, East Rutherford, NJ, for Nepera (Cambrex Corporation), THIRD PARTY DEFENDANT.

Bonnie Harrington, Esq., Dechert, Price & Rhoads, Princeton, NJ, for New Jersey American Waterworks Company, THIRD [**18] PARTY DEFENDANT.

William Schnurr, Esq., American Water Works Service Company, Inc., Haddon Heights, NJ, for New Jersey American Waterworks Company, THIRD PARTY DEFENDANT.

Jane Kozinski, Esq., Saul, Ewing, Remick & Saul, Princeton, NJ, for O'Connor Corp., Instant Disposal Service, Nu-Way Trash Removal, Schiavo Brothers, R&R Sanitation Services, Inc., THIRD PARTY DEFENDANTS.

Stephen M. Offen, Esq., Schachter, Trombadore, Offen, Stanton & Pavics, Somerville, NJ, for Olivetti Office USA, Inc., THIRD PARTY DEFENDANT.

Norman W. Spindel, Esq., Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Orange and Rockland Utilities, Inc., THIRD PARTY DEFENDANT.

John L. Carley, Esq., Orange and Rockland Utilities, Inc., Pearl River, NY, for Orange and Rockland Utilities, Inc., THIRD PARTY DEFENDANT.

Vito A. Pinto, Esq., Lanny Kurzweil, Esq., McCarter & English, Newark, NJ, for Owens-Illinois, Inc., THIRD PARTY DEFENDANT.

Gerald A. Hughes, Esq., Hughes & Hendrix, West Trenton, NJ, for PKF-Mark III, Inc., THIRD PARTY DEFENDANT.

Paul H. Schneider, Esq., Giordano, Halleran & Ciesla, Middletown, NJ, for Paul Murphy, Inc., THIRD PARTY DEFENDANT.

Robert [**19] Cuva, Esq., Angelini, Viniar & Freedman, Cherry Hill, NJ, for Paulsboro Borough, West Deptford Township, THIRD PARTY DEFENDANTS.

Robert P. Frank, Esq., Reed, Smith, Shaw & McClay, Philadelphia, PA, for Paulsen Wire Rope Corporation, THIRD PARTY DEFENDANT.

Dawn Getty-Sutphin, Esq., Philadelphia Electric Company, Philadelphia, PA, for PECO Energy Company, THIRD PARTY DEFENDANT.

David A. Luthman, Esq., Toll, Sullivan & Luthman, Cherry Hill, NJ, for Pennsauken Sewerage Authority, THIRD PARTY DEFENDANT.

Christopher M. Roe, Esq., George Miller, Esq., Dechert Price & Rhoads, Philadelphia, PA, for Philadelphia Newspapers, Inc., American Water Works Service Co.Inc., THIRD PARTY DEFENDANTS.

Katherine Buttolph, Esq., Princeton University, Office of General Counsel, Princeton, NJ, for Princeton University, THIRD PARTY DEFENDANT.

Rocco Covino, Esq., LeBoeuf, Lamb, Greene & MacRae, Washington, DC, for Prudential Insurance Company of America, THIRD PARTY DEFENDANT.

Janet S. Kole, Esq., Law Offices of Janet S.Kole, P.C., Collingswood, NJ, for Quickway, Inc., Robert Hawthorne, THIRD PARTY DEFENDANTS.

Ronald J. Cozean, Esq., RB & W Corporation, Cleveland, OH, [**20] for RB & W Corporation, THIRD PARTY DEFENDANT.

Bruce C. Hasbrouck, Hasbrouck & Uliase, Woodbury, NJ, for Raymond MacKay, THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Gabriel H. Halpern, Esq., Fox and Fox, Livingston, NJ, for Reagent Chemical & Research, Inc., THIRD PARTY DEFENDANT.

Renata Manzo, Esq., Reynolds Metals Company, Richmond, VA, for Reynolds Metals Company, THIRD PARTY DEFENDANT.

Lawrence A. Serlin, Esq., Mesirov Gelman Jaffe Cramer & Jamieson, Cherry Hill, NJ, for Rollins Environmental, Rollins Environmental Services (NJ), Inc., THIRD PARTY DEFENDANTS.

Steven A. Kunzman, Esq., Bivona, Cohen, Kunzman, Coley, Yospin, Berstein and DiFrancesco, Warren, NJ, for S.B. Thomas, Inc. (CPC International), THIRD PARTY DEFENDANT.

Arthur Montano, Esq., Montano & Summers, Cherry Hill, NJ, for S.J. Transportation (Samuel H. Jones, sole-proprietor), THIRD PARTY DEFENDANT.

Lee A. Braem, Esq., Schering-Plough Corporation, Kenilworth, NJ, for Schering Corporation (Schering-Plough), THIRD PARTY DEFENDANT.

Stephen M. Siros, Esq., Jenner and Block, Chicago, IL, for Sears Roebuck and Co., THIRD PARTY DEFENDANT.

Stacy S. Cohen, Esq., Reed Smith Shaw & McClay LLP, Princeton [**21] Forrestal Village, Princeton, NJ, for Shell Oil Company, THIRD PARTY DEFENDANT.

Stephen N. Yermish, Esq., Caplan and Luber, Paoli, PA, for Simon Wrecking, Mid-State Trading, THIRD PARTY DEFENDANTS.

Edwin L. Meyer, Jr., Esq., Woodbury, NJ, for Specialty Castings, Inc., THIRD PARTY DEFENDANT.

Susan P. LeGros, Esq., LeGros Law Partners, Berwyn, PA, for SPS Technologies, Inc. (Standard Pressed Steel), THIRD PARTY DEFENDANT.

Frederick L. Tolhurst, Esq., Scott Thistle, Esq., Cohen & Grigsby, Pittsburgh, PA, for Steelmet, Inc., THIRD PARTY DEFENDANT.

David C. Patterson, Esq., Maressa, Goldstein, Birsner, Patterson, Drinkwater & Oddo, Berlin, NJ, for Stratford Sewage Authority, THIRD PARTY DEFENDANT.

Thomas Haines, Esq., Sun Refining & Marketing Co., Philadelphia, PA, for Sun Refining & Marketing Co., THIRD PARTY DEFENDANT.

Thomas Haines, Esq., Sun Ship, Inc., Philadelphia, PA, for Sun Ship, Inc., THIRD PARTY DEFENDANT.

Peter J. Neeson, Esq., LaBrum and Doak, Philadelphia, PA, for Superior Tube Company, THIRD PARTY DEFENDANT.

David J. O'Aloia, Esq., Saiber Schlesinger Satz & Goldstein, Newark, NJ, for Tenneco Chemicals, Inc., THIRD PARTY DEFENDANT.

R. [**22] Scott McCay, Esq., Texaco, Inc., Houston, TX, for Texaco, Inc., THIRD PARTY DEFENDANT.

David Toomey, Esq., Duane Morris & Hedkscher, Philadelphia, PA, for Texaco, Inc., THIRD PARTY DEFENDANT.

Michael G. Brennan, Esq., Brennan & Bernardin, Collingswood, NJ, for The "Original" W. Hargrove Wrecking Co., THIRD PARTY DEFENDANT.

William H. Howard, Esq., Cozen and O'Connor, Philadelphia, PA, for Township of Bordentown, THIRD PARTY DEFENDANT.

James R. Greene, Esq., Hardin Kundla McKeon, Poletto & Polifroni, Springfield, NJ, for Township of Mantua, THIRD PARTY DEFENDANT.

Charles Lee Thomason, Esq., Red Bank, NJ, for Township of Princeton, THIRD PARTY DEFENDANT.

Joseph Alacqua, Esq., Turnersville, NJ, for Township of Washington, THIRD PARTY DEFENDANT.

Vincent F. Reilly, Esq., Marks, Kent & O'Neill, P.C., Philadelphia, PA, for Triangle Publications, THIRD PARTY DEFENDANT.

David M. Latzko, Esq., David L. Smiga, Esq., Stephan K. Todd, Esq., USS/USX, Pittsburgh, PA, for United States Steel Corporation (USX), THIRD PARTY DEFENDANT.

Christine Picker, Esq., Raymond T. Reott, Esq., Jenner and Block, Chicago, IL, for Video Pipe Services, THIRD PARTY DEFENDANT.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

David [**23] M. Latzko, Esq., W.L Gore & Associates, Inc., Newark, DE, for W.L. Gore & Associates, Inc., THIRD PARTY DEFENDANT.

Susan L. Moreinis, Esq., Certified Civil Trial Attorney, Collingswood, NJ, for Warner Trash Removal, THIRD PARTY DEFENDANT.

Linda Hayes Grasso, Esq., Cleary, Alfieri, Meinders & Madden, Matawan, NJ, for Western Monmouth Utilities Authority, THIRD PARTY DEFENDANT.

Nancy Lem, Esq., Goldstein Till & Lite, Newark, NJ, for Westgrove Industrial Park, THIRD PARTY DEFENDANT.

Donald M. Wolfer, Penns Grove, NJ, for Wolfer Cesspool Service, THIRD PARTY DEFENDANT.

Kirk V. Wiedemer, Esq., Philadelphia, PA, for Atlas Environmental, OPT-OUT PARTY.

John A. Fitzpatrick, Esq., Mylotte, David & Fitzpatrick, Philadelphia, PA, for C.T. Iuliano, OPT-OUT PARTY.

John Cucinotta, Shareholder, Clayton, NJ, for East Coast Pollution Control, OPT-OUT PARTY.

Sandford F. Schmidt, Esq., Law Offices of Sandford F. Schmidt, Medford, NJ, for General Trailers, Inc., OPT-OUT PARTY.

Bruce C. Hasbrouck, Esq., Hasbrouck & Uliase, Woodbury, NJ, for Frank Kanopka, OPT-OUT PARTY.

Leonard T. Schwartz, Esq., Steven M. Slotnick, Esq., Slotnick & Schwartz, Williamstown, [**24] NJ, for Lafferty, Inc., OPT-OUT PARTY.

Mr. Marvin Jonas, Pompano, FL, for Marvin Jonas, Inc., Jonas Steel Drum, OPT-OUT PARTIES.

Robert L. Rattet, Esq., Rattet & Company, P.C., Harrison, NY, for Precision Laboratories, OPT-OUT PARTY.

Antoinette L. Falciani, Esq., Angelo J. Falciani, P.O., Woodbury, NJ, for Rick Licciardello Sanitation, OPT-OUT PARTY.

**JUDGES:** JEROME B. SIMANDLE, U. S. District Judge.

**OPINION BY:** JEROME B. SIMANDLE

**OPINION**

[*276] **MEMORANDUM OPINION**

SIMANDLE, District Judge:

In connection with the remedying of conditions at the Helen Kramer Landfill Superfund Site in Mantua Township, New Jersey, the United States, on behalf of the U.S. Environmental Protection Agency and the State of New Jersey Department of Environmental Protection, have filed the present motions for entry of federal and state consent decrees resolving all direct claims of the governments in these multi-party hazardous waste cases arising under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, et seq., (the "Spill Act"), and other state statutes. The proposed [**25] decrees were published for public comment in May, 1998, and no comments were received.

Under the proposed federal Consent Decree, the "Settling Defendants" (comprised of all viable direct defendants and most third-party defendants, numbering nearly 250 parties) will collectively pay the sum of $ 95 million plus interest to the United States over five years, in reimbursement of past response costs with respect to the Site. A subset of these parties, called the Settling Work Defendants, [1] will perform studies needed by EPA to perform its five-year reviews.

> 1   The "Settling Work Defendants" are: Rohm & Haas Company, E.I. duPont de Nemours & Co., Elf-Atochem North America, Inc., Cytec Industries (on behalf of American Cyanamid Co.), Mobil Research and Development Corp., Chemical Leaman Tank Lines, Continental Can, and Carpenter Technology, Inc.

Under two parallel Consent Decrees with the State of New Jersey (the "State Consent Decree") the Settling Defendants will pay $ 9.77 million to the State plus interest accrued [**26] on the unpaid balance, reimbursing the State's past response costs at the site. The Settling Defendants will be obligated to continue operation and maintenance of the Site and to pay the cost of future response actions through May 12, 2023. The State NRD Consent Decree also requires the Settling Defendants to purchase and conserve a 151-acre parcel of wetlands and wooded uplands and to pay the State an additional $ 190,000 in compensation for natural resource damages. The federal Consent Decree also resolves natural resource damages claims on behalf of the federal natural resource trustees (the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration) by incorporating the Settling Defendants' obligations to

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

comply with the State Natural Resource Damages Consent Decree.

## I. *PROCEDURAL HISTORY AND FACTUAL BACKGROUND*

The Helen Kramer Landfill in Mantua Township, New Jersey, was declared a federal [*277] Superfund site and placed upon the national priorities list by the U.S. Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* The United States undertook [**27] the Remedial Investigation and Feasibility Study, the Remedial Design, and remedy construction, which was largely completed in 1994. These remedial costs, together with enforcement costs and prejudgment interest to January, 1998, have amounted to approximately $ 123 million. The United States commenced suit in 1989 to recover all response and remedial costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and the government had by 1997 filed a Third Amended Complaint against the Direct Defendants alleged to be generators and transporters of hazardous substances deposited at the Landfill. After extensive litigation and settlement efforts, the United States and Direct Defendants reached agreement upon a proposed Consent Decree to resolve the United States' claims against all viable Direct Defendants and a wide majority of the Third-Party Defendants. The Consent Decree was lodged with the Court on May 8, 1998, was served upon all parties in the case including non-settlors, and was published for public comment on June 1, 1998, *see* 63 Fed. Reg. 29,754-55, consistent with Department of Justice regulations at 28 C.F.R. § 50.7. The United States received no comments.

Similarly, [**28] the State DEP commenced suit in 1989 and reached substantial agreement with a subgroup of the Settling Defendants to enable operation and maintenance functions at the Site to be transferred to these settling parties in 1997. The Site had been turned over to the NJDEP for oversight and maintenance on May 11, 1994. The State decrees were lodged with the court in May, 1998, circulated to all parties, and published through newspapers of general circulation seeking comment. The State received no comments. The Settling Defendants are responsible for all future response costs and all operation and maintenance endeavors subject to a comprehensive compliance schedule through May, 2023, when it is anticipated the remediation will be complete.

One party has objected to these proposed Consent Decrees, namely, third-party defendants Sun Company, Inc. (R & M) and Sun Ship, Inc. [hereafter "Sun"], which filed "tentative opposition" arguing that the court needs more information before it can undertake the fairness determination required by CERCLA, and inviting the

court to protect Sun and other non-settlors by holding that the governments are limited to recovering the proportionate share of liability [**29] from any non-settling defendants and that third-party plaintiffs cannot seek to recover more than their fair share in the remaining contribution action. (Tentative Opp. Br. at 7-11.) In its objection filed seven days before the August 7, 1998 hearing date upon these motions, Sun seeks discovery of information underlying the settlement among the Settling Defendants, including the quantities of material and its nature and toxicity, that each settling party was assumed, for purposes of settlement, to have sent to the Site, as well as the settlement share to be paid by each settling party.

The Settling Work Defendants, also known as the "Offerors Group," strenuously oppose Sun's request, arguing that the settlement process leading to the allocation among Settling Defendants was robust and fair to all participants, including Sun, which assertedly had full access to the settlement process information which it now seeks. [2] The United States and State of New Jersey likewise assert that Sun has raised no meritorious objection, because details as to each party's settlement share are unnecessary to the assessment of the fairness of the overall settlement, and because Sun's potential liability [**30] to the United States is irrelevant and moot. [3]

> 2   See Affidavit of William H. Hyatt, Jr. (hereafter "Hyatt Aff.") Aug. 5, 1998, at P 10.
>
> 3   The United States has also argued that Sun's objection is untimely, since Sun made no comment when the settlement was lodged in May and waited instead until the eve of the hearing in August, citing *United States v. Charles George Trucking, Co.*, 823 F.2d 685, 690-91 (1st Cir. 1987)(rejecting defendants' defenses to a penalty action for failure to comply with a CERCLA § 104(e) information request, holding parties waived their right to object when they ignored available avenue for redress). This argument does not fit the present case, since the motions for court approval of the consent decrees were filed upon notice to all parties, and the objection was timely under that motion practice.

[*278] II. *The Settlement Process*

To understand the proposed settlements, we start with the processes that led to them. When the contours of the federal and state cases became apparent, [**31] and after early dispositive motion practice directed at numerous affirmative defenses, *United States v. Kramer*, 757 F. Supp. 397 (D.N.J. 1991), the parties expressed an interest in seeking to resolve the case. Because the construction of the EPA's remedy was ongoing through 1993, the total costs were unknown. The numerous potentially responsi-

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

ble parties ("PRP's") were aligned into Liaison Groups, [4] and representatives of these groups went about drafting a plan for a serious, far-reaching process of data gathering, analysis, and negotiation. This plan was stated in the Settlement Process Protocol, which creates the procedural vehicle for these settlement efforts among the PRP's. Because the ambitious efforts required by the Settlement Process Protocol would require dedication of great resources of time and money, the court agreed to temporarily stay the litigation. The Protocol was adopted by the Settlement Process Participants and was approved by the court, and the liaison counsel were elected to coordinate the process. [5]

4    The Liaison Groups consisted of the Direct Defendants, the Third-Party Plaintiffs, the Third-Party Generators, the Third-Party Transporters and the Third-Party Municipalities. These groups were aligned for case management purposes, and each group selected its liaison counsel. Although over 300 parties were eventually joined in the case (of which 29 were direct defendants and the remainder were third-party defendants), the case could be managed for discovery and other pretrial purposes through the five liaison counsel and the attorneys for the United States and the State of New Jersey.

[**32]
5    The United States and State of New Jersey were not participants in the Settlement Process Protocol. Instead, they were kept informed during frequent periodic conference of all liaison counsel with the court.

The purpose of this process was to reach a fair and reasonable allocation of potential liability among some 300 potentially responsible parties in an ADR process which would create a reliable data base and apply reasonable assumptions regarding the comparative impact of each party's waste stream to the Helen Kramer Landfill. Pursuant to the requisites of the Protocol, all participants were required to respond to a detailed common questionnaire, [6] and responses were audited by the Settlement Process Committee and by the selected Waste Accountant, which was a large accounting firm. (Hyatt Aff. P 5.) When an adequate data base had been achieved, after many months of efforts, the participants selected Clean Sites, Inc., an environmental litigation support firm specializing in dispute resolution, to serve as the Allocation Consultant. (Hyatt Aff. P 6.)

6    The certified questionnaire answers were placed into a common repository, available for review by all participants. The data underwent a seemingly endless process of matching, verification, elimination of double-counting, and cross-

checking against other related participants' reported data. This internal cross-checking was designed to elicit honest and complete information upon which to base an allocation.

[**33]    Pursuant to the Protocol, Clean Sites prepared an allocation plan, which was to be a non-binding "suggested method by which the costs of any such settlement [with the United States and the State] could be divided among the Participants." (Settlement Process Protocol, P III.D.1.) Clean Sites considered criteria suggested by the participants as equitable factors relevant to the relative fault or culpability of the participants. (Hyatt Aff. P 7) Clean Sites then articulated those criteria and applied them, attempting to replicate the result which would have occurred in an allocation of responsibility by the court after trial under CERCLA Section 113(f), 42 U.S.C. § 9613(f). (Hyatt Aff. P 7.) Clean Sites issued a draft allocation report which was subject to advocacy and cross-fire within the settlement process, as one additional step toward a reliable and fair allocation. The final allocation was the "Clean Sites Report."

Under the Protocol, at least two-thirds of weighted voting power was required for the acceptance of the Report as a basis for further negotiations, but the vote fell just short. (Hyatt Aff. P 9.) When no alternative allocation [*279] plan emerged, the court concluded that [**34] sufficient time had been consumed in the allocation process without coming to an approved final plan, and the stay of litigation was lifted, including discovery and motion practice related to the recoverable costs and the liability of direct defendants.

The participants then decided to continue to use the Clean Sites Report as a basis for further negotiations among themselves, subject to the court's supervision by United States Magistrate Judge Joel B. Rosen, who served as Settlement Judge from 1996 to date. [7] The participants selected co-mediators [8] and, pursuant to Section IV of the Protocol, "entered into negotiations to allocate among themselves the cost to settle some or all of the claims associated in the [Federal and State cases]." (Hyatt Aff. P 9.)

7    The use of a magistrate judge as a settlement judge in a CERCLA non-jury case serves to insulate the trial judge from direct settlement negotiations. Federal Judicial Center, *Manual for Complex Litigation, Third*, § 33.73 at 373 (1995).
8    The co-mediators are Linda Singer and Michael Lewis, of Washington, D.C., who worked with the Settlement Process Participants and with counsel for the United States to forge the individual settlements.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

[**35]  Meanwhile, negotiations toward a global settlement had gone forward between the United States and State of New Jersey and the representatives of various groups of PRP's. Court-supervised discussions attempted to develop a framework for compromise of the parties' positions in 1994 regarding the overall settlement demands. [9]  The State reached agreement-in-principle with a group of participants who would take over the operation and maintenance functions at the site in 1997, to be followed upon approval of the Consent Decree by payment of a sum of money which reduces somewhat the State's past costs and guarantees payment of future remedial and administrative costs. The United States reached tentative accord with the Offerors Group, which is the core group of defendants bearing the transaction costs of settlement and the risk of under-recovery.

9    Although the global settlement discussions attempted to narrow the range of debate regarding dollars and terms, such a consensus did not develop in 1994 due to many uncertainties. See Case Management Order ("CMO") No. 11 (filed Oct. 17, 1994). These included whether the Settlement Protocol Process could reach a successful conclusion; whether all the costs incurred by the United States and State of New Jersey were recoverable; whether sufficient proof of nexus to the Landfill could be established; whether the remedy selected by the EPA was procedurally and substantively consistent with CERCLA; the contours of release and reopener rights; and other uncertainties coloring the various claims and defenses. My duties as a Settlement Judge, which had begun as Magistrate Judge assisting the late Chief Judge John F. Gerry and which continued as a District Judge through 1995, came to an end, since it was necessary to reopen plenary discovery, dispositive motion practice, and trial preparation upon the claims of the United States. Various case management orders memorialized progress of plenary discovery on the United States' claims of liability against the direct defendants, as well as the issues of remedy selection and response costs. See, e.g., CMO No. 12 (filed Feb. 6, 1995), CMO No. 14 (filed Mar. 27, 1995), CMO No. 15 (filed May 9, 1995), and CMO No. 16 (filed July 31, 1995), while the Clean Sites allocation process continued through 1996, see Supp. CMO No. 18 (filed Jan. 31, 1996). The various ongoing settlement initiatives and opportunities were described in CMO No. 18 (Second Amdt.) (filed Mar. 19, 1996), including the Settlement Protocol Process, the Global Settlement with State of New Jersey, Private Settlement Initiative among PRP's, EPA DeMinimis Process, and Global Settlement

with United States, and my role as litigation judge was restated. Id. At the request of the settlement process participants, I appointed Magistrate Judge Rosen to perform additional duties as Settlement Judge, enumerated in CMO No. 19 (filed Nov. 14, 1996) and amendments thereto in 1997, while I continued to adjudicate the dispositive matters which arose on the litigation track.

[**36]  According to counsel for the United States, "The Offerors Group offered to settle with the United States, based both on prior and anticipated settlements with other parties and on their willingness to pursue non-settlors in contribution litigation." Mem. of United States at 7.

The Clean Sites Report served as the basis for further negotiations between the Offerors Group and other Settlement Process Participants, resulting in a negotiated allocation among the Offerors Group and about 240 other participants. [10]  This overall group became  [*280] the Settling Defendants listed in Appendix A to the Consent Decree, all of which have submitted signature pages now attached to the original Consent Decree.

10    A significant settlement was also achieved between the Offerors Group and a non-participant in the settlement process, namely, G & S Company, Inc., which was approved by the court after a hearing on July 31, 1998. The G & S settlement is instructive of the manner in which the allocation process functioned. As outlined in the papers supporting approval of the Offerors/G & S settlement, and as restated in the Memorandum of the United States in Support of its Motion for Entry of the Consent Decree at 7-9, the share for G & S was determined as follows.

G & S and its principal, Thomas Gola, were not part of the allocation process under the Settlement Process Protocol and were not assigned shares in the Clean Sites Report. G & S was a broker arranging for disposal of the City of Philadelphia's wastes at the Kramer Landfill, as to which there was good evidence about nexus, quantity and quality. The City of Philadelphia's self-disclosures resulted in an allocated share for the City of 9.92% (reflecting a 33% discount due to its status as a municipality). As a broker, G & S was assigned a half-share (4.96%), since G & S, not the City, dealt with the Kramers and devised the entire disposal scheme for an enormous amount of wastes. In addition, G & S was assigned the entirety of the municipal discount given to Philadelphia (restoring another 4.96%), and it was given a premium as a non-participant in the initial global settlement amounting to 50%.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

The premium was justified because G & S was not accounted for in the Clean Sites allocation, adding uncertainty to a major component of liability, and because G & S should bear some additional responsibility for the substantial "orphan share" in this case, *see United States v. Kramer, 953 F. Supp. 592 (D.N.J. 1997)*, and because G & S allegedly made at least $ 4 million as a result of its brokering and hauling between the City and the Kramer Landfill. Mem. of United States at 8-9 & n.8.

When these percentages were applied to the costs of settling the claims of the United States and the State, the total G & S settlement amount was calculated as $ 17,707,200.

[**37] In addition to these proposed Consent Decrees with the federal and state governments, the United States anticipates concluding negotiations in the future for an amendment to this decree to provide for *de minimis* treatment of approximately 150 of the Settling Defendants. The main effect of such a settlement would be to remove the "re-opener" conditions on the United States' covenant not to sue with respect to such *de minimis* parties, pursuant to CERCLA § 122(g), 42 U.S.C. § 9722(g). Until such negotiations are concluded, such a *de minimis* component is not presently before this court. [11]

11   For procedures used in considering judicial approval of *de minimis* consent decree under CERCLA § 122(g), see the late Chief Judge Gerry's opinion approving the proposed settlement of *de minimis* parties' liability at the Lipari Landfill Superfund Site, *United States v. Rohm & Haas Co., 721 F. Supp. 666 (D.N.J. 1989)*.

### III. *STANDARDS FOR APPROVAL*

#### A. *Scope of Review*

The United States and the [**38] State of New Jersey seek judicial approval of the respective Consent Decrees they have negotiated with the Settling Defendants. [HN1]A court should approve entry of a consent decree when it is satisfied that the decree is fair, reasonable, and consistent with the Constitution and the mandate of law. *United States v. Rohm and Haas Company, 721 F. Supp. at 680*; *United States v. Acton Corp., 733 F. Supp. 869, 871 (D.N.J. 1990)*. The standard to be applied "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objective of the governing statute." *United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990)*; *In re Cuyahoga Equip. Corp., 980 F.2d 110, 118 (2d Cir. 1992)*; *United States v. Akzo Coatings, 949 F.2d 1409,*

*1424-26 (6th Cir. 1991)*; *United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1085 (1st Cir. 1994)*; *United States v. Hercules, Inc., 961 F.2d 796, 800 (8th Cir. 1992)*. Congress anticipated that the federal courts would apply standards with broad generality to determine whether the proposed decrees are both fair and [**39] faithful to the statute, taking into account the interests of the public at large, the settling parties and the non-settlers alike. H.R. Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), *reprinted in* 1986 U.S. Code Cong. & Admin. News 3038, 3042.

The First Circuit noted the adaptability of this review standard to the different circumstances arising in CERCLA matters:

The concepts' amorphous quality is no accident or quirk of fate. We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements, [*281] leaving highly technical issues and relatively petty inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions. When a court considers approval of a consent decree in a CERCLA case, there can be no easy-to-apply check list of relevant factors.

*Cannons, 899 F.2d at 85-86*.

Contrary to the view expressed by Sun as the objecting party, the court does not have the duty to reconstruct the settlement process and review the allocated shares with mathematical exactitude by delving into the data and reports [**40] upon which the settling parties based their negotiations. This approach was rejected by this court in *United States v. Rohm and Haas, 721 F. Supp. at 680-81*, where Judge Gerry wrote:

[HN2][The Court's task] is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of the liability approximately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolution.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Deference to the parties' judgments regarding these settlements is appropriate in this case. [HN3]The policy favoring settlement, articulated in CERCLA, is especially strong where a consent decree has been negotiated by the Department of Justice on behalf of the EPA. *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990); *Akzo Coatings*, 949 F.2d at 1436; *Charles George Trucking*, 34 F.3d at 1085. The quality of the negotiators on behalf of the settlement process participants is likewise [**41] notable where, as here, "a crew of sophisticated players, with sharply conflicting interests, sit at the table" representing "so may affected parties, themselves knowledgeable." *Cannons*, 899 F.2d at 84. Applying these principles, we will consider Sun's objection and examine the overall fairness, reasonableness, and fidelity to law on a detailed basis momentarily.

B. *Sun's Objection*

In addition to considering the overall fairness, reasonableness, and fidelity of the Consent Decrees, the court must consider Sun's specific objection. Sun argues that the decrees are unfair to non-settlers due to the so-called "secretive nature of the settlements" and the failure of the allocation report to adopt the evidence and inferences therefrom that had been urged by Sun in the settlement process. (Tentative Opp. of Sun Third-Party Defendants, at 4-5.) Sun questions the premises of the allocation report as applied to its waste stream, *id.*, which it believes did not go to the Helen Kramer Landfill at all, as stated by Sun's counsel at oral argument.

First, the court finds that the nature of the settlements was not "secretive." Sun, as a settlement process participant, had all the rights [**42] under the Settlement Process Protocol to inspect and review the underlying data from all participants, whether within or outside its suspected waste stream, and to receive and propose corrections to the Waste Accountant's Report and to the Draft and Final Allocation Reports. There is no dispute that the data and the premises applied to these were articulated to all participants by the allocator (Clean Sites). Sun received this information and analysis, and presumably it received feedback to its proposed revisions and redactions, too, all as called for in the Settlement Process Protocol. If one holds this process up against the template of pretrial discovery and adjudication at a non-jury trial, one finds a greater amount of disclosure, testing of the evidence, and repeated opportunity to correct errors of the allocator/adjudicator in the Settlement Protocol Process.

Sun's objection then boils down to its belief that the allocated share assigned to it through the process was too high, because Sun does not credit the underlying factual findings and presumptions. It is the nature of the allocation process that reasonable parties may disagree about the facts and assumptions underlying [**43] the assigned shares, especially where the Kramer Landfill records included no waste-in lists and many records [*282] were lost or destroyed. Although Sun is the only party to object to the allocation process, one suspects many settling parties also may believe they are being asked to pay too much, given other plausible views of their potential liability. [12] It suffices to find that the process took all known facts into account, including Sun's proposed facts, weighed them, entertained Sun's objections, and gave Sun a plausible explanation for its proposed settlement allocation, all as revealed in Sun's own submissions. [Tentative Opp. of Sun, at 4-5 & Ex. 2 (Third-Party Plaintiffs' Supp. and Amended Interrogatory Responses, 7/10/98)]. Sun disagrees and exercises its right to refrain from settlement on the proposed terms. This is not prejudicial nor is it unfair to Sun.

> [12] In this sense, if most settling parties nonetheless believe they are paying more than their fair shares, Kramerland is a bit like Garrison Keillor's Lake Wobegon, "where all the children are above average."

[**44] If Sun is correct that it is not liable for any hazardous wastes discharged at the Helen Kramer Landfill, it will be entitled to judgment in its favor, either by summary judgment or after trial. [13] Moreover, even assuming Sun is correct that the allocators erred in determining Sun's share, such a circumstance does not mean that the overall settlement should be rejected by this court. It is the nature of a multi-party hazardous waste settlement allocation that the process seeks to predict the eventual interplay at trial of complicated facts and relationships based on incomplete or ambiguous data and other uncertainties. Not surprisingly, even reasonable predictions can be "wrong." To say this is not to indict the predictive process; rather, it is to place Sun's objection into perspective. As the only party voicing such an objection, Sun has not persuaded this court that the process was substantially flawed in its determinations. [14]

> [13] This court will not preview any summary judgment motion practice by commenting further upon the information, such as deposition testimony, that Sun proffers in support of its objection to the settlement. To accept Sun's invitation would be to subject this motion to the exacting standards of summary judgment or trial far beyond the proper scope of review, *supra*, and in a manner antithetical to the conservation of judicial

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

and litigant resources that a CERCLA settlement is assigned to foster. *United States v. Rohm and Haas*, 721 F. Supp. at 684.

[**45]

14   Sun also objects that the settlement is unfair to non-settlors because it exposes Sun and others to liability for too great a share of the unrecovered costs. The court will examine this issue below within the context of overall substantive fairness in Part III.C.1, below.

Finally, Sun objects to the form of the Consent Decrees because they do not contain the suballocation amounts for each Settling Defendant. The Consent Decrees instead contain the overall undertakings of the group of settling parties, including payments totaling $ 95 million plus interest in the United States Consent Decree, and $ 9.77 million and O & M expenses in the State Consent Decree, and $ 190,000 and other undertakings to conserve wetlands in the State Natural Resource Damages Decree. Neither the United States nor the State negotiated the shares of individual settlors. Instead, both plaintiffs engaged in the well-recognized (and practically imperative) practice of negotiating an overall settlement with a representative group of PRP's. Groupwide negotiation, through liaison representatives, is nothing new, [15] as other [**46]   courts have recognized. *See United States v. Charles George Trucking*, 34 F.3d at 1081 (explicitly approving process resulting in consent decree which "did no more than assign payment responsibility to classes of [PRPs], leaving the question of allocation *inter sese* to the class members themselves"); *United States v. Acton Corp.*, 733 F. Supp. at 873 (finding EPA's practice of negotiating with a representative group of PRPs, then having them resolve specific allocation shares among themselves, to be practical and reasonable); *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 517 (W.D. Mich. 1989) (entering consent decree and declining to order hearing and further discovery even though there was no actual allocation determination); *In re Energy Coop., Inc.*, 173 B.R. 363, 368 (N.D. Ill. 1994) ("requiring such precision as to the total extent of the harm caused and the role of each potentially responsible party is unwarranted.... [*283] We find no conceivable reason why we should require the environmental settlement agreement to delineate suballocation...."); *United States v. Mid-State Disposal, Inc.*, 131 F.R.D. 573, 577 (W. D. Wis. 1990) ("It is not within this Court's [**47] purview to closely scrutinize the allocation of liability among the potentially responsible parties. The Court's core concern must be whether the proposed consent decree furthers the interest of CERCLA, and one of these interests is to encourage settlement to promote the speedy resolution of harmful environmental concerns."); *United States v. GenCorp, Inc.*, 935 F. Supp. 928, 934-35 (N.D. Ohio 1996) (approving settlement which did not

disclose for each party the settlement amount, the proportion of liability and the rationale).

15   See Federal Judicial Center, *Manual for Complex Litigation, Third*, P 33.73 at 373-381 (1995).

A case cited by Sun, *United States v. Montrose Chem. Corp.*, 50 F.3d 741 (9th Cir. 1995), although reversing approval of a CERCLA settlement whose overall basis was not in the record below, did not speak to the issue of whether the court should require disclosure and evaluation of the individual participants' shares and the basis for them. In *Montrose*, the Ninth Circuit found [**48]   that the district court had no information from which to conclude that the overall $ 45.7 million settlement figure was reasonable. The district court had failed to compare "the proportional relationship between the $ 45.7 million to be paid by the settling defendants and the government's current estimate of total damages...in light of the degree of liability attributable to the settling defendants." *Id.* at 747, citing *Charles George Trucking*, 34 F.3d at 1087. [16] The *Montrose* court's citation to *Charles George Trucking* emphasizes the fact that *Montrose* was not critical of the district court's lack of analysis of individual settlement shares of the participants, for the *Charles George Trucking* Court said that the individual shares don't matter, because:

> After all, the ultimate measure of accountability in any environmental case is the extent of the overall recovery, not the amount of money paid by any individual defendant.

*Charles George Trucking*, 34 F.3d at 1086.

16   This Opinion addresses precisely this issue in determining the reasonableness of the consent decrees in Part III.C.2, below.

[**49]   [HN4]

Disclosure and judicial analysis of the individual participants' shares is irrelevant in this case, where the proposed global settlement is not colored by individual party characteristics, such as inability to pay or severability of harm of particular settlors. The United States and State of New Jersey have seen fit to entertain and accept the group-wide offer. That the individual party shares are in fact already in place within the group, and that each share is derived from the common data, analysis, and negotiation in the Settlement Protocol Process are not in dispute. Further, to require disclosure and judicial examination of each party's proposed settlement share would be to compel the performance of an endless judi-

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

cial task of micro-adjudication of the reasonableness of each of 250 parties' allocated settlement shares. [17] This examination could tend toward causing the precise delay and expenditure of judicial resources that the entry of a CERCLA consent decree is meant to avoid.

> 17    The Clean Sites Report was available to Magistrate Judge Rosen, who used it in the settlement process, and he has retained the copy.

[**50]  For these reasons, this court holds that the [HN5]settling parties need not include in the Consent Decrees their individual monetary settlement shares, their bases of settlement allocation, or their individual proportions of site liability as determined by the settlement process among PRPs. It is sufficient that the terms, rationales, and bases of the Consent Decrees have been disclosed on a groupwide basis including all settling parties, from which the court may determine whether the group's proposed settlement is fair, reasonable, and faithful to CERCLA.

## C. Analysis of the Consent Decrees

### 1. Procedural and Substantive Fairness

Assessing fairness of a CERCLA consent decree requires addressing both procedural and substantive fairness. Procedural fairness considers the openness, candor, and bargaining balance of the settlement process. [*284] *Cannons*, 899 F.2d at 86. The procedural fairness analysis looks at the quality of "informed, arm's length bargaining." *United States v. Rohm and Haas*, 721 F. Supp. at 681, quoting *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 692 (S.D.N.Y. 1988).

As outlined above, the court holds that the Settlement Protocol Process, which led [**51] to the Clean Sites Report and negotiations through the professional mediation team under supervision of the Magistrate Judge, was procedurally fair. Settlement process participants, working with the court, designed and drafted the protocol, which defined the procedures and the participants' obligations and rights. A large majority of the PRPs opted in to the process and selected group liaison counsel to coordinate it. Pursuant to the Settlement Process Protocol, a national accounting firm supervised collection and compilation of data gathered through extensive questionnaire responses and document production. Parties' obligations to one another were enforced through the group liaison counsel, functioning as the Settlement Process Committee. The data were open to inspection and verification by all participants, to assure accuracy and completeness. Two rounds of corrections to this enormous [18] data base were conducted by the Waste Accountant to eliminate mistakes such as double-counting of wastes, underreporting, or misidentification of genera-

tors or haulers. This court oversaw the administration of the Settlement Process Protocol through frequent conference calls and occasional hearings [**52]  as the reliable data base was constructed over a two-year period, during which the settlement process participants' litigation burdens were stayed.

> 18   The Settlement Process Committee reported to the court in 1994 that the computer generated "data dump" reflecting the corrected inputted information in the waste accountant's format was a printout standing four feet high.

Every participant had access to the court to register complaints if it appeared that the settlement process was conducted unfairly or otherwise in a manner inconsistent with the Settlement Process Protocol. Also, disputes as to the adequacy of responses were subject to resolution by a Special Master selected by the participants pursuant to the Protocol. Importantly, the process was entirely non-binding and a participant was free to opt out as if it had never participated, subject only to paying its share of the settlement process fees incurred before its withdrawal.

The assembly of the reliable data base was a necessary but not a sufficient [**53]  step toward completion of the process. Those data, as refined and set forth in the Waste Accountant's Report, were furnished to all participants and eventually to Clean Sites, Inc., which under the Protocol heard the participants' views upon the various equitable allocation factors to be applied. Clean Sites made adjustments for types of wastes and converted the various reported volumes (*e.g.*, tank loads, truck loads, barrels, tons, gallons) to a common currency, and began the allocation process by applying the developed allocation factors and assumptions. Again, the participants, whose interests throughout the process were generally adverse to each other, were afforded opportunities to present advocacy with respect not only to their own allocated shares, but also with respect to the shares allocated to other participants. This arm's length check-and-balance through informed advocacy by knowledgeable counsel was a feature that also assured procedural fairness. There is no dispute that Clean Sites, "after considering the equitable factors suggested by the Participants and selecting those equitable factors it deemed appropriate for consideration under the circumstances, based the [**54]  Clean Sites Report on such equitable factors... [and] supplied those equitable factors, or attempted in good faith to apply those equitable factors, evenhandedly and consistently with respect to all the Participants.... Clean Sites, in preparing the Clean Sites Report, attempted, as best it could, to replicate the result which would have occurred had the Court allocated responsibility pursuant to Section 113(f) of [CERCLA]." (Hyatt Aff. P 7.)

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Finally, the mediation team assisted the participants in reaching closure within the allocation process. Every party voicing an opinion has praised the steadfast and fair efforts of the mediation team and the supervision [*285] and coordination provided by Magistrate Judge Rosen. Counsel for the United States participated informally in the allocation settlement process through the mediators. The United States has received self-disclosure of information from various settling parties and knows that "the participating parties' shares in the allocation were generated based upon various 'nexus theories' tying the parties to the Site through direct shipments and assorted transporters, the quality of the evidence of actual disposal at the Kramer Landfill, [**55] the volume of waste shipped, and the relative toxicity of the waste." (Mem. of United States, at 7.) Further, the United States confirmed that "the allocation report also gave the municipalities a one-third discount due to their status, and allocated unattributable wastes *pro rata* among all participating parties." *Id.*

The court also finds that the underlying allocation and overall settlement embraced in the Consent Decrees are substantively fair. [HN6]Substantive fairness "goes to the fairness of the result, and requires that the settlement terms are 'based upon and roughly correlated with some acceptable measure of comparative fault....'" *United States v. Atlas Minerals and Chems.*, 851 F. Supp. 639, 653 (E.D.Pa. 1994), *quoting Cannons*, 899 F.2d at 86. This requires the government to demonstrate a "plausible explanation" for "measuring comparative fault and allocating liability" in the amount set forth in the Consent Decree. *Cannons*, 899 F.2d at 87. Substantive fairness includes the "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id.* The United States and the State have met this burden.

[**56] The substantive fairness of the apportionment of liability derives from the carefulness with which it was determined in the arm's length bargaining process among many parties with adverse interests. There is a highly rational basis for the apportionment, articulated by the neutral evaluators and evidencing a successful good faith attempt to replicate the application of equitable factors to the facts and assumptions of each participant's comparative fault. A most telling measure of substantive fairness is the fact that the vast majority of participants followed through and ratified the non-binding allocation, with the advice of knowledgeable and experienced counsel.

The substantive fairness also derives from the extensive hard bargaining between the governments and the PRP representatives, and more specifically the counsel for the Settling Work Defendants (or "Offerors"). Untold hours of bargaining between and among these experienced and creative counsel forged these Consent Decrees which provide a fair compromise of the parties' strongest and weakest positions; [19] [HN7]where this settlement "is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise [**57] and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice ... a presumption of validity attaches to that agreement." *United States v. Rohm and Haas*, 721 F. Supp. at 681, *quoting City of New York v. Exxon Corp.*, 697 F. Supp. 677, 692 (S.D.N.Y. 1988). Here, the federal and state environmental experts, armed with thorough knowledge of one of the most intensely studied Superfund sites in the nation, having also conducted confirmatory discovery and information exchange and having the benefit of a completed remedy now in its second year of full operation, negotiated fairly and struck a substantially fair compromise.

19 The reasonableness of the Consent Decrees, measured in terms of the overall stakes and litigation risks and the bearing of future risks, is addressed in Part III.C.2, below.

[HN8]The court has also considered whether the Consent Decrees are fair to non-settlors, as it is required to do. *United States v. Rohm and Haas Co.*, 721 [**58] F. Supp. at 680 ("effect of the proposed settlement on nonsettling parties" is a factor in approval of CERCLA consent decrees); *Akzo Coatings*, 949 F.2d at 1435; *United States v. Charter Int'l Oil co.*, 83 F.3d 510, 522 (1st Cir. 1996). Only one non-settlor, Sun, has expressed any objection on this ground. Sun is concerned that, in compromising their overall claims at 77 percent of the highest damages estimate, [*286] the federal and state Consent Decrees leave a 23 percent uncollected share which may impose too great a burden on non-settling parties, in the event a non-settlor is found to be jointly and severally liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

The short answer is that Sun, like every remaining non-settlor, is not a direct defendant in the Section 107(a) claims of the United States or State, and it is therefore not liable to imposition of joint liability for this site. As this court previously held, [HN9]CERCLA imposes joint and several liability for all response costs only upon direct defendants in Section 107(a) claims. *Kramer*, 757 F. Supp. at 414-16; *United States v. Kramer*, 953 F. Supp. 592, 599-600 (D.N.J. 1997). [HN10]Sun, like all non-settlors, will [**59] occupy the position of a contribution defendant upon the claims for contribution brought on behalf of the Offerors Group of Settling Defendants, pursuant to Section 113(f)(1) of CERCLA. The liability of contribution defendants under Section 113(f) may be several, but it may not be joint. *Id.*

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

As a contribution defendant, Sun's liability must first be proved by the contribution plaintiffs, and, if liable, then a suitable allocation of Sun's share must be determined taking into account such "equitable factors as the court deems appropriate" under CERCLA § 113(f)(1), applying federal common law including the factors reasonably calculated to assess Sun's proportionate fault. *Kramer, 757 F. Supp. at 412*; *Kramer, 953 F. Supp. at 597-601*. It has also been determined that contribution defendants which are found liable may be called upon to bear an equitable share of the "orphan share" of past and future remedial and response costs in this case. *Kramer, 953 F. Supp. at 601*. The court declines to render an advisory opinion as to the future application of the other equitable factors that may apply to Sun if it is found liable for equitable contribution under CERCLA § 113(f)(1). [**60] [20]

20  That a non-settlor may be called upon to bear a disproportionate share of liability is also a possibility. See *Cannons, 899 F.2d at 91*; *GenCorp., 935 F. Supp. at 934*; *Arizona v. Motorola, Inc., 139 F.R.D. 141, 145 (D. Ariz. 1991)* (noting, "This risk of disproportionate liability encourages parties to resolve their liability early, lest they be found responsible for amounts not paid by settling defendants"). If it is demonstrated in the contribution action that the group of PRPs represented by the Offeror Group settled early and took on the risks of under-compensation or no compensation by non-settlors who were shown to be liable at trial, then an equitable apportionment, such as through application of the so-called "Gore factors," 126 Cong. Rec. 26,779 & 26,781 (1980), is permitted by § 113(f)(1), *see, e.g., Kramer, 953 F. Supp. at 598* & n.5; *American Cyanamid Co. v. Nascolite Corp.*, 1995 WL 934871 at *7 (D.N.J. 1995), *quoting Environmental Trans. Sys., Inc. v. Ensco, Inc., 969 F.2d 503, 509 (7th Cir. 1992)*; See also, *State of New Jersey, Dep't of Envtl. Protection and Energy v. GEMS, 821 F. Supp. 999, 1008 n. 15 (D.N.J. 1993)*. One of the listed "Gore factors" on the non-exclusive listing is "the degree of cooperation by the parties with federal, state, or local officials..." which may include the equitable distinction between parties who chose to take the risk of settling early and others, if proved to be similarly situated, who did not. This issue is not here decided but awaits the allocation phase of trial.

[**61]  Further, there is little or no likelihood that the present third-party defendants who are non-settlors can be joined as direct CERCLA defendants by the United States or by the State. It appears the statute of limitations period for doing so expired by October of 1997, assuming no further response costs are incurred in the future. [21] For all those reasons, the court finds that the Consent Decrees are fair to non-settlors, who will continue to enjoy the benefit of pretrial preparation, dispositive motion practice and, if necessary, trial in accordance with the Federal Rules of Civil Procedure and Federal Rules of Evidence.

21  Under this court's ruling in this case, *United States v. Kramer*, slip op. (D.N.J. Feb. 25, 1998), [HN11]Section 113(g)(2) of CERCLA permits the United States to commence a subsequent action against new defendants until three years following the "completion of all response action" at the site. Assuming that the final recoverable expense was the additional work for cap repairs which concluded in October, 1994, the outermost boundary for the expiration of the limitations period would presently appear to have occurred in October of 1997.

[**62]  *2. Reasonableness of Consent Decrees*

It has been held that [HN12]"a district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculation." *United States v. Charter* [*287]  *Int'l Oil Co., 83 F.3d 510, 521 (1st Cir. 1996)*. To ascertain reasonableness, the court must make an independent determination of the technical adequacy of the work to be performed in cleansing and protecting the environment, whether the compensation to the public for response costs is satisfactory, and the risks and delays inherent in continuing the litigation. *Cannons, 899 F.2d at 89-90*.

Here, the technical adequacy of the remediation under this settlement is not in question. [22] The remedy has been completed, the long-term operation and maintenance (O&M) have commenced, and fifteen months' experience of O&M managed by the Settling Work Defendants has been underway and have earned the State's expression of overall satisfaction with their performance. The settlement requires this O&M by the settling parties to continue through May 12, 2023 and to undertake the five-year reviews including any studies reasonably required by EPA. The Consent Decrees also place the incentive [**63]  for thorough and competent O&M squarely upon the settling parties who remain responsible for future response costs.

22  Throughout the litigation, the government's remedy, as carried out by the Army Corps of Engineers through private contractors, was disputed by PRP's as "overkill," that is, designed and executed in an unreasonably expensive, non-cost ef-

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

fective manner. To the extent that the remedy is over-designed, this provides an extra measure of environmental protection. This court previously ruled that [HN13]allegations that the United States' costs were unreasonable and excessive did not provide a defense to cost recovery, *United States v. Kramer*, 913 F. Supp. 848 (D.N.J. 1995). Whether all claimed costs were consistent with the National Contingency Plan, however, has not been adjudicated.

The court also finds the compensation to the public to be satisfactory. The United States will recover $ 95 million of a possible maximum of $ 123 million for Remedial Investigation and Feasibility Study, the remedial design, [**64] remedy construction, indirect and enforcement costs, and pre-judgment interest. This represents a 77% recovery of total costs. By way of compromise, the United States, through the upper levels of the U.S. Department of Justice and the U.S. Environmental Protection Agency, agreed to accept this sum, together with other covenants and undertakings by the settling parties, as appropriate to resolve all claims by the United States. This compromise appropriately takes into account such factors as the estimated volume and nature of the hazardous substances contributed to the Site by the settling parties and various "orphan" parties and the risks and expense of litigation necessary to pursue the case against the Direct Defendants through trial and judgment. (Mem. of United States at 6.)

Likewise, the State of New Jersey, through the Attorney General and the Department of Environmental Protection, assessed the monetary claims for § 107(a) costs and struck a similar balance by way of compromise, accepting the sum of $ 9.77 million of its pre-May 1997 costs and 100% of its future costs at the site. The complexity and risks of litigation and the value of an early settlement freeing state resources [**65] for O & M and remedial measures for use at other sites also spurred the compromise. (Mem. of State at 9.) The State's recovery likewise represents nearly 80% of the total past costs incurred by the State, while guaranteeing the continuation of operation and maintenance at the expense of the settling parties through the year 2023, together with paying the costs of future response actions through that time.

Damage to natural resources, while difficult to quantify, is also suitably addressed by these decrees. The New Jersey Department of Environmental Protection and the federal natural resource trustees in the U.S. Fish & Wildlife Service and the National Oceanic and Atmospheric Administration have studied the effect of the landfill upon its surroundings, especially Edwards Run and associated wetlands adjacent to the landfill which received some discharge of contaminated leachate and runoff. The

effects on migratory waterfowl and fresh water fish, as well as migratory fish, have been examined, since Edwards Run feeds Mantua Creek, which is tidally influenced from the Delaware River. No serious or prolonged degradation toward these species of aquatic life have been noted, yet damage to [**66] the wetlands has been observed; hence, the State National Resource [*288] Damage Consent Decree suitably requires the Settling Defendants to purchase wetlands and wooded uplands amounting to 151 acres, which will be preserved in perpetuity and conveyed by deed to the Township of West Deptford, together with payment of $ 190,000 in damages compensation to the State. This perpetual restriction upon valuable open land (which is itself costing the settling parties an additional sum of $ 968,614), consisting of a greater area than the affected wetlands, constitutes a gain for the public and a desirable resolution of the natural resource damage claims, and is consistent with N.J.S.A. 58:10-23.11g(a)(2). The federal Consent Decree requires compliance with the State's Decree as to these natural resources, consistent with Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C).

The settling parties are also paying a reasonable proportion of the overall liability when one considers the rather substantial fair share which would otherwise be payable by the owner/operator, Helen Kramer and her related entities, if she were not insolvent. The Kramer family were the active owners and operators of the [**67] Superfund site which has made their name somewhat infamous. Although many tons of hazardous waste at this site cannot be linked to any other party, and the origin of many other tons is in dispute, it can all be linked to the Kramers, yet they are unable to contribute to the settlement and have been voluntarily dismissed as a direct defendant. The 77% compromise thus also reflects the governmental recognition that it would be unfair to place this entire owner/operator share upon this subset of other PRPs whose "ideal" share of liability -- "based on perfect knowledge of harm caused by [these] parties only, expressed as a proportion of the total costs of remediation at the site," *Kramer*, 953 F. Supp. at 595 -- is undoubtedly less than the compromise figure reached for this group. These parties are paying a disproportionate share of their liability measured in "ideal" terms, leavened, however, by the risk that their ultimate share of liability to the United States as direct defendants could be 100% by operation of joint and several liability under § 107(a) of CERCLA, as previously discussed. The monetary incentive to settle litigation occurs at that point where the risks of litigation [**68] move the government and the settling parties away from their respective "ideal" positions of 100% recovery for the government versus only the proportionate "ideal" share for a PRP. That balance has been reasonably struck in these consent decrees.

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

The court further finds that the risks of litigation have been reasonably appreciated by the settling parties. The State of New Jersey aptly points out:

> The settlement is also reasonable in light of the complexity of the various liability cases to be made against various Defendants. The matters in dispute arise out of the operation of a landfill as far back as 30 years ago. Memories are inexact. Key witnesses have died. The documentary record is voluminous, complex, and in certain respects, not complete.

Mem. of State at 9.

The United States, too, has properly acknowledge the risks and costs of bringing the matter to trial, given the relative strengths and weaknesses of the parties' litigating positions. (Mem. of United States at 23.) For example, issues remained regarding the scope of review to be applied to post-ROD (record of decision) design changes by the EPA which may have significantly changed the approved remedy, [**69] as to which the direct defendants may have argued that such changes were not in accordance with law or were otherwise inconsistent with the National Contingency Plan. The court mentions, but does not rule on, some of the competing litigation positions, since such a ruling would require an adjudication of merits that can only be performed after discovery and trial, and not in the context of examining the reasonableness of a proposed consent decree; to do so would be at cross-purposes with CERCLA's goal of promoting compromise settlement. *Comerica Bank-Detroit v. Allen Indus.*, 769 F. Supp. 1408, 1411-12 (E.D. Mich. 1991); *Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 148 (D. Ariz. 1991).

Finally, the court finds that the consent decrees are reasonable in placing the risks of future uncertainties upon the settling parties [*289] rather than the governments. For example, the decrees are subject to "reopener" in the event EPA determines that previously unknown conditions or information indicate that the remedial actions are not protective of the human health or the environment. The Settling Defendants, however, have obtained the repose offered by contribution protection under § 113(f)(2) [**70] of CERCLA, by extinguishing the contribution claims of other parties against the Settling Defendants with respect to the Site.

Taking all these factors into account, the court has no hesitation in finding that these Consent Decrees are reasonable.

*3. Consistency with CERCLA*

The mandate of CERCLA is to remedy releases of hazardous substances into the human environment by imposing the burdens of remediation and of future risks upon parties liable for causing the harm, consistent with due process. Similarly, under the Spill Compensation and Control Act, the New Jersey Legislature has declared the State's policy "to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such substances...." N.J.S.A. 58:10-23.11a. These Consent Decrees will serve these public interests.

CERCLA encourages prompt and effective cleanup by responsible parties, while preserving both public finances and public health. The decrees largely replenish the CERCLA Superfund and the New Jersey Spill Fund, which constitute limited public resources, (*See, e.g.*, 131 Cong. Rec. H11,070 (Dec. 5, 1985) (Statement of Rep. Florio); N.J.S.A. 58:10-23.11r.) Further, the Settling Defendants' agreement to perform the five year reviews likewise frees public money to be devoted to other sites where public health and the environment are threatened. The settlements have also well served CERCLA's goal of reducing litigation and transaction costs, *see Cannons, 899 F.2d at 90*; *Rohm & Haas Co., 721 F. Supp. at 696.* By simplifying the remaining litigation, which is reduced to a contribution recovery action by the settlors against a few remaining alleged PRPs, the public and the parties benefit from the "saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Env't v. Gorsuch*, 231 U.S. App. D.C. 79, 718 F.2d 1117, 1126 (D.C. Cir. 1983), *cert. denied sub nom. Union Carbide Corp. v. NRDC*, 467 U.S. 1219, 81 L. Ed. 2d 373, 104 S. Ct. 2668 (1984). Likewise, the savings of governmental litigation resources of experienced counsel and staff may now instead be devoted to other pressing cases where litigation is necessary.

The tangible benefits [**72] of containment, remediation, and restoration of a healthy environment for humans, animals, and plants, and the perpetual preservation of pristine lands in the vicinity, are the highest manifestation of the public benefits of these decrees, all of which this court finds to be faithful to the mandates of CERCLA.

### IV. CONCLUSION

After eight years of litigation and settlement processes, and after an independent review of the procedural and substantive fairness, reasonableness, and fidelity to the public interest embodied by the Federal Consent Decree, the State Consent Decree, and the State Natural

19 F. Supp. 2d 273, *; 1998 U.S. Dist. LEXIS 14183, **;
47 ERC (BNA) 1645; 29 ELR 20294

Resource Damages Consent Decree, this court concludes that these decrees should be approved and entered. [23]

> 23   This court notes the eloquent concluding observation of counsel for the United States, who said in her Reply Memorandum at 12:
>
>> Literally hundreds of thousands of words of advocacy have been submitted to this Court in this case over the years. Let the final words of the United States be these: the settlement is fair.

This court agrees.

[**73] *September 3, 1998*

Date

JEROME B. SIMANDLE

U. S. District Judge