**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
───────────────────────────────── x
In re:                                    :        Chapter 11
                                          :        Case No. 07-12148 (BRL)
ALPER HOLDINGS USA, INC.,                 :
                                          :
                    Debtor.               :
───────────────────────────────── x
                                          :
HARRY HOLT, et al.,                       :
                                          :
                    Appellants,           :        District Court
                                          :        Case No. 08-cv-02489-CM
         v.                               :        (Consolidated)
                                          :
ALPER HOLDINGS USA, INC.,                 :
                                          :
                    Appellee.             :
───────────────────────────────── x
                                          :
RAY AND CATHY FLAKE,                      :
                                          :
                    Appellants,           :
                                          :
         v.                               :
                                          :
ALPER HOLDINGS USA, INC.,                 :
                                          :
                    Appellee.             :
───────────────────────────────── x
                                          :
JON AND CHARLOTTE ARMSTRONG,              :
                                          :
                    Appellants,           :
                                          :
         v.                               :
                                          :
ALPER HOLDINGS USA, INC.,                 :
                                          :
                    Appellee.             :
───────────────────────────────── x

———————————————————— x
                                        :
THE ADKINS CLAIMANTS,                   :
                                        :
                    Appellants,         :
                                        :
          v.                            :
                                        :
ALPER HOLDINGS USA, INC.,               :
                                        :
                    Appellee.           :
———————————————————— x


**APPENDIX OF ITEMS INCLUDED IN BRIEF OF APPELLEE**




MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Counsel for Debtor-Appellee Alper Holdings USA, Inc.*

| **Description of Pleading/Evidence** | **Tab** |
| --- | --- |
| Memorandum Decision and Order Granting Objections of Alper Holdings USA, Inc. to Proofs of Claim Filed by (i) Armstrong Plaintiffs and (ii) Holt Plaintiffs (Docket No. 157) | 1 |
| Declaration of Jessica L. Fink in Support of Objection of Alper Holdings USA, Inc. to Harry Holt Plaintiffs' Proofs of Claim (Docket No. 118) (only referenced portions included) | 2 |
| Harry Holt Plaintiffs' Memorandum of Law In Support of Response To Objections of Alper Holdings USA, Inc. To Proofs of Claim Filed By The Harry Holt Plaintiffs (Docket No. 146) | 3 |
| Response of Harry Holt Plaintiffs to Objection of Alper Holdings USA, Inc. To Proofs of Claim Filed By The Harry Holt Plaintiffs (Docket No. 144) | 4 |

**<u>TAB 1</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter:    11 |
| ALPER HOLDINGS USA, et al. | Case No.:  07-12148 (BRL)<br>            Jointly Administered |
| Debtors. |  |

**MEMORANDUM DECISION AND ORDER GRANTING OBJECTIONS**
**OF ALPER HOLDINGS USA, INC. TO PROOFS OF CLAIM FILED BY**
**(i) ARMSTRONG PLAINTIFFS AND (ii) HOLT PLAINTIFFS**

Alper Holdings USA, Inc. ("Alper"), the debtor, seeks entry of an order disallowing and

expunging (i) claim numbers 12 and 13 (the "Armstrong Claims") filed by the Armstrong

Plaintiffs[1] (the "Armstrong Objection") and (ii) claim numbers 35 through 45 (the "Holt

Claims," and together with the Armstrong Claims, the "Claims") filed by the Holt Plaintiffs[2] (the

"Holt Objection," and together with the Armstrong Objection, the "Objections"), pursuant to

section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Armstrong Plaintiffs and

the Holt Plaintiffs oppose the Objections.

For the reasons set forth below and at oral argument, and in accordance with this Court's

previous Memorandum Decision on Objection of Alper to Proofs of Claim (Claim Nos. 29 and

21) filed by Flake Plaintiffs dated January 15, 2008 (the "Flake Opinion"), the Court finds Alper

cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire

Industrial, Inc.'s ("Saltire") alleged contamination or remediation in Dickson County, Tennessee.

Therefore, the Claims are disallowed.

---

[1]    The Armstrong Plaintiffs include Charlotte Armstrong and Jon Armstrong (together, the
    "Armstrong Plaintiffs").

[2]    The Harry Holt Plaintiffs include Harry Holt, Beatrice Holt, Sheila Holt-Orstead, Jasmine
    Orsted, Bonita Holt, O'Brian Holt, Brandon Holt, Patrick Holt, Bianca Bentley,
    Demetrius Holt and David Brown (collectively, the "Holt Plaintiffs").

## BACKGROUND

This Court has previously discussed the facts and circumstances preceding Alper's bankruptcy at length in the Flake Opinion, including a discussion of Saltire and the contamination in Dickson County, Tennessee, and the Court generally refers all parties to the Flake Opinion.  Briefly, the Armstrong Claims and Holt Claims, much like other claims this Court has had the opportunity to address in these proceedings, both arise in connection with groundwater contamination and environmental problems that arose as far back as the mid-1960's in Dickson County, Tennessee, that were allegedly caused, in part, by Saltire (an incidental and indirect subsidiary of Alper).  From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the "Dickson Plant") where it made automotive tire valves and associated products and where trichloroethylene ("TCE") was used as a degreaser.  The Dickson Plant ceased operations in March 1985.  Since filing for bankruptcy on July 13, 2007, numerous parties have filed claims against Alper based on, among other things, Saltire's alleged contamination in Dickson County.

### The Flake Opinion

On January 15, 2008, this Court issued the aforementioned Flake Opinion, which granted Alper's objection to certain claims asserted by Cathy and Ray Flake (together, the "Flake Plaintiffs") arising out of claims similar to those presently at issue for personal and property damages based upon the alleged contamination in Dickson County.  *In re Alper Holdings USA*, 07-12148 (BRL), 2008 WL 160203 (Bankr. S.D.N.Y. Jan. 15, 2008).  In that instance, the Flake Plaintiffs claimed (the "Flake Claims") to have suffered personal and property damage due to the intentional or negligent failing of Alper (along with 20 other defendants) to "adequately monitor, control, supervise and/or maintain the disposal of the TCE at all locations throughout Dickson."

17584135\V-1

As is also presently the case, the Flake Plaintiffs alleged theories of both direct and indirect liability against Alper.

This Court granted Alper's objection and disallowed the Flake Claims based in large part upon the facts that (i) Alper's ownership interest in Saltire was not only indirect but also incidental as Alper only became the controlling shareholder of Saltire in connection with the reorganization of Saltire's parent First City Industries, Inc.[3] ("First City") and (ii) Alper had no connection or relationship to Saltire or Dickson County prior to obtaining an indirect ownership interest in Saltire in 1992 – nearly two decades after the alleged contamination first occurred and at least seven years after the Dickson Plant was closed.  Specifically, this Court found that Alper had no direct liability to the Flake Plaintiffs because (a) it was Saltire and not Alper that operated the Dickson Plant and, therefore, Alper owed no duty of care to the Flake Plaintiffs, and (b) the Flake Plaintiffs failed to set forth any facts that Alper actually participated in or oversaw Saltire's remediation in Dickson County that would support a finding that Alper may have assumed a duty of care to the Flake Plaintiffs.  *Id.* at *4-5.

This Court also found that Alper had no indirect liability to the Flake Plaintiffs on either a theory of alter ego or piercing the corporate veil because neither the existence of a management agreement between Alper and Saltire nor a common employee between the parent and subsidiary would justify the extraordinary remedy of piercing the corporate veil as argued by the Flake Plaintiffs.  *Id.* at *5-6.  In so holding, the Court clearly held that "Alper cannot be held liable, directly or indirectly, for claims arising out of or relating to Saltire's alleged contamination or remediation in Dickson County, Tennessee."  *Id*. at *7.  With that introduction in mind, the Court now proceeds with the claims presently at issue.

---

[3]    As a creditor of First City, Alper received shares of stock as a stock-for-debt distribution in the reorganized First City on account of its allowed claim pursuant to First City's plan of reorganization.  *See* Transcript of January 8, 2008 Hearing, at 25-26.

## THE ARMSTRONG CLAIMS

On or about September 19, 2007, the Armstrong Plaintiffs filed their original proofs of claim (the "Original Proofs of Claim") asserting contingent, unliquidated, and disputed property damage claims against Alper.  The Original Proofs of Claim <u>were based entirely upon a complaint</u> filed by the Armstrong Plaintiffs against Alper (along with 18 other named defendants) on or about April 8, 2004 (the "Armstrong Complaint"), in which the Armstrong Plaintiffs claim to have suffered a "diminution" in the value of certain real property as a direct result of the "defendants" alleged contamination in Dickson County.  The Armstrong Complaint alleged that Alper was liable for the property damages asserted based upon (a) Alper's own "direct acts and omissions" and (b) a theory that Alper was Saltire's successor-in-interest.  While the Armstrong Complaint alleged that Alper was liable for its own direct acts, the complaint failed to detail with any specificity what those direct acts might actually entail; rather, the Armstrong Plaintiffs relied on broadly pled causes of action asserted generally against the "defendants."

On February 6, 2008, however, the Armstrong Plaintiffs, undoubtedly daunted by the Flake Plaintiffs' holding, amended the Original Proofs of Claims (the "Amended Proofs of Claim").[4]  In the Amended Proofs of Claim, the Armstrong Plaintiffs contend for the first time that they were not alleging that Alper caused or contributed to the initial contamination in Dickson County, but rather, that Alper assumed control of the remediation efforts in Dickson

---

[4]     Alper has objected to the filing of the Amended Proofs of Claim contending that the filing of the Amended Proofs of Claim some five months after the expiration of the September 21, 2007 bar date is "an impermissible amendment to the Original Armstrong Claims because they are based on a set of facts and theory of liability completely different than those asserted in the Original Armstrong Claims and there is no equitable reason to permit the late-filed claims."  Objection of Alper Holdings USA to Amendment of Proofs of Claim (Claim Nos. 12 and 13) Filed by Armstrong Plaintiffs dated February 20, 2008, at ¶ 3.

County and conducted such remediation in a negligent manner.  The pleadings attached to the

Amended Proofs of Claim sought to build upon the theory first introduced by the Flake Plaintiffs

that Alper controlled the remediation in Dickson County (and assumed a duty to the Armstrong

Plaintiffs) by further alleging that Nicholas Bauer, the same common employee of Saltire and

Alper previously discussed in the Flake Opinion, oversaw the remediation in Dickson County on

behalf of Alper.[5]  More precisely, the Amended Proofs of Claim allege that Mr. Bauer: (a)

considered himself an employee of Alper and not Saltire, (b) was hired by Alper for the sole

purpose of overseeing the remediation in Dickson County, (c) represented himself as an Alper

official who had responsibility for environmental matters at Saltire, and (d) operated from an

office in Virginia, a jurisdiction where only Alper and not Saltire was authorized to do business.

Alper objects to the Armstrong Claims arguing that they (as reformulated in the

Amended Proofs of Claims) are fundamentally the same negligent remediation claims that the

Court previously dispensed with in the Flake Opinion.  Additionally, Alper contends that even if

all of the allegations regarding Mr. Bauer are taken as true, the Flake Plaintiffs have still failed to

"allege a plausible basis for liability against Alper."  Alper further contends that any claims for

alter ego or successor liability must be disallowed because such claims were property of Saltire's

bankruptcy estate and were released under Saltire's plan of reorganization (the "Saltire Plan").

In contrast, the Armstrong Plaintiffs claim that the Armstrong Claims should not be

dismissed because *inter alia* (a) the Armstrong Plaintiffs' proofs of claim contained sufficient

allegations to survive what they contend is a motion to dismiss, and (b) the Armstrong Plaintiffs'

---

[5]    The Flake Plaintiffs previously alleged that Mr. Bauer was not an employee of Saltire at all, but rather was hired solely by Alper to deal with the remediation in Dickson County. The Court, however, previously held that not only was Mr. Bauer clearly an employee of Saltire (specifically, vice president of environmental affairs), but also that that he was acting on behalf of Saltire and not Alper in overseeing or participating in the remediation in Dickson County.  *In re Alper Holdings,* 2008 WL 160203, at *6.

alter ego claims against Alper could not have been released under the Saltire Plan because the Armstrong Plaintiffs' alter ego claims were not property of the estate.

As previously discussed in the Flake Opinion, the fact that a parent company and its subsidiary share common employees is insufficient to impose liability on the part of the parent for acts of the subsidiary. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.") (internal quotations omitted); *see In re Alper Holdings*, 2008 WL 160203, at *5-6. Regarding the roles of common or overlapping employees, the United States Supreme Court in *United States v. Bestfoods* stated that "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," absent a situation where a common employee might "depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." 524 U.S. at 69-71; *see also In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560, 588 (S.D.N.Y. 2007).

Like the Flake Plaintiffs before them, the Armstrong Plaintiffs have failed to allege any facts that would justify imposing liability on the part of Alper. Alper's ownership interest in Saltire came about merely as a result of a debt to equity swap in First City's then pending chapter 11 bankruptcy – and the Court will not make use of this incidental ownership interest to hold Alper indirectly liable for events that predated Alper's ownership interest in Saltire by nearly two decades. *See e.g., Da Silva v. Kinsho Intern. Corp.*, 210 F. Supp. 2d 241, 244 (S.D.N.Y. 2000) ("This Court agrees that a parent company should not lightly be held responsible for the acts of its subsidiaries absent proof that the parent was involved in the particular circumstances giving rise to the litigation."). Most notably, as Alper suggests in its reply, even if all of the allegations

- 6 -

regarding Mr. Bauer and Alper are taken as true, the conduct alleged still falls well short of the "depart[ing] so far from the norms of parental influence" standard set forth by the Supreme Court in *Bestfoods* as the Armstrong Plaintiffs have failed to allege any acts by Mr. Bauer that would overcome the legal presumption that he was acting on behalf of Alper and not Saltire.

Accordingly, as the conduct alleged is insufficient to overcome the legal presumption that Mr. Bauer was acting on behalf of Saltire and not Alper, the Court sees no reason to part ways with the reasoning and rationale previously set forth in the Flake Opinion.  *See, e.g., In re Manhattan Invest. Fund Ltd.*, 343 B.R. 63, 67 (S.D.N.Y. 2006) ("The law of the case is a discretionary doctrine, providing 'that where a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  While the law of the case is "a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided," nevertheless, the situations justifying reconsideration are generally limited to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal citations omitted); *641 Ave. of Americas Ltd. Partnership v. 641 Associates, Ltd.*, 189 B.R. 583, 588 (S.D.N.Y. 1995) ("[U]nder the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation.").  The Court finds no basis to impose a duty on the part of Alper – direct, indirect, assumed or otherwise – and therefore, the Armstrong Claims are disallowed.

## THE HOLT CLAIMS

Similar to the Armstrong Claims and the Flake Claims before them, the Holt Claims, which are based upon a separate complaint filed on or about December 3, 2003 (the "Holt Complaint"), assert various claims for both personal and property damage based upon, *inter alia*, Saltire's negligent contamination at the Dickson Plant and surrounding area.  Unlike the

Armstrong Plaintiffs, however, the Holt Plaintiffs allege damages based entirely upon injuries caused by the original contamination in Dickson County and not by any subsequent remediation or negligence. Accordingly, the Holt Plaintiffs' allegations as they pertain to Alper are based entirely on a theory of alter ego liability. In particular, the Holt Plaintiffs assert that Alper is liable as the alter ego of Saltire because (a) Alper was not merely an indirect or incidental parent of Saltire as had been previously contended, but rather was formed for the sole purpose of acquiring First City during its then pending chapter 11 proceeding, (b) Alper dominated and controlled the management and direction of Saltire to a much greater extent than previously suggested, and (c) Alper and First City diverted assets away from Saltire, which left Saltire grossly undercapitalized and eventually necessitated Saltire filing for bankruptcy protection under chapter 11 of the Bankruptcy Code in August 2004.[6]

Alper objects to the Holt Plaintiffs' alter ego and successor liability claims charging that such claims must be disallowed because (i) alter ego claims that Saltire may have had against Alper were property of the estate and were released under the Saltire Plan and (ii) even if such claims were not released pursuant to the Saltire Plan, no alter ego claims could be asserted against Alper because Saltire was a publicly traded company during the entire time that it operated the Dickson Plant and Alper did not exercise any dominion or control over Saltire's operations as required to support such claims.

In response, the Holt Plaintiffs contend that their alter ego claims against Alper were not property of the estate but rather were nondebtor third party claims that Saltire was unable to release under the Saltire Plan because *inter alia* (a) Tennessee law and not Delaware should control the analysis of alter ego claims and under Tennessee law, a debtor does not have the ability to pierce its own corporate veil, and (b) the claims asserted by the Holt Plaintiffs in the

---

[6] *In re Saltire Industrial, Inc.*, Case No. 04-15389 (BRL) (Bankr. S.D.N.Y. 2004).

Holt Complaint are personal to the Holt Plaintiffs and could not have been brought by any creditor of Alper.

As previously set forth in the Flake Opinion, courts are very reluctant to disregard the corporate form.[7]  *See Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 233 F.R.D. 143, 145 (D. Del. 2005) ("[T]he separate and distinct corporate identities of a parent and its subsidiary are not readily disregarded, except in rare circumstances justifying the application of the alter ego doctrine to pierce the corporate veil of the subsidiary."); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("It is only the exceptional case where a court will disregard the corporate form…"); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) ("Since it is the exceptional instance where a court will disregard the corporate form, the party who wishes the court to disregard that form 'bears the burden of proving that there are substantial reasons for doing so.'").  Under Delaware law, a corporate veil will not be pierced absent a showing of "fraud or something like it."  *Mobile Oil Corp.*, 718 F. Supp. at 268; *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) ("[T]o pierce the corporate veil based on an agency or 'alter ego' theory, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (internal quotations omitted).

Under Delaware law, an alter ego cause of action constitutes a corporate right.  *See, e.g.*, *In re Enron Corp.*, 2003 WL 1889040, at *3 ("Based on the fact that Delaware law allows a

---

[7]    While the Holt Plaintiffs suggest otherwise, it is clear under New York law that the law of the state of incorporation controls the analysis of alter ego claims and, accordingly, Delaware law controls our analysis.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (internal quotations omitted); *Kalb v. Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("[b]ecause a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003).

subsidiary to maintain an action against a corporate parent, a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil"); *Pereira v. Cogan*, 00-CIV-619, 2001 WL 243537, at *19-20 (S.D.N.Y. Mar. 8, 2001) ("It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporation fiction, or an involuntary tort creditor. However piercing the corporate veil and alter ego actions are allowed to prevent unjust or inequitable results; they are not based solely on a policy of protecting creditors..... [Therefore] it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.") *citing Phar-Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1240 n. 20 (3d Cir. 1994); *Murray v. Miner*, 876 F. Supp. 512, 516 -17 (S.D.N.Y. 1995) ("One can only conclude that for purposes of applying federal bankruptcy law, Delaware courts would permit a debtor corporation to 'assert[ ] an alter ego claim to pierce its own corporate veil....'") (internal citations omitted). The law permits a debtor to pierce its own corporate veil because "[a]llowing the trustee or debtor-in-possession to pursue the claim avoids the prospect of creditors seeking to gain advantage over other creditors by pursuing the alter ego claims on a first-come, first-serve basis." *In re Enron Corp.*, 2003 WL 1889040, at *4.  As the Second Circuit stated in *Kalb, Voorhis & Co. v. American Fin. Corporation*, 8 F.3d 130 (2d Cir. 1993):

> [G]ranting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of ensuring that all similarly situated creditors are treated fairly; the alter ego action is based upon allegations that if proven would benefit all [the debtor's] creditors, i.e., making more assets available to satisfy [the debtor's] debts.... If [the individual creditor's] action is not stayed it would collect its claim from a pool of assets that should be available to all creditors.

*Id*. at 132.

    "Where a claim is generalized, with no particularized injury stemming from it and where the claim may be brought by any creditor, the trustee or debtor-in-possession is the appropriate

party to assert the claim and creditors are subject to the outcome of the action brought by the trustee or debtor-in-possession." *In re Enron Corp.*, 2003 WL 1889040, at *4; *see also Murray v. Miner*, 876 F. Supp. 512,  516 (S.D.N.Y. 1995) (An alter ego claim "belongs to the trustee if (1) under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, and (2) plaintiffs' claim is a general one, of the type that could be brought by any creditor of the debtor.").

While the Holt Plaintiffs have further expounded upon the successor liability and alter ego theories previously dispensed with in the Flake Opinion,[8] the Court is not persuaded. Among other things, the Holt Plaintiffs assert that (a) Alper and Saltire operated as a single economic unit maintaining the same office space and over lapping employees, and (b) Alper and First City diverted assets away from Saltire and sold of many of Saltire's most profitable businesses, leaving it grossly undercapitalized and forcing Saltire to file for bankruptcy.  Clearly, claims of gross undercapitalization and fraudulent transfer such as those averred in the Holt Complaint are of a generalized nature and do not allege a "particularized injury" specific to the Holt Plaintiffs only and not Saltire's body of creditors at large.  While this Court previously did not address whether Saltire's alter ego claims were property of the estate, *see In re Alper Holdings*, 2008 WL 160203, at * 6, it is clear based upon the conduct presently alleged that such alter ego claims were in fact property of Saltire's bankruptcy estate and, accordingly, that those alter ego claims were released under section 13.1 of the Saltire Plan.[9]  Accordingly, the Holt Claims are disallowed.

---

[8]    The same, however, cannot be said of the Armstrong Plaintiffs, where counsel for the Armstrong Plaintiffs – who previously served as counsel for the Flake Plaintiffs – essentially restated the very same arguments dismissed by the Court in the Flake Opinion.

[9]    Section 13.1(b) of the Saltire Plan states, in pertinent part:

## <u>CONCLUSION</u>

For the reasons set forth above and at the hearing, and for the reasons set forth in the

Flake Opinion, the Court finds that Alper cannot be held liable, directly or indirectly, for claims

arising out of or relating to Saltire's alleged contamination or remediation in Dickson County,

Tennessee.  Therefore, the Claims are disallowed and expunged.

IT IS SO ORDERED.

Dated:  New York, New York
       February 25, 2008


                  _/s/ Burton R. Lifland_____
                  The Honorable Burton R. Lifland
                  United States Bankruptcy Judge

---

The Debtor . . . acquits and forever discharges Alper . . . from any and all actions, causes of action, [and] liabilities . . . in any way relating to the Debtor . . . that the Debtor could assert directly or any Holder of a Claim . . . could assert derivatively or on behalf of the Debtor or its estate . . . . Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

**TAB 2**

Luc A. Despins (LD 5141)
Andrew M. Leblanc (*pro hac vice*)
Jessica L. Fink (JF 6399)
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Counsel for Alper Holdings USA, Inc.,
Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------x
In re:                          :    Chapter 11
                                :
ALPER HOLDINGS USA, INC.,       :    Case No. 07-12148 (BRL)
                                :
                                :
                    Debtor.     :
-----------------------------x

**DECLARATION OF JESSICA L. FINK IN SUPPORT OF**
**OBJECTION OF ALPER HOLDINGS USA, INC.**
**TO HARRY HOLT PLAINTIFFS' PROOFS OF CLAIM**

Jessica L. Fink, pursuant to 28 U.S.C. § 1746, hereby

declares:

1.    I am an attorney with the firm of Milbank, Tweed,

Hadley & M<sup>C</sup>Cloy LLP, counsel for Alper Holdings USA, Inc., debtor

and debtor in possession in the above-captioned chapter 11 case

(the "Debtor").  I submit this declaration in support of the

Debtor's objection to proofs of claim numbered 35, 36, 37, 38,

39, 40, 41, 42, 43, 44, and 45 filed by Harry Holt Plaintiffs.[1]

---

[1]    The Harry Holt Plaintiffs include Harry Holt, Beatrice Holt,
       Sheila Holt-Orstead, Jasmine Orsted, Bonita Holt, O'Brian Holt,
       Brandon Holt, Patrick Holt, Bianca Bentley, Demetrius Holt and
       David Brown (collectively, the "Harry Holt Plaintiffs").

2.     Attached hereto as Exhibit A is a schedule listing the proofs of claim filed by the Harry Holt Plaintiffs.

3.     Attached hereto as Exhibit B is a true and correct copy of the Complaint, as amended, originally filed by the Harry Holt Plaintiffs on or about December 3, 2003.

4.     Attached hereto as Exhibit C is a true and correct copy of the Debtor's Modified First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for its First Amended Chapter 11 Plan of Liquidation in the matter of In re Saltire Industrial, Inc., Chapter 11, Case No. 04-15389 (BRL), dated December 28, 2005.

5.     Attached hereto as Exhibit D is a true and correct copy of the Environmental Indicator Memorandum, dated February 18, 2005.

6.     Attached hereto as Exhibit E is a true and correct copy of the Order Confirming Modified First Amended Plan of Liquidation of Saltire Industrial, Inc. Under Chapter 11 of the Bankruptcy Code, dated March 8, 2006.

7.     Attached hereto as Exhibit F is a true and correct copy of the Modified First Amended Chapter 11 Plan of Liquidation of Saltire Industrial, Inc., dated December 28, 2005.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 9, 2008

/s/Jessica L. Fink
Jessica L. Fink, Esq.

**(Only Referenced Exhibits Included)**

**EXHIBIT A**

| Claim Number | Claimant(s) | Type of Claim | Amount |
|---|---|---|---|
| 35 | Sheila Holt-Orsted | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 36 | Jasmine Orsted | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 37 | O'Brian Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 38 | Brandon Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 39 | David Brown | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 40 | Demetrius Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 41 | Harry Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 42 | Beatrice Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 43 | Bianca Bentley | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 44 | Bonita Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |
| 45 | Patrick Holt | Property Damage and Personal Damage | Unliquidated – Approximately $40 million |

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| BEATRICE HOLT, individually and as | ) | |
| surviving spouse and next of kin of her | ) | |
| husband, HARRY HOLT, deceased; SHEILA | ) | |
| HOLT-ORSTED, individually and as natural | ) | |
| mother of JASMINE ORSTED, a minor; | ) | |
| BONITA HOLT; O'BRIAN HOLT; | ) | |
| BRANDON HOLT; PATRICK HOLT, | ) | |
| individually and as natural parent of | ) | |
| BIANCA BENTLEY, a minor, and PATRICK | ) | |
| HOLT, JR., a minor; DEMETRIUS HOLT; | ) | |
| and DAVID BROWN; all individually and as | ) | |
| next of kin of HARRY HOLT, deceased, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.: 3:07-cv-00727** |
| | ) | **JUDGE HAYNES** |
| **v.** | ) | |
| | ) | |
| SCOVILL, INC., n/k/a SALTIRE INDUSTRIAL | ) | |
| INC.; ALPER HOLDINGS USA, INC.; | ) | |
| COUNTY OF DICKSON, TENNESSEE; | ) | |
| CITY OF DICKSON, TENNESSEE; | ) | |
| BETSY L. CHILD, COMMISSIONER OF THE | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| ENVIRONMENT AND CONSERVATION; and | ) | |
| SUSAN R. COOPER, COMMISSIONER OF | ) | |
| THE TENNESSEE DEPARTMENT OF | ) | |
| HEALTH, | ) | |
| | ) | |
| **Defendants.** | ) | |

**SECOND AMENDED COMPLAINT**

COME NOW the above-captioned Plaintiffs for their Complaint against

Defendants Scovill, Inc., n/k/a Saltire Industrial, Inc. ("Saltire"); Alper Holdings USA,

Inc. ("Alper"); County of Dickson, Tennessee ("County of Dickson"); City of Dickson,

Tennessee ("City of Dickson"); Commissioner Child of the Tennessee Department of

Environment and Conservation ("TDEC"); and Commissioner Cooper of the Tennessee

Department of Health ("TDOH"); and state as follows:

1.      This is an action for declaratory, injunctive, and monetary relief brought by Plaintiffs to redress the harm caused by their exposure to the toxic chemical trichloroethylene ("TCE") and other chemicals.  This action is also brought to redress the harm caused by intentional racial discrimination in the decision by certain Defendants to notify white property-owners of known TCE contamination, but not to notify Plaintiffs, who are African-American.  This action is further brought to redress the harm caused by intentional racial discrimination in the decision by Defendant City of Dickson to locate its dumpsite and landfill in a predominantly African-American community.

2.      This case arises out of Defendant Saltire's disposal of toxic wastes at the Dickson County Landfill and at other locations in the vicinity, including at Saltire's manufacturing facility on Schrader Lane in Dickson, resulting in Plaintiffs' exposure to contaminated water from no later than 1968 to 2000 (the "Exposure Period").  This case also arises under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq.*, because of the failure to warn, failure to exercise due care, and failure to follow the requirements of the Tennessee Solid Waste Disposal Act by Defendants County of Dickson and City of Dickson.  As a result of Defendants' unlawful acts, Plaintiffs have suffered, and will suffer in the future, property damage, personal injury, and death.

3.      This case also arises under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and 42 U.S.C. § 1983, as a result of intentional racial discrimination against Plaintiffs by Defendants County of Dickson, City of Dickson, and the Commissioners of TDEC and TDOH, in the decision by those Defendants not to notify

Plaintiffs of the known risk of exposure to TCE, while promptly notifying similarly situated white families of the risk of TCE contamination in their water sources; and in the decision by the City of Dickson to locate its dumpsite and landfill in a predominantly African-American community.

4.      The action by Beatrice Holt on behalf of Harry Holt, deceased, is by virtue of the Tennessee Wrongful Death Act, Tenn. Code Ann. § 20-5-106(a), for herself and other Plaintiffs as next of kin, for loss of consortium under that Act and related case law.

## JURISDICTION AND VENUE

5.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States; by 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of rights secured by the Constitution and Acts of Congress providing for equal rights; by 28 U.S.C. § 1343(a)(4) because Plaintiffs seek to recover damages and to secure equitable and other relief under Acts of Congress protecting civil rights, including the Civil Rights Act of 1871, as amended and codified at 42 U.S.C. § 1983; by 28 U.S.C. § 1334(b), in that this action arises in or relates to a bankruptcy case under Title 11; and by 28 U.S.C. § 1367(a), because any state-law claims are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Declaratory and injunctive relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in the District Court for the Middle District of Tennessee under 28 U.S.C. §§ 157(b)(5), 1391(b), and 1412.

## PARTIES

8.      Plaintiff Harry Holt, now deceased, resided in and was a citizen of Dickson County, and suffered property and personal damage until his death in January 2007.

9.      Plaintiffs Beatrice Holt, Demetrius Holt, and David Brown currently reside in and are citizens of Dickson County, and have suffered property and/or personal damages.  Plaintiffs Sheila Holt-Orsted and Jasmine Orsted currently reside in Dickson County about half the year and have suffered damages.

10.     Plaintiffs Patrick Holt, Bianca Bentley, and Patrick Holt, Jr., are former residents of Dickson County and currently reside in Davidson County, Tennessee, and have suffered damages.

11.     Plaintiffs Bonita Holt, O'Brian Holt, and Brandon Holt are former residents of Dickson County and currently reside in Montgomery County, Tennessee, and have suffered damages.

12.     During the Exposure Period, Plaintiffs all resided in or were citizens of Dickson County, Tennessee.

13.     All Plaintiffs are African-American.

14.     Defendant Saltire is a Delaware corporation with its principal place of business in New York, New York.  From 1964 to 1985, Saltire operated a manufacturing facility on Schrader Lane in Dickson County.  In August 2004, Saltire filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

15.     Defendant Alper is a Delaware corporation with its principal place of business in New York, New York.  Alper owns one hundred percent of the stock of

4

Saltire.  Alper and Saltire have the same business location at 800 Third Avenue, New York, New York.  Saltire has no employees, officers, or board members separate from those of Alper.  Alper is the alter ego of and controls the assets of Saltire, and has diverted Saltire's assets in such a manner as to leave Saltire grossly undercapitalized.  In July 2007, Alper filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

16.    Defendant County of Dickson is a municipality organized and existing under the laws of the State of Tennessee; is the owner and operator of the Dickson County Landfill on Eno Road in Dickson County, Tennessee ("Landfill"); and is responsible for maintenance of the Landfill in compliance with all applicable state and federal laws.

17.    Defendant City of Dickson is a municipality organized and existing under the laws of the State of Tennessee, and is the owner of the land where the Landfill is located.

18.    Defendants Commissioner of TDEC and Commissioner of TDOH (collectively, the "State Defendants") administer departments of the State of Tennessee and were charged with, among other duties, ensuring that state agencies complied with federal laws regarding operation and use of federally approved landfill at the state and municipal levels.  Prior to 1991, TDEC and TDOH were part of the same Department, known as the Tennessee Department of Health and the Environment (TDHE).  In 1991, the environmental programs of TDHE were transferred to a new Department, TDEC, and the health programs remained in a Department that was renamed TDOH.

## FACTS

19.    Harry Holt resided at the property located at 340 Eno Road, in Dickson, Dickson County, Tennessee (the "H. Holt Property") from 1973 until his death in January 2007 at age 66.  From at least 1961 to 1973, Mr. Holt lived at the home of his parents (the "R. Holt Property"), immediately adjacent to the H. Holt Property.  The domestic water supply for the Holt residence was, until 2000, provided by groundwater wells on the premises.  Mr. Holt was diagnosed with prostate cancer on December 2, 2002.  Mr. Holt was diagnosed with heart condition in October 2003 which is related to his exposure to TCE.  Mr. Holt died of cancer in January 2007, which is related to his exposure to TCE.

20.    Plaintiff Beatrice Holt is age 61 and was married to Harry Holt until his death in January 2007.  She has resided at the H. Holt Property since 1973.  From 1961 to 1973, Mrs. Holt lived at the R. Holt Property.  She was diagnosed with cervical polyps in September 2002.

21.    Plaintiff Sheila Holt-Orsted is age 46 and is the daughter of Harry and Beatrice Holt.  Sheila Holt-Orsted was born in 1961 and lived at the R. Holt Property until moving next door to the H. Holt Property in 1973.  Sheila Holt-Orsted grew up at the H. Holt Property and currently lives there about half the year.  Sheila Holt-Orsted was diagnosed with breast cancer in April 2003.

22.    Plaintiff Jasmine Orsted is a minor, age 13, (date of birth April 23, 1994) and is the natural daughter of Sheila Holt-Orsted.  Jasmine Orsted has resided on the H. Holt Property intermittently since she was an infant and currently lives there about half the year.  Jasmine Orsted suffers from a speech impediment and excessively dry skin.

23.     Plaintiff Bonita Holt is age 41 and is the daughter of Harry and Beatrice Holt.  Bonita Holt was born in 1965 and lived at the R. Holt Property until moving next door to the H. Holt Property in 1973.  Bonita Holt was diagnosed with stomach polyps and gastrointestinal disorder in 2000.

24.     Plaintiff O'Brian Holt is age 20 and is the natural son of Bonita Holt.  O'Brian Holt has resided on the H. Holt Property intermittently, and visited frequently, since he was an infant.  O'Brian suffers from Attention Deficit Hyperactivity Disorder.

25.     Plaintiff Brandon Holt is age 19 and is the natural son of Bonita Holt.  Brandon Holt has resided on the H. Holt Property intermittently, and visited frequently, since he was an infant.  Brandon Holt suffers from Attention Deficit Hyperactivity Disorder.

26.     Plaintiff Patrick Holt is age 43 and is the son of Harry and Beatrice Holt.  Patrick Holt was born in 1964 and lived at the R. Holt Property until moving next door to the H. Holt Property in 1973.  Patrick Holt suffers from deficient immune system.

27.     Plaintiff Bianca Bentley is a minor, age 15 (date of birth February 28, 1993), and is the natural daughter of Patrick Holt.  Bianca Bentley has resided on the H. Holt Property intermittently, and visited frequently, since she was an infant.  Bianca Bentley currently suffers from severe psoriasis of the skin.

28.     Plaintiff Patrick Holt, Jr., is a minor, age 7 (date of birth December 3, 1999), and is the natural son of Patrick Holt.  Patrick Holt, Jr., has resided on the H. Holt property intermittently, and visited frequently, since he was an infant.  Patrick Holt, Jr., currently suffers from skin ailments and severe allergies.

29.     Plaintiff Demetrius Holt is age 40 and is the daughter of Harry and Beatrice Holt.  Demetrius Holt was born in 1966 and lived at the R. Holt Property until moving next door to the H. Holt Property in 1973.  Demetrius Holt grew up on, and currently resides at, the H. Holt Property.  Demetrius Holt suffers from sleep apnea.

30.     Plaintiff David Brown is age 18 and is the natural son of Demetrius Holt.  David Brown has resided on the H. Holt Property intermittently since he was an infant, and currently resides at the H. Holt Property.  David Brown suffers from severe allergies.

31.     The City of Dickson opened a city dump and landfill on Eno Road in 1968.  The small African-American population in Dickson County, less than 5% of the County's overall population, had been historically concentrated on Eno Road in the immediate vicinity of the location that Defendant City of Dickson chose for its dumpsite and landfill in 1968.

32.     The Landfill was an unregulated disposal area until 1972 when the State of Tennessee accepted its construction and operation plan per the Regulations governing Solid Waste Processing and Disposal in Tennessee.  The Division of Sanitation and Solid Waste Management ("DSSWM") issued a permit for the Landfill that same year.  During the years the property operated as a city dump, it accepted a variety of industrial and domestic wastes.

33.     In 1977, the City of Dickson sold the Landfill to Dickson County to be used as a sanitary landfill.  At that time, the Landfill accepted only industrial waste permitted by the DSSWM and domestic waste.

34.     The City continues, to the present, to own at least part of the land on which the Landfill is located.

35.     The Holt groundwater well ("Holt well") is located approximately 500 feet from the Landfill and the Plaintiffs resided within that area during the Exposure Period. Each Plaintiff used well water for all domestic purposes, including drinking, cooking, bathing, gardening, clothes and dish washing, from the time they moved to the area until June 2000.

36.     Defendant Saltire, through its Schrader Automotive Group division, operated a manufacturing facility (the "Schrader Facility") in Dickson County, Tennessee, on Schrader Drive during the period from 1964 through 1985. Saltire leased the facility during the same period from the County of Dickson.

37.     Saltire generated hazardous wastes by its operations in Dickson, including trichloroethylene ("TCE"), which was used as a solvent and degreaser for machinery, and metalplating sludges with high concentrations of heavy metals.

38.     TCE is listed as a hazardous (F001) waste under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and is a contaminant within the meaning of § 1401(6) of the Safe Drinking Water Act, 42 U.S.C. § 300f(6). TCE is toxic and can be dangerous if ingested in water, absorbed through the skin or breathed through the air. TCE can volatize when water in which it is contained is exposed to the air, thereby creating toxic fumes. TCE is heavier than water, and therefore tends to flow quickly through groundwater and pollute deep groundwater sources such as wells. The United States Environmental Protection Agency ("EPA") has found no acceptable level for TCE in the environment, and for that reason has established a Maximum Contaminant Level ("MCL") of 5 parts per billion for TCE in groundwater, and an MCL Goal of 0 (zero) parts per billion.

39.     Saltire routinely disposed of drummed wastes, including TCE, in the Dickson County Landfill from as early as 1968.  Saltire also disposed of its hazardous wastes at other locations in the vicinity of the Landfill, including at the Schrader Facility. Saltire's interim permit status under RCRA was revoked in 1986.

40.     The stored drums from Saltire are now disintegrating and the waste is draining into the groundwater under the Landfill and at other disposal locations in the vicinity.

41.     By no later than November 1988, the State Defendants and the County of Dickson were aware of TCE contamination in Plaintiffs' well.  A November 1988 test of Plaintiffs' well, conducted by the State Defendants, showed the presence of TCE at 3.5 parts per billion.  Despite an MCL Goal of 0 (zero) for TCE in groundwater, the State Defendants sent Harry Holt a letter on December 8, 1988, stating: "your water is of good quality for the parameters tested."  The County of Dickson received a copy of this letter. The County of Dickson did not communicate to Plaintiffs any warning regarding the presence of TCE in the Holt well.

42.     In July 1991, EPA sampled the Holt water well as part of an investigation into possible groundwater contamination in the area.  The test revealed TCE contamination at 26 parts per billion, well above the MCL of 5 parts per billion.  A second test taken shortly after revealed TCE contamination at 3.9 parts per billion.  On December 3, 1991, EPA sent Harry Holt a letter stating: "There were no constituents detected which exceed EPA's National Primary Drinking Water Regulations or any other health-based criteria.  As such, use of your well water should not result in any adverse health effects."

43.     By no later than December 1991, the State Defendants were aware of the July 1991 test results of Plaintiffs' well water, but the State Defendants never warned Plaintiffs regarding the risks to property and human health caused by TCE contamination. Certain employees of the State Defendants expressed concerns internally about the July 1991 test results and the December 1991 reassurance to Plaintiffs that their water was safe, but those concerns were never communicated to Plaintiffs.

44.     In May 1993, Saltire's environmental consultants tested twenty-nine residential water wells within one mile of the Saltire facility.  TCE was detected at levels above the MCL in nine of the twenty-nine wells sampled.  Employees of TDEC and Saltire's environmental consultants immediately contacted these residents, warned them to cease using their well water, and provided them with bottled water for drinking and cooking.  Each family so notified is white.  Plaintiffs were not contacted, were not warned to cease using well water, and were not provided bottled water at this time.

45.     During July and August of 1993, the homes of the nine white families whose wells had shown the presence of TCE were connected to the City of Dickson's municipal water supply.  Plaintiffs' home was not connected to the City of Dickson's municipal water supply at this time.

46.     In or around September 1994, Defendant County of Dickson learned of TCE contamination at a surface water source near the Landfill known as Sullivan Spring. At least two families drawing residential water from Sullivan Spring were immediately notified by Defendant County of Dickson of the presence of TCE and were connected to the City of Dickson's municipal water supply.  Each family so notified is white. Plaintiffs were not warned by the County of Dickson, which knew of TCE contamination

11

in Plaintiffs' well dating back to at least 1988. Nor were Plaintiffs connected to the City

of Dickson's municipal water supply at this time.

47.    By no later than February 1997, Defendants TDEC and the City of

Dickson were aware of TCE contamination in a City well adjacent to the H. Holt

property. Neither TDEC nor the City of Dickson warned Plaintiffs at this time that TCE

was detected in a City well directly adjacent to their property.

48.    Not until October 2000 were Plaintiffs connected to the City of Dickson's

municipal water supply. Plaintiffs were not at this time warned of the risk to their health

of TCE exposure, and were never warned by any of the Defendants of the risks of their

exposure to TCE.

49.    Members of the Holt family were exposed to hazardous levels of TCE

through ingestion, absorption and inhalation on a daily basis from 1968 to the present.

50.    Due to the long-term exposure to TCE caused by Saltire's contamination

of the Landfill and Holt well, Plaintiff Harry Holt suffered from cancer and heart

conditions until his death in January 2007, which was related to his exposure to TCE;

Plaintiff Sheila Holt-Orsted suffers from breast cancer; Plaintiffs Beatrice Holt and

Bonita Holt likely suffer from an increased risk of cancer as evidenced by the detection

of cervical and stomach polyps; Plaintiff Patrick Holt suffers from deficient immune

system; Plaintiffs O'Brian Holt, Brandon Holt, and Jasmine Orsted have suffered

neurological injuries; Plaintiffs David Brown and Patrick Holt, Jr., suffer from severe

allergies; Plaintiffs Bianca Bentley, Jasmine Orsted, and Patrick Holt, Jr., suffer from

skin disorders; and Plaintiff Demetrius Holt suffers from sleep apnea. All Plaintiffs

potentially suffer from additional existing health effects not yet known.  All Plaintiffs are

at increased risk of future adverse health effects not yet manifested.

51.    Due to the long-term exposure to TCE caused by Saltire's contamination

of the Landfill and the Holt well, all Plaintiffs have been, and are, reasonably afraid for

their own future health and the health of their families.  Plaintiffs have incurred and will

continue to incur medical expenses due to testing, treatment, and possible future

treatment for exposure to contaminated water.

52.    As a result of the knowledge that they and their loved ones have consumed

hazardous chemicals, thereby causing injury and death, Plaintiffs have suffered and will

continue to suffer great emotional distress.

53.    Plaintiffs have also been injured by the diminution of the value of their

property due to Saltire's contamination of the Landfill and subterranean waters in the

area, including the Holt well.

## CAUSES OF ACTION

### Count I (Trespass)

Plaintiffs hereby incorporate Paragraphs 1-53 as if they were fully set forth herein

and further state:

54.    Saltire, by its use of TCE and spillage of TCE into the Landfill and other

locations in the vicinity, has caused the contamination of Plaintiffs' groundwater and

drinking water supply by permitting TCE to spill from the stored drums onto the Landfill

and other locations, and to encroach on Plaintiffs' property.

55.    Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful

conduct of Saltire.

56.     Plaintiffs have at no time given their consent to the pollution of the groundwater of their property, and such pollution is an unlawful entry upon Plaintiffs' land.

57.     By the leaking from Saltire's drums stored on the Landfill and at other locations, Saltire has trespassed and continues to trespass on Plaintiffs' property.

58.     As a direct and proximate result of Defendants' trespass, the Plaintiffs have suffered personal injury.

59.     As a direct and proximate result of Defendants' trespass, Plaintiff Beatrice Holt, individually and as surviving spouse and next of kin of her husband, Harry Holt, has additionally suffered a diminution in the value of her residential property value and the value of the improvements connected thereto.

## Count II (Battery)

Plaintiffs hereby incorporate by reference Paragraphs 1-59 as if they were fully set forth herein and further state:

60.     Saltire stored and disposed of TCE in a reckless and wanton manner without regard to the welfare of the Plaintiffs, who resided in close proximity to the Landfill.

61.     Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful conduct of Saltire.

62.     Saltire knew that its reckless and wanton storage and disposal practices were substantially certain to cause Plaintiffs to endure an offensive and harmful contact with TCE.

63.    Saltire's reckless and wanton disposal practices did cause Plaintiffs to endure, without their consent, an offensive and harmful contact with TCE.

### Count III (Permanent Nuisance)

Plaintiffs hereby incorporate by reference Paragraphs 1-63 as if they were fully set forth herein and further state:

64.    The leaking of Saltire's drums of TCE onto the Landfill and other locations constitute a permanent nuisance in that the releases have caused contamination of the groundwater under Plaintiffs' property that will persist for an indefinite time, interfering with Plaintiffs' reasonable use and enjoyment of their property.

65.    The interference with Plaintiffs' use and enjoyment of their property is the direct result of Saltire's negligent storage of TCE in the drums on the Landfill and other locations.  This failure to prevent the escape of hazardous wastes from the drums and Landfill has resulted in the permanent migration of TCE into the water table underlying Plaintiffs' property, creating a hazard to the life and well-being of all surviving Plaintiffs.

66.    Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful conduct of Saltire.

67.    As a direct and proximate result of Defendants' unabated and negligent contamination of the groundwater under their land, Plaintiffs have suffered personal injuries or death.

68.    As a direct and proximate result of Defendants' unabated and negligent contamination of the groundwater under their land, Plaintiff Beatrice Holt, individually and as surviving spouse and next of kin of her husband, Harry Holt, has additionally

suffered a diminution in the value of her residential property and the value of the improvements connected thereto.

**Count IV (Negligence)**

Plaintiffs hereby incorporate by reference Paragraphs 1-68 as if they were fully set forth herein and further state:

69.    Saltire owed Plaintiffs and Plaintiffs' decedents a duty to refrain from action that caused Plaintiffs and Plaintiffs' decedents to be unreasonably exposed to chemicals which can cause personal injury, economic harm, and an increased risk of illness.

70.    TCE is an ultrahazardous substance, and Saltire knew of the dangerous nature of the substance.

71.    Saltire owed a duty of care to Plaintiffs in the use, storage, and disposal of TCE.

72.    Saltire breached its duty of care by negligently disposing of TCE and by failing to investigate possible releases of TCE from the Landfill and other disposal sites.

73.    Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful conduct of Saltire.

74.    As a direct and proximate result of Saltire's negligence, Plaintiffs have suffered personal injuries or death.

75.    As a direct and proximate result of Saltire's negligence, Plaintiff Beatrice Holt, individually and as surviving spouse and next of kin of her husband, Harry Holt, has additionally suffered a diminution in the value of her residential property and the value of the improvements connected thereto.

## Count V (Wrongful Death)

Plaintiffs hereby incorporate by reference paragraphs 1-75 as if they were fully set forth herein and further state:

76.    Saltire failed to exercise due care to prevent the contamination of Plaintiff Harry Holt's water well and his resulting exposure to TCE.

77.    Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful conduct of Saltire.

78.    As a proximate result of Saltire's failure to exercise due care, Harry Holt was exposed to hazardous levels of TCE through ingestion, absorption, and inhalation on a daily basis for thirty-nine years.  This exposure to TCE was a cause of Mr. Holt's death from cancer in January 2007.

79.    As surviving spouse, children, and grandchildren of Harry Holt, Plaintiffs are entitled to damages including medical, funeral, and burial expenses, as well as damages for the loss of Mr. Holt's life and the loss of Mr. Holt's reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice.

## Count VI (Claim for Punitive Damages)

Plaintiffs hereby incorporate by reference paragraphs 1-79 as if they were fully set forth herein and further state:

80.    Saltire knew of the dangerous propensities of the TCE which it placed into the drums and stored on the Landfill and disposed of at other locations.  Saltire knew or should have known of the inadequacies of its storage procedures, and of the inadequacies of the storage tanks, drums, and barrels to contain the hazardous waste.

81.     As a result of its business operations, Saltire has knowingly, intentionally, wantonly, recklessly, willfully, and maliciously stored and disposed of TCE on the Landfill and at other locations in such a manner that it discharged into the groundwater of the neighboring property and underground water sources.

82.     Saltire knowingly, intentionally, wantonly, recklessly, willfully, and maliciously failed to take the precautions necessary to prevent such contamination of the groundwater of surrounding property.

83.     Alper, as the alter ego of Saltire, is liable to Plaintiffs for the wrongful conduct of Saltire.

**Count VII (Claim for Violation of the
Tennessee Governmental Tort Liability Act)**

Plaintiffs hereby incorporate by reference paragraphs 1-83 as if they were fully set forth herein and further state:

84.     The County of Dickson and the City of Dickson are sued in their capacities as governmental entities under the Tennessee Governmental Tort Liability Act ("GTLA").

85.     The City of Dickson had a duty to notify Plaintiffs of dangers associated with large volumes of toxic and contaminated leachate that had accumulated on the City's property and spread to the H. Holt Property.  The City of Dickson also had a duty to monitor the disposal of TCE and other hazardous waste at the Landfill and other disposal sites.  The City of Dickson further had a duty to investigate possible releases of TCE and other hazardous wastes from the Landfill and other disposal sites.

86.     The City of Dickson breached its duties by failing to notify Plaintiffs of the release of toxic wastes from its property, of which the City became aware by no later

than February 1997; and by failing to monitor TCE disposal and investigate TCE releases from its property.  These acts and omissions caused injury to Plaintiffs.

87.    The County of Dickson had a duty to notify Plaintiffs of dangers associated with continued use of their well water after the County of Dickson had notice, by 1988, that the Holt well was contaminated with TCE.  The County of Dickson also had a duty to maintain and operate the landfill in such a manner as to prevent the release of toxic chemicals.

88.    The County of Dickson breached its duties by failing to notify Plaintiffs of the contamination of Plaintiffs' well with TCE, even though the County notified other persons who lived in and around the Landfill upon the detection of TCE in their water sources, and further removed those families from use of the contaminated water source.

89.    The County of Dickson was negligent in performing its duties owed to the Holts and failed to exercise due care to prevent the contamination of the Holt well and their resulting exposure to the TCE.

90.    The County of Dickson knew or should have known of the dangerous propensities of the TCE which was seeping from the drums stored at its Landfill.  The County of Dickson knew or should have known of the inadequacies of the storage drums and barrels.  The County of Dickson knew that TCE had entered the groundwater in high concentrations, and knew or should have known that the TCE was migrating into the groundwater surrounding the Landfill and that toxic concentrations of TCE were contaminating the groundwater of neighboring properties.

91.    Despite their awareness of the Landfill's close proximity to Plaintiffs' home, and of the extensive TCE contamination of groundwater at the Landfill and other

locations, the County of Dickson and the City of Dickson failed to warn Plaintiffs of the

presence of TCE and dangers associated with continued use of the well water for more

than twelve years after the County of Dickson gained such awareness, and more than

three years after the City of Dickson gained such awareness, in complete disregard for

Plaintiffs' health and well-being.

92.    The City of Dickson and the County of Dickson violated the Tennessee

Solid Waste Disposal Act, Tenn. Code Ann. §§ 68-211-104(1), 68-211-104(3), & 68-

211-104(4), by failing to maintain the Landfill in such a manner as to minimize the

generation and accumulation of leachate in the Landfill and by allowing releases of

leachate into the well water.

**Count VIII (Claim for Violations of Title VI
of the Civil Rights Act of 1964)**

Plaintiffs hereby incorporate by reference paragraphs 1-92 as if they were fully set

forth herein and further state:

93.    Title VI of the Civil Rights Act of 1964 was implemented to enforce the

guarantees of the Fourteenth Amendment of the United States Constitution, and provides

in pertinent part: "No person in the United States shall, on the ground of race, color, or

national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance."  42 U.S.C. § 2000d.

94.    Upon information and belief, the State Defendants, the County of

Dickson, and the City of Dickson receive federal funding from various federal agencies,

and must also comply with disparate impact regulations prohibiting discrimination.  The

Landfill received federal grants, funds and/or loans that were not a *de minimis* source of

20

income, and the State Defendants, the County of Dickson, and the City of Dickson were required to comply with Title VI mandates.

95.    Upon information and belief, the City of Dickson in 1968 decided to put a landfill in a predominantly African-American neighborhood on Eno Road, where Plaintiffs then resided and continue to reside.  The City of Dickson allowed the property to exist as an unregulated disposal area until 1972.  The City of Dickson subsequently sold the Landfill to the County of Dickson, which continued to allow Saltire to improperly dispose of its hazardous waste into the Landfill next to Plaintiffs' property, resulting in Plaintiffs' injury and death.  Plaintiffs have been harmed and continue today to be harmed by the City of Dickson's racially discriminatory siting decision.

96.    The City of Dickson's decision to select a historically African-American population enclave within a nearly all-white county as the location for its dumpsite and landfill in 1968, injured Plaintiffs and constitute an act of intentional race discrimination in violation of Title VI of the Civil Rights Act of 1964, regulations promulgated to ensure compliance with that Act, and 42 U.S.C. § 1983.

97.    The State Defendants were aware as early as November 1988 that Plaintiffs' well showed the presence of TCE near the regulatory limit, and further knew as early as July 1991 that Plaintiffs' well was contaminated at levels far above regulatory limits.  The State Defendants did not warn Plaintiffs of the risk of harm, instead sending a letter in 1988 stating, falsely: "your water is of good quality for the parameters tested." Less than two years after the 1991 tests on Plaintiffs' well, in 1993, TDEC learned of TCE contamination in the wells of nine white families.  TDEC immediately notified those families, warned them to cease using their well water, and provided them with

bottled water for drinking and cooking. The white families were also connected to the City of Dickson's municipal water supply. The State Defendants' acts and omissions caused Plaintiffs to incur serious injury and death.

98.    The State Defendants' failure to inform Plaintiffs of the presence of TCE in their well water and failure to provide them with an alternate water supply, when such warnings and protective measures were immediately undertaken by the State Defendants for similarly situated white families, constitutes an act of intentional race discrimination in violation of Title VI of the Civil Rights Act of 1964, regulations promulgated to ensure compliance with that Act, and 42 U.S.C. § 1983.

99.    Defendant County of Dickson was aware as early as November 1988 that Plaintiffs' well showed the presence of TCE near the regulatory limit. The County of Dickson did not warn Plaintiffs of the risk of harm from TCE exposure, and did not take any measures to protect Plaintiffs from further exposure. By no later than September 1994, Defendant County of Dickson learned of TCE contamination in the water supply of several white families. The County of Dickson immediately notified those families of the risk of harm, and those families were connected to the City of Dickson's municipal water supply. The County of Dickson's acts and omissions caused Plaintiffs to incur serious injury and death.

100.    The County of Dickson's failure to inform Plaintiffs of the presence of TCE in their well water and failure to provide them with an alternate water supply, when such warnings and protective measures were immediately undertaken by the County of Dickson for similarly situated white families, constitutes an act of intentional race

discrimination in violation of Title VI of the Civil Rights Act of 1964, regulations promulgated to ensure compliance with that Act, and 42 U.S.C. § 1983.

101.    Defendant City of Dickson was aware by no later than February 1997 that a City well adjacent to the H. Holt property was contaminated with TCE. The City of Dickson also knew or should have known that tests to examine TCE contamination at or from the Landfill – on property owned by the City of Dickson – had been underway for at least ten years by 1997. The City of Dickson did not warn Plaintiffs in 1997 that TCE was detected at the City well, adjacent to the H. Holt property. The City of Dickson did not provide Plaintiffs with an alternate water supply by connecting Plaintiffs to the City of Dickson's municipal water source until 2000. The City of Dickson had arranged with the State Defendants and the County of Dickson to provide municipal water to the white families who were thought to be at risk of TCE exposure several years earlier, in 1993 and 1994. The City of Dickson's acts and omissions caused Plaintiffs to incur serious injury and death.

102.    The City of Dickson's failure to inform Plaintiffs of the risk of TCE exposure by at least 1997, and the City of Dickson's failure to connect Plaintiffs to the municipal water supply until 2000 – when such arrangements were made for similarly situated white families immediately upon learning of the risk of TCE exposure – constitutes an act of intentional race discrimination in violation of Title VI of the Civil Rights Act of 1964, regulations promulgated to ensure compliance with that Act, and 42 U.S.C. § 1983.

103.    Unbeknownst to Plaintiffs, they continued to ingest and be exposed to well water containing TCE until 2000.

104.     In taking the above described actions, the State Defendants, the County of Dickson, and the City of Dickson intentionally discriminated against Plaintiffs on the basis of their race.  These Defendants' actions were taken with malice and/or reckless indifference to Plaintiffs' federally protected rights.

105.     The State Defendants, the County of Dickson, and the City of Dickson have, acting under color of state law, subjected Plaintiffs to intentional discrimination under programs receiving federal financial assistance, on account of Plaintiffs' race, in violation of Title VI and 42 U.S.C. § 1983.

**Count VIII (Claim for Violations of the United States Constitution)**

Plaintiffs hereby incorporate by reference paragraphs 1-105 as if they were fully set forth herein and further state:

106.     The actions of the City of Dickson as described above, in selecting a historically African-American population enclave within a nearly all-white county as the location for its dumpsite and landfill in 1968, have injured Plaintiffs and denied Plaintiffs the right to the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

107.     The actions of the State Defendants, the County of Dickson, and the City of Dickson as described above, in failing to notify Plaintiffs of the risk of harm from TCE exposure and in failing to provide an alternate water source, when such warnings and protective measures were undertaken to protect similarly situated white families, have injured Plaintiffs and denied Plaintiffs the right to the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand the following:

1.     That this case be tried before a jury of twelve;

2.     That all claims against the County of Dickson and City of Dickson also be tried with a jury;

3.     That judgment be entered against Defendants as requested herein;

4.     That Plaintiffs be awarded sufficient damages to compensate them for their losses to personal health and property, as well as to punish the Defendants for that conduct determined to be actionable for an amount of punitive damages;

5.     That all relief, both general and specific, to which Plaintiffs are entitled, be granted;

6.     That Defendants be ordered to comply with all lawful directives of EPA and relevant state agencies in the testing and remediation of Plaintiffs' property;

7.     That Defendants be ordered to keep Plaintiffs informed of all results of all testing done by Defendants on or near the site of the Landfill;

8.     That all court costs and expenses, including consultants' fees and attorneys' fees, be paid by Defendants;

9.     That any requested injunctive relief, as warranted by the evidence in the case, be awarded; and

10.     That punitive damages be awarded.


Dated: <u>October 10, 2007</u>

Respectfully submitted,
BARRETT, JOHNSTON & PARSLEY

 /s/ George E. Barrett
George E. Barrett
Edmund L. Carey, Jr.
David W. Garrison
217 Second Avenue North
Nashville, TN 37201
phone: 615-244-2202
fax: 615-252-3798
email: gbarrett@barrettjohnston.com

Joe R. Whatley, Jr.
Amy Weaver
**Whatley, Drake & Kallas LLC**
1000 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
phone: 205-328-9576
email: jwhatley@whatleydrake.com

Debo P. Adegbile
Matthew Colangelo
**NAACP Legal Defense &**
  **Educational Fund, Inc.**
99 Hudson Street, 16th Floor
New York, NY 10013
phone: 212-965-2268
email: mcolangelo@naacpldf.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 10, 2007, I served by fax and hand delivery a true and correct copy of the foregoing to the following party not currently listed among the Court's electronic filing users in this action:

> Katherine K. Schulz
> *Counsel for Defendants Commissioners of TDEC and TDOH*
> Office of the Attorney General
> Civil Litigation & State Services Division
> 425 Fifth Avenue North, 2nd Floor
> Cordell Hull Building
> Nashville, TN 37243
> fax: 615-741-7327

I certify that on October 10, 2007, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon, in addition to co-counsel, the following currently listed electronic filing users:

> William H. Farmer
> Jones W. Luna
> Jennifer L. Brundige
> *Counsel for Defendant City of Dickson*
> FARMER & LUNA PLLC
> 333 Union St., Suite 300
> Nashville, TN 37201-1430

> Teresa Reall Ricks
> *Counsel for Defendant City of Dickson*
> FARRAR & BATES LLP
> 211 Seventh Avenue North, Suite 420
> Nashville, TN 37219-1823

> Timothy V. Potter
> Kirk Vandivort
> *Counsel for Defendant County of Dickson*
> REYNOLDS, POTTER, RAGAN & VANDIVORT PLC
> 210 E. College St.
> Dickson, TN 37055-6805

> Marilyn Simon
> *Counsel for Defendants City of Dickson and County of Dickson*
> MARILYN SIMON & ASSOCIATES
> 110 E. 59th St., 23rd Floor
> New York, NY 10022-1330

Michael Dore
Michael S. Etkin
Timothy R. Wheeler
*Counsel for Defendant Saltire Industrial, Inc. Creditors Liquidating Trust*
LOWENSTEIN SANDLER PC
65 Livingston Ave.
Roseland, NJ 07068-1791

John S. Hicks
Carrie W. McCutcheon
*Counsel for Defendant Saltire Industrial, Inc. Creditors Liquidating Trust*
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
211 Commerce Street, Suite 1000
Nashville, TN 37201

William T. Ramsey
*Counsel for Defendant Alper Holdings USA, Inc.*
NEAL & HARWELL, PLC
150 Fourth Avenue North, Suite 2000
Nashville, TN 37219-2498


Dated: <u>October 10, 2007</u>.


                          <u>/s/ Matthew Colangelo</u>
                          Matthew Colangelo
                          NAACP Legal Defense & Educational
                            Fund, Inc.
                          99 Hudson St., 16th Floor
                          New York, NY 10013
                          212-965-2268

                          Attorney for the Plaintiffs

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
In re:                                                             :
                                                                   :
SALTIRE INDUSTRIAL, INC.,                                          :        Chapter 11
                                                                   :        Case No. 04-15389 [BRL]
                                                                   :
                                        Debtor.                    :
                                                                   :
-------------------------------------------------------------------X

**DEBTOR'S MODIFIED FIRST AMENDED DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE
FOR ITS FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000

Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

Dated:    December 28, 2005

**TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION   ............................................................................1

II.     OVERVIEW OF THE PLAN ...........................................................2

    A.      GENERAL   .........................................................................2

    B.      CLASSIFICATION AND TREATMENT SUMMARY ...................3

    C.      SOURCE OF PLAN FUNDING..............................................6

III.    PROCEDURAL HISTORY OF THE CASE, BACKGROUND HISTORY
    OF THE DEBTOR AND EVENTS LEADING TO THE CHAPTER 11 FILING .......7

    A.      PROCEDURAL HISTORY OF THE CASE ...................................7

        1.      First Day Orders ...................................................7

        2.      The Official Committee..........................................7

    B.              BACKGROUND OF THE DEBTOR.....................................8

        1.      The Debtor's Operations.........................................8

        2.      The Debtor's Employees.........................................8

        3.      The Debtor's Financials and Debt Structure .......................8

    C.      CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING...........10

        1.      Legacy Liabilities................................................10

IV.     CORPORATE GOVERNANCE OF THE  DEBTOR DURING THE CASE ...........10

    A.      MANAGEMENT   ..............................................................10

V.      SIGNIFICANT DEVELOPMENTS IN THE CASE ................................11

    A.      TERMINATION OF RETIREE BENEFITS....................................11

    B.      ENVIRONMENTAL RELATED LIABILITIES AND LITIGATION ............12

        1.      Description of Environmental Liabilities ..........................12

        2.      The USA Sites ...................................................13

        3.      The USA Motion regarding the Puente Valley Escrow....................14

        4.      Negotiations with the USA.......................................16

        5.      Disposition of the Schrader-Dickson Facility.....................16

    C.      TENNESSEE LITIGATION ...................................................17

        1.      Description of Litigation.........................................17

        2.      Adversary Proceeding against Dickson Plaintiffs .............................17

| | | | |
|---|---|---|---|
| D. | | GENERAL BANKRUPTCY ADMINISTRATION ..................................................... 19 | |
| | 1. | Schedules of Assets and Liabilities and Statement of Financial Affairs ........................................................................ 19 | |
| | 2. | Deadline for Filing Proofs of Claim ................................................. 19 | |
| VI. | | SUMMARY OF THE PLAN ........................................................................................... 19 | |
| | A. | GENERAL ............................................................................................. 19 | |
| | B. | DESCRIPTION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ..................................................... 21 | |
| | | 1. | Unclassified Claims ........................................................................... 21 |
| | | 2. | Classified Claims and Equity Interests .............................................. 22 |
| | C. | TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN .................... 24 | |
| | | 1. | Prosecution of Objections to Disputed Claims ................................. 24 |
| | | 2. | No Distributions Pending Allowance of a Disputed Claim ............ 24 |
| | | 3. | Distributions After Allowance of a Disputed Claim ........................ 24 |
| | | 4. | Disputed Claims Reserve ................................................................... 24 |
| | D. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN ............................................................................................ 25 | |
| | E. | CONDITIONS PRECEDENT TO THE CONFIRMATION DATE AND THE EFFECTIVE DATE OF THE PLAN ............................................. 25 | |
| | | 1. | Conditions Precedent to Confirmation of the Plan ........................... 25 |
| | | 2. | Conditions Precedent to the Effective Date ...................................... 25 |
| | F. | WAIVER OF CONDITIONS PRECEDENT .................................................. 26 | |
| VII. | | MEANS OF IMPLEMENTATION OF THE PLAN .................................................... 26 | |
| | A. | GENERAL ............................................................................................. 26 | |
| | B. | CREATION OF THE LIQUIDATING TRUST ............................................ 26 | |
| | C. | Appointment AND DUTIES of the LIQUIDATING TRUSTEE ................... 27 | |
| | D. | Establishment of the Operating Reserve Account ....................................... 27 | |
| | E. | DISTRIBUTIONS UNDER THE PLAN ....................................................... 27 | |
| | | 1. | Date of Distributions ......................................................................... 27 |
| | | 2. | Delivery of Distributions .................................................................. 28 |
| | | 3. | Time Bar to Cash Payments ............................................................... 28 |
| | | 4. | Disputed Distributions ....................................................................... 28 |

|  |  | 5. | Manner of Payment Under the Plan | 29 |
|  |  | 6. | Distributions After Effective Date | 29 |
|  | F. | OFFICIAL COMMITTEE | | 29 |
|  | G. | CORPORATE ACTION AND CONTINUED EXISTENCE OF DEBTOR | | 29 |
| VIII. | EFFECT OF CONFIRMATION OF THE PLAN | | | 30 |
|  | A. | DISCHARGE OF DEBTOR | | 30 |
|  | B. | DEBTOR'S AUTHORITY | | 30 |
|  | C. | VESTING AND LIENS | | 30 |
|  | D. | TERMINATION OF BANKRUPTCY INJUNCTIONS OR STAYS | | 30 |
|  | E. | INJUNCTION AND RELEASES OF CLAIMS | | 31 |
|  |  | 1. | General Injunction | 31 |
|  |  | 2. | Release and Injunction in Favor of Alper | 31 |
|  |  | 3. | Exculpation | 32 |
|  | F. | AVOIDANCE ACTIONS AND OTHER CAUSES OF ACTIONS | | 33 |
|  |  | 1. | Bankruptcy Code Avoidance and Recovery Actions | 33 |
|  | G. | RETENTION OF JURISDICTION | | 33 |
|  | H. | MODIFICATION OF THE PLAN | | 35 |
|  | I. | NOTICES | | 35 |
| IX. | CERTAIN U.S. TAX CONSEQUENCES OF THE PLAN | | | 36 |
| X. | VOTING AND CONFIRMATION OF THE PLAN | | | 36 |
|  | A. | WHO MAY VOTE | | 36 |
|  | B. | VOTING PROCEDURES | | 38 |
|  | C. | CONFIRMATION AND CONSUMMATION OF THE PLAN | | 39 |
|  |  | 1. | Confirmation Hearing | 39 |
|  |  | 2. | Objections to Confirmation of the Plan | 39 |
|  |  | 3. | Requirements for Confirmation of the Plan | 40 |
|  |  | 4. | Fair and Equitable Test (Cram-Down) | 40 |
| XI. | LIQUIDATION ANALYSIS | | | 41 |
| XII. | CONCLUSION | | | 43 |

## <u>TABLE OF EXHIBITS</u>

Exhibit 1:     Plan of Liquidation

Exhibit 2:     Form of Ballot

# I.

# INTRODUCTION

Saltire Industrial, Inc., as debtor and debtor in possession in the above-captioned Chapter 11 case (the "Debtor"), makes this Disclosure Statement, pursuant to section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 1330 (the "Bankruptcy Code"), for creditors of the Debtor (collectively, the "Creditors") in connection with: (i) the solicitation of acceptances or rejections from Creditors of the Modified First Amended Plan of Liquidation, dated December 28, 2005 (the "Plan"), proposed by the Debtor and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and (ii) the hearing on confirmation of the Plan scheduled for March 8, 2006 at 10:00 a.m. Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement will have the meanings ascribed to them in the Plan, a copy of which is annexed as Exhibit 1 hereto.

The Plan, which this Disclosure Statement describes, is intended to resolve all Claims against, and Equity Interests in, the Debtor, and provides a mechanism for the liquidation of all of the Debtor's remaining assets and for the distribution of Aggregate Cash to the Debtor's Creditors.

The Plan is the product of extensive negotiations between the Debtor and the official committee of unsecured creditors of the Debtor (the "Official Committee"), together with Alper Holdings USA, Inc. ("Alper"), the Debtor's parent, and other parties. The Official Committee supports confirmation of the Plan and urges Creditors to vote to accept the Plan and support confirmation.

On December 28, 2005, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable hypothetical, reasonable investors typical of the Creditors in each Class under the Plan to make an informed judgment as to whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR THE MERITS OF THE PLAN.

EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE OTHER EXHIBITS TO THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE OTHER EXHIBITS AND SCHEDULES HERETO AND THERETO, AND ANY OTHER DOCUMENTS REFERENCED HEREIN OR THEREIN. IN THE EVENT OF ANY DISCREPANCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND CONDITIONS OF THE PLAN SHALL GOVERN.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider the confirmation of the Plan (the "Confirmation Hearing") on March 8, 2006 at 10:00 a.m. before the Honorable Burton R. Lifland, United States Bankruptcy Judge, Courtroom 623, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served upon the Debtor's counsel, counsel for the Official Committee and the Office of the United States Trustee and filed through the Bankruptcy Court's electronic filing system (see the Court's Website at http://www.nysb.uscourts.gov/ for instructions for electronic filing or contact the office of the clerk for the Bankruptcy Court at (212) 668-2870, Monday to Friday, 8:30 a.m. to 5:00 p.m.) with a paper copy delivered to the Chambers of Judge Lifland, Room 625 at the Bankruptcy Court, so as to be received on or before February 20, 2006 at 5:00 p.m. Eastern Prevailing time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTOR BELIEVES THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO ITS CREDITORS. THE DEBTOR THEREFORE BELIEVES ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN. THE OFFICIAL COMMITTEE SUPPORTS CONFIRMATION OF THE PLAN AND URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.

UNLESS OTHERWISE INDICATED, ALL DOLLAR AMOUNTS USED OR REFERENCED HEREIN OR IN THE PLAN ARE UNITED STATES DOLLAR AMOUNTS.

## II.

## OVERVIEW OF THE PLAN

### A.    GENERAL

The following discussion of the Plan is a summary only and is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit 1.

The Plan is intended to resolve all existing Claims against, and Equity Interests in, the Debtor. The Plan provides for payment in full of all Allowed Administrative Expense Claims, Allowed Priority Claims, Allowed Priority Non-Tax Claims, and Secured Claims. Distribution to the Holders of Allowed General Unsecured Claims will be made on a pro rata periodic basis until the Liquidating Trustee, on behalf of the Debtor, completes the liquidation of all remaining assets. Alper, as the Holder of Intercompany Claims against, and the Holder of Equity Interests in, the Debtor will receive no Distribution under the Plan.

**B.    CLASSIFICATION AND TREATMENT SUMMARY**

The following table briefly summarizes the classification and treatment of Claims against, and Equity Interests in, the Debtor under the Plan.

| CLASSES | TYPE OF CLAIM AND TREATMENT |
|---|---|
| Administrative Expense Claims (No Class Designation) | • The Debtor estimates that the aggregate amount of Allowed Administrative Expense Claims as of the Effective Date will not exceed $1 million. Administrative Expense Claims consist of, among others, (i) fees and expenses due Professionals, estimated to be $500,000; (ii) the USA Claim (as defined herein) as it pertains to the parcel of real property owned by the Debtor in Dickson County, Tennessee in the amount of approximately $300,000;[1] and (iii) other expenses of administration, including rent and payroll, estimated to be $125,000. |
| | • Each Holder of an Allowed Administrative Expense Claim shall be paid in Cash from the Operating Reserve Account or the Disputed Claims Reserve, as the case may be, in an amount equal to such Allowed Administrative Expense Claim on the later of: (a) the Effective Date; and (b) ten (10) Business Days after the date on which such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable. |
| | • See Section 3.1 of the Plan. |
| Priority Tax Claims (No Class Designation) | • The Debtor estimates that the aggregate amount of Priority Tax Claims, if Allowed, will not exceed $200,000.[2] |
| | • On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder |

---

[1]    The United States contends that the Estate's liability for this property may exceed this amount.

[2]    The above estimate is not an admission by the Debtor that any valid Priority Tax Claims exist against the Estate.

of an Allowed Priority Tax Claim shall be paid in Cash by the Debtor or the Liquidating Trustee, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor or the Liquidating Trustee.

- See Section 3.2 of the Plan.

Priority Non-Tax Claims
(Class 1)

- Unimpaired.

- The Debtor estimates that the aggregate amount of Allowed Priority Non-Tax Claims will be less than $2,000, representing certain unpaid amounts for prepetition payroll.

- On the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid in Cash, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor or the Liquidating Trustee.

- See Section 5.2.1 of the Plan.

Secured Claims
(Class 2)

- Unimpaired.

- The Debtor does not believe there will be any Allowed Secured Claims on the Effective Date because the Holder of the only known Secured Claim entered into a stipulation with the Debtor that was approved by Bankruptcy Court Order during the Case, pursuant to which stipulation the Secured Claim was fully satisfied.

- To the extent there are any Allowed Secured Claims, on the Effective Date, each Holder of an Allowed Secured Claim shall receive, in the Liquidating Trustee's discretion, either (A)(i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor or the Liquidating Trustee and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash on the later of (a) the Effective Date or

as soon thereafter as may be practical, or (b) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practical;  and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the Allowed amount of such Holder's Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan; or (B) the Liquidating Trustee shall abandon the property securing the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or as soon thereafter as may be practical or (ii) that date which is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order; or (C) such other treatment as the Holder of such Allowed Secured Claim and the Debtor or the Liquidating Trustee shall agree upon in writing.

- See Section 5.2.2 of the Plan.

General Unsecured Claims
(Class 3)

- Impaired.

- The Debtor estimates that the aggregate principal amount of Allowed General Unsecured Claims will not exceed $35 million.

- Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of its Allowed Class 3 Claim, periodic ratable Distributions from Available Cash in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim;  provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Estate's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.  **The Debtor anticipates that Holders of Allowed General Unsecured Claims will**

**receive periodic Distributions, aggregating approximately 15% of the Allowed amount of their Claims.**

- See Section 5.2.3 of the Plan.

Intercompany Claims
(Class 4)

- Impaired.

- The Debtor estimates that the aggregate principal amount of Intercompany Claims will be approximately $1,264,392. Such amount excludes unliquidated amounts that Alper has asserted it is owed pursuant to contractual indemnification agreements with the Debtor.

- On the Effective Date, as part of the Alper Settlement Agreement, Alper shall not receive any Distribution on account of its Intercompany Claims, and such Intercompany Claims shall be deemed discharged.

- See Section 5.2.4 of the Plan.

Equity Interests
(Class 5)

- Impaired.

- On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests. As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

- See Section 5.2.5 of the Plan.

## C.    SOURCE OF PLAN FUNDING

For purposes of making Distributions under the Plan on account of Allowed General Unsecured Claims, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall make such Distributions from the Debtor's Available Cash and/or the X-Fund, as the case may be. Distributions to be made on the Effective Date on account of Allowed

Administrative Expense Claims and Allowed Priority Claims shall be made by the Debtor from Available Cash.

## III.

## PROCEDURAL HISTORY OF THE CASE, BACKGROUND HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE CHAPTER 11 FILING

### A.    PROCEDURAL HISTORY OF THE CASE

On August 17, 2004, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  The Honorable Burton R. Lifland was selected and has served as the presiding Bankruptcy Judge.

### 1.    <u>First Day Orders</u>

On or shortly after the Petition Date, the Debtor sought certain relief from the Bankruptcy Court to facilitate the efficient administration of the Case and the Debtor's transition to debtor in possession status.  The relief granted by the Bankruptcy Court at the commencement of the Case included Orders (i) authorizing the employment of Togut, Segal & Segal LLP as bankruptcy counsel for the Debtor;  and (ii) authorizing the retention of Garden City Group, Inc. as claims and noticing agent for the Debtor.

### 2.    <u>The Official Committee</u>

On September 3, 2004, the Office of the United States Trustee appointed the Official Committee pursuant to section 1102 of the Bankruptcy Code.  At the time of its appointment, the Official Committee consisted of five (5) members, as follows:

1.    Caldwell Trucking Trust Fund
2.    Masco Corporation
3.    Leonard F. Leganza, CPA
4.    Shaw Environmental Infrastructure, Inc.
5.    Engelhard Corporation.

In April 2005, Englehard Corporation resigned from the Official Committee.  Since that time, and through the date of this Disclosure Statement, the Official Committee has consisted of the remaining four (4) members.

Each of the members of the Official Committee is a Holder of a General Unsecured Claim in Class 3.

By Bankruptcy Court Order dated October 21, 2004, the Official Committee was authorized to retain Lowenstein Sandler PC as its counsel.  Lowenstein Sandler PC continues to represent the Official Committee.

## B.    BACKGROUND OF THE DEBTOR

### 1.    The Debtor's Operations

The Debtor, previously known as Scovill, Inc., began operations in the early 1800s and grew to become a major industrial company listed on the New York Stock Exchange.  As such, the Debtor was a manufacturer of diverse consumer and industrial products sold under a variety of brand names, including Scovill, Yale, Hamilton Beach, Nutone and Schrader.

In 1985, the Debtor was acquired by an affiliate of First City Industries Inc. ("First City"), a public company listed on the New York Stock Exchange.  Following its acquisition by First City, the Debtor began a divestiture program which, by 1987, significantly reduced the size and scope of its operations.  The Debtor retains a number of liabilities resulting from its long history of operations prior to 1987.  These liabilities principally related to:  (i) alleged environmental contamination ("Environmental Claims");  (ii) post-retirement employee benefits ("Retiree Claims");  and (iii) other business-risk liabilities such as product liability claims ("Product Liability Claims" and, together with Environmental Claims and Retiree Claims, the "Legacy Liabilities").  Since 1987, the Debtor's primary business has been the administration, management and (if appropriate) funding of these Legacy Liabilities.  In 1992, Alper became the controlling indirect shareholder of the Debtor as a result of its acquisition of First City.  Alper currently is the direct parent of the Debtor.

### 2.    The Debtor's Employees

The Debtor currently has two full-time employees, whose total monthly wages are approximately $24,500.  This amount reflects voluntary salary and staff reductions, effective January 1, 2005, that reduced the Debtor's aggregate payroll by more than 50%.

### 3.    The Debtor's Financials and Debt Structure

On the Petition Date, the Debtor reported (on an uncertified and unaudited basis) assets of approximately $7,153,000 and liabilities of approximately $18,223,000, as of June 30, 2004.

The Debtor's reported assets consisted of approximately:  (i) $1,344,000 in cash;  (ii) $5,653,000 in a note receivable;  and (iii) $156,000 for prepaid expenses and deposits.

The note receivable is dated March 4, 2004 and is payable by Grupo IUSA, S.A. de C.V. ("Grupo"), a Mexican corporation (the "Note").  The principal amount of the Note is $8,250,000 and bears an interest rate of 10% per annum.

As of October 31, 2005, the Debtor reported (on an uncertified and unaudited basis) assets of approximately $4,687,207 and liabilities of approximately $16,870,217, excluding certain contingent liabilities for, among others, indemnification and other litigation claims including claims for property damage and personal injury for which no book reserves have been established.

As of October 31, 2005, the principal outstanding balance of the Note was $3,854,790.80 and accrued but unpaid interest was $22,178.25.  Grupo has agreed to repay the remaining outstanding principal amount and all accrued but unpaid interest as set forth in the Plan.

In addition to the foregoing, the Debtor's assets include (a) the X-Fund, with an estimated value of approximately $475,000 as of October 31, 2005, originally maintained by Aetna under Group Insurance policy #47400 to provide certain life insurance benefits to the Debtor's Retirees (see V.A. below);  and (b) the Puente Valley Escrow in the amount of $500,000, which has been offset against the Debtor's environmental liabilities for financial reporting purposes (see V.B.3 below)[3].  The Debtor also maintains a Workers Compensation insurance policy that the Debtor believes may be utilized to offset, in part, the Debtor's liability.  The Debtor may also have certain Causes of Action, including Avoidance Actions under the Bankruptcy Code, which cannot be quantified at this time.

As of October 31, 2005, per its books and records, the Debtor's outstanding pre-petition liabilities can be categorized as follows:

| | |
|---|---|
| Payables and Accrued Liabilities | $1,429,180 |
| Management Fees Payable | $1,264,392 |
| Environmental Liabilities | $7,568,229 |
| Keyman Life Insurance Obligation | $1,366,000 |
| Retiree Benefits Life | $1,649,901 |
| Retiree Benefits Health | $2,456,651 |
| Deferred Compensation | $647,408 |

Except for the Management Fees Payable, substantially all of the prepetition liabilities arose from, or relate to, the Debtor's operations prior to 1987.  The amounts for Retiree Benefits Life, Retirees Benefits Health, Deferred Compensation and Keyman Life Insurance are based on amounts calculated by the Debtor's prepetition actuarial consultants.  The amount for Environmental Liabilities is an estimate that was prepared by the Debtor's environmental consultants and other advisors.

---

[3]     The United States has appealed the Bankruptcy Court ruling that, among other things, the Puente Valley Escrow is property of the Debtor's estate.  See Section V.B.3

The Debtor's books and records do not reflect any reserves for certain contingent and unliquidated liabilities for, among others, indemnification and other litigation claims, including claims for property damage and personal injury.

## C.    CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING

### 1.    <u>Legacy Liabilities</u>

Since the mid-1980's, the Debtor has pursued a policy of funding its Legacy Liabilities to the extent they were matured, liquidated and not subject to dispute and minimizing its exposure to other liabilities that did not fall into this category. During that time, the Debtor estimates that it has expended in excess of $100 million to: (a) pay medical and life benefits to retirees; (b) fund pension obligations; (c) pay other employee benefits including workers compensation and deferred compensation; (d) fund environmental clean-up and remediation activities; and (e) defend the Debtor against disputed claims. Where possible, the Debtor also settled certain claims relating to the Legacy Liabilities on terms favorable to the Debtor. In spite of its efforts, the Debtor was unable to bring closure to certain of its Legacy Liabilities due to their contingent, unliquidated and/or disputed nature.

The cost of managing, administering and funding the Legacy Liabilities represented a significant use of the Debtor's limited resources. Despite having ceased operations nearly twenty years ago, new claims continued to be asserted against the Debtor with respect to its pre-1987 business operations.

In light of all of the foregoing circumstances, and after carefully considering all available options and alternatives, the Debtor's management concluded that a filing under Chapter 11 would be the best way to preserve the Estate's assets from rapid dissipation, to complete the liquidation of assets, and to provide for the maximum recovery for its Creditors in a fair and equitable manner.

## IV.

## CORPORATE GOVERNANCE OF THE
## DEBTOR DURING THE CASE

## A.    MANAGEMENT

As of the Petition Date and continuing through the Case, the Debtor's senior management consists of:

|  |  |
|---|---|
| Robert A. Bertellotti | President |
| Wayne R. Smith | Senior Vice President and Chief Financial Officer |

**V.**

**SIGNIFICANT DEVELOPMENTS IN THE CASE**

**A.     TERMINATION OF RETIREE BENEFITS**

The Debtor historically provided its retired employees with medical, life, and pension benefits.  Prior to the Petition Date, the Debtor had fully funded and terminated its ERISA-qualified pension plan within the guidelines set forth by the Pension Benefit Guaranty Corporation.  **Pension benefits were annuitized prior to the Petition Date and pension payments to eligible Retirees are not affected by the Debtor's Chapter 11 case or the Plan.**

As of the Petition Date, the Debtor provided medical and/or life insurance benefits to 486 Retirees.  Generally, the medical benefits the Debtor provided were not the Retirees' primary source of medical coverage.  Except for two Retirees, virtually all the Retirees rely on Medicare and Medicaid benefits to cover their major medical costs, while the Debtor's benefit plan provided supplemental medical and prescription drug coverage for them.

During this Case, the Debtor paid, on average, $85,500 per month to cover all post-petition retiree benefits, including insurance premiums.  Consequently, as of May 31, 2005, about nine months into the Case, the Debtor had paid more than $769,000 in retiree benefits on an administrative priority basis.  This ongoing obligation was draining the Debtor's diminishing assets and threatened the Debtor's ability to settle its other Claims and Liabilities.

With the assistance of the Official Committee, the Debtor negotiated with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), whose members comprised the largest group of the Debtor's Retirees, the terms of a modification to the retiree benefits package that provided for, among other things:  (i) the cessation of all retiree benefits as of April 30, 2005;  (ii) the fixing and allowance of a General Unsecured Claim for each Retiree in the amount of their  respective remaining medical and life benefits on a present value basis; and (iii) a one-time payment of $500 to each Retiree entitled to medical benefits.  The $500 payment was on account of, and is to be credited against, any Distribution to which such Retiree would be entitled under a confirmed plan.  A total of 203 Retirees qualified for the $500 payment, aggregating to $101,500.  The X-Fund was the source of the funding for the $500 payments.

The Debtor and the Official Committee filed with the Bankruptcy Court a joint application to obtain approval of the proposed modification.  One of the Debtor's unions, The United Steelworkers of America, AFL-CIO, CLC (the "Steelworkers"), objected to the modification on various grounds.  All of the parties, including both the UAW and Steelworkers, were able to agree upon a revised modification extending medical benefits coverage through May 31, 2005.  The Steelworkers withdrew their objection.

11

On April 21, 2005, the Bankruptcy Court entered an Order approving the joint application, including the modification, as revised (the "Retiree Order"). The Debtor made the $500 payment to each eligible Retiree from the X-Fund and amended its Schedules in accordance with the Retiree Order.

The Debtor has continued to pay Retiree's medical benefit claims incurred through May 31, 2005, that had not yet been processed due to the time lag between the date of service and the date the claim was submitted for reimbursement. Such payments have aggregated an additional $93,920 since May 31, 2005. The amounts the Debtor has paid on a monthly basis have decreased significantly and no further claims will be accepted or paid as of December 31, 2005.

## B.    ENVIRONMENTAL RELATED LIABILITIES AND LITIGATION

### 1.    Description of Environmental Liabilities

As a result of the Debtor's almost 200 years of industrial operations throughout the country, it has been involved in numerous matters relating to the discharge of materials into the environment. The Debtor has participated in a number of on-site cleanups of former operating locations and a number of off-site cleanup locations, which are managed by federal and/or local regulatory agencies. The Debtor was involved in up to twenty-five (25) such sites during the past ten years.

As of the Petition Date, the Debtor was aware of nine (9) environmental sites in which it was involved to varying degrees. Certain of the sites are interrelated due to such factors as, for example, the waste from one site may have been transported to, and disposed of, at another site or one site being within or part of the contamination caused by another site. In certain cases, the Debtor committed to performing certain activities and paying certain amounts of money pursuant to prepetition agreements and/or consent decrees, some of which have been approved by a court of competent jurisdiction. The Debtor has cooperated with local and federal governmental agencies in trying to reach a reasonable settlement of these remediation efforts. As of the Petition Date, the Debtor also was a defendant in a number of proceedings pending in the courts of Tennessee. In such cases, individual plaintiffs sought awards based on claims for property damages and/or personal injuries arising from environmental contamination for which the Debtor is alleged to have been partially or wholly responsible.

Due to the technical and legal nature of the potential environmental-related liabilities, the Debtor has utilized and continues to utilize (on a more limited basis) the services of local counsel and environmental consultants to obtain the technical advice and expertise necessary to ensure that the Debtor's rights are protected.

At virtually all of the sites, the Debtor is but one of several potentially responsible parties. The degree of the Debtor's potential liability varies from site to site. The remediation work at these sites is in varying stages of completion. As a result, in tracking these liabilities for accounting purposes, the Debtor always has faced an

ongoing uncertainty as to the ultimate cost of remediation and the Debtor's portion of financial responsibility.  Therefore, the extent of the Debtor 's liability, if any, cannot be determined with certainty.

## 2.    The USA Sites

Nine sites (collectively, the "USA Sites") in which the Debtor is alleged to have liability are supervised by the United States Department of Justice and the Environmental Protection Agency (the "USA").  On February 15, 2005, the USA filed a single proof of claim to, among other things, recover reimbursement of clean-up costs at the USA Sites (the "USA Claim").

The USA Sites consist of the following:

| USA Site | Potentially Responsible Parties (including the Debtor) | Status |
|---|---|---|
| Saltire Landfill Site, Waterbury, CT | 2 | Work at the site is being conducted in accordance with a Unilateral Administrative Order issued by EPA pursuant to CERCLA. |
| Solvents Recovery Service of New England Superfund Site, Southington, CT | Several hundred | Work at the site is being conducted in accordance with Consent Orders with issued pursuant to CERCLA. |
| Caldwell Trucking Superfund Site, Fairfield, NJ | 90 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Arrowhead Plating, Montross, VA | 3 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Maryland Sand, Gravel, and Stone Superfund Site, Elkton, MD | 40 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Dickson County Landfill, Dickson, TN | At least several, if not more | The Dickson County Landfill is under a State Order to assess and remediate the contamination related to the landfill. |
| Fultz Landfill Superfund Site, Byesville, OH | 5 | Work at the site is being conducted in accordance with a Consent Order with EPA issued pursuant to CERCLA. |
| Puente Valley Operable Unit of the San Gabriel Valley Superfund Site Area 4, Los Angeles County, CA | 80 | Work at the site is being conducted by the potentially responsible parties other than the Debtor in accordance with a Consent Order with EPA issued pursuant to CERCLA.  The |

| USA Site | Potentially Responsible Parties (including the Debtor) | Status |
|---|---|---|
| | | United States disagrees with the characterization by the Debtor as to this site. |
| Saltire-Schrader Facility, Dickson, TN | At least 2 | The site investigation and cleanup was conducted pursuant to an administrative order issued pursuant to section 3008(h) of RCRA. |

As of the Petition Date, the Debtor was in compliance with all existing consent orders and decrees and was making payments to fund its share of remediation costs. During the past twenty years, the Debtor cooperated and engaged in numerous clean-up and remediation operations. The Debtor estimates that it paid in the aggregate at least $50 million for its share of cleanup costs at the USA Sites alone.

The USA Claim, when liquidated, will likely constitute, in the aggregate, the largest Claim against the Debtor's Estate. The USA seeks recovery for, among other things, reimbursement and future funding of remediation costs at the USA Sites. In most of these sites, the Debtor's alleged liability represents a modest percentage of the alleged aggregate liability of all the co-defendants.

**3.    The USA Motion regarding the Puente Valley Escrow**

One of the USA Sites is known as the "Puente Valley Operable Unit of the San Gabriel Valley Superfund Site, Area 4." Prior to the Petition Date, the USA had commenced an enforcement action entitled, United States v. Acorn Engineering, Civil Action No. CV03-5470-WFR(FMOx), against the Debtor and eleven other defendants. This proceeding is pending in the United States District Court for the Central District of California, Western Division (the "California Court"). On December 16, 2002, the defendants, including the Debtor, conditionally entered into a Consent Decree purporting to resolve their respective liabilities in connection with this site. As part of this process, the Debtor signed an Escrow Account Agreement in May 2002. On or about July 5, 2002, pursuant to a Special Deposit Agreement, Saltire deposited into escrow $500,000 (the "Puente Valley Escrow"), subject to the approval of the Consent Decree by the California Court. It is a condition precedent to the release of the escrow fund to the USA that the Consent Decree be entered by the California Court. As of the date of this Disclosure Statement, the Consent Decree has been pending for nearly 2½ years without being approved by the California Court as to the Debtor.[4]

---

[4]    The USA has requested the Debtor to include the following factual allegations regarding the USA Motion:

Saltire entered into Escrow and Special Deposit Agreements with the eleven other settling defendants to this action on May 31, 2002, to establish a fund to be used as payment to the United States upon entry of the Consent Decree. Under the terms of the Escrow Account, Saltire was required to make an irrevocable deposit of $500,000 into the escrow fund and agreed that upon the District Court's approval of the Consent Decree, all amounts paid into the escrow

Based on the terms of the Special Deposit Agreement, the Puente Valley Escrow Account and the Consent Decree, the USA took the position that the $500,000 that the Debtor deposited into the Puente Valley Escrow is not property of the Debtor's Estate and, therefore, is not subject to the automatic stay imposed by section 362(a) of the Bankruptcy Code.

On April 11, 2005, the USA filed a motion seeking, among other things, a declaration that the automatic stay contained in section 362 of the Bankruptcy Code did not apply to the Puente Valley Escrow (the "USA Motion"). The Debtor, joined by the Official Committee, opposed the USA Motion.

At a hearing conducted on May 3, 2005, the Bankruptcy Court denied the USA Motion in its entirety. By motion dated May 10, 2005, the USA asked the Bankruptcy Court to amend or alter its decision on the grounds that the Bankruptcy Court failed to apply the proper legal standards in deciding the USA Motion. In a decision, dated June 3, 2005, the Bankruptcy Court denied the USA's motion for reconsideration. On June 9, 2005, the USA timely filed a notice of appeal. The appeal has been docketed with the United States District Court for the Southern District of New York. The brief of the USA in support of its appeal is due to be filed no later than February 16, 2006. The appellee briefs of the Debtor and the Official Committee in opposition to the appeal are due no later than March 17, 2006. The USA's reply brief is due no later than March 31, 2006.

As a result of negotiations among the Debtor, the USA and the Official Committee, the parties agreed to a procedure so that the USA may pursue entry of the Consent Decree in the Puente Valley matter as to all parties other than the Debtor, so that the Debtor's rights to the Puente Valley Escrow remain unaffected.

Accordingly, on September 8, 2005, the California Court granted the USA's unopposed motion and entered the Consent Decree against all defendants except the Debtor. The Puente Valley Escrow, plus accrued interest thereon, remains intact and continues to earn interest.

---

account, plus interest, were to be released to the United States in the manner set forth in the Consent Decree. On July 5, 2002, in accordance with the Special Deposit Agreement terms, Saltire deposited $500,000 into the "Deposit Fund" as its contribution to the Escrow Account.

Under the terms of the Escrow Account, Saltire transferred its $500,000 deposit beyond its possession and control and retained only a narrow legal right to repossess this property contingent upon the occurrence of specified escrow conditions entirely beyond its control. Saltire then executed the U.S. v. Acorn Engineering, et al. Consent Decree on December 16, 2002, agreeing to entry of the Consent Decree without further notice. The United States simultaneously filed a Complaint and lodged a Consent Decree in the District Court for the Central District of California on July 31, 2003. U.S. v. Acorn Engineering, et al. (Civil Action No. CV03-5470-WJR(ABCOx)).

4.      **Negotiations with the USA**

Despite the ongoing litigation between the USA and the Debtor concerning the Puente Valley Escrow, the parties, including the Official Committee, have met on several occasions to discuss the various aspects of the USA Claim and to explore the possibility of a global settlement respecting all of the USA Sites. These meetings have been constructive and resulted in a productive exchange of ideas and documentation regarding these sites. In addition to exchanging written settlement proposals, the Debtor has provided the USA with documentation analyzing the status of the USA sites, estimating the Debtor's liabilities for the sites, calculating the amounts the Debtor has expended to date for remediation and compliance, and providing a status of remediation efforts on a site-by-site basis.

Based on the foregoing, the Debtor is cautiously optimistic that a global resolution among the Debtor, the Official Committee and the USA can be reached concerning the USA Claim.

5.      **Disposition of the Schrader-Dickson Facility.**

As of the Petition Date, the Debtor held title to approximately thirty-seven (37) acres of land in Dickson, Tennessee (the "Schrader-Dickson Facility"). The Debtor ceased operations at the Schrader-Dickson Facility more than twenty (20) years prior to the Petition Date. In addition, from 1986 through 1988, the USA ordered several investigations of the site. The site investigations resulted in ongoing monitoring and treatment obligations in accordance with a pre-petition administrative order issued pursuant to section 3008(h) of RCRA. The Debtor has continued to fund these monitoring and pump and treat obligations since May 1990 and has expended more than $11 million in investigation and remediation costs. The USA maintains that the Debtor's environmental obligations at this site may exceed another $3 million.

The Debtor and the USA have been and remain in discussions concerning the disposition of the Schrader-Dickson Facility. The site investigations have shown that the environmental issues at the Schrader-Dickson Facility do not present any imminent threat to the public health or welfare.

The Schrader-Dickson Facility has no value to the Estate and represents a continued drain on the Debtor's scant resources. The site has not generated income in over twenty (20) years and is not marketable.

Therefore, the Debtor has concluded that it is in the best interests of the Estate and its creditors to abandon, pursuant to section 554 of the Bankruptcy Code, the Schrader-Dickson Facility effective as of the date the Confirmation Order is entered.

Pursuant to section 554 of the Bankruptcy Code, a debtor in possession may abandon property which does not pose an imminent threat to public health and welfare. See Midlantic Nat'l Bank v. New Jersey Dep't of Environ. Protection, 474 U.S. 494, 507, 106 S. Ct. 755, 88 L.Ed.2d 859 (1986). Therefore, the Debtor's proposed abandonment of the Schrader-Dickson Facility is not in contravention of any statute or

regulation that is reasonably designed to protect the public health or welfare from identified environmental hazards.

## C.    TENNESSEE LITIGATION

### 1.    Description of Litigation

More than twenty years ago, the Debtor ceased manufacturing activities and operations in Dickson, Tennessee.  Over the past several years, however, the Debtor and/or Alper, the Debtor's parent, have been named as a defendant in six (6) lawsuits brought in the courts of the State of Tennessee (collectively, the "Tennessee Actions").[5] The plaintiffs (the "Dickson Plaintiffs") in the Tennessee Actions seek recovery for alleged property damage and/or personal injury claims relating to the Debtor's former operations in Dickson County (the "Tort Claims").

As the Debtor understands the complaints, each contains cursory allegations that Alper is the alter ego of, and/or successor in interest to, the Debtor. It is the Debtor's contention that, to the best of its knowledge, information and belief, any alleged liability on the part of Alper in the Tennessee Actions is derivative of claims against the Debtor.  In fact, Alper did not become the parent of the Debtor until 1992, approximately seven years after the Debtor had ceased business operations in Dickson County, Tennessee.  Moreover, the Debtor was a public corporation during the entire period (through March 1985) that the Dickson Plaintiffs allege that the Debtor contaminated the environment with hazard wastes.  The Debtor had no relationship or connection whatsoever to Alper during that time.  Alper only became the controlling indirect shareholder and ultimate parent of the Debtor subsequent to this period.  The Debtor never assigned any of its liabilities or prospective liabilities to Alper, and Alper never acquired or assumed the Debtor's liabilities or prospective liabilities by operation of law or otherwise.  As the Debtor perceived it, the claims asserted by the Dickson Plaintiffs against Alper were based on theories of alter ego and successor in interest liability and were derivative claims that not only had no legal or factual justification, but if they were colorable, under applicable Delaware case law, those claims belong exclusively to the Debtor.  As a result, the Debtor believed that the continued prosecution of the Tennessee Actions threatened to interfere with property of the Debtor's estate, *i.e.*, the derivative claims, and its ongoing settlement discussions with Alper.

### 2.    Adversary Proceeding against Dickson Plaintiffs

During this period, Alper and the Official Committee were negotiating, among other things, the amount of the settlement contribution to be made by, and the scope of the proposed releases to be granted to, Alper.  To provide the parties with preliminary injunctive protection while these negotiations were being finalized and, in part, to raise the legal issues associated with the proposed release and injunction to be

---

[5]    A similar seventh suit that was filed on March 8, 2005 against Alper and others was subsequently dismissed.

granted under the plan in Alper's favor, the Debtor, supported by the Official Committee, commenced an adversary proceeding by serving a summons and complaint (the "Complaint") on the Dickson Plaintiffs. The Complaint primarily sought a declaratory judgment that the automatic stay of section 362(a) of the Bankruptcy Code precluded the commencement or continuation of the Tennessee Actions against Alper, including any other action with respect to any property in which both Alper and the Debtor have a legal, beneficial, equitable, contractual or other interest. The Complaint also sought entry of a permanent injunction pursuant to section 105(a) of the Bankruptcy Code enjoining the pursuit of all such claims.

At the same time, the Debtor filed a motion seeking injunctive relief that would restrain and enjoin the commencement or continuation of any and all actions or other proceedings against Alper, including the Tennessee Actions, pending a final adjudication of the Complaint. The Debtor argued that an injunction was necessary because the claims against Alper in the Tennessee Actions are derivative of claims against the Debtor; the continued litigation of claims against Alper would place the Debtor at risk of being bound by a judgment adverse to Alper; and, finally, a judgment against Alper also would create a right of contribution or indemnification by Alper against the Debtor thereby increasing the Debtor's liabilities. Accordingly, the Debtor contended that the Court should exercise its power to grant a preliminary injunction to enjoin the Tort Claims asserted against Alper in the Tennessee Actions, pending the final adjudication of the Debtor's adversary proceeding seeking to permanently enjoin the Dickson plaintiffs' from prosecuting the Tort Claims.

After the Debtor served the Complaint and injunction motion papers, certain of the Dickson Plaintiffs jointly retained counsel and one group of plaintiffs appeared *pro se*. The Debtor and counsel reached an interim standstill agreement whereby the Dickson Plaintiffs agreed not to pursue any legal action against Alper until no fewer than 14 days after the Bankruptcy Court ruled on the Debtor's motion for a preliminary injunction. The parties also agreed to reschedule the hearing on the Motion from June 28, 2005 to July 28, 2005 and to a briefing schedule for the motion. The parties memorialized their agreement in a stipulation that the Bankruptcy Court so ordered on June 29, 2005.

On July 28, 2005, the Bankruptcy Court heard argument from the parties, including the Debtor, the Official Committee and the Dickson Plaintiffs. At the conclusion of the hearing, the Bankruptcy Court denied the Debtor's motion. Thereafter, following an extensive dialogue among the Debtor, the Official Committee and Alper, the parties renegotiated the terms and scope of the proposed settlement with Alper that has resulted in the amendment of the plan previously filed by the Debtor. Based on the Alper Settlement Agreement (as modified), the Debtor believes it can confirm its Plan on a largely consensual basis and that Creditors will receive enhanced Distributions on their Claims.

## D.     GENERAL BANKRUPTCY ADMINISTRATION

### 1.     <u>Schedules of Assets and Liabilities and Statement of Financial Affairs</u>

On August 24, 2004, the Debtor filed its Schedules with the Bankruptcy Court. On January 25, 2005, the Debtor filed an amended statement of financial affairs. On April 13, 2005, the Debtor filed an Amended Schedule F to reflect changes to its schedule of Holders of certain General Unsecured Claims. On May 4, 2005, the Debtor filed an Amended Schedule F to reflect, among other things, the Allowed General Unsecured Claims of those Retirees affected by the Retiree Order.

### 2.     <u>Deadline for Filing Proofs of Claim</u>

By Order, dated November 3, 2004, the Bankruptcy Court fixed December 10, 2004 as the deadline for Creditors, excluding governmental entities, to file proofs of Claim against the Debtor based on prepetition debts or Liabilities. The deadline for governmental entities was February 14, 2005. To date, more than 470 proofs of Claim have been filed. The asserted face amount of filed Claims exceeds $590 million in the aggregate, including Claims for unliquidated environmental contamination and personal injury and property damage. Of these claims, several claims relating to the Tennessee Actions were filed by a single family and seek recovery of $560 million. The Debtor so far has filed two omnibus objections to claims.

## VI.

## SUMMARY OF THE PLAN

## A.     GENERAL

This section of the Disclosure Statement summarizes the Plan, a copy of which appears as Exhibit 1 hereto. YOU SHOULD READ THE PLAN IN ITS ENTIRETY AND DISCUSS THE DISTRIBUTIONS AND RIGHTS TO WHICH YOU ARE ENTITLED THEREUNDER WITH YOUR ADVISORS.

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified instead of "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class. For purposes of this Disclosure Statement, the terms "Creditor" and "Equity Interest Holder" refer to the Holder, whether legal or beneficial, of a "Claim" or "Equity Interest", respectively, in a particular Class under the Plan. If such Claims and Equity Interests are "impaired" under the Plan, their Holders are receiving this Disclosure Statement (and the related Ballots and other materials delivered together herewith) for the purpose of voting to accept or reject the Plan, if applicable.

19

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full on the effective date of the plan or are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are conclusively deemed to accept the plan. Accordingly, under section 1126(f) of the Bankruptcy Code, it is not necessary to solicit acceptances from the holders of claims or equity interests in such unimpaired classes. Pursuant to the Plan, Class 1 Priority Non-Tax Claims and Class 2 Secured Claims are not impaired and, therefore, Holders of Claims in these Classes are conclusively deemed to have accepted the Plan.

A Chapter 11 plan also may specify that certain classes of claims or equity interests will not receive or retain any property on the effective date of the plan. These are impaired claims or equity interests, but unlike those that are afforded some treatment by a plan, they receive no treatment and are therefore discharged and extinguished. Under section 1126(f) of the Bankruptcy Code, such classes are conclusively deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Pursuant to the Plan, Class 4 Intercompany Claims and Class 5 Equity Interests are impaired and shall receive no treatment or distribution under the Plan. Accordingly, Holders of Intercompany Claims in Class 4 and Equity Interests in Class 5 are deemed to have rejected the Plan and their votes will not be solicited.

Holders of General Unsecured Claims in Class 3 are impaired and are entitled to vote whether to accept or reject the Plan.

The "Effective Date" of the Plan means the date that is at least (11) eleven days (calculated under Rule 9006 of the Bankruptcy Rules) after the Confirmation Date if no stay of the Confirmation Order is then in effect, which date shall be fixed after the Confirmation Date by the Debtor by filing a notice thereof with the Bankruptcy Court. On the Effective Date, the transactions and distributions contemplated under the Plan are to be effected; provided, however, that in no event will the Effective Date occur prior to the satisfaction of the conditions precedent to the occurrence of the Effective Date of the Plan specified in Section 11.2 of the Plan, unless waived as provided in Section 11.3 of the Plan.

The Plan is the product of extensive negotiations among the Debtor, the Official Committee and Alper. Under the Plan, the Holders of Allowed Administrative Expense Claims and Allowed Priority Claims will be paid on the Effective Date in full, in Cash, by the Debtor. The Holders of Allowed General Unsecured Claims are entitled to receive periodic pro rata Distributions of Aggregate Cash in an amount up to 100% of their Allowed Claims.

**B.    DESCRIPTION AND TREATMENT OF CLAIMS
AND EQUITY INTERESTS UNDER THE PLAN**

**1.    Unclassified Claims**

**A.    Administrative Expense Claims**

Creditors holding Allowed Administrative Expense Claims are those
Entities holding Claims against the Debtor entitled to priority under sections 503(b) and
507(a)(1) of the Bankruptcy Code, including:  (i) all actual and necessary costs and
expenses of preserving the Debtor's Estate;  (ii) any actual and necessary costs and
expenses of operating the business of the Debtor;  (iii) any indebtedness or obligations
incurred or assumed by the Debtor after the Petition Date in connection with the
conduct or operation of its business;  and (iv) any allowances of compensation and
reimbursement of expenses to the extent allowed by Final Order under sections 330 or
331 of the Bankruptcy Code, whether fixed before or after the Effective Date.

Subject to the Administrative Bar Date provisions herein and except to the
extent the Debtor or the Liquidating Trustee and the Holder of an Allowed
Administrative Expense Claim agree to a different treatment, each Holder of an
Allowed Administrative Expense Claim shall be paid, in Cash, by the Debtor or the
Liquidating Trustee an amount equal to such Allowed Administrative Expense Claim
on the later of (a) the Effective Date or (b) ten (10) Business Days after the date on which
such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as
is practicable.

**B.    Priority Tax Claims**

Creditors holding Priority Tax Claims are governmental units with Claims
against the Debtor entitled to priority under section 507(a)(8) of the Bankruptcy Code.
Such Claims are for taxes based on income or gross receipts, property taxes, taxes of
other parties required to be collected or withheld by the Debtor on behalf of
governmental units, excise taxes, transfer taxes, custom duties and penalties for actual
pecuniary loss related to the foregoing.

On the Effective Date, or as soon as practicable after such Claims become
Allowed Claims if the date of allowance is later than the Effective Date, each Holder of
an Allowed Priority Tax Claim shall be paid by the Debtor or the Liquidating Trustee in
Cash, in full, or in such amount and on such other terms as may be agreed on by the
Holder of such Claim and the Debtor.

2.      **Classified Claims and Equity Interests**

A.      **Priority Non-Tax Claims (Class 1)**

Holders of Class 1 Claims are those Creditors holding Priority Claims against the Debtor, other than Administrative Expense Claims and Priority Tax Claims, that are entitled to priority under section 507(a) of the Bankruptcy Code.  These Claims may include employee wages, salaries and commissions (subject in all such cases to certain limitations prescribed by the Bankruptcy Code).

On the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amount and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

**Class 1 Priority Non-Tax Claims are not impaired under the Plan.**

B.      **Secured Claims (Class 2)**

Holders of Class 2 Claims are those Creditors holding Secured Claims against the Debtor.

The Debtor does not believe there will be any Allowed Claims in Class 2 as of the Effective Date because the Holder of the only known Secured Claim was paid in full pursuant to a Final Order entered by the Bankruptcy Court during the Case. Accordingly, the Debtor believes all Class 2 Claims already have been satisfied.

In the event and to the extent there exist any Allowed Secured Claims against the Debtor, each Holder of an Allowed Secured Claim shall receive, in the Debtor's sole discretion, one of the following types of Distribution:

(a)     (i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash, on the later of (A) the Effective Date or as soon thereafter as may be practicable, or (B) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practicable;  and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the amount of such Holder's Allowed Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan;  or

(b)     the Debtor shall abandon the property that secures the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or (ii) that date that

22

is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order;  or

(c)    such other treatment as the Holder and the Debtor shall agree upon in writing.

**Class 2 Secured Claims are not impaired under the Plan.**

### C.    <u>General Unsecured Claims (Class 3)</u>

Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of its Allowed Class 3 Claim, periodic ratable Distributions from the Liquidating Trust in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim;  provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Debtor's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.

**Class 3 General Unsecured Claims are impaired under the Plan.**

### D.    <u>Intercompany Claims (Class 4)</u>

Pursuant to the Alper Settlement Agreement, Alper will waive all claims against the Debtor's Estate, in their entirety and with prejudice, including but not limited to its Intercompany Claim under the Alper management agreement in the amount of $1,264,392.00.  Accordingly, on the Effective Date, Alper shall not receive any Distribution and any such Intercompany Claims shall be deemed discharged.

**Class 4 Intercompany Claims are impaired under the Plan.**

### E.    <u>Equity Interests (Class 5)</u>

On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests.  As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

**Class 5 Equity Interests are impaired under the Plan.**

## C.    TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN

### 1.    Prosecution of Objections to Disputed Claims

Upon the Effective Date, the Liquidating Trustee shall be responsible for pursuing any objection to the allowance of all Disputed Claims with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.  The Liquidating Trustee may compromise and settle any Disputed Claims.  The Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019(a).  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed no later than one hundred twenty (120) days after the Effective Date; provided, however, that this deadline may be extended upon motion by the Liquidating Trustee, without notice to Creditors.

### 2.    No Distributions Pending Allowance of a Disputed Claim

Notwithstanding any other provision of the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until it becomes an Allowed Claim.

### 3.    Distributions After Allowance of a Disputed Claim

Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims in which such Allowed Claim is classified.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim any payment that would have been distributed to such Holder if the Claim had been Allowed on the Effective Date, plus any payments that would have been made on account of such Allowed Claim after the Effective Date, without any interest thereon.

### 4.    Disputed Claims Reserve

On the Effective Date, and prior to making the Distributions to Holders of Allowed General Unsecured Claims required to be made on the Effective Date, the Liquidating Trustee shall establish a Disputed Claims Reserve.  Distributions from the Disputed Claims Reserve shall be governed by Articles III and IV of the Plan.  If, and when, a Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall utilize funds in the Disputed Claims Reserve to make Distributions on account of such Allowed Claim.

D.    **EXECUTORY CONTRACTS AND
      UNEXPIRED LEASES UNDER THE PLAN**

In accordance with Section 10.1 of the Plan, the Plan constitutes a motion by the Debtor to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for any Executory Contract that (a) has been assumed pursuant to an order of the Bankruptcy Court prior to the Effective Date, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code and pending on the Effective Date.

If the rejection of any Executory Contract under the Plan or other pending objection results in damages to the other party or parties to such contract, a Claim for such damages (a "Rejection Claim"), if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Estate, or its properties or interests in property or agents, successors, or assigns, unless a proof of Rejection Claim is filed with the Bankruptcy Court and served upon the Debtor and the Liquidating Trustee (in the event the Effective Date has occurred), on or before thirty (30) days after the earlier to occur of (a) the Effective Date and (b) the entry of an order by the Bankruptcy Court authorizing rejection of a particular Executory Contract.

Any Rejection Claim filed will be treated as a Disputed Claim until the period of time has elapsed within which the Liquidating Trustee may file an objection to such Claim. If no such objection is filed within the prescribed period under the Plan, the Claim shall be deemed as of the expiration of said period to be an Allowed General Unsecured Claim, and the holder thereof have the rights of a Holder of an Allowed General Unsecured Claim.

E.    **CONDITIONS PRECEDENT TO THE CONFIRMATION
      DATE AND THE EFFECTIVE DATE OF THE PLAN**

1.    **Conditions Precedent to Confirmation of the Plan**

This Plan may not be confirmed unless each of the following conditions has been satisfied: (a) the Disclosure Statement Order shall have been entered on the legal docket for the Case and shall have become a Final Order; (b) the Confirmation Order shall be in a form reasonably acceptable to the Debtor and the Official Committee; and (c) the Alper Settlement Agreement has been approved through the Confirmation Order.

2.    **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date is subject to satisfaction of the following conditions: (a) the Confirmation Order shall have been entered on the legal docket for the Case and shall have become a Final Order; (b) Alper shall have paid $1,000,000 to the Debtor's Estate within forty-five (45) days of the entry of the Confirmation Order; (c) upon the entry of the Confirmation Order, Grupo shall have

paid the Debtor's Estate an amount equal to 50% of the total outstanding balance due to the Debtor under the Grupo Note;  (d) within forty-five (45) days of the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate the remaining balance due under the Grupo Note, including all accrued interest thereon;  and (e) all actions and documents necessary to implement the provisions of this Plan shall have been effected or executed and delivered.

Payment in full of the Grupo Note and the $1,000,000 settlement payment by Alper are express conditions to the Effective Date of the Plan.  The Effective Date of the Plan shall be no earlier than two (2) business days after all payments by Alper and Grupo have been paid in full through cleared funds to the Debtor's Estate.

### F.    WAIVER OF CONDITIONS PRECEDENT

The conditions precedent in Sections 11.1 and 11.2 of the Plan as described above, except for the requirements that the Disclosure Statement Order and the Confirmation Order must be entered and become Final Orders, may be waived or modified, in whole or in part, upon the joint consent of the Debtor and the Official Committee.  Any such waiver or modification of a condition precedent in Sections 11.1 and 11.2 hereof may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any other formal action.

### VII.

### MEANS OF IMPLEMENTATION OF THE PLAN

### A.    GENERAL

Each of the transactions required to implement the Plan will be implemented in accordance with the provisions of the Plan, including Article VII thereof.

### B.    CREATION OF THE LIQUIDATING TRUST

On the Effective Date or as soon thereafter as is practicable, all of the assets of the Debtor's Estate will be transferred to the Liquidating Trust for the benefit of Holders of General Unsecured Claims, including, but not limited to, all Cash, receivables and Causes of Action;  provided, however, that the Debtor shall retain such Cash as may be necessary to fund (i) Distributions on the Effective Date to Holders of Allowed Administrative Expense Claims and Allowed Priority Claims, and (ii) the creation and maintenance of the Operating Reserve Account.

26

C.      APPOINTMENT AND DUTIES OF THE LIQUIDATING TRUSTEE

At least ten (10) days prior to the Confirmation Hearing, the Official Committee shall designate the Liquidating Trustee who shall be paid in accordance with the terms of the Liquidating Trust Agreement.

On the Effective Date or as soon thereafter as practicable, all Cash and Assets of the Debtor, including but not limited to Causes of Action, shall be transferred to the Liquidating Trust for liquidation and distribution in accordance with the Plan and the Liquidating Trust Agreement.

As of each March 31, June 30, September 30 and December 31, the Liquidating Trustee shall prepare a quarterly report, and, upon the resolution of the last Disputed Claim or Cause of Action, a final report, regarding receipts, disbursements and the status of pending, contemplated and resolved Disputed Claims and Causes of Action.  Such report shall be filed with the Bankruptcy Court and a copy shall be delivered to the Debtor within fifteen (15) days of the end of each calendar quarter and the final report on or before sixty (60) days following the resolution of the last Disputed Claim, Avoidance Action or Cause of Action.

For purposes of making Distributions on account of Allowed Claims under the terms and conditions of the Plan, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code.

D.      ESTABLISHMENT OF THE OPERATING RESERVE ACCOUNT

On or before the Effective Date, the Debtor will establish the Operating Reserve Account.  The Operating Reserve Account shall be used to pay the post-Confirmation Date Administrative Expense Claims of the Case, including the fees and expenses of any Professionals by the Debtor and/or the Official Committee.  The Operating Reserve Account will be funded from the Estate's Available Cash.  When the Plan has been consummated and the Debtor dissolved, any remaining funds in the Operating Reserve Account shall be transferred to the Liquidating Trustee.

E.      DISTRIBUTIONS UNDER THE PLAN

1.      **Date of Distributions**

Any Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for under the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## 2.     Delivery of Distributions

Subject to Rule 9010 of the Bankruptcy Rules, and except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made at the address of each of such Holders as set forth in the Schedules filed by the Debtor with the Bankruptcy Court, unless superseded by the address set forth on proofs of Claim filed by such Holders (or at the last known address of such Holders if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address).  If any Distribution to any Holder is returned as undeliverable, the Liquidating Trust shall use reasonable efforts to determine the current address of such Holder, but no Distribution to any such Holder shall be made unless and until the Liquidating Trust has determined the then current address of such Holder, at which time such Distribution to such Holder shall be made to such Holder without interest.  Amounts in respect of any undeliverable Distributions made by the Liquidating Trust shall be returned to the Liquidating Trust until such Distributions are claimed.  If such Distributions are not claimed by the expiration of the later of:  (a) one year from the Effective Date;  or (b) one year from the actual date of the making of such Distribution (the "Unclaimed Distribution Date"), such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  If no proofs of Claim are filed and the Schedules filed with the Bankruptcy Court fail to state addresses for Holders of Allowed Claims, Distributions that would have been made on account of such Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the Unclaimed Distribution Date.  After the Unclaimed Distribution Date, all unclaimed property shall be transferred to the Liquidating Trust for Distribution to Holders of Allowed General Unsecured Claims and the Claim of any Holder to such property shall be discharged and forever barred.

## 3.     Time Bar to Cash Payments

Any check issued by the Debtor or the Liquidating Trustee, as the case may be, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof, unless it has been returned as undeliverable.  Requests for reissuance of any check shall be made in writing directly to the Debtor or the Liquidating Trust, as the case may be, by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any request for reissuance of a voided check constituting the Distribution in respect of an Allowed Claim shall be made in writing on or before the first anniversary of the Effective Date.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

## 4.     Disputed Distributions

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, in lieu of making a Distribution to such Person, the Debtor and/or Liquidating Trustee, as the case may be, shall deposit the Distribution at issue into a segregated account until the disposition of such Distribution is determined

by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

      **5.**      **Manner of Payment Under the Plan**

      At the option of the Debtor or the Liquidating Trustee, as the case may be, any Distribution of Cash to be made pursuant to this Plan may be made by a check or wire transfer, or as otherwise required by or provided in applicable agreements.

      **6.**      **Distributions After Effective Date**

      Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**F.**      **OFFICIAL COMMITTEE**

      As of the Effective Date, the Official Committee shall be deemed dissolved and shall have no further duties, authority or responsibility under the Bankruptcy Code, or otherwise, with respect to the Debtor, its assets, or the Plan. Neither the Debtor nor the Liquidating Trustee shall be responsible for any fees, costs or expenses of the Official Committee, its individual members or its Professionals incurred after the Effective Date; provided, however, that following the Effective Date, the responsibilities of the Official Committee and its Professionals shall be limited to the preparation and prosecution of their respective fee applications for which they shall be entitled to reasonable compensation by the Debtor.

**G.**      **CORPORATE ACTION AND CONTINUED EXISTENCE OF DEBTOR**

      From and after the Confirmation Date, the Debtor shall continue in existence solely for the purpose of winding up its affairs as expeditiously as reasonably possible. Except as otherwise provided in the Plan, the Plan will be administered by the Liquidating Trustee and all actions taken thereunder shall be taken through the Liquidating Trustee.

      From and after the Confirmation Date, the then current officers and directors of the Debtor shall continue to serve in their respective capacities through the earlier of the date the Debtor is dissolved under applicable state law and the date such officer or director resigns, is replaced or is terminated. The officer and directors of the Debtor shall continue to serve in their respective capacities on the same terms and conditions upon which they presently serve the Debtor. In addition, after Confirmation and throughout the winding down period, the remaining officers of the Debtor will remain reasonably available to the Liquidating Trustee to assist in the liquidation of any and all assets, including but not limited to, Causes of Action.

## VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.    DISCHARGE OF DEBTOR

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan and the Confirmation Order shall not discharge the Debtor from any Claim or Liability that arose before the Confirmation Date.

### B.    DEBTOR'S AUTHORITY

Until the Effective Date, the Bankruptcy Court shall retain custody and jurisdiction of the Debtor, its properties, interests in property and operations.  On the Effective Date, the Debtor, its properties and interests in property and operations shall be released from the custody and jurisdiction of the Bankruptcy Court, except as provided in Article XV of the Plan.

### C.    VESTING AND LIENS

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, title to all Avoidance Actions, Causes of Action, Assets and Cash of the Debtor and its Estate shall vest in the Liquidating Trust, free and clear of aliens, Claims and Interests.  The Liquidating Trust is a grantor trust and is assumed to have no tax liabilities.  On or before the Effective Date, the Liquidating Trust and the Debtor shall enter into the Liquidating Trust Agreement.  The Liquidating Trustee shall liquidate the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan.  The Debtor shall execute any and all documents necessary to transfer and convey all of its Assets not otherwise required to satisfy its obligations under the Plan to the Liquidating Trust on the Effective Date.

### D.    TERMINATION OF BANKRUPTCY INJUNCTIONS OR STAYS

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays provided for in the Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the occurrence of the Effective Date, all such injunctions or stays shall be deemed terminated or vacated and shall have no further force and effect.

E.    **INJUNCTION AND RELEASES OF CLAIMS**

1.    **General Injunction**

The Debtor shall seek the entry of a Confirmation Order that provides for an injunction permanently enjoining and restraining all Entities from:

(i)    Commencing or continuing any action or proceeding respecting any claim or interest against the Debtor or its property (other than abandoned property);

(ii)    Enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);

(iii)    Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);

(iv)    Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and

(v)    Performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

2.    **Release and Injunction in Favor of Alper**

**As of the Effective Date, the Debtor, on its own behalf, and on behalf of its estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, releases, acquits and forever discharges Alper and its principals, shareholders, subsidiaries, affiliates, and their respective employees, agents, representatives, officers, directors, members, partners, professionals (all solely in their capacities as such), successors and assigns, and any Entity claimed to be liable derivatively through the Debtor, or any of the foregoing (each such party, a "Released Party") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of this Case or during the course of the Case (including through the Effective Date), in any way relating to the Debtor, this Case, or the ownership, management, and operation of the Debtor, that the Debtor could assert directly or any Holder of a Claim or Interest or other Entity could assert derivatively or on behalf of the Debtor or its Estate (the "Released**

Claims"); <u>provided</u> <u>that</u> the foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or cause of action arising out of any express contractual obligation owing by any current or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation of any current or former, director, officer, or employee with respect to a loan or advance made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or cause of action against Grupo and its employees, agents, representatives, officers, directors, members, partners, professionals, successors and assigns (all solely in their capacities as such). The releases described in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity. Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

The Confirmation Order shall provide that the Debtor and its Estate shall be permanently enjoined, from and after the Effective Date, from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to this Plan.

3.    <u>Exculpation</u>

As of the Effective Date, each Holder of a Claim or Equity Interest, each party-in-interest and each Entity acting or claiming or purporting to act or claim by, through under or on behalf of any of the foregoing, shall forever be enjoined from the commencement or continuation of any action, the employment of process, or any act to assert a claim for relief against the Debtor, the Official Committee, Alper and their respective officers, directors, attorneys or other professionals (collectively, the "Plan Releasees") in respect of: (A) any actions taken or not taken in connection with the Case; (B) the Plan; (C) the Disclosure Statement; (D) Distributions, payments or transfers made under the Plan; (E) acts performed pursuant to the Plan; (F) any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with the Plan; or (G) any Claim compromised, settled or released under or pursuant to the Plan; <u>provided</u>, <u>however</u>, that the foregoing release shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for any acts, or omissions to act, evidencing and/or constituting gross negligence, willful misconduct, breach of fiduciary duty or malpractice. Notwithstanding the foregoing, under no circumstances shall a nondebtor third party be enjoined from the continuation or commencement of any derivative action against a Released Party, except to the extent such derivative claim is property of the Debtor's Estate.

**F.    AVOIDANCE ACTIONS AND OTHER CAUSES OF ACTIONS**

**1.    <u>Bankruptcy Code Avoidance and Recovery Actions</u>**

Except as released under Section 13.1(b) of the Plan, as of the Effective Date, the Liquidating Trustee shall retain the right to prosecute, on behalf of itself and the Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor, Debtor in Possession or the Estate, and the Liquidating Trustee expressly retains the right to assert such claims and Causes of Action as defenses to, and setoffs against, Disputed General Unsecured Claims.  The Liquidating Trustee may prosecute, compromise and settle any Cause of Action it deems necessary and appropriate.  All settlements shall be subject to Bankruptcy Court approval under Bankruptcy Rule 9019.

All Causes of Action, whether asserted or not as of the Effective Date, are specifically preserved by the Plan and will survive the occurrence of the Effective Date. Any Cause of Action asserted or commenced as of the Effective Date shall be prosecuted, settled, withdrawn or otherwise disposed of by the Debtor or the Liquidating Trust, as the case may be, in their sole discretion, subject, only to applicable judicial requirements or duties or requirements imposed under the Plan.

**G.    RETENTION OF JURISDICTION**

Section 15.1 of the Plan provides that, as of the Effective Date, the Bankruptcy Court will retain jurisdiction with respect to the matters listed below.  If the Bankruptcy Court exercises its retained jurisdiction, it will have exclusive jurisdiction with respect of all matters arising out of, and relating to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

(d)    To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)     To issue such orders in aid of execution of the Plan in accordance with section 1142 of the Bankruptcy Code;

(g)     To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)     To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to implementation and effectuation of the Plan;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)     To compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(l)     To enforce remedies upon any default under the Plan;

(m)     To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan;

(p)     To determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)     To enter a final decree closing the Case.

34

## H.    MODIFICATION OF THE PLAN

After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper;  provided, however, the Plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified in accordance with Section 15.2 of the Plan if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

## I.    NOTICES

To be effective under the Plan, all notices, requests and demands to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtor:

>   Saltire Industrial, Inc.
>   274 Riverside Avenue
>   Westport, CT 06880
>   Attn.:  Robert A. Bertellotti
>   Telephone:    (203) 454-0077
>   Telecopier:    (203) 454-2277

with copies to:

>   Togut, Segal & Segal LLP
>   One Penn Plaza
>   Suite 3335
>   New York, New York 10119
>   Attn:   Scott E. Ratner
>   Telephone:    (212) 594-5000
>   Telecopier:    (212) 967-4258

To the Official Committee:

Lowenstein Sandler PC
1251 Avenue of the Americas
18th Floor
New York, New York  10020
Attn.:  Michael S. Etkin
Telephone:    (212) 262-6700
Telecopier:    (212) 262-7402

## IX.

## CERTAIN U.S. TAX CONSEQUENCES OF THE PLAN

The Debtor has not evaluated the tax consequences of the Plan to Holders of Claims and Equity Interests.  EACH HOLDER OF A CLAIM AGAINST, OR EQUITY INTEREST IN, THE DEBTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.

## X.

## VOTING AND CONFIRMATION OF THE PLAN

For the Plan to be confirmed, various statutory conditions prescribed by the Bankruptcy Code must be satisfied, including:  (i) acceptance of the Plan by at least one impaired Class of Claims entitled to vote on the Plan;  (ii) provision for payment or distribution under the Plan to each claimant of money and / or other property at least equal in value to what the claimant would have received in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code;  (iii) a finding by the Bankruptcy Court that the Plan is feasible;  and (iv) with respect to each Class, either acceptance of the Plan by that Class or a finding by the Bankruptcy Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against that Class.

The Disclosure Statement has been approved by order of the Bankruptcy Court, dated December 28, 2005.  Accordingly, this Disclosure Statement is being used in connection with the solicitation of acceptances of the Plan from those Creditors holding Claims in Classes entitled to vote on the Plan.

## A.    WHO MAY VOTE

Only the Holder of a Claim in a Class that is impaired under the Plan and that is not deemed to have rejected the Plan is entitled to vote on acceptance or rejection of the Plan.  Generally, section 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless the proposed plan of reorganization

36

proposed leaves unaltered the legal, equitable and contractual rights of the holder of the claim or interest.  In addition, those classes are impaired unless all outstanding defaults, other than defaults relating to the solvency or financial condition of the debtor or the commencement of the Chapter 11 case, have been cured and the holders of claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance on any contractual provisions or applicable law to demand accelerated payment.

Classes 1 and 2 are not impaired under the Plan and, as such, Classes 1 and 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, the Holders of Claims in Classes 1 and 2 are not receiving a Ballot to vote to accept or reject the Plan.

Class 3 is impaired hereunder and the Holders of General Unsecured Claims in such Class are entitled to vote on the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims in Class 4 and Equity Interests in Class 5 are receiving no Distributions under the Plan, and accordingly, each of Class 4 and Class 5 is conclusively deemed to have rejected the Plan.  Therefore, the Holders of Claims and/or Equity Interests in Classes 4 and 5 are not receiving a Ballot to vote to accept or reject the Plan.

The Bankruptcy Code requires, as a condition to confirmation of a consensual plan, that each class of claims against, or equity interests in, a debtor that is impaired under a proposed plan vote to accept such plan.  The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims in that class that cast ballots for acceptance or rejection of the plan.  Under the Bankruptcy Code, acceptance by a class of equity interests requires the acceptance by the holders of at least two-thirds (2/3) of the allowed equity interests of that class held by the holders of equity interests who cast ballots for acceptance or rejection of the plan (that is, at least two-thirds of the shares voting on the plan must vote in favor of the plan to constitute acceptance by a particular class of equity interests).

For the Plan to be confirmable under section 1129(a) of the Bankruptcy Code, the Plan must be accepted by the requisite majorities of holders of claims.  For a complete description of the requirements for acceptance of the Plan, see "Voting and Confirmation of the Plan -- Confirmation and Consummation of the Plan," in subsection "C" immediately below.

The Debtor may also seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, notwithstanding the nonacceptance of the Plan by one or more impaired Classes of Claims.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests.  Under that Bankruptcy Code section, a plan of reorganization may be confirmed if it does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting class.

A Creditor is entitled to vote only if either (i) its Claim has been scheduled by the Debtor as not disputed, contingent or unliquidated, or (ii) it has filed a proof of Claim on or before the applicable Bar Date that is not (a) contingent in nature and/or unliquidated in amount or (b) the subject of a pending objection.

The Holder of a Disputed Claim, or a Claim which is unliquidated and/or contingent, is not entitled to vote unless the Creditor has obtained a Final Order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.  If a Creditor has filed an unliquidated or contingent proof of Claim, *i.e.*, the Creditor failed to specify the dollar amount in the proof of Claim or the Liability is subject to judicial determination, then pursuant to Bankruptcy Rule 3018(a), a dollar value for each such Claim may be estimated and allowed by the Bankruptcy Court solely for voting purposes.  A Creditor's vote may be disregarded if the Bankruptcy Court determines that its acceptance or rejection was not solicited or procured in accordance with the provisions of the Bankruptcy Code.

## B.    VOTING PROCEDURES

A Ballot is enclosed herewith for each Holder of a Claim eligible to vote on the Plan, which will serve as the official Ballot for indicating acceptance or rejection of the Plan pursuant to the requirements of sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018(c).  In voting for or against the Plan, a Creditor must use only the Ballot sent with this Disclosure Statement.

After carefully reviewing this Disclosure Statement, including the Exhibits hereto, each Creditor holding an General Unsecured Claim in impaired Class 3 should vote using the enclosed Ballot and return the Ballot in the pre-addressed envelope so that it is actually received no later than 5:00 p.m. Eastern Prevailing time on February 20, 2006 (the "Voting Deadline").  Please vote and return your Ballot to the Debtor's agent for purposes of receiving and tabulating Ballots ("Voting Agent"):

> The Garden City Group, Inc.
> 105 Maxess Road
> Melville, NY 11747
> Attention:    Ms. Karen E. Petriano

TO BE COUNTED, YOUR BALLOT MUST BE SIGNED AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SPECIFIED ABOVE BY 5:00 P.M. EASTERN PREVAILING TIME ON OR BEFORE FEBRUARY 20, 2006.  ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN (OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION) WILL NOT BE CONSIDERED IN THE TABULATION OF VOTES OF THE PLAN.

IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS REGARDING THE VOTING PROCEDURES, CALL (212) 594-5000, ATTENTION:  MS. DAWN PERSON.

For the Plan to be accepted by a Class, at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of each impaired Class that are actually voted must be cast for acceptance of the Plan. Thus, only Creditors who actually vote on the Plan (*i.e.*, by timely returning a properly completed Ballot) are counted in determining whether the Plan has been accepted or rejected.

If you have any questions about this Disclosure Statement or the Plan or other aspects of the Case, you may contact the Debtor's attorneys at:

> Togut, Segal & Segal LLP
> One Penn Plaza
> Suite 3335
> New York, New York 10119
> (212) 594-5000
> Attention: Ms. Dawn Person

## C.    CONFIRMATION AND CONSUMMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 1.    <u>Confirmation Hearing</u>

Section 1129(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for March 8, 2006, at 10:00 a.m. in Courtroom 623 located at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004.

### 2.    <u>Objections to Confirmation of the Plan</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether it is entitled to vote thereon.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has directed that, on or before February 20, 2006 by 5:00 p.m. (Eastern Prevailing time), any written objections to the Plan must be filed with the Bankruptcy Court and a copy served upon counsel for the Debtor and other parties in interest. Unless the Bankruptcy Court schedules a separate hearing to consider objections to confirmation of the Plan, all properly filed and served objections will be considered by the Bankruptcy Court at the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the hearing or any adjourned hearing. While the Debtor anticipates that any hearing to consider objections to the confirmation of the Plan will be held in conjunction with the Confirmation Hearing, there can be no assurance that such will be the case.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

3.      **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of sections 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include:

(a)      "Best Interests Test" - Confirmation of the Plan requires that, with respect to each impaired Class of Claims, each Holder of an Allowed Claim in the Class has either accepted the Plan or will receive a Distribution under the Plan of property (such as Cash) of a value, as of the Effective Date, that is not less than the amount the Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

(b)      Feasibility of the Plan - In order for the Plan to be confirmed, the Bankruptcy Court must determine that it is feasible; that is, as a practical matter, the Debtor has sufficient resources to meet the obligations prescribed under the Plan on a timely basis according to its terms. The Debtor believes the Plan is feasible.

(c)      Acceptance by Impaired Classes - Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired Class must accept the Plan by the requisite votes for confirmation to occur. A Class of impaired Claims will have accepted the Plan if at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims actually voting in the Class have voted in favor of the Plan. In the event any Class of Claims that is impaired under the Plan fails to accept the Plan by the minimum percentage of votes, the Debtor may seek to modify the Plan or seek confirmation pursuant to the so-called "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to the "dissenting" Class.

4.      **Fair and Equitable Test (Cram-Down)**

Under section 1129(b) of the Bankruptcy Code, "fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests:

(a)      With respect to a <u>secured</u> claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed secured claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of its interest in the property securing its liens; (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of its lien, the impaired secured creditor receives a lien attaching to the proceeds of the sale; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

(b)     With respect to an <u>unsecured</u> claim, "fair and equitable" means either (i) the impaired unsecured creditor receives property of a value, as of the effective date, equal to the amount of its allowed claim;  or (ii) the holders of all claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)     With respect to a class of equity interests, "fair and equitable" means either (i) each holder of an interest in such class receives or retains, on account of such interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest;  or (ii) the holder of any interest that is junior to the interest of such class will not receive or retain any property on account of such junior interest.

# XI.

## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must determine that the Plan is in the "best interests" of each Holder of a Claim in any such impaired Class that has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each dissenting member of such impaired Class a recovery on account of the Holder's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that such Creditor would receive if the Debtor and its property were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what the members of each impaired Class of Claims would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Case were converted to a case under Chapter 7 of the Bankruptcy Code and the Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any Cash held by the Debtor.

Prior to the Petition Date, substantially all of the Debtor's assets already were liquidated and reduced to Cash or its equivalents.  However, the liquidation of the Debtor's remaining assets under Chapter 7 would entail the appointment of a trustee who would not have any experience with the Debtor's records and remaining assets to be liquidated.  Such trustee also would lack the historical knowledge and basis to evaluate and help liquidate the Debtor's significant Legacy Liabilities – virtually all of which are contingent, disputed and/or unliquidated in nature.  A substantial period of time would be required for the education of the trustee, who would retain his or her own professionals (*i.e.*, attorneys, accountants, etc.), to conclude the liquidation of the Debtor's Estate and would add an additional layer of administration costs to this Estate.  Moreover, further delay would result from the need to fix claims that are being compromised by the Plan.  Additionally, in a Chapter 7 context, there are no assurances

that the $1,000,000 consideration to be received by the Estate in connection with the Alper Settlement Agreement will still be available, nor can there be any assurances that the Grupo Note will be paid in full in the same manner as provided for under the Plan. As a result, the conversion of the Debtor's case to Chapter 7 would significantly delay the transmittal of, and reduce the amount of, Distributions to the Holders of Allowed Claims.  The Debtor believes substantial cost and delay will be avoided by confirmation of the Plan.  Consequently, the Plan will provide a greater return, in a more expedient manner, to Holders of Allowed Claims than would dismissal of the Case or a conversion to a Chapter 7 liquidation.  Moreover, given the fact that the Plan proposes to make Distributions to Creditors in accordance with so-called "absolute priority" scheme of the Bankruptcy Code, the Plan, by definition, provides Creditors with at least as much as they would receive in a liquidation under Chapter 7.

**[continued on the following page]**

## XII.

## CONCLUSION

Accordingly, the Debtor urges all Creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before 5:00 p.m. (New York) time on February 20, 2006.

Dated:   December 28, 2005

SALTIRE INDUSTRIAL, INC.,
Debtor and Debtor in Possession


By:  /s/ Robert A. Bertellotti
      Name:  Robert A. Bertellotti
      Title:    President


TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession


By:  /s/ Scott E. Ratner
      SCOTT E. RATNER (SR-0015)
      A Member of the Firm
      One Penn Plaza
      Suite 3335
      New York, New York 10119
      Telephone (212) 594-5000

# EXHIBIT 1

PLAN OF LIQUIDATION

(Filed Separately)

# EXHIBIT 2

FORM OF BALLOT

**MUST BE RECEIVED BY 5:00 PM EASTERN STANDARD TIME _____, 2006**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re:                                             :    Chapter 11
                                                   :    Case No.  04-15389 [BRL]
    SALTIRE INDUSTRIAL, INC.,                       :
                                                   :    **Ballot for Plan of Liquidation**
                                    Debtor.         :
--------------------------------------------------------------x

## CLASS 4 - GENERAL UNSECURED CLAIMS

    1.     **VOTE ON PLAN**    <u>NOTE</u>:  PLEASE CHECK ONLY ONE BOX BELOW.  IF NO BOXES ARE CHECKED, OR IF BOTH BOXES ARE CHECKED, THIS BALLOT WILL NOT BE COUNTED IN THE VOTING ON THE PLAN.  A BALLOT THAT IS NOT SIGNED WILL NOT COUNT.

<u>**ACCEPT PLAN**</u>    <u>**REJECT PLAN**</u>
☐        ☐

    2.     **TAX INFORMATION**  Under penalties of perjury, claimant certifies that:

    A.     Claimant's correct taxpayer identification number is:

    (Social Security Number) _____-_____-_____

    (or Employer Identification Number) _____-_____;  and

    B.     Please check the appropriate box(es) below:
    Claimant is not subject to backup withholding because:

☐    (a)  Claimant is exempt from backup withholding:

☐    (b)  Claimant has not been notified by the Internal Revenue Service ("IRS") that Claimant is subject to backup withholding as a result of a failure to report all interest or dividends;  or

☐    (c)  The IRS has notified Claimant that Claimant is no longer subject to backup withholding.

    3.     **SIGNATURE**  By signing this Ballot, the undersigned certifies that it is either: (a) a creditor with a claim to which this Ballot pertains that is designated in the above-referenced Class pursuant to the Debtor's Modified First Amended Plan of Liquidation dated December ___, 2005 (the "Plan"); or (b) an authorized signatory of such creditor, and has the full power and authority to vote to accept or reject the Plan.  The undersigned also acknowledges that such vote is subject to all the terms and conditions of the Disclosure Statement and the Plan.

    Print or Type Name of Claimant:_____

    Signature:_____

    If by Authorized Agent, Name and Title:_____

    Street Address:_____

    City, State, Zip Code:_____

    Telephone Number:_____

    Date Completed:_____

**PLEASE MAKE SURE YOU HAVE PROVIDED ALL INFORMATION REQUESTED ON THIS BALLOT. PLEASE SEE REVERSE SIDE FOR IMPORTANT VOTING INSTRUCTIONS.**

On December __, 2005, the United States Bankruptcy Court for the Southern District of New York (the "Court") approved the Modified First Amended Disclosure Statement filed by Saltire Industrial, Inc. on December ___, 2005 (the "Disclosure Statement") and directed the Debtor to solicit votes with regard to the approval or rejection of the Debtor's Modified First Amended Plan of Liquidation dated December ____, 2005, which is attached as Exhibit "1" to the Disclosure Statement.

## INSTRUCTIONS

**TO HAVE YOUR VOTE COUNT, YOU MUST COMPLETE, SIGN AND RETURN THIS ORIGINAL BALLOT SO THAT IT IS ACTUALLY <u>RECEIVED</u> BY GARDEN CITY GROUP, VOTING AGENT FOR THE DEBTOR, NOT LATER THAN <u>5:00 P.M. EASTERN STANDARD TIME, ON</u>_____, 2006 (THE "VOTING DEADLINE"). FACSIMILE OR PHOTOCOPIED BALLOTS WILL NOT BE COUNTED. ALL BALLOTS REQUIRE AN ORIGINAL SIGNATURE. BALLOTS ARE TO BE RETURNED TO THE FOLLOWING ADDRESS:**

    (A)   <u>Regular Mail</u>, to: Saltire Industrial, Inc., c/o The Garden City Group, Inc., P.O. Box 9000-#6256, Merrick, NY 11566-9000.

    (B)   <u>Overnight Courier</u> or <u>Personal Delivery</u>, to: Saltire Industrial, Inc., c/o The Garden City Group, Inc., 105 Maxess Road, Melville, NY 11747, Attn: Karen E. Petriano.

**BALLOTS MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 5:00 PM, E.D.T. ON _____, 2006. IF A BALLOT IS RECEIVED AFTER THIS DATE AND TIME, IT WILL NOT BE COUNTED.**

It is important that you vote. The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least 2/3 in amount and more than 1/2 in number of claims actually voting in each voting class of claims. The votes of the claims actually voted in your class will bind those who do not vote. In the event that the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if at least one impaired class of claims has accepted the Plan and the Court finds that it accords fair and equitable treatment to, and does not discriminate unfairly against, the class(es) rejecting it and otherwise satisfies the requirements of section 1129(b) of title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

Your signature is required in order for your vote to be counted. If the claim is held by a partnership, the ballot should be executed in the name of the partnership by a general partner. If the claim is held by a corporation, the ballot must be executed by an officer. If you are signing in a representative capacity, also indicate your title where requested.

This ballot has been prepared to reflect the class(es) in which you are eligible to vote. IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A CLAIM IN A SEPARATE CLASS AND YOU SHOULD COMPLETE AND RETURN ALL OF THEM. If you have any questions, please contact the Saltire Solicitation Agent, Garden City Group, Inc. at (631) 470-5000.

Ballots are being sent to all holders of claims entitled to vote on the Plan as of the voting record date of December __, 2005. Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Court may estimate and temporarily allow a claim for purposes of voting on the Plan. The Debtor may seek an order of the Court, temporarily allowing, for voting purposes only, certain disputed claims. If the Debtor avails itself of this right, allowance for voting purposes does not constitute allowance for purposes of distributions under the Plan.

**This ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or an admission by the Debtor of the validity of a claim.**

If your ballot is damaged or lost or if you did not receive a ballot, you may request a replacement by addressing a written request to Garden City Group, Inc., 105 Maxess Road, Melville, NY 11747 or by calling (631) 470-5000.

If your claim is disputed as of the Voting Deadline, the ballot submitted with respect to that claim shall not be counted, except to the extent the Debtor's objection to that claim states otherwise or the Court orders otherwise upon the timely application of the claim holder in accordance with the Court's Order dated December __, 2005, <u>inter alia</u>, establishing (a) procedures for the estimation of claims for voting purposes and (b) voting procedures and approving forms of ballots, respectively.

**Exhibit D Intentionally Omitted**

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                    :

In re:                                     :    Chapter 11

                                           :    Case No. 04-15389 [BRL]

    SALTIRE INDUSTRIAL, INC.,          :

                                         :

                              Debtor.    :

                                         :
------------------------------------------------------------------x

## ORDER CONFIRMING MODIFIED FIRST AMENDED PLAN OF LIQUIDATION OF SALTIRE INDUSTRIAL, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

          The Modified First Amended Plan of Liquidation of Saltire Industrial, Inc.

under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), dated

December 28, 2005 (the "Plan"), having been filed with this Court by Saltire Industrial,

Inc. (the "Debtor") and assigned docket number 201, and the Debtor's Modified First

Amended Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the

Plan, dated December 28, 2005 (the "Disclosure Statement"), having been approved by

Order of this Court, dated December 28, 2005 (the "Disclosure Statement Order"), as

containing "adequate information" as such term is defined under section 1125 of the

Bankruptcy Code;  and certificates of service and/or certifications of publication having

been filed with the Court demonstrating compliance with the notice, solicitation and

publication requirements of the Disclosure Statement Order;  and acceptances and

rejections of the Plan by those holders of Claims that voted thereon having been duly

received and tabulated by the Debtor with the assistance of The Garden City Group,

Inc. ("GRG"), the Debtor's Court retained voting agent;  and certifications by GRG of

ballots accepting or rejecting the Plan having been filed with the Court;  and upon the

Affidavit of Robert A. Bertellotti submitted in support of confirmation of the Plan;  and

the Court having considered the objections to confirmation of the Plan filed by

(i) Schrader-Bridgeport International, Inc. and (ii) Century Indemnity Company on

behalf of itself and certain related companies (collectively the "Objections");  and all

such Objections to the Plan having been voluntarily withdrawn, overruled or denied by

the Court;  and upon all of the evidence presented and the arguments of counsel made

at the March 8, 2006 hearing to consider, *inter alia*, confirmation of the Plan (the

"Confirmation Hearing");  and upon the entire record of the Debtor's Chapter 11 case;

and after due deliberation, and sufficient cause appearing therefor;  and

**IT HAVING BEEN FOUND AND DETERMINED** by this Court that:

A.      Capitalized terms not otherwise defined herein shall have the

meanings given such terms in the Plan.

B.      This Court has jurisdiction over the Case pursuant to 28

U.S.C. § 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" for

the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

Confirmation of the Plan is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2) and

this Court has jurisdiction to enter a Final Order with respect thereto.  Venue of this

Case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Court takes judicial notice of the docket of the Case

maintained by the Clerk of the Court and/or its duly appointed agent, including,

without limitation, all pleadings and other documents filed, all orders entered, and all

evidence and arguments made, proffered or adduced at, the hearings held before the

Court during the pendency of the Case.

   D.  The classification of Claims and Equity Interests in Article IV of the

Plan is necessary and reasonable to implement the Plan, and satisfies the requirements

of section 1122(a) of the Bankruptcy Code in that each Claim or Equity Interest in each

particular Class is substantially similar to other Claims or Equity Interests in such Class.

   E.  Article IV of the Plan adequately and properly identifies and

classifies all Claims and Equity Interests, thereby satisfying the requirements of

section 1123(a)(1) of the Bankruptcy Code.

   F.  Article V of the Plan identifies the Classes of Claims and Equity

Interests which are not impaired and which are impaired.  Therefore, the Plan satisfies

the requirements of section 1123(a)(2) of the Bankruptcy Code.

   G.  Article V of the Plan specifies the treatment of each impaired Class

of Claims and Equity Interests and thereby satisfies the requirements of

section 1123(a)(3) of the Bankruptcy Code.

   H.  The Plan provides for the same treatment for each Claim or Equity

Interest in a particular Class and thereby satisfies the requirements of section 1123(a)(4)

of the Bankruptcy Code.

   I.  The Plan provides adequate means for its implementation, thereby

satisfying section 1123(a)(5) of the Bankruptcy Code, including, among other things:

(a) the creation of the Liquidating Trust and the appointment of the Liquidating Trustee

to, *inter alia*, liquidate the Assets of the Debtor being transferred under the Plan to the

Liquidating Trust (the "Trust Assets") and perform such other duties as provided in the

Liquidating Trust Agreement;  (b) the transfer to the Liquidating Trust of all the

Debtor's right, title and interest in all of the Trust Assets;  (c) the creation of a Disputed

Claims Reserve;  and (d) the procedures specified in the Plan under which Distributions

will be made to Holders of Allowed Claims.

   J.  The Plan does not provide for the issuance of new equity securities

and section 1123(a)(6) of the Bankruptcy Code is, therefore, inapplicable to the Debtor.

   K.  The provisions of the Plan are consistent with the interests of the

Holders of Claims and Equity Interests and public policy and, therefore, satisfy the

requirements of section 1123(a)(7) of the Bankruptcy Code.

   L.  In accordance with section 1123(b)(1) of the Bankruptcy Code,

Article V of the Plan impairs Class 3, Class 4 and Class 5 under the Plan and leaves

unimpaired Class 1 and Class 2 under the Plan.

   M.  The Plan constitutes a motion by the Debtor to reject, as of the

Effective Date, all Executory Contracts to which the Debtor is a party except for any

Executory Contract that:  (a) has been assumed pursuant to an order of this Court;  (b) is

the subject of a separate motion by the Debtor to assume or assume and assign pursuant

to section 365 of the Bankruptcy Code and is pending as of the Effective Date;  or (c) is

the subject of a stipulation or other written agreement between the Debtor and the other

party to a particular Executory Contract, either approved or to be approved by this

Court.

N.      The Debtor's decision regarding the assumption or rejection of

Executory Contracts, as authorized by section 1123(b)(2) of the Bankruptcy Code and as

provided for in Article X of the Plan, is a reasonable exercise of sound business

judgment and is in the best interests of the Debtor and the Estate.

O.      The Debtor has provided sufficient notice of its intention to

abandon, pursuant to section 554 of the Bankruptcy Code, all of its right, title and

interest in, and to, two parcels of real property consisting of approximately 37 acres

located in Dickson, TN (the "Dickson Parcels") that are identified on the Dickson

County Tax Map as Parcel 91.00, consisting of 30.10 acres, and Parcel 91.03, consisting of

6.37 acres, which parcels lie to the south of State Highway 47, and to the north of

Marshall Stuart Road, located between Tennsco Drive and Printwood Drive.

P.      The Debtor's proposed abandonment of the Dickson Parcels is in

the best interests of the Debtor and the Estate because such parcels are burdensome,

and of inconsequential value and benefit, to the Debtor's Estate.

Q.      Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Plan

provides that the Debtor shall transfer to the Liquidating Trust the right to prosecute,

on behalf of itself and its estate, any avoidance or recovery actions under sections 542,

544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of

Action, or rights to payment of claims, that belong to or could have been raised by or on

behalf of the Debtor or the Estate.

R.      The Plan complies with all applicable provisions of the Bankruptcy

Code, thereby satisfying the requirements of section 1129(a)(1) of the Bankruptcy Code

and, as required by Bankruptcy Rule 3016(a), is dated and specifically identifies the Debtor as the proponent of the Plan.

S.    The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and orders of this Court with respect to the Plan.  Good, sufficient and timely notice of the Confirmation Hearing has been given to holders of Claims and Equity Interests and to other parties-in-interest to whom notice is required to be given in accordance with the Disclosure Statement Order.  The solicitation of votes was made in good faith and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and all other rules, laws and regulations.  Ballots of Holders of Claims entitled to vote on the Plan were properly solicited and tabulated in accordance with the Disclosure Statement Order.  Holders of at least two-thirds (2/3) in amount and one-half (1/2) in number of the Claims actually voting in Class 3 have accepted the Plan.  Holders of Claims in Classes 1 and 2 are not impaired under the Plan and were not entitled to vote to accept or reject the Plan.  Holders of Claims in Class 4 and holders of Equity Interests in Class 5 are conclusively presumed to have rejected the Plan, and were not entitled to vote on the Plan.  Therefore, the Debtor has satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

T.    The Plan, and the compromises and settlements embodied therein, has been proposed in good faith and not by any means forbidden by law, as evidenced by, among other things, the totality of the circumstances surrounding the formulation of the Plan, the record of the Case, and the recoveries of Holders of Claims thereunder.

Therefore, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

U.    Any payment made or to be made under the Plan or by any Person acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Case, or in connection with the Plan and incident to the Case, has been approved by, or will be subject to the approval of, the Court as reasonable, thereby satisfying the requirements of section 1129(a)(4) of the Bankruptcy Code.

V.    The Debtor's current officers and current members of its board of directors shall serve in their respective capacities, pending the Debtor's formal dissolution under applicable state law.  Therefore, the Debtor has satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

W.    Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Case because the Plan does not contain rate changes for which a governmental regulatory commission has jurisdiction after confirmation.

X.    Section 1129(a)(7) of the Bankruptcy Code requires each Holder of a Claim or Equity Interest in an impaired Class to either accept the Plan, or receive or retain under the Plan property having a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive on account of such Claim or Equity Interest if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. The following Classes are impaired under the Plan:  Class 3, Class 4, and Class 5.  Each Holder of a Claim or Equity Interest in such Classes has either accepted the Plan, or will receive or retain under the Plan property having a value, as of the Effective Date of the

Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.  The Plan, therefore, satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

Y.    Section 1129(a)(8) of the Bankruptcy Code requires that for each Class of Claims or Equity Interests under the Plan, such Class has either accepted the Plan or is not impaired under the Plan.  Impaired Class 3 has accepted the Plan. Unimpaired Classes 1 and 2 are conclusively presumed to have accepted the Plan without the solicitation of acceptances or rejections pursuant to section 1126(f) of the Bankruptcy Code.  Impaired Classes 4 and 5 are deemed to have rejected the Plan. Because the impaired Classes 4 and 5 have not accepted the Plan, the requirements of section 1129(a)(8) have not been met, thereby requiring application of section 1129(b) of the Bankruptcy Code.  As is more fully set forth below in paragraph EE of this Confirmation Order, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to Classes 4 and 5.

Z.    The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code since, except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that (i) the Holder of each Allowed Administrative Expense Claim shall be paid in full, in Cash;  and (ii) the Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims shall be paid in full, in Cash, or in such amounts and on such other terms as may be agreed to by the Holders of such Claims and the Debtor, or according to the ordinary business terms of the Debtor and such Holders.

8

AA.    The provisions of section 1129(a)(10) of the Bankruptcy Code are satisfied because at least one impaired Class of Claims (*i.e.*, Class 3) has accepted the Plan, determined without inclusion of any acceptance of the Plan by any insider.

BB.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of, the Debtor, except as proposed by the Plan.  The Plan provides for the liquidation and distribution of all of the Debtor's remaining Assets and, therefore, satisfies section 1129(a)(11) of the Bankruptcy Code.

CC.    The Debtor has paid, or shall pay as provided by the Plan, all amounts due under 28 U.S.C. § 1930, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

DD.    As a consequence of this Court's Order dated April 21, 2005, there are no current and/or continuing "retiree benefit" obligations of the Debtor, as that term is defined in section 1114 of the Bankruptcy Code, as to any current or former employees.  Thus, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Case.

EE.    Neither Holders of Intercompany Claims in Class 4 nor Holders of Equity Interests in Class 5 will receive any Distribution or retain any value under the Plan and, accordingly, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  These are the only Classes which have not accepted, or have been deemed to have rejected, the Plan.  Pursuant to section 1129(b) of the Bankruptcy Code, the Court finds that the Plan does not discriminate unfairly and is fair and

equitable with respect to the treatment of Claims and Equity Interests in Classes 4 and

5. With respect to Classes 4 and 5, as required by section 1129(b)(2)(B) of the

Bankruptcy Code, (i) there is no Holder of a Claim or Equity Interest (as the case may

be) junior to the Holders of Claims in Class 4 or Equity Interests in Class 5 (as the case

may be) which is to receive or retain under the Plan any property on account of such

junior Claim or Equity Interest. Thus, the Plan satisfies section 1129(b) of the

Bankruptcy Code.

FF.    The principal purpose of the Plan is not the avoidance of taxes or

avoidance of the requirements of section 5 of the Securities Act of 1933. No

Governmental Unit has requested that the Court deny confirmation on such basis.

Therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

GG.    The Plan constitutes and embodies a good faith compromise and

settlement of certain disputed claims and issues (including, but not limited to, those

claims and issues encompassed by the Alper Settlement Agreement), which

compromise and settlement is fair, equitable and within the range of reasonableness, is

in the best interests of the Debtor, the Estate and its creditors, and was entered into in

good faith, at arms' length and otherwise satisfies the requirements of Bankruptcy Rule

9019.

HH.    Each of the discharge and injunctive provisions of Article XII and

XIII of the Plan:

    i.  falls within the jurisdiction of this Court under 28 U.S.C.
       § 1334(a), (b), (d) and (e);

ii.    is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

iii.   is an integral element of the transactions incorporated into the Plan;

iv.    confers a material benefit on, and is in the best interests of, the Debtor, the Estate, and its creditors;

v.     is important to the overall objectives of the Plan; and

vi.    is consistent with sections 105, 1123, 1129, and other applicable provisions of the Bankruptcy Code.

II.    All Entities which are benefited by the discharge and injunctive provisions of the Plan have contributed and/or will contribute value to the Debtor and/or the Estate under the Plan.

JJ.    The failure to effect the discharge and injunctive provisions of the Plan would impair the Debtor's ability to confirm the Plan.

KK.    All conditions precedent to confirmation set forth in Article XI of the Plan have been satisfied, will be satisfied by entry of this Confirmation Order, or have been duly waived.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1.    The Plan is confirmed as having satisfied all of the applicable requirements of Chapter 11 of the Bankruptcy Code.

2.    The Alper Settlement Agreement is hereby incorporated by reference into, and is an integral part of, this Confirmation Order.

3.    Any Objection to the Plan and any response or request for continuance regarding confirmation of the Plan not resolved by the terms of this

Confirmation Order, by the terms of a separate order entered contemporaneously herewith, or by a statement announced on the record of the Confirmation Hearing and not otherwise withdrawn, waived or settled, is overruled and denied.

4.    The record of the Confirmation Hearing is closed.

5.    The findings of fact and conclusions of law of the Court set forth herein and at the Confirmation Hearing shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, as made applicable herein by Bankruptcy Rule 9014, and the findings and conclusions of the Court at the Confirmation Hearing are incorporated herein by reference.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and *vice versa.*

6.    Pursuant to section 554 of the Bankruptcy Code, the Debtor's abandonment of its right, title and interest in, and to, the Dickson Parcels is approved.

7.    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its successors and assigns, including, without limitation, the Liquidating Trust, or in the assets of the Debtor, its successors and assigns or the Liquidating Trust, in each case regardless of whether the Claim or Equity Interest of such Holder is impaired under the Plan and whether such Holder has accepted the Plan.

8.    The Liquidating Trust Agreement, substantially in the form filed with the Bankruptcy Court on February 24, 2006, is approved and will be effective as of the Effective Date of the Plan.

12

9.      The initial Liquidating Trustee shall be Mr. Wayne Smith.

10.     Subject to the terms of the Plan and the Liquidating Trust Agreement, the Debtor and the Liquidating Trustee are duly and validly authorized to issue, execute, deliver, file or record any and all documents necessary to implement the Plan, and to take any action reasonably necessary or appropriate to implement the Plan, in accordance with its terms.

11.     In accordance with sections 1141 and 1142 of the Bankruptcy Code and Section 7.1 of the Plan, which is incorporated herein by reference as if set forth herein in extenso, the Debtor shall and hereby does transfer, convey and assign to the Liquidating Trust all of the Debtor's right, title and interest in all of the Trust Assets, free and clear of any Lien, Claim or Interest in such property of any other Person, which transfer, conveyance and assignment shall be effective only upon the Effective Date of the Plan.  Following such transfer, the Liquidating Trust shall hold valid title to all such Trust Assets.  The Trust Assets shall not include those assets otherwise assigned or transferred pursuant to the Plan or this Confirmation Order or retained by the Debtor. The Liquidating Trustee shall administer the Liquidating Trust and the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code for purposes of administering and liquidating the Trust Assets, and the Disputed Claims Reserve and resolving Claims, and shall have all the powers, authority and responsibilities specified in the Liquidating Trust Agreement.

12.     On the Effective Date, and after making all Distributions required to be made on the Effective Date, including, without limitation, Distributions pursuant

13

to Sections 5.2.1., 5.2.2 and 5.2.3 of the Plan, the Debtor and/or the Liquidating Trustee (as the case may be) shall establish the Disputed Claims Reserve, which shall be funded in an amount to be determined by the Debtor or the Liquidating Trustee as required by the terms of the Plan. Distribution(s) on account of a Disputed Claim and/or an Administrative Expense Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made solely from the Disputed Claims Reserve in accordance with the provisions of the Plan governing the Class of Claims in which such Claim is classified, and in accordance with the terms of the Liquidating Trust Agreement. Any Disputed Claim and/or Administrative Expense Claim that becomes an Allowed Claim prior to the Effective Date shall receive such treatment as the Plan prescribes for Claims in the Class in which the Allowed Claim is classified. As for Disputed Claims and/or Administrative Expense Claims that become Allowed Claims subsequent to the Effective Date, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Administrative Expense Claim becomes a Final Order or the parties otherwise agree, the Debtor and/or the Liquidating Trustee, as the case may be, shall distribute to the holder of such Allowed Claim any payment that would have been distributed to such holder if the Claim had been Allowed on the Effective Date, plus any payments that would have been made on account of such Allowed Claim after the Effective Date, without any interest thereon. Any Distributions held in the Disputed Claims Reserve for the benefit of a Holder of a Disputed Claim, which is subsequently disallowed, in whole or in part, shall be distributed in accordance with the Plan.

14

13.    The Liquidating Trustee may settle any Disputed Claim (including without limitation claims based on the rejection of executory contracts) without notice, a hearing or an order of the Bankruptcy Court.  Notwithstanding the foregoing, the Liquidating Trustee may of his own discretion, seek and obtain an order of the Bankruptcy Court compromising or settling any Disputed Claims.

14.    As set forth in Section 13.2 of the Plan, except as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code, the Debtor shall and hereby does transfer, convey and assign to the Liquidating Trust the right to prosecute, on behalf of itself and its Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor or the Estate, which transfer, conveyance and assignment shall be effective only upon the Effective Date of the Plan.  In pursuing any claim, right or Cause of Action, the Liquidating Trustee, as representative of the Estate, shall be entitled to the extensions provided under section 108 of the Bankruptcy Code, if any.

15.    As set forth in Section 12.4 of the Plan, except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, all Liens against any property of the Debtor shall be deemed extinguished and discharged, and the Debtor will be revested with the assets, if any, of the Debtor not distributed or otherwise transferred under the Plan, free and clear of all Liabilities and Liens;

provided, however, that upon the dissolution of the Debtor, any remaining assets shall be contributed to the Liquidating Trust.

16.    Pursuant to section 1141(d)(3) of the Bankruptcy Code and as set forth in Section 12.5 of the Plan, occurrence of the Effective Date will not discharge the Claims against the Debtor;  provided, however, that no Holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment from, or seek recourse against, the Debtor, the Liquidating Trust, the Liquidating Trustee, Alper, or their property, successors and assigns, except as expressly provided in the Plan or this Confirmation Order.

17.    As set forth in Section 13.1 of the Plan, as of the Effective Date, all Entities shall be permanently enjoined and restrained from:  (a) commencing or continuing any action or proceeding  respecting any claim or interest against the Debtor or its property (other than abandoned property);  (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);  (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);  (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and (e) performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order.

18.    As of the Effective Date, the Debtor, on its own behalf, and on behalf of its Estate, subject to the Debtor's receipt of payment pursuant to the Alper

Settlement Agreement, releases, acquits and forever discharges Alper and its principals,

shareholders, subsidiaries, affiliates, and their respective employees, agents,

representatives, officers, directors, members, partners, professionals (all solely in their

capacities as such), successors and assigns, and any Entity claimed to be liable

derivatively through the Debtor, or any of the foregoing (each such party, a "Released

Party") from any and all actions, causes of action, liabilities, obligations, rights, suits,

accounts, covenants, contracts, agreements, promises, damages, judgments, claims,

debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or

contingent, matured or unmatured, known or unknown, foreseen or unforeseen,

existing as of the Effective Date or thereafter arising, in contract or in law, at equity or

otherwise, based in whole or in part upon any act or omission or other event occurring

prior to the commencement of this Case or during the course of the Case (including

through the Effective Date), in any way relating to the Debtor, this Case, or the

ownership, management, and operation of the Debtor, that the Debtor could assert

directly or any Holder of a Claim or Interest or other Entity could assert derivatively or

on behalf of the Debtor or its Estate (the "Released Claims");  provided that the

foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or

cause of action arising out of any express contractual obligation owing by any current

or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation

of any current or former, director, officer, or employee with respect to a loan or advance

made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or

cause of action against Grupo and its employees, agents, representatives, officers,

directors, members, partners, professionals, successors and assigns (all solely in their capacities as such).  The releases as set forth in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity.  Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.

19.    From and after the Effective Date, the Debtor and its Estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, shall be permanently enjoined from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to the Plan and this Confirmation Order.

20.    The provisions of the Plan and this Confirmation Order shall not diminish or impair in any manner the enforceability and coverage of any insurance policies that may cover Claims against the Debtor or any other Person. Notwithstanding any other terms or provisions in the Plan, this Confirmation Order (i) is without prejudice to the rights, remedies, claims, exclusions, limitations and/or defenses of Century Indemnity Company, Pacific Employers Insurance Company and/or any other of their related insurance companies (collectively, the "Insurers") under any insurance policies issued by Insurers that may provide coverage for the

Debtor and/or under any agreements relating to such insurance policies (collectively, the "Agreements") and/or any of the reservations of rights by Insurers as to any issues relating to the Agreements (as such issues are set forth in Insurers' Objections to Debtor's First Amended Disclosure Statement (Doc. No. 197)), <u>provided</u>, <u>however</u>, that nothing in the Plan or this Confirmation Order shall be deemed to constitute a rejection of the Agreements under section 365 of the Bankruptcy Code to the extent the Agreements exist and are executory; (ii) confirms that all of the terms, provisions, conditions, limitations and/or exclusions contained in the Agreements shall remain in full force and effect; (iii) confirms that the Debtor and/or the Liquidating Trust shall remain as the insured under the Agreements, and that the Debtor and the Liquidating Trust shall remain bound by all of the terms, provisions, conditions, limitations and/or exclusions contained in the Agreements; (iv) confirms that the Agreements shall not be assigned by the Debtor, except to the Liquidating Trust pursuant to the Plan, without Insurers' prior express written consent, which consent shall not be unreasonably withheld; (v) confirms that nothing in the Plan shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Agreements, or create any direct right of action against Insurers; (vi) is without prejudice to any of Insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which Insurers may seek a declaration regarding the nature and/or extent of any insurance coverage under the Agreements; (vii) confirms that the Debtor and/or the Liquidating Trust shall satisfy all continuing duties and obligations of the insureds under the Agreements to the extent any such duties and obligations

exist;  and (viii) confirms that nothing in the Plan shall be construed as an
acknowledgment either that the Agreements cover or otherwise apply to any Claims or
that any Claims are eligible for payment under any of the Agreements.

21.     As of the Effective Date, and subject to paragraph 20 above, all
Executory Contracts of the Debtor shall be deemed rejected by the Debtor pursuant to
the provisions of section 365 of the Bankruptcy Code, except:  (a) any Executory
Contract that has been assumed or assumed and assigned pursuant to an Order of the
Bankruptcy Court prior to the Effective Date;  and (b) any Executory Contract to be
assumed or assumed and assigned pursuant to a separate motion of the Debtor pending
on the Effective Date;  or (c) is the subject of a stipulation or other written agreement
between the Debtor and the other party to a particular Executory Contract, either
approved or to be approved by the Court.

22.     As set forth in Section 10.2 of the Plan, if the rejection of any
Executory Contract under the Plan or otherwise, results in damages to the other party
or parties to such contract, a Claim for such damages, if not heretofore evidenced by a
filed proof of Claim, shall be forever barred and shall not be enforceable against the
Debtor, and the Liquidating Trust or their respective properties or interests in property
or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy
Court and served upon the Debtor and the Liquidating Trustee and their respective
counsel, on or before thirty (30) days after the earlier to occur of:  (a) the Confirmation
Date and (b) the entry of an Order by the Bankruptcy Court authorizing rejection of a

particular Executory Contract.  Payment of Allowed Claims based on such rejection

damages, if any, shall be made solely from the Disputed Claims Reserve.

        23.      Except for Administrative Expense Claims of Professionals

requesting compensation or reimbursement of expenses, requests for payment of

Administrative Expense Claims must be filed no later than twenty (20) days after the

notice of entry of this Confirmation Order (the "Administrative Bar Date") is served in

accordance with Paragraph 24 below.  Holders of such Administrative Expense Claims

who are required to file a request for payment of such Claims and who do not file such

requests by the Administrative Bar Date, shall be forever barred from asserting such

Claims against the Debtor, or the Liquidating Trust, the Liquidating Trustee or their

respective property.  To the extent not paid on or prior to the Effective Date, payments

on account of Allowed Administrative Expense Claims shall be made solely from the

Operating Reserve Account contemplated by the Plan.

        24.      Unless otherwise ordered by the Court, all Professionals or other

Entities requesting compensation or reimbursement of expenses pursuant to sections

327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before

the Confirmation Date (including compensation requested by any Professional or other

Entity for making a substantial contribution in the Case) shall file with the Bankruptcy

Court (with a courtesy copy to Judge Lifland's Chambers) an application for final

allowance of compensation and reimbursement of expenses no later than thirty (30)

days after the Confirmation Date and serve such application upon:  (a) counsel for the

Debtor, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York

10119, Attn: Scott E. Ratner, Esq.; (b) Mr. Wayne Smith, Liquidating Trustee for the

Saltire Industrial, Inc. Creditors Liquidating Trust, 274 Riverside Avenue, Suite 1,

Westport, CT 06880; and (c) the United States Trustee, 33 Whitehall Street, 21st Floor,

New York, New York 10004, Attn: Tracy Hope Davis, Esq. Objections to final

applications of Professionals or other Entities for compensation or reimbursement of

expenses must be filed with the Bankruptcy Court and served on the applicable

Professionals or Entity no later than fifty (50) days after the Confirmation Date. All

compensation and reimbursement of expenses allowed by the Bankruptcy Court by a

Final Order and not previously paid by the Debtor shall be paid by the Debtor or the

Liquidating Trustee, as the case may be, to the applicable Professional immediately

thereafter from Available Cash set aside and reserved for such purpose in the Operating

Reserve Account on or before the Effective Date.

25.    Payment obligations incurred after the date and time of entry of

this Confirmation Order, including, without limitation, the fees and expenses of

Professionals incurred from the Confirmation Date (a) shall not be subject to application

or proof of Claim and may be paid by the Debtor in the ordinary course of business and

without further Bankruptcy Court approval, as Administrative Expense Claims, and

(b) shall be paid by the Debtor to the applicable Professional from Available Cash set

aside and reserved for such purpose by the Debtor on or before the Effective Date.

26.    All fees payable pursuant to section 1930 of title 28 of the United

States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be

paid on the Effective Date. Any statutory fees accruing after the Confirmation Date

22

shall be paid by the Debtor or, if the Debtor has dissolved, by the Liquidating Trust, when due and owing.

27.     As of the Effective Date, each Holder of a Claim or Equity Interest, each party-in-interest and each Entity acting or claiming or purporting to act or claim by, through under or on behalf of any of the foregoing, shall forever be enjoined from the commencement or continuation of any action, the employment of process, or any act to assert a claim for relief against the Debtor, the Official Committee, Alper, and their respective officers, directors, attorneys or other professionals (the "Plan Releasees") in respect of:  (a) any actions taken or not taken in connection with the Case;  (b) the Plan; (c) the Disclosure Statement;  (d) Distributions, payments or transfers made under this Plan;  (e) acts performed pursuant to this Plan;  (f) any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with this Plan;  or (g) any Claim compromised, settled or released under or pursuant to this Plan;  provided, however, that the foregoing release shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for any acts, or omissions to act, evidencing and/or constituting gross negligence, willful misconduct, breach of fiduciary duty or malpractice.  Notwithstanding the foregoing, under no circumstances shall a nondebtor third party be enjoined from the assertion of any claim, or the continuation or commencement of any derivative action, against a Released Party, except to the extent such claim or derivative action is property of the Debtor's Estate.

28.    Notwithstanding confirmation of the Plan or the occurrence of the

Effective Date, the Bankruptcy Court shall retain jurisdiction for all purposes permitted

under applicable law, including, without limitation, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided herein;

(d)    To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    To issue such orders in aid of execution of this Plan in accordance with section 1142 of the Bankruptcy Code;

(g)    To consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to the implementation and effectuation of this Plan;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

(j)       To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)      To compel the conveyance of property and other performance contemplated under this Plan and documents executed in connection herewith;

(l)      To enforce remedies upon any default under the Plan;

(m)      To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)      To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)      To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Plan;

(p)      To determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)      To enter a final decree closing the Case.

29.      To the extent this Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, or any other agreement entered into by the Debtor and any third party (excluding, however, the Liquidating Trust Agreement), (i) the Plan shall control (x) the Disclosure Statement and (y) any such agreements between the Debtor and any third party and (ii) this Confirmation Order (and any other orders of the Court) controls the Plan.

30.      The principal purpose of the Liquidating Trust Agreement is to aid in the implementation of the Plan and therefore the Plan incorporates the provisions of

the aforesaid agreement, and the provisions of the Liquidating Trust Agreement are hereby approved. To that end, the Liquidating Trustee shall have the full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of the implementation of the Plan or the Liquidating Trust Agreement, as the case may be. If any provision of the Liquidating Trust Agreement is found to be inconsistent with the provisions of the Plan or this Confirmation Order, the provisions of this Confirmation Order shall control.

31. After the entry of this Confirmation Order and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper; provided that: (i) the Debtor obtains approval of the Bankruptcy Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment, or Distributions of any Class under the Plan.

32. The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety.

33.    To the extent that any provisions of this Confirmation Order could be construed as modifications to the Plan, such modifications do not materially or adversely affect or change the treatment of any Claims against or Equity Interest in the Debtor.  Accordingly, such modifications would not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims against the Debtor be afforded an opportunity to change previously cast acceptances or rejections of the Plan as filed with the Bankruptcy Court.

34.    The Debtor or its authorized agent shall serve notice of (a) entry of this Confirmation Order and (b) the last date to file (i) Administrative Expense Claims and (ii) Claims arising from the rejection of Executory Contracts, substantially in the form annexed hereto as Exhibit "1," which form is hereby approved, on all creditors of the Debtor as of the date hereof and other parties in interest within ten (10) Business Days from the date of entry of this Confirmation Order.

DATED:  New York, New York
        March 8, 2006

/s/Burton R. Lifland
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT "1" TO CONFIRMATION ORDER

TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.
Debtor and Debtor in Possession
One Penn Plaza - Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Scott E. Ratner (SER-0015)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                              :

In re:                                  :   Chapter 11

                                          :   Case No. 04-15389 [BRL]

      SALTIRE INDUSTRIAL, INC.,       :

                                          :

                           Debtor.      :

                                          :
------------------------------------------------------------------x

## NOTICE OF ENTRY OF ORDER (A) CONFIRMING MODIFIED FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF SALTIRE INDUSTRIAL, INC.; AND (B) FIXING DEADLINES FOR THE FILING OF (i) ADMINISTRATIVE CLAIMS AND (ii) CLAIMS RELATING TO REJECTED EXECUTORY CONTRACTS

**TO ALL KNOWN CREDITORS AND PARTIES-IN-INTEREST:**

       **PLEASE TAKE NOTICE** that:

       1.      Saltire Industrial, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 14, 2004 (the "Petition Date") with the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.     On March ___, 2006, the Bankruptcy Court issued an order (the "Confirmation Order") confirming the Debtor's Modified First Amended Plan of Liquidation, dated December 28, 2005 (the "Plan").

3.     Copies of the Confirmation Order, the Plan, and all pleadings filed, and orders entered, in the Debtor's Chapter 11 case may be examined and inspected by interested parties at the Bankruptcy Court, The Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, during regular business hours and are publicly available online in electronic format at the Bankruptcy Court's general web site address at www.nysb.uscourt.gov.

4.     **Administrative Claims Bar Date.**  Except as provided in Paragraph 5 below, all holders of claims against the Debtor arising on or after the Petition Date, which are asserted to be entitled to a priority under sections 503(b) or 507(a)(1) of the Bankruptcy Code as expenses of administration ("Administrative Claims"), are required to file a proof of such Administrative Claim on or before [_____, 2006] (the "Administrative Bar Date") as set forth in Paragraph 6 below.

5.     You are not required to file a proof of an Administrative Claim on or before the Administrative Bar Date if:  (a) you have already filed a proof of Administrative Claim against the Debtor;  (b) your Administrative Claim was previously fixed by Stipulation and/or Order of the Bankruptcy Court;  or (c) you are a professional retained by the Debtor pursuant to Bankruptcy Court Order and your Administrative Claim is for unpaid fees or expenses incurred after the Petition Date.

6.    Each original proof of Administrative Claim must be filed on or before the Administrative Bar Date by delivering same:  (i) if by mail, to Saltire Industrial, Inc., c/o The Garden City Group, Inc., P.O. Box 9000-#6256, Merrick, NY 11566-9000;  or (ii) if by hand delivery or overnight courier, to the Clerk of the Bankruptcy Court, One Bowling Green, Room 534, New York, New York 10004-1408, Attn:  Saltire Industrial, Inc.  A copy only of any proof of Administrative Claim filed with the Bankruptcy Court should also be delivered to counsel to the Debtor at the address indicated below.

7.    Any holder of an Administrative Claim against the Debtor who is required, but fails, to file a proof of Administrative Claim on or before the Administrative Bar Date in the manner set forth in Paragraph 6 above shall be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtor (or from filing a proof of claim with respect thereto), and the Debtor and its property shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Claim and such holder shall not be permitted to participate in any distribution or payment in this Chapter 11 case on account of such Administrative Claim.

**[concluded on the following page]**

3

8. **Rejection of Executory Contracts.** If the rejection by the Debtor of an unexpired contract or lease pursuant to the Plan results in a claim, then such claim shall be forever barred and shall not be enforceable against the Debtor or its property unless a proof of claim is filed with the Clerk of the Bankruptcy Court and served upon counsel to the Debtor at the address indicated below so that it is received on or before [_____, 2006].

DATED:    New York, New York
          March ___, 2006

**BY ORDER OF THE COURT:**

_____
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

SALTIRE INDUSTRIAL, INC.
Liquidated Debtor,
By its attorneys,
TOGUT, SEGAL & SEGAL LLP,
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000
Attention:    Albert Togut, Esq.
              Scott E. Ratner, Esq.

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                   :

In re:                                      :

                                       :

SALTIRE INDUSTRIAL, INC.,       :         Chapter 11

                                       :         Case No. 04-15389 [BRL]

                                       :

                           Debtor.     :

                                       :
--------------------------------------------------------X

 

**DEBTOR'S MODIFIED FIRST AMENDED**
**<u>CHAPTER 11 PLAN OF LIQUIDATION</u>**

 

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza - Suite 3335
New York, New York  10119
(212) 594-5000

Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

Dated:   December 28, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I ...................................................................................................................1

DEFINITIONS ............................................................................................................1

1.1.   "Administrative Bar Date" ...............................................................1
1.2.   "Administrative Expense Claim" ......................................................1
1.3.   "Aggregate Cash" .............................................................................1
1.4.   "Allowed" .........................................................................................1
1.5.   "Alper" ..............................................................................................2
1.6.   "Alper Settlement Agreement" .........................................................2
1.7.   "Assets" .............................................................................................2
1.8.   "Available Cash" ...............................................................................2
1.9.   "Avoidance Actions" ........................................................................2
1.10.  "Ballot" .............................................................................................2
1.11.  "Ballot Date" ....................................................................................2
1.12.  "Bankruptcy Code" ..........................................................................2
1.13.  "Bankruptcy Court" ..........................................................................2
1.14.  "Bankruptcy Rules" ..........................................................................3
1.15.  "Bar Date" ........................................................................................3
1.16.  "Business Day" .................................................................................3
1.17.  "Case" ...............................................................................................3
1.18.  "Cash" ...............................................................................................3
1.19.  "Causes of Action" ...........................................................................3
1.20.  "Claim" .............................................................................................3
1.21.  "Claims Agent" .................................................................................3
1.22.  "Class" ..............................................................................................3
1.23.  "Class [___] Claim" ..........................................................................3
1.24.  "Collateral" .......................................................................................3
1.25.  "Confirmation Date" .........................................................................3
1.26.  "Confirmation Hearing" ...................................................................3
1.27.  "Confirmation Order" .......................................................................4
1.28.  "Debtor" ............................................................................................4
1.29.  "Debtor in Possession" .....................................................................4
1.30.  "Disclosure Statement" .....................................................................4
1.31.  "Disclosure Statement Order" ..........................................................4
1.32.  "Disputed Claim" ..............................................................................4
1.33.  "Disputed Claims Reserve" ..............................................................4
1.34.  "Distribution" ...................................................................................4
1.35.  "Effective Date" ...............................................................................4
1.36.  "Entity" .............................................................................................4
1.37.  "Environmental Claim" .....................................................................5
1.38.  "Equity Interest" ...............................................................................5
1.39.  "Equity Interest Holder" ...................................................................5
1.40.  "Estate" .............................................................................................5
1.41.  "Executory Contract" ........................................................................5

1.42.  "Face Amount"........................................................................................5
1.43.  "Final Order"..........................................................................................5
1.44.  "General Unsecured Claims".................................................................5
1.45.  "Governmental Unit"..............................................................................5
1.46.  "Grupo"...................................................................................................5
1.47.  "Grupo Note"..........................................................................................6
1.48.  "Holder(s)"..............................................................................................6
1.49.  "Intercompany Claims"..........................................................................6
1.50.  "Liability" or "Liabilities".......................................................................6
1.51.  "Lien".......................................................................................................6
1.52.  "Liquidating Trust".................................................................................6
1.53.  "Liquidating Trust Agreement".............................................................6
1.54.  "Liquidating Trustee".............................................................................6
1.55.  "Official Committee"..............................................................................6
1.56.  "Operating Reserve Account"................................................................7
1.57.  "Person"...................................................................................................7
1.58.  "Petition Date"........................................................................................7
1.59.  "Plan".......................................................................................................7
1.60.  "Priority Claims".....................................................................................7
1.61.  "Priority Non-Tax Claim".......................................................................7
1.62.  "Priority Tax Claim"...............................................................................7
1.63.  "Professionals"........................................................................................7
1.64.  "Ratable or Ratable Share"....................................................................7
1.65.  "Retiree"..................................................................................................7
1.66.  "Retiree Claim".......................................................................................7
1.67.  "Schedules".............................................................................................7
1.68.  "Secured Claim"......................................................................................8
1.69.  "Security".................................................................................................8
1.70.  "U.S. Trustee".........................................................................................8
1.71.  "Unsecured Claim".................................................................................8
1.72.  "X-Fund".................................................................................................8

ARTICLE II ........................................................................................................8

INTERPRETATION;  APPLICATION OF DEFINITIONS AND RULES OF
CONSTRUCTION .............................................................................................8

ARTICLE III.......................................................................................................8

PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
CLAIMS ..............................................................................................................8
    3.1   Administrative Expense Claims.........................................................8
    3.2   Priority Tax Claims.............................................................................9

ARTICLE IV.......................................................................................................9

CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS...........................9
    4.1   Claims Against and Equity Interests in the Debtor. ..........................9

ARTICLE V ............................................................................................................9

TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ..............9
  5.1  Designation of Treatment. ......................................................................9
  5.2  Claims Against and Equity Interests in the Debtor. ...........................10

ARTICLE VI...........................................................................................................11

IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS
UNDER THE PLAN;   ACCEPTANCE OR REJECTION OF THE PLAN....................11
  6.1  Holders of Claims and Equity Interests Entitled to Vote....................11
  6.2  Elimination of Classes..........................................................................12
  6.3  One Vote Per Holder. ...........................................................................12
  6.4  Non-consensual Confirmation. .............................................................12
  6.5  Revocation of the Plan..........................................................................12

ARTICLE VII .........................................................................................................12

FUNDING AND IMPLEMENTATION OF THE PLAN .............................................12
  7.1  Creation of the Liquidating Trust. .......................................................12
  7.2  Appointment of the Liquidating Trustee. ............................................13
  7.3  Duties of the Liquidating Trustee. .......................................................13
  7.4  Retention and Compensation of Professionals. ...................................14
  7.5  Resignation, Death or Removal............................................................15
  7.6  Establishment of the Operating Reserve Account. ..............................15
  7.7  Establishment of Disputed Claims Reserve. ........................................15
  7.8  Funding of Distributions.......................................................................15
  7.9  Abandonment of the Schrader-Dickson Facility..................................16
  7.10  Substantial Consummation. .................................................................16

ARTICLE VIII ........................................................................................................16

DISTRIBUTIONS UNDER THE PLAN ...................................................................16
  8.1  Date of Distributions. ...........................................................................16
  8.2  Delivery of Distributions. .....................................................................16
  8.3  Disputed Distributions..........................................................................17
  8.4  Time Bar to Cash Payments..................................................................17
  8.5  Manner of Payment Under the Plan. ....................................................17
  8.6  Distributions After Effective Date........................................................17

ARTICLE IX ..........................................................................................................18

DISPUTED CLAIMS UNDER THE PLAN ...............................................................18
  9.1  Prosecution of Objections to Claims....................................................18
  9.2  Claims Filed or Amended after the Bar Date.......................................18
  9.3  No Distributions Pending Allowance of a Disputed Claim. ................18
  9.4  Distributions After Allowance of a Disputed Claim. ..........................18

ARTICLE X ................................................................................................................19

    EXECUTORY CONTRACTS UNDER THIS PLAN ..........................................19
       10.1  General Treatment. ......................................................................19
       10.2  Deadline to Seek Rejection Damages. ...........................................19

ARTICLE XI ...............................................................................................................19

    CONDITIONS PRECEDENT TO THE CONFIRMATION DATE AND THE
    EFFECTIVE DATE .......................................................................................19
       11.1  Conditions to Confirmation of the Plan. .......................................19
       11.2  Conditions to Effective Date of the Plan. ......................................20
       11.3  Waiver of Conditions Precedent ...................................................20

ARTICLE XII ..............................................................................................................20

    EFFECT OF CONFIRMATION ......................................................................20
       12.1  Debtor's Authority ......................................................................20
       12.2  Corporate Action and Continued Existence of the Debtor .............21
       12.3  Dissolution. ................................................................................21
       12.4  Vesting and Liens. .......................................................................21
       12.5  Discharge of the Debtor. ..............................................................21
       12.6  Binding Nature of Plan. ...............................................................22
       12.7  Termination of Injunctions or Stays. .............................................22

ARTICLE XIII .............................................................................................................22

    INJUNCTION AND RELEASES OF CLAIMS .................................................22
       13.1  Injunctions. ................................................................................22
       13.2  Avoidance and Recovery Actions. .................................................24

ARTICLE XIV .............................................................................................................24

    ADMINISTRATIVE PROVISIONS .................................................................24
       14.1  Further Documents and Action. ....................................................24
       14.2  Official Committee. .....................................................................24
       14.3  Expenses of Liquidation. ..............................................................25
       14.4  Obligations Incurred after Confirmation Date. ..............................25

ARTICLE XV ..............................................................................................................25

    RETENTION OF JURISDICTION ..................................................................25
       15.1  Retention of Jurisdiction. .............................................................25
       15.2  Modification of the Plan. ..............................................................27

ARTICLE XVI .............................................................................................................27

    COMPROMISES AND SETTLEMENTS ........................................................27

ARTICLE XVII ....................................................................................................................28

MISCELLANEOUS PROVISIONS .....................................................................................28
   17.1  Payment of Statutory Fees ...........................................................................28
   17.2  Severability of Plan Provisions. ..................................................................28
   17.3  Governing Law. ...........................................................................................28
   17.4  Notices. ........................................................................................................29
   17.5  Controlling Documents. ...............................................................................29
   17.6  Reservation of Rights...................................................................................30
   17.7  Binding Effect. .............................................................................................30

# MODIFIED FIRST AMENDED
## CHAPTER 11 PLAN OF LIQUIDATION

Saltire Industrial, Inc., as debtor and debtor in possession in the above-captioned Chapter 11 case (the "Debtor"), proposes the following Modified First Amended Chapter 11 Plan of Liquidation, dated as of December 28, 2005 (the "Plan"), pursuant to the provisions of Chapter 11 of Title 11 of the United States Code. The Debtor's history, description of its business and properties, results of operations and a summary and analysis of the Plan and related matters are set forth in the Debtor's First Amended Disclosure Statement. Except as otherwise provided, capitalized terms herein shall have the meanings set forth in Article I of the Plan.

## ARTICLE I

## DEFINITIONS

The following terms, when used in this Plan or any subsequent amendments or modifications thereof, shall have the meanings defined below:

1.1.    "Administrative Bar Date" means the date established by the Bankruptcy Court that shall constitute the final date by which any Administrative Expense Claim must be asserted against the Debtor; provided, however, that the Confirmation Order shall fix a separate date by which final applications by Professionals for the allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code must be filed.

1.2.    "Administrative Expense Claim" means any right to payment constituting a cost or expense of administration of the Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses of preserving the estate of the Debtor; (b) any actual and necessary costs and expenses of operating the business of the Debtor; (c) any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business; and (d) any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 331 of the Bankruptcy Code, whether fixed before or after the Effective Date.

1.3.    "Aggregate Cash" means, as of any date, the amount of Available Cash plus the amount of the X-Fund.

1.4.    "Allowed" means, with reference to any Claim or Equity Interest: (a) any Claim against or Equity Interest in the Debtor, proof of which was filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or (ii) as to which no action has been commenced to avoid such Claim or Equity Interest within the applicable period of limitation fixed by this Plan, or (iii) as to which an objection has been interposed, only to the extent such Claim or Equity Interest has been allowed

1

(whether in whole or in part) by a Final Order;  (b) if no proof of Claim was so filed, any Claim against or Equity Interest in the Debtor which the Debtor has listed in its Schedules, as such Schedules may be amended from time to time in accordance with Rule 1009 of the Bankruptcy Rules, as liquidated in amount and neither disputed nor contingent;  (c) any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code;  or (d) any Claim deemed as allowed by the Plan.

1.5.    "Alper" means Alper Holdings USA, Inc., a Delaware corporation.

1.6.    "Alper Settlement Agreement" means the agreement by and among the Debtor, Alper and the Official Committee pursuant to which, among other things, Alper will make a contribution to the Debtor's Estate, including, but not limited to, payment of the aggregate amount of $1,000,000 in Cash and the waiver of any Distributions on account of any Claims or Equity Interests it may hold against the Debtor's Estate, in exchange for a general release and waiver of any claims and Causes of Action the Debtor's Estate may hold against Alper, as set forth in Section 13.1 of this Plan.

1.7.    "Assets" means all assets of the Debtor, of any nature whatsoever, and property of the Estate pursuant to section 541 of the Bankruptcy Code, including, without limitation, all claims, Causes of Action, rights, interests and property, whether real or personal, tangible or intangible, and any and all insurance coverage and/or policies of the Debtor, as well as any and all rights thereto or thereunder.

1.8.    "Available Cash" means, as of any date, the amount of Cash or Cash equivalents available as of such date to make Distributions to Holders of Allowed Claims in accordance with (and to the extent required by) this Plan.

1.9.    "Avoidance Actions" means rights, claims and causes of action of the bankruptcy estate of the Debtor arising under Chapter 5 of the Bankruptcy Code.

1.10.    "Ballot" means the form or forms distributed to each Holder of an impaired Claim entitled to vote on this Plan on which Ballot is to be indicated either an acceptance or rejection of this Plan.

1.11.    "Ballot Date" means the date set by the Bankruptcy Court by which all Ballots for acceptance or rejection of this Plan must be received.

1.12.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified at Title 11, United States Code, 11 U.S.C. § 101, *et seq.*

1.13.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Case and, to the extent of any reference under section 157, Title 28, United States Code, the unit of such District Court constituted under section 15, Title 28, United States Code.

1.14.   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075, Title 28, United States Code, and the Local Rules of the Bankruptcy Court.

1.15.   "Bar Date" means December 10, 2004 or such other date(s) fixed by order(s) of the Bankruptcy Court by which proofs of Claim must be filed.

1.16.   "Business Day" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.17.   "Case" means the case commenced on the Petition Date under Chapter 11 of the Bankruptcy Code by the Debtor before the Bankruptcy Court, as referenced by Case No. 04-15389 [BRL].

1.18.   "Cash" means legal tender of the United States of America.

1.19.   "Causes of Action" means any and all rights, claims, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity or otherwise, including Avoidance Actions.

1.20.   "Claim" means:  (a) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured;  or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.21.   "Claims Agent" means Garden City Group, Inc. or such successor as the Debtor may designate, subject to approval of the Bankruptcy Court.

1.22.   "Class" means a group of Claims or Equity Interests as classified in Article IV under the Plan.

1.23.   "Class [___] Claim" means a Claim in the particular Class of Claims identified and described in Article IV of the Plan.

1.24.   "Collateral" means any property, or interest in property, of the estate of the Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code.

1.25.   "Confirmation Date" means the date on which the Confirmation Order is entered on the legal docket for the Case.

1.26.   "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan in accordance with section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

1.27.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

1.28.    "Debtor" means Saltire Industrial, Inc., a Delaware corporation.

1.29.    "Debtor in Possession" means the Debtor in its capacity as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

1.30.    "Disclosure Statement" means the disclosure statement relating to this Plan, dated as of December 28, 2005, including the exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time.

1.31.    "Disclosure Statement Order" means the order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code.

1.32.    "Disputed Claim" means a Claim, or a portion of a Claim against the Debtor:  (a) to the extent that allowance of such Claim is the subject of an objection or a motion to estimate interposed by the Debtor;  (b) which is scheduled by the Debtor as disputed, contingent and / or unliquidated;  or (c) which has been filed as unliquidated or contingent, _provided_ that a Disputed Claim shall also include, prior to the time that an objection has been or may be timely filed, that portion of a filed Claim in excess of the amount of the Claim as scheduled by the Debtor other than as disputed, contingent or unliquidated.

1.33.    "Disputed Claims Reserve" means such Cash reserve as may be established on or after the Effective Date by the Liquidating Trustee, with respect to any Disputed Claim in Classes or categories under the Plan, which reserve shall be set aside in a separate interest-bearing account in amounts sufficient to make Distributions on account of up to the Face Amount of each Disputed Claim in accordance with the provisions of this Plan in the event such Disputed Claim becomes an Allowed Claim.

1.34.    "Distribution" means a payment and / or distribution of Cash or other consideration to be made to Holders of Allowed Claims in accordance with the terms and conditions of this Plan.

1.35.    "Effective Date" means the date that is at least eleven (11) days (calculated under Bankruptcy Rule 9006) after the Confirmation Date, if no stay of the Confirmation Order is then in effect, which date shall be fixed after the Confirmation Date by the Debtor by filing a notice thereof with the Bankruptcy Court, and on which date the transactions and distributions contemplated to be made under the Plan on the Effective Date are to be effected;  _provided_, _however_, that in no event shall the Effective Date occur prior to the satisfaction of the conditions precedent to the occurrence of the Effective Date specified in Section 11.2 hereof unless waived as provided in Section 11.3 hereof.

1.36.    "Entity" has the meaning assigned to such term in section 101(15) of the Bankruptcy Code.

1.37.   "Environmental Claim" means a Claim against the Debtor that arises out of environmental contamination allegedly caused by the Debtor.

1.38.   "Equity Interest" means any interest in the Debtor represented by duly authorized, validly issued and outstanding shares of stock.

1.39.   "Equity Interest Holder" means Alper.

1.40.   "Estate" means the bankruptcy estate of the Debtor created as of the Petition Date pursuant to section 541 of the Bankruptcy Code and being comprised of all property, rights and interests of the Debtor, whether existing as of the Petition Date or acquired thereafter.

1.41.   "Executory Contract" means any pre-Petition Date contracts and leases, including leases for nonresidential real property, which had not expired, or were not terminated, prior to the Petition Date and under which performance by the parties thereto remains due to some extent.

1.42.   "Face Amount" means, with respect to any Disputed Claim, the lesser of:  (i) the liquidated amount, if any, set forth in the proof of claim;  (ii) the amount as estimated by the Bankruptcy Court in accordance with section 502(a) of the Bankruptcy Code;  or (iii) such amount as may be agreed to by the Holder of the Disputed Claim for purposes of establishing the Disputed Claims Reserve.

1.43.   "Final Order" means:  (a) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending;  or (b) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.44.   "General Unsecured Claims" means all Unsecured Claims against the Debtor that are not Intercompany Claims.

1.45.   "Governmental Unit" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

1.46.   "Grupo" means Grupo IUSA, S.A. de C.V., a Mexican corporation.

1.47.    "Grupo Note" means the promissory note, dated March 4, 2004, in the original principal amount of $8,250,000 and bearing an interest rate of 10% per annum that is payable by Grupo to the Debtor.

1.48.    "Holder(s)" means the legal or beneficial holder(s) of a Claim or Equity Interest (and, when used in conjunction with a Class or type of Claim or Equity Interest, means a holder of a Claim or Equity Interest in such Class or of such type).

1.49.    "Intercompany Claims" means those Claims, if any, Alper may hold against the Debtor, which the Debtor believes are limited to claims for any outstanding fees and expenses due under a certain management agreement, dated as of January 1, 1995, and any indemnification claims Alper may hold pursuant to such management agreement.

1.50.    "Liability" or "Liabilities" mean any and all costs, expenses, actions, causes of action, suits, controversies, damages, claims, liabilities or demands of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity, or under any statute, based in whole or in part on any act or omission or other occurrence taking place on or prior to the Effective Date.

1.51.    "Lien" has the meaning assigned to such term in section 101(37) of the Bankruptcy Code (but a lien that has been avoided in accordance with sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a Lien).

1.52.    "Liquidating Trust" means the trust to be formed on the Effective Date to receive, liquidate, and distribute the remaining Assets of the Debtor in accordance with the Plan, and to which the Debtor shall assign its rights to (a) make Distributions to Holders of Allowed General Unsecured Claims, and (b) prosecute and settle Causes of Action for the benefit of Holders of Allowed Claims.

1.53.    "Liquidating Trust Agreement" means the Liquidating Trust Agreement, the form of which agreement shall be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing.

1.54.    "Liquidating Trustee" means the trustee of the Liquidating Trust, or any Bankruptcy Court approved successor, who is responsible for implementing the functions of the Liquidating Trust, maintaining and administering the Debtor's Available Cash from and after the Effective Date, and effectuating the Distributions to Holders of Allowed General Unsecured Claims as prescribed by this Plan.  The initial Liquidating Trustee shall be designated by the Official Committee in a notice to be filed with the Bankruptcy Court and served on the United States Trustee at least ten (10) days prior to the Confirmation Hearing.

1.55.    "Official Committee" means the official committee of unsecured creditors appointed in the Debtor's Chapter 11 case, as it was originally constituted and may be reconstituted from time to time.

1.56.   **"**Operating Reserve Account" means an account(s) to be established and maintained by the Debtor and into which funds will be deposited in amounts, sufficient to satisfy the Estate's Allowed Administrative Expense Claims that arise prior to, on or after the Confirmation Date, including expenses of the Estate's administration after confirmation.

1.57.   "Person" means an individual, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint venture, trust, estate, unincorporated organization, or a government or any agency or political subdivision thereof.

1.58.   "Petition Date" means August 17, 2004, the date on which the Debtor filed its petition under Chapter 11 of the Bankruptcy Code.

1.59.   "Plan" means this Modified First Amended Chapter 11 Plan of Liquidation, dated December 28, 2005, including any schedules and exhibits hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

1.60.   "Priority Claims" means all Priority Non-Tax Claims and Priority Tax Claims.

1.61.   "Priority Non-Tax Claim" means any Claim of a kind specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.62.   "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.63.   "Professionals" means the attorneys, accountants and other professionals whose retention has been approved by the Bankruptcy Court in the Case or pursuant to the Liquidating Trust Agreement.

1.64.   "Ratable or Ratable Share" means a number (expressed as a percentage) equal to the proportion that an Allowed Claim bears to the aggregate amount of Allowed Claims plus Disputed Claims (in their aggregate Face Amount) in such Class as of the date of determination.

1.65.   "Retiree" means a former employee of the Debtor who was entitled to receive benefits from the Debtor pursuant to a prepetition medical or life insurance plan that was terminated by the Debtor in accordance with the terms of the Order entered by the Bankruptcy Court on April 21, 2005.

1.66.   "Retiree Claim" means a Claim held by a Retiree.

1.67.   "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed in the Case by the Debtor with the Bankruptcy Court under section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.68.   "Secured Claim" means a Claim secured by a Lien on Collateral to the extent of the value of the Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code.

1.69.   "Security" means security as defined in section 101(49) of the Bankruptcy Code.

1.70.   "U.S. Trustee" means the United States Trustee appointed under section 591, Title 28, United States Code to serve in the Southern District of New York.

1.71.   "Unsecured Claim" means any Claim against the Debtor other than Administrative Expense Claims, Priority Claims and Secured Claims.

1.72.   "X-Fund" means that premium deposit fund originally created pursuant to an agreement entered into by the Debtor with Aetna Life Insurance Company, dated December 29, 1980, to provide life insurance benefits under Aetna's Group Insurance policy #47400, and which currently is being held in a special purpose bank account and whose use is restricted for the benefit of Retirees.  The estimated value of the X-Fund was approximately $475,000 as of October 31, 2005.

## ARTICLE II

### INTERPRETATION;  APPLICATION OF
### DEFINITIONS AND RULES OF CONSTRUCTION

Unless otherwise specified, all article, section, schedule or exhibit references in this Plan are to the respective article or section of, or schedule or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to this Plan as a whole and not to any particular article, section, subsection or clause contained in this Plan.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of this Plan.  Unless otherwise indicated herein, all references to dollars means United States dollars.

## ARTICLE III

### PAYMENT OF ADMINISTRATIVE
### EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

3.1    Administrative Expense Claims.

Subject to the Administrative Bar Date provisions herein and except to the extent the Debtor or the Liquidating Trustee and the Holder of an Allowed Administrative Expense Claim agree to a different treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in Cash by the Debtor or the

Liquidating Trustee from the Operating Reserve Account or the Disputed Claims Reserve, as the case may be, in an amount equal to such Allowed Administrative Expense Claim on the later of: (a) the Effective Date; and (b) ten (10) Business Days after the date on which such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

        3.2       Priority Tax Claims.

        On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amounts and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

        Except for Administrative Expense Claims and Priority Tax Claims, Claims against, and Equity Interests in, the Debtor are classified as follows:

        4.1       Claims Against and Equity Interests in the Debtor.

        4.1.1    Class 1: Priority Non-Tax Claims. Class 1 consists of all Priority Non-Tax Claims against the Debtor.

        4.1.2    Class 2: Secured Claims. Class 2 consists of all Secured Claims against the Debtor.

        4.1.3    Class 3: General Unsecured Claims. Class 3 consists of all General Unsecured Claims, including Retiree Claims, against the Debtor.

        4.1.4    Class 4: Intercompany Claims. Class 4 consists of all Intercompany Claims against the Debtor.

        4.1.5    Class 5: Equity Interests. Class 5 consists of all Equity Interests in the Debtor.

## ARTICLE V

## TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

        5.1       Designation of Treatment. The following treatment set forth in this Article V shall be accorded in full and complete satisfaction of all Claims against, and Equity Interests in, the Debtor designated by Class. No Claim shall entitle the Holder thereof to any Distribution pursuant to this Plan unless, and only to the extent that, such Claim is an Allowed Claim.

     5.2    <u>Claims Against and Equity Interests in the Debtor</u>.

        5.2.1   <u>Class 1:  Priority Non-Tax Claims</u>.

On the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be paid by the Debtor or the Liquidating Trustee in Cash, in full, or in such amount and on such other terms as may be agreed on by the Holder of such Claim and the Debtor.

Class 1 Priority Non-Tax Claims are not impaired.

        5.2.2   <u>Class 2:  Secured Claims</u>.

Each Holder of an Allowed Secured Claim shall receive, in the Debtor's sole discretion, one of the following types of treatment:

    (a)   (i) payment of an amount equal to the value of the Collateral securing the Claim as determined by agreement between the Debtor and the Holder of such Claim or by Final Order of the Bankruptcy Court, in Cash on the later of (A) the Effective Date or as soon thereafter as may be practicable, or (B) the date that such Claim becomes an Allowed Class 2 Claim by a Final Order, or as soon thereafter as may be practicable;  and (ii) an Allowed Class 3 Claim for any deficiency between the value of the Collateral securing the Claim and the amount of such Holder's Allowed Secured Claim, which Allowed Class 3 Claim shall be treated in accordance with Section 5.2.4 of the Plan; or

    (b)   the Debtor shall abandon the property that secures the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date or (ii) the date that is ten (10) days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order; or

    (c)   such other treatment as the Holder of such Allowed Secured Claim and the Debtor shall agree upon in writing.

Class 2 Secured Claims are not impaired.

        5.2.3   <u>Class 3:  General Unsecured Claims</u>.

Subject to the prior satisfaction in full of all Allowed Administrative Expense Claims and Allowed Priority Claims, on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full settlement, release and discharge of their Allowed Class 3 Claim,

periodic ratable Distributions from the Liquidating Trust in an aggregate amount of up to 100% of such Holder's Allowed General Unsecured Claim; provided, however, that Distributions to a Holder of a Retiree Claim will be funded from the proceeds of the X-Fund until such funds are exhausted before receiving any Distribution from the Debtor's Available Cash.  In all instances, all Holders of a Class 3 General Unsecured Claim will share *pari passu* in the Aggregate Cash.

Class 3 General Unsecured Claims are impaired.


5.2.4   Class 4:  Intercompany Claims.

Pursuant to the Alper Settlement Agreement, Alper will waive and release all Claims against the Debtor's Estate in their entirety and with prejudice, including but not limited to its asserted Intercompany Claim under its management agreement with the Debtor in the amount of $1,264,392.  Accordingly, on the Effective Date, Alper shall not receive any Distribution and all Intercompany Claims shall be deemed expunged.

Class 4 Intercompany Claims are impaired.


5.2.5   Class 5:  Equity Interests.

On the Effective Date, Alper shall neither receive any Distribution nor retain any property on account of its Equity Interests.  As of the Effective Date, all Class 5 Equity Interests shall be deemed canceled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

Class 5 Equity Interests are impaired.


## ARTICLE VI

**IMPAIRED AND UNIMPAIRED CLASSES OF CLAIMS
AND EQUITY INTERESTS UNDER THE PLAN;
ACCEPTANCE OR REJECTION OF THE PLAN**

6.1   Holders of Claims and Equity Interests Entitled to Vote.

(a)   Each Holder of an Allowed Claim, or the Holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a), in an impaired Class of Claims against the Debtor, shall be entitled to vote separately to accept or reject this Plan.

(b)   Class 3 is impaired hereunder and the Holders of Allowed Claims in such class are entitled to vote on this Plan.  In accordance with section 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims in Class 4 and Holders of Equity Interests in Class 5 are receiving no Distributions under the Plan and,

accordingly, each of Class 4 and Class 5 is conclusively deemed to have rejected this Plan.

(c)     Classes 1 and 2 are not impaired hereunder.  In accordance with section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are conclusively deemed to have accepted this Plan.

6.2     Elimination of Classes.

Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim, or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Plan for purposes of voting on acceptance or rejection of this Plan, and for purposes of determining acceptance or rejection of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

6.3     One Vote Per Holder.

If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

6.4     Non-consensual Confirmation.

If any impaired Class of Claims shall not have accepted this Plan by the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtor may:  (a) request the Bankruptcy Court to confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code to such non-accepting Class-of-Claims or Equity Interests;  or (b) modify this Plan in accordance with Section 15.2 hereof.

6.5     Revocation of the Plan.

The Debtor reserves the right to revoke and withdraw this Plan at any time prior to entry of the Confirmation Order.  If this Plan is so revoked or withdrawn, then it shall be deemed null and void.

## ARTICLE VII

## FUNDING AND IMPLEMENTATION OF THE PLAN

7.1     Creation of the Liquidating Trust.

On the Effective Date or as soon thereafter as is practicable, all of the Assets of the Debtor's Estate will be transferred to a Liquidating Trust for the benefit of the Holders of General Unsecured Claims, including, but not limited to, all Cash and Causes of Action;  provided, however, that the Debtor shall retain such Cash as may be necessary to fund (i) Distributions on the Effective Date to Holders of Allowed

12

Administrative Expense Claim and Allowed Priority Claims, and (ii) the creation and maintenance of the Operating Reserve Account.

7.2    Appointment of the Liquidating Trustee.

(a)    Prior to the Confirmation Hearing, the Official Committee shall designate the Liquidating Trustee who shall be paid in accordance with the terms of the Liquidating Trust Agreement.

(b)    On the Effective Date or as soon thereafter as practicable, all Cash and Assets of the Estate not otherwise required by the Debtor to satisfy its obligations under this Plan, including but not limited to Causes of Action, shall be transferred to the Liquidating Trust for liquidation and distribution in accordance with the Plan and the Liquidating Trust Agreement.

(c)    For purposes of making Distributions on account of Allowed Claims under the terms and conditions of this Plan, the Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code.

(d)    As of each March 31, June 30, September 30 and December 31, the Liquidating Trustee shall prepare a quarterly report, and, upon the resolution of the last Disputed Claim, Avoidance Action or Cause of Action, a final report, regarding receipts, disbursements and the status of pending, contemplated and resolved Disputed Claims, Avoidance Actions and Causes of Action. Such report shall be filed with the Bankruptcy Court and a copy shall be delivered to the Debtor within fifteen (15) days of the end of each calendar quarter and the final report on or before sixty (60) days following resolution of the last Disputed Claim, Avoidance Action or Cause of Action.

(e)    Post-confirmation and throughout the winding down period, the officers of the Debtor will remain reasonably available to assist in the liquidation of any and all Assets, including but not limited to, Avoidance Actions and Causes of Action that the Liquidating Trust may pursue or commence.

7.3    Duties of the Liquidating Trustee.

(a)    On the Effective Date, the Liquidating Trustee shall begin acting on behalf of the Liquidating Trust and its beneficiaries subject to the provisions hereof and the Liquidating Trust Agreement. The Liquidating Trustee shall be compensated at the rate to be disclosed at or prior to the Confirmation Hearing, plus reimbursement for his/her reasonable, actual and necessary expenses incurred in connection with the performance of his/her duties, without the need of Bankruptcy Court approval. The Liquidating Trustee shall not be liable for any action taken or omitted to be taken that he/she believes in good faith to be authorized or within his/her rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of gross negligence or willful misconduct. All Distributions to Holders of General Unsecured Claims to be made under the Plan after the Effective Date shall be made by the Liquidating Trustee, who shall deposit and hold all Cash in trust pursuant to the Liquidating Trust Agreement.

(b)    The duties and powers of the Liquidating Trustee shall, to the extent not inconsistent with the Plan and the Liquidating Trust Agreement, include the following:

(i)    To exercise all power and authority that may be exercised, commence all proceedings that may be commenced and take all actions that may be taken by any officer, director or shareholder of the Debtor, with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including consummating the Plan and making all transfers thereunder on behalf of the Debtor and prosecuting any Avoidance Actions or Causes of Action;

(ii)    To maintain all accounts, make Distributions and take other actions consistent with the Plan, including the maintenance of appropriate reserves;

(iii)    To take all steps to file and serve on the Office of the United States Trustee any reports that may be required by law and to pay all fees associated therewith;

(iv)    To prosecute objections to General Unsecured Claims and compromise or settle any General Unsecured Claims, Disputed or otherwise;

(v)    To make decisions regarding the retention and employment of Professionals or other Persons and to pay, without Bankruptcy Court order, all reasonable fees and expenses incurred by the Liquidating Trust after the Effective Date;

(vi)    To prepare and file a closing report and a final decree to close this Case;  and

(vii)    To take all other action not inconsistent with the provisions of the Plan and the Liquidating Trust Agreement that the Liquidating Trustee deems reasonably necessary or desirable in connection with the administration of the Plan.

7.4    <u>Retention and Compensation of Professionals</u>.

In order to carry out his/her duties under the Plan and the Liquidating Trust Agreement, the Liquidating Trustee, in addition to the rights hereunder and in the Liquidating Trust Agreement, shall have the right, but not the obligation, to (i) retain and compensate Professionals (including, but not limited to, the Professionals retained by the Official Committee or the Debtor prior to the Effective Date) to assist the Liquidating Trustee in liquidation and distribution of the Assets without prior

14

Bankruptcy Court approval, and (ii) employ such procedures, not inconsistent with the Plan and the Liquidating Trust Agreement, necessary for the Liquidating Trustee to perform his/her duties hereunder. The reasonable and necessary fees and actual and necessary expenses of such Professionals and the Liquidating Trustee shall be paid by the Liquidating Trust upon each monthly submission of a fee statement to the Liquidating Trustee. The Liquidating Trustee shall have fifteen (15) days after the delivery of a fee statement to give notice of an objection to the fee statement of a Professional seeking compensation and/or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is delivered may be submitted to the Bankruptcy Court for resolution. The uncontested portion of the each fee statement shall be paid within thirty (30) days after its delivery to the Liquidating Trust.

7.5     Resignation, Death or Removal.

The Liquidating Trustee may be removed by the Bankruptcy Court upon application for good cause. In the event of resignation, removal, death or incapacitation of the Liquidating Trustee, the Bankruptcy Court shall designate another Person to become the Liquidating Trustee and thereupon the successor shall become fully vested with all the rights, powers, duties and obligations of his/her predecessor. In the event of the removal, resignation or death of the Liquidating Trustee, counsel to the Reorganized Debtor or the Liquidating Trust shall file with the Bankruptcy Court and serve on the United States Trustee a notice regarding such change.

7.6     Establishment of the Operating Reserve Account.

On or before the Effective Date, the Debtor will establish the Operating Reserve Account. The Operating Reserve Account shall be used to pay the post-Confirmation Date Administrative Expense Claims of the Case, including the fees and expenses of any Professionals retained by the Debtor and/or the Official Committee. The Operating Reserve Account will be funded from the Estate's Available Cash. When the Plan has been consummated and the Debtor dissolved, any remaining funds in the Operating Reserve Account shall be transferred by the Debtor to the Liquidating Trustee for subsequent disposition in accordance with terms of Liquidating Trust Agreement.

7.7     Establishment of Disputed Claims Reserve.

On the Effective Date, and prior to making the Distributions to Holders of Allowed General Unsecured Claims required to be made on the Effective Date, the Liquidating Trustee shall establish a Disputed Claims Reserve. Distributions from the Disputed Claims Reserve shall be governed by Articles III and IV of this Plan.

7.8     Funding of Distributions.

All Distributions required to be made by the Debtor on the Effective Date on account of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Non-Priority Tax Claims and Allowed General Unsecured Claims shall be

made by the Debtor and/or the Liquidating Trustee, as the case may be, from the Aggregate Cash.

      7.9      <u>Abandonment of the Schrader-Dickson Facility</u>.

      Effective as of the date the Confirmation Order is entered by the Bankruptcy Court, the Debtor will abandon, pursuant to section 554 of the Bankruptcy Code, its interest in that certain thirty-seven (37) acre tract of land in Dickson, Tennessee known as the "Schrader-Dickson Facility."

      7.10     <u>Substantial Consummation</u>.

      Substantial consummation of this Plan as defined by section 1101(2) of the Bankruptcy Code shall not be deemed to occur, the Case shall remain open and shall not be deemed fully administered, and no final decree closing this Case shall be entered pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022, until the Effective Date, at the earliest.

## <u>ARTICLE VIII</u>

## <u>DISTRIBUTIONS UNDER THE PLAN</u>

      8.1      <u>Date of Distributions</u>.

      Any Distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by this Plan.  If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

      8.2      <u>Delivery of Distributions</u>.

      Subject to Rule 9010 of the Bankruptcy Rules, and except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made at the address of each of such Holder as set forth in the Schedules filed by the Debtor with the Bankruptcy Court, unless superseded by the address set forth on proofs of Claim filed by such Holder (or at the last known address of such Holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address).  If any Distribution to any Holder is returned as undeliverable, the Liquidating Trustee shall use reasonable efforts to determine the current address of such Holder, but no Distribution to any such Holder shall be made unless and until the Liquidating Trustee has determined the then current address of such Holder, at which time such Distribution to such Holder shall be made to such Holder without interest.  Amounts in respect of any undeliverable Distributions made by the Liquidating Trust shall be returned to the Liquidating Trust until such Distributions are claimed.  If such Distributions are not claimed by the expiration of the later of:  (a) one year from the Effective Date;  or (b) one year from the actual date of the making of such Distribution (the "Unclaimed Distribution Date"),

such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  If no proofs of Claim are filed and the Schedules filed with the Bankruptcy Court fail to state addresses for Holders of Allowed Claims, Distributions that would have been made on account of such Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the Unclaimed Distribution Date.  After the Unclaimed Distribution Date, all unclaimed property shall be transferred to the Liquidating Trust for Distribution to Holders of Allowed General Claims and the Claim of any Holder to such property shall be discharged and forever barred.

8.3    Disputed Distributions.

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, in lieu of making a Distribution to such Person, the Debtor and/or the Liquidating Trustee, as the case may be, shall deposit the Distribution at issue into a segregated account until the disposition of such Distribution is determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

8.4    Time Bar to Cash Payments.

Any check issued by the Debtor or the Liquidating Trustee, as the case may be, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof, unless it has been returned as undeliverable.  Requests for reissuance of any check shall be made in writing directly to the Debtor or the Liquidating Trustee, as the case may be, by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any request for reissuance of a voided check constituting the Distribution in respect of an Allowed Claim shall be made in writing on or before the first anniversary of the Effective Date. After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.5    Manner of Payment Under the Plan.

At the option of the Debtor or the Liquidating Trustee, as the case may be, any Distribution of Cash to be made pursuant to this Plan may be made by a check or wire transfer, or as otherwise required by  or provided in applicable agreements.

8.6    Distributions After Effective Date.

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

## ARTICLE IX

## DISPUTED CLAIMS UNDER THE PLAN

9.1     Prosecution of Objections to Claims.

Upon the Effective Date, the Liquidating Trustee shall be responsible for pursuing any objection to the allowance of all Disputed Claims with respect to which an objection has been filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim.

The Liquidating Trustee may compromise and settle any Disputed Claims.  The Bankruptcy Court may approve any compromises and settlements in accordance with Bankruptcy Rule 9019(a).

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed no later than one hundred twenty (120) days after the Effective Date;  provided, however, that this deadline may be extended upon motion by the Liquidating Trustee, without notice to Creditors.

9.2     Claims Filed or Amended after the Bar Date.

Except as otherwise provided in the Plan, any new or amended Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtor or the Liquidating Trust, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the filing.  The Holder of a Claim that is disallowed pursuant to this section shall not receive any Distribution on account of such Claim.

9.3     No Distributions Pending Allowance of a Disputed Claim.

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until it becomes an Allowed Claim.

9.4     Distributions After Allowance of a Disputed Claim.

Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of this Plan governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidating Trustee shall distribute to the Holder of such Claim any payment that would have been distributed to such Holder if the Claim had been Allowed on the Effective Date, plus any payments that have been made on account of such Allowed Claim after the Effective Date, without any interest thereon.

18

# ARTICLE X

## EXECUTORY CONTRACTS UNDER THIS PLAN

10.1    General Treatment.

This Plan constitutes a motion by the Debtor to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for any Executory Contract that (a) has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (b) is the subject of a separate motion filed under section 365 of the Bankruptcy Code and pending on the Effective Date.

10.2    Deadline to Seek Rejection Damages.

If the rejection of any Executory Contract under this Plan or other pending motion results in damages to the other party or parties to such contract, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Estate or its properties or interests in property or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor and the Liquidating Trustee (in the event the Effective Date has occurred), on or before thirty (30) days after the earlier to occur of:  (a) the Confirmation Date;  and (b) the entry of an order by the Bankruptcy Court authorizing rejection of a particular Executory Contract.

# ARTICLE XI

## CONDITIONS PRECEDENT TO THE
## CONFIRMATION DATE AND THE EFFECTIVE DATE

11.1    Conditions to Confirmation of the Plan.

This Plan may not be confirmed unless each of the conditions set forth below is satisfied.  Except as provided in section 11.3 below, any one or more of the following conditions may be waived at any time by the Debtor:

(a)    the Disclosure Statement Order shall have been entered on the legal docket for the Case and shall have become a Final Order;

(b)    the Confirmation Order shall be in a form reasonably acceptable to the Debtor, the Official Committee;  and

(c)    the Alper Settlement Agreement shall be approved through the Confirmation Order.

11.2    <u>Conditions to Effective Date of the Plan</u>.

The Effective Date for this Plan may not occur unless each of the conditions set forth below is satisfied.  Except as provided in section 11.3 below, any one or more of the following conditions may be waived at any time by the Debtor:

(a)    the Confirmation Order shall have been entered on the legal docket for the Case and shall have become a Final Order;

(b)    Alper shall have paid $1,000,000 to the Debtor's Estate within forty-five (45) days of the entry of the Confirmation Order;

(c)    upon the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate an amount equal to 50% of the total outstanding balance due to the Debtor under the Grupo Note;

(d)    within forty-five (45) days of the entry of the Confirmation Order, Grupo shall have paid the Debtor's Estate the remaining balance due under the Grupo Note including all accrued interest thereon;  and

(e)    all actions and documents necessary to implement the provisions of this Plan shall have been effected or executed and delivered.

Payment in full of the Grupo Note and the $1,000,000 settlement payment by Alper are express conditions to the Effective Date of the Plan.  The Effective Date of the Plan shall be no earlier than two (2) business days after all payments by Alper and Grupo have been paid in full through cleared funds to the Debtor's Estate.

11.3    <u>Waiver of Conditions Precedent</u>.

Other than the requirements set forth in sections 11.1(a) and 11.2(a) of this Plan, the requirement that a particular condition set forth in sections 11.1 and 11.2 hereof be satisfied may be waived or modified, in whole or in part, upon the joint consent of the Debtor, and the Official Committee.  Any such waiver or modification of a condition precedent in sections 11.1 and 11.2 hereof may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any other formal action.

## ARTICLE XII

## EFFECT OF CONFIRMATION

12.1    <u>Debtor's Authority</u>.

Until the Effective Date, the Bankruptcy Court shall retain custody and jurisdiction over the Debtor, its properties, interests in property and operations.  On the Effective Date, the Debtor, its properties and interests in property and operations shall

be released from the custody and jurisdiction of the Bankruptcy Court, except as provided in Article XV of this Plan.

    12.2    Corporate Action and Continued Existence of the Debtor.

    From and after the Confirmation Date, the Debtor shall continue in existence solely for the purpose of winding up its affairs as expeditiously as reasonably possible.  Except as otherwise provided herein, the Plan will be administered by the Liquidating Trustee and all actions taken hereunder shall be taken through the Liquidating Trustee.  The Debtor, however, shall retain responsibility for (a) the preparation and submission of all final tax returns, if any, for the Debtor, and (b) the steps necessary to terminate the corporate existence of the Debtor.

    From and after the Confirmation Date, the then current officers and directors of the Debtor shall continue to serve in their respective capacities through the earlier of the date the Debtor is dissolved under applicable state law such officer or director resigns, is replaced or is terminated, the officer and directors of the Debtor shall continue to serve in their respective capacities on the same terms and conditions upon which they presently serve the Debtor.

    12.3    Dissolution.

    Upon completion of its purposes detailed in Section 12.2, the Debtor shall be dissolved under applicable state law.  Immediately prior to such dissolution, to the extent not already done, all remaining Available Cash shall be transferred to the Liquidating Trust for Distribution in accordance with the Plan's treatment of Allowed General Unsecured Claims.

    12.4    Vesting and Liens.

    Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, title to all Avoidance Actions, Causes of Action, Assets and Cash of the Debtor and its Estate shall vest in the Liquidating Trust, free and clear of aliens, Claims and Interests.  The Liquidating Trust is a grantor trust and is assumed to have no tax liabilities.  On or before the Effective Date, the Liquidating Trust and the Debtor shall enter into the Liquidating Trust Agreement.  The Liquidating Trustee shall liquidate the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan.  The Debtor shall execute any and all documents necessary to transfer and convey its Assets not otherwise required to satisfy its obligations under this Plan to the Liquidating Trust on the Effective Date.

    12.5    Discharge of the Debtor.

    In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan and the Confirmation Order shall not discharge the Debtor from any Claim or Liability that arose before the Confirmation Date.

12.6    Binding Nature of Plan.

Except as otherwise provided in section 1141(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind all present and former Holders of Claims against, or Equity Interests in, the Debtor and its successors and assigns, whether the Claim or Equity Interest of such Holder is impaired under the Plan and whether such Holder has filed a proof of Claim or Equity Interest or voted to accept the Plan.  The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

12.7    Termination of Injunctions or Stays.

Unless otherwise provided in this Plan or the Confirmation Order, all injunctions or stays provided for in the Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the occurrence of the Effective Date, all such injunctions or stays shall be deemed terminated or vacated and shall have no further force and effect.

## ARTICLE XIII

## INJUNCTION AND RELEASES OF CLAIMS

13.1    Injunctions.

(a)    General Injunction.  The Debtor shall seek the entry of a Confirmation Order that provides for an injunction permanently enjoining and restraining all Entities from:

(i)    Commencing or continuing any action or proceeding respecting any claim or interest against the Debtor or its property (other than abandoned property);

(ii)    Enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor or its property (other than abandoned property);

(iii)    Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or its property (other than abandoned property);

(iv)    Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtor from any such Entity;  and

22

(v)    Performing any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

(b)    **Release and Injunction in Favor of Alper. As of the Effective Date, the Debtor, on its own behalf, and on behalf of its estate, subject to the Debtor's receipt of payment pursuant to the Alper Settlement Agreement, releases, acquits and forever discharges Alper and its principals, shareholders, subsidiaries, affiliates, and their respective employees, agents, representatives, officers, directors, members, partners, professionals (all solely in their capacities as such), successors and assigns, and any Entity claimed to be liable derivatively through the Debtor, or any of the foregoing (each such party, a "Released Party") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of this Case or during the course of the Case (including through the Effective Date), in any way relating to the Debtor, this Case, or the ownership, management, and operation of the Debtor, that the Debtor could assert directly or any Holder of a Claim or Interest or other Entity could assert derivatively or on behalf of the Debtor or its Estate (the "Released Claims"); provided that the foregoing release shall not operate as a waiver of or release of (i) any liability, claim, or cause of action arising out of any express contractual obligation owing by any current or former, director, officer or employee of the Debtor, (ii) any reimbursement obligation of any current or former, director, officer, or employee with respect to a loan or advance made by the Debtor to such director, officer, or employee, or (iii) any liability, claim or cause of action against Grupo and its employees, agents, representatives, officers, directors, members, partners, professionals, successors and assigns (all solely in their capacities as such). The releases described in Section 13.1(b) of the Plan shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Debtor or any other Entity. Notwithstanding the foregoing, the above release does not release claims any nondebtor third party may hold against any of the Released Parties, except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.**

**The Confirmation Order shall provide that the Debtor and its Estate shall be permanently enjoined, from and after the Effective Date, from asserting any and all Claims and Causes of Action that may lie against Alper with respect to the releases granted to it pursuant to this Plan.**

(c)    Exculpation. As of the Effective Date, each Holder of a Claim or Equity Interest, each party-in-interest and each Entity acting or claiming or purporting to act or claim by, through under or on behalf of any of the foregoing, shall forever be enjoined from the commencement or continuation of any action, the

employment of process, or any act to assert a claim for relief against the Debtor, the Official Committee, Alper, and their respective officers, directors, attorneys or other professionals (the "Plan Releasees") in respect of: (A) any actions taken or not taken in connection with the Case; (B) this Plan; (C) the Disclosure Statement; (D) Distributions, payments or transfers made under this Plan; (E) acts performed pursuant to this Plan; (F) any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken, in connection with this Plan; or (G) any Claim compromised, settled or released under or pursuant to this Plan; provided, however, that the foregoing release shall not release the Plan Releasees (i) from their obligations under the Plan, and (ii) for any acts, or omissions to act, evidencing and/or constituting gross negligence, willful misconduct, breach of fiduciary duty or malpractice. Notwithstanding the foregoing, under no circumstances shall a nondebtor third party be enjoined from the continuation or commencement of any derivative action against a Released Party, except to the extent such derivative claim is property of the Debtor's Estate.

13.2    Avoidance and Recovery Actions.

Except as released under Section 13.1(b) of the Plan, as of the Effective Date, the Liquidating Trustee shall retain the right to prosecute, on behalf of itself and the Estate, any avoidance or recovery actions under sections 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action, or rights to payment of claims, that belong to or could have been raised by or on behalf of the Debtor, Debtor in Possession or the Estate, and the Liquidating Trustee expressly retains the right to assert such claims and Causes of Action as defenses to, and setoffs against, Disputed General Unsecured Claims. The Liquidating Trustee may prosecute, compromise and settle any Cause of Action it deems necessary and appropriate. All settlements shall be subject to Bankruptcy Court approval under Bankruptcy Rule 9019.

## ARTICLE XIV

## ADMINISTRATIVE PROVISIONS

14.1    Further Documents and Action.

The Debtor, the Official Committee and/or the Liquidating Trustee shall: (a) execute and deliver, and are authorized to file with the Bankruptcy Court, such agreements and other documents as may be necessary or appropriate to effect and further evidence the terms and conditions of this Plan; (b) take or cause to be taken such action in connection therewith; and (c) consummate the transactions and transfers contemplated by this Plan. The Debtor and all other parties shall execute any and all documents and instruments that must be executed under, or in connection with, this Plan in order to implement the terms of this Plan and/or effectuate Distributions under this Plan.

14.2    Official Committee.

As of the Effective Date, the Official Committee shall be deemed dissolved and shall have no further duties, authority or responsibility under the Bankruptcy

Code, or otherwise, with respect to the Debtor, its assets, or the Plan. Neither the Debtor nor the Liquidating Trustee shall be responsible for any fees, costs or expenses of the Official Committee, its individual members or its Professionals incurred after the Effective Date; provided, however, that following the Effective Date, the responsibilities of the Official Committee and its Professionals shall be limited to the preparation and prosecution of their respective fee applications for which they shall be entitled to reasonable compensation by the Debtor.

14.3    Expenses of Liquidation.

Except as otherwise provided by the Plan or may as otherwise be agreed, all costs and expenses incurred by the Liquidating Trustee or the Debtor and their respective Professionals for implementing the Plan after the Effective Date, including the costs of fees and expenses of professionals and agents retained by the Estate following the Confirmation Date, shall be paid from the Operating Reserve Account, in the case of costs incurred by the Debtor, and from the Liquidating Trust, in the case of costs incurred by the Liquidating Trustee.

14.4    Obligations Incurred after Confirmation Date.

Payment obligations incurred after entry of the Confirmation Order, including, but not limited to, the fees of Professionals, will not be subject to application or proof of Claim and may be paid by the Debtor and/or the Liquidating Trustee, as the case may be, in the ordinary course without further order of the Bankruptcy Court.

## ARTICLE XV

## RETENTION OF JURISDICTION

15.1    Retention of Jurisdiction.

As of the Effective Date, the Bankruptcy Court shall retain jurisdiction, and if the Bankruptcy Court exercises its retained jurisdiction, shall have exclusive jurisdiction, over all matters arising out of, and relating to, the Case and this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided herein;

(d)    To hear and determine any timely objections to Administrative Expense Claims, Priority Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    To issue such orders in aid of execution of this Plan in accordance with section 1142 of the Bankruptcy Code;

(g)    To consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    To hear and determine all applications of Professionals for final awards of compensation for services rendered and reimbursement of expenses relating to the implementation and effectuation of this Plan;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    To compel the conveyance of property and other performance contemplated under this Plan and documents executed in connection herewith;

(l)    To enforce remedies upon any default under the Plan;

(m)    To enforce all orders, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

(n)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection herewith;

(o)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate

to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Plan;

(p)   To determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, or the Confirmation Order;  and

(q)   To enter a final decree closing the Case.

15.2   Modification of the Plan.

After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, or the Liquidating Trustee acting on behalf of the Debtor after the Effective Date, may propose in writing to modify the Plan in order to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement and/or the Confirmation Order, but such modifications shall not be effective without the consent of the Official Committee and Alper;  provided, however, the Plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified in accordance with Section 15.2 of the Plan if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.


**ARTICLE XVI**

**COMPROMISES AND SETTLEMENTS**

This Plan incorporates a proposed compromise and settlement of certain issues related primarily to Alper's potential liability to the Debtor and its Estate and the cancellation of Intercompany Claims against, and Equity Interests in, the Debtor held by Alper.

This Plan further provides for the compromise and settlement of certain rights, Claims and Causes of Action of, and against, the Debtor as set forth in Articles III, V, IX, X and XIII.  To the extent Bankruptcy Rule 9019 is applicable to such compromises and settlements, this Plan shall be deemed a motion by the Debtor pursuant to Bankruptcy Rule 9019(a) for approval by the Bankruptcy Court thereof and notice of such motion as is required by said Rule and Bankruptcy Rule 2002 shall be deemed to have been provided by the Debtor, if it complies with the provisions of the Disclosure Statement Order concerning notice of the Confirmation Hearing.  The entry of the Confirmation Order shall be deemed an approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019 of all compromises and settlements contained in this Plan and shall be binding upon the Debtor, all creditors and Persons whether such Persons have voted to accept or reject this Plan.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

17.1    Payment of Statutory Fees.

All outstanding fees payable pursuant to section 1930, Title 28, United States Code, shall be paid by the Debtor on or before the Effective Date.  Responsibility for, and the payment of, post-Effective Date quarterly fees and charges through the date of entry of either an order dismissing this Case or a final decree shall be paid by the Liquidating Trust from the Operating Reserve Account or from such other funds as may be available to pay such fees.

17.2    Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the consent of the Debtor, the Official Committee, and Alper shall have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid, enforceable or confirmable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision, as it may have been interpreted, modified or deleted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

17.3    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a schedule or exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York.

17.4    Notices.

To be effective, all notices, requests and demands shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtor:

Saltire Industrial, Inc.
274 Riverside Avenue
Westport, CT 06880
Attn.:  Robert Bertellotti
Telephone:  (203) 454-0077
Telecopier:  (203) 454-2277

with copies to:

(i)    counsel to the Debtor:

Togut, Segal & Segal LLP
One Penn Plaza
New York, New York 10119
Attn.:  Scott E. Ratner
Telephone:    (212) 594-5000
Telecopier:    (212) 967-4258

and

(ii)    counsel to the Official Committee:

Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, New York  10020
Attn.:  Michael S. Etkin
Telephone:    (212) 262-6700
Telecopier:    (212) 262-7402

17.5    Controlling Documents.

To the extent this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan shall be controlling.  To the extent that this Plan is inconsistent with the terms of the Alper Settlement Agreement, the Plan shall control.

17.6     Reservation of Rights.

If this Plan is not confirmed by the Bankruptcy Court or any other court of competent jurisdiction for any reason or if this Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full.  Any concession, compromise or settlement reflected herein, if any, is made for purposes of this Plan only, and if the Effective Date does not occur, no party in interest in the Case shall be bound or deemed prejudiced by any such concession, compromise or settlement.

17.7     Binding Effect.

The rights, benefits and obligations of any Entity named or referred to in this Plan, or whose actions may be required to effectuate the terms of this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for the Debtor under Chapters 7 or 11 of the Bankruptcy Code).  The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

Dated:   December 28, 2005

SALTIRE INDUSTRIAL, INC.,
Debtor and Debtor in Possession

By: /s/ Robert A. Bertellotti
      Name:   Robert A. Bertellotti
      Title:     President

TOGUT, SEGAL & SEGAL LLP
Attorneys for Saltire Industrial, Inc.,
Debtor and Debtor in Possession

By:  /s/ Scott E. Ratner
      SCOTT E. RATNER (SR-0015)
      A Member of the Firm
      One Penn Plaza
      Suite 3335
      New York, New York 10119
      (212) 594-5000

**TAB 3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                         :
In re:                      :
                         :   Chapter 11
ALPER HOLDINGS USA, INC.,      :
                         :   Case No. 07-12148 (BRL)
           Debtor.        :
                         :
---------------------------------------------------------------- x


**HARRY HOLT PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
RESPONSE TO OBJECTION OF ALPER HOLDINGS USA, INC. TO
<u>PROOFS OF CLAIM FILED BY THE HARRY HOLT PLAINTIFFS</u>**

Theodore M. Shaw, Director-Counsel (TS-6630)     Lorraine S. McGowen (LM-1644)
Matthew Colangelo (MC-1746)                Alyssa D. Englund (AE-2300)
NAACP Legal Defense & Educational Fund, Inc.   Orrick, Herrington & Sutcliffe LLP
99 Hudson St., 16th Floor                   666 Fifth Avenue
New York, New York 10013              New York, NY 10103-0002
Telephone: (212) 965-2200              Telephone: (212) 506-5000


                                             Counsel for the Harry Holt Plaintiffs

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   ARGUMENT ......................................................................................... 3

    A.    The Harry Holt Plaintiffs' Alter Ego Claims Were Not Property of
        Saltire's Estate And Were Not Released in the Saltire Bankruptcy...................... 4

        1.    Saltire Cannot Pierce Its Own Veil.......................................................... 6

            a.    Choice of Law.......................................................................... 6

            b.    Tennessee Law Does Not Permit a Bankruptcy Trustee to
                Pursue an Alter Ego Claim .......................................................... 7

            c.    Delaware Law Would Not Permit a Wholly-Owned
                Subsidiary to Pierce Its Own Corporate Veil................................ 9

        2.    The Alter Ego Claims are Personal to the Harry Holt Plaintiffs ............. 12

    B.    Alper As Successor-in-Interest to First City Is Liable ...................................... 16

    C.    The Harry Holt Plaintiffs Have Properly Stated Alter Ego Claims Against
        Alper ........................................................................................................... 17

        1.    Alper and Saltire Operated as a Single Economic Entity ...................... 19

        2.    Maintaining the Corporate Separateness of Alper and Saltire
            Would Perpetuate Injustice and Unfairness .......................................... 24

III.  CONCLUSION..................................................................................... 28

i

## TABLE OF AUTHORITIES

**Cases**

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988) ........................ 10

*Armstrong v. Pedie (In re Dakota Drilling, Inc.)*, 135 B.R. 878 (Bankr. D.N.D. 1991) .............. 12

*Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524 (W.D.N.Y. 2001) ......................................... 16

*Brown v. Gen. Elec. Capital Corp.* (*In re Foxmeyer*), 290 B.R. 229 (Bankr. D. Del. 2003) ....... 25

*Brown v. Vencap Inv. Corp.*, 1984 Tenn. App. LEXIS 3424 (Tenn. Ct. App., Mar. 31, 1984) .... 8,
   13, 15

*Del. Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073 (Del. 2006) ... 16, 17

*Duke Energy Trading & Mktg., L.L.C., v. Enron Corp. (In re Enron Corp.)*, No. 01 B 16034,
   2003 WL 1889040 (Bankr. S.D.N.Y. Apr. 17, 2003) ............................................................. 10

*EEOC v. Local 638*, No. 71 Civ. 2877, 1988 WL 25151 (S.D.N.Y. Mar. 9, 1998) .................... 16

*Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 35 (D. Del. 1988) ................................................ 16

*Fletcher v. Atex*, 68 F.3d 1451 (2d Cir. 1995) ................................................................... 18, 24

*Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784 (Del. Ch. 1992) ................................................. 24

*Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537 (Del. Ch. Sept. 19, 1989)
   ...................................................................................................................................... 19, 24

*Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076 (D. Del. 1990) ................. 18, 19, 24

*In re Phillips Petroleum Sec. Litig.*, 738 F. Supp. 825 (D. Del. 1990) ....................................... 24

*InSITE Servs. Corp. v. Am. Elec. Power Co. (In re InSITE Servs. Corp.)*, 287 B.R. 79 (Bankr.
   S.D.N.Y. 2002) ................................................................................................................... 14

*Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576 (N.Y. 1969) ..................... 6, 7

*Kalb, Voorhis & Co. v. Am. Fin'l Corp.*, 8 F.3d 130 (2d Cir. 1993) ........................... 5, 6, 12, 14

ii

*Kittay v. Flutie N.Y. Corp.* (*In re Flutie N.Y. Corp.*), 310 B.R. 31 (Bankr. S.D.N.Y. 2004) . 19, 26

*Koch Refining v. Farmers Union Cent. Exch. Inc.*, 831 F.2d 1339 (7th Cir. 1987)..................... 12

*Liebert v. Grinnell Corp.*, 194 A.2d 846 (Del. 1963).................................................................... 9

*Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781 (Bankr. M.D. Tenn. 2005)...........8, 13, 15

*Mar-Kay Plastics, Inc. v. Reid Plastics, Inc.* (*In re Mar-Kay Plastics, Inc.)*, 234 B.R. 473 (Bankr.

    W.D. Mo. 1999) ....................................................................................................... 12

*Marks v. Wolfson*, 188 A.2d 680 (Del. Ch. 1963)) ........................................................................ 9

*Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222 (8th Cir. 1987) ................... 12

*Murray v. Miner*, 876 F. Supp. 512 (S.D.N.Y. 1995) ...................................................5, 9, 10, 13

*Nat'l City Bank v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343 (Bankr. D. Md. 2003) ........ 12

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir.

    2003)........................................................................................................................... 18

*Pereira v. Cogan*, 2007 WL 243537 (S.D.N.Y. Mar. 8, 2001).................................................... 10

*Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666 (6th Cir. 2006) ............................ 18

*Seidel v. Houston Cas. Co.*, 375 F. Supp. 2d 211 (S.D.N.Y. 2005)............................................ 18

*Selcke v. Hartford Fire Ins. Co. (In re Rehab. of Centaur Ins. Co.)*, 632 N.E.2d 1015 (Ill. 1994)

    ................................................................................................................................ 11, 12

*Serio v. Ardra Ins. Co.*, 761 N.Y.S. 2d 1 (N.Y. App. Div. 2003) ............................................ 6, 7

*Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971) .............................................................. 9

*Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 2002 WL 31885795 (S.D.N.Y. 2002) ......... 25

*Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126 (S.D.N.Y. 1991).............. 6

*Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223

    (6th Cir. 1996)....................................................................................................... 10, 11

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989) .......... 5, 12, 13, 14

*Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994) ........................................... 14, 15

*Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182 (E.D.N.Y. 1997) ...... 18, 25, 26

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006) .................. 10

*United States v. Bestfoods*, 524 U.S. 51 (1998) ................................................... 21

*United States v. Inn Foods, Inc.*, 515 F. Supp. 2d 1347 (Ct. Int'l Trade 2007) ........................... 21

*United States v. Union Corp.*, 259 F. Supp. 2d 356 (E.D. Pa. 2003) ......................................... 26

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131 (2d Cir. 1991) .... 14

*Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967) ............................................................. 26

## Statutes

11 U.S.C. § 101(32)(A) ........................................................................ 20

11 U.S.C. § 541(a)(1) ......................................................................... 5, 12, 15

## Other Authorities

1 FLETCHER CYC. *Corporations* § 41.35 ................................................. 12

18 AM. JUR. 2D *Corporations* § 46 (1985) .............................................. 11

18 AM. JUR. 2D *Corporations* § 49 (2007) ............................................. 12

Richard L. Epling, *Trustee's Standing to Sue in Alter Ego or Other Damage Remedy Actions*, 6

    Bankr. Dev. J. 191 (1989) .............................................................. 12

OHS East:160386682.6

## I.  PRELIMINARY STATEMENT

The Harry Holt Plaintiffs[1] are not like any other claimant who has appeared before this Court in this case to date.  The Harry Holt Plaintiffs are African-American homeowners whose family has owned the same property in Dickson County, Tennessee for over a century.  They are innocent bystanders who were involuntarily exposed to toxic and carcinogenic industrial pollutants simply by using the water that came into their home each day from a water-well that had been drilled generations earlier.  As a result of this exposure, they have suffered and continue to suffer serious physical injuries, including cancer, neurological impairments, deformities of the reproductive organs, skin ailments and disfiguration, immune deficiency, and even death.

The Harry Holt Plaintiffs' property is extensively contaminated with trichloroethylene ("TCE") in the groundwater and soil.  Saltire Industrial, Inc. ("Saltire"),[2] a former subsidiary of Alper, was an industrial company with an undisputed history of using the toxic substance TCE at Saltire's manufacturing facility in Dickson County, Tennessee ("the Facility") from approximately 1964 to 1985.  Saltire routinely disposed of industrial wastes, including TCE, at its manufacturing plant and at the Dickson County Landfill ("the Landfill"), which is located just a few hundred feet from the Harry Holt Plaintiffs' water-well.  While others were warned by environmental consultants retained by First City (defined below) and Saltire of the potential dangers in using the water, the Harry Holt Plaintiffs were not.

Saltire, Alper, and its predecessor-in-interest First City Industries Inc. ("First City") have intentionally and deliberately embarked on a course of action to evade potential and

---

[1] All defined terms not identified herein are given the meaning ascribed to them in the Response of Harry Holt Plaintiffs to Objection of Alper Holdings USA, Inc. to Proofs of Claim Filed by the Harry Holt Plaintiffs (the "Response").
[2] Saltire was previously known as Scovill, Inc. but will be referred to herein as Saltire.

OHS East:160386682.6

known liabilities springing from their mishandling of TCE and other wastes by repeatedly abusing the bankruptcy system. The Harry Holt Plaintiffs had a claim against Saltire and First City. First City and Alper were aware of these claims. Nevertheless, First City embarked on a plan to dissipate Saltire's and First City's assets without paying or providing for payment of these claims. Upon its acquisition and merger, Alper continued to dissipate Saltire's assets while ignoring the Harry Holt Plaintiffs. Finally, after substantially all of Saltire's assets were sold, Alper and Saltire then resorted to commencing bankruptcy in an effort to evade entirely any liability to the Harry Holt Plaintiffs.

Alper did not unwittingly stumble into its role as defendant in numerous environmental actions stemming from Saltire's use of TCE at the Facility, as it would have this Court believe. Rather, Alper merged with First City to become Saltire's direct and sole owner, and, in the process, knowingly acquired First City's and Saltire's then-apparent environmental liabilities relating to Saltire's Dickson operations.

The Disclosure Statement from First City's bankruptcy unequivocally outlines the environmental issues and potential liabilities that existed at the Facility and clearly states that all contingent and/or unliquidated claims survived First City's bankruptcy. Accordingly, any and all claims the Harry Holt Plaintiffs had against First City were preserved by First City's Plan and were assumed by Alper. From the time Alper obtained a controlling interest in First City, it embarked on a deliberate scheme to evade both potential and known liabilities by extracting any and all excess cash in the form of management fees for undefined services from Saltire and up-streaming it to Alper, brokering questionable loans by and among related entities with solvent subsidiaries of Saltire and selling off any and all of Saltire's assets. As a result of Alper's actions, Saltire was left with no operations, no employees, no assets and no ability to pay

2

environmental claims.  Alper's assertion that it is insulated from liability is misguided.  As explained below, at best there is not even a thin corporate veil to insulate Alper from liability.

The bankruptcy process is designed for the fair and orderly distribution of assets among claimants.  These serial bankruptcy filings by First City, then Saltire, and finally Alper appear to be a carefully orchestrated effort to avoid having to make any payment to the Harry Holt Plaintiffs who unfortunately have not had the opportunity to have their claims adjudicated in a court in Tennessee where the injuries occurred.  Alper has intended that by denying the claims of the Harry Holt Plaintiffs (and others like them) Alper will be able to satisfy the claims of all of their other creditors close to a one hundred percent recovery.  Alper has known about the claims of the Harry Holt Plaintiffs for more than twenty years during which time it has controlled and siphoned off the assets of Saltire.  The Harry Holt Plaintiffs should not be denied the opportunity to have their claims heard and determined.[3]

## II. **ARGUMENT**

Alper's Objection to the Harry Holt Plaintiffs' Proofs of Claim (the "Alper Claim Objection") argues that the Harry Holt Plaintiffs' claims should be disallowed for two reasons: first, because alter ego claims against Alper belonged to Saltire and were released in Saltire's bankruptcy; and second, because Alper cannot be held responsible on an alter ego theory of liability even if alter ego claims were not released.  Alper's arguments are meritless and should be rejected by this Court.  Under applicable state law, alter ego claims were not property of the Saltire estate and could not have been released in Saltire's bankruptcy.  These claims are the

---

[3] By submitting this response to the Alper Claim Objection, the Harry Holt Plaintiffs are not waiving any of their rights relating to jurisdiction.  The Harry Holt Plaintiffs assume, without arguing, that this Court has jurisdiction over the limited question of whether a claim exists but preserve their right to have a Tennessee court adjudicate the underlying personal injury claim.  As was determined in the Saltire bankruptcy case, to the extent the Harry Holt Plaintiffs assert personal injury claims, those claims should be decided by a federal district court.  By filing this Response in this Court, the Harry Holt Plaintiffs do not waive any rights they may have to move to withdraw the reference in this matter.

OHS East:160386682.6

Harry Holt Plaintiffs' claims to assert.  In addition, alter ego liability is proper because Alper and Saltire operated in every respect as a single economic entity.  To recognize any corporate distinction would be to countenance unfairness, injustice, and blatant misuse of the corporate form.

A.    **The Harry Holt Plaintiffs' Alter Ego Claims Were Not Property of Saltire's Estate And Were Not Released in the Saltire Bankruptcy.**

Alper first argues that any alter ego claims were property of the Saltire estate and were released pursuant to the Saltire Plan of Liquidation.[4]  This argument fails because the Harry Holt Plaintiffs' claims against Alper for alter ego liability were not part of Saltire's estate under either Tennessee or Delaware law, and therefore, would not have been released by Saltire pursuant to the Saltire Plan.  Moreover, even if either state would permit a debtor corporation to pierce its own veil, the Harry Holt Plaintiffs' claims are personal to them because they are not claims that could be brought by every creditor.  Therefore, the release contained in the Saltire Plan did not release the Harry Holt Plaintiffs' alter ego claims against Alper.

The Saltire Plan incorporates the terms of a settlement agreement with Alper, which provided that in exchange for a one million dollar payment from Alper to Saltire and the waiver of any claims Alper may have held against Saltire's estate, Saltire agreed to release any legal causes of action it held against Alper.[5]  The Saltire release of claims provides, in material part, as follows:

> The Debtor . . . acquits and forever discharges Alper . . . from any and all actions, causes of action, [and] liabilities . . . in any way relating to the Debtor . . . that the Debtor could assert directly or any Holder of a Claim . . . could assert derivatively or on behalf of the Debtor or its estate . . . .  *Notwithstanding the foregoing, the above release does not release claims any nondebtor third party*

---

[4] Objection of Alper Holdings USA, Inc. to Harry Holt Plaintiffs' Proofs of Claim ("Alper Obj.") ¶¶ 15-18 (Doc. No. 117).
[5] *See* Saltire Plan ¶ 1.6.

4

> *may hold against any of the Released Parties, except to the extent*
> *any nondebtor third party is asserting a claim that is property of*
> *the Debtor's Estate.*[6]

By its terms, the Saltire release only settles claims that were property of the Saltire estate.  The

Saltire release does not purport to settle claims of nondebtor third parties, such as the Harry Holt

Plaintiffs, that were never property of the Saltire estate.

Section 541 of the Bankruptcy Code defines property of the estate to include

"legal or equitable interests *of the debtor* in property as of the commencement of the case."  11

U.S.C. § 541(a)(1) (emphasis added).  Only legal causes of action held *by the debtor* at the

commencement of the case are considered property of the estate, and only such claims may be

litigated or settled by the bankruptcy trustee as the representative of the estate.

The Second Circuit has followed a two-part inquiry to determine whether a cause

of action belongs to the bankruptcy trustee so as to be considered property of the estate: it must

be a claim that the debtor had a right to assert under the applicable state law, and it must be a

claim that is general to the corporation rather than personal to the creditors.  *See Kalb, Voorhis &*

*Co. v. Am. Fin'l Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *St. Paul Fire & Marine Ins. Co. v.*

*PepsiCo, Inc.*, 884 F.2d 688, 700-02 (2d Cir. 1989).  Accordingly, an alter ego claim against

Alper only "belongs to the [Saltire] trustee if (1) 'under governing state law the debtor could

have asserted an alter ego claim to pierce its own corporate veil,' and (2) plaintiffs' claim 'is a

general one,' of the type that 'could be brought by any creditor of the debtor.'"  *Murray v. Miner*,

876 F. Supp. 512, 516 (S.D.N.Y. 1995) (citations omitted) (quoting *Kalb*, 8 F.3d at 132, and *St.*

*Paul*, 884 F.2d at 701).

---

[6] Saltire Plan ¶ 13.1(b) (emphasis added).

1.      *Saltire Cannot Pierce Its Own Veil.*

   a.      Choice of Law.

Because New York is the forum state, New York's choice of law principles determine which state's law applies to the question of whether a bankruptcy trustee has standing to assert veil-piercing claims. *See Kalb*, 8 F.3d at 132. New York has adopted an "interest analysis" under which courts apply the law of the jurisdiction with the greatest interest in the application of its law, in light of the purposes of the particular laws in conflict. *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 582 (N.Y. 1969). Alper argues that Delaware law applies because Delaware is the state of incorporation.[7]

Although New York courts often apply the law of the state of incorporation to questions regarding shareholder liability and the corporate form, *see Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991), this is not a *per se* rule. New York courts do not exclusively apply the law of the state of incorporation to such questions. In *Serio v. Ardra Ins. Co.*, 761 N.Y.S. 2d 1 (N.Y. App. Div. 2003), for example, the Appellate Division declined to apply Bermuda law to a veil-piercing question even though the defendant was incorporated in Bermuda. *See id.* at 1. The court explained that because the defendant's contacts with Bermuda were minimal and all the transactions complained of occurred in New York, it was proper to apply New York law as the jurisdiction with the greatest interest in the litigation. *See id.*

This Court should follow the *Serio* holding and apply Tennessee law to the question of whether the Saltire Trustee possessed and released alter ego claims against Alper

---

[7] *See* Alper Obj. ¶ 16 n.12.

because Tennessee is the jurisdiction with the greatest interest in the litigation.[8]    As in *Serio*,

both Alper and Saltire have minimal contacts with Delaware, notwithstanding that each chose to

incorporate in that state.   And the Harry Holt Plaintiffs have had absolutely no contact, through

contract or otherwise, with Alper or Saltire in Delaware.   By contrast, all of the transactions

underlying the Harry Holt Plaintiffs' claims occurred in Tennessee.   Saltire operated the Facility

in Tennessee.   The Harry Holt Plaintiffs' home is located in Tennessee, within 500 feet of the

Landfill in which Saltire disposed of its waste.   The pollution and groundwater contamination

that form the basis for the complaint occurred in Tennessee, as did the extensive personal injury

and property damage that the Harry Holt Plaintiffs have suffered.   In addition, Alper knowingly

acquired a company with significant environmental and tort liabilities in Tennessee.   Tennessee

has the paramount interest in seeing that responsibility for harm to its citizens and natural

resources is not evaded through, as the Harry Holt Plaintiffs have alleged, the intentional

diversion of corporate assets and control of Saltire by Alper (and its predecessor-in-interest).

Delaware's interest in entities organized under its incorporation laws does not exceed

Tennessee's paramount interest in these particular circumstances.[9]

> b.    Tennessee Law Does Not Permit a Bankruptcy Trustee to Pursue an Alter
> Ego Claim.

Under Tennessee law, a bankruptcy trustee lacks standing to pursue an alter ego

action on behalf of the debtor, because the debtor has no ability to pierce its own corporate veil.

---

[8] Neither Tennessee nor Delaware law would permit a wholly-owned subsidiary to pierce its own corporate veil, and therefore the alter ego claims were not included in the Saltire release regardless of which state's law is applied. Nonetheless, because Tennessee and Delaware law are not identical, a conflict of law exists, and the Harry Holt Plaintiffs submit that the Tennessee standard is more appropriately applied.

[9] The Harry Holt Plaintiffs recognize that this Court held, in its Order granting Alper's objection to the Flake Plaintiffs' claims, that Delaware law controls the analysis of alter ego claims.  *See* Order of Jan. 15, 2008, at 10 n.7 (Doc. No. 123).   However, New York law provides that the interest analysis is context-specific and dependent on the particular facts and claims at issue.  *See Intercontinental Planning*, 248 N.E.2d at 582.   The Harry Holt Plaintiffs respectfully assert that in the specific circumstances of their claims, Tennessee has the greatest interest in the question whether veil-piercing claims against Alper were included in the Saltire release.

In *Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781 (Bankr. M.D. Tenn. 2005), the bankruptcy trustee for a debtor corporation brought suit seeking, inter alia, to recover from certain of its parent corporations on a veil-piercing theory. *See id.* at 830. Relying on a decision of the Tennessee Court of Appeals that was directly on point, the bankruptcy court held that the trustee did not have standing in an action to disregard the corporate form under Tennessee law. *Id.* at 829-35 (discussing *Brown v. Vencap Inv. Corp.*, 1984 Tenn. App. LEXIS 3424 (Tenn. Ct. App., Mar. 31, 1984)). The bankruptcy court quoted the Tennessee court's explanation of this holding, which was based on the nature of the alter ego doctrine under state law:

> The doctrine of alter ego does not create assets for or in the corporation. It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business. The liability springs from fraud. The fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation. And the doctrine has been invoked only at the behest of such third parties as have suffered injury by reason of the fraud.

*Id.* at 833 (quoting *Vencap*, 1984 Tenn. App. LEXIS 3424, at *13-14). The court therefore concluded that an action to pierce the corporate veil "is a right vested in the individual creditors. It is not a right which belongs to the bankrupt and under the Bankruptcy Act the trustee has no standing to maintain such action." *Id.* (quoting *Vencap*, 1984 Tenn. App. LEXIS 3424, at *8-9); *see also id.* at 833-34 ("Tennessee law does not support this trustee's standing to pierce the corporate veils [of the defendants] to create a single business enterprise.").

Because the Saltire Trustee could not have maintained an action to pierce its own corporate veil under Tennessee law, the Harry Holt Plaintiffs' alter ego claims against Alper were not property of the Saltire estate and were not released through the Saltire Plan.

OHS East:160386682.6

      c.      Delaware Law Would Not Permit a Wholly-Owned Subsidiary to Pierce
              Its Own Corporate Veil.

If the Court concludes that choice-of-law principles require application of Delaware law, the Court should still hold that veil-piercing claims against Alper were not property of the Saltire estate and therefore were not released through the Saltire Plan.

Alper broadly asserts that Delaware law "characterizes an alter ego action as a corporate right,"[10] without acknowledging that no Delaware court has ever addressed the question. Alper's argument is based not on Delaware precedent but instead on the holdings of a few federal courts that have attempted to predict whether a Delaware court would permit a subsidiary to pierce its own corporate veil. The cases on which Alper relies are inapt.

In *Murray*, for example, the court recognized that there were no cases in Delaware permitting a debtor corporation to pierce its own corporate veil, but the court analogized to cases permitting a "subsidiary [to] maintain an action against its corporate parent or controlling shareholder." *Murray*, 876 F. Supp. at 516 (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971), *Liebert v. Grinnell Corp.*, 194 A.2d 846 (Del. 1963), and *Marks v. Wolfson*, 188 A.2d 680 (Del. Ch. 1963)). Each case that the *Murray* court identified as analogous involved a corporate parent that owed a fiduciary duty to its subsidiary. The court therefore reasoned that "under Delaware law, *because of a corporate parent's fiduciary duties to a subsidiary*, the subsidiary may institute proceedings against the parent if it has sustained liability to third parties as a result of the parent's control." *Id.* at 516-17 (emphasis added).

Alper cites two other cases in support of its reliance on Delaware law, both of which cite, but do not analyze, *Murray* and which specifically note the analogy to state-law claims for breaches of fiduciary duty. *See Pereira v. Cogan*, 2007 WL 243537, at *19-20

---

[10] Alper Obj. ¶ 16.

(S.D.N.Y. Mar. 8, 2001) (agreeing with *Murray*'s analogy to "claims for breaches of fiduciary duty brought by a subsidiary against its parent, which are recognized under Delaware law"); *Duke Energy Trading & Mktg., L.L.C., v. Enron Corp. (In re Enron Corp.)*, No. 01 B 16034, 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003) (agreeing with *Murray* and *Pereira* because of "the fact that Delaware law allows a subsidiary to maintain an action against a corporate parent").

      However, the state-law analogy on which *Murray* is based is entirely inapplicable to this case. Saltire was a wholly-owned subsidiary of Alper at the time Saltire filed for bankruptcy,[11] and Delaware law states that a corporate parent does *not* owe fiduciary duties to a wholly-owned subsidiary merely by virtue of its ownership of the subsidiary's corporate stock. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191-92 & n.66 (Del. Ch. 2006) ("Under settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors."); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988). Where, as here, the subsidiary is wholly owned by its parent, Delaware law would *not* permit the subsidiary to pursue claims for breaches of fiduciary duty. Because the premise for *Murray*'s prediction regarding Delaware law fails in the context of a wholly-owned subsidiary, this Court should conclude that Delaware would not permit a debtor corporation to pierce its own veil in these circumstances.

      The Sixth Circuit addressed this very question and held that a wholly-owned subsidiary could never pierce its own corporate veil under Michigan law, and that a veil-piercing claim therefore could not be part of the debtor's estate. *See Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 224-26 (6th Cir. 1996). The Sixth Circuit explained that because of the elements required to establish liability on a veil-

---

[11] *See, e.g.*, Saltire Operating Report at 5.

piercing theory under Michigan law, no wholly-owned subsidiary could ever successfully assert such a claim:

> [I]n order for a subsidiary to be able to assert an alter ego claim against its parent company, the subsidiary would need to show that it suffered "an unjust loss or injury" as a result of being used by the parent as an instrumentality to commit a fraud or wrong against itself.[12] Since it is axiomatic that one cannot commit a fraud or wrong against oneself, a subsidiary would never be able to satisfy the standard for disregarding corporate identity under Michigan law.

*Id.* at 226. The court further explained that "basic principles of corporations law" supported its conclusion, because "[t]he general rule is that the corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders." *Id.* (citing 18 AM. JUR. 2D *Corporations* § 46 (1985)).

The Illinois Supreme Court has also held that a wholly-owned subsidiary cannot pierce its own corporate veil under that state's law. *See Selcke v. Hartford Fire Ins. Co. (In re Rehab. of Centaur Ins. Co.)*, 632 N.E.2d 1015 (Ill. 1994). The rehabilitator of an insolvent insurance company claimed the right to assert an alter ego claim against the insurance company's parent, its sole shareholder. *Id.* at 1016. The Illinois Supreme Court held that the rehabilitator did not have standing to assert the alter ego action, because the corporation had no right to pierce its own corporate veil. *Id.* at 1017. The court explained that "[t]he alter ego doctrine was developed for and has been traditionally used by *third persons* injured due to their reliance on the existence of a distinct corporate entity," and that it would be counter to this general principle for a wholly-owned subsidiary to be permitted to pierce its own veil.[13] *Id.* at 1018 (emphasis

---

[12] These elements of a Michigan veil-piercing claim are common to Delaware law as well. *See* Part II.C below.

[13] Although the facts of that case involved a wholly-owned subsidiary, *see Rehab. of Centaur*, 632 N.E.2d at 1016, the court did not limit its language to this circumstance only, and instead held more broadly that no subsidiary corporation may pierce its own corporate veil through its trustee. *Id.* at 1017 ("We conclude that a corporation may not assert an alter ego claim against its own shareholders.").

OHS East:160386682.6

added).  In so holding, the Illinois Supreme Court expressly disagreed with a prior decision of

the Seventh Circuit, which had interpreted Illinois law to permit such a claim.  *Id.* at 1019-20

(discussing *Koch Refining v. Farmers Union Cent. Exch. Inc.*, 831 F.2d 1339 (7th Cir. 1987)).

The court criticized *Koch Refining* as "[involving] a reading of state law [which] fairly tortures

the traditional notion that alter ego actions are for the benefit of creditors only and do not belong

to the corporation."  *Id.* at 1019 (quoting Richard L. Epling, *Trustee's Standing to Sue in Alter

Ego or Other Damage Remedy Actions*, 6 Bankr. Dev. J. 191, 196 (1989)) (alterations in

original).

       The Second Circuit cases that Alper has cited do not dictate a different outcome.

Neither case involved the question whether a *wholly-owned* subsidiary could pierce its own veil

under state law, and neither involved the application of Delaware law.  *See Kalb*, 8 F.3d at 131-

32 (applying Texas law); *St. Paul*, 884 F.2d at 702-04 (applying Ohio law).  Consistent with the

rulings of other courts that have addressed this question, a Delaware court would not permit a

wholly-owned subsidiary to pierce its own corporate veil, and the alter ego claims against Alper

therefore could not have been released through the Saltire Plan.

    2.    *The Alter Ego Claims are Personal to the Harry Holt Plaintiffs.*

       As noted, the *St. Paul/Kalb* test is phrased in the conjunctive: in order for veil-

piercing claims to be property of the Saltire estate, such claims must be *both* (a) claims that a

---

    Numerous other courts have held that the law of particular states does not permit a debtor subsidiary to pierce its own corporate veil, and that alter ego claims therefore do not belong to the trustee under § 541(a) of the Bankruptcy Code.  *See, e.g.*, *Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1224-26 (8th Cir. 1987) (applying Arkansas law); *Nat'l City Bank v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343, 363-366 (Bankr. D. Md. 2003) (applying Maryland law); *Mar-Kay Plastics, Inc. v. Reid Plastics, Inc.* (*In re Mar-Kay Plastics, Inc.)*, 234 B.R. 473, 480-81 (Bankr. W.D. Mo. 1999) (applying Missouri law); *Armstrong v. Pedie (In re Dakota Drilling, Inc.)*, 135 B.R. 878, 884 (Bankr. D.N.D. 1991) (applying North Dakota law); *see also* 18 Am. Jur. 2d *Corporations* § 49 (2007) ("Generally, the corporate veil is never pierced for the benefit of the corporation or its stockholders . . . . Thus, a corporation may not bring an alter ego action against its parent shareholder, thereby piercing its own corporate veil."); 1 Fletcher Cyc. *Corporations* § 41.35 ("The corporate form may be disregarded only where equity requires such action to assist a third party.  Accordingly, a sole shareholder may not choose to ignore the corporate entity when it suits his or her convenience.") (footnotes omitted).

debtor could bring against its parent under applicable state law, *and* (b) claims that are general to the corporation rather than personal to the creditors. *See, e.g.*, *Murray*, 876 F. Supp. at 516. The Harry Holt Plaintiffs have shown that Saltire, as a wholly-owned subsidiary, would not have been able to pierce its own corporate veil under either Tennessee or Delaware law. Accordingly, this Court need go no further, and should conclude without more that veil-piercing claims against Alper were not property of the Saltire estate and were not released through the Saltire Plan.

If the Court disagrees and concludes instead that Saltire could have pierced its own veil under applicable state law, the Court should still hold that the Harry Holt Plaintiffs' veil-piercing claims were not released through the Saltire Plan because those claims are personal to the Harry Holt Plaintiffs.

The Second Circuit has held that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim . . . ." *St. Paul*, 884 F.2d at 701. Under both Tennessee and Delaware law, it is clear that all creditors do *not* necessarily stand in the same position when asserting an alter ego claim. *Del-Met*, 322 B.R. at 833 ("Under the holdings of our courts all creditors of a bankrupt corporation do not necessarily stand in the same position when asserting a claim against a third party on the alter ego theory. While some may be in a position to maintain their claims, others may not.") (quoting *Vencap*, 1984 Tenn. App. LEXIS 3424, at *24-25); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085-86 (D. Del. 1990)) (discussing the "[n]umerous factors that come into play" when considering an alter ego claim, and examining not only corporate operations but also the particular circumstances of the party seeking to pierce the veil). Rather, alter ego claims present fact-specific inquiries that depend on the particular circumstances of each case. *See InSITE Servs. Corp. v. Am. Elec.*

*Power Co. (In re InSITE Servs. Corp.)*, 287 B.R. 79, 96 (Bankr. S.D.N.Y. 2002) ("[T]here are an 'infinite variety of situations' that might call for disregarding the corporate veil, and the ultimate question of veil piercing must be decided by 'considering the totality of the evidence.'") (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

As noted in Part II.C below, the Harry Holt Plaintiffs can show sufficient evidence to justify piercing the veil between Alper and Saltire, in light of their specific factual circumstances and the particular equities that accompany their personal injury claims. Because Alper has not shown, and could not show, that an "[alter ego] claim could be brought by any creditor of the debtor," the Saltire Trustee is *not* the proper person to assert an alter ego claim. *St. Paul*, 884 F.2d at 701.

Alper has previously argued to this Court that under Second Circuit law, an alter ego claim is essentially *always* a claim that is general rather than particularized, because a trustee's successful pursuit of that claim would enlarge the estate for all creditors.[14] This argument is flawed. First, *Kalb*'s discussion of the theory that a claim that enlarges the estate will benefit all creditors was an explicit interpretation of Texas alter ego law. *See Kalb*, 8 F.3d at 132-33 (section entitled "Under Texas Law a Creditor Has No Standing to Bring a Veil-Piercing Action"). As shown above, Tennessee and Delaware law are to the contrary.

Second, the approach of the Tennessee and Delaware courts makes more sense as a logical matter. In *Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994), the Seventh Circuit rejected the same argument that Alper presents here. As Judge Posner explained: "The trustee argues that . . . any judgment he obtains will enure to the benefit of the bankrupt estate; he is therefore suing on behalf of the estate, as he is authorized to do. This reasoning is perfectly

---

[14] *See* Alper Reply to Flake Response ¶ 19 (Doc. No. 110) (citing *Kalb*, 8 F.3d at 133).

14

circular." *Id.* at 892 (explaining that *every* plausible damages action could conceivably benefit the estate, but that this cannot be a basis for assigning every such claim to the trustee). Judge Posner further clarified that the distinction between "personal" and "general" harms is not talismanic, but is simply an analytical approach that may assist in determining whether the corporation itself or its creditors may bring suit:

> When a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party. He has no interest in the suit. The claim in such a case is said to be "personal," not "general." That is not an illuminating usage. *The point is simply that the trustee is confined to enforcing entitlements of the corporation.* He has no right to enforce entitlements of a creditor.

*Steinberg*, 40 F.3d at 893 (emphasis added) (citations omitted). The harm that the Harry Holt Plaintiffs have alleged through their alter ego claims accrued to them as creditors, and not to Saltire as a corporation. *See Del-Met*, 322 B.R. at 833 ("The doctrine of alter ego does not create assets for or in the corporation.") (quoting *Vencap*, 1984 Tenn. App. LEXIS 3424, at *13); *accord Ozark Rest. Equip.*, 816 F.2d at 1225 ("The nature of the alter ego theory of piercing the corporate veil makes it one personal to the corporate creditors rather than the corporation itself . . . ."). And, under both Tennessee and Delaware law, the alter ego claims that the Harry Holt Plaintiffs have alleged are *not* claims that every creditor could bring. Accordingly, even if the Court believes that state law would permit a wholly-owned subsidiary to pierce its own corporate veil, the Court should not hold that the Harry Holt Plaintiffs' claims were released because they are not general claims that every creditor could bring under state law.

In sum, an action to pierce the corporate veil becomes a part of the estate under § 541 and may be asserted by the trustee only if (a) it is allowed by state law, and (b) the harm is general to the debtor instead of personal to the creditors. Because neither element is present here, the Harry Holt Plaintiffs' veil-piercing claims against Alper were not property of the Saltire

15

estate and were not released by Saltire.  The Court should reject Alper's argument that the Harry
Holt Plaintiffs' claims were released through the Saltire Plan.

**B.     Alper As Successor-in-Interest to First City Is Liable.**

Alper cannot contest that it inherited all of First City's liabilities after its merger
with First City.  The law is well settled that a successor inherits the liability of its predecessor
during a merger.  *See Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 530-31 (W.D.N.Y.
2001); *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 35, 40 (D. Del. 1988).  A merger "does not
allow a predecessor corporation to avoid its pre-merger obligations"; rather, the liabilities and
duties of the respective constituent corporations attach to the surviving corporation.  *Del. Ins.
Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077-78 (Del. 2006); *see
also EEOC v. Local 638*, No. 71 Civ. 2877, 1988 WL 25151, at *9 (S.D.N.Y. Mar. 9, 1998)
("[U]nder the general principles of a merger, . . . liability is assumed by the successor entity.").

The Alper Claim Objection presents the following cursory description of its
relationship to First City and Saltire: "Alper received a majority of the stock of Saltire's then
parent, First City . . . as a distribution under First City's own chapter 11 plan of reorganization in
return for Alper's claims against First City.  Alper thereby became the indirect parent company
of First City's subsidiaries, including Saltire."[15]  Alper's description, however, gives this Court
only a partial and highly selective history.  Alper was initially formed as an acquisition vehicle
by Grupo Industrial Cierres Ideal S.A. de C.V. ("Cierres") to acquire claims in the First City
bankruptcy in order to gain control of First City and its only operating subsidiary, Scovill
Fasteners, Inc. – a direct competitor of a subsidiary of Cierres.[16]  This gathering of claims and
hence, control, of First City was viewed as a hostile disruption to the carefully crafted pre-

---

[15] Alper Obj. ¶ 9 n.7.
[16] *See* Response ¶ 15.

16

packaged bankruptcy plan by the Unofficial Steering Committee of Creditors, which sued Cierres for the scheme.[17]  Cierres and the Steering Committee eventually reached a settlement that resulted *not* in Alper simply becoming a majority shareholder and "indirect parent" of Saltire, as Alper claims,[18] but instead resulted in Alper's assumption of all of First City's liabilities by virtue of Alper's merger.  Alper also became the direct and sole owner of Saltire as a result of this merger.[19]

At the time of the merger, Alper had actual and constructive knowledge of potential environmental claims against its predecessor.  The First City Disclosure Statement identified the Facility as a clean-up site, acknowledged the presence of contaminants at the Facility, and indicated that studies were being conducted to determine how much of the surrounding area had been contaminated as well.[20]  The First City Disclosure Statement and Plan in fact went beyond mere disclosure, and provided that the holders of claims arising from environmental contamination (such as the Harry Holt Plaintiffs) were not impaired and were not entitled to notice or to vote on the First City Plan because those claims would survive the First City bankruptcy.  Those claims remained intact.  Because First City incurred and acknowledged its possible liability toward claimants such as the Harry Holt Plaintiffs in its own Disclosure Statement before the merger, that liability can be enforced against Alper as if the liability had been incurred by Alper.  *See Del. Ins. Guar. Ass'n*, 892 A.2d at 1077-78.

**C.**    **The Harry Holt Plaintiffs Have Properly Stated Alter Ego Claims Against Alper.**

In addition to Alper's assertion that any alter ego claims that may have existed were released pursuant to the Saltire Plan, Alper argues that the Court should disallow and

---

[17]*See id.*
[18] Alper Obj. ¶ 9 n.7.
[19] *See* Response ¶ 15.
[20] First City Disclosure Statement at 80.

expunge the Harry Holt Plaintiffs' alter ego claims because no such claims may be asserted against Alper as a matter of law.[21]   Alper's argument on this point is essentially limited to two sentences with no supporting factual or legal citations.[22]   This meager argument is simply insufficient to establish that the Harry Holt Plaintiffs' alter ego claims should be disallowed.

Although the Alper Claim Objection is merely testing the sufficiency of the Harry Holt Plaintiffs' claims, and this Court is not in a position to ultimately determine whether or not Alper is liable under such claims, the Harry Holt Plaintiffs have included a brief analysis of alter ego liability to illustrate for the Court the viability of their claims.   The Harry Holt Plaintiffs are not waiving any of their rights as personal injury claimants to have a non-bankruptcy court determine ultimate liability.   Instead the Harry Holt Plaintiffs assume, without arguing, that this Court has jurisdiction on the narrow issue of whether they have adequately stated a claim.

To prevail on an alter ego claim under Delaware law,[23] "a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'"   *Fletcher v. Atex*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Harper*, 743 F. Supp. at 1085 (alterations in original).   Because bankruptcy courts are courts of equity and piercing the corporate veil is an equitable decision, equity permeates any discussion of alter ego liability.   *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003); *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 203 (E.D.N.Y. 1997).

---

[21] *See* Alper Obj. ¶ 19.

[22] *See id.*

[23] The Harry Holt Plaintiffs discuss Delaware law for the convenience of the Court because the Tennessee and Delaware standards for piercing the corporate veil are substantially the same.   *See Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672-76 (6th Cir. 2006).   Although the Harry Holt Plaintiffs continue to assert that Tennessee law is properly applied to state law questions pursuant to the New York interest analysis, as argued in Part II.A.1.a above, there is no need for a court to determine choice-of-law questions when there is no conflict between the laws of the jurisdictions involved.   *See Seidel v. Houston Cas. Co.*, 375 F. Supp. 2d 211, 218-19 (S.D.N.Y. 2005).

18

1.    *Alper and Saltire Operated as a Single Economic Entity.*

In determining the extent to which a parent and its subsidiary operated as a single economic entity, Delaware courts start with "[a]n examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation." *Harper*, 743 F. Supp. at 1085 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). These factors include:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder.

*Harper*, 743 F. Supp. at 1085 (quoting *Harco*, 1989 WL 110537, at *4). Although the presence of a single factor may not justify disregarding the corporate form, a combination of factors coupled with an overall element of injustice or unfairness may suffice to pierce the corporate veil. *See id*. Alter ego determinations rest on the specific facts of each case. *Kittay v. Flutie N.Y. Corp.* (*In re Flutie N.Y. Corp.*), 310 B.R. 31, 59-60 (Bankr. S.D.N.Y. 2004).

Since the time it was acquired in 1985 by First City, Alper's predecessor, Saltire has been subject to direct assault by corporate raiders, leaving it severely undercapitalized. Immediately after acquiring Saltire, First City restructured the financing First City utilized to acquire Saltire by placing nearly the entire debt burden on its newly acquired entity.[24] After restructuring the debt, First City completed the divestiture of some of Saltire's most profitable businesses, including Schrader Bellows, Schrader Automotive, and Hamilton Beach.[25] Because

---

[24] *See* Response ¶ 16.
[25] *See id.*

of these maneuvers, the company that Alper inherited when it merged with First City was laden with debt and poorly equipped to make a profit. In short, its capitalization was inadequate.

In addition, as demonstrated by Saltire's liquidation through its 2004 bankruptcy filing, Saltire was unable to continue as a going concern because it was insolvent.[26] Even before Saltire filed for bankruptcy protection, Alper recognized its grim financial status. In fiscal year 2000 (four years before the bankruptcy petition), Saltire had an "accumulating deficit" (the net difference between revenues earned versus all expenses incurred) of over $81 million.[27] Since at least 1995, Saltire has had an accumulating deficit, and this deficit increased each year except for 2000.[28] Irrespective of the point in time used to evaluate Saltire's solvency, Saltire has been insolvent the entire time Alper has acted as its parent. *See* 11 U.S.C. § 101(32)(A) (defining insolvency as the financial condition in which debts exceed property).

The irregularity of Saltire's book-keeping and record-keeping practices provides further evidence of the corporate unity of Alper and Saltire. Meetings and conversations between Saltire officers and Saltire's one-person board were not typically documented through minutes or otherwise.[29] Additionally, to the extent records were kept, both Saltire's and Alper's records were kept at Alper's office, and Alper handled Saltire's payroll, benefits, and withholding records.[30]

The pervasive overlap of individuals acting as officers and directors for both Alper and Saltire is additional and powerful evidence that the two companies operated as a single economic entity. Although alter ego liability will not be imposed simply because of the "duplication of some or all of the directors or executive officers," *United States v. Bestfoods*, 524

---

[26] *See id.* ¶ 19.
[27] *See id.*
[28] *See id.*
[29] *See id.* ¶ 25.
[30] *See id.*

U.S. 51, 62 (1998), a significant overlap of officers and directors is one factor in a totality of the circumstances analysis. *United States v. Inn Foods, Inc.*, 515 F. Supp. 2d 1347, 1356 (Ct. Int'l Trade 2007).

For more than a decade, the management and operational structures of Alper and Saltire have overlapped to an overwhelming extent, with the same handful of people serving in identical roles in the two corporations simultaneously. The General Counsel position has also long-overlapped and never been independent.[31] Since 1995, the presidents of Alper and Saltire have never been truly independent; while serving as president of one entity, the same individuals have either been the president or a board member of the other entity.[32] When Saltire filed its bankruptcy petition in 2004, Bertellotti was President and Smith was Senior Vice President and Chief Financial Officer for Saltire. In the same time frame and continuing to today, Bertellotti serves as President and Smith as Senior Vice President and Chief Financial Officer of Alper.[33] Further, starting in 2001, Saltire only had one board member – Luis Felipe Sánchez – who also served as a member of Alper's board at the same time.[34] In addition, Alper employed Nicholas Bauer ("Bauer") as its Vice President for Environmental Affairs to oversee and manage the environmental clean-up at the Facility. Although Bauer simultaneously held the title of Vice President of Environmental Affairs for Saltire, he was paid by Alper, described himself as an Alper employee, and reported solely to Alper regarding all decisions and activities relating to clean-up at the Facility.[35]

This unity of officers continued after Saltire's bankruptcy filing and confirmation of the Saltire Plan when Smith was named as the Saltire Trustee even as he continued his senior

---

[31] *See id.* ¶ 24.
[32] *See id.*
[33] *See id.*
[34] *See id.*
[35] *See id.* ¶¶ 18, 27.

management role at Alper.  In these dual functions, Smith ultimately sat on both sides of the table when negotiating the settlement agreement between Saltire and Alper in the Saltire Bankruptcy – the settlement that Alper argues released it of liability for alter ego claims. Combined with the other factors discussed herein, this striking overlap warrants further scrutiny of Alper's alter ego liability and continues to raise the question of injustice and unfairness.

Another indication that Alper acted as Saltire's alter ego is Alper's systematic plan to remove any semblance of value from Saltire and place it into Alper's (or Alper's affiliates') coffers and beyond the reach of environmental claimants such as the Harry Holt Plaintiffs.  For example, despite Saltire's increasing accumulating deficit and environmental liabilities, Alper extracted millions of dollars from Saltire in fees for undocumented administrative services, including $4.5 million each year in 1999 and 2000, and approximately $2 million each year in 2001, 2002, and 2003.[36]  These excessively high management or administrative fees do not appear to be documented in terms of allocation of actual time spent or description of services rendered.

In addition, the cash assets Saltire had on hand were poorly managed or even squandered.  As one example, in 1992, Saltire loaned Realty Holdings, an Alper affiliate, $5.6 million in 1992.[37]  This loan had no guarantors and was ultimately written off for $5.1 million eight years later, without consulting the officers or directors of either Saltire or Alper.[38]

In 2000 (four years before its bankruptcy), all of Saltire's active subsidiary businesses were sold, including Saltire's principal asset, the Alper Ink Group.[39]  Saltire received $47 million from the Alper Ink Group sale but did not keep those assets for long, immediately

---

[36] *See id.* ¶ 20.
[37] *See id.* ¶ 21.
[38] *See id.*
[39] *See id.* ¶ 22.

OHS East:160386682.6

paying $4.5 million as an administrative fee to Alper.[40]  Further illustrating Alper's pattern of self-dealing, Saltire then loaned $25 million of the sale proceeds to a "related party" – Grupo IUSA – to aid in restructuring Grupo IUSA's debt.[41]  The $25 million note was unsecured and did not have a personal guarantor, and Saltire failed to investigate Grupo IUSA's then-current debt before making the loan.[42]  Saltire was unable to access $21 million of that $25 million until Grupo IUSA repaid it.[43]  The person chiefly responsible for effectuating this transaction was Sánchez, who at that point was not only the sole Saltire director and an Alper director, but was also Grupo IUSA's Chief Financial Officer.[44]  Grupo IUSA repaid the $25 million note in November 2001, but it is unknown where those liquid assets were deposited or utilized and whether Alper or Saltire received them.[45]

        Finally, in all its operations and day-to-day activities, Alper treated Saltire simply as a façade.  Alper was the only entity with systems, staff, and facilities; without Alper, Saltire would have had to have all its own officers, general counsel, general office management and employees, and would have had to obtain its own benefits plans, payroll services, offices, computers, telephone systems, and office furniture.[46]  Further, during the entire time of Alper's ownership, Saltire did not own any manufacturing facilities or sell any products.[47]  Saltire did not have any of its own employees, relying solely on personnel employed and paid by Alper.[48]  Saltire did not even have its own headquarters, instead sharing office space with Alper.[49]

---

[40] *See id.*
[41] *See id.*
[42] *See id.*
[43] *See id.*
[44] *See id.*
[45] *See id.*
[46] *See id.* ¶ 17.
[47] *See id.* ¶ 18.
[48] *See id.*
[49] *See id.*

OHS East:160386682.6

When applying Delaware law, courts with far less evidence of companies acting as a single economic unit than that presented here have held that a claim for alter ego liability is properly stated. *See, e.g.*, *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793-94 (Del. Ch. 1992) (denying a motion to dismiss the plaintiff's alter ego claims because the plaintiff specifically alleged three examples of the parent's control over its subsidiary); *In re Phillips Petroleum Sec. Litig.*, 738 F. Supp. 825, 838-39 (D. Del. 1990) (denying the defendant's motion for summary judgment where the plaintiffs presented facts showing that the parent was the sole owner of its subsidiary; the parent and subsidiary had an overlapping president, vice president, and secretary; the companies shared two common directors; and the parent funded some of the subsidiary's investment activities). In light of the extensive evidence described above, regarding nearly all of the factors that Delaware courts look to in determining whether a parent and its subsidiary operated as a single economic entity, the Court should conclude that Alper and Saltire operated as a single economic entity.

2.  *Maintaining the Corporate Separateness of Alper and Saltire Would Perpetuate Injustice and Unfairness.*

In addition to showing that the parent and the subsidiary operated as a single economic entity, a plaintiff seeking to pierce the corporate veil must also show that an "overall element of injustice or unfairness . . . [is] present." *Fletcher*, 68 F.3d at 1457 (quoting *Harper*, 743 F. Supp. at 1085) (alterations in original).[50] Alper's misuse of the corporate form to divert Saltire's assets and escape its known liabilities would perpetuate injustice and unfairness if left un-remedied.

---

[50] This Court held during the course of these proceedings that piercing the corporate veil under Delaware law requires a showing of "fraud or something like it." Order of Jan. 15, 2008, at 10 (Doc. No. 123). Because the Second Circuit has expressly held that "under Delaware law, the alter ego theory of liability does not require any showing of fraud," *Fletcher*, 68 F.3d at 1457, the Harry Holt Plaintiffs read the Court's description of the standard to be consistent with the "overall element of injustice or unfairness" standard. *See id.*; *see also Harco*, 1989 WL 110537, at *5 ("[A] showing of fraud or wrongdoing is not necessary under an alter ego theory, but the plaintiff must demonstrate an overall element of injustice or unfairness.").

24

As discussed above, Alper's predecessor, First City, began its onslaught on Saltire's assets immediately upon acquiring Saltire by divesting it of income-producing operations and saddling it with debt. Alper perpetuated this asset-drain by lending money to related entities, writing off debt owed to Saltire by Alper affiliates, and generally siphoning off anything of value. Together, Alper and First City misused the corporate form at every turn in order to work injustice and fraud on the Harry Holt Plaintiffs, by stripping assets that should be available to provide redress for the Harry Holt Plaintiffs on their personal injury and wrongful death claims.

Evidence that a parent has drained its subsidiary's assets is alone sufficient to establish the injustice necessary to invoke alter ego liability. *See Brown v. Gen. Elec. Capital Corp.* (*In re Foxmeyer*), 290 B.R. 229, 241-42 (Bankr. D. Del. 2003) ("[F]raud or injustice sufficient to pierce the corporate veil of a subsidiary . . . exists if a parent drains assets out of the same) (citing *Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 2002 WL 31885795, at *11 (S.D.N.Y. 2002)). If this Honorable Court dismisses the Harry Holt Plaintiffs' claims against Alper, their only remedy will be against an impoverished shell of a corporation, which is precisely Alper's design.

Courts have pierced the corporate veil and held a parent responsible for its subsidiary's liabilities in similar circumstances to the ones presented here. The CERCLA liability case of *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182 (E.D.N.Y. 1997), for example, involved a parent-subsidiary relationship that is factually quite similar to the relationship between Alper and Saltire. In *Oyster Bay*, one company ("GAI") was found to exercise pervasive and dominant control over another company ("GACCC") sufficient to find that GACCC was the alter ego of GAI. *Id.* at 203. In support of its finding, the court noted:

(1) GACCC's Board of Directors consisted solely of GAI's Chairman/President, GAI's Secretary, and GAI's Vice-President and, moreover, several corporate officers of GAI were also corporate officers of GACCC; (2) GAI established a $500,000 line of credit for GACCC's capital expenditures; (3) GAI provided management services to GACCC for a fee, but there was apparently no corporate documentation regarding the establishment of the arrangement, the scope of the proposed services and the cost of such services; (4) GAI and GACCC guaranteed certain of each other's financial obligations, which guaranties were not supported by consideration; . . . (6) GACCC was seriously undercapitalized and GAI advanced significant sums to GACCC for working capital without approval from their respective Board of Directors, and apparently without documentation setting forth the interest rates, terms and collateral for these advances; and (7) in connection with the sale of GACCC to [another entity], [the other entity] executed a $3.2 million promissory note to GAI and not to GACCC, the nominal seller, as would be expected in an ordinary sale of assets.

*Id.* Both fact patterns have substantial officer and director overlap, extraordinary inter-company asset transfers, management fees without appropriate documentation and support, and inadequate capitalization of the subsidiary.

In another factually similar case, this Court held that alter ego liability could be imposed where the corporate parents had misappropriated corporate funds, corporate formalities were not properly followed, the subsidiary was inadequately capitalized from the beginning, and the entities lacked separate office space. *Flutie N.Y. Corp.*, 310 B.R. at 45-47, 61.[51] Alper has committed these same acts.

Courts have further held that when a parent corporation acts "with the specific intent to escape liability for a specific tort or class of torts," corporate veil-piercing is appropriate. *United States v. Union Corp.*, 259 F. Supp. 2d 356, 390 (E.D. Pa. 2003) (applying federal common law) (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967)). Alper knew of

---

[51] While the Harry Holt Plaintiffs acknowledge some factual distinctions between the current case and those presented in *Flutie*, such distinctions are inconsequential and have no bearing on the analysis.

26

the sizable tort liabilities connected with Saltire's environmental contamination in Tennessee, yet caused Saltire to cease its revenue-producing activities, caused its assets to be sold and effectively removed any assets that could be attached to an environmental liability judgment as part of a deliberate and concerted scheme to isolate itself from liability and minimize the assets available to satisfy Saltire's liabilities.

As described, Alper ran Saltire as though it was a mere division, not a separate company.  Saltire had no employees.  Alper determined which creditors to pay and the amount to pay them.  Alper determined what amounts should be paid by Saltire to it and how those expenses were to be reflected on Saltire's books.  Alper was responsible for the investigation and remediation of the various environmental claims, including those of the Harry Holt Plaintiffs.  Alper has not functioned with the necessary corporate formality and separation to insulate it from liability under an alter ego analysis.  Looking at the totality of the circumstances, the Harry Holt Plaintiffs have, at a minimum, established that their claims have sufficient merit to overcome Alper's objection.

OHS East:160386682.6

### III.  CONCLUSION

Based on the foregoing, the Harry Holt Plaintiffs respectfully request that this Court enter an order (1) denying the relief requested in Alper's Claim Objection; and (2) granting such other and further relief as is just.

Dated: New York, New York
       February 15, 2008

                                  NAACP Legal Defense & Educational Fund, Inc.


                        By:  _____/s/_____
                             Theodore M. Shaw, Director-Counsel (TS-6630)
                             Matthew Colangelo (MC-1746)
                             99 Hudson St., 16th Floor
                             New York, NY 10013
                             Telephone: (212) 965-2200

                        -and-

                             Lorraine S. McGowen (LM-1644)
                             Alyssa D. Englund (AE-2300)
                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                             666 Fifth Avenue
                             New York, New York  10103
                             Telephone: (212) 506-5000

                             Counsel for the Harry Holt Plaintiffs

OHS East:160386682.6

**TAB 4**

Theodore M. Shaw, Director-Counsel (TS-6630)
Matthew Colangelo (MC-1746)
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson St., 16th Floor
New York, NY 10013
Telephone: (212) 965-2200

Co-Counsel:
Lorraine S. McGowen (LM-1644)
Alyssa D. Englund (AE-2300)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103-0002
Telephone: (212) 506-5000

Counsel for the Harry Holt Plaintiffs

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                                                 :
In re:                                                           :
                                                                 :     Chapter 11
ALPER HOLDINGS USA, INC.,                                        :
                                                                 :     Case No. 07-12148 (BRL)
                    Debtor.                                       :
                                                                 :
---------------------------------------------------------------- x

**RESPONSE OF HARRY HOLT PLAINTIFFS TO**
**OBJECTION OF ALPER HOLDINGS USA, INC. TO**
**PROOFS OF CLAIM FILED BY THE HARRY HOLT PLAINTIFFS**

The Harry Holt Plaintiffs,[1] by and through their undersigned attorneys, hereby file

this Response (this "Response") to the Objection of Alper Holdings USA, Inc. ("Alper" or "the

Debtor") to Harry Holt Plaintiffs' Proofs of Claim (the "Alper Claim Objection"). In support of

this Response, the Harry Holt Plaintiffs respectfully represent as follows:

---

[1] The "Harry Holt Plaintiffs" are Harry Holt (now deceased), Beatrice Holt, Sheila Holt-Orsted, Jasmine Orsted, Bonita Holt, O'Brian Holt, Brandon Holt, Patrick Holt, Bianca Bentley, Demetrius Holt and David Brown. Each is a plaintiff in the personal injury action *Harry Holt, et al. v. Scovill, et al.,* originally docketed at case number CV-1882 on the docket of the Circuit Court of Dickson County, Tennessee and subsequently removed to the United States District Court for the Middle District of Tennessee and docketed at case number 3:07-cv-00727.

# I. **INTRODUCTORY STATEMENT**

1.       As more specifically detailed in the Harry Holt Plaintiffs' Memorandum of Law in support of this Response, the Alper Claim Objection should be denied.  The Harry Holt Plaintiffs have specifically pled facts to establish that Alper should be held liable to them for their personal injury, wrongful death, and property damages as the alter ego of Saltire for the following reasons:

- The Harry Holt Claims expressly were preserved and not released under the Saltire plan.

- Alper inherited all of First City's disclosed environmental liabilities, including the Harry Holt Plaintiffs' claims, following Alper's merger with First City.

- Alper is the alter ego of Saltire based on its continuous and pervasive operation and control of Saltire, and treatment of Alper and Saltire as a single economic unit sufficient to raise alter ego liability.

- Insulating Alper from liability perpetrates injustice and unfairness where Alper has drained Saltire of all value and placed assets out of the reach of those harmed by its wrongdoing.

2.       As a result, the Court should reject the Alper Claim Objection in its entirety and allow the Harry Holt Plaintiffs to proceed with the prosecution of their claims.

# II. **JURISDICTION**

3.       This Court has jurisdiction over this Response pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is also proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Additionally, this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

# III. **PROCEDURAL HISTORY**

4.       In December 2003, the Harry Holt Plaintiffs filed *Harry Holt, et al. v. Scovill, et al.*, originally docketed at case number CV-1882 in the Circuit Court of Dickson County, Tennessee.  As noted, the complaint alleged claims for personal injury and property

damage against Alper, Saltire Industrial, Inc.,[2] the County of Dickson, and the City of Dickson. The Harry Holt Plaintiffs amended their complaint in May 2004 to allege additional claims for intentional racial discrimination against the City, the County, the State of Tennessee, and the EPA.

5.    On August 17, 2004, Saltire filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").   On March 8, 2006 the Court entered an order confirming Saltire's Modified First Amended Plan of Liquidation (the "Saltire Plan"),[3] which became effective on April 25, 2006.   Pursuant to the Saltire Plan, the Creditors' Committee was dissolved on the Effective Date and the Saltire Industrial, Inc. Creditors Liquidating Trust Agreement became effective, with Wayne R. Smith as the Liquidating Trustee (the "Saltire Trustee").   The Saltire Plan incorporates the terms of a settlement agreement with Alper, which provided that in exchange for a one million dollar payment from Alper to Saltire and the waiver of any claims Alper may have held against the Saltire estate, Saltire agreed to release any legal causes of action it held against Alper.[4]   The Saltire release of claims did not release non-debtor third party claims held against Saltire or Alper.[5]

6.    The Saltire Trustee moved, in June 2006, to transfer the Holt Action to federal court pursuant to 28 U.S.C. § 157(b)(5) (providing for the trial of personal injury tort and wrongful death claims in the federal district court where the bankruptcy case is pending or where the claims arose).   The district court (Judge Alvin K. Hellerstein) first granted the Saltire

---

[2] Saltire was previously known as Scovill, Inc. but will be referred to herein as Saltire.
[3] *See* Declaration of Jessica L. Fink In Support of Objection of Alper Holdings USA, Inc. To Harry Holt Plaintiffs' Proofs of Claim, Jan. 9, 2008 (Doc. No. 118) ("Fink Decl."), ¶ 7 & Ex. F ("Saltire Plan").
[4] *See* Saltire Plan ¶ 1.6.
[5] *See* Saltire Plan ¶ 13.1(b).

Trustee's motion, and then reconsidered and remanded the action to state court in Tennessee. The Harry Holt Plaintiffs subsequently filed a motion for reconsideration, requesting that the court transfer the Tennessee Action to federal court pursuant to 28 U.S.C. § 157(b)(5). Alper supported the Harry Holt Plaintiffs' request for reconsideration, explaining to the district court: "Although Alper is adverse to the Plaintiffs[] in the underlying tort litigation, Alper believes that the *entire case, against all defendants,* should proceed in this Court [Southern District of New York]."[6] At oral argument, Judge Hellerstein directed the Harry Holt Plaintiffs to submit a motion to withdraw the reference as to the objection to their claims pending in this Court, which they did.

7.    In June 2007, Judge Hellerstein granted the Harry Holt Plaintiffs' motion for reconsideration and their motion to withdraw the reference, and transferred the litigation against all defendants to the United States District Court for the Middle District of Tennessee. Shortly thereafter, on July 13, 2007, Alper filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. By order dated July 25, 2007, the Bankruptcy Court established September 21, 2007, as the last date for the filing of proofs of claim against the Debtor by the Debtor's known creditors. Each of the Harry Holt Plaintiffs timely filed a proof of claim with the Bankruptcy Court.[7]

8.    Although the Tennessee Action is stayed as against Alper, the remaining parties have commenced initial and limited discovery exchanges.

---

[6] *See* Affidavit of Alyssa D. Englund In Support Of Response of Harry Holt Plaintiffs To Objection Of Alper Holdings USA, Inc. To Proofs Of Claim Filed By The Harry Holt Plaintiffs, Feb. 15, 2008 ("Englund Aff.") ¶ 2 & Ex. 2 at 1-2 (Alper Holdings, U.S.A., Inc's Response in Support of Plaintiff's Motion for Reconsideration) (emphasis added).
[7] *See* Fink Decl. ¶¶ 1-2 & Ex. A (listing Proofs of Claim filed by the individual Harry Holt Plaintiffs numbered 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, and 45) (the "Claims"). The Harry Holt Plaintiffs also incorporate herein each of the Claims which are located in this Court's claims register.

## IV.  BACKGROUND

**A.    Factual Background Regarding the Harry Holt Plaintiffs' Claims.**

9.    The Harry Holt Plaintiffs are eleven family members who belong to three generations of an African-American family that have owned the same property on Eno Road in Dickson County, Tennessee, for over one hundred years – going back to the late nineteenth century (the "Holt Property").

10.    The litigation that forms the basis of the Harry Holt Plaintiffs' claims was filed in state court in December 2003, against Saltire, Alper, the County of Dickson, and the City of Dickson, alleging state-law claims for personal injury and property damage caused by the contamination of their well-water by an adjacent landfill.[8]    The Harry Holt Plaintiffs subsequently amended their complaint to add federal statutory and constitutional civil rights claims for intentional racial discrimination against the City, the County, two agencies of the State of Tennessee, and the United States Environmental Protection Agency.

11.    The Harry Holt Plaintiffs' complaint alleges the following facts:[9]

- •    Each of the Harry Holt Plaintiffs lived or currently lives on the Holt Property, and, until 2000, their domestic water supply was provided by groundwater wells on the premises.[10]

---

[8] The Alper Claim Objection asserts that the personal injury claims of three of the eleven plaintiffs, and the property damage claims, are barred by the applicable statutes of limitations under Tennessee law.  *See* Alper Obj. ¶ 23 n.14.  The Harry Holt Plaintiffs disagree with Alper's assertion, but note that Alper expressly concedes that consideration of whether certain claims are time-barred is not appropriate at this stage in the proceedings.  Accordingly, the Harry Holt Plaintiffs will not here address the timeliness of their personal injury and property damage claims, and will rebut Alper's argument when raised by Alper.

[9] The Alper Claim Objection references the Harry Holt Plaintiffs' Proposed Second Amended Complaint, and Alper filed the Second Amended Complaint with this Court in support of its Objection.  *See* Alper Obj. ¶ 1; Fink Decl.  ¶ 3 & Ex. B (the "Second Am. Compl.").  The Harry Holt Plaintiffs' motion to amend their complaint was filed in October 2007 against Saltire, the City, the County, and the State of Tennessee, and is currently pending before the Middle District of Tennessee.  Because Alper had commenced the instant bankruptcy case on July 13, 2007, the Harry Holt Plaintiffs did not move to amend as against Alper in October 2007.  The Second Amended Complaint does not raise any new claims against any of the defendants but merely clarifies the facts underlying the claims previously asserted.  By filing the Second Amended Complaint with this Court in support of the Alper Claim Objection, Alper has made clear that it is on notice of the facts and claims alleged in the Second Amended Complaint, and has waived any possible objection to the Harry Holt Plaintiffs' reference to the Second Amended Complaint in considering the Harry Holt Plaintiffs' Proofs of Claim.  Accordingly, the Harry Holt Plaintiffs will cite to their Second Amended Complaint in describing the facts alleged.

- Each member of the Holt family daily used water from their well for drinking, cooking, bathing, and cleaning.[11]

- The City of Dickson opened a city dump and landfill on Eno Road in 1968 ("the Landfill"), the boundary of which is less than 500 feet from the Harry Holt Plaintiffs' water-well.[12]

- From 1968 until 1985, Saltire routinely disposed of industrial wastes including trichloroethylene ("TCE") at the Landfill; Saltire's manufacturing facility in Dickson County, Tennessee ("the Facility"); and at other locations in the surrounding area.[13]

- TCE and other wastes disposed of by Saltire have drained into the groundwater under the Landfill and at other disposal locations, and have migrated through the groundwater to contaminate the Harry Holt Plaintiffs' well.[14]

- Each of the Harry Holt Plaintiffs has since developed serious physical injuries, including cancer, neurological impairments, deformities of the reproductive organs, skin ailments and disfiguration, and immune deficiency.[15]  One of the plaintiffs, Harry Holt, died of cancer in January 2007.[16]

- The Harry Holt Plaintiffs allege that these personal injuries were caused by Saltire's disposal of TCE and other wastes at the Landfill, the Facility, and other locations.[17]  The Harry Holt Plaintiffs also allege that their property is extensively contaminated with TCE in the groundwater and soil, caused by Saltire's disposal of TCE and other wastes.[18]

- As described in more detail below, the Harry Holt Plaintiffs have further alleged that Alper is the alter ego of Saltire, and is therefore liable to the Harry Holt Plaintiffs on the claims of trespass, battery, permanent nuisance, negligence, wrongful death, and punitive damages included in the Harry Holt Plaintiffs' complaint.[19]

---

[10] Second Am. Compl. ¶¶ 19-30, 35.
[11] Id. ¶ 35.
[12] Id. ¶¶ 31, 35.
[13] Id. ¶¶ 36-39.
[14] Id. ¶¶ 40, 54-83.
[15] Id. ¶¶ 19-30.
[16] Id. ¶¶ 19, 76-79.
[17] Id. ¶¶ 49-52, 54-83.
[18] Id. ¶ 53.
[19] Id. ¶¶ 15, 54-83.

12.    The Harry Holt Plaintiffs' lawsuit seeks declaratory, injunctive, and monetary relief against Saltire, Alper, the City of Dickson, and the County of Dickson for the personal injuries and property damage alleged.[20]

## B.    Alper and Saltire Corporate History.

13.    The Alper Claim Objection points out that Alper did not exist as a corporate entity during the time period when Saltire was using and dumping TCE at the Facility, the Landfill, and throughout Dickson County.  However, Alper fails to inform the Court of the liabilities it inherited at its formation.[21]

### 1.    *The Acquisition of Saltire.*

14.    First City Industries, Inc. ("First City") acquired Saltire in 1985.[22] Although Saltire was a public company at the time of the acquisition, it was wholly-owned by

---

[20] *Id.* ¶¶ 1-4 & at 25.  The Harry Holt Plaintiffs' lawsuit also seeks relief against the governmental defendants for intentional racial discrimination in violation of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964.  *Id.*  The civil rights claims allege that government officials were aware since at least 1988 that the well-water of properties adjacent to the landfill was contaminated with the toxic chemical TCE; that white families adjacent to the landfill were warned by the governmental defendants and by environmental consultants retained by Alper and Saltire not to drink the water and were put on the municipal water supply; but that the African-American family (the Holt family) was repeatedly and affirmatively assured for almost fifteen years that their water was safe to drink.  *Id.* ¶¶ 41-48, 93-107.  It was not until 2000 that the Harry Holt Plaintiffs were placed on the municipal water supply, and even at that point, the Harry Holt Plaintiffs were never warned by any of the defendants of the health risks associated with TCE exposure.  *Id.* at ¶ 48.

[21] The Harry Holt Plaintiffs include limited facts outside their pleadings to demonstrate to the Court the underpinnings and good faith basis for their claims.  By including these limited facts, the Harry Holt Plaintiffs do not intend to convert this proceeding to one for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure, nor to waive their rights to future discovery.

Because there has been virtually no discovery in the Harry Holt Plaintiffs' litigation, the factual citations included herein are to public records, court filings, corporate history documents, and deposition transcripts from prior litigation by different plaintiffs against Alper and Saltire.  All citations to deposition transcripts are to depositions taken in *Norman v. Scovill, Inc.*, a tort lawsuit against Alper and Saltire arising out of TCE contamination in Dickson, Tennessee (Case No. 383 on the docket of the Circuit Court of Dickson County, Tennessee).

The Alper Claim Objection makes reference to discovery requests that Alper served on the Harry Holt Plaintiffs in March 2005.  *See* Alper Obj. ¶ 8 n.6.  Present counsel were not aware of that discovery request, and will of course participate in discovery in the appropriate venue upon rejection by this Court of Alper's request to disallow the Harry Holt Plaintiffs' claims.  We note for the Court that the Harry Holt Plaintiffs were originally represented by counsel from Tennessee who subsequently withdrew from representation, at which point the Harry Holt Plaintiffs proceeded *pro se*.  Present counsel have represented the Harry Holt Holt Plaintiffs since January 2007, and have reconstructed most but not all of the case files to that point.

[22] *See* Englund Aff. ¶ 3 & Ex. 2, at 3 (First City Industries Inc., Annual Report (Form 10-K) (Mar. 31, 1987) ("First City 1987 Annual Report")).

First City and was no longer a public company shortly thereafter.[23]  When First City acquired the stock of Saltire, First City either knew or should have known of the environmental issues at the Facility and the Landfill.[24]  Despite the early indications of potentially significant environmental liabilities, First City nonetheless immediately commenced divesting Saltire of its assets.[25]  Over the course of a few years, nearly all of Saltire's operating subsidiaries were sold, the proceeds of which were either up-streamed to First City or loaned to First City, its affiliates, or related entities.  Several years later, in 1992, First City filed, for itself only, a pre-packaged Chapter 11 bankruptcy plan with the United States Bankruptcy Court for the District of Delaware.  While the public docket for First City's bankruptcy is surprisingly sparse, the Harry Holt Plaintiffs have obtained a copy of the Disclosure Statement and Proposed Plan of Reorganization (the "First City Disclosure Statement").[26]  In reference to the Facility, the First City Disclosure Statement indicates:

> [A] survey of residential wells in the area surrounding the facility site is being conducted.  Although the results of the investigation indicate the presence of contaminants on the facility site, due to the preliminary nature of the information it is not possible to accurately estimate the cost of any necessary remediation; however, such costs are not expected to be less than a range of $1.8 to $3.7 million.[27]

Despite the inclusion of potential Dickson County liabilities in First City's Disclosure Statement, the Harry Holt Plaintiffs were never notified of First City's bankruptcy filing, nor were they provided with a copy of the First City Disclosure Statement or Plan.  The Harry Holt Plaintiffs were not given an opportunity to consider the proposed plan.  First City provided that these

---

[23] *See* First City 1987 Annual Report at 72.
[24] *See id.* at 39.
[25] *See* Englund Aff. ¶ 4 & Ex. 3 (Alison Leigh Cowan, *Market Place; Belzberg Gain on Scovill Deal*, N.Y. TIMES, Sept. 1, 1987).  *See infra* ¶¶ 11, 15 & 17.
[26] *See* Englund Aff. ¶ 5 & Ex. 4 ("First City Discl. Stmt.").  For reasons unknown to the undersigned, the First City Disclosure Statement was filed under seal and was not readily available.
[27] First City Discl. Stmt. at 80.

claims were unimpaired and were not entitled to vote because their claims survived the bankruptcy. "Class 3 consists of . . . significant non-debt accrued and contingent liabilities of Scovill [(Saltire)] with respect to which a third party may seek to hold the Company liable under certain theories of control group or other theories of liability."[28]   Under the terms of the First City Plan, First City provided that: "At the option of the creditor, (i) the Debtor may leave unaltered the legal, equitable, and contractual rights of the holder of a Class 3 Claim, or (ii) the Debtor may pay such Claim in a manner agreed to by the holder of such Claim."[29]

15.    Alper, which was initially formed as an acquisition vehicle by Grupo Industrial Cierres Ideal S.A. de C.V. ("Cierres"),[30] acquired claims in the First City bankruptcy to gain control of First City and its only operating subsidiary, Scovill Apparel Fasteners, Inc. ("Scovill Fasteners") – a direct competitor of a Cierres's subsidiary.[31]   This claim acquisition process and hence, control, of First City was viewed as a hostile disruption to the carefully crafted pre-packaged bankruptcy plan by the Unofficial Steering Committee of Creditors, which sued Cierres for the scheme.[32]   Cierres and the Steering Committee eventually reached a settlement that resulted *not* in Alper simply becoming a majority shareholder and "indirect parent" of Saltire, as Alper claims,[33] but instead resulted in Alper's assumption of all of First City's liabilities.  By 1992, Alper had acquired the majority of First City's stock and, by 1994,

---

[28] First City Discl. Stmt. at 32.
[29] First City Discl. Stmt. at B-21.
[30] Grupo Industrial Cierres Ideal S.A. de C.V. is an affiliate of Grupo IUSA.  *See* Englund Aff. ¶ 6 & Ex. 5 (Grupo IUSA, Footwear and Clothing website, available at http://www.iusa.com.mx/ENG_calzado.htm (last accessed Feb. 14, 2008)).  Grupo IUSA is an indirect parent of Alper and current note-holder of a $32.238 million note due to Alper.  *See* Debtor's Initial Operating Statement for the Period July 14, 2007 thru July 31, 2007 filed Sept. 17, 2007 [Docket No. 12].
[31] *See* Englund Aff. ¶ 7 & Ex. 6 ¶ 1 (Adversary Complaint, *Unofficial Steering Committee of Creditors v. Grupo Industrial Cierres Ideal S.A. de C.V.*, Case. No. 92-1288 (Docket No. 12) (Bankr. D. Del. 1992) ("Adversary Complaint")).
[32] *See generally* Adversary Complaint.
[33] Alper Obj. ¶ 9 n.7.

Alper had merged with First City. [34]  By virtue of this merger, Alper assumed all of First City's liabilities, including the disclosed Class 3 contingent and unliquidated claims relating to the Facility, which include the Harry Holt Plaintiffs' claims.  As a direct participant in the First City bankruptcy case, Alper went in with its eyes open to the potential claims against both Saltire and First City it acquired relating to the contamination at the Facility and the Landfill.  Alper then proceeded to, in a concerted way, assume control of Saltire and redirect funds to related companies and to Alper's own coffers – safely out of reach of claimants such as the Harry Holt Plaintiffs.

    2.    *Financial Status.*

        16.    Saltire's assets have been methodically removed over the course of the past twenty-three years, by both Alper and its predecessor in interest, First City.  Immediately after First City acquired Saltire in 1985, First City restructured the financing First City utilized to acquire Saltire by placing nearly the entire debt burden on its newly acquired entity:

> On August 15, 1985, Industries restructured the financing associated with the acquisition of Old Scovill . . . .  After giving effect to the issuance of the Scovill Subordinated Notes and the Scovill Subordinated Debentures, and the indebtedness incurred pursuant to the Scovill Loan Agreement, *Scovill became highly leveraged.*
>
>                . . . . .
>
> As a result of the restructuring of the Scovill acquisition financing, Industries reduced its cash investment in Scovill from $258,000,000 to $125,000,000.[35]

After restructuring the debt so as to place it squarely on Saltire's shoulders, First City completed the divestiture of some of Saltire's most profitable businesses: Schrader Bellows, Schrader

---

[34] *See* Alper Obj. ¶ 9 n.7; Englund Aff. ¶ 8 & Ex. 7 (Dun and Bradstreet Information Report for Alper Holdings USA Inc. printed July 18, 2007) ("Jeffrey Holdsberg, CFO, stated that as of Dec 31 1994 Alper Holding USA, Inc [sic] and First City Industries merged, with the surviving entity being First City Industries Inc.  Also, after the merger First City Industries Inc [sic] has changed its name to Alper Holding USA, Inc.").
[35] Englund Aff. ¶ 9 & Ex. 8 at 16-17 (First City Industries Inc., Annual Report (Form 10-K) (Mar. 31, 1986) ("First City 1986 Annual Report")) (emphasis added).

Automotive, and Hamilton Beach, leaving it with few assets with which to satisfy its liabilities, including the claims of the Harry Holt Plaintiffs.[36]  Thus, the company Alper acquired when it merged with First City was highly leveraged and comprised of few profit-making enterprises. And those enterprises that held value such as the Alper Ink Group[37] and Scovill Fasteners,[38] were subsequently sold off or liquidated, and Alper siphoned off the proceeds.  Alper ran Saltire as though it was a mere division – not a separate company.  Saltire had no employees.  Alper determined which of Saltire's assets to sell, the terms of the sale, and how the proceeds were to be used.  Alper determined which creditors to pay and the amount to pay them.  Alper determined what amounts should be paid by Saltire to it and how those expenses were to be reflected on Saltire's books.  As to the Facility, Alper was responsible for the investigation and remediation of the various environmental claims, including those of the Harry Holt Plaintiffs.

17.     Wayne R. Smith ("Smith"), then the Vice President and Chief Financial Officer of both Alper and Saltire, testified in a 2001 deposition that Alper is the "only one that has systems, staff, [and] facilities . . . ."[39]  And Robert Bertellotti ("Bertellotti"), then the President of both Alper and Saltire, testified in a 2003 deposition that but for Alper, Saltire would have had to have "[i]ts own president, general counsel, chief financial officer, controller, accounts payable clerk, office manager, systems administrator, receptionist, secretaries, benefits administrator, and human resources manager and to obtain its own benefits plans, payroll services, offices, computers, telephone systems, office furniture, etc."[40]

---

[36] First City 1987 Annual Report, at 3.

[37] *See* discussion *infra* ¶ 22.

[38] Scovill Fasteners was a subsidiary of Saltire, which First City acquired in 1985.  *See* First City 1987 Annual Report  at 3.  Scovill Fasteners was sold by Alper in 1995 to KSCO Acquisition.  *See* Englund Aff. ¶ 10 & Ex. 9 at 11 (Scovill Fasteners Inc., Annual report (Form 10-K/A) (June 2, 1999)).  Very little information is available about this transaction, its profits, or to whom the profits inured.  *See id.*

[39] Englund Aff. ¶ 11 & Ex. 10 at 70-73 (Deposition of Wayne Ray Smith (Dec. 14, 2001) ("Smith Dep. I")) (referencing the Alper-Saltire Management Agreement).

[40] Bertellotti Dep. Ex. 2 ¶ 22 (Affidavit of Robert Bertellotti).

18.    Furthermore, after 2001, Saltire no longer owned any manufacturing facilities, nor did Saltire sell any products.[41]  Saltire did not even have its own headquarters but shared office space with Alper.[42]  Saltire did not have its own employees; instead, it used Alper's.[43]  Between 1996 and 2003, Nicholas Bauer ("Bauer") was employed by Alper to oversee and manage the clean-up and monitoring of all environmental activities at the Facility. Bauer was both the Vice President of Environmental Affairs for Saltire and Alper, but considered himself an Alper employee because Alper paid his salary and was the signatory on his employment agreement.[44]  Bauer, as an Alper employee made primary decisions relating to routine and technical matters at the Facility.

19.    At least four years prior to Saltire's bankruptcy petition,[45] Alper realized its subsidiary's dire financial status.[46]  Smith explained in his 2001 deposition that Saltire had an "accumulating deficit," which he defined as the net difference between revenues earned versus all expenses incurred, of over $81 million for fiscal year 2000.[47]  Smith also noted that throughout his entire history with the company, Saltire was never without an accumulating deficit, which increased each year except for 2000.[48]

20.    Despite the fact that Saltire had an ever-present and increasing accumulating deficit, Alper required its subsidiary to pay large fees for purported administrative services.  In 1998, Saltire was charged either $3.5 or $4 million for administrative services from

---

[41] *See* Englund Aff. ¶ 13 & Ex. 12 at 111-14, 116-18 (Deposition of Nicholas B. Bauer (Feb. 22, 2001) ("Bauer Dep.")).

[42] *See* Bertellotti Dep. at 24-26; *see also* Smith Dep. I at 185-86.

[43] *See* Englund Aff. ¶ 14 & Ex. 13 at 23-25 (Deposition of Wayne Ray Smith (Oct. 22, 2003).

[44] *See* Bertellotti Dep. Ex. 13 at 12 (Alper's Reply in Tennessee Action); *see also* Bauer Dep. at 18, 132-38, 198-200; Bertellotti Dep. at 35-36, 81-95, 106-07; and Smith Dep. I at 183-86.

[45] *See* Englund Aff. ¶ 15 & Ex. 14 (Voluntary Petition, *In re Saltire Industrial, Inc.*, Case No. 04-15389 (Bankr. S.D.N.Y. Aug. 17, 2004) (Lifland, J.) (Docket No. 1) ("Saltire Petition")).

[46] *See* Englund Aff. ¶ 16 & Ex. 15 at 5 (Monthly Operating Statement, Case No. 04-15389 (Bankr. S.D.N.Y. Oct. 14, 2004) (Lifland, J.) (Docket No. 31) ("Saltire Operating Report")) (noting that Saltire was Alper's wholly-owned subsidiary).

[47] *See* Smith Dep. I at 176-79.

[48] *Id.*

Alper.[49]  In both 1999 and 2000, Saltire paid an additional $4.5 million to Alper, which did not

cover any direct expenses incurred by Alper that would have been charged separately.[50]  Saltire

paid additional management fees to Alper of approximately $2 million in 2001, 2002, and

2003.[51]  These management or administrative fees, as significant as they are in dollar amounts,

do not appear to be documented in terms of allocation of actual time spent or description of

services rendered.

21.    Over the course of several years preceding Saltire's bankruptcy, Alper

caused Saltire to make a series of transfers of assets to various Alper subsidiaries and affiliates

while Saltire derived no real benefit and Saltire's creditors (including the Harry Holt Plaintiffs)

remained unsatisfied.  For example, at Alper's direction, Saltire made a loan to Realty Holdings,

an Alper affiliate, for $5.6 million in 1992.[52]  The loan had no guarantors[53] and was ultimately

written off for $5.138 million in 2000.[54]

22.    Beyond draining Saltire's assets through management fees and writing off

inter-company loans, in 1999, Alper's Board of Directors adopted a plan to sell Alper Ink, a

Saltire subsidiary.[55]  In 2000 (four years before the commencement of Saltire's bankruptcy case),

Alper accomplished its objective and completed the sale of all of Saltire's active subsidiaries –

including the Alper Ink Group, Saltire's principal asset.[56]  There is no indication that Saltire's

Board of Directors voted on whether to sell.[57]  Saltire received $47 million from the Alper Ink

Group sale but did not keep those assets for long; $4.5 million was paid in administrative fees to

---

[49] Smith Dep. at 167-74.
[50] Bertellotti Dep. at 125-29; *see also* Smith Dep. I at 167-74, 176-79.
[51] Bertellotti Dep. at 185-87.
[52] Bertellotti Dep. at 231-41.
[53] Smith Dep. I at 165.
[54] Smith Dep. I at 111-12; *see also* Bertellotti Dep. Ex. 8 at 12 (1999 and 2000 Saltire Auditor's Report).
[55] *See* Bertellotti Dep. Ex. 8 at 14 (1999 and 2000 Saltire Auditor's Report).
[56] *See* Bertellotti Dep. at 65; *see also* Smith Dep. I at 117, 126-30.
[57] *Id*.

Alper, and at Alper's direction, $25 million, a substantial portion of Saltire's total assets, was loaned to a "related party" – Grupo IUSA, to aid in restructuring Grupo IUSA's debt.[58]  Again, it is unclear what benefit, if any, Saltire derived from the making of this loan.  The $25 million note was unsecured and did not have a guarantor.[59]  Further, no investigation of Grupo IUSA's then-current debt load occurred before the loan was made.[60]  Luis Felipe Sánchez ("Sánchez"), a director of Alper and the sole Saltire director, was Smith's principal contact in effectuating this transaction.[61]  He also happened to be Grupo IUSA's Chief Financial Officer.[62]  Grupo IUSA repaid the $25 million note in November 2001.[63]  Where those payments were deposited or utilized and whether Saltire or Alper received them is, however, unknown.[64]  Thus, at the time Saltire commenced its bankruptcy case it listed assets of $5,916,460 and liabilities of $17,320,744 (not including the Harry Holt Plaintiffs' claims).[65]  Surprisingly, when Alper filed three years later, it listed assets of $42,382,876 and liabilities of $1,358,395 (again ignoring the Harry Holt Plaintiffs' claims).[66]

       3.     *Corporate Structure.*

       23.     Alper also controlled Saltire through the combined corporate management. The management structures of Alper and Saltire have overlapped to a large extent at least since 1994, with Saltire having only a minimal number of officers and directors.

---

[58] *See* Bertellotti Dep. at 109-114; *see also* Smith Dep. I at 117, 126-30, 136-62, 211-12.

[59] *See* Smith Dep. I at 136-41, 146-62, 211-12.

[60] *See id.*

[61] *See id.*

[62] *See* Englund Aff. ¶ 17 & Ex. 16 (Elisabeth Malkin, *Private Sector; Chasing the Americas' Pastime*, N.Y. TIMES, Oct. 27, 2002).

[63] *See* Smith Dep. I at 140.

[64] Of note, one of the notes receivable listed in Alper's Schedule of Financial Affairs and described in the Initial Operating Statement is a loan made to Grupo IUSA on March 12, 2004, with an original principle balance of $32.238 million.  This loan, along with a second loan made on April 2, 2004, to another "related party" Promociones y Administraciones Punta Diamante, S.A. de C.V. in the original amount of $4.5 million, continues Alper's pattern of shuffling assets around and placing them beyond the reach of creditors.  Both notes bear interest at the very low rate of 5% per annum – a rate low enough it should raise concern from a tax perspective.

[65] *See* Saltire Operating Report.

[66] *See* Debtor's Monthly Operating Statement for Month of September 2007, filed Oct. 17, 2007 [Docket No. 49].

24.     For example, since 1995, the presidents of Alper and Saltire were never truly independent; while serving as president of one entity, the president was either on the board of the other entity or also serving as the other entity's president.[67]   When Saltire filed its bankruptcy petition in 2004, Bertelloti was President and Smith was Senior Vice President and Chief Financial Officer for Saltire.  During the same time period and continuing today, Bertelloti serves as President and Smith as Senior Vice President and Chief Financial Officer of Alper. The General Counsel position has also long-overlapped and never been independent.[68]   Further, starting in 2001, Saltire only had one director on its Board – Sánchez,[69] who simultaneously served on Alper's board of directors.[70]   Even following Saltire's bankruptcy filing and confirmation of its plan of liquidation, this unity of officers continues since Smith was appointed liquidating trustee of Saltire while he continues his role as Vice President and Chief Financial Officer at Alper.

25.     These interwoven officers and boards kept dubious corporate records. Though Bertellotti testified that "independent books and records are kept for all of Alper's subsidiaries,"[71] his statement is misleading.  When Bertellotti, as president of Saltire, spoke with the entire Saltire board, otherwise known as Sánchez, minutes were typically not taken.[72] Moreover, to the extent records were kept, both Saltire's and Alper's records were kept at

---

[67] In 1995, that person was Nicholas Combemale.  *See* Bertellotti Dep. at 101-02; and Smith Dep. I at 93-97, 100-103.  From 1996 onward, that person was Robert Bertellotti.  *See* Englund Aff. ¶ 18 & Ex. 17 (Saltire Industrial, Inc. Mass. Sec'y of the Commonwealth Filing (Jan. 24, 1997)); *see also* Bauer Dep. at 111-14, 116-18, 132-38; Bertellotti Dep. at 7-14, 65-66; Smith Dep. I at 63-65; Englund Aff. ¶ 19 & Ex. 18 at Sch. E (Schedules of Assets and Liabilities, *In re Saltire Industrial, Inc.*, Case No. 04-15389 (Bankr. S.D.N.Y. Aug. 17, 2004) (Doc. 12)); and Debtor's Summary of Schedules, Declaration Concerning Debtor's Schedules (Docket No. 12).

[68] *See* Bauer Dep. at 198-200; *see also* Bertellotti Dep. at 14-17; and Smith Dep. I at 93-97, 100-03.

[69] As noted earlier, Sánchez is also the chief financial officer of an Alper affiliate, Grupo Industrias Unidas (also known as "Grupo IUSA") and the son-in-law to an Alper consultant and indirect controlling individual, Carlos Peralta.  *See* Englund Aff. ¶ 17 & Ex. 16 (Elisabeth Malkin, *Private Sector; Chasing the Americas' Pastime*, N.Y. TIMES, Oct. 27, 2002).

[70] *See* Bertellotti Dep. at 101-02, 210-12; *see also* Smith Dep. I at 93-97, 100-103.

[71] *See* Bertellotti Dep. at 33-34.

[72] *See id.* at 212-214.

Alper's office, which also served as Saltire's headquarters.[73]  Alper handled Saltire's payroll, benefits, and withholding records.[74]  In sum, the facts demonstrate a long history of Alper's control of Saltire and disregard of Saltire as a separate legal entity.

       4.     *Alper and First City Controlled the Environmental Remediation and Investigatory Activities at the Facility.*

      26.     Alper and its predecessor, First City, directed the remediation and investigative activities at the Facility.  The initial remediation contract was between First City U.S. Corporation, a First City affiliate, and ICF Kaiser, an environmental consulting and remediation service.[75]  As indicated by the contract, First City played an active role at the Facility and supervised investigatory studies,[76] waste disposal,[77] residential utility water testing,[78] and residential well surveys.[79]  Budget increase requests were sent to First City,[80] and employee time sheets indicated work was performed for First City.[81]  Substantive questions, such as whether to proceed with additional work at the Facility, were also directed to First City.[82]  As noted in a letter from ICF Kaiser, the work at the Facility was performed as "services render[ed] to First City."[83]

      27.     This close supervision and oversight continued after Alper merged with First City.  Alper's Vice President of Environmental Affairs, Nicholas Bauer, supervised the

---

[73] *See id.* at 24-25, 35-36.

[74] *See id.* at 85-88.

[75] *See id.* Ex. 14 (Master Agreement).

[76] *See id.* Ex. 14 (Letter to S. Robbins from C. Brand dated May 23, 1994 (requesting approval from Scott Robbins of First City U.S. Corporation for modifications to the dye tracer study)); and (Task Order 7 (requesting permission to investigate offsite water flow paths and to identify the source of volatile organic compounds in the groundwater)).

[77] *See id.* Ex. 14 (Faxed agreement letter to Scott Robbins of First City Capital Corporation and signed by Scott Robbins as Executive Vice President of Scovill, Inc. dated July 21, 1994 ).

[78] *See id.* Ex. 14 (Faxed letter with attachment from the EPA to J. Crum dated Dec. 21, 1993, noting the planned protocol for residential water testing).

[79] *See id.* Ex. 14 (Letter to S. Robbins from C. Brand dated May 26, 1992).

[80] *See id.* Ex. 14 (Letter to S. Robbins from ICF Kaiser dated Nov. 18, 1994).

[81] *See id.* Ex. 14 (Time sheets for periods: 10/9/93 to 10/15/93, 10/16/93, to 10/22/93 and 10/23/93 to 10/29/93).

[82] *See id.* Ex. 14 (Letter to S. Robbins from C. Brand dated May 26, 1992).

[83] *See id.* Ex. 14  (Letter to S. Robbins from S. Wendt dated July 20, 1992).

environmental remediation and investigation performed at and around the Facility.[84]   Bauer
considered himself an Alper employee.[85]   In Tennessee, Bauer was the point of contact for
environmental consultants and all other local and federal authorities investigating and working at
the Facility.[86]

## V.  ARGUMENT

28.    Alper has controlled Saltire to such a degree that it must be held liable for
personal injury and wrongful death claim suffered by the Harry Holt Plaintiffs.  Alper was aware
of these claims when it acquired and merged with First City.   After assuming First City's
liabilities, Alper controlled the investigation and the environmental remediation at the Facility
and failed to remediate those conditions.  More importantly, despite knowing of the existence of
these claims and that the remediation costs would be significant, Alper proceeded to sell off
Saltire's assets and to siphon the proceeds.  Having divested Saltire of any assets with which to
pay its creditors (including the Harry Holt Plaintiffs), Saltire was forced to file bankruptcy, and
Alper followed in order to preclude any recovery on these claims, which First City asserted
would be "unimpaired" by its bankruptcy.   Allowing Alper to evade liability on these claims
after it and its predecessor-in-interest derived significant benefit from the control and diversion
of Saltire's assets is simply unjust and a manifest abuse of the purposes of bankruptcy.

## VI.  MEMORANDUM OF LAW

29.    A separate Memorandum of Law in support of this Response, as well as
the Affidavit of Alyssa D. Englund in Support of Response of Harry Holt Plaintiffs to Objection

---

[84] *See* Bauer Dep. at 198-200.
[85] *See* Bauer Dep. at 125-26, 131-32.  Bauer's sole employment agreement was a "letter agreement" with Alper.  *See also* Bertellotti Dep. at 81-84.
[86] *See* Englund Aff. ¶ 20 & Ex. 19 at 65-66 (Deposition of Claudia Brand dated Feb. 19, 2001 ("Brand Dep.")).

of Alper Holdings USA, Inc. to Proofs of Claim Filed by the Harry Holt Plaintiffs, has been filed

contemporaneously with this Response.

### VII.  **CONCLUSION**

WHEREFORE, the Harry Holt Plaintiffs respectfully request that this Court enter

an order (1) denying the relief requested in Alper's Claim Objection; and (2) granting such other

and further relief as is just.

Dated:  New York, New York
       February 15, 2008

                  NAACP Legal Defense & Educational Fund, Inc.


By:  _____/s/_____
      Theodore M. Shaw, Director-Counsel (TS-6630)
      Matthew Colangelo (MC-1746)
      99 Hudson St., 16th Floor
      New York, NY 10013
      Telephone: (212) 965-2200

     -and-

      Lorraine S. McGowen (LM-1644)
      Alyssa D. Englund (AE-2300)
      ORRICK, HERRINGTON & SUTCLIFFE LLP
      666 Fifth Avenue
      New York, New York  10103
      Telephone: (212) 506-5000
      Counsel for the Harry Holt Plaintiffs